**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

AIRQUIP, INC.,
on behalf of itself and all others similarly situated,

      Plaintiff,

v.

HOMEADVISOR, INC.,
IAC/INTERACTIVECORP, and
DOES 1 through 10,

      Defendants.

---

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Airquip, Inc. (the "Plaintiff"), by and through its counsel, brings this class action on behalf of itself and a proposed class of all others similarly situated, against Defendants IAC/InterActiveCorp ("IAC") and its operating business HomeAdvisor, Inc. ("HomeAdvisor" or "Company"), and hereby alleges upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation undertaken by its counsel, as follows:

## NATURE OF THE CASE

1.     This is a class action complaint brought by Plaintiff against IAC and HomeAdvisor for monetary damages, restitution, and injunctive and declaratory relief, arising from Defendants' fraudulent, deceptive, and misleading practices in violation of the law.

2.    IAC is a media and Internet company comprised of some of the world's most recognized brands and products, such as HomeAdvisor, Vimeo, About.com, Dictionary.com, The Daily Beast, Investopedia, and Match Group's online dating portfolio.

3.    IAC claims that HomeAdvisor is a leading nationwide home services digital marketplace that helps connect consumers and homeowners (collectively "Homeowners") with persons and businesses in the HomeAdvisor network who provide home improvement services (the "Home Service Professionals").    In 2004, IAC acquired HomeAdvisor (formerly ServiceMagic), which has been conducting this business since October 1999.    HomeAdvisor is presently an operating business and reportable segment of IAC.    In 2014, HomeAdvisor acquired a majority stake in and operates mHelpDesk, a provider of cloud based field service software for small to mid-size businesses.

4.    Defendants did not charge the Homeowners for using the HomeAdvisor services. Instead, Defendants charged the Home Service Professionals, like Plaintiff and the Class, an annual membership fee (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and the predecessor and subsequent membership programs (hereinafter, the "Membership Programs")). As members, Plaintiff and the Class were to receive basic services from HomeAdvisor (such as a listing in HomeAdvisor's directories) and "qualified new business opportunities (ProLeads)" ("Leads").  In addition to the annual membership fee and other costs, Defendants required Home Service Professionals to *pay for the cost of <u>each</u> individual Lead sent to them*.

5.    As of December 31, 2015, HomeAdvisor's network of Home Service Professionals consisted of approximately 102,000 paying Service Professionals in the United States, who provided services ranging from home repairs to larger home remodeling projects.

For 2015, IAC, and its operating segment HomeAdvisor, generated revenue from Home Service Professionals of over *$360 million.*

6.        Defendants market HomeAdvisor's services and ProLeads[TM] as providing Home Service Professionals with: Leads that are characterized as targeted, serious, qualified and project-ready Homeowners; Leads that are qualified business opportunities for the Home Service Professionals; and Leads that are only sent to up to four Home Service Professionals.

7.        For example, *see infra* ¶¶ 36, 44-46, 48-57, Defendants state that:

- "When you're a HomeAdvisor Pro member, HomeAdvisor matches you with *homeowners actively seeking the services* you provide…";

- "Get connected to *qualified homeowners* who are seeking the services you provide. You will receive homeowner contact and service request information so that you can reach out to close the deal."

- "You'll also get a listing in our online directory…access to helpful business management and marketing tools, and *qualified new business opportunities (Pro Leads) to keep your pipeline full*.";

- HomeAdvisor "*allows you to spend your time with the right 'ready-to-buy' customers";*

- the Leads are from "*project ready"* Homeowners;

- "we *find homeowners looking for help completing home projects and collect information about their project*. Our patented ProFinder technology then identifies relevant professionals, taking into account our pros' availability, service

3

type and locations preferences. When we have a match, we send the homeowner's information *to the matched pro instantly so that he/she can win the job."*

- the Leads are generated from the purported "*patented pro finder technology"* that matches Home Service Professionals "*to serious homeowners in [the Home Service Professional's] area*";

- a "vast majority of [HomeAdvisor's] homeowners and consumers come to [HomeAdvisor] through homeadvisor.com.   We also have the exclusive partnerships with the websites [ ] such as Better Homes and Gardens and This Old House…"

- the Leads are for "*targeted prospects*" and "*highly targeted prospects*";

- Home Service Professionals "won't have to waste [ ] time with customers who just window-shop"; and,

- Leads are only sent to *up to four* Home Service Professionals.

8.      Quality Leads are the lifeblood of the HomeAdvisor model, and the identification and delivery of quality Leads are the essential service components of HomeAdvisor's business for Home Service Professionals.   The receipt of quality Leads is the reason Plaintiff and other Home Service Professionals pay for a Membership Program and the Leads.   As HomeAdvisor's own marketing materials recognized, poor and unproductive Leads were a waste of Plaintiff's and Class Members' money and resources.

9.      Delivery of quality Leads to Plaintiff and the Class was the most material aspect of the business arrangement between them.

10.     Defendants, however, misled the Home Service Professionals about the nature and quality of the Leads and failed to disclose material information about HomeAdvisor's Lead generating and vetting processes.   Defendants did not generate a vast majority of the Leads through the HomeAdvisor website using ProLeads and/or ProFinder, and, moreover, did not employ the filtering and "three-step vetting process" measures that were to garner qualified Leads to the Class.

11.     Rather, Defendants secured Leads from a variety of sources, including through agreements with affiliates and third-parties.   The business operations and personnel of the affiliates and third-parties were not supervised, monitored or regulated by IAC or HomeAdvisor.

12.     Defendants' systemic deception and fraudulent business practices were revealed in recent filings in a lawsuit in which HomeAdvisor is a defendant and in which HomeAdvisor is seeking to disassociate itself from liability for violations of the Telephone Consumer Protection Act ("TCPA") arising from unsolicited telemarketing allegedly committed by a third-party that generated Leads purchased by HomeAdvisor.

13.     In its eagerness to shed liability for illegal telemarketing, HomeAdvisor has acknowledged one of the many fundamental and systemic flaws of its business and practices. And HomeAdvisor's admissions provide direct evidence of the deception and fraud perpetrated by HomeAdvisor on Plaintiff and the Class.

14.     Moreover, HomeAdvisor's pulling back of the curtain in the TCPA lawsuit provides confirmation and validation of the numerous and consistent complaints of Class Members (as well as a former HomeAdvisor employee) that HomeAdvisor's business model is a scam and that the Leads it provides to Class Members are largely unvetted by HomeAdvisor,

secured by affiliates and third-parties using highly questionable methods, and predominantly bogus.

15.     Defendants' deceptive and fraudulent practices do not end with the sale of bogus Leads to Class Members.  Defendants have adopted fundamentally unfair business practices in dealing with Class Members once they join HomeAdvisor's Membership Programs.  These improper business practices include, but are not limited to, the following:

(a) Soliciting new members for Membership Programs by using heavy-handed and coercive means, including the threat of posting bad reviews for prospective Home Service Professionals that refused to join HomeAdvisor.

(b) Consistently violating stated assurances that Leads will be delivered to no more than four Home Service Professionals.  Both Class Members and the Homeowners who constitute the Leads have reported the systemic failure of Defendants to adhere to this material term with respect to the dissemination of the Leads.

(c) Foisting on Class Members, without notice, explanation, or authorization, the integration of another of HomeAdvisor's products called "mHelpDesk" for an additional monthly fee.

(d) Adopting uniform internal procedures intended to deny and discourage refunds and/or Lead credits when Class Members sought reimbursement for bogus Leads.

(e) Notwithstanding their having professed to the Home Service Professionals that "You're In Control" of the type and volume of Leads, and the Lead budget,

Defendants were blatantly disregarding such parameters and systematically surpassing the spend ceilings established by the Home Service Professionals.

16.     The initial annual fees for the Membership Programs currently range from $347.98 to $959.99.  The fees for Leads, which can range from $8 to over $90 *per Lead*, are paid by the Home Service Professionals automatically upon the sending of each Lead to them by Defendants.  Moreover, the Lead fee is paid "regardless of whether the professional ultimately provides the requested service".  (IAC Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2015).

17.     In order to effectuate this payment system, the Home Service Professionals are required to provide either a checking / savings account from which Defendants can automatically debit all Membership Fees and Lead fees, or a credit card on which Defendants can automatically charge such fees.   *On a weekly basis,* Defendants automatically bill the Home Service Professionals for each Lead sent. The fee for each Lead is automatically charged to the Home Service Professionals' credit card and/or debited from his/her/its debit account. Therefore, Class Members who disputed the bona fides of a Lead or being charged for a Lead are in the position of having already paid Defendants, rendering it much more difficult to secure a refund.

