**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:16-cv-01849

AIRQUIP, INC.,
KELLY DASILVA
AND NICOLE GRAY, on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

HOMEADVISOR, INC.,
IAC/INTERACTIVECORP, and
DOES 1 through 10,

      Defendants.

---

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

# TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................................1

PARTIES ....................................................................................................................10

    The Plaintiffs.............................................................................................................10

    The Defendants ........................................................................................................11

DEFENDANTS' FORMER EMPLOYEES ..................................................................12

JURISDICTION AND VENUE ....................................................................................13

FACTS ......................................................................................................................14

    I.     IAC AS A "CENTRAL FLYWHEEL". ..........................................14

    II.    HOMEADVISOR'S "RECORD" GROWTH. ....................................15

    III.   HOMEADVISOR PRODUCTS SOLD TO HOME
          SERVICE PROFESSIONALS. .........................................................21

        A.     The Membership Programs.........................................................22

        B.     ProLeads$^{TM}$ ................................................................................24

        C.     mHelpDesk...............................................................................34

    IV.   THE LEAD GENERATION PROCESS IS A SHAM...........................36

    V.    THE LEADS ARE A SHAM. ...........................................................42

        A.     Defendants' Former and Current Employees Confirm
             the Bogus Nature of the Leads. ................................................44

        B.     The Plaintiffs' Experiences with HomeAdvisor and the Bogus Leads.......50

        C.     Home Service Professionals Nationwide Have Been Subjected to the
             Fraud......................................................................................58

        D.     The Homeowners Confirm the Fraud. .......................................77

VI.     HOW HOME SERVICE PROFESSIONALS ARE SOLD THE SHAM
        PRODUCT. ..........................................................................................................80

VII.    DEFENDANTS DENY REFUNDS AND/OR LEAD CREDITS
        AND UTILIZE COLLECTION AGENCIES TO CONTINUE
        THE FRAUD ON HOME SERVICE PROFESSIONALS. ..................................93

VIII.   DEFENDANTS CONTINUE TO DEFRAUD
        HOME SERVICE PROFESSIONALS USING EXACT
        MATCH LISTINGS POST-TERMINATION. .....................................................96

CLASS ACTION ALLEGATIONS ...........................................................................................100

CAUSES OF ACTION ...............................................................................................................105

Plaintiffs Airquip, Inc., Kelly DaSilva and Nicole Gray (collectively, the "Plaintiffs"), by and through their counsel, bring this class action on behalf of themselves and a proposed class of all others similarly situated, against Defendants IAC/InterActiveCorp ("IAC") and HomeAdvisor, Inc. ("HomeAdvisor").  Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation undertaken by their counsel through public records, the accounts of homeowners who were contacted by home service professionals, the accounts of home service professionals, interviews of former employees of Defendants IAC and HomeAdvisor, and IAC's filings made with the Securities and Exchange Commission ("SEC").  Plaintiffs allege as follows:

<u>**NATURE OF THE CASE**</u>

1.      IAC, a media and Internet company, claims that its operating business HomeAdvisor is a leading nationwide home services digital marketplace that helps connect consumers and homeowners (collectively "Homeowners") with persons and businesses in the HomeAdvisor network who provide home improvement services (the "Home Service Professionals").

2.      Defendants charge the Home Service Professionals, like Plaintiffs and the Class, an annual membership fee (including for HomeAdvisor's Pro Connect$^{TM}$, Total Connect$^{TM}$, and the predecessor and subsequent membership programs (hereinafter, the "Membership Programs")).  Upon payment for the Membership Program, Plaintiffs and the Class receive purported "qualified new business opportunities (ProLeads)" (the "Leads") from HomeAdvisor.

The cost of the Leads are ***not*** included in the Membership Program fee.  Instead, Home Service Professionals must ***pay for <u>each</u> individual Lead sent to them, sight unseen***.

3.      IAC and HomeAdvisor have been taking any measure conceivable to pump up and inflate HomeAdvisor's earnings during at least the prior three years. IAC has told the investing public that HomeAdvisor is its big-revenue generator and a growth business, and appears to be positioning HomeAdvisor as its next spin-off.

4.      IAC and HomeAdvisor's revenue is driven by the Home Service Professionals. To investors and analysts, IAC touts HomeAdvisor's record increase in the number of "Paying SPs" – paying Home Service Professionals – over time, as depicted in this chart prepared by IAC as of June 30, 2016:



Source:      http://files.shareholder.com/downloads/IACI/2476416435x0x901680/2D24D5E2-D8AF-4550-A942-597D7B85BFE7/Q2_2016_Shareholder_Letter.pdf

5.      Specifically, on the backs of Home Service Professionals, HomeAdvisor's growth has been exponential year-to-year:

| HomeAdvisor Year Ended | Paying Home Service Professionals | Revenue | % Revenue Increase Over Prior Year |
|---|---|---|---|
| December 31, 2015 | 102,000 | $361,201,000 | 27% |
| December 31, 2014 | 85,000 | $283,541,000 | 18% |
| December 31, 2013 | 80,000 | $239,417,000 | (not reported) |

6.       And, in 2016, as of September 30, 2016, the record growth has continued: HomeAdvisor revenue increased 34%, driven primarily by a 39% increase in HomeAdvisor domestic revenue due to a **48%** increase in Paying Home Service Professionals to **137,000**. HomeAdvisor's operating income as of September 30, 2016 had increased 110% and adjusted EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization) increased 79% due to the higher revenue, notwithstanding increases in selling and marketing expenses, among other things.

7.       The significant growth in Paying Home Service Professionals and the corresponding sharp increase in revenue have been built on a fraudulent scheme that has been and continues to be perpetrated on the Home Service Professionals.

8.       The Home Service Professionals have been defrauded into purchasing a HomeAdvisor membership, thereby enabling HomeAdvisor to automatically deduct hundreds or thousands of dollars from each of the Home Service Professionals' bank accounts when they are sent sham Leads.  Not content with creating and implementing this automatic bank account deduction model, if a Home Service Professional challenges HomeAdvisor's conduct and entitlement to payment, HomeAdvisor sends the matter to a collection agency hired by HomeAdvisor and IAC.  The substantial economic and monetary benefits that have and will inure to the executives of IAC and HomeAdvisor are the product of the costly fraud inflicted on the Home Service Professionals.   At bottom, motivation and end-game aside, IAC and

HomeAdvisor have exponentially increased the number of Home Service Professionals, who are the source of HomeAdvisor's revenue, while utterly failing to supply them with the promised product and service.

9.     Defendants market HomeAdvisor's services and ProLeads[TM] as providing Home Service Professionals with Leads that are characterized as: targeted, serious, qualified and project-ready Homeowners; qualified business opportunities for the Home Service Professionals; and only sent to up to four Home Service Professionals.  For example, *see infra* ¶¶ 62, 66-79, Defendants state that:

- "When you're a HomeAdvisor Pro member, HomeAdvisor matches you with ***homeowners actively seeking the services*** you provide…";

- "Get connected to ***qualified homeowners*** who are seeking the services you provide. You will receive homeowner contact and service request information so that you can reach out to close the deal.";

- "You'll also get a listing in our online directory…access to helpful business management and marketing tools, and ***qualified new business opportunities (Pro Leads) to keep your pipeline full***.";

- HomeAdvisor "***allows you to spend your time with the right 'ready-to-buy' customers";***

- the Leads are from "***project ready"*** Homeowners;

- "we ***find homeowners looking for help completing home projects and collect information about their project***. Our patented ProFinder technology then identifies relevant professionals, taking into account our pros' availability, service type and locations preferences. When we have a match, we send the homeowner's information ***to the matched pro instantly so that he/she can win the job.";***

- the Leads are generated from the purported "***patented pro finder technology"*** that matches Home Service Professionals "***to serious homeowners in [the Home Service Professional's] area***";

- a "vast majority of [HomeAdvisor's] homeowners and consumers come to [HomeAdvisor] through *homeadvisor.com.* We also have the exclusive partnerships with the websites [ ] such as *Better Homes and Gardens and This Old House*…";

- the Leads are for "*targeted prospects*" and "*highly targeted prospects*";

- Home Service Professionals "won't have to waste [ ] time with customers who just window-shop"; and,

- Leads are only sent to *up to four* Home Service Professionals.

10.     Quality Leads are the lifeblood of the HomeAdvisor model. The identification and delivery of quality Leads are supposed to be the essential service components of HomeAdvisor's business for Home Service Professionals.  The receipt of quality Leads is the reason Plaintiffs and other Home Service Professionals pay for a Membership Program and agree to pay, sight unseen, for the Leads.  As HomeAdvisor's own marketing materials recognized, poor and unproductive Leads were a waste of Home Service Professionals' money and resources. Delivery of quality Leads to Plaintiffs and the Class was the most material aspect of the business arrangement between them.

11.     Defendants, however, misled the Home Service Professionals about the nature and quality of the Leads and failed to disclose material information about HomeAdvisor's Lead generating and vetting processes.  Defendants did not generate a vast majority of the Leads through the HomeAdvisor website using ProLeads and/or ProFinder, and, moreover, did not employ the filtering and "three-step vetting process" measures that were supposed to garner qualified Leads for the Class.

12.     Plaintiffs and the Class are not receiving Leads constituting targeted, serious, qualified or project-ready Homeowners.  An overwhelming number of Leads are the product of

Defendants' systemically flawed system and process, and are illusory as they are characterized by: wrong or disconnected phone numbers and contact information; persons who never heard of HomeAdvisor; stale Leads, including for projects that Homeowners completed months or years prior to the Lead being sent; contacts for homes that were listed for sale; and contacts for vacant or non-existent residences.  In reality, the Leads are the product of telemarketing, cold-calling, sweepstake entries and other third-party Lead generation companies and sources used by Defendants, a far cry from a process that could be calculated to generate Leads that constitute qualified, project-ready Homeowners.

13.     Defendants' systemic deception and fraudulent business practices were confirmed in filings in a lawsuit against HomeAdvisor and in which HomeAdvisor sought to disassociate itself from liability for violations of the Telephone Consumer Protection Act ("TCPA") arising from unsolicited telemarketing allegedly committed by a third-party that generated Leads purchased by HomeAdvisor. The TCPA lawsuit confirms and validates the numerous and consistent complaints of Class Members (as well as former HomeAdvisor employees) that HomeAdvisor's business model is a scam and that the Leads it provides to Class Members are largely unvetted by HomeAdvisor, secured by affiliates and third-parties using highly questionable methods, and predominantly bogus.  HomeAdvisor's admissions provide direct evidence of the deception and fraud perpetrated by HomeAdvisor on Plaintiffs and the Class.

14.     In addition, Plaintiffs and the Class frequently received Leads that had been sent to, in many instances, substantially more than four Home Service Professionals, in clear violation of the Defendants' express operating conditions.  Defendants' motivation for not adhering to the "no more than four" condition is apparent: collection of fees from as many Class members as

possible for the same Leads.  In sum, Defendants' business model is built on a framework of deception that maximizes Defendants' business revenues at the expense of Plaintiffs and the Class.

15.     Defendants' deceptive and fraudulent practices do not end with their charging Plaintiffs and the Class Members for bogus Leads.  Defendants have adopted fundamentally unfair business practices in all aspects of their dealings with Class Members, including the following:

(a) Soliciting new members for Membership Programs by using heavy-handed and coercive means, including the threat of posting bad reviews for prospective Home Service Professionals that refused to join HomeAdvisor.

(b) Consistently violating stated assurances that Leads will be delivered to no more than four Home Service Professionals.  Both Class Members and the Homeowners who constitute the Leads have reported the systemic failure of Defendants to adhere to this material term with respect to the dissemination of the Leads.

(c) Embedding another of HomeAdvisor's products called "mHelpDesk" into its service, and charging Class Members an additional monthly fee, without notice, explanation, or authorization.

(d) Adopting uniform internal procedures intended to deny and discourage refunds and/or Lead credits when Class Members sought reimbursement for bogus Leads.

(e) Notwithstanding their having professed to the Home Service Professionals that "You're In Control" of the type and volume of Leads, and the Lead budget,

Defendants blatantly disregard such parameters and systematically surpass the spend ceilings established by the Home Service Professionals.

16.     The cost to the Home Service Professionals is substantial. The initial annual fees for the Membership Programs currently range from $347.98 to $959.99.  The fees for Leads, which can range from $8 to over $90 *per Lead*, are paid by the Home Service Professionals automatically upon the sending of each Lead to them by HomeAdvisor.  Moreover, the Lead fee is paid "regardless of whether the professional ultimately provides the requested service".  (IAC Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2015).

17.     Further, in order to effectuate this payment system, the Home Service Professionals are required to provide either a checking / savings account from which Defendants can automatically debit all Membership Fees and Lead fees, or a credit card on which Defendants can automatically charge such fees.   *On a weekly basis,* Defendants automatically bill the Home Service Professionals for each Lead sent. The fee for each Lead is automatically charged to the Home Service Professionals' credit card and/or debited from his/her/its debit account. Therefore, Class Members who disputed any charge are in the position of having already paid Defendants, rendering it much more difficult to secure a refund. And, Class Members who have had to close out their checking and savings accounts to stop IAC and HomeAdvisor from running the accounts dry, are sent to collections.

18.     Consequently, the viability, accuracy, seriousness, quality and limited distribution of each Lead are material to the Home Service Professional.

19.     Defendants' former employees have confirmed the fraud.  In sum: take any measure necessary, including deceit, to sign up Home Service Professionals; process the

membership fee; and start billing for as many Leads as possible, irrespective of the nature of the Leads. The HomeAdvisor sales representatives had to sign up Home Service Professionals and meet demanding sales goals, or get fired.   Defendants' former employees describe HomeAdvisor's culture and sales practices as follows:

- "Calling this place hell on earth is an insult to actual hell…it's that bad!"

- "It's a horrific environment.  We were treated like expendable pieces of crap."

- "It was unbelievable how we would bully the contractors to sign them up."

- "I constantly heard sales reps blatantly lying to Service Professionals just to get them to sign up." [sic].

- "The more crooked you are internally, the more they [management] will turn their heads as long as you are making the sale."

- A Senior Sales Executive based in Denver, Colorado "encourages an environment [ ] where his managers [ ] will train the new employees to LIE to contractors just to get a sale." [sic].

20.     As a result of Defendants' unfair, deceptive and fraudulent business practices, Plaintiffs and Class Members have suffered the loss of an ascertainable amount of money. Defendants have operated a scheme designed to bestow significant financial benefits upon themselves to the detriment of Plaintiffs and the Class.  Had Defendants not concealed and falsely characterized the true nature of the Membership Programs and the Leads, Plaintiffs and the Class would not have paid money for the Membership Programs and the Leads.

21.     On behalf of themselves and the Class, Plaintiffs state a cause of action under the Racketeer Influenced and Corrupt Organizations Act ("RICO Statute"), 18 U.S.C. § 1962(c), alleging that the Defendants created an enterprise and/or an association-in-fact enterprise designed to mislead and deceive Home Service Professionals through the use of the United

States wires.  In addition, on behalf of themselves and the Class, Plaintiffs seek injunctive relief pursuant to the Colorado Consumer Protection Act ("CCPA"), COLO. REV. STAT. § 6-1-101, *et seq*.  Furthermore, on behalf of themselves and the members of the Class, Plaintiffs state claims for fraud and fraudulent concealment, breach of implied contract, and unjust enrichment/restitution.

22.     On behalf of the members of the Class, Plaintiffs seek damages and equitable relief, including but not limited to: treble their monetary damages; restitution; injunctive relief; punitive damages; costs and expenses, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiffs and the Class.

**PARTIES**

**The Plaintiffs**

23.     Plaintiff Airquip, Inc. ("Airquip") is a certified Trane Comfort Specialist[TM] Dealer corporation with its principal place of business located at 830 Linden Avenue, Rochester, New York.  Plaintiff Airquip paid for a Pro Connect[TM] membership with HomeAdvisor on or about September 16, 2015, and was thereafter charged by HomeAdvisor for over 150 Leads.  As a result of the conduct described herein, Plaintiff Airquip was injured.

24.     Plaintiff Kelly DaSilva ("DaSilva") is the owner and operator of Marble Doctors LLC which specializes in marble installation, care and restoration services.  Plaintiff DaSilva's principal place of business is located at 7777 Glades Road #100, Boca Raton, Florida.  Plaintiff DaSilva paid for a HomeAdvisor Pro Connect[TM] membership on or about November 5, 2015,

and was thereafter charged by HomeAdvisor for approximately 40 Leads.  As a result of the conduct described herein, Plaintiff DaSilva was injured.

25.     Plaintiff Nicole Gray ("Gray") is the owner and operator of J.O.N.E.S. Way Cleaning Company which specializes in cleaning and janitorial services. Plaintiff Gray's principal place of business is located at 5531 W 35th Street, Indianapolis, Indiana.  Plaintiff Gray paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about February 4, 2016, and was thereafter charged by HomeAdvisor for over 170 Leads.  As a result of the conduct described herein, Plaintiff Gray was injured.

### **The Defendants**

26.     Defendant HomeAdvisor, Inc. is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Suite 200, Golden, Colorado.  HomeAdvisor was founded and launched in October 1999 as ServiceMagic in Golden, Colorado, and acquired by Defendant IAC in September 2004 for an undisclosed amount.   On October 1, 2012, IAC rebranded ServiceMagic and launched it as HomeAdvisor.  HomeAdvisor is an operating business of IAC.

27.     Defendant IAC is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 555 West 18th Street, New York, New York.  IAC is a media and Internet company that owns more than 20 operating businesses comprising over 150 brands and products, including HomeAdvisor and some other recognized brands, such as Vimeo, About.com, and the Match Group's online dating portfolio, which includes Match, OkCupid, and Tinder.  IAC is the parent company and majority shareholder of HomeAdvisor.  In the fourth quarter of 2015, IAC realigned itself into six reportable segments:

HomeAdvisor, Match Group, Publishing, Applications, Video and Other.  IAC generated over $3 billion in revenue in 2015.

28.     The true names and capacities of the defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such defendants by such fictitious names. Each of the defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek to add to this Complaint the actual names, capacities and roles of the DOE defendants when such identities become known.

## DEFENDANTS' FORMER EMPLOYEES

29.     Numerous former employees of HomeAdvisor contacted Plaintiffs' Counsel with respect to this litigation. This Amended Complaint contains allegations based on information provided by some of these former employees, who are treated herein as Confidential Witnesses.

30.     **Former Employee A:** Former Employee A worked for HomeAdvisor for approximately three years.  Prior to departing, he held the position of a customer service manager for a year and a half at HomeAdvisor's headquarters located in Golden, Colorado.

31.     **Former Employee B:**  Former Employee B was a HomeAdvisor sales representative in Colorado Springs, Colorado for approximately ten months before departing HomeAdvisor in October 2016.

