IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-01849-PAB-KLM

AIRQUIP, INC.,
KELLY DASILVA, and
NICOLE GRAY, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

HOMEADVISOR, INC.,
IAC/INTERACTIVECORP, and
DOES 1 THROUGH 10,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on HomeAdvisor, Inc.'s Partial Motion to Dismiss

Amended Complaint [Docket No. 42] and IAC/InterActiveCorp's Motion to Dismiss

Amended Complaint [Docket No. 44]. The Court has jurisdiction pursuant to 28 U.S.C.

§§ 1331 and 1332(d)(2).

## I. BACKGROUND[1]

      HomeAdvisor, Inc. ("HomeAdvisor") uses a digital marketplace to help connect

persons providing home improvement services with homeowners in need of such

services. Docket No. 32 at 4, ¶ 1. Plaintiffs Airquip, Inc. ("Airquip"), Kelly DaSilva, and

_____

      [1] The facts below are taken from plaintiffs' amended complaint, Docket No. 32,
and are presumed to be true for purposes of the motions to dismiss.

Nicole Gray are home service professionals[2] who paid for memberships with HomeAdvisor. *Id.* at 13-14, ¶¶ 23-25. As part of these memberships, HomeAdvisor provided each plaintiff with leads for new business opportunities. *Id.* at 4, ¶ 2. Plaintiffs were required to pay HomeAdvisor a fee for each lead ranging from $8 to over $90 per lead. *Id.* at 11, ¶ 16. Plaintiffs claim that HomeAdvisor misrepresented the quality of its leads and that the leads are characterized by "wrong or disconnected phone numbers and contact information; persons who never heard of HomeAdvisor; stale Leads, including for projects that Homeowners completed months or years prior to the Lead being sent; contacts for homes that were listed for sale; and contacts for vacant or non-existent residences." *Id.* at 8-9, ¶ 12. On behalf of a nationwide class of service professionals who used HomeAdvisor's services, plaintiffs claim that defendants' services were fraudulent. *Id.* at 103-107, ¶¶ 256-269.

### A. IAC's Acquisition of HomeAdvisor

IAC/InterActiveCorp ("IAC") is a media and internet company that owns more than twenty operating businesses. *Id.* at 14. ¶ 27. IAC acquires, develops, and spins off media and internet businesses. *Id.* at 17, ¶¶ 40-41. In 2004, IAC acquired ServiceMagic, which it later rebranded as HomeAdvisor. *Id.* at 14, ¶ 26.

IAC has been the parent company and majority shareholder of HomeAdvisor since 2004. *Id.* at 18-19, ¶ 45. IAC executives oversee and direct the HomeAdvisor business and IAC has made substantial capital contributions to HomeAdvisor. *Id.* at 19,

---

[2]The amended complaint defines "Home Service Professionals" as "persons and businesses in the HomeAdvisor network who provide home improvement services." Docket No. 32 at 4, ¶ 1.

¶¶ 46-47. Since 2012, IAC has repeatedly emphasized HomeAdvisor's growth opportunities to IAC's investors. *Id.* at 20-22, ¶¶ 50-54. In so doing, IAC executives have touted changes to HomeAdvisor's subscription services, which are intended to make HomeAdvisor's revenue generation "stickier." *Id.* at 21, ¶ 53.

By increasing its salesforce and modifying its subscription model, HomeAdvisor has generated exponential year-to-year growth in revenue and substantially increased the number of home service professionals who pay for HomeAdvisor's services. *Id.* at 23, ¶¶ 56-57.

### B. HomeAdvisor's Business Model

HomeAdvisor offers a membership model that allows home service professionals to pay an annual fee to become a "HomeAdvisor[SM]Pro." *Id.* at 25-26, ¶¶ 62-63. The basic membership, "Pro Reach[TM]," allows home service professionals to list their services on the HomeAdvisor website. *Id.* However, home service professionals can upgrade to a "Pro Connect[TM]" or "Total Connect[TM]" membership, which has a lower up-front cost and provides home service professionals with "ProLeads[TM]." The ProLeads service includes "targeted leads" and "exact match leads." *Id.* at 25-26, ¶ 62. Targeted leads match home service professionals with "homeowners who are actively looking for the type of work [the professional] specialize[s] in." *Id.* Exact match leads are matches with homeowners searching for services in the professional's area who are interested in that specific professional. *Id.* HomeAdvisor's website describes the leads as "highly targeted," coming from "serious homeowners" and "ready-to-buy" customers. *Id.* at 29-31, ¶¶ 70-73. According to the website, if a homeowner requests a referral, HomeAdvisor will refer "up to four Service Professionals." *Id.* at 29-30, ¶ 70.

