IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION

## ORDER

This matter is before the Court on defendant HomeAdvisor, Inc.'s Motion to Compel Arbitration and to Stay Claims [Docket No. 51].[1] The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

## I. BACKGROUND

Defendant HomeAdvisor, Inc. ("defendant") is an online business that connects consumers with home service professionals ("HSPs"). Docket No. 51 at 6. An HSP is generally an independent contractor in the business of doing home repairs, remodeling, or inspections. *See* Docket No. 1 at 15-20, ¶¶ 8-15. HomeAdvisor's business model is that HSPs become members of its network. Docket No. 51 at 6. HomeAdvisor charges the HSP for each potential customer referral, or a "lead," that it provides. Docket No. 1 at 24, ¶¶ 35-36. Plaintiffs are all former members of HomeAdvisor's network. *Id.* at 15-20, ¶¶ 8-15. Plaintiffs allege that HomeAdvisor misrepresented the quality of its leads as "project-ready homeowners." *Id.* at 24-25, ¶ 37. In reality, plaintiffs claim, the leads were materially defective in that they contained incorrect contact information, included

---

[1]After the briefing on this motion was completed, the Court consolidated Civil Action No. 16-cv-01849-PAB-KLM with Civil Action No. 18-cv-01802-WJM-MEH. Docket No. 82. All citations to the docket herein refer to documents filed in the latter case unless otherwise noted.

individuals who had no home service needs and had not contacted HomeAdvisor, and included contacts for vacant or non-existent residences, among other things. *Id.* at 27, ¶ 40-41.

Each plaintiff became a HomeAdvisor member through a telephone sign-up process. Docket No. 73 at 5. After speaking with a HomeAdvisor representative, agreeing to become a HomeAdvisor member, and providing payment information, an interested HSP is transferred to a "voice log" while the HomeAdvisor representative stays on the line. Docket No. 74-5 at 5. A pre-recorded voice message then states, "This confirmation process should be completed with the principal of the business. At the tone, as confirmation that you are an authorized principal of the company, and that you agree to HomeAdvisor's terms and conditions, please state your full name and company name." Docket No. 51 at 10; Docket No. 73 at 7. Each plaintiff did so. Docket No. 51 at 11. The voice log did not recite the terms and conditions and did not inform the individual of a way to access the terms and conditions. Docket No. 46-7 at 2.[2]

Upon completion of the voice log process, the HSP is subject to a background check by HomeAdvisor, which usually is completed within 24 hours. Docket No. 73 at

---

[2]HomeAdvisor contends the terms and conditions "were available on all webpages of the HA Pro Site when Plaintiffs assented to the voice log prompts, and Plaintiffs easily could have reviewed them prior to electing to proceed with enrollment if they wished." Docket No. 51 at 15. But the terms and conditions on the Pro Site were only available to plaintiffs "at all times when Plaintiffs were approved as members and held memberships with HomeAdvisor." Docket No. 46 at 12, ¶ 18. During the voice log process, plaintiffs had not yet been approved as HomeAdvisor members and had not been provided a link to access the company's terms and conditions. Docket No. 51 at 8; Docket No. 46-7 at 2.

9. HomeAdvisor then automatically bills the initial fee to the credit card the HSP provided over the telephone. *Id.* Afterwards, the HSP receives a "welcome email" and a "confirmation email." *Id.*; Docket No. 46-7 at 3-4.

The welcome email directs the HSP to click a hyperlink to access his or her HomeAdvisor account on the HomeAdvisor "Pro Site." *Id.* at 3. Underneath that hyperlink, the email states, "By using this site, you are agreeing to our Terms & Conditions."[3] *Id.* There is a corresponding hyperlink to the terms and conditions. *Id.* The confirmation email also references the company's terms and conditions, stating, "See Terms & Conditions," which also contains a hyperlink. *Id.* at 4. By clicking on the terms and conditions hyperlink, the recipient is provided with the full terms and conditions, including an arbitration agreement. Docket No. 46 at 8, ¶ 13. The confirmation email states, "Membership fees are non-refundable and are charged automatically on each renewal date until canceled."[4] Docket No. 46-7 at 4. Neither the confirmation or welcome email, however, provides the terms and conditions in the body or in an attachment. Docket No. 51 at 11.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") "manifests a liberal federal policy favoring

