IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION

---

### ORDER

---

This matter is before the Court on HomeAdvisor, Inc., IAC/InterActiveCorp, and Angi HomeServices, Inc.'s Partial Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [Docket No. 284], Defendants C. David Venture Management, LLC and Venture Street, LLC's Motion to Dismiss Consolidated Amended Class Action Complaint and Demand for Jury Trial [Docket No. 313], and CraftJack, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [Docket No. 325]. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

## I.  BACKGROUND[1]

HomeAdvisor, Inc. ("HomeAdvisor") is an online marketplace that helps connect persons providing home improvement services, i.e., home service professionals ("HSPs"), with homeowners in need of such services.  Docket No. 279 at 12-13, ¶ 1. HomeAdvisor is a subsidiary of defendant IAC, which is a media and internet company that owns over 20 operating businesses comprising over 150 brands and products.  *Id.*

---

[1] These facts are taken from plaintiffs' Consolidated Amended Class Action Complaint and Demand for Jury Trial [Docket No. 279] ("the complaint") and are presumed true for purposes of this order.  *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

at 25, ¶ 22.  IAC acquired HomeAdvisor, which was then-named ServiceMagic, Inc., in 2004.  *Id.* at 12, ¶ 1.  IAC has made substantial capital contributions to HomeAdvisor since its acquisition, *id.* at 154, ¶ 391, and its executives are intimately involved in operating HomeAdvisor's business.  *Id.* at 156, ¶ 398.  HomeAdvisor realized exponential yearly growth from 2013 to 2017.  *Id.* at 155-56, ¶ 396.  In April 2017, defendant ANGI was founded and launched to serve as the holding company for HomeAdvisor and non-party Angie's List.  *Id.* at 25, ¶ 23.  IAC contributed HomeAdvisor to ANGI in September 2017.  *Id.*

Plaintiffs are home service professionals who paid for memberships with HomeAdvisor.  *Id.* at 19-24, ¶¶ 9-19.  As part of plaintiffs' membership, HomeAdvisor provided plaintiffs with homeowners' service requests or "leads."  *Id.*  The HSPs must pay for each lead, a cost which is not included in their membership fees.  *Id.* at 13, ¶ 2.  HomeAdvisor charged HSPs $8 to $140 per lead, depending on the type of home service request and location of the request.  *Id.* at 31, ¶ 54.  Plaintiffs allege that HomeAdvisor misrepresents the quality of the leads it sells to HSPs.  *Id.* at 32-34, ¶ 58.  Specifically, plaintiffs claim that HomeAdvisor advertises its leads are connected to high quality, project-ready customers.  *Id.* at 32, ¶ 57.  However, plaintiffs claim that the leads provided to HSPs are of no value because the leads often directed HSPs to "wrong or disconnected phone numbers," "wrong contact information," "persons who never even heard of HomeAdvisor" or "persons who are not homeowners," "stale Leads, including for projects that homeowners completed months or years prior to the Lead being sent," or "contacts for vacant or non-existent residences," among other

things.  *Id.* at 37, ¶ 66.  On behalf of nationwide and nine state classes,[2] plaintiffs claim that HomeAdvisor's business practices were fraudulent.  *Id.* at 17-18, ¶ 7.

According to plaintiffs, HomeAdvisor contracts with over 100 lead generator companies, including defendants C. David Venture Management ("CDVM"), VentureStreet, LLC ("VentureStreet") (collectively, the "Venture defendants"), and defendant CraftJack, Inc. ("CraftJack") to obtain leads.  *Id.* at 46, ¶ 86.  IAC exercised control over the terms of the lead generation agreements that HomeAdvisor entered into with these third-party lead generators.  *Id.*, ¶ 87.  Plaintiffs allege that some of these third-party lead generators, such as CraftJack, are HomeAdvisor's direct competitors and, in many instances, sell the same leads provided to HomeAdvisor to their own networks of home service contractors, a fact which HomeAdvisor did not disclose to plaintiffs.  *Id.*, ¶ 88.  HomeAdvisor does not exercise any quality control over the leads it purchases from these third party lead generators, for which it pays a "nominal" amount, and plaintiffs claim that HomeAdvisor is aware that a low number of its leads result in actual home service projects for the HSPs.  *Id.* at 48, ¶ 92.

From April 2016 until April 2017, HomeAdvisor acquired between 162,000 and 259,000 leads each month from its direct lead generators, which included CraftJack.  *Id.* at 49, ¶ 96.  CraftJack has provided HomeAdvisor with leads since April 2011 and supplied HomeAdvisor with over 1.15 million leads from January 1, 2012 until June 20, 2017.  *Id.* at 55, ¶ 112.  For fiscal years 2015 and 2016, CraftJack generated

---

[2] Plaintiffs seek to certify the following state classes: a California class, a Colorado class, a Florida class, an Idaho class, an Illinois class, an Indiana class, a New Jersey class, a New York class, and an Ohio class.  Docket No. 279 at 169-70.

approximately half of its total revenue from selling leads to HomeAdvisor. *Id.*
According to plaintiffs, CraftJack and HomeAdvisor duplicate leads, and the leads that
CraftJack generates for HomeAdvisor are poor quality, with low contact and win rates.
*Id.*, ¶¶ 113-14.  For example, according to plaintiffs, HomeAdvisor's internal tracking
demonstrates that certain leads generated by CraftJack only have a 24 percent chance
of ever making contact with the homeowner. *Id.*, ¶ 114.  Plaintiffs allege that, at some
point,[3] CraftJack became a subsidiary of IAC, at which point IAC and HomeAdvisor
operated CraftJack as a department within HomeAdvisor. *Id.* at 54, ¶ 111.

Since June 2012, defendant CDVM has maintained a lead generation agreement
with HomeAdvisor. *Id.* at 55-56, ¶ 115.  Under the terms of the agreement, CDVM and
VentureStreet[4] receive 55 percent of the revenue that HomeAdvisor generates from
CDVM and VentureStreet leads. *Id.*  In 2016 and 2017, CDVM generated 198,883 and
229,036, respectively, for HomeAdvisor. *Id.* at 57, ¶ 121.  For those same two years,
VentureStreet generated 152,691 and 201,003 leads for HomeAdvisor. *Id.*  In 2016
and 2017, CDVM earned nearly $8 million in revenue from HomeAdvisor. *Id.*  Plaintiffs
allege that the Venture defendants' leads are exclusively generated through websites
owned and operated by both entities. *Id.* at 55-56, ¶ 115.  Plaintiffs claim that the

---

[3] It is unclear from the complaint at which point IAC acquired CraftJack, but it
was apparently sometime after 2014. *See* Docket No. 279 at 54, ¶ 110.

[4] CDVM and VentureStreet are owned and operated by the same person.
Docket No. 279 at 55, ¶ 115.  The complaint alleges that CDVM owns 70 percent of
VentureStreet. *Id.* at 26, ¶ 25.  However, the complaint does not clarify whether
VentureStreet has a separate lead generation agreement with HomeAdvisor or whether
it is covered by CDVM's agreement with HomeAdvisor.

Venture defendants and HomeAdvisor were aware that robots were generating fake leads through the Venture defendants' website, but that the Venture defendants failed to include a CAPTCHA[5] to prevent such abuse.  *Id.* at 56, ¶ 117.

Plaintiffs allege that HomeAdvisor fails to sufficiently screen the quality of the leads it purchases from third-party generators and sells to HSPs.  *Id.* at 74, ¶ 176. According to plaintiffs, from October 1, 2012 until October 1, 2017, HomeAdvisor's quality filter flagged approximately four to five percent of the leads received, and in most cases, HomeAdvisor ignored the fact that the lead was flagged by the filter.  *Id.*, ¶ 176.  In all, more than 98 percent of the leads obtained by HomeAdvisor from this five-year period were inserted into HomeAdvisor's lead database without any significant screening or verification.  *Id.*  HomeAdvisor made no attempt to validate the accuracy of the address, phone number, or homeowner name associated with its leads.  *Id.* at 75, ¶ 183.  Plaintiffs claim that defendants' pattern of misrepresenting the quality of the leads provided and providing poor quality leads was deceptive and fraudulent.  *Id.* at 64, ¶ 148.