18.     Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the Home Service Professional.

19.     In reality, Plaintiff and the Class, have been victims of a systemic deception that has the following core characteristics:

20.     Plaintiff and the Class are not receiving Leads constituting targeted, serious, qualified or project-ready Homeowners.  A significant number of Leads are the product of

Defendants' systemically flawed system and process, and are illusory as they are comprised of: wrong or disconnected phone numbers and contact information; persons who never even heard of HomeAdvisor; stale Leads, including for projects that Homeowners completed months or years prior to the Lead being sent; contacts for homes that were listed for sale; and contacts for vacant or non-existent residences.   The Leads are the product of telemarketing, cold-calling, sweepstake entries and other third-party Lead generation companies and sources used by Defendants, a far cry from a process that generates Leads that constitute qualified, project-ready Homeowners.

21.     In addition, Plaintiff and the Class frequently received Leads that had been sent to, in many instances substantially, more than four Home Service Professionals, in clear violation of the Defendants' express operating conditions.   Defendants' motivation for not adhering to the "no more than four" condition is apparent: collection of fees from as many Class members as possible for the same Leads.   In sum, Defendants' business model is built on a framework of deception that maximizes Defendants' business revenues at the expense of Plaintiff and the Class.

22.     As a result of Defendants' unfair, deceptive and fraudulent business practices, Plaintiff and Class Members have suffered the loss of an ascertainable amount of money. Defendants have operated a scheme designed to bestow significant financial benefits upon themselves to the detriment of Plaintiff and the Class.   Had Defendants not concealed and falsely characterized the true nature of the Membership Programs and the Leads, Plaintiff and the Class would not have paid money for the Membership Programs and the Leads.

23.     Plaintiff seeks relief pursuant to the Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-101, *et seq*., for breach of duty of good faith and fair dealing and unjust enrichment.

## PARTIES

### The Plaintiff

24.     Plaintiff Airquip, Inc. is a certified Trane Comfort Specialist[TM] Dealer corporation with its principal place of business located at 830 Linden Avenue, Rochester, New York. Plaintiff paid for a Pro Connect[TM] membership with HomeAdvisor on or about September 16, 2015, and was thereafter charged by HomeAdvisor for over 150 Leads.   As a result of the conduct described herein, Plaintiff was injured.

### The Defendants

25.     Defendant HomeAdvisor, Inc. is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Suite 200, Golden, Colorado.   HomeAdvisor was founded and launched in October 1999 as ServiceMagic in Golden, Colorado, and acquired by Defendant IAC in September 2004 for an undisclosed amount.   On October 1, 2012, IAC rebranded ServiceMagic and launched it as HomeAdvisor.  HomeAdvisor is an operating business of IAC.

26.     Defendant IAC is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 555 West 18th Street, New York, New York.  IAC is a media and Internet company that owns more than 20 operating businesses comprising over 150 brands and products, including HomeAdvisor and some other recognized brands, such as Vimeo, About.com, and the Match Group's online dating portfolio, which

includes Match, OkCupid, and Tinder.  IAC is the parent company and majority shareholder of HomeAdvisor.  By virtue of the interrelation of operations of IAC and HomeAdvisor through IAC's control and direction of HomeAdvisor and its employees, as well as IAC's capital investment in HomeAdvisor,  IAC and HomeAdvisor are properly considered a single integrated enterprise and a single employer, rendering IAC liable jointly and severally for the actions of HomeAdvisor as described herein.  In the fourth quarter of 2015, IAC realigned itself into six reportable segments: HomeAdvisor, Match Group, Publishing, Applications, Video and Other.  IAC generated over $3 billion in revenue in 2015.  IAC dominated HomeAdvisor in such a way as to subject it to liability for the actions of HomeAdvisor:

(a) IAC has been the parent company and majority shareholder of HomeAdvisor since 2004.  In IAC's filings and press releases, and in the statements by its officers, HomeAdvisor is referred to as an operating business, segment, and wholly owned subsidiary.  Under IAC's direction and control, HomeAdvisor has been transformed from an unprofitable business to one of IAC's fastest-growing and most profitable segments. (IAC Q1 2016 Shareholder Letter, 5/4/16).

(b) IAC has made significant capital and other expenditures in connection with HomeAdvisor.  Since 2013, IAC has made capital contributions to HomeAdvisor of approximately $80 million for marketing and approximately $150 million to increase the salesforce. (IAC Q1 2016 Shareholder Letter, 5/4/16).

(c) IAC governs personnel decisions and has the authority to appoint HomeAdvisor executives.  For instance, in February 2012, IAC appointed Jeff Kip as Executive Vice President and Chief Financial Officer of IAC.  In April 2016, IAC

announced the appointment of Glenn Schiffman as Kip's successor and that Kip would "oversee the international expansion of the HomeAdvisor business."  Joey Levin, Chief Executive Officer and Director of IAC, stated, "***We've*** found a way to keep Jeff in the family in a new operating role. Jeff has been a key contributor in HomeAdvisor's success, so ***we're very pleased to charge him*** with replicating and growing that success abroad." (*IAC Appoints Glenn H. Schiffman as Chief Financial Officer*, PR Newswire, 4/7/16) (emphasis added).

(d) HomeAdvisor's directors and executives do not act independently in the interest of the operating business; rather they take direction from IAC.  The directives for HomeAdvisor's business strategies and operations come from IAC.  For 2016 IAC has established the following priorities for HomeAdvisor:

- Grow brand awareness, primarily through marketing
- Add SPs, primarily through our sales force
- Innovate the product, primarily through Instant Connect and Instant Booking, especially on mobile
- Expand internationally, where ***we've*** moved Jeff Kip to bring a renewed focus on the opportunity

(IAC Q1 2016 Shareholder Letter, 5/4/16) (emphasis added).

(e) On information and belief, HomeAdvisor employees are directed, managed and/or employed by IAC.  According to IAC's career website page (http://iac.com/careers/overview), individuals interested in joining the "IAC team" have the option to explore the jobs available at IAC's 20 plus operating businesses.  The jobs available through IAC's operating businesses also include IAC benefits, such as the "IAC Retirement Plan" and health benefits.  IAC is

responsible for the Form 5500 filings for both the retirement savings plan, and the health and welfare benefit plan.  HomeAdvisor does not make any such filings.

27.     The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiff will seek to add to this Complaint the actual names, capacities and roles of the DOE defendants when such identities become known.

## JURISDICTION AND VENUE

28.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more members of the Class; (ii) there is an amount in controversy that exceeds the sum or value of five million dollars ($5,000,000), exclusive of interest and costs; (iii) the members of the Class are citizens of states different from Defendants; and, (iv) greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

29.     This Court has personal jurisdiction over Defendants because they are authorized to do business and are conducting business throughout the United States, including Colorado, and HomeAdvisor's principal executive offices are located in Denver, Colorado.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, Defendants are authorized to conduct business in this District, and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District.

31.     Furthermore, venue is proper because Defendants intended to avail themselves of the laws and courts of this District by stating on HomeAdvisor.com that the laws of the State of Colorado apply to disputes arising from its operations including with Home Service Professionals and that the state or federal courts in Denver, Colorado are the exclusive forum for litigation.

**FACTS**

**A.  Overview of HomeAdvisor.**

32.     HomeAdvisor is a nationwide home services digital marketplace that helps connect Homeowners with Home Service Professionals.

33.     HomeAdvisor matches Homeowners with Home Service Professionals from its Home Service Professional network based on the type of services desired and the homeowner's location.  Homeowners may also review profiles of Home Service Professionals with whom they have been matched and select the professional they believe best meets their specific needs. In addition to (or in lieu of) submitting a request through HomeAdvisor's digital marketplace, Homeowners can also search, select and contact Home Service Professionals directly through HomeAdvisor's online directory.

34.     Since October 2013, HomeAdvisor has been marketing and selling three subscription offerings to Home Service Professionals.  The basic Membership Program includes membership in its network of Home Service Professionals, as well as a listing in HomeAdvisor's online directory.  The two additional Membership Programs include all of the basic Membership Program services, plus Leads and, in the case of one Membership Program, custom website and

mobile development and hosting services, as well as integration with another of HomeAdvisor's products called "mHelpDesk".

35.     Home Service Professionals who were new to HomeAdvisor must generally sign up for one of the subscription products described above. As of December 31, 2015, approximately 93% of the roughly 102,000 domestic paying Home Service Professionals within HomeAdvisor's network paid for a Membership Program.