32.     **Former Employee C:**  Former Employee C was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately five months before leaving HomeAdvisor in October 2016.

33. **Former Employee D:** Former Employee D was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately a year and a half before resigning in June 2016.

34. **Former Employee E:** Former Employee E was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately seven months before resigning in June 2016.

## JURISDICTION AND VENUE

35. This Court has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the RICO Statute, 18 U.S.C. § 1961-1968.

36. This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more members of the Class; (ii) there is an amount in controversy that exceeds the sum or value of five million dollars ($5,000,000), exclusive of interest and costs; (iii) the members of the Class are citizens of states different from Defendants; and, (iv) greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

37. This Court has personal jurisdiction over Defendants because they are authorized to do business and are conducting business throughout the United States, including Colorado, and HomeAdvisor's principal executive offices, located in Golden, Colorado.

38. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, Defendants are authorized to conduct business in this District, and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District.

**FACTS**

I.      **IAC AS A "CENTRAL FLYWHEEL".**

39.     Barry Diller is IAC's founder and currently its Chairman and Senior Executive. In addition, Mr. Diller, members of Mr. Diller's family and trusts for the benefit of Mr. Diller's family, beneficially own all of the 5,789,499 outstanding shares of IAC Class B common stock and 193,407 shares of IAC common stock, collectively representing approximately 44% of the total outstanding voting power of IAC and approximately 7.5% of the total outstanding economic interests of IAC, as of October 27, 2016.

40.     Mr. Diller touts his "unique business model" for IAC, which is to, "[b]uy digital businesses, fold them into a conglomerate and then spin [them] out …." *See, The New York Times*, DealBook, "Barry Diller's Business Model Bears Fruit", 11/23/2015, http://www.nytimes.com/2015/11/24/business/dealbook/barry-dillers-business-model-bears-fruit.html?_r=0 (last visited 11/2/2016).  Mr. Diller runs IAC as a "sort of 'central flywheel' to create, buy and finance companies to later be spun out."  Since the mid-2000s, IAC has been "a minifactory of spinoffs. 'I'm really an anti-conglomerateur,' Mr. Diller said." *Id.*

41.     IAC is like a business incubator.  It has acquired, developed and spun off media and internet businesses including Expedia, TripAdvisor, HSN, LendingTree.com and the Match Group.  Continuing that business model, on October 5, 2015, IAC's CEO Joey Levin approached the President and CEO of Angie's List, a HomeAdvisor competitor, regarding a potential combination.    http://www.insideindianabusiness.com/_story/30536339/angies-list-says-no-to-iac-offer (last visited 11/2/2016).  Then, on October 23, 2015 and on November 11, 2015, Mr.

Levin sent letters to Angie's List's board proposing to acquire Angie's List for $8.50 and $8.75 per share in cash, respectively. *Id.* Angie's List's board unanimously rejected the proposals. *Id.*

42.     Notably though, the November 11, 2015 letter from IAC, made public by IAC, stated that "we are also prepared to discuss **a combination of Angie's List with our HomeAdvisor business**….." http://www.prnewswire.com/news-releases/iac-proposes-to-acquire-angies-list-for-875-per-share-300177032.html (emphasis added) (last visited 11/3/2016).

43.     Analysts and IAC shareholders have been, according to Mr. Levin, demanding "a timeline for the next spinoff".   IAC Q2 2016 Shareholder Letter, dated July 27, 2016. http://files.shareholder.com/downloads/IACI/247_6416435x0x901680/2D24D5E2-D8AF-4550-A942-597 D7B85BFE7/ Q2_2016_ Shareholder_ Letter.pdf (last visited 11/3/2016).  Such goal was affirmed in Forbes' recent release of its "40 Under 40", which reported that Mr. Levin is seeking ways to spin off the company's digital businesses, which includes HomeAdvisor. http://fortune.com/40-under-40/joey-levin-11/ (last visited 11/3/2016).

44.     By all accounts, it appears that IAC's next spin off will be HomeAdvisor.  In order to accomplish that, IAC and HomeAdvisor have been undertaking to report and sustain purported "record" growth at HomeAdvisor.  Such purported growth however, has been built on a fraudulent business model, and has been achieved at the expense, livelihoods, and on the backs of  Home Service Professionals.

## II.     HOMEADVISOR'S "RECORD" GROWTH.

45.     IAC has been the parent company and majority shareholder of HomeAdvisor since 2004.  In IAC's SEC filings and press releases, and in the statements by its officers,

HomeAdvisor is referred to as an operating business, segment, and wholly owned subsidiary of IAC.

46.     IAC executives oversee and direct the HomeAdvisor business.  For instance, in February 2012, Jeff Kip became IAC's Executive Vice President and Chief Financial Officer.  In April 2016, IAC acknowledged that Mr. Kip had been "a key contributor in HomeAdvisor's success" and that, with Mr. Kip being succeeded by Glenn Shiffman, Mr. Kip would "oversee the international expansion of the HomeAdvisor business."  (*IAC Appoints Glenn H. Schiffman as Chief Financial Officer*, PR Newswire, 4/7/16).

47.     In addition, IAC makes significant capital and other expenditures in connection with HomeAdvisor.  Since 2013, IAC has made capital contributions to HomeAdvisor of approximately $80 million for marketing and approximately $150 million to increase the salesforce. (IAC   Q1   2016   Shareholder   Letter,   5/4/16   http://files.shareholder.com/ downloads/IACI/2419670841x0x889889/8E4DCC2D-13E3-4535-BB85-70C6D3CBD05C/ Q1_2016_Shareholder_Letter.pdf) (last visited 11/7/2016).

48.     IAC   also   establishes   and   directs   HomeAdvisor's   business   strategies   and operations.  For example, for 2016, IAC established the following priorities for HomeAdvisor:

- "Grow brand awareness, primarily through marketing"
- "Add SPs [Home Service Professionals], primarily through our sales force"
- "Innovate the product, primarily through Instant Connect and Instant Booking, especially on mobile"
- "Expand internationally, where we've moved Jeff Kip to bring a renewed focus on the opportunity"

(*Id.* IAC Q1 2016 Shareholder Letter, 5/4/16).

49.     HomeAdvisor   employees   are   directed,   managed   and/or   employed   by   IAC. According to IAC's career website page (http://iac.com/careers/overview), individuals interested

in joining the "IAC team" have the option to explore the jobs available at IAC's 20 plus operating businesses.  The jobs available through IAC's operating businesses also include IAC benefits, such as the "IAC Retirement Plan" and health benefits.  IAC is responsible for the Form 5500 filings for both the retirement savings plan and the health and welfare benefit plan. HomeAdvisor does not make any such filings.

50.     IAC has reported that, under its direction and control, HomeAdvisor has been transformed from an unprofitable business to one that IAC reports as its fastest-growing and most profitable segment. (IAC Q1 2016 Shareholder Letter, 5/4/16 http://files.shareholder.com/downloads/IACI/2419670841x0x889889/8E4DCC2D-13E3-4535-BB85-70C6D3CBD05C/Q1_2016_Shareholder_Letter.pdf) (last visited 11/7/2016).

51.     In 2012, Chris Terrill was hired as HomeAdvisor's new Chief Executive Officer. During IAC's October 24, 2012 Q3 2012 earnings call, Mr. Kip, IAC's then-Executive Vice President and Chief Financial Officer, noted the expected growth in HomeAdvisor for 2013, and Mr. Diller noted that he was "very impressed thus far and I will have to see but I can't imagine, I shouldn't say it that way – *I have big expectations for the growth of HomeAdvisor over the next years*." Source:  http://seekingalpha.com/article/947591-iac-interactivecorps-ceo-discusses-q3-2012-results-earnings-call-transcript?part=single (emphasis added) (last visited 11/7/2016).

52.     Early in 2013, on its May 1, 2013 Q1 2013 earnings call, Mr. Kip noted that IAC's revenue growth was offset by HomeAdvisor's underperformance, which was "driven by some technical glitches in the rebranding of the service".  Source: http://seekingalpha.com/article/1389861-iac-interactivecorp-management-discusses-q1-2013-results-earnings-call-transcript?part=single (last visited 11/7/2016).

53.     In its July 31, 2013 Q2 2013 earnings call, IAC deemed 2013 a transition year for HomeAdvisor, and highlighted their "working on rolling out *some alternate business models to help make the business stickier with our service professionals*."  As Gregory R. Blatt, IAC's then Chief Executive Officer and Director, highlighted about HomeAdvisor,

> It's growing now. We're -- simultaneously with the consumer side of the rebrand, we've been *working hard on the service provider side in terms of developing new business model alternatives, subscription products, et cetera, to go along with the traditional regeneration model, which, we think, makes it stickier. And we expect momentum to continue to build.* Clearly, the first 6 months, were rockier than we expected with the rebrand. And some of that was by our own hands, some of it is just the nature of these things. But we think that's behind us, and we think the stuff on the SP [Home Service Professional] side is promising. So we see momentum coming out of the year.

Source: http://seekingalpha.com/article/1590082-iac-interactivecorp-management-discusses-q2-2013-results-earnings-call-transcript?part=single (emphasis added) (last visited 11/7/2016).

54.     "Stickier" and "momentum", indeed:

(a) During the April 30, 2014 Q1 2014 earnings call, IAC was able to report its "first quarter of double-digit revenue growth since the first quarter of 2012, and its first quarter of double-digit EBITDA growth since the third quarter of 2012. Additionally…active [Home Service Professionals] grew 15% year-over-year".  Source:  http://seekingalpha.com/article/2177683-iac-interactive corp-management-discusses-q1-2014-results-earnings-calltranscript?       part= single (last visited 11/7/2016).

(b) During the October 29, 2014, Q3 2014 earnings call, IAC, and Mr. Kip specifically, reported that HomeAdvisor's revenue increased 20% versus the prior year, and that *the number of paying Home Service Professionals was*

*up nearly 30% year-on-year in the third quarter*.   Source: http://seekingalpha.com/article/2611655-iac-interactivecorp-iaci-q3-2014-results-earnings-call-transcript?part=single (emphasis added) (last visited 11/7/2016).

(c) During the February 4, 2015, Q4 2014 earnings call, IAC reported that HomeAdvisor was profitable, with almost $300 million in revenue, and with growth expected to continue in the 20%-30% range in 2015.   Source: http://seekingalpha.com/article/   2884126-iac-interactivecorp-iaci-q4-2014-earnings-call-transcript?part=single (last visited 11/7/2016).

(d) During the Q3 2015 earnings call on October 27, 2015, Mr. Kip highlighted and confirmed that HomeAdvisor's growth is tied to the Home Service Professionals:  "so we just got crossed [sic] 100,000 service professionals last week, which is a huge milestone for us and we crossed it faster than we thought";  "the engagement and *spend from the average service professional is up significantly* year-over-year ……and *it is those guys [the Home Service Professionals] who are supplying the revenue* and fulfilling the customers and that the SP network is the biggest driver."   Source: http://seekingalpha.com/article/3609106-iac-interactivecorp-iaci-ceo-joey-levin-q3-2015-results-earnings-call-transcript?part=single (emphasis added) (last visited 11/7/2016).

55.    Moreover, HomeAdvisor's salesforce has been increased exponentially.  As of September 2016, Mr. Terrill touted that the salesforce had expanded 46% over the prior year.

*See, Change is way of life for HomeAdvisor's Chris Terrill;* Denver Business Journal, http://www.bizjournals.com/_denver/news/2016/09/23/change-is-way-of-life-for-homeadvisor-s-chris.html. The sole impetus for expanding the salesforce was to acquire more paying Home Service Professionals. As Mr. Levin reported in his Q1 2016 Shareholder Letter to investors, dated May 4, 2016, he expected HomeAdvisor to deliver closer to 150% adjusted EBITDA for 2016, rather than the 100% they earlier predicted, and stated that a priority for 2016 was to add Home Service Professionals through the salesforce.

56.     Consequently, IAC has experienced an incredible increase in the number of "Paying SPs"  - paying Home Service Professionals – over time, as depicted in this chart prepared by IAC as of June 30, 2016:



Source:        http://files.shareholder.com/downloads/IACI/2476416435x0x901680/2D24D5E2-D8AF-4550-A942-597D7B85BFE7/Q2_2016_Shareholder_Letter.pdf (last visited 11/7/2016).

57.     Consequently, HomeAdvisor's growth have been exponential year-to-year:

| HomeAdvisor Year Ended | Paying Home Service Professionals | Revenue | % Revenue increase over prior year |
|---|---|---|---|
| December 31, 2015 | 102,000 | $361,201,000 | 27% |
| December 31, 2014 | 85,000 | $283,541,000 | 18% |
| December 31, 2013 | 80,000 | $239,417,000 | (not reported) |

58.     As of September 30, 2016, the record growth has continued: HomeAdvisor revenue increased 34%, driven primarily by a 39% increase in HomeAdvisor domestic revenue, due to **48%** growth in paying Home Service Professionals to **137,000**.   HomeAdvisor's operating income as of September 30, 2016 had increased 110% and adjusted EBITDA increased 79% due to the higher revenue, notwithstanding increases in selling and marketing expenses, among other things.

59.     In IAC's Q3 2016 shareholder letter, dated November 2, 2016, Mr. Levin hyped HomeAdvisor's record quarter: "HomeAdvisor also had another record quarter with domestic revenue growing 39% and *a new record Adjusted EBITDA, up nearly 80% year over year*…[T]he [Home Service Professional] network was up nearly 50% year over year again…To put this growth in perspective, since we offered to acquire Angie's List in Q3 of last year, *we have added a net number of service professionals roughly equivalent to the size of Angie's [List's] entire network*."   Source:   http://files.shareholder.com/downloads/IACI/_2419670841 x0x915248/8A989FB7-9FBD-4267-971A-7652B3932415/Q3_2016_Shareholder_Letter.pdf (emphasis added) (last visited 11/7/2016).

III.    **HOMEADVISOR PRODUCTS SOLD TO HOME SERVICE PROFESSIONALS.**

60.     Since October 2013, HomeAdvisor has been marketing and selling three subscription offerings to Home Service Professionals.  The basic Membership Program includes membership in its network of Home Service Professionals, as well as a listing in HomeAdvisor's online directory.  The two additional Membership Programs include all of the basic Membership Program services, plus Leads and, in the case of one Membership Program, custom website and

mobile development and hosting services, as well as integration with another of HomeAdvisor's products called "mHelpDesk".

61.     Home Service Professionals must generally sign up for one of the subscription products described above. As of December 31, 2015, approximately 93% of the roughly 102,000 domestic paying Home Service Professionals within HomeAdvisor's network paid for a Membership Program.

**A.      *The Membership Programs.***

62.     To become a HomeAdvisor$^{SM}$PRO, a Home Service Professional pays for a Membership Program, which during relevant times were presented by HomeAdvisor as follows:





*See*  http://welcome.homeadvisor.com/membership/packages-93SW-3320VD.html  (last  visited 6/29/2016).

63.     The  pricing  for  Membership  Programs  were  further  described  during  relevant times as follows:



*See*  http://welcome.homeadvisor.com/membership/packages-93SW-3320VD.html  (last  visited 6/29/2016).

64.     And, as follows:



*See* http://welcome.homeadvisor.com/membership (last visited 7/11/2016).

65.     The pricing structure of the Membership Programs is tactical:  membership in Pro Connect[TM] or Total Connect[TM] includes access to ProLeads[TM] plus ***all*** the benefits of the basic Pro Reach[TM] membership, but at an ostensibly lower up-front cost.  As a result, the vast majority of Home Service Professionals select either Pro Connect[TM] or Total Connect[TM] since those Membership Programs appear to deliver the most cost-effective benefits.

**B.     ProLeads[TM]**

66.     Defendants state that with ProLeads[TM], Home Service Professionals will "Get connected to ***qualified homeowners*** who are seeking the services you provide. You will receive homeowner contact and service request information ***so that you can reach out to close the deal.***" *See supra* ¶62 (second screenshot).

67.     In consideration for the payment of hefty Membership Program annual fees and Lead fees, Home Service Professionals are to receive "highly targeted prospects", and have the

ability to monitor and precisely budget their "spend targets and spend ceilings" on Leads.  *See* HomeAdvisorPro website, "How it works," at https://pro.homeadvisor.com/how-it-works/ (last visited 7/12/2016).

68.     Home Service Professionals are paying for highly targeted prospects, which is how such Leads are repeatedly described by Defendants:  "Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. It's just one of the reasons you can ***depend on us to bring you highly targeted prospects*** that will grow your business. Getting started is easy." https://pro.homeadvisor.com/how-it-works/ (last visited 6/28/2016) (emphasis added). This message appears prominently on the HomeAdvisor Pro website:



69.     Defendants are supposed to deliver Leads to Home Service Professionals that are from serious, project-ready Homeowners and are targeted to the Home Service Professionals'

business and geographic reach, and Defendants are to send such Leads to a limited number of Home Service Professionals.

70.     The arrangement and the terms of the service provided to Home Service Professionals are unequivocal:

(a) "Home Advisor is the number 1 marketplace for **project ready homeowners** to connect with prescreened pros." HomeAdvisor video, https://youtube/bOxwhpnxU5g (last viewed 6/29/2016).

(b) "[W]ith Home Advisor's **patented pro finder technology you are only matching to _serious homeowners_ in your area**. Home Advisor then instantly connects you over the phone, via email….." HomeAdvisor video, https://youtube/bOxwhpnxU5g (last viewed 6/29/2016) (emphasis added).

(c) "Connect with the **Targeted Prospects** You Need to Succeed. Tell us what you do and where, and we deliver prospects that meet your exact needs." https://pro.homeadvisor.com/ (last visited 6/29/16) (emphasis added).

(d) "**How It Works**     Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. **It's just one of the reasons you can depend on us to bring you highly targeted prospects that will grow your business.**" https://pro.homeadvisor.com/ (last visited 6/29/16) (emphasis added).

(e) "Q. How does HomeAdvisor work? A. First we **find homeowners looking for help completing home projects and collect information about their project**. Our patented ProFinder technology then identifies relevant professionals, taking into

account our pros' availability, service type and locations preferences. When we have a match, we send the homeowner's information to the matched pro instantly so that he/she can win the job." https://pro.homeadvisor.com/how-it-works/ (last visited 7/7/2016).

(f) "There are several ways [Homeowners] can find Service Professionals from HomeAdvisor. Profinder, our service where [Homeowners] request a referral for a specific task, and **_we refer [Homeowners] to up to four Service Professionals_**." http://www.homeadvisor.com/servlet/TermsServlet (last visited 6/29/2016).

71.     Defendants understood that Plaintiffs and Class Members would deem the statements and representations set forth in ¶¶62, 66-70 to be material and that Home Service Professionals would reasonably rely on such statements and representations in deciding to join HomeAdvisor, and to pay the Membership Program fees and Lead fees.