3

HomeAdvisor represents to home service professionals that members are able to manage and monitor the leads sent to them by HomeAdvisor. *Id.* at 34, ¶ 79. HomeAdvisor states that the home service professional is able to set a budget for leads and select the service types and locations for his or her leads. *Id.*, ¶ 80.

On September 3, 2014, IAC announced that HomeAdvisor had acquired a majority stake in mHelpDesk, a startup that offered software services for small to mid-size businesses. *Id.* at 37, ¶ 89. HomeAdvisor promptly began making mHelpDesk's services available to HomeAdvisor members. *Id.* However, HomeAdvisor did not inform home service professionals that, if they joined HomeAdvisor, they would be automatically enrolled in mHelpDesk and charged for its services after a one-month free trial. *Id.* at 38, ¶ 91. HomeAdvisor members were automatically charged $59.99 - $99.00 a month for mHelpDesk without any prior authorization. *Id.* at 39, ¶¶ 93-94.

### C. Fraudulent Leads

Plaintiffs claim that the manner in which leads are generated is inconsistent with HomeAdvisor's representations and that the leads offered by defendants are a sham. *Id.* at 39-53, ¶¶ 95-127. Plaintiffs allege that HomeAdvisor relies on three sources for its leads: (1) direct lead generators, which "are in the business of generating consumer contact information for a variety of industries," *id.* at 40, ¶ 98; (2) partner affiliate networks, which "are businesses that connect 'advertisers' like HomeAdvisor with 'publishers' like bloggers and other businesses; publishers promote HomeAdvisor on their websites and generate leads that are then sent to HomeAdvisor in exchange for a payment to the "publisher," *id.* at 40-41, ¶ 99; (3) home improvement branded affiliates, which are "established companies and brands [] in the home décor and home

improvement business" whose websites and in-store promotions are used by defendants to generate leads. *Id.* at 41, ¶ 100.

Plaintiffs allege that "HomeAdvisor conceals the nature and genesis of its Leads by misrepresenting that Leads are exclusively generated and vetted through its patented ProFinder™ and ProLeads™ systems." *Id.* at 45, ¶ 105. To the contrary, HomeAdvisor's leads "are the product of telemarketing, cold-calling, sweepstake entries and other third-party Lead generation companies and sources used by Defendants, a far cry from a process that would be designed and calculated to generate Leads that constitute qualified project-ready Homeowners." *Id.*, ¶ 107.

Each plaintiff describes a similar pattern of paying for sham leads. Plaintiff Airquip joined HomeAdvisor on or about September 16, 2015. *Id.* at 54-55, ¶¶ 130-31. Over the course of six months, it received approximately 180 leads and paid HomeAdvisor $6,300. *Id.* Airquip states that it encountered a number of issues with the leads including disconnected phone numbers, leads outside Airquip's service area, stale leads, leads from non-homeowners, leads from individuals with no familiarity with HomeAdvisor, and inaccurate lead information. *Id.* In addition, Airquip states that it was charged $59.99 a month for mHelpDesk without being told that it would be automatically enrolled in the system.

On or about November 5, 2015, plaintiff DaSilva paid $347.98 for a HomeAdvisor Pro Connect™ membership. *Id.* at 56, ¶ 135. DaSilva states that she received approximately twenty-five leads from HomeAdvisor for which she was charged over $715. *Id.*, ¶ 136. DaSilva encountered problems with her leads including "disconnected phone numbers; persons stating that they were not the Homeowner of

the property and were not interested in the service; Leads for services Plaintiff DaSilva did not offer; and even a Lead with a fictitious address." *Id.* at 56-57, ¶ 137. DaSilva stated that the most common deficiency with her leads, however, was that the homeowners regularly complained that she was the "***tenth or even twentieth HomeAdvisor Home Service Professional*** " to contact them. *Id.* (emphasis in original). DaSilva discovered in April 2016 that she had been charged $59.99 a month for four months for mHelpDesk. *Id.* at 58, ¶ 141. DaSilva was not told that she would be enrolled in mHelpDesk. *Id.*