---

[3] Welcome emails sent to plaintiffs Ervine and Linda McHenry differed from the welcome emails sent to the other plaintiffs, as they did not contain this statement. Docket No. 46-10 at 3; Docket No. 46-12 at 3; *see also* Docket No. 46 at 10-11, ¶ 15 (identifying Docket No. 46-10 as containing emails sent to Ervine and Docket No. 46-12 as containing emails sent to McHenry).

[4] Further, the terms and conditions stated HomeAdvisor was not obligated to provide any refund unless the membership was terminated within 72 hours. Docket No. 46-1 at 7.

arbitration." *Comanche Indian Tribe v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991)). Consequently, the Court must "resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" *P & P Industries, Inc. v. Sutter Corp.*, 179 F.3d 861, 866 (10th Cir. 1999) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "In addition, this liberal policy 'covers more than simply the substantive scope of the arbitration clause,' and 'encompasses an expectation that [arbitration] procedures will be binding.'" *Id.* (citation omitted).

"[A]lthough the presence of an arbitration clause generally creates a presumption in favor of arbitration, this presumption disappears when the parties dispute the existence of a valid arbitration agreement." *Bellman v. i3Carbon*, LLC, 563 F. App'x 608, 613 (10th Cir. 2014) (unpublished) (citations omitted). Determining whether a dispute is subject to arbitration "is similar to summary judgment practice." *Id.* at 612 (quoting *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012)). The party moving to compel arbitration must present "evidence sufficient to demonstrate the existence of an enforceable agreement." *Id.* The burden then shifts to the nonmoving party "to raise a genuine dispute of material fact regarding the existence of an agreement." *Id.* "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate has been made by the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Vernon v. Qwest Comm. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012), *aff'd*, 925 F. Supp. 2d 1185 (D. Colo. 2013).

## III. ANALYSIS

Defendant argues plaintiffs assented to the terms and conditions during the voice log process. Docket No. 51 at 10. Plaintiffs oppose the motion, arguing that, because they were never informed about the terms and conditions before the voice log process, and had no opportunity to read or access the terms and conditions before being prompted to accept them, they could not have assented to them before they became members. Docket No. 73 at 13.

### A. Choice of Law

Defendant argues that the terms and conditions contain a choice of law provision that Colorado law applies. Plaintiffs challenge the validity of the choice of law provision, but do not challenge the use of Colorado law. Docket No. 73 at 13, n.8. The Court will therefore apply Colorado law to the question of contract formation. *See Terlizzi v. Altitude Mktg., Inc.*, No. 16-cv-01712-WJM-STV, 2018 WL 2196090, at *7 (D. Colo. May 14, 2018).

Under Colorado law, "[a]rbitration is a matter of contract and is governed by contract principles." *Winter Park Real Estate & Invs., Inc. v. Anderson*, 160 P.3d 399, 403 (Colo. App. 2007). "A contract is formed when an offer is made and accepted . . . and the agreement is supported by consideration." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). "The parties' agreement is evidenced by their manifestations of mutual assent." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986). "The terms of the offer must be sufficiently definite that the promises and performances of each party are reasonably certain." *Watson v. Pub. Serv. Co. of Colo.*,

5

207 P.3d 860, 868 (Colo. App. 2008).

## B. Assent

Defendant argues that plaintiffs assented to its terms and conditions by completing the voice log process during sign-up. Docket No. 51 at 15. In the alternative, it argues that plaintiffs assented to the terms and conditions by continuing to use its service after they had received the welcome and confirmation emails containing hyperlinks to the company's terms and conditions. *Id.* at 17.