In addition to this behavior, the complaint alleges that HomeAdvisor, IAC, and ANGI diverted business away from HSPs by co-opting, using, and exploiting the identities of current and former HSPs.  *Id.* at 128-29, ¶ 340.  When an HSP becomes a HomeAdvisor member, HomeAdvisor creates an online profile page based on

---

[5] A CAPTCHA is "a program or system intended to distinguish human from machine input, typically as a way of thwarting spam and automated extraction of data from websites."  Docket No. 279 at 42, ¶ 75.  It is designed to thwart non-human internet traffic.  *Id.* at 48, ¶ 92.

information gathered during the enrollment process and extracted from the HSPs' websites and other online sources. *Id.* at 129, ¶ 342. These profile pages are accessible through HomeAdvisor's online directory or through general internet search engines. *Id.* Plaintiffs allege that HomeAdvisor's "online marketing and search engine optimization ('SEO') capabilities are employed to rank the HSPs' HomeAdvisor Online Profile Pages at the top of internet search results, outranking even the HSPs' own websites, paid adwords, and other listings." *Id.* at 132, ¶ 347. Plaintiffs allege that, once an HSP's HomeAdvisor membership is terminated or expires, HomeAdvisor does not remove the HSP's profile page, but continues to manipulate internet traffic to route homeowners away from HSPs' websites and toward a HomeAdvisor-related domain. *Id.* at 133, ¶ 351.

In addition, plaintiffs claim that the defendants employ "various browser hijacking website domains," which use the company names of current and former HomeAdvisor HSPs to redirect legitimate traffic and searches away from the HSPs' websites to HomeAdvisor's domains. *Id.* at 147, ¶ 378. For example, plaintiff Hans Hass performed an internet search for terms related to his business – "Alpine Roofing" and "Alpine Roofing Sidney." *Id.*, ¶ 379. His company's website was listed between a Google ad for roofing.zone/Alpine domain and his business's HomeAdvisor profile page. *Id.* When he clicked the roofing.zone link, Hass completed a form asking for his contact information and details about his home improvement project. *Id.* at 148, ¶ 380. He was then contacted by other HomeAdvisor roofing HSPs who had received Hass's contact information in the form of a HomeAdvisor lead. *Id.* at 149, ¶ 381. When Hass

complained to HomeAdvisor, he was told that the issue would be reviewed and that HomeAdvisor would follow up with him about the website hijacking.  *Id.*, ¶ 382. According to plaintiffs, this diversion of legitimate business away from HSPs is part of HomeAdvisor's business model.  *Id.* at 134, ¶ 352.

Plaintiffs filed this lawsuit on July 19, 2016.  Docket No. 1.  On September 21, 2017, the Court dismissed plaintiffs' RICO claim without prejudice as to all defendants and dismissed plaintiffs' fraud/fraudulent concealment claim without prejudice.  Docket No. 104; *Airquip v. HomeAdvisor, Inc.*, No. 16-cv-01849-PAB-KLM, 2017 WL 4222618, at *10 (D. Colo. Sept. 21, 2017).  On September 25, 2019, plaintiffs filed the consolidated amended class action complaint.  Docket No. 279.  In all, plaintiffs raise 57 causes of action against the various defendants.  *Id.* at 5-11.

## II.  LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face."  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."

7

*Bryson*, 534 F.3d at 1286 (alteration marks omitted).

## III.  ANALYSIS

### A.  Plaintiffs' RICO Claim

All moving defendants seek to dismiss plaintiffs' claim brought under the Racketeer Influenced and Corrupt Organizations Act, ("RICO"), 18 U.S.C. § 1962(c). Docket No. 279 at 180-85, ¶¶ 459-83.  A claim for civil RICO must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *See Bixler v. Foster*, 596 F.3d 751, 761 (10th Cir. 2010).  Defendants argue that plaintiffs have failed to adequately plead the existence of a RICO enterprise.  Docket No. 284 at 2; Docket No. 313 at 5; Docket No. 325 at 3.  Moreover, defendants argue that plaintiffs have not sufficiently pled facts demonstrating a pattern of racketeering activity.  Docket No. 284 at 7; Docket No. 313 at 10; Docket No. 325 at 6.  Finally, the Venture defendants and CraftJack argue that plaintiffs failed to plead that these defendants participated in the conduct of the enterprise.  Docket No. 313 at 7; Docket No. 325 at 3.

#### 1.  *RICO Enterprise*

A RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  Plaintiffs' RICO claim is based on an allegation of an "association-in-fact" enterprise.  Docket No. 279 at 180-81, ¶ 465.  An association-in-fact enterprise "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these

associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

Plaintiffs allege that "the affiliation between and among IAC, ANGI, HomeAdvisor, CDVM, VentureStreet and CraftJack constituted an enterprise" and that this enterprise "also included the businesses and persons who sold leads to HomeAdvisor, including CDVM, VentureStreet, CraftJack, [non-defendant entities,] and John Does," as well as "the businesses and persons utilized by HomeAdvisor to collect monies from HSPs for the bogus Leads." Docket No. 279 at 180-81, ¶¶ 465-67. Plaintiffs state that this enterprise had a common purpose: "to generate revenue through HomeAdvisor by signing up HSPs, and generating sham Leads and collecting money from HSPs for sham Leads." *Id.*, ¶ 470. Defendants raise arguments as to whether plaintiffs sufficiently pled an enterprise. The Court will address these arguments in turn.

HomeAdvisor, IAC, ANGI, and CraftJack argue that plaintiffs have failed to sufficiently allege an enterprise because they have simply alleged that the supposed enterprise members are engaged in their normal course of business. *See* Docket No. 284 at 4 (arguing that "Plaintiffs simply describe the expected workings of diverse corporate entities engaged in legitimate, ordinary-course business with each other"); Docket No. 325 at 2 (arguing that plaintiffs' allegations amount to nothing more than defendants conducting their normal business affairs). Plaintiffs respond that the allegations go further than merely alleging normal business practices, as the defendants and other enterprise members are engaged in fraudulent behavior. Docket

9

No. 298 at 9; Docket No. 342 at 5.

The parties provide no Tenth Circuit authority addressing whether companies engaged in purportedly "normal" business activities, but which are alleged to be fraudulent, can constitute a RICO enterprise.  HomeAdvisor, IAC, ANGI, and CraftJack cite *Marlow v. Allianz Life Insurance Co. of North America*, No. 08-cv-00752-CMA-MJW, 2009 WL 1328636 (D. Colo. May 12, 2009), for the proposition that, "where an alleged enterprise is really nothing more than a defendant corporation and its affiliates and associates conducting normal business affairs, RICO liability does not attach."  *Id.* at *5 (citing *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994)); *see also* Docket No. 325 at 2; Docket No. 284 at 4.  However, this case does not help these defendants' argument.  In *Marlow*, the court was tasked with determining whether a corporate RICO defendant was an entity distinct from the alleged enterprise.  2009 WL 1328636, at *5.  The court found that, because the plaintiff's allegations demonstrated "nothing more than an enterprise . . . acting in the normal course of business," the plaintiff had failed to "plausibly allege[] that [the RICO defendant was] a person sufficiently distinct from the enterprise" and had failed to state a RICO claim.  *Id.* at *6.

In contrast, these defendants do not raise a distinctness argument; instead, they argue that no enterprise exists simply because the involved entities were engaged in normal business affairs.  But the weight of authority is that allegations of fraudulent or illegal activity by involved entities do not constitute "normal business affairs."  *See Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F.Supp.2d 826, 844 (D. Md. 2013)

10

(finding that the plaintiffs had "alleged more than the performance of ordinary business functions" by alleging that defendant and its agents "deliberately overcharged and misappropriated amounts due for the purchase of title insurance, in violation of Maryland law" because "unlawful acts are not conducted in the ordinary course of business."); *see also In re Duramax Diesel Litig.*, 298 F.Supp.3d 1037, 1080-81 (E.D. Mich. 2018) (quotation omitted) ("[W]hen the essential purpose of a particular business relationship is fraud, the related conduct is not ordinary or normal business activities. . . . [W]hen both companies are aware of and contribute to the fraud, they cannot argue that they have a routine commercial relationship."); *Schwartz v. Lawyers Title Ins. Co.*, 680 F.Supp.2d 690, 708 (E.D. Pa. 2010) (finding that plaintiff had sufficiently pled a RICO enterprise where plaintiff "alleged with particularity a pattern of racketeering which encompasses fraudulent behavior on the part of Lawyers and its title agents that existed apart from a normal business relationship"); *cf. Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 461 (E.D. Pa. 2010) ("While these activities may seem legitimate on the surface, they are not ordinary or normal business activities if they are used to advance the alleged fraudulent scheme."); *but see Cisneros v. Petland, Inc.*, 341 F.Supp.3d 1365, 1372 (N.D. Ga. 2018) (stating that, "[w]here businesses are alleged to be part of a RICO enterprise, a plaintiff must allege activity by the business that goes beyond the normal business activity, even if the plaintiff alleges that the business activity was itself fraudulent.").