**B.      The Membership Programs.**

36.     To become a HomeAdvisor$^{SM}$PRO, a Home Service Professional pays for a Membership Program, which during relevant times were presented by HomeAdvisor as follows:





*See* http://welcome.homeadvisor.com/membership/packages-93SW-3320VD.html (last visited 6/29/16).

37.   The pricing for Membership Programs were further described during relevant times as follows:



*See*  http://welcome.homeadvisor.com/membership/packages-93SW-3320VD.html  (last  visited

6/29/16).

And, as follows:



*See,* http://welcome.homeadvisor.com/membership (last visited 7/11/16).

38.     The pricing structure of the Membership Programs is tactical:  membership in Pro Connect[TM] or Total Connect[TM] includes access to ProLeads[TM] plus ***all*** the benefits of the basic Pro Reach[TM] membership, but at a ostensibly lower up-front cost.  As a result, the vast majority of Home Service Professionals select either Pro Connect[TM] or Total Connect[TM] since those Membership Programs appear to deliver the most cost-effective benefits.

39.     HomeAdvisor sells its Membership Programs to Home Service Professionals over the phone through its massive salesforce.  With IAC's investment of approximately $150 million since 2013, HomeAdvisor expanded its salesforce to about 900 sales representatives as of May 2016.

40.     Sales of Membership Programs are not completed on-line.   Home Service Professionals do not execute any written contract or written agreement with Defendants.  Once Defendants secure a payment source (credit card or debit account number) from the Home Service Professional, the Membership Program fee is charged or debited, and the Lead referrals and fee payments begin.

41.     The most commonly employed form of solicitation of the Home Service Professionals is proactive cold calling by Defendants' salesforce.  The salesforce uses search engine marketing, trade associations and affiliate marketing channels to identify potential Service Professionals, including, *inter alia*, local plumbers, painters, electricians, handymen, and home improvement and maintenance personnel.

42.     Defendants' salesforce contacts prospective Home Service Professionals directly, often relentlessly, to solicit participation in Membership Programs that include ProLeads[TM] and

enroll them over the phone in one of the three Membership Programs.  The persistent sales tactics employed by Defendants' salesforce often becomes aggressive.  In several instances, the sales consultants have even threatened to harm prospective Home Service Professionals' reputations via the posting of baseless, bad reviews if they refused to join HomeAdvisor.

### B. ProLeads[TM]

43.     Defendants state that with ProLeads[TM], Home Service Professionals will "Get connected to *qualified homeowners* who are seeking the services you provide. You will receive homeowner contact and service request information *so that you can reach out to close the deal.*" *See supra ¶*36.

44.     In consideration for the payment of hefty Membership Program annual fees and Lead fees, Home Service Professionals are to receive "highly targeted prospects", and have the ability to monitor and precisely budget their "spend targets and spend ceilings" on Leads.  *See* HomeAdvisorPro website, "How it works," at https://pro.homeadvisor.com/how-it-works/ (last visited 7/12/2016).

45.     Home Service Professionals are paying for highly targeted prospects, which is how such Leads are repeatedly described by Defendants:  "Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. It's just one of the reasons you can *depend on us to bring you highly targeted prospects* that will grow your business. Getting started is easy. https://pro.homeadvisor.com/how-it-works/ (last visited 6/28/16) (emphasis added). This message appears prominently on the HomeAdvisor Pro website:



46.     Defendants' promise to deliver Leads that are serious and targeted, and that such Leads will be sent to a limited number of Home Service Professionals, is unequivocal:

(a) "Home Advisor is the number 1 marketplace for ***project ready homeowners*** to connect with prescreened pros." HomeAdvisor video, https://youtube/bOxwhpnxU5g (last viewed 6/29/2016).

(b) "[W]ith Home Advisor's ***patented pro finder technology you are only matching to <u>serious homeowners</u> in your area***. Home Advisor then instantly connects you over the phone, via email….." HomeAdvisor video, https://youtube/bOxwhpnxU5g (last viewed 6/29/2016) (emphasis added).

(c) "Connect with the ***Targeted Prospects*** You Need to Succeed. Tell us what you do and where, and we deliver prospects that meet your exact needs." https://pro.homeadvisor.com/ (last visited 6/29/16) (emphasis added).

(d) "**How It Works**     Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. ***It's just one of the reasons you can depend on us to bring you highly targeted prospects that will grow your business.***" https://pro.homeadvisor.com/ (last visited 6/29/16) (emphasis added).

(e) "Q. How does HomeAdvisor work? A. First we ***find homeowners looking for help completing home projects and collect information about their project***. Our patented ProFinder technology then identifies relevant professionals, taking into account our pros' availability, service type and locations preferences. When we have a match, we send the homeowner's information to the matched pro instantly so that he/she can win the job." https://pro.homeadvisor.com/how-it-works/ (last visited 7/7/16).

(f) "There are several ways [Homeowners] can find Service Professionals from HomeAdvisor. Profinder, our service where [Homeowners] request a referral for a specific task, and ***we refer [Homeowners] to up to four Service Professionals***." http://www.homeadvisor.com/servlet/TermsServlet (last visited 6/29/2016)

47.     Defendants understood that Plaintiff and Class Members would deem the statements and representations set forth in paragraphs 36, 44-46, 48-57 to be material and that Home Service Professionals would reasonably rely on such statements and representations in deciding to join HomeAdvisor, and to pay the Membership Program fees and Lead fees.

48.     As set forth in HomeAdvisor's Frequently Asked Questions contained on its membership webpage, http://welcome.homeadvisor.com/membership (last visited 7/11/2016),

HomeAdvisor touts that the "benefit from HomeAdvisor Pro membership" are "matches [] with homeowners **actively seeking** the services you provide…", and "*qualified* **new business opportunities (ProLeads)** to keep your pipeline full."



49.     Similarly, as set forth in HomeAdvisor's Frequently Asked Questions contained on its Pro help and FAQ webpage, https://pro.homeadvisor.com/help/faqs/ (last visited

7/11/2016), Defendants acknowledge that the "Benefits of Joining" are "You won't have to **waste your time with customers who just window-shop**" and it "***allows you to spend your time with the right "ready-to-buy" customers"***:



> **Benefits of Joining**
>
> **Can HomeAdvisor increase a service professional's profits?**
> Absolutely. You won't have to waste your time with customers who just window-shop. HomeAdvisor allows you to spend your time with the right "ready-to-buy" customers. We do our best to fully educate customers about the scope, cost, and timing of their projects. Then we'll match them with you, based on your preferences for job type and location.
> Absolutely. You won't have to waste your time with customers who just window-shop. HomeAdvisor allows you to spend your time with the right "ready-to-buy" customers. We do our best to fully educate customers. Then we'll match them with you, based on your preferences for job type and location.
>
> **How will HomeAdvisor generate the right customers for service professionals?**
> While you're on the job, HomeAdvisor is finding qualified customers for you. We spend millions of dollars driving consumers to our Web site and educating them for you. We use the power of the Internet to expand your word-of-mouth advertising and build a whole new customer base for you.
>
> **What does HomeAdvisor Certified mean?**
> The HomeAdvisor Certified seal of approval tells customers that you're one of the best. We have the most thorough qualification system in the industry. All of our certified members have their required licensing, insurance, and bonding; have clean credit and legal histories; and have a minimum of three satisfied customer ratings from current HomeAdvisor customers. All of our certified members have their required licensing, have clean credit and legal histories; and have a minimum of three satisfied customer ratings from current HomeAdvisor customers.
>
> to top

50.     Defendants also explain that the qualified, targeted Leads are generated through the HomeAdvisor website, including www.homeadvisor.com/profinder/, whereby Homeowners access the Home Service Professionals for home improvements, repairs and maintenance projects.   Then, Homeowners interested in connecting with a Home Service Professional select the requested service and then complete a project inquiry form.   Upon completion of the form, the homeowner is instantly matched with "up to four local Home Service Professionals who have been background-checked and are qualified and available to do to the job." http://www.abouthomeadvisor.com/iac-relaunches-servicemagic-as-homeadvisor-the-next-generation-of-online-solutions-for-home-improvement-and-repair-projects/.

51.     According to Defendants, as soon as the Homeowner's request is processed, the Homeowner's contact information is supplied, as a Lead, to the matched Home Service

Professionals who are then able to contact the qualified, targeted Homeowner concerning the project.