72.     As set forth in HomeAdvisor's Frequently Asked Questions contained on its membership webpage, http://welcome.homeadvisor.com/membership (last visited 7/11/2016), HomeAdvisor touts that the "benefit from HomeAdvisor Pro membership" are "matches [] with homeowners **actively seeking** the services you provide…", and "**_qualified_ new business opportunities (ProLeads)** to keep your pipeline full."



73.     Similarly, as set forth in HomeAdvisor's Frequently Asked Questions contained

on its Pro help and FAQ webpage, https://pro.homeadvisor.com/help/faqs/ (last visited

7/11/2016), Defendants acknowledge that the "Benefits of Joining" are "You won't have to

*waste your time with customers who just window-shop*" and it "*allows you to spend your time*

*with the right "ready-to-buy" customers"*:

**Benefits of Joining**

**Can HomeAdvisor increase a service professional's profits?**
Absolutely. You won't have to waste your time with customers who just window-shop. HomeAdvisor allows you to spend your time with the right "ready-to-buy" customers. We do our best to fully educate customers about the scope, cost, and timing of their projects. Then we'll match them with you, based on your preferences for job type and location. Absolutely. You won't have to waste your time with customers who just window-shop. HomeAdvisor allows you to spend your time with the right "ready-to-buy" customers. We do our best to fully educate customers. Then we'll match them with you, based on your preferences for job type and location.

**How will HomeAdvisor generate the right customers for service professionals?**
While you're on the job, HomeAdvisor is finding qualified customers for you. We spend millions of dollars driving consumers to our Web site and educating them for you. We use the power of the Internet to expand your word-of-mouth advertising and build a whole new customer base for you.

**What does HomeAdvisor Certified mean?**
The HomeAdvisor Certified seal of approval tells customers that you're one of the best. We have the most thorough qualification system in the industry. All of our certified members have their required licensing, insurance, and bonding; have clean credit and legal histories; and have a minimum of three satisfied customer ratings from current HomeAdvisor customers. All of our certified members have their required licensing, have clean credit and legal histories; and have a minimum of three satisfied customer ratings from current HomeAdvisor customers.

to top

74.     Defendants also explain that the qualified, targeted Leads are generated through the HomeAdvisor website, including www.homeadvisor.com/profinder/, whereby Homeowners access the Home Service Professionals for home improvements, repairs and maintenance projects.  Then, Homeowners interested in connecting with a Home Service Professional select the requested service and then complete a project inquiry form.   Upon completion of the form, the homeowner is instantly matched with "up to four local Home Service Professionals who have been  background-checked  and  are  qualified  and  available  to  do  to  the  job." http://www.abouthomeadvisor.com/iac-relaunches-servicemagic-as-homeadvisor-the-next-generation-of-online-solutions-for-home-improvement-and-repair-projects/         (last         visited 11/9/2016).

75.     According to Defendants, as soon as the Homeowner's request is processed, the Homeowner's  contact  information  is  supplied,  as  a  Lead,  to  the  matched  Home  Service Professionals who are then able to contact the qualified, targeted Homeowner concerning the project.

76.     This same process is described and depicted in the webinar provided by HomeAdvisor for its Home Service Professionals at https://pro.homeadvisor.com/articles/videos#web-ha-experiencewww.youtube.com (last visited 7/11/2016), and which webinar is also available via https://www.youtube.com/watch?v=FB6oLz6abR0 (downloaded 6/29/2016):





77.     The commentary that accompanies the forgoing depiction of the Lead vetting process, is given by Mitch Anderson (who is described as a long-time HomeAdvisor employee working in Sales and Operations), who informs Home Service Professionals that the Leads are generated through a process whereby the Homeowners "Complete a four page questionnaire prior to being matched with one of our Service Professionals. The information we're going to request of those homeowners includes geographic information, details unique to the job, the job

status as well as the time frame for completion and all homeowner contact information." https://www.youtube.com/watch?v=FB6oLz6abR0 (downloaded 6/29/2016).

78.     Mitch Anderson also states that a "vast majority of [HomeAdvisor's] homeowners and consumers come to [HomeAdvisor] through homeadvisor.com.  We also have the exclusive partnerships with the websites [ ] such as Better Homes and Gardens and This Old House…" https://pro.homeadvisor.com/articles/videos#web-ha-experiencewww.youtube.com (last visited 7/11/2016).

79.     Defendants also inform Home Service Professionals that they can manage and monitor the Leads, including, *inter alia*, that Home Service Professionals have the ability to "control the volume" of Leads and "modify spend targets and ceilings any time," thereby giving Service Professionals "full control of [the] budget" through the user-friendly system.  *See* HomeAdvisorPro, "Solutions for Every Business," at https://pro.homeadvisor.com/how-it-works/ (last visited 7/11/2016).

80.     Since Defendants automatically bill credit cards and deduct funds from checking accounts of the Home Service Professionals, the ability of Home Service Professionals to set caps was material, and Defendants recognized that materiality:



*See* https://pro.homeadvisor.com/how-it-works/ (last visited 7/7/2016).

81.     However, Defendants' former employees confirm that Home Service Professionals' monthly Leads budgets were constantly ignored and surpassed, including because sales representatives were trained to establish *only* one monthly spend ceiling when in fact HomeAdvisor has two categories of Leads – Market Match and Exact Match – each of which has separate budgets.

82.     HomeAdvisor describes the two "targeted Leads" services as follows:







*See* https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp?link_id=14354  (last visited 11/7/2016).

83.     Leads are generated differently for Market Match and Exact Match Leads, with Exact Match Leads resulting in a premium Lead fee charge.  As a result, according to Former Employee C, sales representatives were advised not to mention that there are two categories of Leads, each with a separate budget.  Instead, sales representatives were to ask Home Service Professionals for a maximum monthly Leads budget which was *only* applied to, the less expensive, Market Match Leads.  By wantonly failing to establish a maximum budget for Exact Match Leads, Defendants were permitted to charge Home Service Professionals any desired amount for Exact Match Leads, which could result in charges of hundreds or thousands of dollars above the Home Service Professionals' anticipated maximum monthly Leads budget.

84.     If a Home Service Professional demanded more details about the Leads budget, Former Employee C said sales representatives would broadly discuss the difference between the two categories of Leads, but require that the monthly minimum budgets be set to $400 for Market Match Leads and $200 for Exact Match Leads, even though the actual minimum budgets for each category were $250 and $150, respectively.

85.     Additionally, Home Service Professionals are not informed that if they freeze their Leads *at any time* during the course of the month (*e.g.*, over the weekend), the monthly Leads budget resets, thereby allowing Defendants to reach the maximum monthly Leads budgets during each interval that the Lead service is interrupted.

86.     Moreover, the amount that HomeAdvisor charges per Lead is purportedly determined by the service requested and location.  Home Service Professionals can be charged from under $10 to at least $94.56 *per* Lead.  HomeAdvisor, however, does not publish nor distribute any Lead fee schedule to Home Service Professionals.  Instead, HomeAdvisor tells prospective members to contact HomeAdvisor "to learn more":

> Q. How much do leads cost?
>
> A. The price of our service requests varies by the type of request and the location of the request. To learn more based on your specific situation, start your sign up today by clicking the link below.

*See* https://pro.homeadvisor.com/how-it-works/(last visited 11/9/2016).

87.     Former employees claim that Defendants did not readily disclose the Lead fees and misrepresented the anticipatory costs associated with the Lead generation service to avoid losing potential sales.  Former Employee C said that sales representatives were told to state that no Lead fee schedules were available, and only offer a Lead fee range or, better yet, an average Lead fee, if pressed.  However, according to Former Employee B, sales representatives not only

have access to Lead fee schedules, but tools available to generate custom Lead fee schedules based on a Home Service Professional's selected region and services.

88.     By HomeAdvisor's refusal to provide Service Professionals accurate and comprehensive Lead fee information, the cost of each Lead is generally unknown until the Lead is received and the charge is automatically billed to the Home Service Professional's credit card or deducted from the Home Service Professional's checking or savings account.

### C.     mHelpDesk

89.     On September 3, 2014, IAC announced that HomeAdvisor had acquired a majority stake in mHelpDesk, a startup, cloud-based field service software for small to mid-size businesses.   According to some contemporaneous news reports about the acquisition, mHelpDesk's software helps businesses schedule appointments, track work orders and invoices, and manage tasks on a smartphone. In those same reports, HomeAdvisor's Chief Executive Officer Chris Terrill advised that the software will be made available to HomeAdvisor's 80,000 Home Service Professionals to help improve their services and draw more customers, and was further quoted as stating that, with respect to mHelpDesk, "[i]f we help the Service Professionals better manage their day-to-day operations, it gives us a lot of very unique ways to allow homeowners to engage with those Service Professionals."     Source: http://www.bloomberg.com/news/articles/2014-09-03/iac-s-homeadvisor-buys-stake-in-mHelp Desk-startup.  Moreover, IAC affirmatively acknowledged in its Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2015, that certain HomeAdvisor Membership Programs are integrated with mHelpDesk; however, no such integration is reflected in the Membership Comparison chart below:



*See* http://welcome.homeadvisor.com/membership/features-93SW-16125K.html (last visited 7/7/2016).

90.      In fact, information about mHelpDesk is absent from the publicly-available information provided on-line by Defendants in connection with the descriptions of HomeAdvisor, its business, the Membership Programs, the Leads and the nature of the services provided to Home Service Professionals.

91.      Home Service Professionals are not informed during the Membership Subscription purchasing process that they will be automatically enrolled in and charged for mHelpDesk following a one-month free trial.

92.      Former Employee E confirmed that sales representatives were incentivized to represent mHelpDesk as a complimentary membership feature because sales representatives received an $80 "kicker" or bonus for signing Home Service Professionals up for the service.  As a result of the compensation, Former Employee E stated that sales representatives would not present mHelpDesk as an option, and would not inform the Home Service Professionals that

there was an additional fee for the service.  Instead, sales representatives would either gloss over the add-on feature entirely, or simply state that a mHelpDesk representative would contact the Home Service Professional to discuss the service.

93.     As a result, Plaintiffs and Home Service Professionals were left to discover that, in addition to their annual Membership fee and per Lead fee, Defendants automatically charged their credit card or debited their checking account $59.99 - $99.00 a month for "mHelpDesk."

94.     Defendants did not notify or seek prior authorization from Plaintiffs and Class Members before activating and charging for mHelpDesk.

## IV.    THE LEAD GENERATION PROCESS IS A SHAM.

95.     Plaintiffs and the members of the Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads that are the product of a systemically flawed and illusory Lead generation and vetting service run by Defendants.

96.     Defendants acquire, generate and charge Plaintiffs and Home Service Professionals for Leads that are not from targeted, serious, qualified and/or project-ready Homeowners.   Instead, Defendants employ various methods that result in Plaintiffs and Home Service Professionals receiving and paying for a vast majority of Leads that are at best "cold calls" and more likely illusory.   Defendants' Lead generation process is systemically flawed in that it does not and cannot generate Leads of targeted, serious, qualified and project-ready Homeowners.

97.     IAC and HomeAdvisor utilize various persons and businesses to accomplish the fraud perpetuated on the Home Service Professionals.

98. **Direct Lead Generators**: IAC, HomeAdvisor and/or IAC through HomeAdvisor utilize companies, including One Planet Ops, Inc., HomeImprovement.net (owned by Global Ventures Network), and Buyerlink, that are in the business of generating consumer contact information for a variety of industries ("Direct Lead Generators").  Some Direct Lead Generators also buy and re-sell leads from other Lead Generators, like The Lead House, LLC, which generates leads which are then ultimately sold to buyers, like HomeAdvisor, through an auction-based system.  There are other Direct Lead Generators in the industry that HomeAdvisor may also be purchasing leads directly or indirectly from, including: Salesgenie, YOT7 Corp., LeadGenius, Inc. and Leadspace, Inc.

99. **Partner Affiliate Networks**:   IAC, HomeAdvisor and/or IAC through HomeAdvisor utilize Partner Affiliate Networks, including CJ Affiliate f/k/a Commission Junction (http://www.cj.com/) and Pepperjam (https://www.pepperjam.com/publishers/getting-started), to establish leads.  The Partner Affiliate Networks are businesses that connect "advertisers" like HomeAdvisor with "publishers" like bloggers and other businesses; publishers promote HomeAdvisor on their websites and generate leads that are then sent to HomeAdvisor in exchange for a payment to the "publisher".   The "publishers" are called **"Affiliate Program Partners"**.



http://www.homeadvisor.com/servlet/AffiliateSignupServlet (last visited 11/3/2016).

100.   **Home Improvement Branded Affiliates:**   IAC, HomeAdvisor and/or IAC through HomeAdvisor also utilize established companies and brands specifically in the home décor and home improvement business, including Better Homes and Gardens ("BH&G"), Home & Garden Television ("HGTV"), Bed Bath & Beyond ("BB&B"), and Wayfair, to generate Leads.   BH&G, HGTV, BB&B and Wayfair may also be HomeAdvisor Affiliate Program Partners.   Through such companies' websites and in store-promotions, Defendants generate Leads by obtaining contact information from persons who enter sweepstakes or who are interested in other promotional offerings but who are unaware that their information is being sent to HomeAdvisor and is being disseminated as a Lead to paying Home Service Professionals.

101.   The source of Leads is also confirmed by filings made by HomeAdvisor in a 2016 lawsuit, filed in federal court in Ohio, captioned *Johansen v. HomeAdvisor, Inc., et al.* Case No. 2:16-cv-00121 (U.S.D.C. S.D. Ohio)("*Johansen Action*"):

(a) The *Johansen Action* alleges that HomeAdvisor and One Planet Ops, Inc. ("One Planet") violated the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA") by placing telemarketing calls to a telephone number Mr. Johansen and others of a purported class of persons had registered on the National Do Not Call Registry for the purposes of advertising the services and securing new business for HomeAdvisor.

(b) The *Johansen Action* also alleges that Mr. Johansen *had twice previously* sued HomeAdvisor for calls made to him by third parties that engage in telemarketing to obtain new clients—once in September of 2014, and another lawsuit was filed in December of 2014.

102.    In response, HomeAdvisor filed a motion to dismiss the *Johansen Action* (*see,* Case: 2:16-cv-00121, Dkt. # 18, filed April 13, 2016), and attached and referenced therein the Declaration of  Matt Zurcher, the Senior Vice President, Customer Care at HomeAdvisor (*id.* Dkt. # 18-1, "Zurcher Decl.").  In its filings in the *Johansen Action,* HomeAdvisor attempted to escape liability for Leads allegedly generated in violation of the TCPA by claiming that it did not directly place or initiate the calls, but rather only purchased the unqualified Leads.  In denying responsibility for the Lead generation practices employed by affiliates and/or third-parties, HomeAdvisor attested to and revealed facts that give a glimpse into the true nature of HomeAdvisor's service, business practices and the nature and quality of the Leads:

(a) HomeAdvisor and One Planet are parties to a contract under which One Planet may sell consumer home services leads to HomeAdvisor ('Lead Supply Services Agreement'). (*Id.* at ¶ 8.) ....[T]he Lead Supply Services Agreement [ ] gives

HomeAdvisor an opportunity to purchase consumer Leads generated or aggregated by One Planet… (*Id.* at ¶ 9.)

(b) HomeAdvisor is not involved with and has no right to control the manner in which One Planet generates or obtains consumer leads. (*Id.* at ¶ 10.)

(c) One Planet operates an online marketing platform for the acquisition of locally targeted and category specific leads. (Ex. B, Declaration of Richard Lippincott [One Planet's Vice President, Marketplace] ("Lippincott Decl.") at ¶ 2.) These leads are generated through the websites of One Planet's operating companies and by contracting with third parties for the purchase of lead data. (*Id.*) One Planet does not place marketing telephone calls to consumers for purposes of generating leads. (*Id.*) In fact, One Planet does not operate a call center. (*Id.*) Once acquired, One Planet sells the leads to interested buyers. (*Id.* at ¶ 3.) To facilitate the acquisition and sale of leads, One Planet operates a real-time, automated ping-and-post system utilizing an application programming interface ("API"). (*Id.*) This API system is internally referred to as the "Marketplace". Through the API, independent affiliates can, at their discretion, ping One Planet's Marketplace with the intent of submitting consumer lead information. (*Id.*) Generally, once an affiliate's ping is received by the Marketplace, One Planet, in real-time, pings all potential purchasers. (*Id.*) Then, interested prospective purchasers respond back to the ping, through a ping response, indicating whether or not they intend to purchase the full lead information. (*Id.*) The highest posted bid wins the right to purchase the lead. (*Id.*) When a lead enters One Planet's system, One Planet does

not know, in advance, who will ultimately purchase the lead—or if the lead will be purchased at all. (*Id.* at ¶ 3.)

(d) Lead House, LLC had been an independent contractor supplying leads to One Planet. (*Id.* at ¶ 4.) Lead House is not a traditional telemarketer that makes telephone calls on behalf of its clients, selling the products of its clients. Rather, Lead House sells its own products—Leads. (*See id.* at ¶ 4.) Although One Planet does not direct or control the manner by which Lead House generates leads, One Planet only bargained for leads from Lead House that were to be generated from inquiries from individuals who completed an online form hosted by Lead House. (*Id.* at ¶¶ 5-6.) The form included confirmation of the consumer's express consent to receive marketing messages and telephone calls, and that such calls were generated in compliance with the law. (*Id.* at ¶ 6.)

(e) HomeAdvisor and Lead House have no business relationship, contractual or otherwise. (Zurcher Decl. at ¶ 7.) HomeAdvisor has not directly communicated with or contacted Lead House at any time. (*Id.*) HomeAdvisor was not aware of Lead House or of any relationship between One Planet and Lead House prior to receipt of the Complaint in the *Johansen Action*. (*Id.*)

103.    HomeAdvisor's filings in the *Johansen Action* confirm that HomeAdvisor and One Planet have maintained a lead supply services agreement since at least June 17, 2010 to generate volumes of unqualified Leads through methods that flatly contradict the characteristics and nature of the Leads and services for which Plaintiffs and the Home Service Professionals were being charged.

104. The source of the HomeAdvisor Leads is arbitrary, accomplished through cold-calling and conducted by third-parties that do not maintain a direct relationship with HomeAdvisor and/or who may not even be known to HomeAdvisor.

105. HomeAdvisor conceals the nature and genesis of its Leads by misrepresenting that Leads are exclusively generated and vetted through its patented ProFinder™ and ProLeads™ systems that are designed to weed out the casual internet browser from serious, qualified and project-ready Homeowners.