Plaintiff Gray signed up for a HomeAdvisor Pro Connect™ on or about February 4, 2016. *Id.* at 58-59, ¶ 144. Gray encountered deficiencies with the leads including "disconnected phone numbers, numbers that went to fax lines and numbers that rang incessantly before disconnecting." *Id.* at 59, ¶ 145. In total, Gray received over 170 leads and paid HomeAdvisor approximately $4,500 for a Pro Connect™ membership and leads. *Id.* at 60, ¶ 148. Gray was also enrolled in mHelpDesk for $59.99 a month without prior notice. *Id.* at 59-60, ¶ 146.

The complaint further describes how home service professionals in California, Connecticut, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, Ohio, Pennsylvania, Texas, and Virginia have experienced a range of problems in working with HomeAdvisor. *Id.* at 62-73, ¶¶ 153-192.

### D. Procedural History

Plaintiffs filed suit on July 19, 2016. Docket No. 1. On November 14, 2016, plaintiffs filed an amended complaint. Docket No. 32. The amended complaint alleges five causes of action against all defendants: (1) violations of the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); (2) violations of the

Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-101, *et seq.*; (3)

fraud/fraudulent concealment under Colorado law; (4) breach of implied contract under

Colorado law; and (5) unjust enrichment under Colorado law. *Id.* at 108-123,

¶¶ 270-326.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege

enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . .

plausible on its face." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts

do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged – but it has not shown – that the pleader is entitled to relief."

*Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration

marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving,

"a complaint still must contain either direct or inferential allegations respecting all the

material elements necessary to sustain a recovery under some viable legal theory."

*Bryson,* 534 F.3d at 1286 (alteration marks omitted).

## III.  ANALYSIS

### A.  Plaintiffs' RICO claim

Plaintiffs' first claim for relief is brought pursuant to 18 U.S.C. § 1962(c).  Docket

No. 32 at 108-114, ¶¶ 270-288.  A claim for civil RICO pursuant to 18 U.S.C. § 1962

must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity."  *See Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010).  HomeAdvisor

argues that plaintiffs have failed to adequately plead the first two elements of a RICO claim.  Docket No. 42 at 3-9.

Defendants argue that plaintiffs have failed to allege a RICO enterprise.  *Id.* at 3-7; Docket No. 44 at 11.  RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiffs allege an "association-in-fact enterprise," Docket No. 32 at 108, ¶ 271, which "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Plaintiffs identify a large enterprise that includes IAC, several of IAC's employees and officers, HomeAdvisor, HomeAdvisor's CEO, lead generators, partner affiliate networks, affiliate program partners, home improvement affiliates, and collection agencies.  Docket No. 32 at 108-110, ¶¶ 271-273.  Plaintiffs state that the members of the RICO enterprise had a common purpose: "to generate revenue through HomeAdvisor by signing up Home Service Professionals and collecting money from Home Service Professionals for sham Leads."  *Id.* at 111, ¶ 275.

HomeAdvisor argues that dismissal is appropriate because plaintiffs' allegations demonstrate that "there is no actual affiliation among these many diverse business entities, and to the extent they are alleged to have directly interacted with HomeAdvisor, it was simply to advance their own business interests."  Docket No. 42 at 6.  Plaintiffs respond that they are not required to plead "elements to prove that an enterprise actually exists."  Docket No. 56 at 7 (quoting *Darrick Enterprises v. Mitsubishi Motors*

8

Corp., 2007 WL 2893366, at *7 (D.N.J. Sept. 28, 2007).  However, the authority cited

by plaintiffs is based on pre-*Iqbal* pleading requirements.[3]  *Id.* (citing *Darrick*, 2007 WL

2893366, at *7; *In re Ins. Brokerage Antitrust Litig.*, 2007 WL 1062980, at *8 (D.N.J.

Apr. 5, 2007)).  Plaintiffs are required to plead facts showing that their RICO claim is

"plausible on its face."  *Iqbal*, 556 U.S. at 678 (citation omitted); *George v. Urban*

*Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016) (plaintiffs must "plausibly

allege" that each defendant meets the elements of § 1962(c)).