"The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Pierce v. St. Vrain Valley Sch. Dist. RE–1J*, 981 P.2d 600, 603 (Colo. 1999). In assessing whether a party assented to an agreement's terms, "the threshold issue" is whether the consumer had "reasonable notice, either actual or constructive, of the terms of the putative agreement" and whether the "consumer manifest[ed] assent to those terms." *Vernon*, 857 F. Supp. 2d at 1149 (applying Colorado law). When determining whether a contract has been formed, the Court assesses "whether the contractual terms were 'reasonably conspicuous' and whether [the] alleged assent to them was 'unambiguous.'" *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1026 (D. Colo. 2012) (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17 (2nd Cir. 2002) (applying Colorado contract law and noting that Colorado law "bears some similarity to the California law assessed in *Specht*")).

Defendant argues that plaintiffs manifested such assent when they affirmatively stated their names after the telephone recording asked them to do so to agree to

HomeAdvisor's terms and conditions. But the Court concludes that reasonable HSPs would not have understood, in confirming that they were the principal of the business, they were also agreeing to terms and conditions on unrelated topics. A person using the phone log hears the following message: "This confirmation process should be completed with the principal of the business. At the tone, as confirmation that you are an authorized principal of the company, *and that you agree to HomeAdvisor's terms and conditions*, please state your full name and company name." Docket No. 46-7 at 2 (emphasis added).

"When a party is unaware of a term of a contract because it was hidden or obscured, there can be no presumption that there was a meeting of the minds as to such term." *Grosvenor*, 854 F. Supp. 2d at 1026. Here, the reference to the terms and conditions was obscured by the surrounding, unrelated inquiry regarding the plaintiff's role in his or her business. Docket No. 46-7 at 2. An HSP would naturally focus on the issue of whether or not he or she was a principal, and not understand or focus on terms and conditions that were never explained or stated. A response to the telephone prompt cannot be considered an unambiguous assent to reasonably conspicuous contractual terms and cannot be said to give the plaintiffs "reasonable notice, either actual or constructive, of the terms of the putative agreement." *Vernon*, 857 F. Supp. 2d at 1149.

In an analogous case, the Third Circuit evaluated consumer assent in the context of a company "offering services via one medium (an interactive telephone voice-response system) and purporting to bind users of those services to terms that are accessible only through a different medium (the internet)." *James v. Global TelLink*

*Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). As in this case, the enrollment process in *James* "occurred entirely through an automated telephone system, a medium that adverted to the terms of use without stating them." *Id.* at 266. On the call, consumers were informed that their accounts were "governed by the terms of use and the privacy statement posted at www.offenderconnect.com." *Id.* at 264. But the consumers were not given the terms of use, nor were they required to demonstrate acceptance through any affirmative act. *Id.* at 266-67. "To access the terms of use, [the consumers] would have needed to connect to the internet, visit [the company's] website, and then click on a hyperlink." *Id.* at 266. The court determined that, because "th[e] terms were neither conspicuous nor readily accessible" to the consumers, the consumers could not "manifest[] assent to terms contained on a website they never visited." *Id.* at 267-68 n.3. Similarly, plaintiffs here completed the enrollment process via an automated telephone service. Docket No. 73 at 5. As in *James*, plaintiffs were told that terms and conditions existed, but were not provided with the terms and conditions until after the transaction was complete.

Defendant argues the terms and conditions were available on the HomeAdvisor "Pro Site" and plaintiffs "easily could have reviewed them prior to electing to proceed with enrollment if they wished." Docket No. 51 at 15. But the voice log did not inform plaintiffs where to access the Pro Site, let alone that the terms and conditions were available on the website. Docket No. 46 at 11-12, ¶¶ 17-18; Docket No. 46-7 at 2. Defendant is correct that a party "generally cannot avoid contractual obligations by claiming that he or she did not read the agreement." *Vernon*, 857 F. Supp. 2d at 1152.