In their complaint, plaintiffs allege that the enterprise (1) had a common purpose to unlawfully generate revenue by generating fake leads and collecting money for such

illegitimate leads, Docket No. 279 at 181, ¶ 470; (2) was forged by the relationships among those associated with the enterprise, including defendants and non-defendants, *id.* at 181-82, ¶¶ 471-72; and (3) that this enterprise "has remained in existence for several years, enabling its members to pursue the enterprise's purpose." *Id.*, ¶ 472. The Court finds that plaintiffs' allegations meet the *Boyle* standard and finds that plaintiffs have sufficiently stated the existence of a RICO "enterprise," which is defined "broadly." *Boyle*, 556 U.S. at 944; *see also Levine*, 682 F. Supp. 2d at 460 (finding that plaintiff had stated a RICO enterprise under *Boyle* where the plaintiff had alleged that the enterprise consisted of an insurance company and its title agents who overcharged for title insurance and misled purchasers into believing that the correct amount was being paid). Accordingly, the Court rejects these defendants' argument.

The Venture defendants argue that plaintiffs' allegations of a RICO enterprise are deficient as to them because "[t]here are no allegations of structure or communications between [the Venture defendants] and the other enterprise participants" so as to "suggest coordinated behavior on the part of the enterprise participants." Docket No. 313 at 6. The Venture defendants argue that, to sufficiently allege a RICO enterprise, a plaintiff must allege that the "enterprise participants were communicating to commit the predicate acts" and argue that plaintiffs' allegations of a "wheel-and-spoke" enterprise is insufficient to state a claim. *Id.* Plaintiffs respond that (1) a plaintiff need not establish that all participants had contact with each other to plead the existence of a RICO enterprise, and (2) if such contact is required, the complaint sufficiently alleges that the Venture defendants had communications with

12

other enterprise members.  Docket No. 332 at 5-6.

"Most courts have found that complaints alleging hub-and-spoke enterprises fail to satisfy the RICO enterprise requirement."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 183 (D. Mass. 2003); *see, e.g., Target Corp. v. LCH Pavement Consultants, LLC*, 2013 WL 2470148, at *4 (D. Minn. June 7, 2013) ("[A] rimless hub-and-spoke[] organization does not qualify as an association-in-fact enterprise."); *Negron v. Cigna Health & Life Ins.*, 300 F.Supp.3d 341, 365-67 (D. Conn. 2018) (dismissing a RICO claim for failure to allege an association-in-fact where the "plaintiffs [did] not allege that any of the [spoke defendants] had relationships, agreements, or collaborative communications amongst each other" and because "parallel conduct by separate actors is insufficient to establish an association-in-fact RICO enterprise").  While primarily district courts have addressed this issue, the Third Circuit has ruled that, "[e]ven under the relatively undemanding standard of *Boyle*," allegations of hub-and-spoke enterprises "fail the basic requirement that the components function as a unit, that they be 'put together to form a whole.'"  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 374 (3d Cir. 2010).  However, the Third Circuit also determined that the plaintiffs' allegations that the defendant insurers – the "spokes" – had engaged in "bid-rigging," in which they coordinated when each insurer would submit a fraudulent bid to the "hub" broker to drive up prices, "evince[d] an expectation of reciprocity and cooperation among the insurers" and was sufficient to allege a RICO enterprise.  *Id.* at 375-76.  According to the court, these allegations "provide[d] the 'rim' to the . . . enterprise's hub-and-spoke configuration, satisfying

13

*Boyle*'s requirements." *Id.* at 375.  The Tenth Circuit has not addressed whether allegations of a rimless hub-and-spoke enterprise satisfy the *Boyle* criteria.  However, another district court in this circuit has predicted that the Tenth Circuit would follow the Third Circuit and find hub-and-spoke enterprise allegations insufficient to state a RICO claim.  *See Tronsgard v. FBL Financial Grp.*, 312 F. Supp. 3d 982, 1001 (D. Kan. 2018); *cf. United States v. Hutchinson*, 573 F.3d 1011, 1022 (10th Cir. 2009) (noting that the district court had required the government to demonstrate that "the members of the alleged enterprise shared a common purpose, *that they interacted or associated in some way to advance this shared purpose*, and that the members of the enterprise so functioned long enough to complete a pattern of racketeering activity" and that, "[a]fter *Boyle*, no more is required to show that an enterprise has the requisite structure." (emphasis added)).

The Court agrees with the majority view and finds that allegations of a hub-and-spoke enterprise, without allegations of collaboration between the "spoke" participants, are insufficient to allege a RICO enterprise.  Without this connection among the participants, "there are no allegations of concerted actions among the spokes, only allegations of parallel conduct. . . . And an association-in-fact enterprise requires more than parallel conduct; it requires relationships among those associated with the enterprise, and it requires those associated with the enterprise to 'function as a unit, that they be put together to form a whole.'"  *Target Corp.*, 2013 WL 2470148, at *4 (quoting *In re Ins. Brokerage*, 618 F.2d at 374).  Thus, the Court must determine whether plaintiffs have sufficiently alleged that the Venture defendants communicated

14

with, collaborated with, or otherwise had contact with the other enterprise defendants so as to demonstrate that the Venture defendants worked with the other enterprise members as a unit.

Plaintiffs make two arguments that they sufficiently alleged communication between the Venture defendants and other defendants: first, they argue that the complaint "alleges that [the Venture defendants] are operated by the same person and therefore necessarily communicate with each other regarding the fraudulent scheme (and are aware of the others' involvement)."  Docket No. 332 at 5-6.  In addition, plaintiffs contend that the complaint sufficiently alleges collaboration because it "alleges that [the Venture defendants] communicated with Defendant CraftJack, and non-Defendant Lead generators, such as Networx, regarding the generation of Leads." *Id.* at 6.

The Court is not convinced by plaintiffs' arguments.  To the extent that plaintiffs argue that the complaint "necessarily" alleges communication between the Venture defendants, the Court finds that, while it must construe all reasonable inferences in favor of plaintiffs, it need not read allegations into plaintiffs' complaint that are not actually contained in the complaint, which has no allegations of communications between the spoke defendants.  Moreover, although plaintiffs claim that the complaint contains allegations between the Venture defendants and CraftJack or Networx, the allegations that plaintiffs direct the Court to demonstrate no such thing.  Instead, these paragraphs simply allege that, "as CraftJack [became] fully integrated as a subsidiary of IAC, CraftJack began purchasing Leads from third party Lead generators such as

15

[the Venture defendants]," Docket No. 279 at 54, ¶ 110, and that CDVM "may match a user to multiple third parties in [CDVM's] network, including HomeAdvisor, Networx, CraftJack, and Web.com."  *Id.* at 57, ¶ 118.  But these allegations do not demonstrate that the Venture defendants acted in concert with the other enterprise members to further the enterprise's goal so as to "function as a unit."  Plaintiffs cite to no other allegations in the complaint to support its contention that the complaint "alleges that [the Venture defendants] [were] aware that other Lead generators are also involved in the enterprise's scheme, led by HomeAdvisor, ANGI and IAC, to provide fraudulent Leads to the HSPs and that [the Venture defendants] knowingly participated in the scheme."  Docket No. 332 at 6.  As the Court set out in an earlier order, "[i]t is not incumbent on the Court to review" plaintiff's 299-page complaint to determine whether some allegation might demonstrate that the Venture defendants collaborated with the other enterprise members. *Airquip*, 2017 WL 4222618, at *5.  For these reasons, the Court finds that plaintiffs have failed to demonstrate an association-in-fact enterprise as to the Venture defendants and have failed to state a RICO claim against them.  For this reason, plaintiffs' RICO claim will be dismissed against the Venture defendants.[6]

### 2.  *Pattern of Racketeering Activity*

HomeAdvisor, ANGI, IAC, and CraftJack argue that plaintiffs' RICO claim should be dismissed because plaintiffs failed to sufficiently allege a pattern of racketeering activity. Docket No. 284 at 7; Docket No. 325 at 6.  Plaintiffs' RICO claim is based on allegations of wire fraud.  *See* Docket No. 279 at 182-84, ¶¶ 473-77.  Plaintiffs allege

---

[6] This ruling has no effect on plaintiffs' RICO claim as to the other defendants.

that defendants' "thousands of violations" of federal wire fraud laws constitute a pattern of racketeering to support their RICO claim.  *Id.* at 184, ¶ 478.