52.    This same process is described and depicted in the webinar provided by HomeAdvisor                for                its                Home                Service                Professionals                at https://pro.homeadvisor.com/articles/videos#web-ha-experiencewww.youtube.com (last visited July    11,    2016),    and    which    webinar    is    also    available    via https://www.youtube.com/watch?v=FB6oLz6abR0 (downloaded 6/29/2016):





53.    The commentary that accompanies the forgoing depiction of the Lead process, is given by Mitch Anderson (who is described as a long-time HomeAdvisor employee working in

Sales and Operations), who informs Home Service Professionals that the Leads are generated through a process whereby the Homeowners, "Complete a four page questionnaire prior to being matched with one of our Service Professionals.  The information we're going to request of those homeowners includes geographic information, details unique to the job, the job status as well as the time frame for completion and all homeowner contact information." https://www.youtube.com/watch?v=FB6oLz6abR0 (downloaded 6/29/2016).

54.     Mitch Anderson also states that a "vast majority of [HomeAdvisor's] homeowners and consumers come to [HomeAdvisor] through homeadvisor.com.  We also have the exclusive partnerships with the websites [ ] such as Better Homes and Gardens and This Old House…" https://pro.homeadvisor.com/articles/videos#web-ha-experiencewww.youtube.com (last visited 7/11/2016)

55.     Defendants also inform Home Service Professionals that they can manage and monitor the Leads, including, *inter alia*, that Home Service Professionals have the ability to "control the volume" of Leads and "modify spend targets and ceilings any time," thereby giving Service Professionals "full control of [the] budget" through the user-friendly system.  *See* HomeAdvisorPro, "Solutions for Every Business," at https://pro.homeadvisor.com/how-it-works/ (last visited 7/11/2016).

56.     Since Defendants automatically bill credit cards and deduct funds from checking accounts of the Home Service Professionals the ability of Home Service Professionals to set caps was material, and Defendants recognized that materiality:



*See* https://pro.homeadvisor.com/how-it-works/ (last visited 7/7/16).

57.     Moreover, the amount that HomeAdvisor charges per Lead is purportedly determined by the service requested and location.  HomeAdvisor, however, does not publish nor distribute any Lead fee schedule to Home Service Professionals.  Instead, HomeAdvisor tells prospective members to contact HomeAdvisor "to learn more":

Q. How much do leads cost?

A. The price of our service requests varies by the type of request and the location of the request. To learn more based on your specific situation, start your sign up today by clicking the link below.

https://pro.homeadvisor.com/how-it-works/.   As a result, the cost of each Lead is generally unknown until the Lead is received and the charge is automatically billed to the Home Service Professional's credit card or deducted from the Home Service Professional's checking or savings account.

58.     Home Service Professionals can be charged from under $10 to at least $94.56 per Lead.

59.     As alleged herein, the Leads and services Defendant promised were not provided as represented.

### C. mHelpDesk

60.     On September 3, 2014, IAC announced that HomeAdvisor had acquired a majority stake in mHelpDesk, a startup, cloud-based field service software for small to mid-size businesses.     According to some contemporaneous news reports about the acquisition, mHelpDesk's software helps businesses schedule appointments, track work orders and invoices, and manage tasks on a smartphone. In those same reports, HomeAdvisor's Chief Executive Officer Chris Terrill advised that the software will be made available to HomeAdvisor's 80,000 home improvement professionals to help improve their services and draw more customers, and was further quoted as stating that, with respect to mHelpDesk, "[i]f we help the Service Professionals better manage their day-to-day operations, it gives us a lot of very unique ways to allow     homeowners     to     engage     with     those     Service     Professionals." http://www.bloomberg.com/news/articles/2014-09-03/iac-s-homeadvisor-buys-stake-in-mHelpDesk-startup.  Moreover, IAC affirmatively acknowledged in its Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2015 that certain HomeAdvisor Membership Programs are integrated with mHelpDesk; however, no such integration is reflected in the Membership Comparison chart below:



*See*   http://welcome.homeadvisor.com/membership/features-93SW-16125K.html   (last   visited

7/7/16).

   61. In fact, information about mHelpDesk is absent from the publicly-available

information provided on-line by Defendants in connection with the descriptions of

HomeAdvisor, its business, the Membership Programs, the Leads and the nature of the services

provided to Home Service Professionals.

62.     Home Service Professionals are not informed during the Membership Subscription purchasing process that they will be automatically enrolled in mHelpDesk following a one-month free trial.

63.     Instead, Plaintiff and Home Service Professionals discovered that, in addition to their annual membership fee and per Lead fee, Defendants automatically charged their credit card or debited their checking account $59.99 - $99.00 a month for "mHelpDesk."

64.     Defendants did not notify or seek prior authorization from Plaintiff and Class Members before activating and charging for mHelpDesk.

**D.  Defendants' Deceptive and Unconscionable Business Practices**

65.     Defendants acquire, generate and charge Plaintiff and Home Service Professionals for Leads that are not from targeted, serious, qualified and/or project-ready Homeowners.

66.     Defendants employ various methods that result in Plaintiff and Home Service Professionals receiving and paying for a vast majority of Leads that are at best "cold calls" and more likely illusory.

67.     Plaintiff and the members of the Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads that are the product of a systemically flawed and illusory Lead generation and vetting service run by Defendants.

68.     Defendants' Lead generation process is systemically flawed in that it does not and cannot generate Leads of targeted, serious, qualified and project-ready Homeowners, as confirmed by filings made by HomeAdvisor in a 2016 lawsuit, filed in federal court in Ohio, captioned *Johansen v. HomeAdvisor, Inc., et al.* Case No. 2:16-cv-00121 (U.S.D.C. S.D. Ohio)("*Johansen Action*"):

(a) The *Johansen Action* alleges that HomeAdvisor and One Planet Ops, Inc. ("One Planet") violated the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA") by placing telemarketing calls to a telephone number Mr. Johansen and others of a purported class of persons had registered on the National Do Not Call Registry for the purposes of advertising the services and securing new business for HomeAdvisor.

(b) The *Johansen Action* also alleges that Mr. Johansen *had twice previously* sued HomeAdvisor for calls made to him by third parties that engage in telemarketing to obtain new clients—once in September of 2014, and another lawsuit was filed in December of 2014.

69.    In response, HomeAdvisor filed a motion to dismiss the *Johansen Action* (*see,* Case: 2:16-cv-00121, Dkt. # 18, filed April 13, 2016), and attached and referenced therein the Declaration of  Matt Zurcher, the Senior Vice President, Customer Care at HomeAdvisor (*id.* Dkt. # 18-1, "Zurcher Decl."). In its filings in the *Johansen Action,* HomeAdvisor attempted to escape liability for Leads allegedly generated in violation of the TCPA by claiming that it did not directly place or initiate the calls, but rather only purchased the unqualified Leads. In denying responsibility for the Lead generation practices employed by affiliates and/or third-parties, HomeAdvisor attested to and revealed facts that give a glimpse into the true nature of HomeAdvisor's service, business practices and the nature and quality of the Leads:

(a) HomeAdvisor and One Planet are parties to a contract under which One Planet may sell consumer home services leads to HomeAdvisor ('Lead Supply Services Agreement'). (*Id.* at ¶ 8.) ....[T]he Lead Supply Services Agreement [ ] gives

HomeAdvisor an opportunity to purchase consumer Leads generated or aggregated by One Planet… (*Id.* at ¶ 9.)

(b) HomeAdvisor is not involved with and has no right to control the manner in which One Planet generates or obtains consumer leads. (*Id.* at ¶ 10.)

(c) One Planet operates an online marketing platform for the acquisition of locally targeted and category specific leads. (Ex. B, Declaration of Richard Lippincott [One Planet's Vice President, Marketplace] ("Lippincott Decl.") at ¶ 2.) These leads are generated through the websites of One Planet's operating companies and by contracting with third parties for the purchase of lead data. (*Id.*) One Planet does not place marketing telephone calls to consumers for purposes of generating leads. (*Id.*) In fact, One Planet does not operate a call center. (*Id.*) Once acquired, One Planet sells the leads to interested buyers. (*Id.* at ¶ 3.) To facilitate the acquisition and sale of leads, One Planet operates a real-time, automated ping-and-post system utilizing an application programming interface ("API"). (*Id.*) This API system is internally referred to as the "Marketplace". Through the API, independent affiliates can, at their discretion, ping One Planet's Marketplace with the intent of submitting consumer lead information. (*Id.*) Generally, once an affiliate's ping is received by the Marketplace, One Planet, in real-time, pings all potential purchasers. (*Id.*) Then, interested prospective purchasers respond back to the ping, through a ping response, indicating whether or not they intend to purchase the full lead information. (*Id.*) The highest posted bid wins the right to purchase the lead. (*Id.*) When a lead enters One Planet's system, One Planet does

not know, in advance, who will ultimately purchase the lead—or if the lead will be purchased at all. (*Id.* at ¶ 3.)