106. By its own admissions, HomeAdvisor acquires Leads from a variety of sources, including "affiliate websites, through telephone contacts from consumers, and through marketplace sources such as independent contractors" and ancillary lead supply services agreement. (*See* Zurcher Decl at ¶ 5.)

107. The Leads are the product of telemarketing, cold-calling, sweepstake entries and other third-party Lead generation companies and sources used by Defendants, a far cry from a process that would be designed and calculated to generate Leads that constitute qualified, project-ready Homeowners.

108. Defendants do not procure or vet the Leads, yet HomeAdvisor supplies and charges Home Service Professionals for the unsubstantiated Leads.

V.     **THE LEADS ARE A SHAM.**

109. Plaintiffs and the Class are not receiving Leads constituting targeted, serious, qualified or project-ready Homeowners. Leads are the product of Defendants' systemically flawed system and process, and are illusory as they are comprised of: wrong or disconnected phone numbers and contact information; persons who never even heard of HomeAdvisor; stale

Leads, including for projects that Homeowners completed months or years prior to the Lead being sent; contacts for homes that were listed for sale; and contacts for vacant or non-existent residences.

110.   The Plaintiffs and the Class of Home Service Professionals have been subjected, at each turn, to deceptive, coercive and unfair business practices employed by Defendants with respect to the Leads and the purported benefits of the Membership Programs:

(a) Defendants used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads that were required, yet Defendants sent to and charged the Home Service Professionals for such Leads.

(b) Defendants did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready Homeowners.

(c) Defendants charged the Home Service Professionals for Leads that were not qualified business opportunities.

(d) Defendants charged Plaintiffs and the members of the Class for Leads that have been sent to more than four Home Service Professionals.

(e) Defendants charged Home Service Professionals for mHelpDesk without knowledge or consent of the Home Service Professionals.

(f) Defendants systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to Home Service Professionals.

(g) Defendants employed tactics that prevent Home Service Professionals from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

**A.  Defendants' Former and Current Employees Confirm the Bogus Nature of the Leads.**

111.    Defendants' deficient Leads are the direct result of a systemically flawed Lead generation process in that it does not and cannot generate Leads of targeted, serious, qualified and project-ready Homeowners.

112.    Defendants' former and current employees have exposed and confirm details regarding the sham Leads that were and continue to be sold to the Home Service Professionals.

113.    Former Employee A, one of only two HomeAdvisor customer service managers, at the time, confirmed that HomeAdvisor's third-party affiliate Lead generation agreements were fundamentally flawed.

114.    According to Former Employee A, HomeAdvisor agreed to purchase Leads from third-parties in bulk.  The bulk Lead agreements incentivized third-parties to generate Leads by any means possible in order to satisfy the required number of Leads to trigger bulk purchases. Former Employee A stated that HomeAdvisor "knew their affiliates were doing shady things" to generate Leads.

115.    For example, Former Employee A specifically recalls HomeAdvisor's Lead agreement with Publishers Clearing House ("PCH") as "disastrous" because PCH had allegedly generated bogus Leads through PCH sweepstakes which HomeAdvisor bought, in bulk, and then supplied and charged Service Professionals for the illusory Leads.  Similarly, Former Employee B stated that her sales manager informed her that HomeAdvisor was buying contact information supplied by attendees at home shows and converting the information into phony Leads.

116.    The net result of these types of Lead acquisitions was Home Service Professionals paying for and contacting Leads who never submitted a service request; who were not familiar with HomeAdvisor; and who did not want to be contacted by Home Service Professionals.

117.    According to Former Employee A, by approximately July 2011, HomeAdvisor was acquiring more Leads from third-party affiliates than it was independently generating.  In resolving Home Service Professional disputes that were escalated, Former Employee A's credentials permitted him to view the Lead sources of each Lead a Home Service Professional had been supplied – a majority of which were Leads from affiliates.

118.    But, even the Leads HomeAdvisor creates internally are flawed.   A former ServiceMagic outbound consumer lead manager explained that her team would call clients looking for contractors with the goal to "up-sell them on additional services" which produced unqualified Leads.  The former employee described the process as follows:

> If a client was in need of a plumber, we were taught to envision ourselves in the client's bathroom and imagine all of the other problems there may be based on their initial problem. For example, if the client needed a plumber for a busted pipe, we would ask if they had flooding and needed flooring, tile, drywall, mold abatement, etc....If the client said yes or maybe in the future, the sales rep would put in a lead (which they were making commission on) and that lead would be sent to multiple contractors. The client's phone would then blow up with calls from professionals. Some would often call back and complain that they had more than 4 calling them.

119.    As a result of Defendants unmonitored and deceitful practices employed to generate unqualified and unverified Leads, Home Service Professionals constantly contact their sales representatives to complain about the Leads.   Former Employee E estimated that he

received 20-30 voicemails a day about the Leads from Home Service Professionals who said the "Leads were complete trash" or that the "Leads were bogus."

120.    Although HomeAdvisor instructed sales representatives to forward dissatisfied Home Service Professionals directly to customer service, Former E confirmed that Leads supplied to his Home Service Professionals appeared on other Lead generation sites, such as http://homeimprovement.net/.

121.    Former Employee E also had reason to believe that Leads were being replicated as purported new or different Leads.  He noticed in reviewing "bad" Leads that the *exact* same Leads were repeatedly being duplicated – including the same grammar, punctuation, and even grammatical errors – and the only variations were geographic location, and the Lead name and contact information.

122.    Defendants' former and current employees have spoken out on online forums about the systemically bogus Leads.  As a post by an author identified as a former HomeAdvisor sales employee confirms:  "***I personally believe they have a program running in the back ground [sic] to send contractors fake leads.  I was working with a contractor in California and I personally looked into EVERY lead HA sent him.  7 out of 10 were completely fabricated and I personally could not find the so called lead in internet searches (like google & yahoo) or even in the phone book…***"



**HomeAdvisor Review: Statement from an x- HA Sales employee**

Last Updated On: March 10, 2016
Filed On: March 10, 2016
By: x- HA Sales employee
Rating: **1** out of **5**

I worked at **Homeadvisor** for about 7 months until I got so sick of the BS, so I quit. Brad Foster is the VP of Denver Sales and he encourages an environment to where his managers (like C. Joseph) will train the new employees to LIE to contractors just to get a sale.

There are also sales policies in effect to where if a sales rep does not get at least 3 sales a week (no matter what) the will loose their job regardless on how long they have worked there. I have personally heard Bead Foster say things like, "I do not care if they get fired, we have new training classes every 2 weeks".

I personally believe they have a program running in the back ground to send contractors fake leads. I was working with a contractor in California and I personally looked into EVERY lead HA sent him. 7 out of 10 were completely fabricated and I personally could not find the so called lead in internet searches (like google & yahoo) or even in the phone book (yellow pages).

The idea of HA is awesome but the people running the company are greedy and will lie to you just to get your money. Consumer beware.....

*See* http://www.complaintslist.com/2016/homeadvisor-statement-from-an-x-ha-sales-employee/ (last visited 6/28/2016).

123.    A person who was identified as a former HomeAdvisor inside sales employee explained the bogus nature of the Leads as follows: "The 'leads' are awful! You're supposed to be calling contractors, ***I had leads that were churches and schools***.", and "In order to sell anything you have to memorize a FOUR PAGE archaic sales script that swindles contractors into spending thousands of dollars a year!" [sic].

Sep 17, 2016                                                                    Helpful (4)

**"Hell on earth"**
                    Former Employee - Inside Sales in Colorado Springs, CO

■ Doesn't Recommend          ▨ Neutral Outlook          ▨ No opinion of CEO

I worked at HomeAdvisor full-time (Less than a year)

**Pros**
The office is nice, that's literally it.

Calling this place hell on earth is an insult to actual hell bc it's that bad!

**Cons**
Where do I even begin?

The "leads" are awful! You're supposed to be calling contractors, I had leads that were churches and schools!

They make you clock in and out!

They use internet explorer. You don't even get a laptop. They micromanage everything. Our trainer told us we were using the restroom too much!

In order to sell anything you have to memorize a FOUR PAGE archaic sales script that swindles contractors into spending thousands of dollars a year!

Turnover is atrocious! I started with 14 ppl and six of us are gone.... In three weeks!

The managers don't do a thing! They walk around w yo yos and megaphones making sure their sales ppl are dialing all day!

Do not bother w this place!

Show Less

**Advice to Management**
Invest in decent tools: better salaries, benefits from the first day, decent leads, and Salesforce. Also turn down the awful music and get your managers off your employees backs!

*See*   https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P3.htm   (last   visited 11/2/2016).

124.    As a person identified as a former HomeAdvisor employee characterized the business: "Possibly one of the most insidious business strategies in the U.S. *Get your pro customers to pay for bogus leads, create extensive Fear & Loathing among them*, manipulate everyone & instigate false confidence in your customers [their clients] while ripping everyone off. Incredible !" [sic].



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P3.htm (last visited 11/2/2016).

125.    As described in the below post by an author identified as a then-current HomeAdvisor employee:  "I really think this is a terrible company for what they do to their clients they *lie to you to tell contractors they are giving the leads they are selling up to 3 other contractors in their area and really is [sic] is much more* and they charge up wards [sic] of 60 dollars for each lead." "Stop telling people they are doing a good thing when you know that you are ripping blue collar companies off!!"



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P17.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

126.    Another person identified as a former HomeAdvisor sales employee confirms that

the sales pitch is to "Lie to contractors about the leads being quality leads."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

127.    As described in the below post by a former HomeAdvisor employee: "Selling

product primarily to contractors who cannot afford it, ***and who receive bad-quality 'LEADS'***

***[sic]." "The entire situation is a racket***.  They are stealing money from the poor schmucks who

sign up. Don't coach your Sales Reps to sell through fear, and to *'omit' crucial facts to the customers signing up*. That's the same as lying."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

### B. The Plaintiffs' Experiences with HomeAdvisor and the Bogus Leads.

128.    Like the members of the Class of Home Service Professionals, Plaintiffs were subjected to Defendants' unfair, deceptive and fraudulent business practices as follows.

### **Plaintiff Airquip**

129.    On or about September 16, 2015, Plaintiff Airquip contacted HomeAdvisor and paid $347.98 for a HomeAdvisor Pro Connect[TM] membership.  During the call, Defendants' sales consultant touted how HomeAdvisor's proven ProLeads[TM] lead generation platform would grow Plaintiff Airquip's business through qualified, serious leads that would cost between $15 and $45 each depending on the service selected.

130.     Plaintiff Airquip received its first Leads on September 16, 2015 and within days began keeping a detailed lead log about the Leads.

131.     Over the course of six months, Plaintiff Airquip received approximately 180 Leads for $6,300.  The unpredictable fee associated with each Lead fluctuated between $8 and over $86 – nearly double the maximum Lead fee quoted by Defendants' sales consultant.  The following is an example of the purportedly "proven" ProLeads for which Plaintiffs was charged. Of the 180 Leads, Plaintiff Airquip encountered a variety of systemic issues concerning the legitimacy and viability of the Leads:

(a) **Disconnected phone numbers or non-working voicemails:**  Plaintiffs routinely received Leads that contained out-of-service or non-working phone numbers. Many of Plaintiff Airquip's attempts to contact Leads were futile because the phone numbers continuously rang until disconnecting, or a voicemail, often automated, would pick up, but then inform Plaintiff Airquip that a message could not be recorded since the voicemail was either not set up or was full.

(b) **Outside the service area:**  Plaintiff Airquip services the Rochester, New York region and its Lead geographic parameters reflected such.  However, Plaintiff Airquip received and paid as much as $86 for Leads from as far away as Massachusetts and Florida.

(c) **Stale Leads:**  On several occasions Plaintiff Airquip contacted Leads within hours of when they were received only to learn that the service request had already been completed, sometimes even weeks before the Lead was received, or that another service professional had already been selected.

(d) **Lead was not the Homeowner:**  Several Leads that were successfully contacted informed Plaintiff Airquip that they were not the homeowner of the property; therefore they were not seeking the service indicated on the Lead and questioned how their contact information was obtained.

(e) **Lead submission denial:**  Numerous Leads full-heartedly denied submitting any service request through HomeAdvisor.com and some leads were completely unfamiliar with HomeAdvisor. Yet, Plaintiff Airquip was still required to pay as much as $50.99 for these unsubstantiated Leads.

(f) **Inaccurate Lead contact information:** For several, when Plaintiff Airquip called the phone number provided in the Lead, the person answering claimed that they did not know the person who was identified in the Lead.  Also, Plaintiff Airquip was told that the individual listed on the Lead was deceased.

132.    In agreeing to pay for a membership and each Lead, Plaintiff Airquip relied on Defendants' representations concerning its vetted and quality Lead service.  Had HomeAdvisor disclosed that the Leads were illusory, Plaintiff Airquip would not have agreed to subscribe to an annual membership or pay for Leads.

133.    Additionally, prior to Plaintiff Airquip paying for its Pro Connect[TM] membership, neither Defendants nor any of their representatives informed Plaintiff Airquip that it would be automatically enrolled in mHelpDesk at a rate of $59.99 a month following a one-month free trial.  Plaintiff Airquip only learned of the mHelpDesk product when Defendants' sales consultant contacted Plaintiff Airquip during the trial period to activate the system.  Plaintiff Airquip, at that time, informed the consultant that it was not interested in the product and

requested that the service be terminated. Irrespective of Plaintiff Airquip's request, HomeAdvisor charged Plaintiff Airquip $59.99 a month for a system they never accessed.

134.    On or around March 23, 2016, Plaintiff Airquip terminated its subscription with HomeAdvisor. In total, Plaintiff Airquip paid in excess of $7,200 for HomeAdvisor's Pro Connect™ membership, mHelpDesk, and Leads. As a result of Defendants' conduct, Plaintiff Airquip has been injured.

**Plaintiff DaSilva**

135.    On or about November 5, 2015, a HomeAdvisor sales representative contacted Plaintiff DaSilva. The sales representative conveyed that HomeAdvisor only had one or two other Home Service Professionals performing marble polishing and surfacing services in Plaintiff DaSilva's area and HomeAdvisor needed more contractors to fulfill requests from targeted, serious, project-ready Homeowners. The sales representative assured Plaintiff DaSilva that if she encountered *any* issues with the Leads that HomeAdvisor would simply issue a refund or replace the Lead. According to the sales representative, Plaintiff DaSilva had "nothing to lose." Based upon these representations, Plaintiff DaSilva paid $347.98 for a HomeAdvisor Pro Connect™ membership.

136.    Within the first month, Plaintiff DaSilva received approximately 25 Leads for which she was charged over $715. The unpredictable fee associated with each Lead fluctuated from $13 to approximately $60 depending on the service selected and whether it was a Market Match or Exact Match Lead.

137.    Plaintiff DaSilva immediately encountered problems with the Leads. Plaintiff DaSilva received Leads that consisted of disconnected phone numbers; persons stating that they

were not the Homeowner of the property and were not interested in the service; Leads for services Plaintiff DaSilva did not offer; and even a Lead with a fictitious address.   Yet, the most common Lead deficiency Plaintiff DaSilva confronted were Homeowners that informed her that she was not the first or the fourth HomeAdvisor Home Service Professional to contact them, but the ***tenth or even twentieth HomeAdvisor Home Service Professional***.   Plaintiff DaSilva was under the impression that there were only one or two other competitors in the HomeAdvisor network, but according to the Homeowners they were being inundated with unwelcomed calls.

138.    Plaintiff DaSilva attempted, unsuccessfully, to contact her sales representative to complain about the quality of the Leads, but her calls were forwarded to customer service. Plaintiff DaSilva requested credits for the bogus Leads, but in contradiction to the information provided by the sales representative that sold Plaintiff DaSilva the membership, HomeAdvisor did not willingly issue Lead credits.   Plaintiff DaSilva was only issued a few credits for the deficient Leads.

139.    Shortly thereafter, Plaintiff DaSilva contacted HomeAdvisor to cancel the membership because she could no longer reasonably justify wasting any money on bogus Leads. Rather than cancel the membership, HomeAdvisor offered to adjust Plaintiff DaSilva's Lead mode.   The "Opportunity Leads" would permit Plaintiff DaSilva to view limited Lead descriptions and choose whether to accept, and be charged, only for the Leads she selected.

140.    Plaintiff DaSilva accepted a few Opportunity Leads which, unbeknownst to her, incurred a premium Lead fee charge.   Unfortunately, the Lead quality was no better.   The Leads were for fictitious people, or Homeowners who were furious because they had been contacted by

countless other HomeAdvisor Home Service Professionals.  As a result, Plaintiff DaSilva stopped accepting Leads.

141.    Then in April 2016, Plaintiff DaSilva discovered that HomeAdvisor had been charging her $59.99 for four months for mHelpDesk.  At no time had HomeAdvisor informed Plaintiff DaSilva that she would be automatically enrolled in mHelpDesk at a rate of $59.99 a month following a one-month free trial.  Plaintiff DaSilva immediately notified HomeAdvisor that she wished to terminate and cancelled the credit card linked to her HomeAdvisor account.

142.    Plaintiff DaSilva did not receive any Leads or charges after April 2016, until HomeAdvisor fraudulently tried to charge a Lead fee of $55.69 to the credit card on file on September 23, 2016.  HomeAdvisor assessed a $20 fee for the rejected credit card and issued, on October 11, 2016, Plaintiff DaSilva a final notice that her account will be sent to a collection agency if she does not pay $75.69.

143.    In total, Plaintiff DaSilva has been charged over $1,500 for HomeAdvisor's Pro Connect$^{TM}$ membership, mHelpDesk, and Leads.  Plaintiff DaSilva has been injured as a result of Defendants' conduct.  In agreeing to pay for a membership and each Lead, Plaintiff DaSilva relied on Defendants' representations concerning its vetted and quality Lead service.  Had HomeAdvisor disclosed that the Leads were illusory, Plaintiff DaSilva would not have agreed to subscribe to an annual membership or pay for Leads.

**Plaintiff Gray**

144.    Plaintiff Gray contacted HomeAdvisor in December 2015 to learn whether the service could assist her in her efforts to market and acquire new clients for her cleaning and janitorial business.   The HomeAdvisor sales representative assured her that the Leads were

targeted, verified, pre-screened Leads in Plaintiff Gray's area, and that Plaintiff Gray would have full control over the Lead flow and budget.  Plaintiff Gray was tentative about the service and unwilling to sign up at that time, so the HomeAdvisor sales representative offered her "preview Leads", which according to HomeAdvisor are samples of actual, targeted Leads that match the prospective Home Service Professional's profile.   The HomeAdvisor sales representative persistently contacted Plaintiff Gray for over a month, until she signed up and paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about February 4, 2016.