      The Court first considers the adequacy of the allegations regarding the non-

defendant entities claimed to be part of the association-in-fact enterprise.  The

amended complaint is devoid of any reference to actions in furtherance of the alleged

enterprise by any non-defendant entity.  Even a lower rung participant "must do more

than simply provide, through its regular course of business, goods and services that

ultimately benefit the enterprise."  *George*, 833 F.3d at 1251 (quoting *BancOklahoma*

*Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1101-02 (10th Cir. 1999)).  The

amended complaint itself states that the non-defendant entities are independent and

merely engage in commercial transactions with plaintiffs.  Docket No. 32 at 40-41,

¶¶ 98-100 (noting that direct lead generators "are in the business of generating

consumer contact information for a variety of industries"; that partner affiliate networks

"are businesses that connect 'advertisers' like HomeAdvisor with 'publishers' like

bloggers and other businesses"; and that the home improvement affiliates are

---

[3]The passage of *Darrick* cited by plaintiffs relied on *Seville Indus. Mach. Corp. v.*
*Southmost Mach. Corp.*, 742 F.2d 786, 789 (3d Cir. 1984), which was abrogated in part
by *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007).  *See Travelers Indem. Co. v.*
*Cephalon, Inc.*, 620 F. App'x 82, 86 (3d Cir. 2015) (noting the abrogation of *Seville*).

established companies and brands in the home improvement business); 42-43, ¶ 102 (describing lead generation services from one provider and noting that "HomeAdvisor is not involved with and has no right to control the manner in which [the lead generator] generates or obtains consumer leads" and that the lead generator "does not know, in advance, who will ultimately purchase the lead"). Plaintiffs do not allege that any of the non-defendant entities was aware of or participated in HomeAdvisor's representations. *See Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1354 (11th Cir. 2016) (finding RICO allegations inadequate where plaintiffs failed to allege that other entities "were aware of or participated in [defendant's] alleged misrepresentations"). Nor do plaintiffs allege that officials from the non-defendant companies "involved themselves in the affairs" of the enterprise, that profits from the scheme were shared among entities, or that any of the non-defendant entities engaged in any conduct outside their normal business practices. *See United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854-55 (7th Cir. 2013). In fact, plaintiffs' response brief makes no attempt to identify any allegations that the non-defendant entities had some part in operating or managing the affairs of the purported association-in-fact enterprise.

Even if their RICO allegations involving the non-defendant entities are insufficient, plaintiffs argue that IAC, HomeAdvisor, and their employees or agents can form the relevant enterprise. Docket No. 56 at 8. "§ 1962(c) requires that the 'person' conducting the enterprise's affairs be distinct from the 'enterprise.'" *George*, 833 F.3d at 1249 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 160 (2001)). As a result, "a defendant corporation, acting through its subsidiaries, agents, or employees

10

typically can't be both the RICO 'person' and the RICO 'enterprise.'" *George*, 833 F.3d at 1249 (citing *Brannon v. Boatmen's First Nat'l Bank of Oklahoma*, 153 F.3d 1144, 1149 (10th Cir. 1998)); *In re ClassicStar Mare Lease Litig*., 727 F.3d 473, 493 (6th Cir. 2013) (a parent corporation and its subsidiaries do not ordinarily satisfy the distinctness requirement). Here, as in *George*, plaintiffs do not contend that "either a parent corporation or its subsidiary corporation is the enterprise. Rather, they assert that . . . two separate legal entities . . . joined together . . . to form and conduct the affairs of [an] . . . association-in-fact enterprise." 833 F.3d at 1250. The parent/subsidiary relationship between HomeAdvisor and IAC does not prevent a finding of distinctiveness given the allegation of an association-in-fact enterprise.

IAC claims that, regardless of whether plaintiffs have properly alleged an association-in-fact enterprise, their allegations against IAC are deficient. Specifically, IAC argues, given that plaintiffs' RICO claim is predicated on acts of wire fraud, plaintiffs must plausibly allege that IAC committed wire fraud. Docket No. 44 at 5. To adequately allege wire fraud, plaintiffs must plead facts showing: "(i) Defendants engaged in a scheme to defraud by means of false pretenses; (ii) the Defendants acted with the requisite intent to defraud; and (iii) the scheme contemplated the use of . . . wire transactions." *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1076 (D. Colo. 2012) (citing *Burnett v. Amrein*, 243 Fed. App'x 393, 395 (10th Cir. 2007) (unpublished)). As noted by IAC, plaintiffs' RICO allegations regarding wire fraud, Docket No. 32 at 111-113, ¶¶ 278-282, refer generally to "defendants" and make no specific allegations regarding IAC. Such allegations are insufficient to allege that IAC committed wire fraud. *Cf. Brannon*, 153 F.3d at 1150 (finding that plaintiffs failed to