But this is not a case of a party willfully neglecting to read terms and conditions, but a case of these specific terms and conditions being unavailable to the plaintiffs. Docket No. 46 at 11-12, ¶¶ 17-18; Docket No. 46-7 at 2. Because the terms of the arbitration agreement were not reasonably available to them, plaintiffs did not assent to the arbitration agreement during the voice log enrollment when they entered into their subscription agreements with HomeAdvisor. *See James*, 852 F.3d at 267-68; *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012) (finding that arbitration provision delivered to members after enrollment in program was not binding on members because "a reasonable person would not be expected to connect an email that the recipient may not actually see until long after enrolling in a service (if ever) with the contractual relationship he or she may have with the service provider").

Defendant also argues that, if the Court determines plaintiffs did not assent during the voice log process, they nevertheless assented to the arbitration agreement when they continued to receive the benefits of HomeAdvisor membership after they were twice provided with links to the company's terms and conditions. Docket No. 51 at 17. "While general contract formation principles and more specifically the requirement of mutual assent have not changed with the emergence of e-commerce, . . . courts are being asked to apply those common law principles to ever-evolving transactional settings." *Vernon*, 857 F. Supp. 2d at 1149. For example, some online agreements, called "clickwrap" agreements, present terms and conditions to the consumer and require the consumer to affirmatively indicate acceptance of those terms. *Id.* A similar but distinct type of agreement is the "browsewrap" agreement, in which the terms and conditions are posted on the company's website and the consumer conveys assent by

continuing to use that website rather than affirmatively agreeing to the terms. *Id.* Alternatively, there exists a "hybrid arrangement[]" in which the consumer "must take affirmative action – pressing a 'click' button – but, like a browsewrap agreement, the terms being accepted do not appear on the same screen as the accept button, but are available with the use of a hyperlink." *Id.*

Neither "clickwrap" nor "browsewrap" agreements are closely analogous to this case. Defendant argues that plaintiffs affirmatively assented to the terms and conditions by completing the voice log process – similar to a "clickwrap" agreement – but plaintiffs were never affirmatively presented with the terms and conditions before doing so. Docket No. 46-7 at 2. And, although the more passive "browsewrap" agreement is closer to the case at hand, the voice log merely referenced "terms and conditions" without informing plaintiffs whether they were available to view until the transaction had been completed. *Id.*

Defendant argues that this case is analogous to *Vernon*, in which the court determined that continued use of a service upon the receipt of terms and conditions, after an agreement had been formed by either telephone or internet, constituted assent to those terms. 857 F. Supp. 2d at 1151. In *Vernon*, plaintiffs argued that they had not assented to the company's subscriber agreement, which contained an arbitration clause, because they had never been presented with the agreement when signing up for internet service. *Id.* at 1148. However, after signing up for the internet service, subscribers were made aware of the subscriber agreement "through multiple communications," such as a letter sent to subscribers and two notices during the

10

software installation process. *Id.* at 1150. The subscriber letter and software notices each requested that the subscriber "review the terms, which include arbitration and limits on Qwest liability," and provided a direct link to those terms. The software further required the user to click a button labeled "I accept" to agree to the terms of service. *Id.* at 1146. Further, both the letter and the software notices directed the customer to "call Qwest and cancel your service within 30 days" if the customer did not agree to the terms. *Id.* The court determined the defendants had sufficiently made *a prima facie* showing that the plaintiffs not only had notice of the subscriber agreement, but had accepted the terms by their continued use of the service. *Id.* at 1151-52.

This case differs from *Vernon* in important ways. In *Vernon*, the software notices and letters instructed the subscribers to review the terms and clearly informed them that the terms included an arbitration provision. 857 F. Supp. 2d at 1145-46. Further, after informing the potential subscriber of the arbitration provision, the software notice required the individual to click a box indicating agreement to those terms and conditions. *Id.* A subscriber could not enroll via the internet without agreeing to such terms. *Id.* at 1145. Here, the HSPs were able to enroll with HomeAdvisor with no knowledge that an arbitration clause existed and with no meaningful opportunity to review any of HomeAdvisor's terms and conditions. Docket No. 46-7 at 2. Moreover, the welcome and confirmation emails sent to plaintiffs after their enrollment make no reference to an arbitration clause and contain no description of the contents of the terms and conditions, which makes an HSP less likely to review them. Docket No. 46-7 at 3-4.