In their motion to dismiss, ANGI and IAC argue that plaintiffs fail to allege a pattern of racketeering activity because the complaint fails to connect the wire fraud allegations to particular defendants.  Docket No. 284 at 7.[7]  CraftJack makes the same argument.  Docket No. 325 at 7.

In the Court's earlier motion to dismiss order, the Court found plaintiffs' wire-fraud-based RICO claims deficient because plaintiffs had pled allegations as to "defendants" generally as opposed to identifying which defendant committed which supposedly fraudulent acts.  *Airquip*, 2017 WL 4222618, at *8.  "[W]here fraud is alleged against multiple defendants, blanket allegations of fraud couched in language such as 'by the defendants' are insufficient.  Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth."  *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003).

To adequately allege wire fraud, plaintiffs must plead facts showing: "(i) Defendants engaged in a scheme to defraud by means of false pretenses; (ii) the Defendants acted with the requisite intent to defraud; and (iii) the scheme contemplated the use of . . . wire transactions."  *L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 863 F. Supp. 2d 1066, 1076 (D. Colo. 2012) (citing *Burnett v. Amrein*, 243 F. App'x 393, 395 (10th Cir. 2007) (unpublished)).  "[W]ire fraud . . . require[s] an underlying

---

[7] This argument is made as to defendants IAC and ANGI, but not HomeAdvisor. *See* Docket No. 284 at 8 and n.4.

fraud, which, in common law, 'consists of (1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9) injury.'" *Just Us Realtors, LLC v. Nudge, LLC*, 2019 WL 2526731, at *7 (D. Utah June 19, 2019) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006)).

"Claims for wire fraud as a RICO predicate must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)." *Internet Archive v. Shell*, 505 F. Supp. 2d 755, 768 (D. Colo. 2007). In other words, the plaintiff must (1) "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof" and (2) "identify the purpose of the use of the wires within the fraudulent scheme." *Id.* (citations omitted). "When [a] plaintiff is dealing with more than one defendant, he or she is under a Rule 9(b) obligation to specify which defendant told which lie and under what circumstances." *Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1477 (D. Colo. 1995).

### a.  IAC and ANGI

Plaintiffs' complaint alleges that IAC and ANGI made representations in online press releases that homeowners visiting the HomeAdvisor website were "project-ready" and that the service requests submitted to the HomeAdvisor websites were "valid." Docket No. 279 at 34, ¶ 59. Plaintiffs allege that IAC "was and remains intimately involved in the day-to-day operations of HomeAdvisor" and "had the ultimate say on whether HomeAdvisor should cut poor quality Lead generation sources . . . and

reviewed and had to approve Lead Generation Agreements between HomeAdvisor and certain Lead generators." *Id.* at 157, ¶ 401. With respect to ANGI, plaintiffs claim that ANGI "would intentionally misstate by telephone and/or email the nature and quality of the products for which the HSPs were charged." *Id.* at 184, ¶ 477. Plaintiffs assert that these allegations sufficiently allege that IAC and ANGI "were aware that [HomeAdvisor], the Lead Generators and the collection agencies would use the mail and wires to effect the scheme to defraud the HSPs" and that IAC and ANGI "utilized the mail and wires in furtherance of the scheme by making fraudulent representations regarding the quality of [HomeAdvisor's] Leads in press releases and SEC filings." Docket No. 298 at 10.

The Court finds that plaintiffs have failed to sufficiently state a RICO claim against IAC and ANGI because they did not sufficiently pled that these defendants engaged in a pattern of racketeering activity based on wire fraud. "To sustain a claim under 18 U.S.C. § 1962(c), a plaintiff must plead that <u>each defendant</u> engaged in a pattern of racketeering activity by committing at least two predicate acts." *Just Us Realtors*, 2019 WL 2526731, at *6 (emphasis in original). Even construing the complaint in the light most favorable to plaintiffs, plaintiffs do not establish that IAC or ANGI each committed at least two predicate acts of wire fraud. As to defendant ANGI, plaintiffs' allegation that ANGI would "intentionally misstate by telephone and/or email the nature and quality of the products for which the HSPs were charged," *see* Docket No. 279 at 184, ¶ 477, is insufficiently specific to satisfy Rule 9(b) pleading requirements, as it fails to set forth the time, place and contents of the allegedly false

representations.  *See In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 686 (S.D.N.Y. 2018) (stating that plaintiffs had failed to plead a RICO wire fraud claim where plaintiffs alleged that "Express Scripts represented that it would charge only competitive benchmark pricing for prescription medications. . ." but did not set forth what the misrepresentations were, when these alleged misrepresentations occurred, where they occurred, or who made the statements); *see also Snyder v. ACORD Corp.*, 14-cv-01736-JLK, 2016 WL 192270, at *5 (D. Colo. Jan. 15, 2016) (finding that the plaintiffs' "very few vague accusations of misrepresentations . . . plainly [did] not meet the requirements of Rule 9(b).").  With respect to defendant IAC, merely alleging that IAC was "intimately involved" in the operations of HomeAdvisor and made decisions concerning whether to cut poor lead-generating services does not allege a specific act of wire fraud so as to establish that IAC engaged in a pattern of racketeering activity; allegations that IAC controlled a company do not set forth that IAC made a specific statement, let alone set out where and when the statement was made and the content thereof.  *See ZibalStar, L.C. v. Conte*, 2018 WL 1578019, at *4 (D. Utah Mar. 27, 2018) (to state a RICO claim, plaintiff must allege "that each defendant conducted the affairs of an enterprise through the *defendant's own pattern* of racketeering activity") (emphasis added).  Because these allegations are deficient, and because plaintiff does not direct the court to any other specific allegations concerning conduct by IAC or ANGI, the Court finds that plaintiffs have failed to state a RICO claim as to IAC or

ANGI.[8]

### b. CraftJack

Like IAC and ANGI, CraftJack argues that plaintiffs fail to state a RICO claim

against it for failure to specifically allege that CraftJack engaged in a pattern of

racketeering activity.  Docket No. 325 at 6-7.  Plaintiffs point to several allegations in

their complaint that they claim "are both specific to CraftJack and clearly establish that

use of the mail or wire was reasonably foreseeable/closely related to the scheme."

Docket No. 342 at 8-9.  The Court disagrees, as these paragraphs do not set out any

specific wire-based misrepresentations CraftJack allegedly made, let alone provide any

of the specific information required by Rule 9(b).  At best, the paragraphs cited by

plaintiffs allege that CraftJack "purports that its leads are 'high-quality, phone verified,'"

Docket No. 279 at 54, ¶ 109; that CraftJack provides HomeAdvisor with leads duplicate

to those it provides its own customers, *id.* at 55, ¶¶ 112-13; and that CraftJack's leads

had a poor "win-rate," which may indicate a lack of quality.  *Id.* at 67-68, ¶¶ 158-59.

These allegations do not identify or allege any affirmative, specific misrepresentations

or meet the requirements of Rule 9(b).[9]  A plaintiff cannot cobble together a claim

---

[8] Plaintiffs' allegations in the "Wire Fraud" section of their complaint, *see* Docket No. 279 at 182-84, are insufficient to state a claim against either IAC or ANGI because the allegations refer to conduct by "defendants" and do not allege any specific conduct attributable to either ANGI or IAC.  *See Airquip*, 2017 WL 4222618, at *5.

[9] Plaintiffs' citations to generic allegations against "[d]efendants" do not help their position, as these allegations are not specific to CraftJack.  *See* Docket No. 279 at 182-83, ¶ 475.  Plaintiffs argue that "it would have been unwieldy to individually name [the specific defendants] every time" given the number of defendants in this case.  Docket No. 342 at 8 n.2.  Given the strict pleading requirements of Rule 9(b), the Court is not convinced by plaintiff's argument.  "While this style of pleading may be

21

based on a number of different paragraphs in an attempt to cobble together a claim. The Court finds that plaintiffs have failed to state a RICO claim against CraftJack.