(d) Lead House, LLC had been an independent contractor supplying leads to One Planet. (*Id.* at ¶ 4.) Lead House is not a traditional telemarketer that makes telephone calls on behalf of its clients, selling the products of its clients. Rather, Lead House sells its own products—Leads. (*See id.* at ¶ 4.) Although One Planet does not direct or control the manner by which Lead House generates leads, One Planet only bargained for leads from Lead House that were to be generated from inquiries from individuals who completed an online form hosted by Lead House. (*Id.* at ¶¶ 5-6.) The form included confirmation of the consumer's express consent to receive marketing messages and telephone calls, and that such calls were generated in compliance with the law. (*Id.* at ¶ 6.)

(e) HomeAdvisor and Lead House have no business relationship, contractual or otherwise. (Zurcher Decl. at ¶ 7.) HomeAdvisor has not directly communicated with or contacted Lead House at any time. (*Id.*) HomeAdvisor was not aware of Lead House or of any relationship between One Planet and Lead House prior to receipt of the Complaint in this case. (*Id.*)

70.    HomeAdvisor's filings in the *Johansen Action* confirm that HomeAdvisor (f/k/a ServiceMagic, Inc.) and One Planet (f/k/a Reply, Inc.) have maintained a Lead Supply Services Agreement since at least June 17, 2010 to generate volumes of unqualified Leads through methods that flatly contradict the characteristics and nature of the Leads and services for which Plaintiff and the Home Service Professionals were being charged.   The source of Leads is

arbitrary, accomplished through cold-calling and conducted by third-parties that do not maintain a direct relationship with HomeAdvisor and/or who may not even be known to HomeAdvisor.

71.     HomeAdvisor conceals the nature and genesis of its Leads by misrepresenting that Leads are exclusively generated and vetting through its patented ProFinder$^{TM}$ and ProLeads$^{TM}$ systems that are designed to weed out the casual internet browser from serious, qualified and project-ready Homeowners.

72.     By its own admissions, HomeAdvisor acquires Leads from a variety of sources, including "affiliate websites, through telephone contacts from consumers, and through marketplace sources such as independent contractors" and ancillary Lead Supply Services Agreements.  (*See* Zurcher Decl at ¶ 5.)  HomeAdvisor has neither input nor any control over the manner in which these Leads are procured and vetted, yet HomeAdvisor supplies and charges Home Service Professionals for the unsubstantiated Leads.

73.     Defendants deceived Home Service Professionals by failing to disclose the true nature of its business, services and Leads. For Defendants, it appears to be a volume business – get the fee for the Membership Program and push out and charge for as many Leads as possible before the Home Service Professional tries to cancel.

74.     The complaints lodged by Home Service Professionals on consumer complaint blogs, including with the Better Business Bureau, are profuse and consistent, in their experiences and that the Leads they were charged for are illusory, not as advertised and generated from unqualified and unsuspecting prospects (just like in Mr. Johansen's situation).

75.     For example:

    (a) From HomeAdvisor's Facebook page "Visitor Posts" from June 29, 2016:

▸ **HomeAdvisor**

So i wanted to go ahead and state a few problems with this terrible service. I listed my remodeling company with homeadvisor back in January and the leads that they were sending me had bad phone numbers, fake email addresses and i more then one case the people didn't even own the houses they wanted work done on. I put in several request for refunds only to be denied. I then contacted them to terminate my agreement with them because of unqualified leads and they apologized and said they would provide me with 5 free leads. Out of those five leads one was a qualified lead. So i started up again, received another 5 leads that i paid for and those leads were unqualified leads, once again bad phone numbers and fake emails. So i stopped payment on the auto draft. They then reached out to me in an attempt to collect and i stated i would only pay for qualified leads and they said they can not guarantee qualified leads so i said i could not guarantee payment. This is by far one of the worst companies i have ever done business with. I asked them why would it be so hard to qualify a potential costumer? Once the lead is generated have someone from Homeadvisor dial the potential customer back and if the potential customer answers then they can be qualified with a few quick questions. I was told that did not work out for Homeadvisor.... Of course it didn't because your leads went form10 to 1 and you could not sell 1 good lead to a contractor you needed to sell 10 unqualified leads to a contractor. Enough of this. I will never recommend Homeadvisor to a potential contractor or a customer. POOR QUALITY CONTROL

(b) From HomeAdvisor's Facebook page "Visitor Posts" from June 29, 2016:

▸ **HomeAdvisor**

Do you not verify people's phone numbers before giving them out to your contractors? I never went to your website. I DO NOT OWN A HOME!!! I live on the west coast. I am getting calls daily at 6 and 7 in the morning from the east coast for roofing. I have asked multiple contractors to have my number removed, but the next day I get calls again. I contacted you chat rep and he says my number is not in your list. Bull everyone of these contractors are telling me that you are the one giving out my number. STOP GIVING OUT MY NUMBER HOME ADVISOR!!!

33

(c) From "ComplaintsList", http://www.complaintslist.com/2013/home-advisor-bogus-leads/ (last visited July 1, 2016):

**HomeAdvisor Review: Bogus Leads given from HomeAdvisor**

Last Updated On: April 28, 2016
Filed On: April 1, 2013
By: john olmstead
Rating: **1** out of **5**
**Reported Customer Loss = $3,000.00**

I signed up and bought $600 in leads up front. The first lead the home owner did not exist.......the address did not exist and the phone number did not work and was out of town. The second lead the phone number did not work .......the lead said it was about a bid for a slate roof where the neighborhood was very rundown............what a waste of my time! I texted them to stop by cell and over 7 emails.

(d) From "ComplaintsList", http://www.complaintslist.com/2016/home-advisor-is-a-scam/ (last visited July 1, 2016):

**HomeAdvisor Review: A Scam**

Last Updated On: April 22, 2016
Filed On: April 22, 2016
By: Jay
Rating: **1** out of **5**
**Reported Customer Loss = $3,000.00**

This is a big SCAM.

I signed in as contractor with Home Adviser and it was the best worst experience ever.

I spent about $3000 in 2 months and a got ripped off.

The quality of the leads they send you is very bad, many of them contact numbers that only lead you to voice mails. They don't pre-screen the potential customers and they only send you garbage and they expect you to pay top money in return.

DON'T DO IT.

(e) From "Pissed Consumer" on March 4, 2016,

http://homeadvisor.pissedconsumer.com/deceitful-sales-pitch-false-leads-huge-waste-of-money-20160304803113.html (last visited July 1, 2016):

34

> If you are a business owner: STAY AWAY FROM HOMEADVISOR.
>
> When looking into the company and speaking with "sales" people, they promised that their leads were vetted, that we could adjust the frequency and amount of leads and that the submitted requests were verified for accuracy. None of that is true!
>
> 8/10 leads have false information - incorrect phone numbers, project category (we are a home remodel/renovation company, not tree trimmers), phase of project (as in, not actually interested in talking to a contractor, just wants general pricing) or you just NEVER get a response.
>
> We have invested $2k and, as a new company struggling to grow, are INCREDIBLY disappointed, annoyed and, honestly, furious about the "leads" we are being charged ridiculous amounts for and the lies we were told when we signed up.
>
> They are making INSANE amounts of money from the phony leads they send. As the owner, office manager and marketing manager of our company, this was pitched as a very promising lead generator and has turned into a pit of wasted money, time and energy.

(f)  From "ResellerRatings", http://www.resellerratings.com/store/HomeAdvisor (last visited July 1, 2016):



★★★★★ **1/5**                                    📅 2016-02-17

salah968

**IT'S A SCAM don't use them**

"I realized that Home Advisors lied to me like they did to many other contractors to let me accept their service under high pressured sign up, I was flooded with bogus leads most of them were out of my service area, the leads were so bad I couldn't get in touch with almost any of the customers or they said they didn't request any service or they had already been called 3 or 4 times by other contractors, HA sells the same leads to many numbers of contractors who all pay for. In addition many leads were out of my service area.
I called HA customer service and tried to explain to them that I was not notified that the same lead would be sold to numerous other contractors, the services were sold to me under misleading, I told them that the sales representative promised I would get legitimate leads from HomeAdvisor and this was not true and I'm paying more for the leads than I was making from them myself, but he saw no reason why this would be credited back. The customer service representative was extremely unprofessional and careless, he just try to convince me it's their way to do business and I have to pay anyway their fake leads, all what he can do for me is to correct my service area."

76.     In addition to complaints lodged by Home Service Professionals, both current and former HomeAdvisor employees have posted reviews on the job site Glassdoor.com that confirm HomeAdvisor's aggressive sales culture, and deceptive and fraudulent sales practices.