145.   Upon activation of the Leads, Plaintiff Gray began encountering repetitive deficiencies with the Leads for which she was incurring Leads fees that ranged from $16 to over $55 per Lead.   Plaintiff Gray received Leads that had disconnected phone numbers, numbers that went to fax lines and numbers that rang incessantly before disconnecting.  Plaintiff Gray even received duplicate Leads and Leads with fictitious addresses.   Of the few Homeowners Plaintiff Gray was able to successfully contact, her calls were unwelcomed because the Homeowners claimed they did not submit any request through HomeAdvisor and demanded to know how Plaintiff Gray received their contact information.

146.   Plaintiff Gray contacted HomeAdvisor on several occasions to complain about the quality of the Leads and to request Lead credits, which HomeAdvisor required her to submit through the HomeAdvisor Pro portal.  Although some Lead credits were issued to Plaintiff Gray, the Lead credit request process was cumbersome and arbitrary.   Additionally, in April 2016, Plaintiff Gray discovered that HomeAdvisor had charged her $59.99 for mHelpDesk on her March and April statement.   At no time had HomeAdvisor informed Plaintiff Gray that she would be automatically enrolled in mHelpDesk at a rate of $59.99 a month following a one-

month free trial.  Plaintiff Gray demanded a refund and was credited for the $59.99 charge on the April statement.

147.    Furthermore, in contrast to HomeAdvisor's assertions that the service granted the Home Service Professional the ability to establish and monitor monthly Lead budgets, Plaintiff Gray's monthly budget was continuously surpassed.  After receiving and paying for so many bogus Leads, Plaintiff Gray decreased her Lead budget to $200 a month – $100 for Exact Match Leads and $100 for Market Match Leads.  But, HomeAdvisor routinely charged and withdrew the monthly Lead allowance on a *weekly* basis.  When Plaintiff Gray contacted HomeAdvisor about the unauthorized charges and account discrepancy, HomeAdvisor justified its actions by claiming that Plaintiff Gray "must have" frozen her Leads during the week, thereby initiating a new budget.  However, Plaintiff Gray had not frozen her leads, nor was she informed that freezing Leads would essentially "reset" her monthly Lead budget.

148.    In total, Plaintiff Gray received over 170 Leads and was charged approximately $4,500 for HomeAdvisor's Pro Connect™ membership, mHelpDesk, and Leads.  As a result of Defendants' conduct Plaintiff Gray has been injured and is in jeopardy of being evicted from her residence because the cost associated with her HomeAdvisor service far exceeded the costs she had anticipated, and no lucrative jobs were secured from the service.  In agreeing to pay for a membership and each Lead, Plaintiff Gray relied on Defendants' representations concerning its vetted, quality, budget-conscious Lead service. Had HomeAdvisor disclosed the true nature and quality of the Membership Program and Leads, Plaintiff Gray would not have agreed to subscribe to an annual membership or pay for Leads.

149.    The Plaintiffs' experiences, as corroborated by the complaints by other Home Service Professionals (*see infra*) and the information shared by HomeAdvisor's former employees, confirm that HomeAdvisor has engaged in a uniform and fraudulent scheme to induce Home Service Professionals to pay for Membership Programs and Leads that were a sham, and that IAC and HomeAdvisor falsified and concealed the nature and quality of the Leads to generate millions of dollars in revenue from the Home Service Professionals.

150.    As a result of Defendants' unfair, deceptive and fraudulent business practices, Home Service Professionals and Plaintiffs have suffered substantial and an ascertainable loss of money.

151.    Defendants have operated a scheme designed to bestow significant financial benefits upon themselves to the detriment of Plaintiffs and the Class.  Had Defendants not concealed and falsely characterized the true nature of the Membership Programs and the Leads, Plaintiffs and the Class would not have paid millions of dollars for the Membership Programs and Leads.

### C.    *Home Service Professionals Nationwide Have Been Subjected to the Fraud.*

152.    Home Service Professionals nationwide have confirmed that HomeAdvisor has engaged in a uniform and fraudulent scheme to induce Home Service Professionals to pay for Membership Programs and Leads that were a sham, and that IAC and HomeAdvisor falsified and concealed the nature and quality of the Leads to generate millions of dollars in revenue from the Home Service Professionals.

*CALIFORNIA*

153.     A California based landscaper and pool maintenance contractor was contacted by HomeAdvisor in August 2015. Based upon the representations made over the phone by the HomeAdvisor sales representative concerning the quality of the Leads, the Home Service Professional signed up and paid for a Pro Connect<sup>TM</sup> membership.   The sales representative also informed the Home Service Professional that the membership included mHelpDesk and that he would be contacted by a representative about the service.

154.     Shortly thereafter, the Home Service Professional began to notice that a majority of the Leads were deficient.  The Leads he was charged for consisted of, *inter alia*, disconnected phone numbers, wrong numbers, people claiming they never submitted a service request, duplicate Leads, competitors testing the system, Leads that were contacted by over 5 HomeAdvisor Home Service Professionals, Leads containing bogus names, such as "123 ABC." In addition to the Lead fees, the Home Service Professional discovered, after reviewing his statements, that he was charged $99/month for mHelpDesk.

155.     The Home Service Professional contacted HomeAdvisor and requested to cancel his membership; however, HomeAdvisor did not process the cancellation and continued to send the Home Service Professional Leads for over 30 days and charged him $900 in Lead fees.  The Home Service Professional refused to pay HomeAdvisor for the Lead fees incurred after he requested to cancel his service.  Thereafter, HomeAdvisor sent the Home Service Professional's account to Credit Mediators Inc. (CMI) for collections.

*CONNECTICUT*

156.   A Connecticut based landscaper was contacted by HomeAdvisor in July 2016 and told that there were a lot of landscaping requests from Homeowners in his area and HomeAdvisor was looking for qualified contractors who would be interested in the Leads – which only cost $10 each.   Based on these representations, the Home Service Professional signed up for a Pro Connect™ membership.

157.   The Home Service Professional immediately encountered issues with the Leads. The first Lead was for a service he did not offer. He immediately called HomeAdvisor and demanded a credit.  The sales manager that he spoke with assured him he would be credited, but no such credit was ever received.  Within a month, the Home Service Professional received 13 Leads that ranged in price from $11-$20 per Lead.  Of the 13 Leads he only spoke to two Homeowners, but no landscaping job was secured from either Lead.   The 11 other Leads consisted of disconnected phone numbers, non-existent addresses, a competitor testing the system, Homeowners claiming they did not want the work done,  and incorrect email addresses.

158.   By the end of his first month, the Home Service Professional had been charged over $530 and his bank account had been over drafted because HomeAdvisor withdrew from his bank account on a weekly basis, rather than on a monthly basis as communicated by the sales representative. The Service Professional attempted to contact his sales representative several times to resolve these issues.  When he finally reached a representative he requested to cancel his service.  The Home Service Professional was transferred to four different representatives who tried to convince him not to cancel his membership and offered him Lead credits.  The Home Service Professional, thoroughly frustrated by the entire scheme, terminated the membership.

159.    Within days of cancelling the membership, the Home Service Professional began receiving multiple calls from HomeAdvisor sales representatives pleading with him to re-activate his membership and even offered him 5 free Leads.  The Home Service Professional declined and requested that HomeAdvisor stop calling him.

### MARYLAND

160.    A home remodeling contractor located in Maryland contacted HomeAdvisor in August 2016 to learn about the offered services.  The HomeAdvisor sales representative described HomeAdvisor's ProLeads$^{TM}$ as verified, pre-screened Leads and indicated that the Leads were only distributed to a total of three Home Service Professionals in HomeAdvisor's network.  Based upon these representations, the Home Service Professional agreed to purchase a Pro Connect$^{TM}$ Membership.

161.    Once the membership was activated, the Home Service Professional began receiving Leads and his account was charged, on average, $87 *per* Lead.  The Home Service Professional experienced recurring issues with the Leads, including Leads consisting of fictitious addresses and disconnected phone numbers.  Of the few Leads he was able to successfully contact, the frustrated Homeowners informed him that he was the fifth or more HomeAdvisor Home Service Professional to contact them.

162.    When the Home Service Professional contacted HomeAdvisor to complain about the quality of the service and over distribution of the Leads, the HomeAdvisor customer service representative confessed that Leads are routinely distributed to ***five or more contractors***.  Upon learning this information, the Home Service Professional requested to freeze his Lead generation services.  However, unbeknownst to the Home Service Professional, HomeAdvisor reactivated

the Leads on several occasions and continued to charge his account without proper notification and authorization.

163.    In total, the Home Service Professional received about 40-50 Leads and was charged, on average, $87 *per* Lead. Had the Home Service Professional not been misled about the true nature and quality of the Membership Program and Leads, he would not have signed up and paid for a membership.

### MASSACHUSETTS

164.    In August 2015, a construction company in Massachusetts paid for a Pro Connect[TM] membership based upon the representations made over the phone by the HomeAdvisor sales representative.  The Home Service Professional was told that he would receive targeted, qualified Leads in his area.  At no point during registration process was he informed that he would be charged for each and every Lead, whether he was able to successfully make contact with the Lead or not.

165.    The Home Service Professional was charged approximately $85 for each of the 35 or so Leads that he received.  A majority of the Leads were unviable Leads.  They consisted of unresponsive Leads, people claiming they never owned the property, homeowners stating that he was the fifth or sixth HomeAdvisor Service Professional to contact them.

166.    When the Home Service Professional contacted HomeAdvisor about the issues and demanded Lead credits, HomeAdvisor denied the requests claiming that those scenarios did not qualify for Lead credits and suggested that the Home Service Professional continue calling the unresponsive Leads. As a result, the Home Service Professional terminated his membership

and refused to pay the outstanding $1,400 in Lead fees.  HomeAdvisor has now sent his account to collections.

### MINNESOTA

167.    In January 2016, a roofing contractor operating out of Minnesota signed up for a Pro Connect™ membership with HomeAdvisor with the expectation that he would receive qualified Leads from project-ready homeowners.

168.    Immediately upon receiving the first Leads the Home Service Professional became suspicious of the Leads because the Leads were completely unresponsive, he spoke to Homeowners that claimed they had already been contacted by five other HomeAdvisor Service Professionals, and other Leads stated they were not the homeowners. The Home Service Professional even contacted an Exact Match Lead who informed him that 4 other HomeAdvisor Service Professionals had already contacted him. The Home Service Professional received a total of 30 Leads, 22 of which he deemed to be bad Leads.  Each Lead fee ranged between $38 and $122.  The Home Service Professional paid a total of $1,800 for the Leads, in addition to the hidden mHelpDesk fees.

169.    Within a month of signing up for the membership, the Home Service Professional felt terribly misled and contacted HomeAdvisor to request that the membership be cancelled and that he be refunded for the 22 bad Leads.  HomeAdvisor refused to refund the Home Service Professional, but confirmed that his membership would be cancelled.

170.    Three weeks later, the Home Service Professional learned that the service was not cancelled, but instead the Leads had been paused. The Home Service Professional attempted to cancel his membership three more times before it was finally cancelled in June 2016.

171.    The Home Service Professional recorded his calls with HomeAdvisor to document the issues he was encountered when requesting Lead credits and cancellation of the service.   He posted these videos on YouTube.com to expose HomeAdvisor for its fraudulent business practices.   Upon learning about the YouTube videos, HomeAdvisor offered the Home Service Professional $1,000 to take down the video recordings, which the Home Service Professional declined.

### *MISSOURI*

172.    A painter in Missouri signed up for a HomeAdvisor Pro Connect$^{TM}$ membership in February 2016.   While the Home Service Professional had his Leads activated, he received 10 Leads which cost him about $30 each.   Several of the Leads were for work the Home Service Professional did not perform.   Many Leads never answered their phones or replied to emails, and when the Home Service Professional was able to successfully contact the Leads he was told that the Homeowners had never gone on HomeAdvisor's website to submit a service request.

173.    After this experience with HomeAdvisor's Lead service, he froze the Leads.   In agreeing to pay for a membership and each Lead, the Home Service Professional relied on Defendants' representations concerning its vetted and quality Lead service.   Had HomeAdvisor disclosed that the Leads were illusory, the Service Professional would not have agreed to subscribe to an annual membership or pay for Leads.

### *NEW JERSEY*

174.    In December 2014, a New Jersey architecture firm spoke with a HomeAdvisor sales representative who described HomeAdvisor's ProLeads$^{TM}$ as qualified new business opportunities from targeted, verified, project-ready Homeowners. When asked about

HomeAdvisor's refund policy for bad Leads, the sales representative assured the architect that HomeAdvisor would credit any Lead that was, *inter alia*, unresponsive or if the Lead was a competitor testing the system. Based upon these representations, the architect paid for a Pro Connect[TM] membership and began receiving Leads.

175.    In 2015, the architect received over 25 Leads with Lead fees that ranged from $38 to $85. The Leads were almost entirely bogus.  A majority of the Leads had numbers that either rang incessantly because no voicemails were set up or had automated voicemails, none of which resulted in a return phone call.  Of all the Leads, the architect successfully contacted only four people, all of whom stated they did not submit any such request and were not interested in having any work performed. The architect contacted HomeAdvisor several times to request Lead credits for the deficient Leads which, according to the HomeAdvisor sales representative, were eligible for credits; however, all Lead credit requests were denied.

176.    Dissatisfied with the quality of the service, the architect attempted to cancel the service several times, but the HomeAdvisor representatives implemented barriers intended to make it difficult to cancel the service by continuously forwarding the architect from person to person and department to department.  After spending a considerable amount of time on the phone, the cancellation attempts only amounted to temporary deactivation of the Lead service.

177.    During these cancellation attempts, the architect did indicate that he did not wish to renew the subscription; however, HomeAdvisor disregarded the request and automatically renewed and charged the architect $287.99 in December 2015 for another annual membership. Since then, the architect has mindfully monitored the account to keep the Lead generation service deactivated to avoid incurring wasteful charges.

178.    As of November 2016, the architect contacted HomeAdvisor to request and confirm that the membership will not renew again in December 2016.  Since the service cannot be terminated online, the architect is fearful that HomeAdvisor will disregard the request and charge him another membership fee.  Had the architect not been misled about the true nature and quality of the Membership Program and Leads, he would not have signed up and paid for a membership and each Lead.

### OHIO

179.    A  painter  based  in  Ohio  signed  up  for  a  HomeAdvisor  Pro  Connect[TM] membership in February 2016.  Within just 10 days, the Home Service Professional was charged almost $1,200 for the membership fee and Leads.  The Leads that the Home Service Professional was  charged  for  included  services  that  he  did  not  perform,  Homeowners  that  already  had estimates from other contractors, Homeowners not interested in speaking to the Home Service Professional, and unresponsive Leads.

180.    The Home Service Professional is the owner of a small business and the charges incurred  from  the  HomeAdvisor  membership  and  Leads  hurt  his  business.    He  contacted HomeAdvisor to explain the deficiency of the Leads, but HomeAdvisor was unwavering and informed him that he was not entitled to any money back.    As a result, the Home Service Professional terminated his membership the same month he opened it.

### PENNSYLVANIA

181.    A  Pennsylvania  based  interior  and  exterior  remodeling  Home  Service Professional,  servicing  northwestern  Pennsylvania  and  western  New  York,  contacted HomeAdvisor in August 2016 to learn about the offered services.  The HomeAdvisor sales

representative described HomeAdvisor's ProLeads[TM] as verified, pre-screened Leads from project-ready homeowners in the Home Service Professional's targeted geographic region. Based upon these representations, the Home Service Professional agreed to purchase a Pro Connect[TM] Membership.

182.    Over the course of four months, the Home Service Professional received approximately 15 Leads.  The Home Service Professional was not informed what the Lead fee for each Lead would be prior to being charged nearly $100 for each Lead.   In addition to surpassing his spend ceiling of $400 a month by charging him almost $800 in a single month, the Home Service Professional immediately encountered a variety of systemic issues concerning the legitimacy and viability of the Leads upon activation of the service including, *inter alia*: disconnected phone numbers; duplicate Leads; Leads for services not performed by the Home Service Professional or outside the target geographic region; phone numbers that rang incessantly before disconnecting; and Leads claiming that they never submitted a request through HomeAdvisor's website.

183.    The Home Service Professional credit requests for bogus Leads were routinely denied.  HomeAdvisor even implemented an ad hoc policy requiring the Service Professional to submit credit requests within 24 hours which violated HomeAdvisor's Lead Credit Guidelines which state that, "[c]redits must be requested…within 30 days of the date that the charge was incurred." *See* https://pro.homeadvisor.com/terms/lead-credit-guidelines/ (Last visited 11/2/16).

184.    After being charged nearly $2,000 for the service within just four months the Home Service Professional froze his Lead generation service and will not renew his membership with HomeAdvisor.

*TEXAS*

185.    In October 2016, a master carpenter operating out of a small town in Texas signed up for a Pro Connect[TM] membership with HomeAdvisor with the expectation that he would receive qualified Leads from project-ready homeowners.

186.    Within the first day of signing up for the service, the Home Service Professional received four Leads for $60-$80 each.  When he contacted the Homeowners, all four claimed to have never heard of HomeAdvisor.  The Home Service Professional received another Lead which he followed up with several times before the Homeowner informed him that he did not know anything about a service request and had no pending home projects that would require the Home Service Professional's expertise.  Another Lead the Home Service Professional contacted told him that the project was completed by Lowe's six weeks earlier.

187.    The Home Service Professional received a total of 8 unqualified Leads.  He immediately terminated his HomeAdvisor membership and submitted a fraud claim to his bank.

*VIRGINIA*

188.    A Virginia based kitchen and bathroom remodeling Home Service Professional in the Virginia Beach region signed up with HomeAdvisor in December 2015 and paid $347.98 for a HomeAdvisor Pro Connect[TM] annual Membership.  Based upon the representations made over the phone by the HomeAdvisor sales consultant during the sign up process, the Home Service Professional believed he was paying for a Lead generation service that would supply him Leads from targeted, serious, qualified and project-ready Homeowners in his service area. Unbeknownst to him, the Pro Connect[TM] membership also automatically enrolled him in mHelpDesk, a cloud-based software program for $99.99 a month after the first month.