allege that parent company committed wire fraud; therefore, plaintiffs' RICO claim against parent was insufficient). Plaintiffs do not respond to this argument. It is not incumbent on the Court to review the 124-page long amended complaint to determine whether some allegation might make out a wire fraud claim against IAC. The Court finds that plaintiffs' RICO allegations against IAC are insufficient.

Given the dismissal of the RICO claim against IAC and the inadequacy of plaintiffs' allegations concerning the non-defendant entities, the question becomes whether plaintiffs' RICO claim can survive based solely on plaintiffs' allegations against HomeAdvisor. Plaintiffs allege that the RICO enterprise included "HomeAdvisor, along with several of [its] respective employees and officers, including . . . from HomeAdvisor Chris Terrill." Docket No. 32 at 108, ¶ 271. As noted earlier, "§ 1962(c) requires that the 'person' conducting the enterprise's affairs be distinct from the 'enterprise.'" *George*, 833 F.3d at 1249 (citing *King*, 533 U.S. at 160). While it is possible, as in *King*, that the president of a company can be distinct for RICO purposes from the company itself, *id*. at 160-164, plaintiffs make no specific RICO allegations regarding HomeAdvisor CEO Terrill. Plaintiffs do not claim that Mr. Terrill (or any other unnamed employee) and HomeAdvisor formed the association-in-fact enterprise. Instead, plaintiffs allege that the enterprise was formed by the "affiliation between IAC and HomeAdvisor." Docket No. 32 at 108, ¶ 271. As a result, the "person" conducting the enterprise's affairs (HomeAdvisor) is not distinct from the enterprise. *See George*, 833 F.3d at 1249. Plaintiffs' RICO claim against HomeAdvisor is also insufficient.

Accordingly, the Court finds that plaintiffs have failed to allege a RICO violation and plaintiffs' first claim for relief will be dismissed.

**B. Plaintiffs' Colorado Consumer Protection Act Claim**

Plaintiffs' second claim for relief is under the CCPA. Docket No. 32 at 114-119, ¶¶ 289-305. HomeAdvisor argues that dismissal is appropriate because the CCPA does not apply to conduct outside the state of Colorado.[4] Docket No. 42 at 9-13.

"Absent language in the statute evidencing a contrary intent, Colorado courts presume that a statute[] does not have extraterritorial effect." *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, No. 12-cv-02432-WYD-KMT, 2013 WL 5448078, at *6 (D. Colo. Sept. 27, 2013) (citing *Frontier Airlines, Inc. v. Dep't of Revenue*, 571 P.2d 1088, 1089 (Colo. 1977). The presumption against extraterritorial effect can be overcome if a party presents "authority manifesting a contrary intent" from the Colorado legislature. *Frontier*, 571 P.2d at 1089. The CCPA does not contain express language that it applies extraterritorially; accordingly, plaintiffs must overcome the presumption against extraterritorial application. *See Friedman*, 2013 WL 5448078, at *6.

Plaintiffs cite Colorado decisions noting that the CCPA has a "broad legislative purpose" and indicating that the CCPA has been interpreted expansively in order to support their claim that the CCPA should apply to non-residents. *See* Docket No. 56 at 12 (citing *Hall v. Walter*, 969 P.2d 224, 230 (Colo. 1998); *Crowe v. Tull*, 126 P.3d 196,

---

[4]Defendants also argue that the CCPA bars class claims for damages. Docket No. 42 at 14-15. In their response, plaintiffs state that, "[f]or the proposed Class with respect to the CCPA claim, Plaintiffs seek class remedies consistent with § 6-1-113(2) (referencing that actual damages, statutory damages, trebled damages, and attorney's fees and costs are not available for a class)." Docket No. 56 at 11. Accordingly, the Court need not consider whether actual damages are available to a class under the CCPA. Plaintiffs will be held to their representation that their CCPA claim is limited to injunctive relief. *See* Docket No. 32 at 118-119, ¶ 304 (enumerating the requested injunctive relief).