11

Further, unlike *Vernon*, it does not appear that plaintiffs here were given the opportunity to opt out of the arbitration agreement. The welcome and confirmation emails provided no express opt-out provision. *See id.* at 3-4. In fact, the confirmation email informed the HSPs that they could not opt out, stating that "[m]embership fees are non-refundable and are charged automatically on each renewal date until canceled." *Id.* at 4. While the terms and conditions provided that a refund of the membership fee was possible, such a refund was only available in the event that the HSP rescinded or terminated his or her subscription within 72 hours of the agreement to purchase the subscription. Docket No. 46-1 at 7. Moreover, this provision, which is contradicted by the confirmation email sent directly to each new HSP, was not tied to the arbitration provision and did not inform plaintiffs that they could opt out of the arbitration provision specifically. *Compare Terlizzi*, 2018 WL 2196090, at *5; *Howard v. Ferrellgas Partners*, L.P., 92 F. Supp. 3d 1115, 1138 (D. Kan. 2015); *and Valle v. ATM Nat'l, LLC*, 2015 WL 413449, at *2 (S.D.N.Y. Jan. 30, 2015) (expressly informing customers that they could opt out of the arbitration provision). Thus, the Court finds that there was no opt-out provision provided to plaintiffs.

Even if the 72-hour refund provision could be construed as an opt-out provision, the Court finds that plaintiffs' continued use of the service cannot constitute assent by a failure to opt out. "In determining whether a plaintiff's failure to opt out of an arbitration agreement amounts to assent," other courts have "previously examined whether the plaintiff had adequate notice of the terms and conditions and a meaningful opportunity to opt out." *Pullam v. Apria Healthcare, LLC*, 2018 WL 5013521, at *8 (D. Kan. Oct. 15,

2018). Here, there was no such meaningful opportunity. Although plaintiffs were eventually provided access to the defendant's terms and conditions after completing the enrollment process, they were never told they could reject the terms and conditions or cancel their membership. Docket No. 46-7 at 2. Further, the 72-hour refund period is so brief that it cannot be deemed a "meaningful" opt-out period. *Cf. Clerk v. First Bank of Del.*, 735 F. Supp. 2d 170, 184 (E.D. Pa. 2010) (finding seven-day, inconspicuous opt-out clause rendered arbitration provision procedurally unconscionable). In cases from this district and others finding assent to an arbitration via continued use of a service, the agreement contained an express opt-out clause that was a more significant period of time and was known to the plaintiff. *See Vernon*, 857 F. Supp. 2d at 1146 (30-day opt-out window); *Terlizzi*, 2018 WL 2196090, at *5 (45-day opt-out window); *Howard*, 92 F. Supp. 3d at 1138 (30-day opt-out window); *Valle*, 2015 WL 413449, at *2 (60-day opt-out window). Due to the lack of an express opt-out provision, the brief permitted time for a refund, and the contradictory email precluding refunds sent to plaintiffs, their continued use of the product did not constitute assent to the terms and conditions.

Defendant has failed to meet its burden to present "evidence sufficient to demonstrate the existence of an enforceable agreement," *Bellman*, 563 F. App'x at 612, and therefore defendant's motion to compel arbitration and stay claims will be denied.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that defendant HomeAdvisor, Inc.'s Motion to Compel Arbitration and

13

to Stay Claims [Docket No. 51] is **DENIED**. It is further

ORDERED that Plaintiffs' Motion for Leave to File Sur-Reply [Docket No. 187][5] is **DENIED AS MOOT**. It is further

ORDERED that within fourteen days of this Order, defendant HomeAdvisor shall file an answer to plaintiffs' Class Action Complaint and Demand for Jury Trial [Docket No. 1].

DATED September 17, 2019.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
Chief United States District Judge

---

[5]This motion was filed in Civil Action No. 16-cv-01849-PAB-KLM.