### c.  HomeAdvisor

In IAC, ANGI, and HomeAdvisor's motion to dismiss, defendants argue that plaintiffs' RICO claim cannot survive solely against HomeAdvisor.  Docket No. 284 at 8. By virtue of granting defendants' motions to dismiss plaintiffs' RICO claim [Docket Nos. 284, 313, and 325], the Court has dismissed plaintiffs' RICO claim against all defendants except HomeAdvisor.  In the Court's earlier order, the Court dismissed plaintiffs' RICO claim against HomeAdvisor on the basis that, standing alone, HomeAdvisor was not distinct from the enterprise.  *Id.*  As noted in the Court's earlier order, "§ 1962(c) requires that the 'person' conducting the enterprise's affairs be distinct from the 'enterprise.'"  *Airquip*, 2017 WL 4222618, at *6 (quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1249 (10th Cir. 2016)).  HomeAdvisor argues that "[t]here is no basis for departure from the Court's previous ruling."  Docket No. 284 at 9.  Plaintiffs do not respond to this argument.  *See* Docket No. 298.  The Court finds that, because the only remaining RICO defendant is HomeAdvisor, the RICO claim cannot survive because the defendant is not distinct from the entity.  *George*, 833 F.3d at 1249.  As a result, plaintiffs' first claim for relief will be dismissed in its entirety.

### B.  Plaintiffs' Lanham Act and Unfair Competition Claims

---

convenient, . . . it does not satisfy Rule 9(b)."  *Just Us Realtors*, 2019 WL 2526731, at *7.

HomeAdvisor[10] argues that the Court should dismiss plaintiffs' false association, false advertising, trademark infringement, and unfair competition claims against HomeAdvisor "to the extent they are premised upon a supposed 'website hijacking' theory.'" Docket No. 284 at 9.[11]   Specifically, HomeAdvisor seeks dismissal of Counts XLIX and L (brought under the Lanham Act), Count LII (brought under the Colorado Consumer Protection Act ("CCPA")), Count LIV (brought under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")), Count LVI (brought under the Idaho Consumer Protection Act ("ICPA")), Count LI (seeking a declaratory judgment that HomeAdvisor violated the Lanham Act, CCPA, FDUTPA, and ICPA), and Counts LIII, LV, and LVII (common law claims).  Docket No. 284 at 9.

As an initial matter, plaintiffs respond that their claims under the CCPA, FDUTPA, and ICPA and most of their common law unfair competition claims "are entirely supported by allegations of other misappropriation by Defendants," i.e., not based on a website-hacking theory.  Docket No. 298 at 12 n.19 (citing Docket No. 279

---

[10] Because plaintiffs' Lanham Act and common law unfair competition claims are brought only against HomeAdvisor and John Does, *see* Docket No. 279 at 18, ¶ 8, the Court refers to the arguments made in IAC, ANGI, and HomeAdvisor's motion to dismiss as arguments made solely by HomeAdvisor.

[11] Plaintiffs argue that defendants cannot seek to dismiss claims based on certain theories, citing out-of-circuit cases in support.  Docket No. 298 at 12.  Courts in this district, however, routinely dismiss claims insofar as they are based on certain theories or allegations.  *See, e.g., Grubka v. WebAccess Int'l, Inc.*, 445 F. Supp. 2d 1259, 1271 (D. Colo. 2006); *Hale v. Ashcroft*, No. 06-cv-00541-REB-KLM, 2008 WL 4426125, at *1 (D. Colo. Sept. 24, 2008); *RCHFU, LLC v. Marriott Vacations Worldwide Corp.*, No. 16-cv-01301-PAB-GPG, 2018 WL 1535509, at *11 (D. Colo. Mar. 29, 2018); *Wright Medical Tech., Inc. v. Paragon 28*, No. 18-cv-00691-PAB-STV, 2019 WL 4751807, at *8 (D. Colo. Sept. 30, 2019).

at ¶¶ 340-88).  HomeAdvisor does not respond to this argument.  *See* Docket No. 304.

For this reason, the Court declines to address any argument raised by HomeAdvisor

that these claims should be dismissed, as HomeAdvisor's basis for dismissal does not

relate to these claims.[12]  Accordingly, the Court narrows its focus to plaintiffs' Lanham

Act claims and plaintiffs' New York common law unfair competition claim (Count LVII),

which are based in part on a website-hijacking theory.  *See* Docket No. 298 at 12.

Plaintiffs bring two claims under the Lanham Act: (1) false association and

trademark infringement, Docket No. 279 at 280, and (2) false advertising and trademark

infringement.  *Id.* at 282.  The Lanham Act provides that

> (1) Any person who, on or in connection with any goods or services, or
> any container for goods, uses in commerce any word, term, name,
> symbol, or device, or any combination thereof, or any false designation of
> origin, false or misleading description of fact, or false or misleading
> representation of fact, which –
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive
> > as to the affiliation, connection, or association of such person with
> > another person, or as to the origin, sponsorship, or approval of his
> > or her goods, services, or commercial activities by another person,
> > or
> >
> > (B) in commercial advertising or promotion, misrepresents the
> > nature, characteristics, qualities, or geographic origin of his or her
> > or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she
> is or is likely to be damaged by such act.

15 U.S.C. § 1125(a).  This section "creates two distinct bases of liability: false

---

[12] In any event, because HomeAdvisor does not set forth an argument with
respect to the majority of these claims, *see* Docket No. 284 at 10 n. 7 (citing the
Colorado Consumer Protection Act but making no argument under any of the other
state laws), the Court cannot address them.

association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  To state a claim of trademark infringement on a false association theory, a plaintiff must plead facts demonstrating: "(1) that the plaintiff has a protectable interest in [a] mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse consumers."  *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1238 (10th Cir. 2013).  To state a claim for false advertising, "a plaintiff must allege that: (1) the Defendants made a materially false or misleading representation of fact (2) in connection with their commercial advertising or promotion (3) in interstate commerce; (4) such representation misrepresents the nature of the plaintiff's services or commercial activities; and (5) the plaintiff has been or is likely to be injured as a result."  *GDHI Marketing LLC v. Antsel Marketing LLC*, 416 F.Supp.3d 1189, 1207 (D. Colo. 2019).

The complaint alleges that HomeAdvisor engaged in "website hijacking"; in other words, plaintiffs claim that HomeAdvisor used various website domains, such as roofing.zone, to redirect legitimate internet traffic away from the HSPs' own websites or businesses by using current and former HSPs' company names on these domains, which confuses consumers and takes legitimate business opportunities away from HSPs.  Docket No. 279 at 147, ¶ 378.  For example, the complaint alleges that plaintiff Hass performed an online search for "Alpine Roofing" or "Alpine Roofing Sidney" –  the name of his business – and that his company website appeared below a sponsored ad from roofing.zone/Alpine.  *Id.*, ¶ 379.  When Hass input his contact information on this

domain, he was contacted by "other HomeAdvisor roofing HSPs who had received Plaintiff Hass' contact information in the form of a Lead from HomeAdvisor and for which each were charged approximately $70." *Id.* at 149, ¶ 381.  When Hass canceled his HomeAdvisor account and requested that the deceptive ads be removed, "HomeAdvisor assured Plaintiff Hass that the issue would be reviewed." *Id.*, 382.

HomeAdvisor argues that these allegations fail to state a claim because they fail to allege that HomeAdvisor was connected to any misappropriation or trademark infringement or that HomeAdvisor "owned the allegedly problematic domains or had any control over or affiliation with the owners of those domains." Docket No. 284 at 10. In response, plaintiffs rely upon a contributory infringement theory, arguing that, because the complaint alleges that HomeAdvisor "suggested that it could resolve the problem" when plaintif Hass complained about his information being on the roofing.info domain. Docket No. 298 at 13-14.  According to plaintiffs, this is "an indication that [HomeAdvisor] either owns or has control over the website," and the complaint "alleges that [HomeAdvisor], at minimum, facilitates the website hijacking." *Id.*

The Court disagrees with plaintiffs.  Contributory trademark infringement occurs when a defendant "enables a third party to infringe on the mark while knowing or having reason to know that the third party is infringing, yet failing to take reasonable remedial measures." *1-800 Contacts*, 722 F.3d at 1249.  But, to be liable for contributory infringement, "a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." *Perfect 10,*

*Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 807 (9th Cir. 2007) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982)).  "When the alleged direct infringer supplies a service rather than a product, under the second prong of this test, the court must 'consider the extent of control exercised by the defendant over the third party's means of infringement.'"  *Id.* (quoting *Lockheed Martin Corp. v. Network Sol., Inc.*, 194 F.3d 980, 984 (9th Cir. 1999)).  "Allegations of '[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark' could suggest contributory infringement."  *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F.Supp.3d 816 (N.D. Cal. 2016) (quoting *Lockheed*, 194 F.3d at 984).