77.     <u>Below are examples of HomeAdvisor employee accounts of the sales practices HomeAdvisor promoted and encouraged throughout the relevant period:</u>

(a) As described in the below post by an author identified as a then-current HomeAdvisor sales employee: "You are expected to call 150+ people a day and sell them the first time you speak.  If the contractors have legitimate reasons for not signing up, you need to push for it any ways [sic]".



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P18.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(b) As described in the below post by an author identified as a then-current HomeAdvisor sales representative: "If you don't sell you're fired. If you DO [sic] and the contractor decides to turn off their leads before 24 hours, you could get

fired. You have to lie to contractors and tell the [sic] what they want To [sic] hear

and not what will actually benefit them."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P19.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(c) As described in the below post by an author identified as a then-current

HomeAdvisor sales employee: "You're taught and expected to bend and omit the

truth.  For example, you're expected to tell every prospect that there are a certain

amount of leads available in their city even though it's usually not true."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-
E11291_P20.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(d) As described in the below recent post by an author identified as a former
HomeAdvisor sales associate:   "The script that mgmt [sic] will give you (that you
are pretty much required to repeat word for word) includes common objections
that contractors will give to buying a membership.   These are VERY [sic]
legitimate objections, like why we charge 3 contractors for the same job if only
one of them gets it.   You are taught to counter these objections with vague and
borderline dishonest responses."



\*        \*        \*

-The script that mgmt will give you (that you are pretty much required to repeat word for word) includes common objections that contractors will give to buying a membership. These are VERY legitimate objections, like why we charge 3 contractors for the same job if only one of them gets it. You are taught to counter these objections with vague and borderline dishonest responses. Selling someone a HomeAdvisor membership is a very long process, in which the contractor must give you his personal information (SSN, DOB) and his credit card info, which any smart person wouldn't give out to some stranger over the phone. You are also expected to make the sale in one call, mgmt does not care about building a rapport or any sort of relationship with the contractor. The whole sales process just feels very shady and dishonest.

\*       \*       \*

**Advice to Management**
care more about the contractors you are selling to. dont put such an emphasis on one call closes, and instead focus on getting a good name for yourself and building a relationship with potential clients.

*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P21.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(e) As described in the below recent post by an author identified as a former HomeAdvisor marketing associate: "Unethical and unprofessional work environment. Sales reps are encouraged to stretch the truth to get one call closes [sic]. i.e. in weekly training meetings they will have you listen to a call from a top rep. [sic] you hear people stretching the truth all the time, and managers running the meeting just say 'stay away from using that term, try this instead.'"



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P17.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

78.      Former and current HomeAdvisor employees have also exposed details and concerns regarding the systemically flawed Lead generation system through reviews posted on complaint blogs and job sites.

79.      <u>Below are examples of HomeAdvisor employee concerns related to the nature, quality and source of the Leads sent and charged to the Home Service Professionals throughout the relevant period:</u>

     (a) As recently described in the below post by an author identified as a former HomeAdvisor sales employee:  "I personally believe they have a program running in the back ground [sic] to send contractors fake leads.  I was working with a contractor in California and I personally looked into EVERY lead HA sent him.  7

out of 10 were completely fabricated and I personally could not find the so called

lead in internet searches (like google & yahoo) or even in the phone book…"

**HomeAdvisor Review: Statement from an x- HA Sales employee**

Last Updated On: March 10, 2016
Filed On: March 10, 2016
By: x- HA Sales employee
Rating: **1** out of **5**

I worked at **Homeadvisor** for about 7 months until I got so sick of the BS, so I quit. Brad Foster is the VP of Denver Sales and he encourages an environment to where his managers (like C. Joseph) will train the new employees to LIE to contractors just to get a sale.

There are also sales policies in effect to where if a sales rep does not get at least 3 sales a week (no matter what) the will loose their job regardless on how long they have worked there. I have personally heard Bead Foster say things like, "I do not care if they get fired, we have new training classes every 2 weeks".

I personally believe they have a program running in the back ground to send contractors fake leads. I was working with a contractor in California and I personally looked into EVERY lead HA sent him. 7 out of 10 were completely fabricated and I personally could not find the so called lead in internet searches (like google & yahoo) or even in the phone book (yellow pages).

The idea of HA is awesome but the people running the company are greedy and will lie to you just to get your money. Consumer beware.....

*See* http://www.complaintslist.com/2016/homeadvisor-statement-from-an-x-ha-sales-employee/
(Last visited 6/28/2016).

(b) As described in the below post by an author identified as a former HomeAdvisor

sales consultant:  "Sales is told to sell by revenue target -- leads pour into

customers [sic] account--credit card automatically charged.  Customer has no

recourse-sales reps fired for mispractice [sic]."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-
E11291_P18.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(c) As described in the below post by an author identified as a former HomeAdvisor

sales representative:  "Worst place I ever worked, great place if you have no soul

and love to rip off people."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-
E11291_P20.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(d) As described in the below post by an author identified as a then-current HomeAdvisor employee: "I really think this is a terrible company for what they do their clients they lie to you to tell contractors they are giving the leads they are selling up to 3 other contractors in their area and really is [sic] is much more and they charge up wards [sic] of 60 dollars for each lead." "Stop telling people they are doing a good thing when you know that you are ripping blue collar companies off!!"



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P17.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(e) As described in the below post by an author identified as a former HomeAdvisor sales employee: "Lie to contractors about the leads being quality leads. The

company does not advertise that the contractor has to pay for the leads so some people have no interest in getting an estimate, they just fill out information and the contractor has to pay for it."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(f) As described in the below post by a former HomeAdvisor employee: "Lie to contractor about the leads being quality leads.  The company does not advertise that the contractor has to pay for the leads so some people have no interest in getting an estimate, they just fill out information and the contractor has to pay for it."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

(g) As described in the below post by a former HomeAdvisor employee: "Selling product primarily to contractors who cannot afford it, and who receive bad-quality 'LEADS' [sic]." "The entire situation is a racket.  They are stealing money from the poor schmucks who sign up. Don't coach your Sales Reps to sell through fear, and to 'omit' crucial facts to the customers signing up. That's the same as lying."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

80.     Like the members of the Class, Plaintiff was subjected to Defendants' unfair, deceptive and fraudulent business practices as follows.

81.     On or about September 16, 2015, Plaintiff contacted HomeAdvisor and paid $347.98 for a HomeAdvisor Pro Connect[TM] membership.  During the call, Defendants' sales consultant touted how HomeAdvisor's proven ProLeads[TM] lead generation platform would grow Plaintiff's business through qualified, serious leads that would cost between $15 and $45 each depending on the service selected.

82.     Plaintiff received its first Leads on September 16, 2015 and within days began keeping a detailed lead log about the Leads.

83.     Over the course of six months, Plaintiff received approximately 180 Leads for $6,300.  The unpredictable fee associated with each Lead fluctuated between $8 and over $86 –

nearly double the maximum Lead fee quoted by Defendants' sales consultant.  The following is an example of the purportedly "proven" ProLeads for which Plaintiff was charged. Of the 180 Leads, Plaintiff encountered a variety of systemic issues concerning the legitimacy and viability of the Leads:

(a) **Disconnected phone numbers or non-working voicemails:**  Plaintiff routinely received Leads that contained out-of-service or non-working phone numbers. Many of Plaintiff's attempts to contact Leads were futile because the phone numbers continuously rang until disconnecting, or a voicemail, often automated, would pick up, but then inform Plaintiff that a message could not be recorded since the voicemail was either not set up or was full.

(b) **Outside the service area:**  Plaintiff services the Rochester, New York region and its Lead geographic parameters reflected such.  However, Plaintiff received and paid as much as $86 for Leads from as far away as Massachusetts and Florida.

(c) **Stale Leads:**  On several occasions Plaintiff contacted Leads within hours of when they were received only to learn that the service request had already been completed, sometimes even weeks before the Lead was received, or that another service professional had already been selected.

(d) **Lead was not the homeowner:**  Several Leads that were successfully contacted informed Plaintiff that they were not the homeowner of the property; therefore they were not seeking the service indicated on the Lead and questioned how their contact information was obtained.

(e) **Lead submission denial:**  Numerous Leads full-heartedly denied submitting any service request through HomeAdvisor.com and some leads were completely unfamiliar with HomeAdvisor. Yet, Plaintiff was still required to pay as much as $50.99 for these unsubstantiated Leads.

(f) **Inaccurate Lead contact information:** For several, when Plaintiff called the phone number provided in the Lead, the person answering claimed that they did not know the person who was identified in the Lead.  Also, Plaintiff was told that the individual listed on the Lead was deceased.