189.    Within ten days the Home Service Professional received ten leads and was charged more than $700 for the Leads.  Below is an accurate summary of the issues concerning the legitimacy and viability of the Leads supplied to the Home Service Professional by HomeAdvisor.

| Lead | Date | Requested Service | Lead Fee | Match Type | Issue |
|------|------|-------------------|----------|------------|-------|
| 1 | Dec. 11, 2015 | Remodel a Kitchen | $ 63.04 | Market | Automated recording stated that the customer was not receiving calls. |
| 2 | Dec. 12, 2015 | Remodel a Kitchen | $ 94.56 | Exact | Fully renovated home, including a new kitchen, had just been listed for sale 7 days earlier and the phone number for this Lead was a landline in Gasburg, VA, located over 2 hours away from Virginia Beach. |
| 3 | Dec. 13, 2015 | Remodel a Kitchen | $ 94.56 | Exact | Address did not exist. |
| 4 | Dec. 15, 2015 | Build/Replace a Deck/Non-Masonry Porch | $ 47.46 | Market | Customer was not interested in proceeding with the project. |
| 5 | Dec. 17, 2015 | Remodel a Bathroom | $ 62.91 | Market | Scheduled an appointment with this customer, only to have the customer cancel. |
| 6 | Dec. 19, 2015 | Remodel a Bathroom | $ 62.91 | Market | Customer was already under contract with another contractor. |
| 7 | Dec. 19, 2015 | Build an Addition | $ 62.58 | Market | Recently renovated home was on the market for sale. |
| 8 | Dec. 20, 2015 | Remodel a Bathroom | $ 62.91 | Market | Phone number not in service. |
| 9 | Dec. 21, 2015 | Remodel/Renovate One or More Rooms | $ 63.04 | Market | Customer already had a contractor for the job. |
| 10 | Dec. 22, 2015 | Remodel a Kitchen | $ 94.56 | Exact | Customer was only interested in a ballpark estimate. |
| | **Total Cost for Leads** | | **$ 708.53** | | |

190.    The images below appeared in the property listing which showcased a newly remolded kitchen for which the Service Professional was charged $94.56.



191.    Over the course of the ten days the Service Professional was charged over $700 for ten Leads, none of which were qualified business opportunities from project-ready homeowners.  The Service Professional demanded refunds for the bad Leads, but was initially only offered one "credit" for the Lead that had a disconnected phone number because his account manager stated that the other scenarios were not eligible for Lead credits.

192.    The Home Service Professional threatened to cancel his service and file a formal complaint with the Federal Trade Commission because he was charged over $700 for invalid, bogus Leads – the Service Professional did not secure a single job from the Leads, let alone even have an opportunity to submit a proposal for a job.  The Home Service Professional's persistent demands for a full refund were escalated and eventually he was fully reimbursed for all nine of the unqualified Leads.  He did not cancel his HomeAdvisor account, which will expire in December 2016, since he paid in full, the non-fundable fee of $347.98 for the annual Membership.  But, to prevent further charges, the Lead generation service was frozen and will remain deactivated, and mHelpDesk service was discontinued.   Had the Home Service Professional known the true nature and quality of the Membership Program and Leads, he would not have signed up and paid for the Membership Program.

### Online Complaints Lodged by Home Service Professionals

193.    In addition to the direct testimonials provided by Home Service Professionals, the complaints lodged by Home Service Professionals on consumer complaint blogs are profuse and consistent, in their experiences and that the Leads they were charged for are illusory, not as advertised and generated from unqualified and unsuspecting prospects (just like in Mr. Johansen's situation).

194.    This Home Service Professional's experience, posted on "Complaints List",

http://www.complaintslist.com/2015/stay-away-from-home-advisors/ (last visited 11/10/2016),

precisely summarizes Defendants' fraudulent scheme. The Home Service Professional from

California stated that HomeAdvisor is an "unethical company" that uses "guerilla sales tactics"

and "continuous badgering", "pressuring contractors in to considering the service and then

blatantly lying to them so they sign up".  When the Home Service Professional cancelled his

membership within six days of signing up, not only was his request for a refund denied, but

HomeAdvisor threatened to send him to collections.

**Stay away from them** - HomeAdvisor

Last Updated On: June 24, 2016
Filed On: April 24, 2015
By:
Rating: **1** out of **5**
Reported Customer Loss = **$347.04**

CONRACTORS AND CONSUMERS BEWARE!

**Home Advisors** use guerilla sales tactics to lure contractors into their referral system. Consumers; please keep in mind that the recommendations you see posted are supplied by the contractors themselves. When you "hand pick" the people to recommend your business it's impossible to NOT get 5 stars!

After continuous badgering, weeks of almost daily phone solicitation by one of their very aggressive salespeople, we agreed to give their referral service a try (how I wish I had looked into "**Home Advisors**" complaints first.) The sheer volume of complaints is mind boggling. This is a dishonest, despicable company! The salesperson we dealt with, an Amy Larkin, flat out lied – not once or twice but numerous times when I questioned her about how Home Advisors charged the contractors for the "leads." I asked Ms. Larkin on three separate occasions' this basic question and fundamental question; "So, we as contractors only pay Home Advisors if we actually do some kind of work for the homeowner you've referred to us…is that Correct?" and Amy replied, "Yes, that is absolutely correct."

Based on the massive amount of complaints against Home Advisors this type of "sales tactics," pressuring contractors in to considering the service and then blatantly lying to them so they sign up must be the norm for this unethical company.

When I discovered that the salesperson had lied, I immediately called to cancel out service. We were with home advisors for six days, and ran up a whopping $347 bill (this included lead charges for two homes in a city that was a four hour round trip drive – two and a half hours beyond any area we advertise in or make calls to.)

When I called to cancel and get a refund the customer service rep actually laughed and said "that's not going to happen," clearly a less than professional response from a company that I will be reporting to the Better Business Bureau. The sheer volume of complaints made about Home Advisors to various reporting agencies, and particularly the "Better Business Bureau" is beyond belief.

Now, after disputing the charges that were applied to our credit card and having our credit card company investigate and uphold the disputed charges. Home Advisors is now calling our company and threatening to send us to collections.

Again, and I cannot be more emphatic, STAY AWAY FROM HOME ADVISORS!!!! No one gets a square deal with this company…..not the contractor or the consumer!

195.    This contractor posted his experience to HomeAdvisor's Facebook page "Visitor Posts" from June 29, 2016, highlighting that the Leads had bad phone numbers and fake emails, and when he stopped the automatic payment for Leads, HomeAdvisor contacted him and told him that qualifying Leads before charging Home Service Professionals did not "work out" for HomeAdvisor:



196.    Similarly, the following Home Service Professional identified on "Complaints List", http://www.complaintslist.com/2013/home-advisor-bogus-leads/ (last visited 7/1/2016), that the Leads he received were for a non-existent Homeowner, for an address that did not exist, and for phone numbers that did not work:

197.   This Home Service Professional identified that he spent $3,000 for very bad Leads ("Complaints List", http://www.complaintslist.com/2016/home-advisor-is-a-scam/ (last visited 7/1/2016)):



198.   A Home Service Professional posted on "Pissed Consumer" (March 4, 2016, http://homeadvisor.pissedconsumer.com/deceitful-sales-pitch-false-leads-huge-waste-of-money-20160304803113.html (last visited 7/1/2016)), noting that the Leads had false information, including incorrect phone numbers and a project for tree trimming, when the Home Service Professional provides home remodeling services:



If you are a business owner: STAY AWAY FROM HOMEADVISOR.

When looking into the company and speaking with "sales" people, they promised that their leads were vetted, that we could adjust the frequency and amount of leads and that the submitted requests were verified for accuracy. None of that is true!

8/10 leads have false information - incorrect phone numbers, project category (we are a home remodel/renovation company, not tree trimmers), phase of project (as in, not actually interested in talking to a contractor, just wants general pricing) or you just NEVER get a response.

We have invested $2k and, as a new company struggling to grow, are INCREDIBLY disappointed, annoyed and, honestly, furious about the "leads" we are being charged ridiculous amounts for and the lies we were told when we signed up.

They are making INSANE amounts of money from the phony leads they send. As the owner, office manager and marketing manager of our company, this was pitched as a very promising lead generator and has turned into a pit of wasted money, time and energy.

199.    Another Home Service Professional confirmed the bogus nature of the Leads on "ResellerRatings", http://www.resellerratings.com/store/HomeAdvisor (last visited 7/1/2016):

★★★★★ **1/5**    📅 2016-02-17

salah968

IT'S A SCAM don't use them

"I realized that Home Advisors lied to me like they did to many other contractors to let me accept their service under high pressured sign up, I was flooded with bogus leads most of them were out of my service area, the leads were so bad I couldn't get in touch with almost any of the customers or they said they didn't request any service or they had already been called 3 or 4 times by other contractors, HA sells the same leads to many numbers of contractors who all pay for. In addition many leads were out of my service area.
I called HA customer service and tried to explain to them that I was not notified that the same lead would be sold to numerous other contractors, the services were sold to me under misleading, I told them that the sales representative promised I would get legitimate leads from HomeAdvisor and this was not true and I'm paying more for the leads than I was making from them myself, but he saw no reason why this would be credited back. The customer service representative was extremely unprofessional and careless, he just try to convince me it's their way to do business and I have to pay anyway their fake leads, all what he can do for me is to correct my service area."

200.    During the relatively brief time this litigation has been pending, Plaintiffs'

Counsel have received communications from over 120 former and current Home Service

Professionals who have conveyed similar experiences they have had with HomeAdvisor and its employees. Without exception, the vignettes Plaintiffs' Counsel have been given are consistent with the detailed allegations contained *supra,* thereby supporting the conclusion that Defendants' conduct is systemic and pervasive with respect to Home Advisor's operations. *See supra* ¶¶ 152-193.

201.    Likewise, former and current Home Service Professionals victimized by Defendants' practices have also submitted a plethora of complaints to the Better Business Bureau ("BBB"); however, HomeAdvisor maintains an A+ rating.   Former Employee A almost exclusively dealt with complaints that had been filed with the BBB.   Former Employee A confirmed that HomeAdvisor could retain its positive rating as long as HomeAdvisor could prove that it affirmatively reached out to complainants in an attempt to resolve the issue(s), but a resolution is not required to close a complaint.

202.    As of November 8, 2016, HomeAdvisor closed 966 complaints with the Better Business Bureau in 3 months, including 435 complaints in just the last 12 months.   Below is HomeAdvisor's BBB complaint type summary:

### Customer Complaints Summary

**966 complaints closed with BBB in last 3 years | 435 closed in last 12 months**

| Complaint Type | Total Closed Complaints |
| --- | --- |
| Advertising/Sales Issues | 309 |
| Billing/Collection Issues | 236 |
| Delivery Issues | 33 |
| Guarantee/Warranty Issues | 7 |
| Problems with Product/Service | 381 |
| Total Closed Complaints | 966 |

*See* http://www.bbb.org/denver/business-reviews/referral-contractor/homeadvisor-in-lakewood-co-22000608/complaints (last visited 11/8/2016).

203.    The BBB's resolution policy permits HomeAdvisor to superficially mask the true nature of its business.   HomeAdvisor's BBB A+ rating not only starkly contradicts the complaints submitted to the BBB, but also the customer reviews.

204.    Since January 2014, 157 customers (72.0%) have reported a negative experience with HomeAdvisor, whereas only 58 customers (26.7%) have reported a positive experience with HomeAdvisor during that same time.   Below is HomeAdvisor's BBB customer reviews summary:





*See*   http://www.bbb.org/denver/business-reviews/referral-contractor/homeadvisor-in-lakewood-co-22000608/customer-reviews (last visited 11/8/2016).

### D.    *The Homeowners Confirm the Fraud.*

205.    Persons who are on the recipients of the calls from unsuspecting Home Service Professionals have also spoken out about the bogus nature of the Leads and their statements confirm that the Leads are unvetted and not as represented.

206.    As alleged *supra,* one of the "Leads", Mr. Johansen *had twice previously* sued HomeAdvisor for calls made to him by third parties that engage in telemarketing to obtain new clients—once in September of 2014, and another lawsuit was filed in December of 2014. The *Johansen Action* alleges that HomeAdvisor and One Planet violated the TCPA by placing telemarketing calls to a telephone number Mr. Johansen and others of a purported class of persons had registered on the National Do Not Call Registry *for the purposes of advertising the services and securing new business for HomeAdvisor*.

207.    Similarly, Homeowners have conveyed specific details concerning their experience as recipients of calls from Home Service Professionals that confirms the nature of the Leads as unvetted. The invasive and widespread impact of the sham Lead generation and sham Leads are highlighted by the following posts:

(a) A July 6, 2016 post by a Homeowner highlights issues with the Leads being outside of the Home Service Professionals' geographic reach:

> July 6, 2016
>
> I just started getting calls from contractors out in South Carolina and GA. I live in Washington; It got to a point where I told them yea come give me an estimate and gave them my address. What was crazy some of them continued to ask me for more info until I pointed out to them that I live in WA. I contacted Home Advisor and ask them to remove my number, yet I still got calls after 8 days. Found out that you guys are paying for my number and I NEVER EVER went to their website. What gives?

*See* http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-to-know/ (last visited 11/8/2016).

(b) A post to HomeAdvisor's Facebook page "Visitor Posts" on June 29, 2016 highlights that Home Service Professionals on the east coast were calling a "Lead" located on the west coast, who was not even a homeowner looking for any service from Home Service Professionals:



(c) From "Complaints List", http://www.complaintslist.com/staffing/home-advisor/ (last visited 11/8/2016).



(d) From "Complaints List", http://www.complaintslist.com/staffing/home-advisor/ (last visited 11/8/2016).



208.   Even Homeowners who previously utilized HomeAdvisor to locate Home Service Professionals are victimized by the HomeAdvisor's practices.   The following posts from Homeowners describe circumstances in which they continue to receive unwanted calls, even months after submitting a service request, or when just visiting HomeAdvisor's website:

(a) From "Trust Pilot" on October 27, 2016,

https://www.trustpilot.com/review/www.homeadvisor.com?stars=1&stars=2&stars=3&page=7 (last visited 11/8/2016).



(b) From "Trust Pilot" on March 2, 2016,

https://www.trustpilot.com/review/www.homeadvisor.com?stars=1&stars=3&page=4 (last visited 11/8/2016).



## VI.     HOW HOME SERVICE PROFESSIONALS ARE SOLD THE SHAM PRODUCT.

209.    How does such an inherently defective and worthless product get sold? HomeAdvisor sells its Membership Programs to Home Service Professionals over the phone through a massive and growing salesforce.  Sales of Membership Programs are not completed on-line.  Home Service Professionals do not execute any written contract or written agreement with Defendants.  Once Defendants secure a payment source (credit card or debit account number) from the Home Service Professional, the Membership Program fee is charged or debited, and the Lead referrals and fee payments begin.

210.    The most commonly employed form of solicitation of the Home Service Professionals is proactive cold calling by Defendants' salesforce.  The salesforce uses search engine marketing, trade associations and affiliate marketing channels to identify potential Service Professionals, including, *inter alia*, local plumbers, painters, electricians, handymen, and home improvement and maintenance personnel.

211.    Defendants' salesforce contacts prospective Home Service Professionals directly, often relentlessly, to solicit participation in Membership Programs that include ProLeads[TM] and enroll them over the phone in one of the three Membership Programs.  The persistent sales tactics employed by Defendants' salesforce often becomes aggressive.  In several instances, the

sales consultants have even threatened to harm prospective Home Service Professionals' reputations via the posting of baseless, bad reviews if they refused to join HomeAdvisor.

212.   Defendants deceive Home Service Professionals by failing to disclose the true nature of its business, services and Leads. For Defendants, it appears to be a volume business – get the fee for the Membership Program and push out and charge for as many Leads as possible before the Home Service Professional tries to cancel.

213.   Defendants' former employees have revealed how the HomeAdvisor service was sold to Home Service Professionals.  Their testimonials are further corroboration of Defendants' practice to generate revenue from signing up paying Home Service Professionals, notwithstanding Defendants' failure to be able to provide the product being sold, the Leads.

214.   By all accounts, HomeAdvisor employs and encourages aggressive, deceptive and fraudulent sales practices in furtherance of Defendants' sole objective to exponentially grow the number of paying Service Professionals within its network and generate revenue from Lead fees.

215.   To achieve Defendants' goals, HomeAdvisor generally conducts orientations for training classes comprised of 10-person teams every couple of weeks.  During the two-week training sessions, new sales representatives are briefly educated about HomeAdvisor's product, but primarily focus on the sales pitch and overcoming objections.  Once on the sales floor, to be eligible for commissions, sales representatives must sign up a minimum of 3-5 Service Professionals a week by dialing 150-200 prospects a day and logging 3-5 hours of minimum talk time a day.

216.   As described by Former Employees B and D, contact information for prospective Home Service Professionals could be acquired through three sources: (1) independent

identification (*e.g.*, phonebook, internet searches, etc.); (2) "phone-in" inquiries from interested Service Professionals, which were referred to internally as "Hot Leads", but these Leads were supplied exclusively HomeAdvisor's top sales representatives, or; (3) most commonly, HomeAdvisor's algorithm-generated prospect list.

217.    When HomeAdvisor sales representatives successfully contact prospective Home Service Professionals a formulaic sales process, based upon the four-page script provided during training, ensues.  The sales process consists of the following four steps that are exclusively executed over the phone, often on recorded lines: Step #1 – Intro; Step #2 – Questions with a Purpose; Step #3 – Presentation; and Step #4 – Close.  According to Former Employees B and D, sales representatives would identify the prospect's area of expertise, review license requirements, describe how the prospect would benefit from the service, complete the application (*e.g.*, background check), build the Home Service Professional's profile, and process the payment.  All the former sales representatives unanimously confirmed that Home Service Professionals do not execute any written contract or written agreement with Defendants.  Also, no terms and conditions are recited and no copy of the terms and conditions are issued prior to signing up for the HomeAdvisor membership. Once Defendants secure a payment source (credit card or debit account number) from the Home Service Professional, the Membership Program fee is charged or debited, and the Lead referrals and fee payments begin.

218.    Although there was a script, sales representatives, as stated by Former Employee C, "were encouraged to deviate from the script", and "there was a lot of discretion as to what could be said to Service Professionals", according to Former Employee D.  Sales representatives

routinely recited and guaranteed the following selling points, as confirmed by Former employees D and E:

- Leads are qualified, project-ready, serious homeowners that submitted service requests through HomeAdvisor's website;

- There is no contract and that the service can be cancelled at any time;

- The Home Service Professional will speak to the homeowner or decision maker of the residence and not a renter;

- The address is for an actual residence;

- The Leads will meet the Home Service Professional's profile criteria; and,

- The Home Service Professional will have full control over the lead flow and ability to monitor costs.

219.    All the former sales representatives acknowledged that many sales representatives went well beyond stating the above, which in fact were not actual guarantees that HomeAdvisor consistently honored.   In fact, sales representatives were trained and encouraged to make selective omissions, and over-extend promises about the quality of the service and HomeAdvisor's lenient credit policy.

220.    At the outset, HomeAdvisor sales representatives were incentivized to manipulate Service Professionals' Lead criteria in order to bypass certain internal systems and increase the profitability of the sale.  This scheme was designed to bestow significant financial benefits upon Defendants to the detriment of the Plaintiffs and the Class.