202 (Colo. 2006)).  Plaintiffs' citations, however, do not support a finding that the CCPA was intended to apply extraterritorially.  While both decisions state that the CCPA should be read "expansively," *Hall*, 969 P.2d at 232; *Crowe*, 126 P.3d at 202, neither decision suggests or implies that the Colorado legislature intended the CCPA to apply extraterritorially.

Plaintiffs also cite *Thornell v. Seattle Serv. Bureau, Inc.*, 363 P.3d 587 (Wash. 2015), as evidence that the CCPA should apply extraterritorially.  Docket No. 56 at 12-13 n.13.  Colorado courts have held that Washington State serves as "a model for the development of consumer protection legislation," *Hall*, 969 P.2d at 233, and that Colorado courts may rely on Washington Supreme Court decisions in reading the CCPA.  *See id.*  However, while the court in *Thornell* concluded that the Washington consumer protection statute had extraterritorial application, it based its decision on the definition of "commerce," which encompassed acts "*directly or indirectly affecting* the people of the state of Washington."  363 P.3d at 590 (citation omitted) (emphasis in original).  The CCPA does not define "commerce" or otherwise contain a similar definition.  *See* Colo. Rev. Stat. § 6-1-102; *see also Hall*, 969 P.2d at 234 (noting the lack of a comparable definition of "trade" or "commerce" under the CCPA).  As a result, the Court does not consider *Thornell* persuasive.

The Court finds that plaintiffs fail to overcome the presumption that the CCPA does not apply extraterritorially.[5]  Plaintiffs do not dispute that none of the plaintiffs

---

[5]The parties also dispute whether the CCPA would apply under a conflict of laws analysis.  *See* Docket No. 42 at 12-14; Docket No. 56 at 13-15.  Because the Court concludes that the CCPA does not apply to the out-of-state plaintiffs, the Court need not consider the appropriate consumer protection statute under other principles.

resides in Colorado or was harmed in Colorado.  *See* Docket No. 32 at 13-14, ¶¶ 23-25 (noting that Airquip is based in New York, DaSilva's business is located in Florida, and Gray's business is located in Indiana).  Accordingly, the CCPA does not apply to this dispute and plaintiffs' second claim for relief will be dismissed.

### C.  Plaintiffs' Claims Sounding in Fraud

Plaintiffs' fraud claim (third claim for relief) and unjust enrichment claim (fifth claim for relief) are each predicated on defendants' allegedly fraudulent conduct.  *See* Docket No. 32 at 119-121, ¶¶ 306-312 (alleging fraud); 122-123, ¶ 324 (alleging that defendants have been unjustly enriched by their "fraudulent and deceptive conduct").  For those claims sounding in fraud, plaintiffs are required to meet the heightened pleading requirements under Fed. R. Civ. P. 9(b).  *See Baker v. Wood, Ris & Hames, Prof'l Corp.*, 364 P.3d 872, 883 (Colo. 2016) ("Colorado courts have consistently required all claims sounding in fraud to be pleaded with particularity.")

As an initial matter, plaintiffs argue that, because fraud is not an element of unjust enrichment in Colorado, plaintiffs' fifth cause of action should be "measured by the ordinary standard of plausibility."  Docket No. 55 at 11.  Plaintiffs state that IAC's liability on the fifth claim for relief does not turn on the elements of fraud since IAC can be required to disgorge money obtained as a result of HomeAdvisor's fraudulent conduct.  *See* Docket No. 55 at 12.  IAC argues that, because the unjust enrichment claim "is merely an alternative pleading of their other fraud-based claims, [plaintiffs] must meet the pleading standard of Rule 9(b)."  Docket No. 64 at 7.

Defendants are correct that plaintiffs' unjust enrichment claim is predicated on fraudulent conduct.  Docket No. 32 at 123, ¶ 324 ("Defendants have been unjustly

enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs and the Class.").  However, HomeAdvisor has not moved to dismiss plaintiffs' fraud claim[6] and IAC does not claim that plaintiffs' allegations related to HomeAdvisor's fraudulent conduct are insufficiently pled.  Under Colorado law, "[i]nnocent third party recipients of benefits must sometimes surrender them if such benefits are the result of fraud."  *Bock v. Am. Growth Fund Sponsors, Inc.*, 904 P.2d 1381, 1386 (Colo. App. 1995) (citing Restatement of Restitution §§ 13, 17, 28, 107, & 123 (1937)). Accordingly, plaintiffs need not plead that IAC engaged in fraudulent conduct in order to state a claim against IAC for unjust enrichment.  Because IAC does not dispute that plaintiffs have adequately pled fraud by HomeAdvisor, plaintiffs' unjust enrichment claim will not be dismissed.