The complaint is devoid of factual allegations purporting to show that HomeAdvisor intentionally induced the alleged trademark infringement.  Moreover, the only allegation that plaintiffs make concerning the extent of control exercised by HomeAdvisor over the roofing.zone domain is that, when Hass complained to HomeAdvisor about the allegedly infringing website, HomeAdvisor indicated that it could resolve the problem.  This lone allegation – which contains no information about who from HomeAdvisor made such a representation – does not sufficiently demonstrate a degree of control over the roofing.zone domain by HomeAdvisor so as to allege a contributory infringement theory.

The Court will dismiss plaintiffs' Lanham Act claims against HomeAdvisor for failure to allege trademark infringement to the extent they are based on a website-hijacking theory.  As a result, plaintiffs' New York common law unfair competition claim will also be dismissed to the same extent.  *See Innovation Ventures, LLC v. Ultimate*

*One Dist. Corp.*, 176 F. Supp. 3d 137, 157 (E.D.N.Y. 2016) ("To establish a claim for common law unfair competition, the plaintiff must state a Lanham Act claim coupled with a showing of bad faith or intent.") (citation omitted).

### C.   Plaintiffs' Aiding and Abetting Fraud and Unfair Business Practices Claims

IAC seeks dismissal of the following claims against it: Counts III, VIII, XIII, XVIII, XXIII, XXVIII, XXXII, XXXVII, XLII (common law aiding and abetting fraud or fraudulent concealment); Count V (violation of the California Unfair Competition Law ("UCL")); Count VI (false and misleading advertising under California's false advertising law ("FAL")); and Count XVI (violation of FDUTPA).  Docket No. 284 at 10 n.8.  Specifically, IAC argues that plaintiffs' complaint fails to allege that IAC encouraged or assisted HomeAdvisor with any fraud because it "describe[s] nothing more than a traditional parent corporation attuned to its subsidiary's business and supportive of its growth and success."  Docket No. 284 at 12.

While IAC states that eight aiding and abetting claims should be dismissed, IAC does not make a substantive legal argument explaining why each of these claims must be dismissed under each state's law that these claims are brought under or whether these states recognize a common law claim of aiding and abetting fraud or fraudulent concealment.  *See, e.g., Medved v. DeAtley*, No. 12-cv-03034-PAB-MEH, 2013 WL 4873054, at *7 (D. Colo. Sept. 11, 2013) (recognizing that "[t]he Colorado Supreme Court has not addressed whether plaintiffs can assert claims for aiding and abetting common law fraud.").  At best, it cites one case – from this district – explaining that a

claim of aiding and abetting, *under Colorado law*, requires proving a "substantial assistance element" that requires a showing that "the secondary party proximately caused the violation, or . . . that the encouragement or assistance be a substantial factor in causing the tort." Docket No. 284 at 11 n.10 (quoting *Sender v. Mann*, 423 F. Supp. 2d 1155, 1176 (D. Colo. 2006)). But IAC has not set forth whether this same element is required in the other jurisdictions under whose laws plaintiffs raise their remaining aiding and abetting claims. Because IAC did not develop any argument as to these claims, the Court denies its motion to dismiss to the extent that it seems dismissal of Counts III, VIII, XVIII, XXIII, XXVIII, XXXII, XXXVII, and XLII. *See Schlect v. Lockheed Martin Corp.*, No. 11-cv-03072-RM-BNB, 2014 WL 6778709, at *2 (D. Colo. Nov. 25, 2014) ("Undeveloped arguments raised in a perfunctory manner are waived.") (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998)); *see also Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (arguments unsupported by pertinent authority are deemed waived). Thus, the Court will address defendants' arguments with respect to plaintiffs' Colorado-law-based unfair competition claim and plaintiffs' claims under the UCL, FDUTPA, and FAL.

To state a claim of aiding and abetting fraud under Colorado law, a plaintiff must (1) allege the elements of common law fraud and (2) allege that the defendant "knowingly participate[d] in the underlying breach or violation." *See Medved*, 2013 WL 4873054, at *7.[13] The "knowing participation" element is "satisfied if the defendant is

---

[13] As set out by the Court in *Medved*, "[t]he Colorado Supreme Court has not addressed whether plaintiffs can assert claims for aiding and abetting common law fraud." 2013 WL 4873054, at *7. Because IAC does not argue that this claim is not

'generally aware of his role as part of an overall illegal or tortious activity'" and

"knowingly and substantially assists the principal violation."  *Sender*, 423 F. Supp. 2d at

1176, and this requirement is not satisfied by pleading "reckless or negligent conduct."

*Medved*, 2013 WL 4873054, at *7.  IAC attacks plaintiffs' allegations regarding the

knowing participation element, arguing that plaintiffs failed to allege that IAC

participated in any fraudulent conduct and argues that plaintiffs' allegations amount to

nothing more than a description of a traditional parent-subsidiary relationship.  Docket

No. 284 at 12.

Plaintiffs' complaint alleges that IAC was aware that the leads it was receiving

from third-party lead generators were low quality and resulted in poor win-rates, but that

IAC made the business decision to increase the number of leads it acquired rather than

improve the quality of leads.  Docket No 279 at 69-70, ¶ 164.  It also alleges that IAC

was aware of the HSPs' frequent complaints over the quality of leads and requests for

refunds.  *Id.* at 111-12, ¶ 280.  Plaintiffs' complaint alleges that IAC exercised control

over HomeAdvisor: IAC is involved in the day-to-day operations of HomeAdvisor and

has "the ultimate say" on whether HomeAdvisor should cut poor-quality leads, *id.* at 157,

¶ 401; IAC initiated and drove internal discussions concerning how to grow

HomeAdvisor's market share and HomeAdvisor's branding strategy, *id.* at 159, ¶ 407;

and IAC "exerted operational control over HomeAdvisor and its business."  *Id.* at 163,

¶ 414.  The complaint states that "IAC's . . . direct control over HomeAdvisor and its

_____

cognizable under Colorado law, *see* Docket No. 284, the Court assumes for purposes
of this motion that this claim is cognizable.

business[] supports claims for . . . aiding and abetting fraud/fraudulent concealment."
*Id.* at 168, ¶ 427.

While plaintiffs assert that the complaint "alleges that IAC is aware of the fraud and intentionally contributes to it," Docket No. 298 at 14, knowledge alone is insufficient to state an aiding and abetting claim; plaintiffs' complaint "does not identify a single false or misleading statement" made by HomeAdvisor that IAC allegedly participated in. *Airquip*, 2017 WL 4222618, at *8.[14]  Merely exerting control over HomeAdvisor, who plaintiffs allege made false representations, without any allegations setting forth "the 'who, what, when, where and how' of the alleged fraud," *U.S. ex rel. Lacy v. New Horizons Inc.*, 348 F. App'x 421, 424 (10th Cir. 2009) (unpublished), is insufficient to state an aiding and abetting fraud claim against IAC.  As a result, plaintiffs' Colorado aiding and abetting fraud or fraudulent concealment claim, Count XIII, will be dismissed against IAC.

Plaintiffs also raise claims under the UCL, FAL, and FDUPTA.  Each of these laws requires an affirmative deceptive act by the defendant.  *See, e.g., Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) (to state a claim under FDUTPA, "Plaintiff must allege that Defendants engaged in a deceptive act or practice in trade and that Plaintiff is a person 'aggrieved' by the deceptive act or practice"); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1084 (N.D. Ca. 2017) ("To state a

---

[14] IAC argues that plaintiffs' argument is "an implicit request that the Court pierce the corporate veil between HomeAdvisor and IAC."  Docket No. 284 at 13.  However, plaintiffs do not make such an argument, *see* Docket No. 289, and thus, the Court need not address whether piercing the corporate veil is appropriate here.