84.    In agreeing to pay for a membership and each Lead, Plaintiff relied on Defendants' representations concerning its vetted and quality Lead service.  Had HomeAdvisor disclosed that the Leads were illusory, Plaintiff would not have agreed to subscribe to an annual membership or pay for Leads.

85.    Additionally, prior to Plaintiff paying for its Pro Connect$^{TM}$ membership, neither Defendants nor any of their representatives informed Plaintiff that it would be automatically enrolled in mHelpDesk at a rate of $59.99 a month following a one-month free trial.  Plaintiff only learned of the mHelpDesk product when Defendants' sales consultant contacted Plaintiff during the trial period to activate the system.  Plaintiff, at that time, informed the consultant that it was not interested in the product and requested that the service be terminated.  Irrespective of Plaintiff's request, HomeAdvisor charged Plaintiff $59.99 a month for a system Plaintiff never accessed.

86.    On or around March 23, 2016 Plaintiff terminated its subscription with HomeAdvisor.  In total, Plaintiff paid in excess of $7,200 for HomeAdvisor's Pro Connect$^{TM}$

membership and has been injured as a result of Defendants' conduct.  Plaintiff's experiences, along the countless other complaints by Class Members and the statement made by HomeAdvisor's former employee, make it clear that HomeAdvisor has engaged in a uniform and fraudulent scheme to induce service professionals to sign up for memberships that include Lead generation services by falsifying the nature and quality of the Leads.

87.     The Plaintiff and the Class of Home Service Professionals have been, at each turn, subjected to deceptive, coercive and unfair business practices employed by Defendants with respect to the Leads and the purported benefits of the Membership Programs:

(a)  Defendants used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads that were required, yet Defendants sent to and charged the Home Service Professionals for such Leads.

(b)  Defendants did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready Homeowners.

(c)  Defendants charged the Home Service Professionals for Leads that were not qualified business opportunities.

(d)  Defendants charged Plaintiff and the members of the Class for Leads that have been sent to more than four Home Service Professionals.

(e)  Defendants charged Home Service Professionals for mHelpDesk without knowledge or consent of the Home Service Professionals.

(f)  Defendants systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to Home Service Professionals.

(g)   Defendants employed tactics that prevent Home Service Professionals from

cancelling their membership and Leads, and from disputing the propriety of a

Lead in order to secure a refund.

88.   As a result of Defendants' unfair, deceptive and fraudulent business practices,

Home Service Professionals and Plaintiff have suffered substantial and an ascertainable loss of

money.

89.   Defendants have operated a scheme designed to bestow significant financial

benefits upon themselves to the detriment of Plaintiff and the Class.   Had Defendants not

concealed and falsely characterized the true nature of the Membership Programs and the Leads,

Plaintiff and the Class would not have paid millions of dollars for the Membership Programs and

the Leads.

## CLASS ACTION ALLEGATIONS

90.   Plaintiff realleges and incorporates by reference the allegations set forth in each of

the preceding paragraphs of this Complaint.

91.   Plaintiff seeks to bring the claims asserted herein as a class action pursuant to

Federal Rule of Civil Procedure 23, on behalf of itself and all others similarly situated.   The

proposed Class is defined as:

> All persons who, since October 1, 2012, paid for a HomeAdvisor home service
> professional membership (including for HomeAdvisor's Pro Connect™, Total
> Connect™, and/or for the predecessor or subsequent HomeAdvisor home service
> professional membership programs), and paid for homeowner contact and service
> requests ("Leads") and/or mHelpDesk.

92.   Plaintiff reserves the right to modify or amend the definition of the proposed

Class before the Court determines whether certification is appropriate. Excluded from the Class

are: Defendants, any entity in which any Defendant has a controlling interest, and each Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; all Service Professionals who make a timely election to be excluded; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

93.     Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.

94.     All members of the Class were and are similarly affected by the wrongful and deceptive practices of Defendants, and the relief sought herein is for the benefit of Plaintiff and members of the Class.

95.     All members of the Class similarly relied on Defendants' deceptive representations and practices and such reliance resulted in harm to each Class Member.

96.     Based on Defendants' public statements, it is apparent that the Class consists of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

97.     Questions of law and fact common to the Plaintiff and Class exist that predominate over the questions affecting only individual members of the Class. The common legal and factual questions include, *inter alia*:

> (a) Whether Defendants employed a deceptive course of conduct of charging members of the Class for Leads that were not qualified business opportunities, qualified, targeted, serious, or from project-ready Homeowners.

(b) Whether Defendants concealed material information about the nature, quality and source of the Leads and the HomeAdvisor services charged to Home Service Professionals.

(c) Whether Defendants used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads advertised.

(d) Whether Defendants sent to and charged the Home Service Professionals for Leads that were not targeted, and not from serious, qualified or project ready Homeowners.

(e) Whether Defendants charged the Home Service Professionals for Leads that were not qualified business opportunities.

(f) Whether Defendants charged Plaintiff and the members of the Class for Leads that were sent to more than four Home Service Professionals.

(g) Whether Defendants charged Home Service Professionals for mHelpDesk without knowledge or consent of the Home Service Professionals.

(h) Whether Defendants systemically disregarded the parameters and limits placed by Home Service Professionals on the type and number of Leads to be charged to Home Service Professionals.

(i) Whether Defendants employed tactics that prevent and prevented Home Service Professionals from cancelling their membership and receipt of Leads, and from disputing the propriety of Leads in order to try to secure a refund.

(j) Whether the conduct alleged herein is in violation of Colorado's Consumer Protection Act.

(k) The amount of revenues and profits Defendants received and/or the amount of monies imposed on or lost by the members of the Class as a result of Defendants' conduct.

(l) Whether the members of the Class are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(m) Whether the members of the Class are entitled to payment of damages plus interest thereon.

98.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Class, as the claims arise out of the same wrongful and unlawful course of conduct by Defendants, including Defendants' deceitful business practices with respect to the HomeAdvisor Leads and its membership services. Plaintiff and the other members of the Class have sustained economic injuries arising from HomeAdvisor's conduct, and the relief sought is common to each member of the Class.

99.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class, and does not have interests antagonistic to the interests of any other member of the Class.

100.    Plaintiff has retained counsel competent and experienced in the prosecution of class actions, in particular consumer protection class actions.

101.    Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members of the Class.  This

predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

102.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiff and the members of the Class have all suffered and will continue to suffer harm and damages as a result of Defendants unlawful and wrongful conduct.  Absent a class action, most members of the Class would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the damages of each member of the Class, it is highly likely that Plaintiff or any other member of the Class would be able to protect their own interest and afford to seek legal redress for Defendant's misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery.  Therefore, absent a class action, members of the Class will continue to incur damages and Defendants' misconduct will continue without remedy.

103.    Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Plaintiff and the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of Home Service Professionals subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## FIRST CAUSE OF ACTION

### VIOLATIONS OF COLORADO CONSUMER PROTECTION ACT ("CCPA"), COLO. REV. STAT. § 6-1-101, ET SEQ.

104.   Plaintiff re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

105.   Plaintiff is informed and believes, and thereon alleges, that Defendants engaged in extensive marketing, advertising and selling, including, but not limited to, electronic media, television, internet and direct marketing through their agents, to promote and sell its Membership Programs and ProLeads.   Defendants characterized the Leads as:   from targeted, serious, qualified and project ready Homeowners; qualified new business opportunities (Pro Leads) to keep your pipeline full; from 'ready-to-buy' customers; targeted prospects and highly targeted prospects; from project ready Homeowners; from Homeowners actively seeking the services; from qualified Homeowners;  from serious Homeowners; and being sent only to up to four Home Service Professionals. *See supra* ¶¶ 7, 36, 44-46, 48-57.   But, the Leads are not as Defendants represented or of the quality and nature of what Plaintiff and the Class paid for because Defendants maintain and employ systemically flawed and deficient processes to generate Leads, and send and charge Home Service Professionals for Leads that were not of such nature and quality.

106.   In addition, Defendants concealed and omitted material information about: (a) the Leads, including the true source and nature of the Leads, in that, *inter alia*, the Leads were generated through methods that could not and did not provide the Leads as advertised; and, (b)

that substantial monthly fees would be charged to the Home Service Professionals for mHelpDesk.

107.    Defendants also systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to Home Service Professionals.

108.    Defendants employed tactics that prevented or discouraged Home Service Professionals from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

109.    Defendants had knowledge that the Leads and their practices and services were contrary to what the Home Service Professionals had paid over $360 million for in 2015 alone.