221.    According to Former Employee B and C, in order to sell the Lead generation services to a prospect, the sales software required there to be a minimum number of Leads

available in the Home Service Professional's selected service area.  If there were not enough Leads that met the Home Service Professional's criteria, sales managers pressured sales representatives to disregard the Home Service Professional's specified criteria by expanding the target geographic region (*e.g.*, increase the Home Service Professional's desired service area from 20 miles to 100 miles) or supplement the Home Service Professional's list of services offered, for jobs not performed by the Home Service Professional, until the Lead minimum was satisfied.

222.    Former Employee B said that HomeAdvisor was "taking advantage of little contractors in the middle of nowhere" by adjusting criteria, unbeknownst to Service Professionals.  In response to Former Employee C's concern that Service Professionals would receive and be charged for Leads that did not match their criteria, his manager flippantly said, "Let the Service Professionals figure it out on their own and they can work it out with Customer Care."  As a result of internal manipulation, Plaintiffs and Class members were charged for the erroneous Leads that did not meet their specified criteria.

223.    Defendants' commission structure also encourages sales representatives to disregard Class members' requests to terminate Memberships and/or freeze the Lead generation services. Based upon information provided by Former Employees C, D and E, a Service Professional's Lead generation service must remain activated for the first 24-hours after purchasing a Membership Program in order for the sales representative to receive a commission on the membership.  A retention bonus could then be earned by sales representatives for Home Service Professionals that kept their Leads activated for the first month of the membership.

Moreover, sales representatives were also eligible for a residual commission for Home Service Professionals who kept the Lead service activated for a majority of the membership.

224.    This commission structure incentivizes sales representatives to hinder Home Service Professionals' abilities to terminate the service and/or deactivate the Lead generation services.  Former Employee C offered an example of such an occurrence when he received a voicemail, the day before he left for vacation, from a newly signed up Home Service Professional that wished to terminate her Membership.  Since she was calling to cancel the Membership within 72 hours of signing up, she was entitled to be reimbursed the Membership fee.  Rather than process this request and lose a sale for HomeAdvisor and lose commission for the sales representative, Former Employee C's sales manager advised, "[Bleep] it bro.  You're on vacation.  Forget about it, and say you didn't get the voicemail before you left."  Since the Service Professional's membership cancellation request was not processed within 72 hours, she was not entitled to reimbursement of the membership fee.  The below post by a Home Service Professional from April 4, 2016 describes similar treatment:



I too got scammed by Home advisor. They refused to return my call to cancel on the second day and then said I was out of my three day grace period and could not rescind the contract. I spoke to at leasy 8 people and none on them had any authority and would not connect me to anyone who did have the authority to discuss the request with me. It is obvious that they now manage a scam knowingly. They refused any effort to even have anyone with authority discuss it with me. Their answer was to try to collect and then send it to collections. Continue to contact your AG, BBB, and Golden Chamber of Commerce about their unethical practices.

See http://www.complaintsboard.com/complaints/home-advisor-service-magic-scam-c639368.html (last visited 11/9/2016).

225.   The former sales representatives uniformly agreed that they often believed that they could not ethically sell the service to prospective Home Service Professionals. Former Employee D said, "If I told Service Professionals the truth about the service they would often decline the service."   As a result, Former Employee D was criticized by her sales manager for allegedly talking prospective Home Service Professionals out of the service by over educating them about the service and warning them about the potential to overdraw accounts.   Former Employee D was coached to talk less about the service, be more aggressive, and close deals more quickly.   Former Employee B was also coached to talk less about the product and she was instructed never to let a prospect off the phone before processing the payment.   Former Employee B's sales manager would say, "Slam them. Get their credit card and get that payment."

226.   The use of coercive sales tactics was not uncommon.   According to Former Employee B, "it was unbelievable how we would bully the contractors to sign them up.  I would constantly hear sales reps beating them [prospective Service Professionals] up over the phone. Sales reps would belittle the contractors and tell them if they don't sign up that they were going to be out of business."

227.   This is consistent with contractors' accounts.  An owner of a painting company in Michigan stated the following:  "I keep getting calls from home advisor. I have politely declined their service. The last call I received from them the guy got rude and threatened to put me out of business by contacting all my competition because I would not sign up." [sic].

228.   These sales practices were employed with the full knowledge, and at the direction, of the individuals tasked with running HomeAdvisor's sales force. According to Former Employee E, even the Vice President of Sales was aware of how sales were being conducted, but

no action was taken. Former Employee C said that Vice President of Sales was fond of saying, "we aren't a sale at any cost type of organization"; although that is exactly the type of organization HomeAdvisor is, according to the former sales representatives. An author identified as a former HomeAdvisor sales employee had the following to say: "Brad Foster is the VP of Denver Sales and he encourages an environment to where his managers [ ] will train the new employees to LIE to contractors just to get a sale…I have personally heard [Brad] say things like, 'I do not care if they get fired, we have new training classes every 2 weeks." [sic]. *See supra* ¶122.

229. The expendability of HomeAdvisor's sales representatives was known by the former employees. According to the former sales representatives, job security was continually threatened and used as motivation to execute more sales. Former Employee B said, "It's a horrific environment. We were treated like expendable pieces of crap."

230. The sales goals and commission structure, coupled with HomeAdvisor's high-pressure threats, fostered a sales culture that induced unlawful and wrongful business practices. For example, Former Employee E said that other sales representatives could be overheard "blatantly lying to Service Professionals" just to make the sale. Similarly, Former Employee B claimed that "the more crooked you are internally, the more they [management] will turn their head as long as you are making the sale."

231. In addition, Defendants' current and former employees have posted reviews on the job site Glassdoor.com that confirm HomeAdvisor's aggressive sales culture, and deceptive and appalling sales practices to warn other prospective employees.

232.    For example, an author identified as a then-current HomeAdvisor sales employee advised: "You are expected to call 150+ people a day and sell them the first time you speak.  If the contractors have legitimate reasons for not signing up, you need to push for it any ways [sic]".



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P18.htm?sort.sortType=OR&sort.ascending=false (Last visited 7/14/2016).

233.    Another post by an author identified as a then-current HomeAdvisor sales representative states:  "If you don't sell you're fired. If you DO [sic] and the contractor decides to turn off their leads before 24 hours, you could get fired. You have to lie to contractors and tell the [sic] what they want To [sic] hear and not what will actually benefit them."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-
E11291_P19.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

234.    As a person identified as a then-current HomeAdvisor sales employee explained:

"You're taught and expected to bend and omit the truth.  For example, you're expected to tell

every prospect that there are a certain amount of leads available in their city even though it's

usually not true."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-
E11291_P20.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

235.     A person identified as a former HomeAdvisor sales associate confirms the hide-the-ball tactics employed to get Home Service Professionals to hand over their payment information:   "The script that mgmt [sic] will give you (that you are pretty much required to repeat word for word) includes common objections that contractors will give to buying a membership.  These are VERY [sic] legitimate objections, like why we charge 3 contractors for the same job if only one of them gets it.  You are taught to counter these objections with vague and borderline dishonest responses."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P21.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

236.    A former HomeAdvisor marketing associate offered this commentary about HomeAdvisor: "Unethical and unprofessional work environment.  Sales reps are encouraged to stretch the truth to get one call closes.  i.e. in weekly training meetings they will have you listen to a call from a top rep. you hear people stretching the truth all the time, and managers running the meeting just say 'stay away from using that term, try this instead.'" [sic].



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P17.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

237.    An author identified as a former HomeAdvisor inside sales representative commented on both the sales tactics and the Leads: "Not a lot of integrity across the org -- reps are incentivized to find loopholes and do whatever they can to make sale…Back-end ops cannot keep up with sales growth – product does take advantage of many of the client they purport to serve."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291.htm   (last   visited 11/2/2016).

238.   As described in the below post by an author identified as a former HomeAdvisor

sales consultant:  "Sales is told to sell by revenue target -- *leads pour into customers account--*

*credit card automatically charged.   Customer has no recourse-sales reps fired for*

*mispractice."* [sic]. (emphasis added).



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P18.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

239.    This author, identified as a former HomeAdvisor sales representative, summed it up as follows:  "Worst place I ever worked, ***great place if you have no soul and love to rip off people***."



*See* https://www.glassdoor.com/Reviews/HomeAdvisor-Reviews-E11291_P20.htm?sort.sortType=OR&sort.ascending=false (last visited 7/14/2016).

## VII.    DEFENDANTS DENY REFUNDS AND/OR LEAD CREDITS AND UTILIZE COLLECTION AGENCIES TO CONTINUE THE FRAUD ON HOME SERVICE PROFESSIONALS.

240.    HomeAdvisor adopted uniform internal procedures intended to deny and discourage refunds and/or Lead credits when Home Service Professionals sought reimbursement for bogus Leads.

241.    Former Employee A, the customer service manager, stated that the customer service team does not review or verify the validity of individual Lead credit requests from Home Service Professionals. Rather, customer service representatives would simply review the Home Service Professional's account to determine how many Lead credit requests had been submitted.

242.    If the Home Service Professional had requested Lead credits for more than 15% of his or her total Leads received, HomeAdvisor's standard protocol mandates automatic denial of the Lead credit request.  Moreover, HomeAdvisor incentives customer service representatives to arbitrarily process Lead credit requests since the compensation structure for customer service representatives is dictated by the quantity of Lead credit requests processed, absent any quality assurance measures.

243.    According to this Home Service Professional's post on "Complaints List", http://www.complaintslist.com/2013/home-advisor-pro-prev-service-magic-is-scams-contractors/ (last visited 11/10/16), when his credit requests for "bogus leads" were denied, the customer service representative shared that HomeAdvisor receives "***over 150,000 credit requests a month.***" (emphasis added).



**Home advisor pro / Service magic is scams contractors** - HomeAdvisor

Last Updated On: March 14, 2016
Filed On: January 8, 2013
By:
Rating: **2** out of **5**
Reported Customer Loss = **$1,900.00**

WE signed up for leads that we were promised would bring us so much work we would have to higher more people. we'll not so all they did was send us 100's of leads that were either fake or people didn't want any work done.

Then when you try to get a credit for the lead they deny the credit. We have been charged $1,900.00 for leads when only $350 were actual real leads. We refuse to pay for these bogus leads and called a customer serv rep for **home advisor** he told us that **home advisor** received over 150,000 credit request a month.

So the company is well aware that they are stealing contractors money and they don't care.

I'm thinking about starting a class action law suit against home advisor because if someone doesn't stop them the owners are just going to keep scamming contractors out of millions.

244.    Furthermore, HomeAdvisor implemented discriminatory practices that favored Home Service Professionals that were more lucrative for HomeAdvisor.  According to Employee E, it was known on the sales floor that the issuance of Lead credits was influenced by the size of the Home Service Professional's account with HomeAdvisor. The former sales representative

said, "The more the Service Professional spent with HomeAdvisor, the more likely HomeAdvisor would issue a Lead credit."

245.    Former Employee A confirmed that this precise practice is executed through HomeAdvisor's "Executive Program."  The top 10% of HomeAdvisor's Home Service Professionals, which are categorically larger companies, qualify for the Executive Program which is "much more lenient" in issuing Lead credits.

246.    Defendants' arbitrary, unsubstantiated and biased review process prevents and denies Home Service Professionals credits and/or refunds that they are rightfully entitled to receive.

247.    When Home Service Professionals try to put an end to the scam, including by trying to stop their bank accounts from being completely depleted by the Defendants' charges for bogus Leads, Defendants send the Home Service Professionals to collection agencies.

248.    Defendants have associated at least with CMI Credit Mediators, Inc. (https://www.cmiweb.com/) and McCarthy, Burgess & Wolff (http://www.mbandw.com/) which have sought to collect monies from Home Service Professionals for the bogus Leads.

249.    The following statements from Home Service Professionals confirm the heavy handed and improper tactics taken by Defendants in sending the Home Service Professionals to collection agencies.

(a) In June 2016, a construction contractor from Florida was persuaded by a HomeAdvisor sales representative that a Pro Connect[TM] membership would help market and grow his small business. At no time did the sales representative inform him that he would be charged for each individual Lead. Once he was

registered, his account was "immediately flooded with Leads." He estimates that he received as many as 20 Leads the first day. Within two weeks, HomeAdvisor had billed the Home Services Professional over $4,400. The Home Service Professional tried to dispute the charge with his credit card company, but HomeAdvisor sent him to collections for a total of $5,800.

(b) A commercial and residential HVAC contractor from Colorado said, "I have tried to cancel my account numerous times and they keep "reopening". I have since canceled my credit card and they've sent my returned charges to collections." [sic].

(c) A Home Service Professional from California that signed up in April 2016 "was told that the leads would cost anywhere between $45 to $50 dollars, but actually each fee was $90." After 30 days, the Home Service Professional requested to cancel his membership because the Leads did not seem legitimate. But by August, the former Home Service Professional received another bill from HomeAdvisor for over $700.00 in Lead fees and was sent to collections.

250. Unless stopped, Defendants have been and will continue to initiate and proceed with improper collection actions against Class Members to collect the fees and costs wrongly imposed on Home Service Professionals.

## VIII.   DEFENDANTS CONTINUE TO DEFRAUD HOME SERVICE PROFESSIONALS USING EXACT MATCH LISTINGS POST-MEMBERSHIP.

251. HomeAdvisor's fraudulent and deceptive conduct persists, through the manipulation of Exact Match listings, even after Home Service Professionals terminate their relationship with HomeAdvisor and affirmatively leave the HomeAdvisor network.

252.     HomeAdvisor characterizes Exact Match listings as a free customized online profile used to promote the Home Service Professional's business online by getting their "name out there on the most searched internet sites and business directories." See https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp (last visited 11/3/2016). Home Service Professionals provide HomeAdvisor the content for the listing (including the business logo, description and contact information), but HomeAdvisor replaces the Home Service Professional's phone number with a HomeAdvisor telephone number. By doing such, HomeAdvisor intercepts calls from Homeowners in order to generate Exact Match Leads, which are then distributed at a premium Lead fee charge to the requested Home Service Professional or others in the HomeAdvisor network, according to HomeAdvisor's guidelines.

253.     Active Home Service Professionals are misled as to the nuances of this service and HomeAdvisor, at its discretion, violates the terms of the service by distributing and charging several Home Service Professionals for Exact Match Leads.  For instance, when an active Home Service Professional is not accepting Leads, HomeAdvisor will redistribute the Exact Match generated Lead to competitors that are accepting Leads, but HomeAdvisor continues to charge the premium Lead fee even though the Homeowner did not specifically request to be contacted by the other Home Service Professionals.  The  impact of these practices is highlighted by the following posts:

(a) From   Consumer   Affairs   on   September   25,   2014, https://www.consumeraffairs.com/homeowners/homeadvisor.html?page=182 (last visited 11/9/2016).



(b) From "Pissed Consumer" on June 26, 2013, https://homeadvisor.pissedconsumer.com/what-a-scam-home-advisor-is-20130626423527.html (last visited 11/9/2016).



(c) From "Handyman Startup" on November 12, 2013, http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-to-know/ (last visited 11/9/2016).

> **kemccull256**   November 12, 2013
>
> Its not necessarily what HomeAdvisors does, its what the lie to you that they don't do. They will lie to you about what exact match is and what they do to attract exact match leads. they will basically steal your market identity then feed it back to you at 150% of a market match lead. In other words, they will insert (somehow, I dont know how) their contact info in seemingly every place you have contact info for you company. So, anyone that looks you up gets their contact info. So rather than contact you directly, they contact HomeAdvisor. Then HA bills you 150% of the market match price for this. If you have paused your leads, you dont get the info.
>
> Its not what they do, its what they lie to you to get your business. this is fraudulent. And needs to be reported. Oh, by the way, now they have a "listing" that clients can review and call you directly. For $30 per month flat. No choice. Ask them to produce what this is? they cant. Another rip off.
>
> this needs to be report to you state Attorney General.

254.    Furthermore, when Home Service Professionals terminate and/or do not renew their membership, HomeAdvisor does not remove the Home Service Professional's Exact Match listing within a reasonable amount of time from its affiliate websites.   According to Former Employee A, former Home Service Professionals' listings would often remain active for 300-500 days post termination.   During such time, HomeAdvisor would continue fielding proactive phone calls from Homeowners seeking to contact the Home Service Professional on the listing.   Since that Home Service Professional was no longer active, HomeAdvisor distribute and charge other active Home Service Professionals for Exact Match Lead.   In just one month, the Exact Match Leads generated from former Home Service Professionals' listings resulted in $22,000 in revenue for HomeAdvisor, according to Former Employee A.

255.     Defendants' deceptive conduct constitutes theft of business opportunities, false advertising, and commercial impersonation of former Home Service Professionals which is wantonly executed with the objective to bestow significant financial benefits upon Defendants.

## CLASS ACTION ALLEGATIONS

256.     Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Amended Complaint.

257.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other members of the Class.   The proposed Class is defined as:

> All persons who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

258.     Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate. Excluded from the Class are: Defendants, any entity in which any Defendant has a controlling interest, and each Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

259.     Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.

260.    All members of the Class were and are similarly affected by the wrongful and deceptive practices of Defendants, and the relief sought herein is for the benefit of Plaintiffs and members of the Class.

261.    All members of the Class similarly relied on Defendants' deceptive representations and practices and such reliance resulted in harm to each Class Member.

262.    Based on Defendants' public statements, it is apparent that the Class consists of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

263.    Questions of law and fact common to the Plaintiffs and Class exist that predominate over the questions affecting only individual members of the Class.  The common legal and factual questions include, *inter alia*:

> (a) Whether Defendants employed a deceptive course of conduct of charging members of the Class for Leads that were not qualified business opportunities, qualified, targeted, serious, or from project-ready Homeowners.

> (b) Whether Defendants concealed material information about the nature, quality and source of the Leads and the HomeAdvisor services charged to Home Service Professionals.

> (c) Whether Defendants used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads advertised.

(d) Whether Defendants sent to and charged the Home Service Professionals for Leads that were not targeted, and not from serious, qualified or project ready Homeowners.

(e) Whether Defendants charged the Home Service Professionals for Leads that were not qualified business opportunities.

(f) Whether Defendants charged Plaintiffs and the members of the Class for Leads that were sent to more than four Home Service Professionals.

(g) Whether Defendants charged Home Service Professionals for mHelpDesk without knowledge or consent of the Home Service Professionals.

(h) Whether Defendants systemically disregarded the parameters and limits placed by Home Service Professionals on the type and number of Leads to be charged to Home Service Professionals.

(i) Whether Defendants employed tactics that prevent and prevented Home Service Professionals from cancelling their membership and receipt of Leads, and from disputing the propriety of Leads in order to try to secure a refund.

(j) Whether the conduct alleged herein is in violation of Colorado's Consumer Protection Act.

(k) The amount of revenues and profits Defendants received and/or the amount of monies imposed on or lost by the members of the Class as a result of Defendants' conduct.