Plaintiffs' third claim for relief alleges that IAC and HomeAdvisor committed fraud.  Docket No. 32 at 119-121, ¶¶ 306-312.  In order to state a claim for fraud, plaintiffs must allege that the "defendant made a false representation of fact, that the representation was made to induce a person to act or with the intention that it be acted upon, and that damage was sustained in reliance on, or in consequence of, the false or deceptive representation."  *Nelson v. Gas Research Inst.*, 121 P.3d 340, 344 (Colo. App. 2005).

Under Federal Rule of Civil Procedure 9(b), "fraud or mistake" must be pled with particularity, meaning that a plaintiff must, at the minimum, "set forth the time, place

---

[6]HomeAdvisor has not moved to dismiss plaintiffs' claims for fraud/fraudulent concealment (third claim for relief), breach of implied contract (fourth claim for relief), or unjust enrichment/restitution (fifth claim for relief).  *See* Docket No. 42.

16

and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 727 (10th Cir. 2006) (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)). Although a plaintiff may generally plead "[m]alice, intent, knowledge, and other conditions of a person's mind," Rule 9(b) "merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade the less rigid-though still operative-strictures of Rule 8." *Iqbal*, 556 U.S. at 686-87.

IAC argues that plaintiffs' third claim for relief should be dismissed because plaintiffs do not allege with particularity any fraudulent acts taken by IAC. Docket No. 44 at 8-9. Plaintiffs respond by citing sections of the amended complaint purportedly reflecting IAC's fraudulent conduct. Docket No. 55 at 4. However, none of the paragraphs cited by plaintiffs identifies any fraudulent conduct undertaken by IAC. *See* Docket No. 32 at 14, ¶ 26 (alleging that IAC purchased and rebranded ServiceMagic in 2004); 24-25, ¶ 60 (describing actions taken by HomeAdvisor); 37, ¶ 89 (referring to an IAC announcement that HomeAdvisor had acquired a majority stake in mHelpDesk); 27-31, ¶¶ 66-73 (referring to representations on HomeAdvisor's website and in HomeAdvisor's YouTube videos); 53-60, ¶¶ 129-148 (describing plaintiffs' experiences and making no reference to IAC); 61-73, ¶¶ 152-192 (describing other HomeAdvisor members' experiences without any reference to IAC).

The amended complaint repeatedly alleges that "defendants" engaged in fraudulent acts, without specifying which defendants did what. Such allegations are insufficient. "[W]here fraud is alleged against multiple defendants, blanket allegations

of fraud couched in language such as 'by the defendants' are insufficient. Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth." *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003). The amended complaint does not identify a single false or misleading statement made by IAC, as opposed to HomeAdvisor.

In the alternative, plaintiffs claim that the allegations in the amended complaint support piercing the corporate veil. Docket No. 55 at 6-9. "A request to pierce the corporate veil is governed by the law of the defendant company's state of incorporation."[7] *United States ex rel. Fowler v. Evercare Hospice, Inc.*, No. 11-cv-00642-PAB-NYW, 2015 WL 5568614, at *13 (D. Colo. Sept. 21, 2015) (citing Restatement (Second) of Conflicts § 307 (1971); Charles Alan Wright et al., 7 Fed. Prac. & Proc. Civ. § 1826 (3d ed.)). HomeAdvisor is incorporated in Delaware. Docket No. 32 at 14, ¶ 26.

As the Court set out in *Medtronic Navigation, Inc. v. Saint Louis Univ.*, No. 12-cv-01706-PAB-MJW, 2013 WL 5323307, at *9 (D. Colo. Sept. 23, 2013), "Delaware law permits a court to pierce the corporate veil of a company where there is fraud or where it is in fact a mere instrumentality or alter ego of its owner." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (internal citation and alterations omitted). To prevail on an alter ego claim under Delaware law, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of

---

[7]Plaintiffs refer to the factors for piercing the corporate veil under Colorado law. Because plaintiffs fail to explain why Colorado law would apply, the Court considers only Delaware law.