31

claim under the UCL, a plaintiff must establish that the [defendant's] practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public).") (quotation omitted); *Marolda v. Symantec Corp.*, 672 F. Supp. 2d 992, 1005 (N.D. Ca. 2009) ("To state a claim under the FAL plaintiff must allege that defendant intentionally made statements it knew or should have known to be untrue or misleading thereby inducing consumers to enter into obligations related to the misrepresented product.").

Plaintiffs argue that "[c]ourts have interpreted [the UCL, FAL, and FDUTPA] to allow claims against a parent for its involvement in a subsidiary's fraud when the parent is involved in the subsidiary's efforts to engage in the fraudulent scheme." Docket No. 298 at 14-15. In support, plaintiffs cite *Pecanha v. Hain Celestial Grp., Inc.*, 2018 WL 534299 (N.D. Cal. Jan. 24, 2018), and *Hankinson v. R.T.G. Furniture Corp.*, 2016 U.S. Dist. LEXIS 136984 (S.D. Fla. Sept. 29, 2016). These cases do not support plaintiffs' position. In *Pecanha*, the court found that the plaintiffs had sufficiently stated a claim under the FAL upon determining that the plaintiffs had alleged that the parent company itself – not just the subsidiary – had engaged in fraudulent activity by manufacturing, selling, and marketing deodorant that was allegedly mis-marketed as "natural." 2018 WL 534299, at *7. The court drew "a reasonable inference that [the parent company] had a role in the marketing of [the subsidiary's] products" due to the parent company's representations that its brands had one management team and employed uniform marketing over all of its brands. *Id.* Similarly, in *Hankinson*, the court determined that the plaintiffs had sufficiently stated a claim under FUDTPA where the plaintiffs had

32

alleged that the parent and subsidiary "share a common nerve center where common sales policies and procedures are developed."   2016 U.S. Dist. LEXIS 136984, at *8.

Plaintiffs do not point to any allegations in the complaint demonstrating that IAC had control over HomeAdvisor's marketing or that IAC and HomeAdvisor had common marketing procedures or personnel, beyond alleging that IAC "drove internal discussions" over HomeAdvisor's branding strategy.  *Id.* at 159, ¶ 407.  This statement, alone, is insufficient to allege that IAC "intentionally made statements it knew or should have known to be untrue or misleading thereby inducing consumers to enter into obligations related to the misrepresented product," *Marolda*, 672 F. Supp. 2d at 1005, or "engaged in a deceptive act or practice in trade." *Kertesz*, 635 F. Supp. 2d at 1348.  Plaintiffs have not made a connection between IAC's purported "driving" of HomeAdvisor's "branding strategy" to any of the allegations concerning HomeAdvisor's alleged misrepresentations.  The Court finds that plaintiffs have failed to state a claim under the UCL, FAL, and FDUTPA against IAC, and will dismiss these claims against IAC.

### D.   Plaintiffs' Unjust Enrichment Claims

CraftJack and the Venture defendants seek dismissal of plaintiffs' Count IV unjust enrichment claim against them.[15]  Docket No. 313 at 13; Docket No. 325 at 13.  To state

---

[15] While plaintiffs raise several other unjust enrichment claims in their complaint, these claims are not brought against CraftJack or the Venture defendants.  *See* Docket No. 279 at 202-03, 214-15, 223-24, 233-34, 244, 251-52, 261, 271, and 279 (unjust enrichment claims brought against the "Unjust Enrichment Defendants"); *see also id.* at 18, ¶ 7(d) (defining "Unjust Enrichment Defendants" as HomeAdvisor, IAC, and ANGI).

a claim for unjust enrichment under Colorado law,[16] a plaintiff must allege that "(1) at plaintiff's expense, (2) defendant received a benefit (3) under circumstances that would make it unjust for defendant to retain the benefit without paying." *Robinson v. Colo. State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008).   Both CraftJack and the Venture defendants argue that plaintiff has failed to establish that they received a benefit at plaintiffs' expense.  Docket No. 325 at 9-10; Docket No. 313 at 14.

Plaintiffs respond that their complaint adequately alleges that these defendants received a benefit at plaintiffs' expense because the complaint alleges that these defendants (1) provided HomeAdvisor leads and (2) each had a revenue sharing agreement with HomeAdvisor.  Specifically, with regard to CraftJack, plaintiffs reference allegations in the complaint that (1) CraftJack provided HomeAdvisor with 1.15 million leads from January 1, 2012 until June 20, 2017; (2) CraftJack and HomeAdvisor have a revenue-sharing agreement by which CraftJack receives 50 percent of the revenue HomeAdvisor generates through CraftJack-supplied leads; and (3) CraftJack generated roughly half of its total revenue from selling leads to HomeAdvisor for fiscal years 2015 and 2016.  Docket No. 279 at 55, ¶ 112.  The complaint also alleges that CraftJack and HomeAdvisor duplicate leads "and send them out to their HSPs which results in HSPs being double charged for the same Lead." *Id.*, ¶ 113.  With respect to the Venture defendants, plaintiffs do not cite any specific allegations in support of their unjust

---

[16] All parties cite Colorado law in their unjust enrichment arguments. *See* Docket No. 313 at 13-14; Docket No. 332 at 12; Docket No. 325 at 9; Docket No. 342 at 10. Thus, the Court assumes Colorado law applies. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

enrichment claim.  *See* Docket No. 332 at 12-14.  However, they generally reference allegations that (1) the Venture defendants have a revenue-sharing agreement with HomeAdvisor in which the Venture defendants receive fifty-five percent of the revenue HomeAdvisor generates from Venture-supplied leads, Docket No. 279 at 56, ¶ 115; (2) the Venture defendants generated approximately 600,000 leads for HomeAdvisor in 2016 and 2017, *id.* at 57, ¶ 121; (3) CDVM "earned nearly $8 million in revenue from HomeAdvisor" in 2016 and 2017, *id.*; and (4) the Venture defendants were aware that HomeAdvisor and CDVM were charging HSPs for bogus leads.  *Id*., ¶ 120.

Because the arguments raised in the motions to dismiss are substantially similar, the Court will address the arguments together.  First, the Venture defendants argue that "[t]here is no allegation that [the Venture defendants] engaged in any transactions with the Plaintiffs or HSPs."  Docket No. 313 at 14.  Similarly, CraftJack notes that "Plaintiffs do not allege they had any transaction or any interaction whatsoever with CraftJack."  Docket No. 325 at 9.  But defendants have cited no Colorado authority holding that the benefit received by the defendant must come directly from the plaintiff.  *See In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 544 (E.D. Pa. 2010) (stating that "as a general matter, unjust enrichment does not require that the benefit conferred be done so directly," but noting that some states, such as Florida have a "direct benefit" requirement).[17]  Instead, the law in Colorado requires that the defendant receive a

---

[17] Even states that have a "direct benefit" requirement do not require that the plaintiff provide the benefit to the defendant firsthand.  *See Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1368 (S.D. Fla. 2015) (stating that the "direct benefit element of an unjust enrichment claim may be satisfied where a benefit is conferred through an intermediary.").

benefit *at plaintiff's expense*.  *Robinson*, 179 P.3d at 1007; *cf. Salzman v. Bachrach*, 996

P.2d 1263, 1265 (Colo. 2000) (stating that unjust enrichment "does not depend on any

contract, oral or written" and "does not require any promise or privity between the

parties.").  The Court finds that a lack of a direct transaction or interaction with plaintiffs

is not an adequate basis for dismissal.  *See Sheet Metal Workers Local 441 Health &*

*Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 440 (E.D. Pa. 2010)

(rejecting a similar argument where the defendant "ha[d] not provided any clear authority

that Missouri courts require that a benefit flow directly from the plaintiff to the defendant

to state a claim for unjust enrichment.").[18]

The Court is similarly unpersuaded by defendants' reliance on *Mandelbaum v.*

*Fiserv, Inc.*, 787 F. Supp. 2d 1226 (D. Colo. 2011).  In *Mandelbaum*, the plaintiffs were

retirement account owners who instructed the trustees of their accounts to send their

retirement funds to Bernard Madoff's brokerage firm; this resulted in the plaintiffs' funds

being lost in Madoff's Ponzi scheme.  *Id*. at 1232.  The plaintiffs sued the trustees for

unjust enrichment based on an alleged quasi-contract between Madoff and the trustees

through which Madoff paid the trustees.  *Id.* at 1244.  First, the court found that the

plaintiffs' unjust enrichment claim was barred because the plaintiffs had an enforceable

contract with the trustees.  *Id.* at 1243.  Moreover, the court found that, to the extent that

the plaintiffs argued that the money that Madoff had paid the trustees came from the

---

[18] Insofar as the Venture defendants argue that any benefit conferred was at HomeAdvisor's expense because the parties' profit-sharing agreement implies that HomeAdvisor would do its own screening of the quality of the leads, *see* Docket No. 313 at 14, this is a factual argument unsuited for a motion to dismiss.

plaintiffs' investments, "this basis for Plaintiffs' unjust enrichment claim [was] tangential and tenuously connect[ed] Plaintiffs to Defendants' extra-contractual benefit." *Id.* at 1244.  Here, unlike in *Mandelbaum*, plaintiffs do not allege that monies paid pursuant to an unrelated third-party contract somehow came from plaintiffs' pockets.  Instead, plaintiffs allege that the leads provided to HomeAdvisor by the Venture defendants were fraudulently sold to plaintiffs and that the monies plaintiffs paid to HomeAdvisor made its way to the Venture defendants through the Venture defendants' and HomeAdvisor's profit-sharing agreement.  The Court does not find that the connection between plaintiffs' payments and the Venture defendants' profits is "tenuous" or "tangential."

These defendants also argue that the unjust enrichment claim should be dismissed because plaintiffs "have failed to allege that even a single payment they made to HomeAdvisor for a 'bogus' lead was received by" defendants.  Docket No. 313 at 14; *see also* Docket No. 325 at 9 (CraftJack arguing that dismissal is warranted because "Plaintiffs do not allege that they received a single lead from CraftJack . . . or that they conferred any specific benefit on CraftJack to their detriment.").  Again, defendants cite no authority to support the proposition that a plaintiff pleading an unjust enrichment claim must identify the exact payment that was conferred by the plaintiff and received by the defendant.  In reviewing a motion to dismiss, the Court must take the well-pleaded allegations as true and construe all reasonable inferences in favor of plaintiffs.  Here, plaintiffs allege that (1) the Venture defendants generated hundreds of thousands of leads for HomeAdvisor, and CraftJack generated over one million leads for HomeAdvisor; (2) HomeAdvisor had profit-sharing agreements with both the Venture

defendants and CraftJack that provided the Venture defendants and CraftJack with fifty-five percent and fifty percent, respectively, of the profits HomeAdvisor earned from leads provided by those entities; and (3) plaintiffs purchased defective leads from HomeAdvisor.  Taking these facts as true and drawing all reasonable inferences in favor of plaintiffs, *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1193 (10th Cir. 2017), the Court finds that plaintiffs have plausibly alleged that the Venture defendants and CraftJack received a benefit conferred by plaintiffs in the form of profits arising from leads purchased by plaintiffs.  *Cf. L'Oreal USA S/D, Inc. v. Hair Casino Ventures, LLC*, 2010 WL 11632861, at *5 (D. Nev. Jan. 27, 2010) (finding that the plaintiff had adequately alleged that defendant retained a benefit at plaintiff's expense by alleging that defendant had profited from sales wrongly diverted from plaintiff to defendant).  The Court will deny the Venture defendants' and CraftJack's motions to dismiss to the extent they seek dismissal of plaintiff's unjust enrichment claim against them.

### E.  Prejudice

All defendants request that plaintiffs' claims be dismissed with prejudice.  Docket No. 284 at 14; Docket No. 313 at 15; Docket No. 325 at 10.  Plaintiffs assert that, since the filing of their amended complaint, they "have learned of additional evidence and facts" to support their claims against defendants.  *See, e.g.*, Docket No. 342 at 12.  They ask that, should the Court dismiss any claims, it do so "without prejudice and with leave to amend the [complaint]."  *Id.* at 13; *see also* Docket No. 332 at 14; Docket No. 298 at 15 n.25.

"Dismissal with prejudice would, effectively, deny the plaintiffs any further

opportunity to amend their complaint" as to the claims dismissed with prejudice.  *United States ex rel. Hanlon v. Columbine Mgmt. Servs., Inc.*, 13-cv-00826-REB-KLM, 2016 WL 8673000, at *2 (D. Colo. Mar. 25, 2016).  "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  *Castiegien, Inc. v. Resolution Trust Corp.*, 984 F.2d 1571, 1585 (10th Cir. 1993).

The Court previously dismissed plaintiffs' RICO claim against HomeAdvisor and IAC without prejudice.  Docket No. 104 at 21; *Airquip*, 2017 WL 4222618, at *10.  The Court finds that further delaying the progress of this case to permit plaintiffs to amend a twice-denied RICO claim would not be within the interests of justice.  *See* Fed. R Civ. P. 15(a) (stating that leave to amend should be given "when justice so requires"); *see also In re Bio-Technology General Corp.*, 2006 WL 3068552, at *14 (D.N.J. Oct. 26, 2006) ("Plaintiff has had two large bites at the apple and the Court is convinced that a third would not render a different result."); *Hanlon*, 2016 WL 8673000, at *3 (considering the fact that the case was three years old in determining to dismiss claims with prejudice).  For this reason, the Court will dismiss the RICO claim, Count I, against all defendants[19] with prejudice.

However, since the Court ruled on HomeAdvisor's and IAC's initial motions to dismiss, plaintiffs have filed fifty-seven claims on behalf of ten proposed classes, and

---

[19] While the Court has not previously dismissed any RICO claims against ANGI, CraftJack, or the Venture defendants, the judicial economy concerns apply equally to plaintiffs' RICO claim against those defendants.

many of the claims raised in the operative complaint – e.g., plaintiffs' Lanham Act claims, aiding and abetting fraud or fraudulent conceal claim, and claims under the FAL, UCL, and FDUTPA – are being addressed here by the Court for the first time. Defendants do not argue that amendment of these claims would be futile. *See* Docket No. 325 at 10-11; Docket No. 284 at 14; Docket No. 313. For this reason, the Court will dismiss the remaining claims without prejudice. *See Sanaah v. Howell*, 2009 WL 4250127, at *1 n.1 (D. Colo. Nov. 23, 2009) ("[B]ecause it is not clear that amendment would be utterly futile, . . . dismissal . . . should be without prejudice.").

        In their responses, plaintiffs seek leave to amend their complaint. *See, e.g.*, Docket No. 342 at 12. The Court declines to consider plaintiffs' request for leave to amend. Under the District of Colorado's Local Rules, "[a] motion shall not be included in a response or reply to the original motion." *See* D.C.COLO.LCivR 7.1(d). Thus, the Court cannot construe the requests in plaintiffs' response briefs as a motion to amend under Fed. R. Civ. P. 15. *See Calderon v. Kan. Dept. of Social and Rehab. Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion."); *see also Airquip*, 2017 WL 4222618, at *9 n.8 (noting that "plaintiffs' request for leave to amend the complaint is inadequate"). Should plaintiffs seek to amend their complaint, they may file a motion to amend under Rule 15.

## IV.  CONCLUSION

        For these reasons, it is

        **ORDERED** that HomeAdvisor, Inc., IAC/InterActiveCorp, and Angi

HomeServices, Inc.'s Partial Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [Docket No. 284] is **GRANTED IN PART** and **DENIED IN PART** as set forth in this order.  It is further

ORDERED that Defendants C. David Venture Management, LLC and Venture Street, LLC's Motion to Dismiss Consolidated Amended Class Action Complaint and Demand for Jury Trial [Docket No. 313] is **GRANTED IN PART** and **DENIED IN PART** as set forth in this order.  It is further

ORDERED that CraftJack, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint [Docket No. 325] is **GRANTED IN PART** and **DENIED IN PART** as set forth in this order.  It is further

ORDERED that Count I is dismissed with prejudice.  It is further

ORDERED that Counts XLIX, L, and LVII are dismissed without prejudice as to HomeAdvisor to the extent they are based on a website-hijacking theory.  It is further

ORDERED that Count XIII is dismissed without prejudice as to IAC.  It is further

ORDERED that Counts V, VI, and XVI are dismissed without prejudice as to IAC.


DATED September 29, 2020.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge


41