110.    Defendants' failure to disclose and instead to conceal the foregoing facts was intended to and induced Plaintiff and the members of the Class to pay millions of dollars for Membership Programs, Leads and mHelpDesk.

111.    This cause of action is brought on behalf of Plaintiff and all similarly situated members of the Class, pursuant to COLO. REV. STAT. § 6-1-105(e), (g), (i), (l), (n) and (u), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

> \*        \*        \*
>
> (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
>
> \*        \*        \*

(g)  Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

\*       \*       \*

(i) Advertises goods, services, or property with intent not to sell them as advertised;

\*       \*       \*

(l)  Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

\*       \*       \*

(n)  Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

\*       \*       \*

(III)  Requiring tie-in sales or other undisclosed conditions to be met prior to selling the advertised goods, property, or services;

\*       \*       \*

(u)  Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

112.    In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

113.    Defendants' deceptive practices occurred in the course of Defendants' business, vocation or occupation.

114.   Defendants' misconduct significantly impacts the public as actual or potential consumers of the Defendants' services described herein.  The deceptive marketing, advertising and selling through electronic media, television, internet and direct marketing were directed to the market generally resulting in deception of actual and prospective purchasers.

115.   The wrongdoing alleged herein has a significant public impact.  Among other things: as of December 31, 2015, HomeAdvisor's network of Home Service Professionals consisted of approximately 102,000 paying Service Professionals in the United States, who provided services ranging from home repairs to larger home remodeling projects to thousands of Homeowners nationwide;   IAC is a multi-billion dollar media and Internet company comprised of some of the world's most recognized brands and products, including HomeAdvisor, and as such, is sophisticated and has superior bargaining power over the Service Professionals, as well as the Homeowners, who are affected by the deceptive and false practices challenged herein; and, the wrongdoing has impacted Service Professionals, causing them substantial monetary damages, and has the significant potential to do so in the future.

116.   Defendants' deceptive practices caused damage to Plaintiff and all Class Members.  Because of Defendants' unfair, deceptive and fraudulent business practices, Plaintiff and Class Members suffered injuries by way of monetary loss.

117.   In all respects, the foregoing constitutes deceptive trade practices by Defendants. Defendants committed deceptive acts ad practices, and omitted material information, which have a capacity, tendency, and/or likelihood to deceive or confuse reasonable Home Service Professionals in that such consumers had a good faith basis for believing that (a) the Leads were generated, marketed, distributed and charged to the Home Service Professionals in a reliable and

honest manner; (b) they would not be charged for mHelpDesk; and (c) they would be able to control the Leads, as well as suspend or cancel receipt of and being charged for the Leads. Instead, Plaintiff and the members of the Class were and were likely to be deceived by Defendants, as set forth herein.

118.    Plaintiff therefore seeks an order of this Court:

(a) Enjoining Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to their marketing, distribution, taking of monies for, and the management of Leads, Membership Programs, mHelpDesk, Lead management, requests for refunds, and requests for suspension or cancellation of involvement in a Membership Program, Leads and mHelpDesk, in such manner as set forth in detail above;

(b) Restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive acts or practices;

(c) Requiring Defendants to cease business practices that generate and charge for unqualified Leads;

(d) Enjoining Defendants from representing that the Leads are qualified and of similar nature and quality, when they are not; and,

(e) Requiring Defendants to cease charging for mHelpDesk without written, clear confirmation of a Home Service Professional's knowledge of the service and attendant charges, and his/her/its acceptance of such service and charges.

119.     Plaintiff and the members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and/or deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiff and the members of the Class.

120.     Also, as a result of Defendants' violation of Colorado's Consumer Protection Act, Plaintiff and the members of the Class are entitled to restitution for out-of-pocket expenses and economic harm.

121.     Further, Plaintiff and members of the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.

122.     In addition, the amount of damages suffered by Plaintiff and the members of the Class as a result Defendants' wrongful conduct is a sum certain and capable of calculation and Plaintiff is entitled to damages and interest in an amount according to proof.

<u>SECOND CAUSE OF ACTION</u>
**Fraud/Fraudulent Concealment**

123.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

124.     Prior to Plaintiff and the members of the Class buying one of the Membership Programs, Defendants represented that Leads were of a certain nature and quality, *see supra* ¶¶ 7, 36, 44-46, 48-57.

125.     Defendant knew that Plaintiff and Class Members relied upon such material representations about the Leads, and Defendants made such material representations to induce Plaintiff and members of the Class to act, *i.e.* to pay for a Membership Program to get access to

the Leads.  Moreover, to pay for the Leads, the Home Service Professionals were required to provide either a checking / savings account from which Defendants can automatically debit all Membership Fees and Lead fees, or a credit card on which Defendants can automatically charge such fees.  Then, *on a weekly basis,* Defendants automatically charged the Home Service Professionals for each Lead sent. The fee for each Lead is automatically charged to the Home Service Professionals' credit card and/or debited from his/her/its debit account.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the Home Service Professional.

126.   The representations about the Leads and the omissions about the Leads were material to Plaintiff, such that, had Plaintiff known that the representations were false and Defendants had omitted material information, Plaintiff would not have purchased a Membership Program and provided Defendants with the means to charge their credit card and/or debit their bank accounts.  But Plaintiffs did not know the true facts, and relied upon the material representations made by Defendants.

127.   Defendants knew their statements were false, and intended that Plaintiff and Class Members would rely upon the false representations.

128.   Defendants concealed and failed to disclose to Plaintiff and Class Members that, despite its affirmative representations about the services, including the Leads, it would charge Plaintiff and the Class for unqualified Leads and mHelpDesk.

129.   As a result of Defendants' fraudulent representations and omissions, Plaintiff and members of the Class were induced into the purchase of goods and/or services that they

otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

### THIRD CAUSE OF ACTION
**Restitution**

130.    Plaintiff repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

131.    Plaintiff and members of the Class conferred a benefit on Defendants by paying money for goods and/or services, all of which were to be of a certain nature and quality. *See supra* ¶¶ 7, 36, 44-46, 48-57.

132.    Nevertheless, Defendants extracted unauthorized charges from Plaintiff and the Class for unqualified Leads and mHelpDesk.

133.    Plaintiff and members of the Class further conferred a benefit on Defendants by buying an annual Membership Program, described herein, on the basis that such purchase would give them access to the qualified Leads, as descried herein.

134.    Defendants have been unjustly enriched in retaining the revenue derived from money paid by Plaintiff and members of the Class, who did not receive the goods and/or services for which they paid.  Equity militates against Defendants retaining these ill-gotten gains under these circumstances, and permitting Defendants to do so would be unjust and inequitable because of Defendants' misrepresentations and misconduct as against Plaintiff and Class Members, as alleged herein

135.    Plaintiff and members of the Class were injured as a direct and proximate result of Defendants' misrepresentations and omissions because they paid for goods and/or services that they did not receive and that they would not have purchased had they known the true facts.

136.    Because Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff and the members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and members of the Class for their unjust enrichment, as ordered by the Court.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**

137.    Plaintiff repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

138.    As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from Plaintiff and the Class' purchase of the Membership Programs and payment for the Leads and mHelpDesk.

139.    Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of Defendants' misconduct alleged herein, Plaintiff and the Class were not receiving services of the quality, nature, fitness, or value that had been represented by Defendants, and that a reasonable consumer would expect.

140.    Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff and the Class, at the expense of these parties.

141.    Equity and good conscience militate against permitting Defendants to retain these profits and benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of members of the Class, respectfully requests that this Court:

a. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class;

b. Appoint Plaintiff as the representative of the Class and his counsel as Class counsel;

c. Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiff and Class Members are entitled;

d. Award pre-judgment and post-judgment interest on such monetary relief;

e. Award injunctive relief is appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing; and

f. Award all other relief deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims asserted in this Complaint so triable.


Dated: July 19, 2016

By:  _s/ Gordon W. Netzorg_
Gordon W. Netzorg
Jeffrey Kendall *(Colorado District Court Application Pending)*
**SHERMAN & HOWARD L.L.C.**
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Direct: (303) 297-2900
gnetzorg@shermanhoward.com
and
Nicholas E. Chimicles *(Colorado District Court Application Pending)*

Kimberly Donaldson Smith *(Colorado District Court Application Pending)*
Stephanie E. Saunders *(Colorado District Court Application Pending)*
**CHIMICLES & TIKELLIS LLP**
361 W. Lancaster Avenue
Haverford, PA 19041
(610) 642-8500
Nick@Chimicles.com
KMD@Chimicles.com
SES@Chimicles.com

*Attorneys for Plaintiff*

<u>*Plaintiff's Address:*</u>
830 Linden Avenue
Rochester, New York