(l)   Whether the members of the Class are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(m)  Whether the members of the Class are entitled to payment of damages plus interest thereon.

264.   The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Class, as the claims arise out of the same wrongful and unlawful course of conduct by Defendants, including Defendants' deceitful business practices with respect to the HomeAdvisor Leads and its membership services. Plaintiffs and the other members of the Class have sustained economic injuries arising from HomeAdvisor's conduct, and the relief sought is common to each member of the Class.

265.   Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, and do not have interests antagonistic to the interests of any other member of the Class.

266.   Plaintiffs have retained counsel competent and experienced in the prosecution of class actions, in particular consumer protection class actions.

267.   Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members of the Class.  This predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

268.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and the members of the Class have all suffered and will continue to suffer harm and damages as a result of Defendants unlawful and wrongful conduct.  Absent a class action, most members of the Class would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the damages of each member of the Class, it is highly likely that Plaintiffs or any other member of the Class would be able to protect their own interest and afford to seek legal redress for Defendants' misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery.  Therefore, absent a class action, members of the Class will continue to incur damages and Defendants' misconduct will continue without remedy.

269.    Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Plaintiffs and the Class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of Home Service Professionals subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## VIOLATIONS OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C)

270. Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

### A. *RICO Enterprise*

271. From at least October 1, 2012, to the present, the affiliation between IAC and HomeAdvisor constituted an enterprise. The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included IAC, HomeAdvisor, along with several of their respective employees and officers, including, from IAC Barry Diller, Joseph Levin and Jeff Kipp and from HomeAdvisor Chris Terrill.

272. The association-in-fact enterprise also included the businesses and persons who sold leads to HomeAdvisor, including:

> (a) the Lead Generators, namely One Planet Ops, Inc., HomeImprovement.net (owned by Global Ventures Network), Buyerlink and The Lead House, LLC, as well as, on information and belief,  Salesgenie, YOT7 Corp., LeadGenius, Inc. and Leadspace, Inc., which entities are in the business of generating consumer contact information for a variety of industries and selling or re-selling leads to HomeAdvisor.

> (b) the Partner Affiliate Networks, namely, CJ Affiliate f/k/a Commission Junction and Pepperjam, which are in the business of connecting "advertisers" like

HomeAdvisor with "publishers" like bloggers and other businesses that then promote HomeAdvisor on their websites and generate leads that are then sent to HomeAdvisor in exchange for a payment.

(c) the Affiliate Program Partners, which promote HomeAdvisor in various media, including on their websites, to generate leads that are sent to HomeAdvisor in exchange for a payment.

(d) the Home Improvement Branded Affiliates, namely, established companies and brands specifically in the home décor and home improvement business, including BH&G, HGTV, BB&B and Wayfair, that generate leads for HomeAdvisor.



273.    The association-in-fact enterprise also includes the businesses and persons who

IAC and HomeAdvisor utilize to collect monies from Home Service Professionals for the bogus

Leads, including CMI Credit Mediators, Inc. and McCarthy, Burgess & Wolff, when Home

Service Professionals try to put an end to the scam.

274.    Defendants conducted and participated in the enterprise's affairs through a pattern

of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire

communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c).

275.    The members of the RICO enterprise all had a common purpose: to generate revenue through HomeAdvisor by signing up Home Service Professionals and collecting money from Home Service Professionals for sham Leads. The foregoing misconduct, as alleged *supra,* was done at Defendants' direction and with Defendants' full knowledge.

276.    Moreover, the RICO enterprise was also forged by the relationships among those associated with it. As described *supra,* IAC and/or HomeAdvisor contracted with various third-parties that gathered and sold HomeAdvisor the sham Leads.  IAC and HomeAdvisor purchased Leads that were not of the quality and nature represented to the Home Service Professionals and turned around and charged the Home Service Professionals for the Leads.

277.    This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose. IAC and/or HomeAdvisor conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in at least 2012 and continues through the present and has consisted of hundreds of thousands (or millions) of acts of wire fraud under 18 U.S.C. § 1343.

### B.    Wire Fraud

278.    As alleged *supra,* Defendants engaged in a scheme or artifice to defraud Home Service Professionals by charging them for a sham product, including bogus Leads.

279.    Wire services, including internet, telephone and email were used in furtherance of the scheme. The use of the wire services to further the scheme was known Defendants and it was

reasonably foreseeable that wire services would be used for the purpose of signing up Home Service Professionals, collecting their payment information, and charging them for the Leads.

280.   As described throughout this Amended Complaint, Defendants have repeatedly violated the federal wire fraud statutes, which have all occurred in the last few years, include:

(e) Contacting Home Service Professionals about the HomeAdvisor products by telephone, email and text messages;

(f) Maintaining a website, Homeadvisor.com, that informed Home Service Professionals about the Membership Programs and the Leads;

(g)  Collecting payment information from Home Service Professionals over the phone and by email for Membership Program and Lead fees;

(h) Sending the bogus Leads to the Home Service Professionals by email and text message;

(i) Charging Home Service Professionals' credit cards, and deducting automatically from Home Service Professionals' bank accounts, fees and costs for bogus Leads, mHelpdesk, and Membership Programs;

(j) Providing over the phone and email, false information about the Leads to the Home Service Professionals;

(k) Use of websites and emails of Affiliate Program Partners and other third parties to generate Leads that would be used in furtherance of the scheme.

(l) Use of emails, phone and website to prevent Home Service Professionals from cancelling their membership and Leads and from disputing the propriety of a Lead in order to secure a refund; and,

(m) Communications with third-parties, including the members of the enterprise, with respect to buying and bidding on the Leads through the internet and email.

281.   As part of and in furtherance of the scheme to defraud, Defendants would receive documents and information by telephone and/or email from the Home Service Professionals with respect to the Membership Programs, mHelpdesk and the Leads.

282.   As part of and in furtherance of the scheme to defraud, Defendants would intentionally misstate by telephone and/or email the nature and quality of the products for which the Home Service Professionals were charged.

### C.      Pattern of Racketeering

283.   The thousands of violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding Home Service Professionals and involve the same participants, victims, and methods of commission. And, because Defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

284.   Each of the Defendants associated with the RICO enterprise knew of the existence of the enterprise and its related activities. IAC, through its designated officers and employees, devised the scheme and coordinated with HomeAdvisor to carry it out. Defendants' employees oversaw, directed, and managed various aspects of the scheme, including commanding that sales persons employ the unscrupulous methods alleged herein to retain and secure payment information from Home Service Professionals, and to misstate and omit material information about the Leads when communicating with Home Service Professionals.

285.    IAC and/or IAC and HomeAdvisor and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. The Defendants participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud.

286.    As part of their participation, Defendants knowingly and intentionally transmitted or caused to be sent, emailed, or transmitted fraudulent solicitations and information in interstate or foreign commerce. The fraudulent information constituted numerous and repeated violations of the federal wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c).

287.    Defendants knew, or at a minimum were reckless in not knowing, that the information was misleading, deceptive, and/or false when transmitted.

288.    Defendants' conduct and pattern of racketeering activity foreseeably and proximately caused damages to Plaintiffs and to members of Class. Those damages include: wrongful payment for the Leads, the Membership Programs and mHelpDesk, and wrongful collection proceedings and harm to credit.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF COLORADO CONSUMER PROTECTION ACT ("CCPA"), COLO. REV. STAT. § 6-1-101, ET SEQ.

289.    Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

290.    Plaintiffs are informed and believe, and thereon allege, that Defendants engaged in extensive marketing, advertising and selling, including, but not limited to, electronic media,

television, internet and direct marketing through their agents, to promote and sell its Membership Programs and ProLeads.

291.    Defendants characterized the Leads as:  from targeted, serious, qualified and project ready Homeowners; qualified new business opportunities (Pro Leads) to keep your pipeline full; from 'ready-to-buy' customers; targeted prospects and highly targeted prospects; from project ready Homeowners; from Homeowners actively seeking the services; from qualified Homeowners; from serious Homeowners; and being sent only to up to four Home Service Professionals. *See supra* ¶¶ 62, 66-79.  But, the Leads are not as Defendants represented or of the quality and nature of what Plaintiffs and the Class paid for because Defendants maintain and employ systemically flawed and deficient processes to generate Leads, and send and charge Home Service Professionals for Leads that were not of such nature and quality.

292.    In addition, Defendants concealed and omitted material information about: (a) the Leads, including the true source and nature of the Leads, in that, *inter alia*, the Leads were generated through methods that could not and did not provide the Leads as advertised; and, (b) that substantial monthly fees would be charged to the Home Service Professionals for mHelpDesk.

293.    Defendants also systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to Home Service Professionals.

294.    Defendants employed tactics that prevented or discouraged Home Service Professionals from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

295.   Defendants had knowledge that the Leads and their practices and services were contrary to what the Home Service Professionals had paid over $360 million for in 2015 alone.

296.   Defendants' failure to disclose and instead to conceal the foregoing facts was intended to and induced Plaintiffs and the members of the Class to pay millions of dollars for Membership Programs, Leads and mHelpDesk.

297.   This cause of action is brought on behalf of Plaintiffs and all similarly situated members of the Class, pursuant to COLO. REV. STAT. § 6-1-105(e), (g), (i), (l), (n) and (u), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

> \*        \*        \*
>
> (e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;
>
> \*        \*        \*
>
> (g)  Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;
>
> \*        \*        \*
>
> (i) Advertises goods, services, or property with intent not to sell them as advertised;
>
> \*        \*        \*
>
> (l)  Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;
>
> \*        \*        \*
>
> (n)  Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other

than those advertised and which is also accompanied by one or more of the following
practices:

             \*       \*       \*

        (III)  Requiring tie-in sales or other undisclosed conditions to be
met prior to selling the advertised goods, property, or services;

    \*       \*       \*

(u)  Fails to disclose material information concerning goods, services, or property
which information was known at the time of an advertisement or sale if such failure
to disclose such information was intended to induce the consumer to enter into a
transaction.

298.    In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in
this section are in addition to and do not limit the types of unfair trade practices actionable at
common law or under other statutes of this state."

299.    Defendants' deceptive practices occurred in the course of Defendants' business,
vocation or occupation.

300.    Defendants' misconduct significantly impacts the public as actual or potential
consumers of the Defendants' services described herein.  The deceptive marketing, advertising
and selling through electronic media, television, internet and direct marketing were directed to
the market generally resulting in deception of actual and prospective purchasers.

301.    The wrongdoing alleged herein has a significant public impact.  Among other
things: as of December 31, 2015, HomeAdvisor's network of Home Service Professionals
consisted of approximately 102,000 paying Service Professionals in the United States, who
provided services ranging from home repairs to larger home remodeling projects to thousands of
Homeowners nationwide;   IAC is a multi-billion dollar media and Internet company comprised
of some of the world's most recognized brands and products, including HomeAdvisor, and as

such, is sophisticated and has superior bargaining power over the Service Professionals, as well as the Homeowners, who are affected by the deceptive and false practices challenged herein; and, the wrongdoing has impacted Service Professionals, causing them substantial monetary damages, and has the significant potential to do so in the future.

302.    Defendants' deceptive practices caused damage to Plaintiffs and all Class Members.  Because of Defendants' unfair, deceptive and fraudulent business practices, Plaintiffs and Class Members suffered and continue to suffer injuries by way of monetary loss.

303.    In all respects, the foregoing constitutes deceptive trade practices by Defendants. Defendants committed deceptive acts ad practices, and omitted material information, which have a capacity, tendency, and/or likelihood to deceive or confuse reasonable Home Service Professionals in that such consumers had a good faith basis for believing that (a) the Leads were generated, marketed, distributed and charged to the Home Service Professionals in a reliable and honest manner; (b) they would not be charged for mHelpDesk; and (c) they would be able to control the Leads, as well as suspend or cancel receipt of and being charged for the Leads. Instead, Plaintiffs and the members of the Class were and were likely to be deceived by Defendants, as set forth herein.

304.    Plaintiffs therefore seek an order of this Court:

(a) Enjoining Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to their marketing, distribution, taking of monies for, and the management of Leads, Membership Programs, mHelpDesk, Lead management, requests for refunds, and requests for

suspension or cancellation of involvement in a Membership Program, Leads and mHelpDesk, in such manner as set forth in detail above;

(b) Requiring Defendants to cease business practices that generate and charge for unqualified Leads;

(d) Enjoining Defendants from representing that the Leads are qualified and of similar nature and quality, when they are not;

(e) Requiring Defendants to cease charging for mHelpDesk without written, clear confirmation of a Home Service Professional's knowledge of the service and attendant charges, and his/her/its acceptance of such service and charges; and

(f) Enjoining Defendants from initiating and proceeding with any collection action against Plaintiffs and the members of the Class.

305. Plaintiffs and the members of the Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and/or deceptive acts and practices of Defendants, as described above, present a serious threat to Plaintiffs and the members of the Class.

### THIRD CAUSE OF ACTION
#### Fraud/Fraudulent Concealment

306. Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

307. Prior to Plaintiffs and the members of the Class buying one of the Membership Programs, Defendants represented that Leads were of a certain nature and quality. *See supra* ¶¶ 62, 66-79.

308.   Defendant knew that Plaintiffs and Class Members relied upon such material representations about the Leads, and Defendants made such material representations to induce Plaintiffs and members of the Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the Home Service Professionals were required to provide either a checking / savings account from which Defendants can automatically debit all Membership Fees and Lead fees, or a credit card on which Defendants can automatically charge such fees.   Then, *on a weekly basis,* Defendants automatically charged the Home Service Professionals for each Lead sent. The fee for each Lead is automatically charged to the Home Service Professionals' credit card and/or debited from his/her/its debit account.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the Home Service Professional.

309.   The representations about the Leads and the omissions about the Leads were material to Plaintiffs, such that, had Plaintiffs known that the representations were false and Defendants had omitted material information, Plaintiffs would not have purchased a Membership Program and provided Defendants with the means to charge their credit card and/or debit their bank accounts.   But Plaintiffs did not know the true facts, and relied upon the material representations made by Defendants.

310.   Defendants knew their statements were false, and intended that Plaintiffs and Class Members would rely upon the false representations.

311.   Defendants concealed and failed to disclose to Plaintiffs and Class Members that, despite its affirmative representations about the services, including the Leads, it would charge

Plaintiffs and the Class for unqualified Leads and mHelpDesk.   Defendants concealed these material facts with the intention that Plaintiffs and Class Members would act.

312.    As a result of Defendants' fraudulent representations and omissions, Plaintiffs and members of the Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Contract**

313.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

314.    Plaintiffs and the members of the Class paid money to Defendants in exchange for Leads.

315.    An implied contract was created between Defendants and the Home Service Professionals whereby Defendants were to acquire, generate and charge Plaintiffs and Home Service Professionals for Leads that were from targeted, serious, qualified and/or project-ready Homeowners.

316.    The Plaintiffs and the members of the Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

317.    The Leads, as well as Defendants' Lead generation process, however, are systemically flawed and Defendants do not and cannot generate Leads of targeted, serious, qualified and project-ready Homeowners.

318.    The Leads were not of the nature and quality of the Leads that were required, yet Defendants sent to and charged the Home Service Professionals for such Leads.   Defendants did

not generate Leads for the Home Services Professionals that were targeted and from serious,
qualified or project-ready Homeowners. Also, Defendants charged Plaintiffs and the members of
the Class for Leads that have been sent to more than four Home Service Professionals.
Defendants also charged Home Service Professionals for mHelpDesk without knowledge or
consent of the Home Service Professionals.  Furthermore, Defendants systemically disregarded
the parameters and limits placed on the type and number of Leads to be charged to Home Service
Professionals.  Finally, Defendants employed tactics that prevent Home Service Professionals
from cancelling their membership and Leads, and from disputing the propriety of a Lead in order
to secure a refund.

319.    Accordingly, Defendants have breached the implied contract that was formed
between them and Plaintiffs and the Class.

320.    As a result, Plaintiffs and the members of the Class have been harmed and/or
injured have incurred economic damages as a proximate and direct result of the breach by
Defendants.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment/Restitution**

321.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing
allegations as though fully set forth herein.

322.    As the intended and expected result of their conscious wrongdoing, Defendants
have profited and benefited from Plaintiffs and the Class' purchase of the Membership Programs
and payment for the Leads and mHelpDesk.

323.    Defendants have voluntarily accepted and retained these profits and benefits, with
full knowledge and awareness that, as a result of Defendants' misconduct alleged herein,

Plaintiffs and the Class were not receiving services of the quality, nature, fitness, or value that had been represented by Defendants, and that a reasonable consumer would expect.

324.    Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs and the Class, at the expense of these parties.

325.    Equity and good conscience militate against permitting Defendants to retain these profits and benefits, and permitting Defendants to do so would be unjust and inequitable because of Defendants' misrepresentations and misconduct against Plaintiffs and members of the Class, as alleged herein.

326.    Because Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiffs and the members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiffs and members of the Class, as ordered by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually on behalf of themselves and on behalf of members of the Class, respectfully request that this Court:

a.  Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class;

b.  Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

c.  Award all actual, general, special, incidental, statutory, treble, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

d.  Award pre-judgment and post-judgment interest on such monetary relief;

e.   Award injunctive relief is appropriate and necessary to remedy Defendants' wrongful

conduct and to prevent the wrongful conduct from continuing; and

f.   Award all other relief deemed appropriate by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury for all claims asserted in this Complaint so triable.

Dated: November 14, 2016                    By:   _s/ Jeffrey M. Kendall_____
                                                  Gordon W. Netzorg
                                                  Jeffrey M. Kendall
                                                  **SHERMAN & HOWARD L.L.C.**
                                                  633 Seventeenth Street, Suite 3000
                                                  Denver, Colorado 80202
                                                  Direct: (303) 297-2900
                                                  snetzorg@shermanhoward.com
                                                  JKendall@shermanhoward.com

                                                  **CHIMICLES & TIKELLIS LLP**
                                                  Nicholas E. Chimicles (*pro hac vice*)
                                                  Kimberly Donaldson Smith (*pro hac vice*)
                                                  Stephanie E. Saunders (*pro hac vice*)
                                                  361 W. Lancaster Avenue
                                                  Haverford, PA 19041
                                                  (610) 642-8500
                                                  Nick@Chimicles.com
                                                  KMD@Chimicles.com
                                                  SES@Chimicles.com
                                                  ***Attorneys for Plaintiffs***

Plaintiffs' Address:
830 Linden Avenue
Rochester, New York

H0059580.9                    121

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 14, 2016, I electronically filed the foregoing **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

Alexander C. Clayden, Esq.
Lathrop & Gage, LLP
950 17th Street
U.S. Bank Building, Suite 2400
Denver, CO  80202
aclayden@lathropgage.com

*s/  Terri Gonzales*