18

injustice or unfairness is present." *Id.* (internal citations and alterations omitted).

Under the first prong of the test, the degree of influence required of the parent company over the child company is "exclusive domination and control . . . to the point that [the child company] no longer has legal or independent significance of its own." *Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) (internal citation and alterations omitted). To determine whether this standard has been met, courts consider "factors which reveal how the corporation operates . . .[, including] whether the corporation was adequately capitalized . . .; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed;. . . and whether . . . the corporation simply functioned as a facade for the dominant shareholder." *In re Foxmeyer Corp.*, 290 B.R. 229, 235 (Bankr. D. Del. 2003).

The second prong requires a showing of fraud or injustice inherent "in the defendants' use of the corporate form." *Foxmeyer*, 290 B.R. at 236. Any breach of contract or tort is "in some sense, an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud." *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989). "The underlying cause of action, at least by itself, does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Foxmeyer*, 290 B.R. at 236 (internal citations and alterations omitted).

Plaintiffs allege that piercing the corporate veil is appropriate because IAC owns and is the majority shareholder of HomeAdvisor, has made capital contributions to

HomeAdvisor, and represents to the public that HomeAdvisor is a subsidiary of IAC. Docket No. 55 at 8.  None of these arguments comes close to demonstrating that HomeAdvisor "no longer has legal or independent significance."  *See Wallace*, 752 A.2d at 1183-84.  To the contrary, the amended complaint suggests that IAC and HomeAdvisor are distinct entities and that IAC has every intention of spinning HomeAdvisor off as an independent company.  Docket No. 32 at 18, ¶ 44.

Because plaintiffs have not alleged IAC's fraudulent conduct with particularity and have not presented a basis for piercing the corporate veil, plaintiffs' third claim for relief will be dismissed as to defendant IAC.

### D.  Plaintiffs' Breach of Implied Contract Claim

Plaintiffs' fourth claim for relief is for breach of implied contract.  Docket No. 32 at 121-122, ¶¶ 313-320.  To state a claim for breach of implied contract, plaintiffs must allege that "the parties' conduct [] evidences a mutual intention to enter into a contract." *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1192 (Colo. 2001).  IAC argues that the amended complaint is "devoid of any pleaded facts even remotely suggesting an agreement between IAC and any of Plaintiffs."  Docket No. 44 at 13. Plaintiffs respond that their "claim of breach of implied contract as against IAC is based on the notion that HomeAdvisor is IAC's instrumentality, and that IAC was, at minimum, de facto contractual participant in the implied contractual relationship with Plaintiffs." Docket No. 55 at 14-15.  As discussed above, plaintiffs have not presented any basis for disregarding the corporate form and treating HomeAdvisor as an instrumentality of IAC.  Because the amended complaint makes no reference to any action taken by IAC evidencing an intent to form a contract with plaintiffs, plaintiffs' fourth claim for relief will

20

be dismissed as to IAC.[8]

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that HomeAdvisor, Inc.'s Partial Motion to Dismiss Amended

Complaint [Docket No. 42] is **GRANTED** and IAC/InterActiveCorp's Motion to Dismiss

Amended Complaint [Docket No. 44] is **GRANTED** in part and **DENIED** in part.  It is

further

**ORDERED** that plaintiffs' first claim for relief is dismissed without prejudice as to

all defendants.  It is further

**ORDERED** that plaintiffs' second claim for relief is dismissed with prejudice as to

all defendants.  It is further

**ORDERED** that plaintiffs' third and fourth claims for relief are dismissed without

prejudice as to defendant IAC/InterActiveCorp.

---

[8]Plaintiffs request that, if the Court dismisses any of their claims, the Court dismiss them without prejudice and with leave to amend.  Docket No. 55 at 15; Docket No. 56 at 15.  The Court sees no reason for dismissing plaintiffs' second claim for relief without prejudice because the dismissal is based on a narrow issue of statutory interpretation and therefore amendment would be futile.  As to the other claims, the Court will dismiss them without prejudice, but notes that plaintiffs' request for leave to amend the complaint is inadequate.  *See Glenn v. First Nat'l Bank in Grand Junction*, 868 F.2d 368, 370 (10th Cir. 1989).

DATED September 21, 2017.

BY THE COURT:

　s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge