# EXHIBIT 1

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

---

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION

---

## CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

NATURE OF THE CASE ..................................................................................................... 1

PARTIES ............................................................................................................................... 8

    The Plaintiffs ................................................................................................................. 8

    The Defendants ............................................................................................................ 14

    The Relevant Non-Parties ........................................................................................... 16

HOMEADVISOR'S FORMER EMPLOYEES ................................................................. 18

JURISDICTION AND VENUE ......................................................................................... 19

FACTS ................................................................................................................................. 20

I.      HOMEADVISOR'S LEAD BUSINESS IS DECEPTIVE
       AND FRAUDULENT ............................................................................................ 20

      A.    HomeAdvisor Engages in a Pattern of Misrepresentations and
            Omissions Regarding the Quality and Nature of Its Leads ................................. 21

      B.    The Leads That Are Sold to HSPs Are Overwhelmingly Bogus
            Because The Lead Sources are Incapable of Generating Project
            Ready, Targeted Leads ....................................................................................... 26

            i.   HomeAdvisor's Lead Generation Practices Are Incapable
                Of Producing Targeted, Project-Ready Leads ............................................. 27

            ii.  HomeAdvisor Blindly Purchases "Leads" that are Devoid of
                Oversight and Any Quality Control From Direct
                Lead Generators ........................................................................................ 35

            iii. Pop-Under Ads and Exits From Publishers' Clearing
                House are Directed to HomeAdvisor's Website to Inflate
                Web Traffic and Incentive Users to Submit Service Requests ..................... 49

            iv. HomeAdvisor's Employees Corroborate the Deficient
                and Fraudulent Nature of the Leads ........................................................... 51

      C.    ██████████████████████████████ ................................................ 54

            i.   ███████████████████████████ ..................................... 55

   *ii.*                   56

 D. HomeAdvisor Protects Bad Actor Lead Generators At The Expense
   of HSPs ......................................................................................................58

 E. HomeAdvisor Does Not Filter, Verify or Check the Quality
   of the Leads...............................................................................................62

 F. Use of Purported Monthly Lead Budgets to Deceive and Cheat HSPs ...............65

 G. Concealment of Lead Fee Schedules to Deceive HSPs .........................................70

 H. HSPs Nationwide were Defrauded Into Buying Memberships and
   Unlawfully Charged for Bogus Leads ................................................................72

II. THE TREATMENT OF HSPS IS DECEITFUL, UNLAWFUL
 AND UNCONSCIONABLE ......................................................................................85

 A. The Sales and Account Management Processes Are Fraudulent and
   Deceitful...................................................................................................86

 B. Fraud and Deceit Inflected on HSPs Seeking Recourse ......................................95

 C. The Treatment of HSPs is in Stark Contrast to HomeAdvisor's Dealing
   with its Corporate and Elite 360 Members ...........................................................103

III. HOMEADVISOR IMPOSES UNAUTHORIZED MHELPDESK
 CHARGES ON HSPS..............................................................................................106

IV. OTHER BUSINESSES PARTICIPATED IN AND FURTHERED
 THE FRAUD ..........................................................................................................109

  A. The Better Business Bureau..............................................................................109

  B. Debt Collection Agencies .................................................................................113

V. THE LANHAM ACT DEFENDANTS UNLAWFULLY
 DIVERT BUSINESS FROM HSPS .........................................................................120

 A. HomeAdvisor Uses Former HSPs' Online Listings
   To Hijack Customers and Generate Leads..........................................................125

   *i.* HomeAdvisor's use of Former HSPs' Online Profile Pages ..................127

    ii.  HomeAdvisor Does Not Promptly Remove Former HSPs from the Exclusive Partner Network or Exact Match Listings.............................137

    iii.  Website Hijacking...................................................................................139

    iv.  HSPs Nationwide are Victimized By The Lanham Act Defendants' Scheme .................................................................142

VI.  IAC AND ANGI EXERT OPERATIONAL CONTROL OVER, AND PROFIT FROM, HOMEADVISOR ...............................................144

   A.  IAC Led the Fraud to Achieve Record Growth for HomeAdvisor...............145

   B.  IAC Not Only Financed The Fraudulent Business Model of Home-Advisor, IAC Actively Controlled And Influenced HomeAdvisor's Day-to-Day Business Operations...................................................148

   C.  IAC Capitalizes on Its Control of HomeAdvisor...........................................153

CLASS ACTION ALLEGATIONS .........................................................................159

I.  CLASS ACTION ALLEGATIONS FOR THE DECEPTIVE BUSINESS PRACTICES CLAIMS.........................................................159

II.  CLASS ACTION ALLEGATIONS FOR THE MISAPPROPRIATION CLAIMS.......166

CAUSES OF ACTION ...........................................................................................171

I.  THE DECEPTIVE BUSINESS PRACTICES CLAIMS ...............................................171

NATIONWIDE............................................................................................................171

COUNT I
Violations Of Racketeer Influenced And Corrupt Organizations Act,
18 U.S.C. § 1962(C)
(Against All Defendants On Behalf of the Nationwide Class)...................................171

   A.  RICO Enterprise...................................................................................172

   B.  Wire Fraud ...........................................................................................173

   C.  Pattern of Racketeering.......................................................................175

COUNT II
Fraud/Fraudulent Concealment Act
(On Behalf of the Nationwide Class)........................................................................176

COUNT III
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of the Nationwide Class)..........................................................................................179


COUNT IV
Unjust Enrichment/Restitution
(Against All Defendants On Behalf Of The Nationwide Class).................................................181

California ...................................................................................................................................182

COUNT V
Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code §§ 17200, *et seq.*
(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)....................................182

COUNT VI
False and Misleading Advertising,
Cal. Bus. & Prof. Code §§ 17500, *et seq.*
(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)....................................185

COUNT VII
Fraud/Fraudulent Concealment
On Behalf of Plaintiffs Seldner and LaPlaca and the California Class ......................................187

COUNT VIII
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)....................................190

COUNT IX
Breach of Implied Contract
(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)....................................192

COUNT X
Unjust Enrichment/Restitution
(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)....................................193

Colorado....................................................................................................................................195

COUNT XI
Violations of Colorado Consumer Protection Act ("CCPA"),
Colo. Rev. Stat. § 6-1-101, *et seq.*
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class .............................195

COUNT XII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class) ............................199

COUNT XIII
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class) ............................202

COUNT XIV
Breach of Implied Contract
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class) ............................204

COUNT XV
Unjust Enrichment/Restitution
(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class) ............................205

Florida ....................................................................................................................................207

COUNT XVI
Violation of the Florida Deceptive and Unfair Trade Practices Act,
 Fla. Stat. §501.201, *et seq.* ("DUTPA")
 On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class) ..........................................207

COUNT XVII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class) ..........................................208

COUNT XVIII
Aiding and Abetting Fraud/Fraudulent Concealment
(On Behalf of Plaintiff DaSilva and Ervine and the Florida Class) ...........................................211

COUNT XIX
Breach of Implied Contract
(On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class) ..........................................213

COUNT XX
Unjust Enrichment/Restitution
 (On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class) .........................................214

Idaho ...................................................................................................................216

COUNT XXI
Violations of the Idaho Consumer Protection Act,
 Idaho Civ. Code, § 480, *et seq.*
(On Behalf of Plaintiff Haukenes and the Idaho Class) ..........................................216

COUNT XXII
 Fraud/Fraudulent Concealment
 (On Behalf of Plaintiff Haukenes and the Idaho Class)...........................................218

COUNT XXIII
 Aiding and Abetting Fraud/Fraudulent Concealment
  (On Behalf of Plaintiff Haukenes and the Idaho Class)...........................................220

COUNT XXIV
Breach of Implied Contact
 (On Behalf of Plaintiff Haukenes and the Idaho Class)...........................................223

COUNT XXV
Unjust Enrichment/Restitution
 (On Behalf of Plaintiff Haukenes and the Idaho Class)...........................................224

Illinois ..................................................................................................................225

COUNT XXVI
Violations of the Illinois Uniform Deceptive
 Trade Practices Act ("Illinois DTPA")
 815 Ill. Comp. Stat. §§ 510/1, *et seq.*
 (On Behalf of Plaintiff Filipiak and the Illinois Class)...........................................225

COUNT XXVII
Fraud/Fraudulent Concealment
(On Behalf of Plaintiff Filipiak and the Illinois Class)...........................................228

COUNT XXVIII
Aiding and Abetting Fraud/Fraudulent Concealment
 (On Behalf of Plaintiff Filipiak and the Illinois Class)...........................................231

COUNT XXIX
Breach of Implied Contract
(On Behalf of Plaintiff Filipiak and the Illinois Class)...........................................233

COUNT XXX
Unjust Enrichment/Restitution
 (On Behalf of Plaintiff Filipiak and the Illinois Class)...........................................234

Indiana ...................................................................................................................................236

COUNT XXXI
Fraud/Fraudulent Concealment
   (On Behalf of Plaintiff Gray and the Indiana Class)..................................................236

COUNT XXXII
Aiding and Abetting Fraud/Fraudulent Concealment
   (On Behalf of Plaintiff Gray and the Indiana Class)..................................................238

COUNT XXXIII
Breach of Implied Contract
   (On Behalf of Plaintiff Gray and the Indiana Class)..................................................240

COUNT XXXIV
Unjust Enrichment/Restitution
   (On Behalf of Plaintiff Gray and the Indiana Class)..................................................242

New Jersey..............................................................................................................................243

COUNT XXXV
Violations of the New Jersey Consume Fraud Act
   N.J.S.A. §§ 56:8-1, *et seq.* ("NJCFA")
   (On Behalf of Plaintiff Costello and the New Jersey Class)......................................243

COUNT XXXVI
Fraud/Fraudulent Concealment
   (On Behalf of Plaintiff Costello and the New Jersey Class)......................................245

COUNT XXXVII
Aiding and Abetting Fraud/Fraudulent Concealment
   (On Behalf of Plaintiff Costello and the New Jersey Class)......................................248

COUNT XXXVIII
Breach of Implied Contract
   (On Behalf of Plaintiff Costello and the New Jersey Class)......................................250

COUNT XXXIX
Unjust Enrichment/Restitution
   (On Behalf of Plaintiff Costello and the New Jersey Class)......................................251

New York .......................................................................................................................253

COUNT XL
Violations of the New York General Business Law,
  N.Y. GEN. BUS. LAW § 349
(On Behalf of Plaintiff AirQuip and the New York Class) ........................................253

COUNT XLI
 Fraud/Fraudulent Concealment
  (On Behalf of Plaintiff AirQuip and the New York Class) ........................................255

COUNT XLII
Aiding and Abetting Fraud/Fraudulent Concealment
  (On Behalf of Plaintiff AirQuip and the New York Class) ........................................257

COUNT XLIII
Breach of Implied Contract
  (On Behalf of Plaintiff AirQuip and the New York Class) ........................................259

COUNT XLIV
Unjust Enrichment/Restitution
  (On Behalf of Plaintiff AirQuip and the New York Class) ........................................261

Ohio...............................................................................................................................262

COUNT XLV
Violations of the Ohio Deceptive
  Trade Practices Act ("Ohio DTPA")
  O.R.C. 4165.01, *et seq.*
  (On Behalf of Plaintiff Baumann and the Ohio Class..............................................262

COUNT XLVI
Fraud/Fraudulent Concealment
  (On Behalf of Plaintiff Baumann and the Ohio Class) .............................................265

COUNT XLVII
Breach of Implied Contract
  (On Behalf of Plaintiff Baumann and the Ohio Class) .............................................267

COUNT XLVIII
Unjust Enrichment/Restitution
  (On Behalf of Plaintiff Baumann and the Ohio Class) .............................................269

II.  THE MISSAPPROPRIATION CLAIMS ...............................................................270

Lanham Act...............................................................................................................270

COUNT XLIX
Violations of the Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A)
  (False Association and Trademark Infringement)
  (On Behalf of the Lanham Act Class)........................................................270

COUNT L
Violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
  (False Association and Trademark Infringement)
  (On Behalf of the Lanham Act Class)........................................................272

COUNT LI
Declaratory Judgment
  (On Behalf of the Lanham Act and State Misappropriation Classes)........................274

Colorado...................................................................................................................278

COUNT LII
Violations of Colorado Consumer Protection Act ("CCPA"),
  Colo. Rev. Stat. § 6-1-101, *et seq.*
  (On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class)..................276

COUNT LIII
Common Law Unfair Competition
  (On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class)..................279

Florida.....................................................................................................................280

COUNT LIV
Violations of the Florida Deceptive and Unfair Trade Practices Act,
  Fla. Stat. § 501.201 *et seq.* ("FDUTPA")
  (On Behalf of Plaintiffs Ervine and the Florida Misappropriation Class).................280

COUNT LV
Common Law Unfair Competition
  (On Behalf of Plaintiffs Ervine and the Florida Misappropriation Class).................282

Idaho ......................................................................................................................283

COUNT LVI
Violations of the Idaho Consumer Protection Act,
  Idaho Civ. Code, § 480, *et seq.*
  (On Behalf of Plaintiff Haukenes and the Idaho Misappropriation Class).................283

New York ...................................................................................................................286

COUNT LVII
Common Law Unfair Competition
  (On Behalf of Plaintiff Hass and the New York Misappropriation Class) ...............................286


PRAYER FOR RELIEF ...........................................................................................287

JURY DEMAND ......................................................................................................288

Plaintiffs Airquip, Inc., Kelly DaSilva, Nicole Gray, Charles Costello, Bruce Filipiak, Josh Seldner, Anthony Baumann, Kourtney Ervine, Hans Hass, Iva Haukenes, and Brad and Linda McHenry and Lisa LaPlaca (collectively, the "Plaintiffs"), by and through their counsel, bring this class action on behalf of themselves and a proposed class of all others similarly situated home service professionals ("HSPs"), against Defendants HomeAdvisor, Inc. ("HomeAdvisor"), IAC/InterActiveCorp ("IAC"), ANGI Homeservices Inc. ("ANGI"), C. David Venture Management, LLC ("CDVM"), Venture Street, LLC ("VentureStreet"), CraftJack, Inc. ("CraftJack") and John Does 1-11. Plaintiffs make the following allegations based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation undertaken by their counsel; analysis by consultants with expertise in disciplines relevant to this case; information that Plaintiffs have secured from certain Defendants, non-parties through discovery in this litigation and publicly available data; information provided to Plaintiffs' counsel by many hundreds of current and former HSPs who have been part of HomeAdvisor's member network; the accounts of homeowners who have utilized HomeAdvisor's network of HSPs; interviews of former employees of HomeAdvisor and ANGI; and the filings of IAC, ANGI, and Angie's List, Inc. made with the Securities and Exchange Commission ("SEC").  Plaintiffs allege as follows:

## NATURE OF THE CASE

1.      HomeAdvisor is a corrupt enterprise that twisted a lead generation business into a vehicle for greed and abuse.  HomeAdvisor, which was launched in 1998 as ServiceMagic, Inc. and was acquired by IAC in 2004 and rebranded in 2012 as HomeAdvisor, claims that it is an online marketplace for matching HSPs with consumers (homeowners) seeking to have home services performed.  Whereas the service is free to homeowners, revenue is generated primarily

from the fees paid by HSPs for memberships and homeowner service requests ("Leads"). On its face, such a matching service seems innocuous enough, but this business model was devised for wrongful, unlawful conduct in furtherance of systemically flawed and deficient processes used to generate illicit revenue from HSPs.

2.     In contrast to fixed-cost membership platforms, like Angie's List[1], where the homeowner pays a fee to have access to a directory of screened and customer-reviewed contractors to use for search and selection purposes, HomeAdvisor's business model turns such conventional behavior upside down by selling memberships to HSPs **plus** charging HSPs the cost of each supposed "qualified" homeowner Lead. From HomeAdvisor's, ANGI's and IAC's perspective, it is a far more profitable model because HomeAdvisor's potential revenue is essentially limitless, as it is predicated on the Lead pipeline that can be filled with bogus Leads.

3.     At bottom, it comes down to supply and demand. While HomeAdvisor's robust sales force, omitting information about the true nature of the Leads, and using false promises of success and misrepresentations of membership conditions, can fulfill the demand by aggressively selling HSP memberships and adding HSPs to the HomeAdvisor network, it is the supply-side, the homeowner Leads, that HomeAdvisor has less ability to control. HomeAdvisor, unable to resist the motive of greed, vigorously supplements the Lead pipeline by means that are inherently

---

[1]     In 1995, Angie's List founded what is known as the home services marketplace, an unbiased platform for consumers to research the quality of products or services provided by a variety of companies, most of which were contractors and home improvement companies. *See* https://www.softwareplatform.net/2016/03/07/angies-list-and-two-sided-market-pricing/ (last visited 1/3/19); https://www.fieldpulse.com/academy/angies-list-home-advisor-thumbtack-yelp-service-contractors/ (last visited 1/3/19). From 1995 to mid-2016, Angie's List employed a consumer driven business model where homeowners looking for a contractor would pay a membership fee to access a directory of local contractors and reviews from other homeowners. After searching Angie's List's directory and reviews, homeowners could then select and communicate with their chosen contractor.

incapable of generating real, genuine leads for HSPs, and with information acquired through a spider web of unscrupulous lead generating companies (including several named as defendants herein and other subsidiaries of IAC).

4.     HomeAdvisor does not subject any Leads, both those submitted on HomeAdvisor-run websites, including HomeAdvisor.com, or acquired through third-parties, to any meaningful check, filter or verification to assure any semblance of validity. HomeAdvisor does not actively monitor the manner in which third-parties gather "lead" information.  Nor does HomeAdvisor require or use itself any methods in an effort to eliminate non-human, robot traffic from generating "leads."

5.     Defendants' misconduct also goes beyond the generation of systemically flawed leads and infiltrates all aspects of HomeAdvisor's business and interactions with HSPs.

    a.  **Membership Solicitation:** HomeAdvisor uses nefarious means, including abject misrepresentations and threats, to entice, coerce and persuade contractors to become HSPs and to charge them hundreds and thousands of dollars for membership fees, Leads, and add-on services spawned from a sham business model.

    b.  **Deceptive and Fraudulent Sales Practices:** A nihilistic sales force is specially trained and incentivized to hawk HomeAdvisor's defective product to HSPs. Liars are rewarded; borderline truth tellers are fired.  HomeAdvisor's sales representatives are rewarded for lying or concealing material facts about the Leads to prospective HSPs to sell the memberships and secure the HSP's credit-card information to begin the flow of bogus Leads.  The systemic misconduct among sales personnel includes disregarding and/or changing HSPs' directives

concerning profiles and account settings related to services performed, desired geographic service area and maximum Lead spend budgets. Such sales culture does not end once the HSP becomes a member. HomeAdvisor call centers are also sites where there was frequent use and sale of illicit drugs, and alcohol consumption by staff members during business hours, further undermining adherence to business ethics and acceptable codes of conduct.

c. **Misrepresentation of HomeAdvisor's Services:** HomeAdvisor's scam also involves: charging HSPs for products and services they do not affirmatively seek and agree to receive and, misrepresenting (i) the benefits of membership, (ii) the quality of the Leads, (iii) fees to be charged, (iv) the ease and ability to monitor and adjust budgets, and (v) HSPs' inconsequential recourse with respect to complaints about Leads.

d. **Credit/Termination Requests:** When the truth about HomeAdvisor's services and the Leads become apparent to HSPs, their calls to HomeAdvisor seeking cancellation, refunds and to lodge complaints are avoided, obstructed, and even ignored. HomeAdvisor's sales representatives are trained to deflect Lead quality complaints and further are restrained ████████████ to the amount and type of credit that can be granted to a particularly vocal HSP. Moreover, HomeAdvisor's business model is grounded on the assumption that ██████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████

e. **Meritless Debt Collection Actions:** HomeAdvisor enters into illicit compacts

with debt collection firms (several of which are co-conspirators identified at ¶¶ 35-38 below) to wrongly coerce an HSP *back* into being a member of the network, or paying an illegitimate debt, thereby furthering the scam. ████████████████████████████████████████████ ████████████████████████████████████ This practice contradicts the notion that the HSPs are non-paying, undesirable customers and suggests the debt collection agencies are used to scare HSPs back into HomeAdvisor memberships. ████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ These practices underscore the illegitimacy of the HSPs' debt that HomeAdvisor seeks to collect and, equally important, highlight that Home Advisor is employing shake-down tactics that typically characterize organized criminal enterprises.

f. **Misappropriation of Business Opportunities:** Post-termination, HomeAdvisor exploits terminated HSPs by maintaining their online profiles in order to shamelessly generate and pilfer Leads for its current network of HSPs. Homeowners arrive on the desired HSPs' profile pages or call the number listed on the online profile page, without knowledge that the HSPs are no longer associated with HomeAdvisor, which results in HomeAdvisor diverting away

from a former HSP a genuine business opportunity created by a homeowner looking to hire the former HSP.

6.  Through fraudulent business practices, HomeAdvisor's revenues soared.  As of December 31, 2017, HomeAdvisor had revenues of over $736 million generated off of the backs of hard-working HSPs. In 2017, HomeAdvisor's parent, IAC, orchestrated the acquisition of Angie's List, combining it with HomeAdvisor to form ANGI[2], a public company (collectively referred to herein as "HomeAdvisor").  HomeAdvisor remains predominantly owned and controlled by IAC (86.5% and 98.5% of the economic and voting interest, respectively, as of October 10, 2018), and continues to operate as a fraudulent enterprise.

7.  Defendants' wrongful, unlawful conduct as alleged herein consists of: selling and charging HSPs memberships through concealment, fraud and misstatements about the true nature of HomeAdvisor's service; charging HSPs for bogus Leads; charging HSPs for unauthorized mHelpDesk fees; and unlawful and unconscionable dealings with HSPs throughout and subsequent to their HomeAdvisor relationship.  Defendants conduct has been corroborated by over 1,335 HSPs who have contacted Plaintiffs' Counsel and whose experiences with HomeAdvisor are reflected in Appendix I, attached hereto.  Defendants' unlawful conduct has caused substantial monetary damages and irreparable, ongoing harm, to HSPs. Such conduct gives rise to:

(a) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (c) (Count I) as against HomeAdvisor, IAC, ANGI, CDVM, VentureStreet, CraftJack and John Does (collectively the "RICO Defendants");

(b) fraud and fraudulent concealment (Counts II, VII, XII, XVII, XXII, XXVII, XXXI, XXXVI, XLI, and XLVI) as against HomeAdvisor and ANGI;

(c) claims for aiding and abetting fraud and fraudulent concealment (Counts III, VIII, XIII,

---

[2]  As discussed below in ¶¶ 23 and 413-423, ANGI and HomeAdvisor are effectively a singular entity and do not operate as separate corporations.  As such, any act or conduct asserted with respect to HomeAdvisor should be deemed to apply equally to ANGI.

XVIII, XXIII, XXVIII, XXXII, XXXVII, and XLII) as against IAC;

(d) claims for unjust enrichment and restitution by the HSPs (Counts IV, X, XV, XX, XXV, XXX, XXXIV, XXXIX, XLIV, and XLVIII) as against HomeAdvisor, IAC, and ANGI[3] (collectively the "Unjust Enrichment Defendants");

(e) breaches of implied contract between HSPs and HomeAdvisor (Counts IX, XIV, XIX, XXIV, XXIX, XXXIII, XXXVIII, XLIII, and XLVII) as against HomeAdvisor and ANGI; and

(f) unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor and ANGI in violation of the following state laws: California Unfair Competition Law[4] (Count V); California False and Misleading Advertising (Count VI); Colorado Consumer Protection Act (Count XI); Florida Deceptive and Unfair Trade Practices Act (Count XVI); Idaho Consumer Protection Act (Count XXI); Illinois Uniform Deceptive Trade Practices Act (Count XXVI); New Jersey Consumer Fraud Act (Count XXXV); New York General Business Law (Count XL); and Ohio Deceptive Trade Practices Act (Count XLV) (collectively the "Deceptive Business Practices Claims").

8.     In addition, HomeAdvisor's and John Does' (collectively the "Lanham Act Defendants") deceptive conduct in diverting business from HSPs, which conduct bestows significant financial benefits upon the Lanham Act Defendants, constitutes false association, false advertising, and unfair competition in violation of The Lanham Act, Section 1125(a)(1)(A) (Count XLIX), and Section 1125(a)(1)(B) (Count L); unfair competition in violation of the following state laws: Colorado Consumer Protection Act (Count LII); Colorado Unfair Competition law (Count

---

[3]     CDVM, VentureStreet, and CraftJack are also named as Defendants in Count IV. As to CDVM and VentureStreet, Count IV is asserted against them solely by Plaintiffs Airquip, Inc., Charles Costello, Bruce Filipiak, Kourtney Ervine, Hans Hass, and Lisa LaPlaca, with respect to leads that are the subject of CDVM's and VentureStreet's revenue share agreement with the other Defendants for which CDVM and/or VentureStreet retained a benefit.  As to CraftJack, Count IV is asserted against them solely by Plaintiffs Airquip, Inc., Anthony Bauman, Charles Costello, Nicole Gray, Hans Hass, Lisa LaPlaca and Brad and Linda McHenry, with respect to leads that are the subject of CraftJack's revenue share agreement with HomeAdvisor for which CraftJack retained a benefit.

[4]     IAC is also named as a Defendant for violations of the California Unfair Competition Law (Count V); California False and Misleading Advertising (Count VI) and Florida Deceptive and Unfair Trade Practices Act (Count XVI).

LIII); Florida Deceptive and Unfair Trade Practices Act (Count LIV); Florida Unfair Competition

law (Count LV); Idaho Consumer Protection Act (Count LVI); and New York Unfair Competition

law (Count LVII) (collectively the "Misappropriation Claims").  The Misappropriation Plaintiffs

also seek a Declaratory Judgment that the Lanham Act Defendants violated the Lanham Act,

Colorado Consumer Protection Act, Florida Deceptive and Unfair Trade Practices Act and Idaho

Consumer Protection Act (Count LI).

## PARTIES

### The Plaintiffs

9.      Plaintiff Airquip, Inc. ("Airquip") is a certified Trane Comfort Specialist$^{TM}$ Dealer

corporation with its principal place of business located at 830 Linden Avenue, Rochester, New

York.  Plaintiff Airquip paid for a Pro Connect$^{TM}$ membership with HomeAdvisor on or about

September 16, 2015, and was thereafter charged by HomeAdvisor for over 180 Leads.  On or

around April 4, 2016, Plaintiff Airquip terminated its membership with HomeAdvisor.  In total,

Plaintiff Airquip paid $347.98 for a HomeAdvisor Pro Connect$^{TM}$ membership, over $6,500 for

approximately 182 Leads (including sales tax), and over $350 in hidden mHelpDesk fees which

totaled over $7,200 in payments to HomeAdvisor.  HomeAdvisor concealed the true nature of the

membership programs, including the quality of the service and Leads, and absent such

concealment Plaintiff Airquip would not have agreed to subscribe to a membership or pay for

Leads.  As a result of Defendants' conduct, Plaintiff Airquip has been injured.

10.      Plaintiff Kelly DaSilva ("DaSilva") is the owner and operator of Marble Doctors

LLC which specializes in marble installation, care and restoration services.  Plaintiff DaSilva's

principal place of business is located at 7777 Glades Road #100, Boca Raton, Florida.  Plaintiff

DaSilva paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about November 5, 2015, and

was thereafter charged by HomeAdvisor for approximately 40 Leads before terminating the service on or around September 15, 2016. In total, Plaintiff DaSilva paid $347.98 for a HomeAdvisor Pro Connect^{TM} membership, nearly $850 for approximately 40 Leads, and almost $300 in hidden mHelpDesk fees which totaled approximately $1,500 in payments to HomeAdvisor. In agreeing to pay for a membership and each individual Lead, Plaintiff DaSilva relied on HomeAdvisor's representations concerning the quality of HomeAdvisor's Leads, the marketplace competition, and the flexible nature of the service. HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such concealment, Plaintiff DaSilva would not have agreed to subscribe to an annual membership or pay for Leads. As a result of the conduct described herein, Plaintiff DaSilva was injured.

11. Plaintiff Nicole Gray ("Gray") is the owner and operator of J.O.N.E.S. Way Cleaning Company which specializes in cleaning and janitorial services. Plaintiff Gray's principal place of business is located at 5531 W 35th Street, Indianapolis, Indiana. Plaintiff Gray paid $347.98 for a HomeAdvisor Pro Connect^{TM} membership on or about February 4, 2016. Between February 4, 2016 and October 3, 2016, Plaintiff Gray paid over $4,000 for approximately 170 Leads, and $59.99 in mHelpDesk fees which totaled approximately $4,500 in payments to HomeAdvisor. As a result of Defendants' conduct Plaintiff Gray has been injured and was in jeopardy of being evicted from her residence because the cost associated with her HomeAdvisor service far exceeded the costs she had anticipated. In agreeing to pay for a membership and each Lead, Plaintiff Gray relied on HomeAdvisor's representations concerning its vetted, quality, budget-conscious Lead service. HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such concealment Plaintiff Gray would not have agreed to subscribe to a membership or pay for Leads.

12.     Plaintiff Charles Costello ("Costello") is the owner Costello Home Construction, LLC which specializes in roof repairs and replacements and home remodeling.  Plaintiff Costello's principal place of business is located at 116 N. Dorset Ave., Ventnor City, New Jersey.  Plaintiff Costello paid for a HomeAdvisor Pro Connect™ membership on or about October 13, 2016 and was charged over $15,314 by HomeAdvisor for the membership and Leads.  In agreeing to pay for a membership and each Lead, Plaintiff Costello relied on HomeAdvisor's representations concerning its vetted and quality Lead service.  HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such concealment Plaintiff Costello would not have purchased a membership or agreed to pay for Leads. As a result of the conduct described herein, Plaintiff Costello was injured.

13.     Plaintiff Bruce Filipiak ("Filipiak") is the owner and President of Genesis Construction Services IL, LLC which specializes in renovation projects for kitchens, bathrooms and basements.  Plaintiff Filipiak's principal place of business is located at 701 Dorchester Dr., Bolingbrook, Illinois.  Plaintiff Filipiak paid for a HomeAdvisor Pro Connect™ membership on or about January 4, 2017, and was thereafter charged by HomeAdvisor for approximately 28 Leads.   In total, Plaintiff Filipiak has been charged nearly $2,700 for HomeAdvisor's Pro Connect™ membership and Leads.  In agreeing to pay for a membership and each Lead, Plaintiff Filipiak relied on HomeAdvisor's representations concerning its vetted and quality Lead service. HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Filipiak would not have agreed to subscribe to an annual membership or pay for Leads. Plaintiff Filipiak has been injured as a result of Defendants' conduct.

14.     Plaintiff Josh Seldner ("Seldner") is an unlicensed contractor who performs general handyman services.  Plaintiff Seldner operates his small side business, referred to by HomeAdvisor

as, "All Weather Handyman 365," from his residence in Sacramento, California. After fielding relentless solicitations from HomeAdvisor for eight months, Plaintiff Seldner paid $287.99 for a HomeAdvisor Pro Connect™ membership on August 16, 2017, and was thereafter charged by HomeAdvisor for approximately 26 Leads before being sent to collections on or around November 27, 2017. Between August 16 and October 5, 2017, Plaintiff Seldner was charged $245.32 for approximately 26 Leads. In response to Plaintiff Seldner disputing the charges with his credit card, HomeAdvisor attempted to re-process four charges totaling $529.39 on October 31, 2017, all of which failed. As a result, HomeAdvisor applied $80.00 in "interest", $20 for each failed transaction for an outstanding balance of $609.39, before sending Plaintiff Seldner to collections for a total amounting to $812.52. In agreeing to pay for a membership, Plaintiff Seldner relied on HomeAdvisor's representations that he was entitled to receive advertising and marketing services, and that he was not signed up to receive any Lead services. Had HomeAdvisor disclosed that Plaintiff Seldner was enrolled in Lead services, for which he would be charged for each Lead, Plaintiff Seldner would not have purchased a membership. As a result of the conduct described herein, Plaintiff Seldner was injured.

15. Plaintiff Anthony Baumann ("Baumann") is the owner and operator of 1st Choice Roofing Cincy which specializes in roofing, siding, gutters, and insulation work. Plaintiff Baumann's principal place of business is located at 6926 Tyler Court, Mason, Ohio. Plaintiff Baumann became a HomeAdvisor Pro Connect™ member in April 2014. Between April 23, 2014 and March 18, 2018 HomeAdvisor charged Plaintiff Baumann $11,743.42 for 222 leads. Plaintiff Baumann relied on HomeAdvisor's representations that the leads were verified, targeted and a cost-effective way to connect with new customers. HomeAdvisor concealed the true nature of the membership programs, including the quality of the service and Leads, and absent such

concealment Plaintiff Baumann would not have agreed to join HomeAdvisor's network of HSPs or pay for Leads. As a result of the conduct described herein, Plaintiff Baumann was injured.

16. Plaintiff Kourtney Ervine ("Ervine") is an owner and operator of Glass Act Window Cleaning which specializes in window cleaning and pressure washing services. Plaintiff Ervine's principal place of business is located at 612 Prosperity Farms Road, North Palm Beach, Florida. In total, Plaintiff Ervine has been charged over $1,500 for HomeAdvisor's Pro Connect$^{TM}$ membership and Leads from August 24, 2016 through approximately August 25, 2017. Notwithstanding that Plaintiff Ervine cancelled her membership on or about August 25, 2017, HomeAdvisor continues to maintain her company's Online Profile Page in order to improperly divert homeowners who are interested in contacting and potentially conducting business with Glass Act Window Cleaning to HomeAdvisor. In agreeing to pay for a membership and each Lead, Plaintiff Ervine relied on HomeAdvisor's representations concerning the quality of its Lead service. HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Ervine would not have agreed to subscribe to an annual membership or pay for Leads. As a result of the conduct described herein, Plaintiff Ervine was injured.

17. Plaintiff Hans Hass ("Hass") is the owner and operator of Alpine Metal Roofing which specializes in metal roofing, and also installs shingle and rubber, residential and commercial roofing. Plaintiff Hass' principal place of business is located at 164 River Street, Sidney, New York. Plaintiff Hass paid for a HomeAdvisor Pro Connect$^{TM}$ membership on or about August 24, 2015. Before terminating his membership with HomeAdvisor in December 2016, Plaintiff Hass uncovered that another website, Roofing.zone, was running fraudulent advertisements using his company name, and was diverting otherwise legitimate traffic and inquiries from his website for HomeAdvisor's benefit. Upon submitting the requested information on Roofing.zone, Plaintiff

Hass was contacted by other local HSPs that had received his contact information in the form of a Lead sold by HomeAdvisor. Plaintiff Hass complained to HomeAdvisor about the deceptive and fraudulent conduct which persisted even after cancelling his membership. As a result of the conduct described herein, Plaintiff Hass was injured.

18.     Plaintiff Iva Haukenes ("Haukenes") is an owner of Bergen Certified Inspections, LLC ("Bergen Certified") which specializes in home inspections light commercial surveys. Plaintiff Haukenes' principal place of business is located in Post Falls, Idaho. Plaintiff Haukenes paid for a HomeAdvisor Pro Connect[TM] membership on or about February 18, 2017, and was thereafter charged by HomeAdvisor for approximately 4 Leads. Plaintiff Haukenes relied on HomeAdvisor's representations concerning its vetted and quality Lead service. HomeAdvisor concealed that the Leads were illusory, and absent such concealment Plaintiff Haukenes would not have agreed to subscribe to an annual membership or pay for Leads. As a result of the conduct described herein, Plaintiff Haukenes was injured.

19.     Plaintiffs Brad and Linda McHenry ("McHenry's" or "McHenry Plaintiffs") are the owners of B&B Carpentry which specializes in residential and commercial remodeling. The McHenry Plaintiffs' principal place of business is located at 11005 Dover St., Unit 300, Westminster, Colorado. The McHenry Plaintiffs paid for HomeAdvisor Pro Connect[TM] memberships on or about March 31, 2016 and on or about June 26, 2017 and were charged over $1,300 by HomeAdvisor for the memberships and Leads. In agreeing to pay for a membership and each Lead, the McHenry Plaintiffs relied on HomeAdvisor's representations concerning its vetted and quality Lead service. HomeAdvisor concealed that the Leads were illusory, and absent such concealment, the McHenry Plaintiffs would not have agreed to subscribe to the annual memberships or pay for Leads. As a result of the conduct described herein, the McHenry Plaintiffs

were injured.

19A.     Plaintiff Lisa LaPlaca ("LaPlaca") owns and operates Lisa LaPlaca Interior Design. Lisa LaPlaca Interior Design is a sole proprietorship company that specializes in both commercial and residential interior design consultation services in the Santa Barbara, California area. Plaintiff LaPlaca's principal place of business are located at 3888 State St., Suite 103, Santa Barbara, CA 93105.  Plaintiff LaPlaca was signed up by HomeAdvisor over the phone for a HomeAdvisor membership on or about May 24, 2018 and was charged $347.98 by HomeAdvisor for the membership. From May 2018 through approximately May 2019, LaPlaca paid approximately $2,800 for leads sent from HomeAdvisor and one month of mHelpDesk.  At the time LaPlaca purchased the membership over the phone, LaPlaca did not sign a contract and no terms and conditions were disclosed or made available to LaPlaca.   In agreeing to pay for a membership and each Lead, LaPlaca relied on HomeAdvisor's representations concerning its vetted and quality Lead service.  HomeAdvisor concealed that the Leads were illusory, and absent such concealment, the LaPlaca would not have agreed to subscribe to the annual memberships or pay for Leads.  As a result of the conduct described herein, LaPlaca was injured.

20.     Plaintiffs Ervine, Hass, Haukenes, and the McHenry Plaintiffs are also referred to collectively as the Misappropriation Plaintiffs.

**The Defendants**

21.     Defendant HomeAdvisor, Inc. is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Suite 200, Golden, Colorado.

22.     Defendant IAC is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 555 West 18th Street, New York,

14

New York. IAC is a media and Internet company that owns more than 20 operating businesses comprising over 150 brands and products, including HomeAdvisor and some other recognized brands, such as Vimeo, About.com, and the Match Group's online dating portfolio, which includes Match, OkCupid, and Tinder. IAC has been at all relevant times the parent company and/or majority shareholder of HomeAdvisor.

23. Defendant ANGI is a corporation organized and in existence under the laws of the State of Delaware with its principal place of business located at 14023 Denver West Parkway, Building 64, Golden, Colorado. ANGI was founded and launched in April 2017 as Halo TopCo, Inc., a wholly owned subsidiary of IAC, to serve as the holding company for HomeAdvisor and Angie's List. On September 29, 2017, IAC contributed HomeAdvisor to ANGI, a publicly held company.

24. Defendant C. David Venture Management, LLC ("CDVM", d/b/a HomeBlue) is owned and operated by Christopher F. David ("C. David"). CDVM is organized and in existence under the laws of the State of Delaware with its principal place of business located in McLean, Virginia. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████    ██████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

25. VentureStreet, LLC ("VentureStreet"), a lead generator in the home services

industry, 

VentureStreet is organized and in existence under the laws of the State of Delaware with its principal place of business located in McLean, Virginia.

26.     Defendant CraftJack Inc. ("CraftJack"), is a corporation organized and in existence under the laws of the State of Illinois with its principal place of business located in Evanston, Illinois.  In November 2012, IAC and HomeAdvisor announced that HomeAdvisor had acquired CraftJack.  However, in its Form 10-Ks filed with the Securities and Exchange Commission for the years ending December 31, 2012 through December 31, 2017, IAC has listed CraftJack as one of its subsidiaries.  *See i.e.* http://ir.iac.com/static-files/66a65771-ec1c-480d-8e89-64d2d312d44c (last visited 1/8/19).  Prior to the transaction with HomeAdvisor and Angie's List, CraftJack was described as an online marketplace connecting homeowners to contactors for home improvement needs.  Following the merger, both ANGI and IAC altered the description of CraftJack by referring to it as a third-party lead generation service for home service professionals.

27.     Defendant John DOE 1 is the owner of the website domain roofingzone.com, to the extent the owner is not a Defendant named herein.

28.     The true names and capacities of the Defendants sued herein as DOES 2 through 11, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein related to creating, acquiring or transmitting bogus Leads; and/or misappropriating HSPs names or likenesses to generate Leads for

HomeAdvisor.  Plaintiffs will seek to add to this Complaint the actual names, capacities and roles of the DOE Defendants when such identities become known.

**The Relevant Non-Parties**

29.      Non-Party One Planet Ops Inc. ("One Planet") is the parent company of BuyerLink.com, formerly Reply.com, an online lead generation marketplace for the acquisition of locally-targeted consumer leads in automotive, real estate and home improvement industries, located in San Ramon, CA.

30.      Non-party Networx, Inc. ("Networx") is an online lead generation marketplace for the acquisition of locally-generated consumer leads in the home improvement industries, located in Atlanta, GA.

31.      Non-party Modernize, Inc. ("Modernize") f/k/a Home Improvement Lead, Inc. and Cal Finder Group Inc. is an online lead generation marketplace for the acquisition of consumer leads in the home improvement industries, located in Austin, TX.

32.      Non-party Triares, Inc. ("Triares") is an online local lead generation business through its 2,000+ brands located in Woburn, MA.

33.      Non-party Meredith Performance Marketing LLC acquired ███████████████

███████████████████████████████████████████████████████

██████  ████  █████  █████  █  █████  ███  ██████  █████  ██████

██████████████████████████████

34.      Non-Party RBIM, Inc. ("Reed Badra") is an online lead generation business located in Boise, Idaho.

35.      Non-party CMI Credit Mediators, Inc. ("CMI") is a debt collection agency located in Upper Darby, Pennsylvania.

36.     Non-party McCarthy, Burgess & Wolff ("MBW") is a debt collection agency, located in Cleveland, Ohio.

37.     Non-party Greenberg, Grant & Richards, Inc. ("GGR") is a debt collection agency, located in Houston, Texas.

38.     Non-party Phoenix Financial Service, LLC ("PFS") is a debt collection agency, located in Indianapolis, Indiana.

39.     The Non-parties listed in paragraphs 29-38 are collectively referred to as the "RICO Non-Parties."

## **HOMEADVISOR'S FORMER EMPLOYEES**

40.     This Complaint contains allegations based on information provided by the following former employees, who are treated herein as Confidential Witnesses.

41.     **Former Employee A:** Former Employee A worked for HomeAdvisor for approximately three years, before leaving HomeAdvisor in November 2012.  Prior to departing, Former Employee A held the position of a customer service manager for a year and a half at HomeAdvisor's headquarters located in Golden, Colorado.

42.     **Former Employee B:**  Former Employee B was a HomeAdvisor sales representative in Colorado Springs, Colorado for approximately ten months before departing HomeAdvisor in October 2016.

43.     **Former Employee C:**  Former Employee C was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately five months before leaving HomeAdvisor in October 2016.

44.     **Former Employee D:** Former Employee D was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately a year and

a half before resigning in June 2016.

45.     **Former Employee E:**     Former Employee E was a HomeAdvisor sales representative at HomeAdvisor's headquarters in Golden, Colorado for approximately seven months before resigning in June 2016.

46.     **Former Employee F:** Former Employee F was a HomeAdvisor Project Advisor in Colorado Springs, Colorado for approximately eight months before leaving HomeAdvisor in March 2017.

47.     **Former Employee G:** Former Employee G joined HomeAdvisor in July 2015 and held the position of a Sales Manager in Colorado Springs, Colorado before voluntarily leaving in September 2016.

## JURISDICTION AND VENUE

48.     This Court has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-1968 and the Lanham Act, 15 U.S.C. § 1125(a).

49.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1332(d)(2) because: (i) there are 100 or more members of the Class; (ii) there is an amount in controversy that exceeds the sum or value of $5,000,000, exclusive of interest and costs; (iii) the members of the Class are citizens of states different from Defendants; and, (iv) greater than two-thirds of the Class Members reside in states other than the state in which Defendants are citizens.

50.     This Court has personal jurisdiction over HomeAdvisor, ANGI, CraftJack, CDVM, VentureStreet and IAC because they are authorized to do business and are conducting business throughout the United States, including Colorado, and HomeAdvisor's and ANGI's principal executive offices are located in Golden, Colorado.

51. This Court also has personal jurisdiction over HomeAdvisor, CDVM and Venture Street because the facts and claims alleged herein arise out of and are connected to ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████

52. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, Defendants are authorized to conduct business in this District, and Defendants regularly conduct and transact business in this District and are therefore subject to personal jurisdiction in this District.

## FACTS

## I. HOMEADVISOR'S LEAD BUSINESS IS DEFECTIVE, DECEPTIVE AND FRAUDULENT

53. HomeAdvisor flipped the transparent, fixed-cost membership model, like Angie's List, on its head by operating a "two-sided home services marketplace[], where both consumers and high-quality service professionals come to be matched to one another." IAC Q4 2014 Management's Prepared Remarks at p. 7 (http://ir.iac.com/static-files/bb7ac3da-a1b2-463f-ac57-b87dc2433b8c) (last visited 1/4/19); *see also* https://www.softwareplatform.net/2017/05/09/when-business-models-collide-homeadvisor-and-angies-list/ (last visited 1/3/19). By relieving the homeowner of any financial obligation for using the service and placing HomeAdvisor in the role as the conduit between the homeowner and HSP, the quality and veracity of the Leads HomeAdvisor sells to HSPs are imperative.

54.    HomeAdvisor automatically charges HSPs from $8 to over $140 *per* Lead, depending on the type of service requested and the location of the request. It is therefore critical that the Leads are, as HomeAdvisor represents, from serious, project-ready homeowners, that the information reflected in the Lead is accurate, that the Leads are targeted to the services performed by the HSP and within the HSP's geographic reach, and that the Leads are sent to a limited number of HSPs.

55.    However, HomeAdvisor conceals the true nature and genesis of its Leads and, during all relevant times, has misrepresented that Leads are exclusively generated and vetted through its patented ProFinder[TM] and ProLeads[TM] systems that are purportedly designed to weed out the casual internet browser from serious, qualified and project-ready homeowners, thereby assuring the quality of the Leads sold to the HSPs.

### A.    HomeAdvisor Engages in a Pattern of Misrepresentations and Omissions Regarding the Quality and Nature of Its Leads

56.    HomeAdvisor's salesforce uses search engine marketing, trade associations and affiliate marketing channels to identify potential Service Professionals, including, *inter alia*, local plumbers, painters, electricians, handymen, and home improvement and maintenance personnel. In addition, HomeAdvisor acquires contact information for prospective HSPs through three sources: (1) independent identification (*e.g.*, phonebook, internet searches, etc.); (2) "phone-in" inquiries from interested Service Professionals, referred to internally as "Hot Leads", or; (3) most commonly, HomeAdvisor's algorithm-generated prospect list.

57.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████        ████████████████████



58.     In addition to the extensive email campaigns, throughout the class period HomeAdvisor has misrepresented the Leads as follows:

a.  "Get in front of ***ready-to-hire*** homeowners seeking your skills and expertise." *See* http://welcome.homeadvisor.com/membership#Membership (last visited 1/8/19) (emphasis added);

b.  "…HomeAdvisor matches you with homeowners actively seeking the services you provide in your area — making it easier than ever to connect with new customers and win more jobs." *Id*.;

c.  You'll be charged only for ***qualified leads*** matching your exact specifications, so you set the budget and the pace. *Id*. (emphasis added);

d.  HSPs will receive "***qualified* new business opportunities (ProLeads)** to keep [their] pipeline full." *Id.* (emphasis added);

e.  HSPs will receive "***highly targeted prospects***", and have the ability to monitor and precisely budget their "spend targets and spend ceilings" on Leads. *See* HomeAdvisorPro website, "How it works," at https://pro.homeadvisor.com/how-it-works/ (last visited 1/3/19) (emphasis added);

f.  "HomeAdvisor is the number 1 marketplace for ***project ready homeowners*** to connect with prescreened pros." HomeAdvisor video, https://youtube.com/watch?v=bOxwhpnxU5g (last visited 1/3/19);

g.  homeowners are instantly matched with "up to four local Home Service Professionals who have been background-checked and are qualified and available to do to the job." http://www.abouthomeadvisor.com/iac-relaunches-servicemagic-as-homeadvisor-the-next-generation-of-online-solutions-for-home-improvement-and-repair-projects/ (last visited 1/3/19);

h.  "[W]ith HomeAdvisor's ***patented pro finder technology you are only matching to serious homeowners*** *in your area*. HomeAdvisor then instantly connects you over the phone, via email….." HomeAdvisor video https://youtube.com/watch?v=bOxwhpnxU5g (last visited 1/3/19);

i.  The "Benefits of Joining" are "You won't have to ***waste your time with customers who just window-shop***" and it "***allows you to spend your time with the right "ready-to-buy" customers***": https://pro.homeadvisor.com/help/faqs/ (last visited 1/3/19) (emphasis added);

j.  And "[w]hile you're on the job, HomeAdvisor is finding ***qualified*** customers for you" and you "pay a ***nominal*** fee for each lead you match to." *Id.*

k.  "Connect with the ***Targeted Prospects*** You Need to Succeed. Tell us what you do and where, and we deliver prospects that meet your exact needs." https://pro.homeadvisor.com/ (last visited 1/3/19) (emphasis added);

l.  "**How It Works**   Over 30 million homeowners have trusted HomeAdvisor to help them find quality pros with the expertise to turn their home improvement dreams into reality. ***It's just one of the reasons you can depend on us to bring you highly targeted prospects that will grow your business.***" https://pro.homeadvisor.com/how-it-works/ (last visited 1/3/19) (emphasis added);

m.  "Q. How does HomeAdvisor work? A. First we ***find homeowners looking for help completing home projects and collect information about their project***. Our patented ProFinder technology then identifies relevant professionals, taking into account our pros' availability, service type and locations preferences. When we have a match, we send the homeowner's information to the matched pro instantly so that he/she can win the job." *Id.*; and

n.  "There are several ways [homeowners] can find Service Professionals from HomeAdvisor (collectively, "Service Professionals"). Profinder, our service where [homeowners] request a referral for a specific task, and ***we refer [homeowners] to up to four Service Professionals***." http://www.homeadvisor.com/servlet/TermsServlet (last visited 1/3/19).

59.  IAC and ANGI made similar representations in press releases and SEC filings about the Leads:

a.  "Each year more than six million ***project-ready*** homeowners visit HomeAdvisor.com …" http://www.iac.com/media-room/press-releases/homeadvisor-launches-exclusive-category-sponsorship-program (last visited 1/4/19) (emphasis added); and

b. "HomeAdvisor agrees to pay these third parties a fixed fee when visitors from their websites click through to the HomeAdvisor website and submit a *valid* service request through the HomeAdvisor platform, or when visitors submit a *valid* service request on the affiliate website and the affiliate transmits the service request to HomeAdvisor…" https://www.sec.gov/Archives/edgar/data/1705110/000170511017000004/angi-2017309x10q.htm (last visited 1/3/19) and, https://www.sec.gov/Archives/edgar/data/891103/000089110317000003/iac-20161231x10k.htm (last visited 1/3/19)(same).

60. HomeAdvisor has designed its business so that the only way HSPs can sign up for its service are through telephonic sales calls. During these telephonic sales calls, sales representatives routinely recited the following selling points that assured the quality and nature of HomeAdvisor's Leads, ██████████████████████████████████████████████

███████████████████ the reports of former HSPs and Former Employees B, D and E:

- Leads are qualified, project-ready, serious homeowners that submitted service requests through HomeAdvisor's website;

- ████████████████████████████████████████████
████████████████████

- If the homeowner is just considering a job, but they are not ready to buy, HomeAdvisor will not sell it as a Lead;

- ██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████

- There is no contract and that the service can be cancelled at any time;

- The HSP will speak to the homeowner or decision maker of the residence and not a renter;

- The address is for an actual residence;

- The Leads will meet the HSP's profile criteria;

- This Lead would only be distributed to a total of four HSPs;

- The HSP will have full control over the lead flow and ability to monitor costs; and



61.

62.

63.

████████████████████

64.    Former Employee E said that other sales representatives could be overheard "blatantly lying to Service Professionals" just to make the sale.  Similarly, Former Employee B claimed that "the more crooked you are internally, the more they [management] will turn their head as long as you are making the sale."

65.    The "Leads", however, are bogus for several reasons.  The Leads originate from sources that are neither reliable nor capable of generating the kinds of Leads that HomeAdvisor markets and sells.  HomeAdvisor acquires, generates and charges Plaintiffs and HSPs for Leads that are not verified nor are they from targeted, serious, qualified and/or project-ready homeowners.  Instead, the HSPs receive and pay far more than "a nominal fee" for Leads that are essentially worthless.

**B.    The Leads That Are Sold to HSPs Are Overwhelmingly Bogus Because The Lead Sources are Incapable of Generating Project Ready, Targeted Leads**

66.    The Leads charged to HSPs are the product of HomeAdvisor's systemically flawed system and process, and are of no value because they are often comprised of:

a.    wrong or disconnected phone numbers;

b.    wrong contact information;

c.    persons who never even heard of HomeAdvisor;

d.    persons who are not homeowners;

e.    persons who did not submit a service request and/or are not interested in having the service performed;

f.    stale Leads, including for projects that homeowners completed months or years prior to the Lead being sent;

g.    Leads that are over distributed;

      h.   contacts for homes that were listed for sale; and

      i.   contacts for vacant or non-existent residences.

67.    Due to HomeAdvisor's concealment of the materially defective nature and substance of the Leads, and contrary to HomeAdvisor's representations about the Leads (¶ 57-61 *supra*), Plaintiffs and the members of the Nationwide and State Classes (defined below) were and continue to be charged for Leads that do not constitute targeted, serious or qualified Leads, and are not Leads from project-ready homeowners.  The Leads sold to the HSPs were generated through processes that flatly contradict HomeAdvisor's representations as to the characteristics and nature of the Leads.

68.    IAC, ANGI and HomeAdvisor utilize various persons and businesses to accomplish the fraud perpetuated on the HSPs.

      i.      **HomeAdvisor's Lead Generation Practices Are Incapable of Producing Targeted, Project-Ready Leads**

69.    Contrary to its representations to HSPs, HomeAdvisor's internal Lead generation practices cannot produce the quality, project-ready Leads that it promises to HSPs.

70.    The Lead submission form found on HomeAdvisor's website does not deter "price shoppers" and "tire kickers" but, to the contrary, expressly encourages such behavior.  In several places, HomeAdvisor's Lead form provides homeowners with the impression that they are merely submitting a request for a price quote that will appear on their computer after completing the form. As the homeowner fills out the submission form, which contrary to representations made by HomeAdvisor's sales reps takes only 2 – 3 minutes to complete, they are asked the status and the timing of the "project."  Instead of limiting the potential responses to "ready to hire" or "project ready," HomeAdvisor's Lead submission form includes options that expressly indicate that the homeowner is not "project ready," such as "planning and budgeting," "timing is flexible" and the

homeowner does not intend on completing the request within the next two weeks and, in the case of some services, the next two months.



*See* https://www.homeadvisor.com/task.Tree-Stump-Remove.40328.2.html?5591=3526&7181=11218&7735=20767&80000=11152&90000=4702&501504=10001&529_2661=2661&529_924=924&step=7735&postalCode=19707&sar=true (last visited 1/4/19).

At the conclusion of the service request form, HomeAdvisor encourages the homeowner to submit their information by promising the homeowner will "Get quotes from up to 3 prescreened pros."

71.     HomeAdvisor's failure to take any steps to discern the level of interest from individuals completing the Lead form creates a disconnect between HomeAdvisor's representations to HSPs that Leads are project-ready and the individuals filling out the form who have no intention of completing the project, but rather are expecting to see price quotes or estimates displayed once the form is submitted.  Nor does HomeAdvisor put homeowners on notice, who would be hesitant or resist to submitting the Lead form, that each HSP will be charged upon receipt of the homeowner's information.

72.



73.

*See* Appendix I at ¶ 236, 237, 409, 585 and 630.

74.





75. Notably, HomeAdvisor.com and the sub-domains do not utilize a CAPTCHA to prevent robot traffic from submitting phony information. A CAPTCHA is "a program or system intended to distinguish human from machine input, typically as a way of thwarting spam and automated extraction of data from websites." Google search; *see also* http://www.dictionary.com/browse/captcha?s=t ("an online test designed so that humans but not computers are able to pass it, used as a security measure and usually involving a visual-perception task"). Common CAPTCHAs include the following:



76.

77.

78. HomeAdvisor also utilizes its Project Advisor Team ("PA Team") to generate hundreds of thousands of Leads per month. According to Former Employee F, the PA Team was created for the purpose of generating Leads. Following the initial distribution and sale of a Lead, the PA Team tries to contact the Leads with the goal to generate additional Leads by either matching the same service request to a new batch of HSPs and/or creating new Leads for other home service projects.

79. Similarly, a former ServiceMagic outbound consumer lead manager explained that her team would call homeowners looking for contractors with the goal to "up-sell them on additional services" which produced unqualified Leads. The former employee described the process as follows:

> If a client was in need of a plumber, we were taught to envision ourselves in the client's bathroom and imagine all of the other problems there may be based on their initial problem. For example, if the client needed a plumber for a busted pipe, we would ask if they had flooding and needed flooring, tile, drywall, mold abatement, etc....If the client said yes or maybe in the future, the sales rep would put in a lead (which they were making commission on) and that lead would be sent to multiple contractors. The client's phone would then blow up with calls from professionals. Some would often call back and complain that they had more than 4 calling them.

80.     Just like the issues experienced by the HSPs that received and paid for HomeAdvisor's deficient Leads, the PA Team encountered, first-hand, difficulties contacting the Leads. ███████████████████████████████████████████████████████████████ ███████████████████████████████ Former Employee F confirmed that a vast majority of outreach attempts to the Leads are futile.  The Leads are plagued by disconnected phone numbers, wrong or fake numbers, phone numbers that rang incessantly, and email addresses that bounce back as undeliverable.  When Former Employee F was able to successfully reach the "Lead", he was often told that the person did not request the service; that the person was not familiar with HomeAdvisor; or the person would hang up once he stated that he was calling from HomeAdvisor.

81.     In the instances that Former Employee F was able to successfully reach a Lead and either re-submit a Lead or create a new Lead, the Lead was matched using one of three options: (1) Market Match, (2) Exact Match, or (3) Instant Booking.  Although a maximum of four HSPs are to be selected for a Market Match and only one for the premium Exact Match, Former Employee F states that PA Team members were motivated by sales goals to routinely override the simplistic Lead distribution restrictions. Also, according to Former Employee F, the PA Team had the ability to access the calendars of participating HSPs to book appointments through Instant Booking, the most expensive Lead-type, absent any request from the purported homeowner.

33

82. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████

83. ██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████    ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████

84.     Not only does this practice directly contradict HomeAdvisor's representations that Market Match Leads are sold to a *maximum* of four HSPs, and only one HSP receives an Exact Match Lead, but it completely dilutes the quality and authenticity of the Leads.

85. ██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████        █████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

### ii.        HomeAdvisor Blindly Purchases "Leads" that are Devoid of Oversight and Any Quality Control From Direct Lead Generators

86.    HomeAdvisor contracts with over ███ lead generator companies, including One Planet, ████████████████████████████████████████████ ███ that are in the business of generating consumer contact information for a variety of industries (collectively with John Does the "Direct Lead Generators"), to generate some of the Leads HomeAdvisor sells to HSPs. ████████████████████████████████ ████████████████████████████████████████████████████ ██████

87.    ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

88.    ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████

89.    At no point does HomeAdvisor inform HSPs that they will be competing against

an unknown network of contractors for jobs from Leads.  To the contrary - as discussed in ¶¶ 60, 79 and Appendix I at 33, 106, 138, 587 - HomeAdvisor sales representatives only tell prospective HSPs about HomeAdvisor's network, concealing the fact that the HSP will be competing against many other contractors.  In agreeing to sign up for a Membership with HomeAdvisor and purchase Leads, the HSPs rely on these representations without being aware of the omitted material facts that they will be effectively competing against a mosh pit of home service contractors from other networks.

90. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████

91. ████████████████████████████████████████████
██████████████████████████████  ████████████
████████████████████████████████████████████



94. In turn, the Direct Lead Generators are complicit in this business model because they are aware of their own deficient processes and systems for receipt and conveyance of

legitimate Leads, and they persist in these lucrative transactions with HomeAdvisor, knowing that the ultimate consumers (*i.e.* HSPs) are unwittingly being victimized by the fraudulent business practices employed by them and HomeAdvisor.

95.     Former Employee A, one of only two HomeAdvisor customer service managers, from 2010 to 2012, and whose credentials permitted him to view the Lead sources of each Lead confirmed that: HomeAdvisor's third-party affiliate Lead generation agreements were fundamentally flawed; Lead agreements incentivized third-parties to generate Leads *by any means possible*; HomeAdvisor "knew their affiliates were doing shady things" to generate Leads; and, by approximately July 2011, HomeAdvisor was acquiring more Leads from third-party affiliates than it was generating.

96.



97.     *One Planet.*

98.     According to the Declaration of Matt Zurcher, the Senior Vice President of Customer Care at HomeAdvisor (*see Johansen v. HomeAdvisor, Inc., et al.* Case No. 2:16-cv-

---

5

00121 (U.S.D.C. S.D. Ohio), Dkt. No. 18-1, "Zurcher Decl."), HomeAdvisor purchases leads from One Planet and HomeAdvisor "***does not control, and has no right to control***, the manner in which One Planet generates or obtains" consumer Leads and that "***HomeAdvisor has no input and does not work with One Planet regarding how One Planet procures or receives***" Leads which are generated, *inter alia*, (i) through the websites of One Planet's operating companies, which own over 485 website domains (as of March 30, 2017) that consist of QualitySmith.com and remodelrepairandreplace.com, and (ii) by purchasing lead data from other third parties, referred to as "publishers", including entities such as Lead House, LLC. Zurcher Decl. at ¶¶ 7 and 10.



6   Non-U.S. ISPs are internet service providers located outside of the United States.

39





103. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

104. **_Networx_** is one of HomeAdvisor's competitors that purports to be a subscription-based model where contractors pay a "small flat fee per month" and receive _unlimited_ Leads from "target[ed] serious homeowners who are 'ready to buy' customers." _See_ https://www.networx.com/contractor-leads; _see also_ https://www.networx.com/how-it-works (last visited 1/3/19). ████████████████████████████

---

7 ████████████████████████████████████████████████████
████████████████████████

41



105. ████████████████████████████████████████████████

██████████████████████████████████ ████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████

106. Although Networx contends that it attracts potential customers exclusively through its websites, in reality Networx generates its Leads from unreliable sources that fail to weed out robot generated or bogus Leads.

107. Disabused contractors have posted their experiences with Networx on the Internet which include claims that Networx and HomeAdvisor are selling the same Leads. *See* https://networx-com.pissedconsumer.com/very-bad-experience-201708011082245.html (last visited 1/3/19). In addition, contractors have levied complaints against Networx with the BBB complaining that Networx's Leads are a scam and consist of phone numbers that don't answer, fake names, fake email addresses and no address listed in the Lead. *See* https://www.bbb.org/atlanta/business-reviews/referral-contractor/networx-systems-in-sandy-springs-ga-27471935/reviews-and-complaints (last visited 1/3/19).

108. ████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

8 ████████████████████████████████████████████████

██████████████████████████████████████████



109. **CraftJack** is essentially a competitor of HomeAdvisor, as it is an online service that connects homeowners with home improvement contractors. Like HomeAdvisor CraftJack too purports that its leads are "high-quality, phone verified" so that paying service professional, "don't have to waste time with the bogus leads." *See* https://craftjack.com/LearnMore (last visited 1/3/19).

110.

111.

---

9    SEO refers to search engine optimization, a marketing discipline focused on growing visibility in organic (non-paid) search engine results. *See* https://moz.com/beginners-guide-to-seo. SEM refers to search engine marketing, which is a marketing tactic to increase traffic through paid search listings. *See* https://searchengineland.com/guide/what-is-sem.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

112.     ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

113.     ██████████████████████████████████████

█████████████████████████████████████████████████ See

Appendix I at 142, 313 and 342.

114.     ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

115.     ***CDVM (d/b/a HomeBlue) and Venture Street*** ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

116.     HomeBlue states that it matches users to pre-screened contractors for free, no obligation estimates, and touts that there are "[o]ver 20,000 matches every month." *See* Homeblue.com. █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████.

The process described above fails to clarify that "step 3" is entirely optional and that step 4 does not contain any CAPTCHA.

117.     ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

118.     Furthermore, according to HomeBlue's Terms and Conditions, HomeBlue may match a user to *__multiple__* third parties in HomeBlue's network, including HomeAdvisor, Networx, CraftJack, and Web.com, and there is no reference in the Terms and Conditions that the request

45

will be distributed to only "4 local pros" as stated at the end of HomeBlue's four- step process.

(*See* https://lawn-care.homeblue.com/get-quotes.aspx (last visited 1/3/19).

Source: http://www.homeblue.com/terms-of-use.htm (last visited 1/3/19).

119.

120.

121.

122.



125. ***Triares*** operates "an online local lead generation business" through its 2,000+ brands. Triares sells Leads to HomeAdvisor that are generated through Triares' wholly owned subsidiary, Homeyou, Inc. (www.homeyou.com), and brands, including eHardHat (www.eHardHat.com).

126. eHardHat, one of Triares' owned and operated brands, states that it matches users to background checked contractors for free with no obligation to hire, and touts that there are "[o]ver 2,800,000 home improvement professionals listed in [its] directory" See eHardHat.com.

eHardHat states that the Leads it sends "are real customers looking for services right now." https://signup.ehardhat.com/step1.  However consistent with the other Lead generators, eHardHat does not use a CAPTCHA to weed out non-human submissions.



132. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ Double-serving is Google policy that "prevents multiple ads from the same or

commonly-owned company from appearing on the same search results page." *See*

https://www.quora.com/What-is-a-double-serving-policy-in-Google-AdWords (last visited

1/3/19). ████████████████████████████████████████████████

██████████████████████████

133. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████

134. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████

   **iii.** ████████████████████████████████████████

████████████████████████████████████

135. ████████████████████████████████████████████████



136.    The redirect tactics are devised to accomplish two goals: (1) inflate the number of unique visitors to HomeAdvisor's website, and (2) confuse and induce users, many of which just submitted a sweepstake entry, to complete another form.

137.    ████████████████████████████

████████  pop-under which is:

> … the sneakier relative of the pop-up ad. While pop-up ads are often shown (and closed) instantly, pop-under ads linger behind the current browser window, appearing only after other windows have been closed.

Source: https://www.marketingterms.com/dictionary/pop_under_ad/ (last visited 1/3/19).  ████

138.    ████████████████████████████

139.    ████████████████████████████

████████████████████ Thereby, the creation of a Lead associated with a sweepstakes entry is deficient and not a reliable source for the creation of legitimate, "qualified", "project-ready" Leads, as HomeAdvisor represents to its HSPs.  In fact, Former Employee A called HomeAdvisor's Lead agreement with PCH "disastrous" because a large percentage of Lead credit requests were attributable to Leads associated with PCH.

### iv. HomeAdvisor's Employees Corroborate the Deficient and Fraudulent Nature of the Leads

140.     According to HomeAdvisor former employees, HomeAdvisor engaged in deceptive practices to generate Leads from duplicating and recycling Leads, to repurposing purchased consumer information, all in an effort to increase revenue from Lead fees.

141.     Former Employee F claims that duplicate Leads were prevalent.  According to Former Employee F, he routinely saw the *exact* same Lead coming through the system from different affiliate channels, but the system would not flag the Lead as a duplicate; therefore, each record of the same Lead was treated as a unique Lead that was then sent to four or more HSPs.

142.     Former Employee E stated that he learned that Leads supplied to his HSPs were also being distributed through other Lead generation sites, such as http://homeimprovement.net/. And that he believed HomeAdvisor was replicating or accepting replicated Leads because there were duplicates of the *exact* same Leads – including the same grammar, punctuation, and even grammatical errors, and the only variations were the name or service location.

143.     Former Employee B recalls that her sales manager informed her that HomeAdvisor was buying contact information supplied by attendees at home shows and converting the information into phony Leads.

144.     Former Employee E routinely received calls from dissatisfied HSPs who said the "Leads were complete trash" or that the "Leads were bogus."

145.     HomeAdvisor's former and current employees have also spoken out on online forums about the systemically bogus Leads.  As a post by an author identified as a former HomeAdvisor sales employee confirms: "I personally believe they have a program running in the back ground [sic] to send contractors fake leads.  I was working with a contractor in California and I personally looked into EVERY lead HA sent him.  7 out of 10 were completely fabricated

and I personally could not find the so called lead in internet searches (like google   yahoo) or even         in         the        phone       book  ”     *See* https   web.archive.org web 201610251 143   http   www.complaintslist.com 2016 homeadvisor   statement from an x ha sales employee  (last visited 1 3 1  ).

146.    HomeAdvisor's former and current employees' assessments of the Leads ▮

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████      █████████████████████████████████

████████████████████████

        █████████████████████

        ██████████████████████████

        ███████████████████

        ████████████

        ██████████████████████

        █  █████████████

147.    ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████

        █████████████████████████████████████

                █████████████████████████████████

                █████████████████████████████████

                █████████████████████████████████



148. The foregoing unfair, deceptive and fraudulent conduct in characterizing, procuring, buying, filtering and validating the quality of the Leads, violates RICO (Count I), constitutes fraud and fraudulent concealment (Counts II, VII, XII, XVII, XXII, XXVII, XXXI, XXXVI, XLI, and XLVI), supports claims for unjust enrichment and restitution by the HSPs (Counts IV, X, XV, XX, XXV, XXX, XXXIV, XXXIX, XLIV, and XLVIII), breaches the implied contract between HSPs and HomeAdvisor (Counts IX, XIV, XIX, XXIV, XXIX, XXXIII, XXXVIII, XLIII, and XLVII), and constitutes unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor in violation of the state laws (Counts V, VI, XI, XVI XXI, XXVI, XXXV, XL, and XLV).





152. ████████████████████████  ████████████████████████

153. ██████████████████████████████████

   i. ████████████████████████████

154. ██████████████████████████████████

155. ████████████████████████ Appendix I at 107, 319, 565, 940, 1124, and 1133, █

156. ██████████████████████████████████



157.

158.

159.



160. ███████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

161. ███████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████ ████████████████████

██████████████████████████████████████████████████

[10] ████████████████████████████████████████████

█████████████ ████████████████ ████████ ████████████

████████████████████████████████████ ████████████



165. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████

166. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████



167.

168.

169.



170.

171.

172.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████

173.  ███████████████████████████████████

███████████████████████████████



174.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

175.  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████

E.   <u>HomeAdvisor Does Not Filter, Verify or Check the Quality of the Leads</u>

176.  HomeAdvisor's verification and filtering protocol is illusory.  ████████

███████████████████████████████████████████



181.    ███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    ████████████████████████

███████████████████████████████████████████████

████████████████████████

182.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

183.    HomeAdvisor's Lead generation efforts are just that – Lead generation, not Lead verification.  HomeAdvisor does not validate the accuracy of the address, phone number or homeowner name associated with a Lead.  HomeAdvisor makes no effort to verify that the individual identified in the Lead is the property owner, that the individual submitted the Lead or is project-ready.  Nor does HomeAdvisor call the alleged homeowners prior to distributing and charging HSPs for Leads.  HomeAdvisor's sole objective is to amass Leads to fill the pipeline and sell as many Leads as possible, irrespective of quality.

184.    ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

**F.    Use of Purported Monthly Lead Budgets to Deceive and Cheat HSPs**

185.    HomeAdvisor misrepresents HSPs' ability to control the volume of Leads they will receive.  For example, HomeAdvisor told HSPs they could "modify spend targets any time," thereby giving HSPs "full control" of their account through the user-friendly system.  *See* HomeAdvisorPro, "Solutions for Every Business," at https://pro.homeadvisor.com/how-it-works/ (last visited 1/10/19).

186.    Because HomeAdvisor automatically charges HSPs' credit cards and deducts funds from their checking accounts, the ability of HSPs to set monthly spend caps and establish budgets is material.  HomeAdvisor knows and prays on that importance by misrepresenting to the HSPs that they can control the amount of Leads they receive and set budgets, including by stating the following on its website:



*See* https://pro.homeadvisor.com/how-it-works/ (last visited 1/3/19).

187.    In reality, HomeAdvisor routinely ignores and surpasses HSPs' monthly Leads budgets.

65

188.     HomeAdvisor's former employees confirm that this was accomplished by using several tactics.  One tactic entailed the use of HomeAdvisor's two categories of "Targeted Leads", (1) "Market Match" Leads, and (2) "Exact Match" Leads:

    a.   **Market Match**: "Consumers ***come to HomeAdvisor.com*** and give us detailed info about their project. We match that info with your work and area preferences, and connect you with homeowners that match your needs"

    b.   **Exact Match**: "Get your name out there on the most searched internet sites and business directories. We do more to promote your business online than anyone. And, you'll only pay for leads when a consumer views your business profile and then decides they want to connect with you."

*See* https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp (last visited 1/3/19) (emphasis added).   HomeAdvisor represents that these two Lead categories are generated differently, resulting in a premium Lead fee for the so-called Exact Match Leads.

189.     Each of HomeAdvisor's Targeted Leads categories has its own separate budget, yet HomeAdvisor trains its sales representatives to establish *only* one monthly spend ceiling to the less expensive Market Match Leads, resulting in HSPs having no budget for Exact Match Leads. Moreover, HomeAdvisor does not disclose that ██████████████████████████ ████████████████. This deception masks the fact that the spend target will not include all fee costs and likely will become a floor, not a ceiling, leading to HSPs being charged hundreds or thousands of dollars above the HSPs' anticipated maximum monthly Leads budget.

190.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████

191.     ████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

192.    Also, if by chance an HSP questions the application of a budget to both Lead categories, Former Employee C said that sales representatives would impose "required" minimum budgets on the HSP (*e.g.* setting monthly minimum budgets to \$400 for Market Match Leads and \$200 for Exact Match Leads).

193.    ████████████████████████████████████

███████████████████████████████████████████

█████████████████████████



194.    Additionally, HomeAdvisor conceals that if an HSP freezes their Leads *at any time*

during the course of the month, or increases or decreases the spend target, the monthly Leads budget resets, thereby allowing HomeAdvisor to impose the maximum monthly Leads budget *during each interval* that the Lead service is interrupted.

195.    For example, on or about January 5, 2017, during a live orientation session with a HomeAdvisor representative concerning use of HomeAdvisor's system, Plaintiff Filipiak's monthly Lead Budget was set at $1,000 per month.  Plaintiff Filipiak immediately informed the HomeAdvisor representative that he did not want a monthly budget that was higher than $300-$500.  The HomeAdvisor representative assured Plaintiff Filipiak that the $1,000 monthly budget was a placeholder and Plaintiff Filipiak could adjust his desired monthly budget whenever he wanted.  At no point did the HomeAdvisor representative inform Plaintiff Filipiak that every time the Lead budget is adjusted, the monthly Lead budget resets.  Despite Plaintiff Filipiak having lowered his monthly Lead budget on two separate occasions during the month of January, HomeAdvisor charged him for 28 Leads at a cost of over $2,400 for January.

196.    Rather, HomeAdvisor represents to HSPs that they "have ***full control*** over the type and volume of business opportunities" received from HomeAdvisor, but HomeAdvisor omits to mention that "turning the leads off" impact HSPs' Lead budgets.



⌄ How much control do I have over the leads I receive?

With Pro Leads, you have full control over the type and volume of business opportunities you receive from HomeAdvisor. That means that you turn your leads off when you're too busy to take new jobs and ask for more leads when your schedule's light.

Source: http://welcome.homeadvisor.com/membership (last visited 4/26/18).

197.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

198. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

199. ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

200. ██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████

201.     ***Plaintiff Gray.*** Despite HomeAdvisor's assertions that HSPs were granted the ability to establish and monitor monthly Lead budgets, Plaintiff Gray's monthly budget was continuously surpassed.  When Plaintiff Gray joined HomeAdvisor she stressed the need to be budget-conscious.  However, when she initially established her monthly Lead budget the sales representative did not inform her that there were two Lead budgets.  As a result, Plaintiff Gray's Lead budget only applied to one category of Leads, allowing her to be charged amounts in excess of, what she believed to be, the total monthly Lead budget.  Thereafter, the construct of the Lead budget categories was finally revealed to Plaintiff Gray after repeated inquiries about the overages.  After receiving and paying for so many bogus Leads, Plaintiff Gray decreased her Lead budget to $200 a month – $100 for Exact Match Leads and $100 for Market Match Leads.  But, HomeAdvisor routinely charged and withdrew the monthly Lead allowance on a *weekly* basis.  When Plaintiff Gray contacted HomeAdvisor about the unauthorized charges and account discrepancy, HomeAdvisor falsely stated that Plaintiff Gray "must have" frozen her Leads during the week, when, in fact, she had not.

### G.     Concealment of Lead Fee Schedules to Deceive HSPs

202.     HomeAdvisor automatically charges HSPs' credit cards and deducts funds from their checking accounts for Leads.  The HSPs' ability to know the magnitude of the charges is therefore material.  However, information about the Lead fees is concealed from the HSPs and

HSPs are misled about Lead fees, which can range from under $10 to more than $140 per Lead.

203.    While the amount that HomeAdvisor charges per Lead is purportedly determined by the service requested and location, HomeAdvisor does not publish nor distribute any Lead fee schedule to HSPs.  Instead, HomeAdvisor tells prospective members to contact HomeAdvisor.

> ∨ How much do leads cost?
>
> Individual lead prices vary based on service type and location. You'll be charged only for qualified leads matching your exact specifications, so you set the budget and the pace.
>
> To learn how much leads will cost your business please email or call us at 855-801-6255.

*See* http://welcome.homeadvisor.com/membership (last visited 4/26/18).

204.    HomeAdvisor purposefully conceals material information regarding the huge range in Lead fees to avoid losing potential sales.  Former Employee C said that HomeAdvisor told sales representatives to falsely state to HSPs that no Lead fee schedules were available.  HomeAdvisor trained its sales representatives to instead offer a Lead fee range or, better yet, an average Lead fee, if pressed, when, according to Former Employee B, they had access to Lead fee schedules.

205.    ***Plaintiff Airquip.***  When ***Plaintiff Airquip*** signed up for a HomeAdvisor Pro Connect™ membership, it was told that Leads would cost between $15 and $45 each depending on the service selected; however, over 75% of Airquip's approximate 182 Leads reflected Lead fees that exceeded $45 and were as high as $86.26.

206.    ***Plaintiff Ervine.***  In fact, when Plaintiff Ervine confronted a HomeAdvisor representative about Lead fees surpassing the $14 to $18 range she relied upon when joining HomeAdvisor, the representative stated that Plaintiff Ervine must have heard wrong because HomeAdvisor would never tell a HSP the rates it charges for Leads.

207.    As a result of HomeAdvisor's refusal to provide HSPs with accurate and material Lead fee information, the cost of each Lead is concealed until the charge for the Lead is automatically applied.

71

### H. HSPs Nationwide were Defrauded into Buying Memberships and Unlawfully Charged for Bogus Leads

208.     Each of the named Plaintiffs was a victim of HomeAdvisor's deceitful practices employed to generate unqualified and unverified Leads that were charged to Plaintiffs and HSPs.

209.     ***Plaintiff Airquip***, on or about September 16, 2015, paid $347.98 for a HomeAdvisor Pro Connect™ membership, and was told by HomeAdvisor's sales consultant that HomeAdvisor's proven ProLeads™ lead generation platform would grow Plaintiff Airquip's business through qualified, serious leads.  Over the course of six months, Plaintiff Airquip received approximately 182 Leads for which it paid $6,300.  Plaintiff Airquip encountered a variety of systemic issues concerning the legitimacy and viability of the Leads:

> a.  Leads with phone numbers that continuously rang until disconnecting, or a voicemail, often automated, would state that either the voicemail was not set up or was full so no message could be recorded.
>
> b.  Leads that were hundreds of miles outside of Plaintiff Airquip's service area.
>
> c.  Leads were not the homeowners who also questioned how their contact information was obtained.
>
> d.  The service requested had already been completed, sometimes even weeks before the Lead was received, or that another service professional had already been selected.
>
> e.  Numerous Leads full-heartedly denied submitting any service request through HomeAdvisor.com and some leads were completely unfamiliar with HomeAdvisor.
>
> f.  Inaccurate Lead contact information.

210.     ***Plaintiff DaSilva,*** agreed to become a HomeAdvisor member in November 2015 under the pretense that she would be the only HomeAdvisor Home Service Professional providing marble polishing services in her selected geographic region, to receive Leads purportedly from targeted, serious, project-ready homeowners, and was told that if she encountered any issues with

the Leads that HomeAdvisor would simply issue a refund or replace the Lead. The first month after signing up with HomeAdvisor, Plaintiff DaSilva received approximately 25 Leads for which she was charged over $715. The Leads consisted of: disconnected phone numbers; persons stating that they were not the homeowner of the property and were not interested in the service; Leads for services Plaintiff DaSilva did not offer; and even a Lead with a fictitious address.  Yet, the most common Lead deficiency Plaintiff DaSilva confronted was homeowners who informed her that she was not the first or the fourth HomeAdvisor HSP to contact them, but the *tenth or even twentieth HomeAdvisor HSP.*

211.    When *Plaintiff Gray* agreed to become a HomeAdvisor HSP in February 2016, she sought to receive Leads that were targeted, verified, and pre-screened Leads, that were in her service area, and over which Plaintiff Gray would have full control over the Lead flow and budget. However, upon activation of the Leads, Plaintiff Gray was charged from $16 to over $55 per Lead for Leads that were: disconnected phone numbers, numbers that went to fax lines and numbers that rang incessantly before disconnecting; duplicate Leads; fictitious addresses; or individuals who claimed they did not submit any request through HomeAdvisor and demanded to know how Plaintiff Gray received their contact information.

212.    After two years of being harassed by pushy and forceful HomeAdvisor sales representatives and being bombarded by HomeAdvisor advertisements sent to his personal email, *Plaintiff Filipiak* signed up for a HomeAdvisor membership in January 2017. Within hours, HomeAdvisor inundated Plaintiff Filipiak with Leads; after the first week, he received 13 Leads ranging in price from $18.16 to $141.96, for a total cost of over $890.  Despite Plaintiff Filipiak having lowered his monthly Lead budget in January on two separate occasions until it reached $0, HomeAdvisor charged him for 28 Leads at a cost of over $2,400 in January alone. Only two Leads

sent to Plaintiff Filipiak resulted in a job, and the remaining Leads consisted of: a mortgage broker looking for contractors to attend a class on renovation loans; people who did not own a house; unanswered phone numbers; phone numbers that cut-off without the opportunity to leave messages; and persons stating that they were not interested in the requested service, notwithstanding that he was told there was a unfulfilled need for HSPs in Plaintiff Filipiak's service area.  Even for the four "instant booking" Leads, which were supposedly from homeowners who scheduled a direct appointment with Plaintiff Filipiak through HomeAdvisor's website, two never answered the door or phone calls and the other two Leads stated they were not the homeowner indicated on the Lead form and they were not looking for the services offered by Plaintiff Filipiak. After less than a month with HomeAdvisor, on or about February 5, 2017, Plaintiff Filipiak called HomeAdvisor to cancel his membership and request a refund of his membership fee.  HomeAdvisor refused to refund his membership fee and Plaintiff Filipiak froze his Lead services.

213.    On or about August 16, 2017, after eight months of persistent solicitation from HomeAdvisor, *Plaintiff Seldner* agreed to join HomeAdvisor's HSP network.  Plaintiff Seldner agreed to pay $287.99 for the membership in exchange for, what he thought was strictly, advertising and marketing for his small, side-job, handyman business.  Over the course of the eight months that HomeAdvisor aggressively pursued Plaintiff Seldner, he reiterated how he was only interested in advertising and that Leads were not practical for his business.  The HomeAdvisor sales representative confirmed that Leads were an add-on service and that Plaintiff Seldner was under no obligation to receive Leads; however, a Leads budget was a required field in the happenstance he decided to use the service, so the representative told Plaintiff Seldner that it was set to $100.

214.    Within the month, Plaintiff Seldner received approximately 22 Leads, and was charged **over $440**. Plaintiff Seldner contacted HomeAdvisor to complain and to demand a refund. The representative said she would credit the account (notably, only $109.95 was issued in Lead credits) and freeze the Leads, which unbeknownst to Plaintiff Seldner automatically turned on within two weeks.  When the Leads reactivated he received four Leads within two days and incurred additional charges of nearly $85. Plaintiff Seldner called the HomeAdvisor sales representative to complain, but after several calls went unanswered, he finally spoke to a HomeAdvisor manager and requested a refund for the Leads and that the Leads be turned off.  The manager said that HomeAdvisor does not refund money, and advised Plaintiff Seldner to cancel to service completely if he was not interested in receiving Leads.  Plaintiff Seldner responded that since he paid for the annual membership he was entitled to receive the promised advertising and marketing, but that he did not want to receive Leads, to which the manager indicated that his Leads would be permanently frozen.

215.    On or about April 23, 2014, ***Plaintiff Baumann*** paid a quarterly membership fee of $80.99 to join the HomeAdvisor Pro network on the representations that he was to receive targeted Leads, and that the service would be a "reliable and cost-effective way to connect with new customers."  From April 23, 2014 through March 2, 2018, Plaintiff Baumann received over 220 Leads ranging in cost from $9.18 to $145.45 each which totaled nearly $11,745.  Plaintiff Baumann experienced issues with the Leads shortly after joining HomeAdvisor, but after the first year Plaintiff Baumann noticed a drastic decrease in Lead quality. Plaintiff Baumann encountered systemic issues concerning validity of the Leads including, *inter alia*:

      a.  Phones that ran incessantly, or phone numbers with no voicemails set up or automated voicemails;

      b.  Disconnected phone numbers;

      c.   Individuals stating that they did not submit a request or were not interest in having the service performed;

      d.   Individuals listed on the Lead were not the homeowners;

      e.   Addresses for vacant lots; and

      f.   Email addresses that would be kicked back as undeliverable.

216.    Dissatisfied with the quality of the Leads and difficulty in obtaining credit for deficient Leads, Plaintiff Baumann began freezing the Lead service. Plaintiff Baumann was reluctant to cancel his HomeAdvisor account because he relied upon the online profile that he worked to build on HomeAdvisor's directory for marketing and referral purposes. However, Plaintiff Baumann grew tired of constantly monitoring his HomeAdvisor account and freezing his Leads since he could not permanently deactivate the Lead service. As a result, every so often, the Leads would turn on before Plaintiff Baumann had an opportunity to freeze them again resulting in the issuance of and being charged for more bogus Leads. Eventually Plaintiff Baumann canceled his HomeAdvisor account. Meanwhile HomeAdvisor continues to pursue him for outstanding charges in the amount of $227.90 and has threatened to send him to collections.

217.    When **_Plaintiff Ervine_** agreed to become a HomeAdvisor HSP in August 2016, the Leads charged to her were to be only from homeowners who were ready to hire, to be provided to only one or two HSPs, and cost between $14 and $18 for residential Leads and $18 and $20 for commercial Leads. Within the first month, she was charged over $325 for approximately 15 Leads, all of which were residential leads with the charges ranging from $14 to approximately $30 per Lead.  Plaintiff Ervine immediately encountered problems with the Leads, which consisted of unanswered phone numbers, persons stating that the requested service had already been completed, Leads outside of her geographical area, and even Leads with fictitious contact information.

Plaintiff Ervine was also informed by homeowners on several occasions that she was not the first or second HomeAdvisor HSP to contact them, and in one case was at least the *sixth HomeAdvisor HSP* to contact the homeowner.

218.    Further, despite having frozen her Leads, in December 2016 Plaintiff Ervine received a Lead for a job that had already been completed, and from March to July 2017, HomeAdvisor continued to send and charged her for four more Leads totaling over $110. Ultimately, Plaintiff Ervine sought out and received credits for these Leads.  After Plaintiff Ervine terminated her membership account, HomeAdvisor continued to send Plaintiff Ervine coercive and misleading text messages purporting to be "Leads."  The six text messages were a ruse designed by HomeAdvisor to try to fraudulently induce Plaintiff Ervine to reactivate her HomeAdvisor membership:  First, none of the text messages came from phone numbers within Plaintiff Ervine's geographic region (originating from California, Minnesota, Oklahoma, Tennessee, Texas and Wisconsin); Second, the text messages instructed Plaintiff Ervine to reply by email, not phone, to the purported homeowners' spouse; and Third, on their face, the text messages have no indicia of credibility as a "Lead", as depicted in the following 3 examples:





219.     When **Linda McHenry**, President of B&B Carpentry, agreed to become a
HomeAdvisor HSP on or about March 31, 2016, and paid $287.99 for a HomeAdvisor Pro
Connect™ membership, a HomeAdvisor sales representative represented that B&B Carpentry
would be charged for qualified and verified Leads and HomeAdvisor would provide a refund for
any bad Leads.  Immediately, HomeAdvisor bombarded the McHenry Plaintiffs with Leads, and
within three days of signing up, the McHenry Plaintiff's $700 monthly Lead budget was met. The
Leads charged to the McHenry Plaintiffs were not quality, project-ready Leads; instead they
consisted of unanswered phone numbers, persons that missed appointments, Leads outside of the
McHenry Plaintiffs' geographical area or scope of service, Leads with fictitious contact
information, and Leads that were over distributed.  Less than one week after signing up with
HomeAdvisor, Plaintiff Linda McHenry froze the Lead service and continued to freeze the Leads
on a monthly basis until the HomeAdvisor membership terminated.

220.     Not long after terminating their membership, HomeAdvisor began aggressively
pursuing the McHenry Plaintiffs in an effort to convince them to rejoin HomeAdvisor, including
through emails claiming that HomeAdvisor, in response to feedback from HSPs, implemented new
features including: Improved Customer Service, Easier Credit Requests, More Targeted
Connections, and $100 in free Lead credits.

221.     In addition to the barrage of emails, HomeAdvisor repeatedly pressured and harassed the McHenry Plaintiffs with relentless phone calls. On or about June 26, 2017, Plaintiff Brad McHenry spoke with a HomeAdvisor sales representative and explained that he was reluctant to rejoin HomeAdvisor because, based on his prior experience, HomeAdvisor was operating a fraudulent business model of selling to multiple contractors bogus Leads that were not from project-ready homeowners.  The sales representative acknowledged that this is the main complaint that HomeAdvisor receives from other HSPs, but promised that HomeAdvisor had recognized the problems with the Leads, improved the quality of the Leads and would be more responsive to requests to refund bogus or unverified Leads.

222.     Based on these representations, *Plaintiff Brad McHenry* agreed to resign-up for a HomeAdvisor Membership and was charged $347.98.  Nevertheless, the Leads subsequently sold to the McHenry Plaintiffs quickly demonstrated that nothing had changed with HomeAdvisor's business model or Leads.  Plaintiff Brad McHenry paid over $440 for the subsequent Leads, but those Leads suffered from the same deficiencies that the McHenry Plaintiffs experienced during their previous HomeAdvisor membership.  As a result, less than one month after re-signing up for HomeAdvisor, the McHenry Plaintiffs cancelled their membership again.

223.     Immediately after *Plaintiff Haukenes* launched her home inspection business website, HomeAdvisor bombarded her with email and phone call solicitations, including emails stating that HomeAdvisor would provide "Targeted Leads focused on the types of jobs you want, in the locations you request."  On February 18, 2017, Plaintiff Haukenes spoke to a HomeAdvisor sales representative who stated that the Leads would come from real people, would only be for the services that Plaintiff Haukenes' provides (which was important since Plaintiff Haukenes specified she was a home inspector and *did not* offer roof repair), and the Leads would only be from the

exact geographical areas Plaintiff Haukenes specified, because the HomeAdvisor sales representative initially offered Leads that were several hours away.

224. Based upon these representations, Plaintiff Haukenes paid $287.99 for a HomeAdvisor Pro Connect™ membership, and was charged a total of $73.32 for four Leads between March 8, 2017 and March 12, 2107 (she was charged between $14 and $22 per Lead). Plaintiff Haukenes immediately encountered problems with the Leads, which contained non-existent addresses, fictitious phone numbers, Leads for roof repair, and Leads outside her geographic service area (one was from Las Vegas, NV, located more than 1,100 miles from her office, and contained a fake telephone number).

225. When **Plaintiff Costello** spoke with a HomeAdvisor sales representative on or about October 7, 2016, about HomeAdvisor's Membership Programs and the nature and quality of the Leads, the HomeAdvisor sales representative told Plaintiff Costello that HomeAdvisor did not use any third parties to generate its Leads, that the Leads were vetted and verified, and that the Leads were real homeowners looking for roof replacements. The HomeAdvisor sales representative assured Plaintiff Costello that if a Lead was not from a real homeowner seeking a roof replacement, HomeAdvisor would credit any bogus Lead. In addition, Plaintiff Costello was advised that there were 74 Leads in his area looking for roofing contractors. Based upon these representations, Plaintiff Costello paid $287.99 for a HomeAdvisor Pro Connect™ membership.

226. Despite setting his Lead budget at $1,000 a month, four days after signing up with HomeAdvisor, Plaintiff Costello had not received a single Lead. When Plaintiff Costello followed up with HomeAdvisor customer care about the lack of Leads he was informed that in order to receive Leads he had to increase his spend target to $10,000 a month. Once Plaintiff Costello increased his Lead budget to $10,000 and began receiving Leads, it immediately became apparent

that the Leads were not the vetted homeowners that the HomeAdvisor sales representative had promised. Plaintiff Costello received Leads that consisted of unanswered phone numbers; people that were not the homeowners; requests for services that Plaintiff Costello does not perform; and Leads with fictitious contact information. Specifically, Plaintiff Costello received Leads that consisted of:

      a.  Leads with profane language for the name;

      b.  Contact information for children;

      c.  A 13-year old submitting his name to win an Itunes gift card;

      d.  homeowners that informed HomeAdvisor that they never filled out a request for service and no longer wanted to be harassed by calls from HomeAdvisor HSPs;

      e.  Scammers that sent text messages containing profanity and sexual statements; and

      f.  A Lead with an inactive phone number, a fake address and symbols in the comment section.

226A.  As to **Plaintiff LaPlaca**, in November, 2017, HomeAdvisor first began soliciting her by phone to join HomeAdvisor. The HomeAdvisor sales representatives told Plaintiff LaPlaca that HomeAdvisor was receiving many calls from homeowners around the immediate area of Santa Barbara and HomeAdvisor needed professionals like Plaintiff LaPlaca to take on the jobs. The HomeAdvisor representatives told Plaintiff LaPlaca that the Leads were targeted, vetted and qualified through HomeAdvisor to ensure that they were serious about either commercial or residential interior design consulting services. Plaintiff LaPlaca reasonably believed that every Lead was legitimate and that she would at least have a meaningful opportunity to sell her services to each Lead. Furthermore, according to the HomeAdvisor representatives, if any of the leads were bad or did not meet Plaintiff LaPlaca's lead parameters, Plaintiff LaPlaca simply had to request a credit through the HomeAdvisor "app" and a credit, which Plaintiff LaPlaca understood to mean

a cash refund, would be automatically issued.

(i)    Once Plaintiff LaPlaca's membership was activated in May 2018, Plaintiff LaPlaca instantly began experiencing issues with the Leads. Upon receiving a Lead, Plaintiff LaPlaca would promptly call the telephone number provided with the Lead; however, many of Plaintiff LaPlaca's calls went unanswered and often Plaintiff LaPlaca would not receive a response to the voicemails she left.

(ii)    When Plaintiff LaPlaca did reach a live person, Plaintiff LaPlaca was often told that they:

        a.   were not interested in any interior design project;

        b.   did not submit a service request through HomeAdvisor;

        c.   did not own the property;

        d.   were not the person listed on the Lead information conveyed to Plaintiff LaPlaca by HomeAdvisor; or,

        e.   were just looking for an estimate.

(iii)    Plaintiff LaPlaca also received leads for the wrong task category, including one lead which was purportedly requesting assistance with the assembly of an item from Walmart and installation of a closet shelf.

(iv)    Plaintiff LaPlaca also received duplicate leads and leads from competitors testing HomeAdvisor's system.

(v)    Following Plaintiff LaPlaca's purchase of the HomeAdvisor membership and after encountering problems with the Leads, on several occasions Plaintiff LaPlaca attempted to contact the HomeAdvisor sales representative who sold her the membership to discuss her questions and concerns about the Membership and

Leads; however, the representative never responded to any of Plaintiff LaPlaca's communications.

(vi)    Due to the poor quality of HomeAdvisor's Leads and service as a whole, on or about February 1, 2019, Plaintiff LaPlaca contacted HomeAdvisor to cancel her membership and Leads. Plaintiff LaPlaca spent hours on hold waiting to talk to someone, and HomeAdvisor's customer service representative tried to convince Plaintiff LaPlaca not to cancel by offering free Leads. It was not until February 21, 2019, that Plaintiff LaPlaca received an email from Josh Lent, HomeAdvisor's Customer Relations Department Manager, stating that he was sorry to hear Plaintiff LaPlaca had decided to cancel her account and would give her 3 free Leads if she signed up again.

(vii)   Thereafter on April 9, 2019, HomeAdvisor started charging and sending Plaintiff LaPlaca more Leads. Plaintiff LaPlaca called HomeAdvisor to question the charges since she had closed her HomeAdvisor account.

(ix)    From May 2018 through May 2019, Plaintiff LaPlaca was charged for approximately 91 Leads in the approximate amount of $2,800. Of the 91 Leads, Plaintiff LaPlaca was unable to contact a vast majority, and submitted credit requests for roughly 60. For only 24 Leads, HomeAdvisor provided Plaintiff LaPlaca with credits in the form of Lead replacements and not cash refunds.

(x)     After Plaintiff LaPlaca closed her account, she received emails from HomeAdvisor on May 16, 2019 threatening to her to collections if she did not pay $47.47, and on June 14, 2019 stating that her account had been forwarded to HomeAdvisor's outside collection agency. On June 18, 2019, she received a collection letter from

McCarthy, Burgess & Wolff claiming she owed $71.21. Although the debt was not legitimate, she paid the debt collector because she was fearful of their taking illegitimate action against her.

(xi)     In the beginning of 2020, HomeAdvisor began soliciting Plaintiff LaPlaca again to join HomeAdvisor.

(xii)    Plaintiff LaPlaca filed complaints with the State of California Department of Consumer Affairs on July 1, 2020, and the California Attorney General on July 5, 2020 concerning HomeAdvisor's deceptive and fraudulent business practices.

227.    The foregoing conduct illustrates HomeAdvisor's willful, deceptive conduct that it systemically and pervasively sold Leads that fell far short of the quality represented by HomeAdvisor.  The foregoing misconduct and Plaintiffs' experiences have been corroborated by over 760 former and current HSPs who have communicated with Plaintiffs' Counsel to convey their similar experiences with HomeAdvisor. Appendix I contains the HSPs' first-hand accounts, of which the following is just a sample:

> "I signed up for HomeAdvisor lead generation program, only to find out that I was being scammed. Leads that led me to nowhere, leads that led me to (literally) a vacant lot, leads that had no one to talk to, leads that were clearly from someone who was paid to fill out false and unexisting requests, leads that led me to no one answering the phone, because there's no one there to answer and etc. HomeAdvisor is a company that must stop the way they conduct their business, making the lives of entrepreneurs even more difficult to survive" Appendix I at Entry No. 323.

228.    ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████
████████████████████████████████████



229.   HomeAdvisor's and ANGI's wrongful, unlawful conduct of acquiring, selling and charging HSPs for memberships and Leads through concealment, fraud and misstatements about the true defective and bogus nature of the HomeAdvisor business and charging HSPs for bogus Leads violates RICO (Count I), constitutes fraud and fraudulent concealment (Counts II, VII, XII, XVII, XXII, XXVII, XXXI, XXXVI, XLI, and XLVI), supports claims for unjust enrichment and restitution by the HSPs (Counts IV, X, XV, XX, XXV, XXX, XXXIV, XXXIX, XLIV, and XLVIII), breaches the implied contract between HSPs and HomeAdvisor (Counts IX, XIV, XIX, XXIV, XXIX, XXXIII, XXXVIII, XLIII, and XLVII), and constitutes unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor in violation of the state laws (Counts V, VI, XI, XVI XXI, XXVI, XXXV, XL, and XLV).

## II.   THE TREATMENT OF HSPS IS DECEITFUL, UNLAWFUL AND UNCONSCIONABLE

230.   Defendants HomeAdvisor, IAC, and ANGI churn HSPs, because, in their view, there is an unending supply of unknowing and uninformed HSPs.[11]  At each step of the process,

---

[11]   IAC acknowledged in a May 1, 2017 presentation titled "HomeAdvisor + Angie's List: Accelerating Category Leadership," that HomeAdvisor has only penetrated 3% of the potential

Defendants act willfully and with an intent to deceive. The fraud is perpetuated on home service providers and contractors who do not have the monetary resources and time to seek refunds, credits and other recourse.

### A. The Sales and Account Management Processes Are Fraudulent and Deceitful

231. HomeAdvisor generally conducts orientations for training classes comprised of 10-person teams every couple of weeks. During the two-week training sessions, HomeAdvisor briefly educates new sales representatives about HomeAdvisor's product, but primarily focuses on the sales pitch and overcoming objections.



232.

233.

---

HSP market. According to this presentation, roughly 90% of contractors secure jobs offline. During IAC's Q3 2017 Earnings Call, ANGI's Former CEO, Chris Terrill, acknowledged that HomeAdvisor was trying to capture more small contractors by accelerating the growth of its sales force in an effort to pursue the untapped contractors.



234. 

235. 

236.



237.

238.    Former Employee E said that other sales representatives could be overheard "blatantly lying to Service Professionals" just to make the sale.  Similarly, Former Employee B claimed that "the more crooked you are internally, the more they [management] will turn their head as long as you are making the sale."

239.    HSPs do not execute any written contract or written agreement with HomeAdvisor. Nor are HSPs required to click on an "I agree" box after being presented with any terms and conditions.  In fact, HomeAdvisor provides no terms and conditions prior to an HSP signing up for the HomeAdvisor membership.

240.    Once HomeAdvisor secures a payment source (credit card or debit account number) from the HSP, the Membership Program fee is charged or debited, and the barrage of Leads and charges  begins.  ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████

241.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

242.    The first of the emails received by the HSP after the telephonic sales call are the Welcome Email and the Confirmation Email, which are sent after the HSP passes the background pre-screening and HomeAdvisor processes payment for the membership fee; the emails confirm that the HSP is an approved member of HomeAdvisor.  However, by the time the HSP receives

these emails, HSPs are informed that the membership fee is non-refundable.

243.     Further, by many accounts of Former Employees and HSPs (*see e.g.,* Appendix I at Entry Nos 337, 456, 526, 591, 624, 914 and 1022 and Appendix II), HomeAdvisor employs and encourages aggressive, deceptive and fraudulent sales practices to exponentially grow the number of paying HSPs within its network and generate revenue from Lead fees.

244.     HomeAdvisor sales representatives threaten to harm prospective HSPs' reputations via the posting of baseless, bad reviews if they refuse to join HomeAdvisor.  According to Former Employee B, "it was unbelievable how we would bully the contractors to sign them up.  I would constantly hear sales reps beating them [prospective Service Professionals] up over the phone. Sales reps would belittle the contractors and tell them if they don't sign up that they were going to be out of business."

245.     The former sales representatives uniformly agreed that absent the fraud, deception and coercion, they often believed that they could not ethically sell the service to prospective HSPs. Former Employee D said, "If I told Service Professionals the truth about the service they would often decline the service."  As a result, Former Employee D was criticized by her sales manager for allegedly talking prospective HSPs out of the service by overeducating them about the service and warning them about the potential to overdraw accounts.  Former Employee D was coached to talk less about the service, be more aggressive, and close deals more quickly.  Former Employee B was also coached to talk less about the product and she was instructed never to let a prospect off the phone before processing the payment.  Former Employee B's sales manager would say, "Slam them. Get their credit card and get that payment."

246.     Attached as Appendix II is a compilation from HomeAdvisor's current and former employees who have posted on the job site Glassdoor.com, which corroborate and confirm

HomeAdvisor's aggressive, deceptive and unconscionable sales practices of sales representatives being "encouraged to stretch the truth" and "taught and expected to bend and omit the truth.  For example, you're expected to tell every prospect that there are a certain amount of leads available in their city even though it's usually not true." *See* Appendix II, and https://www.glassdoor.com/Reviews/Employee-Review-HomeAdvisor-RVW8965054.htm (last visited 1/3/19).

247.    To encourage and perpetuate its fraudulent scheme, HomeAdvisor ████ designed its commission structure to bestow significant financial benefits to HomeAdvisor employees who employ deceptive sales practices.  The commission structure creates an incentive to sign up HSPs at whatever cost.

248.    

249.    The commission structure also incentivizes representatives to manipulate HSPs' Lead criteria.  For example, in order to sell the Lead generation services to a prospect, the sales software requires there to be a minimum number of Leads available in the HSP's selected service area.  If there are not enough Leads that met the HSP's criteria, sales managers pressure sales representatives to disregard the HSP's specified criteria by expanding the target geographic region

(*e.g.*, increase the HSP's desired service area from a radius of 20 miles to 100 miles) or supplement the HSP's list of services offered, for jobs not performed by the HSP, until the Lead minimum was satisfied.[13] According to Former Employee G, to qualify as a premium sale there needed to be $100 in Leads available.  If that threshold was not met, sales representatives were instructed to expand the service area, to the whole state if necessary, or add additional services to satisfy the requirement.

250.    Also, based upon information provided by Former Employees C, D, E and G, HSPs' Lead services must remain activated for the first 24-hours after purchasing a membership in order for the sales representative to receive a commission on the membership.  A retention bonus could then be earned by sales representatives for HSPs that kept their Leads activated for the first month of the membership.  Moreover, sales representatives were also eligible for a residual commission for HSPs who kept the Lead service activated for a majority of the membership.  According to Former Employee G the amount of commission a sales representative can receive is also directly tied to the monthly spend targets for a HSPs account.

251.    If an HSP limited or terminated its membership and Leads, sales representatives also faced termination.  As Former Employee B said, "It's a horrific environment.  We were treated like expendable pieces of crap."  Another post by an author identified as a then-current HomeAdvisor sales representative titled "Look elsewhere" and dated January 26, 2015 states:  "If you don't sell you're fired. If you DO [sic] and the contractor decides to turn off their leads before 24 hours, you could get fired. You have to lie to contractors and tell the [sic] what they want To [sic]    hear    and    not    what    will    actually    benefit    them."    *See*

---

[13] *See* "Not worth the trouble, time, or free food." https://www.glassdoor.com/Reviews/Employee -Review-HomeAdvisor-RVW15464580.htm (entry dated June 13, 2017) (last visited 1/3/19).

https://www.glassdoor.com/Reviews/HomeAdvisor-Online-Sales-Representative-Reviews-EI_IE11291.0,11_KO12,39.htm (last visited 1/4/19).

252.    Former Employee C offered this experience as an example of the foregoing: The day before he left on vacation he received a voicemail from a newly signed up HSP who wished to terminate her membership.  Since her call was within 72 hours of signing up, she was entitled to be reimbursed the membership fee.  However, rather than process this request, lose a sale for HomeAdvisor, and lose the commission, Former Employee C's sales manager advised, "[Bleep] it bro.  You're on vacation.  Forget about it, and say you didn't get the voicemail before you left." Her cancellation request was not processed within 72 hours.  The below post by a HSP from April 4, 2016 describes similar treatment:



*See*    http://www.complaintsboard.com/complaints/home-advisor-service-magic-scam-c639368.html (last visited 1/3/19).

253.    A former HomeAdvisor sales employee had the following to say: "Brad Foster [sic] is the VP of Denver Sales and he encourages an environment to where his managers [ ] will train the new employees to LIE to contractors just to get a sale…".    *See* http://www.complaintslist.com/2016/homeadvisor-statement-from-an-x-ha-sales-employee/  (last visited 11/30/17).

254.    Accounts from HomeAdvisor's former employees paint a picture of call centers that are lifted right out of the movie *The Wolf of Wall Street* (Paramount Pictures (2013)). Alcohol

and drug use on the HomeAdvisor sales floors are open and notorious.  This environment, described below, further cultivated the unethical and deceptive sales techniques that is cultivated at HomeAdvisor:

  a. "If you are not friends with a manager and you do not drink everyday and smoke marijuana forget it. Lots of illegal drug activity in the parking lot and drugs being sold on the sales floor.  No advancement unless you are buddies with a manager – meaning you party with them. Managers are not exempt from selling and purchasing illegal drugs.  I have seen my manager buy in the parking lot." ("Marketing Consultant", entry dated December 20, 2015);

  b. "… I witnessed extremely unprofessional behavior during mandatory happy hour in the office (clothing being removed, sexual conduct, etc)." ("Brutal", entry dated February 11, 2016);

  c. "You can drink and do drugs……Drugs everywhere, sexual harassment, overlooked.  Lies to sp's [service professionals] is encouraged by managers. Managers favor reps that give them drugs.  Doing illegal practices regarding customers secure information." ("A complete mess!!! Be warned do not work for this employer", entry dated April 28, 2016);

  d. "3 people were arrested within the month I worked there in the parking lot." ("Marketing Consultant", entry dated August 17, 2016);

  e. "Absolutely horrible. Drug problem rampant all over the office, everyone is smoking pot and getting high selling and distributing drugs and pills." ("Not worth the trouble, time or free food", entry dated June 13, 2017);

  f. "Unhealthy drug environment" ("Online Marketing Consultant", entry dated April 11, 2016);

  g. "Drug test would wipe out half of the current sales staff." ("Inside Sales", entry dated May 15, 2016); and

  h. "Everyone is on drugs (Seen employees snorting substances and smoking pot in the parking lot.)" ("A call center that represents a worthless product", entry dated May 5, 2017).

*See*   https://www.glassdoor.com/Reviews/Employee-Review-HomeAdvisor-RVW8965054.htm (last visited 1/3/19).

  255. This sales culture and these practices were employed with the full knowledge, and at the direction, of the individuals tasked with running HomeAdvisor's sales force.

### B.    Fraud and Deceit Inflicted on HSPs Seeking Recourse

256.    HomeAdvisor has adopted uniform internal procedures to deny and discourage refunds or credits when HSPs seek reimbursement for membership fees and bogus Leads.

257.    HomeAdvisor has a strict no cash refund policy for membership fees and for bogus Leads. *See* Appendix I at Entry Nos. 27, 136, 186, 301, 384, 810 and 849.  As a result, the only recourse left for HSPs is to request a "Lead credit" for bogus Leads.  However, a Lead credit, even when secured, amounts to no recourse at all because HomeAdvisor is just "crediting" the HSP by replacing one deficient Lead with another deficient Lead.

258.    HomeAdvisor has also erected multiple barriers to deter and prevent HSPs from seeking and receiving Lead credits. HSP credit requests for bogus Leads are routinely denied. HomeAdvisor even implemented an *ad hoc* policy requiring the HSP to submit credit requests within 24 hours, violating HomeAdvisor's, insufficiently disclosed, Lead Credit Guidelines which state that, "[c]redits must be requested by you within 30 days of the date that the charge was incurred." *See* https://pro.homeadvisor.com/terms/lead-credit-guidelines/ (Last visited 1/3/19).

259.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



260. █████████████████████████████████

███████████████████████████

█ ████████████████████████

█ ████████████████████

█ ███████████████████

█ ██████████████

261. █████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████

█ ████████████████████

█ ███████████████████████

█ ██████████████████████████████████

████████████████

262. █████████████████████████████████

██████████████████████████████████

██████████████████████████████████

█ ███████████████████████████████████████
████████████████



██████████████████████████████████████████████████████

████████████████████████

266.     Furthermore, HomeAdvisor implemented discriminatory practices that favored HSPs that were more lucrative for HomeAdvisor.  According to Employee E, it was known on the sales floor that the issuance of Lead credits was influenced by the size of the HSP's account with HomeAdvisor. The former sales representative said, "The more the Service Professional spent with HomeAdvisor, the more likely HomeAdvisor would issue a Lead credit."

267.     However, ███████████████████████ do not tell the whole story and likely down-play the severity of the credit requests.  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

268.     In addition, HomeAdvisor does not log every credit request.  **_Plaintiff Costello_** identified at least 16 requests for credits that he had submitted on HomeAdvisor's website that HomeAdvisor claimed it did not receive.

269.     █████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

98

270. As a result of HomeAdvisor's credit request policies, ███████████████████████

271. Plaintiffs were repeatedly denied refund requests and were forced to jump through many hoops to obtain credits. **Plaintiff DaSilva** attempted to contact her sales representative to complain about the quality of the Leads, but her calls were forwarded to customer service. Ultimately, Plaintiff DaSilva requested credits for the bogus Leads, but was only issued a few credits for the deficient Leads.  Shortly thereafter, Plaintiff DaSilva contacted HomeAdvisor to cancel the membership because she could no longer reasonably justify wasting any more money on bogus Leads. But, rather than cancel the membership, HomeAdvisor offered to her supposed "Opportunity Leads", which would permit Plaintiff DaSilva to view limited Lead descriptions and choose whether to accept, and be charged, for any Lead she selected.  Plaintiff DaSilva accepted a few Opportunity Leads which, unbeknownst to her, incurred a premium Lead fee charge. Importantly, the "Opportunity Lead" quality was no different, as the Leads were for fictitious people, or homeowners who were furious because they had been contacted by countless other HomeAdvisor HSPs.  As a result, Plaintiff DaSilva stopped accepting Leads.

272. **Plaintiff Gray** contacted HomeAdvisor on several occasions to complain about the quality of the Leads and to request Lead credits, which HomeAdvisor required her to submit

through the HomeAdvisor Pro portal.  Some Lead credits were issued to Plaintiff Gray, but only after she made substantial efforts to go through a cumbersome and arbitrary process.

273.    After less than a month with HomeAdvisor, on or about February 5, 2017, **Plaintiff Filipiak** called HomeAdvisor to cancel his membership and request a refund of his membership fee.  HomeAdvisor refused to refund his membership fee and Plaintiff Filipiak froze his Lead services.

274.    After the **McHenry Plaintiffs'** attempts to obtain Lead credits for the bad Leads were rejected by HomeAdvisor, they contacted HomeAdvisor to cancel their membership. However, HomeAdvisor made such efforts exceedingly difficult; when they called to cancel the membership, HomeAdvisor would place the calls on hold indefinitely and would hang up on the McHenry Plaintiffs.  After numerous phone calls amounting to countless hours that spanned multiple days, it was not until the McHenry Plaintiffs called HomeAdvisor under the pretense of opening a new account  that they were able to eventually cancel their membership.

275.    When **Plaintiff Ervine** contacted HomeAdvisor to cancel her membership HomeAdvisor refused.  Instead, HomeAdvisor informed Plaintiff Ervine that she had two months left on her membership and to call back at the end of the two month period at which time HomeAdvisor automatically renewed her membership by trying to charge $287.99 to the credit card on file.  When Plaintiff Ervine called HomeAdvisor to cancel the automatically renewed membership and request a refund, she was told that HomeAdvisor never issues refunds and if she wanted to dispute the charge any further, she would have to retain a lawyer.  Ultimately, HomeAdvisor refunded the fraudulent charges after Plaintiff Ervine filed a complaint with the BBB.

276.    **Plaintiff Haukenes** tried to receive credits for fake Leads by sending a letter and

emails, and placing telephone calls to HomeAdvisor, including calls on March 13-14, 2017. However, HomeAdvisor refused to provide a credit for any of the Leads. Even when Plaintiff Haukenes informed HomeAdvisor that the city clerk for the town of Worley, Idaho confirmed that the address in one of the Leads did not exist, HomeAdvisor refused to credit the Lead and told Plaintiff Haukenes to continue to try and contact the Lead. Notwithstanding that Plaintiff Haukenes spent hours of lost time (worth approximately $1,500) to contact the fraudulent Leads and dispute the Lead charges with HomeAdvisor, she was not issued any refund. On March 14, 2017, Plaintiff Haukenes canceled her HomeAdvisor membership and instructed her credit card company to reject any charges from HomeAdvisor.

277. Within two weeks of activating his HomeAdvisor membership, one of *Plaintiff Costello's* employees contacted HomeAdvisor customer care to inquire about the process of requesting Lead credits for homeowner Leads who claimed that they did not submit a request or were not interested in new roofing. HomeAdvisor customer care fraudulently responded that:

> HomeAdvisor does not have the ability to obtain a customer's [sic] information without them first entering our site or calling us with an interest in the service you provide. Unless the information provided by a customer is bogus (wrong name, phone number or disconnected phone number), we are unable to provide a credit for the situation.

278. Plaintiff Costello submitted credit requests for all of the bogus Leads he received. After HomeAdvisor failed to respond to the credit requests for weeks, Plaintiff Costello followed up with HomeAdvisor and was told that HomeAdvisor needed more information for the credit requests. After Plaintiff Costello provided a specific explanation for each requested credit, two months after submitting the requests, HomeAdvisor rejected the overwhelming majority of the credit requests claiming that they were outside the 30 day window for requesting credits. So long as the telephone number in a Lead matched the individual identified in a Lead, HomeAdvisor

would reject Plaintiff Costello's credit requests without following up with the Lead to determine if the individual actually submitted the Lead or requested roofing work. Despite HomeAdvisor's initial denials, Plaintiff Costello continued to pursue the rejected credit requests with HomeAdvisor. During these conversations, HomeAdvisor stated that the Leads it was selling to Plaintiff Costello came from a third party affiliate site that produced bad Leads. However, HomeAdvisor continued to refuse to refund or credit the bogus Leads, asserting – contrary to its public statements, advertising and its own website – that it doesn't sell Leads, it sells information.

279.   The experiences of the HSPs who have contacted Plaintiffs' Counsel also demonstrate the flagrant systemic abuse of the HSPs with respect to the handling of HSPs' credit requests:

a.   "I demanded, and was told I'd receive, a credit for each of these leads and closed my membership. HomeAdvisor did *not* credit my leads…." Appendix I at Entry No. 1330,

b.   "I had called about a charge for a lead and they were suppose[d] to credit my account back but after a month still no credit. At that time I cancelled my account with them. I called back after a month, when the woman said she wasn't authorized to credit my account I asked to speak to a manager after waiting someone finally answered. I was told that they could not give me a refund but a credit towards another lead, I said my account was cancelled and was not renewing it." Appendix I at Entry No. 773,

c.   "Then they've sent us crap leads and keep taking money out of our checking account for these bogus leads. When we ask for credit they deny the credit. We are struggling to make a living and this big company is taking advantage of us. When we told them that we were dissatisfied with the leads and quality of their practices they told us that if we wanted out we could get out but we would NOT receive any refund for anything." Appendix I at Entry No 389.

See Appendix I for additional HSP experiences with HomeAdvisor's refusal to provide refunds and denial of credits.

280.   ████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████

281.   ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

**C.    The Treatment of HSPs is in Stark Contrast to HomeAdvisor's Dealings with its Corporate and Elite 360 Members**

282.   The deceptive treatment of the HSPs is in contrast to HomeAdvisor's dealings with

its ████████████████████████████████████████████████████

███████ █ ██████████████████████████████████████████████

██████████████████████████████████████████

283.   ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

284.   ███████████████████████████████████████████



285. ████████████████████████████████████████

286. ████████████████████████████████████████

287. ████████████████████████████████████████

288. ████████████████████████████████████████



289. ███████████████████████████████████████

290. ███████████████████████████████████████

291.     After charging **_Plaintiff Costello_** over $15,000 for bogus Leads, HomeAdvisor conceded the Leads that Plaintiff Costello received were bad and that HomeAdvisor had problems with the affiliate that generated the Leads that were sold to Plaintiff Costello. HomeAdvisor offered to forgive the outstanding Lead charges if he agreed to join HomeAdvisor's Elite 360 program on a one-month trial for $5,000, which would increase to a minimum of $10,000 per month after the trial period concluded. The Elite 360 sales representative advised Plaintiff Costello that if, after the first month, he was not satisfied with the quality of the Leads or less than 45% of the Leads resulted in jobs, HomeAdvisor would refund Plaintiff Costello 50% of the one-month

trial membership fee. Plaintiff Costello declined the offer to join the Elite 360 program because he was unwilling to agree to pay the hefty fees associated with the Elite 360 program before HomeAdvisor resolved the outstanding charges for the bogus Leads.

292. HomeAdvisor knows that its contrasting relationship and conduct directed to HSPs bears no resemblance to its business dealings with its corporate or Elite 360 members, which further evidences how HSPs are being wrongfully exploited and harmed.

## III. HOMEADVISOR IMPOSES UNAUTHORIZED MHELPDESK CHARGES ON HSPs

293. On September 3, 2014, IAC announced that HomeAdvisor had acquired a majority stake in mHelpDesk, a startup, cloud-based field service software for small to mid-size businesses. mHelpDesk's software purportedly helps businesses schedule appointments, track work orders and invoices, and manage tasks on a smartphone. HomeAdvisor's Former Chief Executive Officer Chris Terrill advised that the software will be made available to HomeAdvisor's 80,000 HSPs. *See* https://www.bloomberg.com/news/articles/2014-09-03/iac-s-homeadvisor-buys-stake-in-mHelp Desk-startup.

294. Moreover, IAC affirmatively stated in its Annual Report on Form 10-K for the Fiscal Year Ended 12/31/2016, that certain HomeAdvisor membership programs are *integrated* with mHelpDesk.

295. Until recently, information about mHelpDesk, however, was absent from the publicly-available information provided online by HomeAdvisor and IAC in connection with the descriptions of HomeAdvisor's services.

296. HSPs are not adequately informed during the membership purchasing process that they will be automatically enrolled in and charged for mHelpDesk following a one-month free trial.

297.    Former Employee E confirmed that sales representatives were incentivized to represent mHelpDesk as a complimentary membership feature because sales representatives received an $80 "kicker" or bonus for signing HSPs up for the service.

298.    As a result of the compensation structure, sales representatives would not present mHelpDesk as an option, and would not inform the HSPs that there was an additional fee for the service.

299.    Therefore, Plaintiffs and HSPs were left to discover that, in addition to their annual membership fee and per Lead fee, Defendants automatically charged their credit card or debited their checking account $59.99 - $99.00 a month for mHelpDesk.

300.    Defendants did not notify or seek prior authorization from Plaintiffs and Class Members before activating and charging for mHelpDesk.

301.    Prior to signing up for a membership program, neither HomeAdvisor nor any of its representatives informed *Plaintiff Airquip* that it would be automatically enrolled in mHelpDesk at a rate of $59.99 a month following a one-month free trial.  Plaintiff Airquip only learned of the mHelpDesk product when HomeAdvisor's sales consultant contacted Plaintiff Airquip during the trial period to activate the system.  Plaintiff Airquip, at that time, informed the consultant that it was not interested in the product and requested that the service be terminated.  In contravention of Plaintiff Airquip's request, HomeAdvisor charged Plaintiff Airquip $59.99 a month for a system they never accessed.

302.    *Plaintiff DaSilva* was charged $59.99 for four months before she found out that HomeAdvisor had signed her up for mHelpDesk.  At no time had HomeAdvisor informed Plaintiff DaSilva that she would be automatically enrolled in mHelpDesk following the one-month free trial.  Plaintiff DaSilva immediately notified HomeAdvisor that she wished to terminate and

cancelled the credit card linked to her HomeAdvisor account.

303.    In April 2016, *Plaintiff Gray* discovered that HomeAdvisor had charged her $59.99 for mHelpDesk on her March and April statement.   At no time had HomeAdvisor informed Plaintiff Gray that she would be automatically enrolled in mHelpDesk following a one-month free trial.   Plaintiff Gray demanded a refund and was credited for the $59.99 charge on the April statement.

304.    The HSPs that have contacted Plaintiffs' Counsel have recounted similar deceptive practices utilized by HomeAdvisor to bill HSPs for mHelpDesk.   Specifically, one HSP from Washington stated:

> "I wanted to cancel mHelp desk, which I did not want to sign up for and never used. A refund request was refused. When I asked to hear the recording in which I supposedly agreed to sign up for mHelp desk I was told that it is an internal quality thing and they "don't get on the phone". I view this an intentionally layering the system such that the customer is unable to verify what was said on the phone and therefore the customer is powerless to argue their case. A refund was refused and credit for more leads was given after 15 minutes of arguing. I don't want the lead credit. I want a refund for that charge which I did not agree too because I do not intend to continue using the unethical lead generation service."

Appendix I at Entry No. 1285.   Additional experiences with HomeAdvisor's fraudulent charging of MHelpDesk are detailed in Appendix I at Entry Nos. 294, 703, 704, 906, 1014.

305.    As a result of HomeAdvisor's unfair, deceptive and fraudulent business practices, HSPs and Plaintiffs have suffered substantial and an ascertainable loss of money.  Defendants have operated a scheme designed to bestow significant financial benefits upon themselves to the detriment of Plaintiffs and the Classes.  Had Defendants not concealed and falsely characterized the true nature of the membership programs and the Leads, Plaintiffs and the HSPs would not have paid collectively millions of dollars for the membership programs, Leads and mHelpDesk.

## IV.   OTHER BUSINESSES PARTICIPATED IN AND FURTHERED THE FRAUD

306.   HomeAdvisor accomplishes the wrongful and unlawful conduct of selling and charging HSPs memberships and charging for bogus Leads by employing the aid of third-parties, in addition to the Lead sources/generators described above.   The participation of the Better Business Bureau ("BBB") and the Debt Collection Agencies directly promotes and furthers the fraud and the scheme.   Their roles and participation in the fraud fall outside the expected traditional business relationship (one of independent reviewer and debt collectors, respectively) that places them squarely as participants in the enterprise and fraud.

### A.   The Better Business Bureau

307.   Former and current HSPs victimized by HomeAdvisor's practices have submitted a plethora of complaints to the BBB. As of January 3, 2019, HomeAdvisor received 1,470 complaints through the BBB in the last 3 years, including 599 complaints in the preceding 12 months.   Here is HomeAdvisor's BBB complaint type summary:

| Complaint Type | |
| --- | --- |
| Advertising/Sales | 194 |
| Billing/Collections | 646 |
| Delivery Issues | 15 |
| Guarantee/Warranty | 9 |
| Problems with Product & Services | 606 |
| **Totals** | 1,470 |

*See* https://www.bbb.org/denver/business-reviews/contractor-referral/homeadvisor-in-lakewood-co-22000608/reviews-and-complaints (last visited 1/3/19).

308.    Since January 2016, 786 consumers submitted reviews for HomeAdvisor to the BBB.  Out of these 786 reviews, 750 consumers (95%) have reported a negative experience (denoted by a 1 or 2 star review) with HomeAdvisor to the BBB, whereas only 27 customers (3%) have reported a positive experience (denoted by a 4 or 5 star review) with HomeAdvisor during that same time period.  *See* https://www.bbb.org/us/co/lakewood/profile/contractor-referral/homeadvisor-0885-22000608/customer-reviews (last visited 1/3/19).

309.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

310.    ████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████

311.   ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████



312.   ████████████████████████████████████████████

██████████████████████████████████████████████



313. ███████████████████████████████████████

███████████████████████████████████████

██████████

314. ███████████████████████████████████████

███████████████████████████████████████

█████████████

315. ███████████████████████████████████████

████████████████

316.     Former Employee A, who almost exclusively dealt with complaints that had been filed with the BBB, confirmed that HomeAdvisor could retain its positive rating as long as it could show that it affirmatively reached out to complainants in an attempt to resolve the issue(s), but that a resolution was not required to close a complaint.

317.     Whatever the reasons may be for HomeAdvisor's being able to maintain a B+ rating, it has nothing to do with the bona fides of the HSP complaints or the utter failure of HomeAdvisor to effect necessary changes to its fraudulent business practices.  The purpose of the BBB is to set standards for ethical business behavior and monitor compliance and help consumers identify trustworthy businesses. *See* https://www.bbb.org/en/us/about-bbb/ (last visited 1/3/19).

318.     By allowing HomeAdvisor to maintain a B+ rating, ████████████████████

███████ the BBB violated its purpose and placated HomeAdvisor by allowing it to continue to conceal and perpetrate the fraud on the HSPs.

### B.   Debt Collection Agencies

319.   Faced with the futility of stopping the bogus Lead charges and inability to terminate their memberships, HSPs are forced to cancel the credit and debit cards to avoid incurring additional authorized and erroneous charges.  *See* Appendix I at Entry Nos. 44, 183 and 223. In response, HSPs are sent by HomeAdvisor to debt collection agencies.

320.   HomeAdvisor has associated with ███████ debt collection agencies, CMI, MBW, ███████ (collectively with any John Doe debt collection agencies the "Debt Collection Agencies") to collect monies from HSPs for the bogus Leads.

321.   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

322.   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████

---

[16]   The Debt Collection Agencies and HomeAdvisor utilize the internet, email and telephone to transmit and receive the HSPs' information and pursue the HSPs for collection.

323.     After Plaintiff DaSilva terminated her membership with HomeAdvisor in April 2016, HomeAdvisor fraudulently tried to charge a Lead fee of $55.69 to the credit card on file on September 23, 2016.  The charge failed because the credit on file was no longer valid. On October 11, 2016, HomeAdvisor then applied the chargeback amount of $55.69 to Plaintiff DaSilva's terminated account and assessed a $20 "interest" penalty. That same day HomeAdvisor sent Plaintiff DaSilva an email titled, "Final Account Notice – Avoid being sent to Collections" which reflected a past due balance of $75.69.  Thereafter, on November 8, 2016, Plaintiff DaSilva received an email from MBW indicating that a collection action had been initiated against her for $98.40 ($75.69 balance, plus $22.71 in collection charges).  The collection notice also states the following,  neither of which are accurate as Plaintiff DaSilva did not enter into a contract with HomeAdvisor nor was she made aware of any applicable billing terms when signing up for the membership:

   1. "You voluntarily contracted with HomeAdvisor, Inc. resulting in the balance outstanding.

   2. You were aware of billing terms at the time you contracted for said goods and/or services."

324.     ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

325.     HomeAdvisor also initiates collection actions against HSPs who have successfully

won a chargeback from their financial institution. A chargeback occurs if HomeAdvisor fails to produce evidence sufficient to support the charge and the financial institution rejects the HomeAdvisor charge and credits the HSP's account. When HSPs win a chargeback, despite the fact that a financial institution has found the charge to be invalid, HomeAdvisor pursues the HSP through the Debt Collection Agencies.

326. **Plaintiff Costello** filed a dispute related to the HomeAdvisor Lead charges with Discover card. Discover card challenged HomeAdvisor to provide evidence of the validity of the Leads or a contract that supported its new assertion that it was selling information, not Leads. After HomeAdvisor failed to provide the requested information, Discover card reversed the charges on Plaintiff Costello's card. As a result, on May 6, 2017, HomeAdvisor sent Plaintiff Costello's account to CMI to initiate collections. CMI is currently trying to pursue Plaintiff Costello for a fraudulent debt in the amount of $21,519.60 which consists of $15,453.81 in bogus Lead charges, $914.52 in interest and a $5,151.27 collection charge for CMI.

327. Similarly, after **Plaintiff Seldner** incurred additional unauthorized charges for Leads he did not agree to receive, he contacted his credit card company which issued a chargeback of $529.39 to HomeAdvisor. On October 31, 2017 HomeAdvisor tried to re-process the four separate charges that were reversed totaling $529.39. All four charges were rejected, resulting in HomeAdvisor applying $20 "interest" penalties on each charge, for a total outstanding balance of $609.23. Plaintiff Seldner received an email the same day from HomeAdvisor titled, "Final Account Notice – Avoid being sent to Collections" that reflected a balance of $609.39. On November 27, 2017, Plaintiff Seldner received another email from HomeAdvisor which indicated that his account had been sent to an outside collection agency and that additional fees and possibly interest would be added to the balance. The following day he received an email from CMI which

stated that Plaintiff Seldner now owed \$812.52.  In response to another email received from CMI on January 7, 2018, Plaintiff Seldner filed a complaint with the Consumer Financial Protection Bureau about CMI.  Currently, CMI is pursuing Plaintiff Seldner for \$819.73.

328.  ████████████████████████████████████

████████████████████████████████  ████████

████████████████████████████████████████

████████████



329.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

330.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

331.  ████████████████████████████████████

████████████████████████████████████

█  ████████████████████████████████████████



332. 

333. Contrary to the business and goal of a Debt Collection Agency,

334. Likewise, when an HSP threatens to file a complaint against HomeAdvisor with the BBB, or a state Attorney General or retains an attorney, HomeAdvisor backs off or instructs the Debt Collection Agency to cease collection actions and the HSPs complaint is resolved.

335. In response to HomeAdvisor's refusal to credit *Plaintiff Haukenes* for the bogus Leads, on March 14, 2017 she canceled her HomeAdvisor membership and instructed her credit card company to reject any charges from HomeAdvisor. Visa then reversed two charges for $287.99 and $73.32 on Plaintiff Haukenes' credit card. On April 12, 2017, HomeAdvisor attempted to process the two reversed charges, but both failed, resulting in the assessment of $20 "interest" penalties on both charges. That same day, HomeAdvisor sent Plaintiff Haukenes an email titled "Final Account Notice – Avoid being sent to Collections" alleging that she now owed

HomeAdvisor $401.31. The notice threatened that if Plaintiff Haukenes did not pay the balance that her account would be sent to an outside collection agency, and additional collection fees and/or litigation fees would be assessed, and a negative report would be made against her credit. This harassment continued for more than two months until Plaintiff Haukenes responded to HomeAdvisor's baseless threats by filing complaints with the Idaho Attorney General. In response to the complaint filed with the Idaho Attorney General, HomeAdvisor promptly "wiped her entire balance" and ceased any further collection efforts.

336.  designed to prevent the true nature of HomeAdvisor's fraudulent business practices from becoming subject to governmental or legal scrutiny. Second, the primary purpose of HomeAdvisor's use of debt collection agencies is to use them as a cudgel to force HSPs to continue paying HomeAdvisor for the fraudulent Leads.

337.

338.    The relationship between HomeAdvisor and the Debt Collection Agencies is not a traditional lender and debt collector business relationship. The Debt Collection Agencies know of, or recklessly disregard, the fact that the HomeAdvisor debts are illegitimate. Together, the Debt Collection Agencies and HomeAdvisor utilize their moniker of "debt collector" to browbeat HSPs into remaining with HomeAdvisor to ultimately charge them for more bogus Leads.

339.    HomeAdvisor, ANGI, the Debt Collection Agencies, and the BBB's conduct and associations were in aid of, furtherance of and a direct cause of the fraud and unlawful treatment inflicted on the HSPs, and constitute a violation of RICO (Count I), fraud and fraudulent concealment (Counts II, VII, XII, XVII, XXII, XXVII, XXXI, XXXVI, XLI, and XLVI), unjust enrichment and entitling HSPs to restitution (Counts IV, X, XV, XX, XXV, XXX, XXXIV, XXXIX, XLIV, and XLVIII), breaches of the implied contract between HSPs and HomeAdvisor (Counts IX, XIV, XIX, XXIV, XXIX, XXXIII, XXXVIII, XLIII, and XLVII), and constitute unlawful, unfair and fraudulent business acts and practices, and unfair, deceptive, untrue and misleading advertising, by HomeAdvisor in violation of various states' laws (Counts V, VI, XI, XVI XXI, XXVI, XXXV, XL, and XLV).

## VII. THE LANHAM ACT DEFENDANTS UNLAWFULLY DIVERT BUSINESS FROM HSPs.

340. The sharp increase in the number of HSPs in HomeAdvisor's network translates to increased revenue through membership and Leads fees. But, in order for HomeAdvisor to maximize revenue from Lead fees, the quantity of Leads needs to grow with HomeAdvisor's ever-increasing number of HSPs. To do so, the Lanham Act Defendants devised schemes that unlawfully co-opt, use and exploit the identities of current and former HSPs to divert legitimate business away from the HSPs to HomeAdvisor.

341. In marketing and selling the membership programs, HomeAdvisor advertises its basic annual membership package as including: (i) a business profile page on HomeAdvisor.com ("Online Profile Page" or "OPP"); (ii) listing in the HomeAdvisor Premier Online Directory and the Exclusive Partner Network; and (iii) an Exact Match Listing (collectively "Online Listings").



342. *Online Profile Pages* are created for HSPs at the enrollment stage and are created based upon information gathered by HomeAdvisor during the enrollment process and extracted

from HSPs' websites and other internet sources. The OPPs are accessible through internet search engine results or through HomeAdvisor's online directory. HomeAdvisor represents that these customized OPPs will result in an increase in customer contacts by putting HSPs "in front of ready-to-hire homeowners." *See* https://pro.homeadvisor.com/r/membership/ (last visited 1/9/19). Once a HSP completes the enrollment process with HomeAdvisor and the OPP, the profile becomes active and looks nearly uniform to Plaintiff Ervine's OPP, shown here.



*See* https://www.homeadvisor.com/rated.GlassActWindowCleaning.58137807.html (last visited 8/15/18).

343. **Premier Online Directory** allows homeowners to browse the directory of HSPs by choosing a type of service from the list of 80+ services and entering the applicable zip code.



*See* https://www.homeadvisor.com/c.html (last visited 1/3/19).

344.   Upon clicking "Browse Reviews" a list of HSPs matching the search criteria populates. The list contains the truncated versions of the HSPs' Online Profile Pages and commonly includes a "Get a Quote" button.  When users click that button either on the search results page, or on the selected HSP's Online Profile Page, the user is asked to submit their contact information.  HomeAdvisor takes the homeowner's submission and turns it into a Lead that HomeAdvisor then sells to other HSPs, at HomeAdvisor's sole discretion, irrespective of the homeowner's desire to connect with the HSP that they had selected.

345.   ***Exclusive Partner Network*** is touted by HomeAdvisor as another marketing extension that will benefit HSPs by exposing their business to 15 million homeowners every month by automatically placing their business listing on top home improvement sites such as:



*See* http://welcome.homeadvisor.com /exclusive-partner-network (last visited 4/26/18).



346.   ***Exact Match Listings*** are characterized by HomeAdvisor as a free customized online profile used to promote the HSP's business online by getting their "name out there on the most searched internet sites and business directories." *See* https://www.homeadvisor.com/rfs/enroll/spPostEnrollLeadsDetails.jsp (last visited 1/3/19).   The Pro and Pro Plus membership programs include two categories of Leads – Market Match and Exact Match Leads.  HomeAdvisor represents that Exact Match Leads are generated exclusively through click-throughs to the HSP's Exact Match listing and OPP which appear on HomeAdvisor.com and elsewhere on the Internet, or submission of service requests via telephone calls to a HSP's "Exact Match Number," which is a HomeAdvisor telephone number that is unique to the HSP's Exact Match listings.  HSPs provide HomeAdvisor the content for the listing (including the business logo, description and contact information), but HomeAdvisor replaces the HSP's phone number with a HomeAdvisor operated Exact Match Number. By doing such, HomeAdvisor intercepts calls from homeowners in order to generate Exact Match Leads, which are then distributed to the HSP at a premium Lead fee charge.

347.   What HomeAdvisor does not disclose to HSPs is that when the OPPs and Online Listings are activated and the HSP's internet presence is seized by HomeAdvisor,  HomeAdvisor's online  marketing  and  search  engine  optimization ("SEO") capabilities are employed to rank

the HSPs' HomeAdvisor Online Profile Pages at the top of internet search results, outranking even the HSPs' own websites, paid adwords, and other listings. HomeAdvisor's SEO convinces search engines, such as Google, that the OPPs on HomeAdvisor's website are more relevant and useful to a user than other search results, including the HSPs' own website. HomeAdvisor's dominant online marketing and SEO tactics are no match for the marketing and advertising efforts of the average HSP, which is often a sole proprietor or small company with a limited marketing budget. From the moment of activation, numerous HomeAdvisor affiliated websites, using the HSP's name, will populate the top search results whenever a homeowner searches for the HSP's business. As a result, the organically grown, word of mouth business generated by the HSP without HomeAdvisor's assistance or service is directed to HomeAdvisor.

348.    For example, a Texas HSP reported that after signing up with HomeAdvisor his Google analytics report showed that all traffic to his website stopped. When the HSP googled the name of his business, the only results that appeared were for HomeAdvisor. Appendix I at Entry No. 1136.

349.    HomeAdvisor is fully aware that it dominates and takes over HSP's web presence once the HSP's OPP becomes active. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

350.    In fact, when a Michigan HSP confronted a HomeAdvisor sales representative about this issue, the HomeAdvisor sales representative openly acknowledged that if the HSP were to sign up with HomeAdvisor, the HSP's organically generated internet business would be

evaporated.  *See* https://www.youtube.com/watch?v=sGwQFFP07S0 (last visited 1/3/19).

### A.    HomeAdvisor Uses Former HSPs' Online Listings To Hijack Customers and Generate Leads

351.    Once an HSP's membership with HomeAdvisor is terminated or expires and they become a "Former HSP", HomeAdvisor does not remove the Online Listings but instead HomeAdvisor continues to: 1) manipulate internet traffic to route homeowners away from their preferred HSP and directing them, to a HomeAdvisor related domain; 2) create the illusion for the homeowner that they are contacting their chosen HSP; 3) make false or misleading representations about the HSPs; and 4) foist an unwanted and deceptive association with HomeAdvisor upon the Former HSP.

352.    The perpetual misuse of Former HSPs' company names and Online Profile Page is an essential and calculated part of HomeAdvisor's business model, as  evidenced by the number of  Online Profile Pages HomeAdvisor  maintains. As  of  September 30,  2018, HomeAdvisor  reported that  approximately  206,000  HSPs[17]  were members  of  its network. However, HomeAdvisor has more than  408,800 OPPs  indexed for purposes of internet search results, evidencing that HomeAdvisor  currently maintains OPPs for approximately 202,000 HSPs who are not members of or associated with HomeAdvisor.

353.    HomeAdvisor employs three techniques to capitalize on the HSPs' OPPs well beyond the time the HSP wishes to be associated with HomeAdvisor.  *First*, as discussed *supra* in paragraphs  252  and  274,  HomeAdvisor raises  substantial  barriers  to  prevent  HSPs  from terminating their membership with HomeAdvisor.

---

[17]  *See* Form 10-Q for ANGI HomeServices Inc. for the  period ending September 30, 2018, *https://www.sec.gov/Archives/edgar/data/1705110/000170511018000013/angi-2018309x10q.htm* (last visited January 3, 2019)

354.    *Second*,  However, even when a HSP expressly requests that HomeAdvisor remove their OPP, HomeAdvisor ignores the request and continues to use the HSPs business name to improve HomeAdvisor's SEO and drive homeowners away from the Former HSP and to HSPs that are still active in HomeAdvisor's network. For example, HSPs have reported:

- I closed my account within 24 hours...but my account is still active on their website...This is hurting my business. They refuse to close my profile, it is still active today. (Appendix I at 1136);
- They will not remove my business from their site no matter how much I complain. (Appendix I at 343);
- They refused to take me off there listings after I cancelled and said I wasn't interested in using their services. (Appendix I at 637);
- After my last contact when I told them I wanted to be removed from all things HomeAdvisor, I will still get an occasional call from someone who says they saw our company listing HomeAdvisor website (Appendix I at 632); and
- Even after termination for the last 2 years I'm still listed on their website, have asked many time's to be taken off and they refuse to do so… (Appendix I at 566);

355.    *Lastly*, HomeAdvisor maintains HSPs' OPPs for months or years after the expiration or termination of the HSPs' annual membership. After the end of the one year anniversary of their membership purchases, Plaintiff Ervine's OPP remained active for *another* 434 days, Plaintiff Haukenes' OPP remained up for *another* 254 days, and the McHenry Plaintiffs' OPP remained up for *another* 125 days. Indeed, HomeAdvisor is currently listing OPPs for SPs whose memberships likely terminated more than 6 years ago. *See* https://www.homeadvisor.com/sp/advance (OPP for Advance, Inc., an HSP who's last Review is dated May 29, 2011) (last visited January 3, 2019).

356.

████ ██ ██ █ ██ ██ ███ ██ ██ █ ██ ██ ███ ██ █

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

### i.    HomeAdvisor's use of Former HSPs' Online Profile Pages

357.    Throughout the relevant time period, HomeAdvisor employed three types of OPPs for Former HSPs that contained false and misleading representations about the Former HSPs in order to generate Leads and revenue for HomeAdvisor.

358.    ***Online Profile Pages With a "Get a Quote" Button.*** HA uses a deceptive "Get a Quote" button on Former HSP's Online Profile Pages, which are indistinguishable from the Online Profile Pages of current HSPs, to intentionally mislead customers into believing that they are submitting a request for a quote directly to the desired HSP.  Once a prospective customer enters their address, one of two pop-up windows are displayed.

359.    The first window prepopulates the address that was entered and gives the customer the ability to provide project details that, supposedly, are then submitted directly to the

---

[18] "Factual provides product and engineering teams, marketers and data analysts access to the world's most trusted, accurate and comprehensive data on places and people worldwide, transforming products, advertising and businesses with data that puts everything in context." *See* https://www.factual.com/company/ (last visited 1/7/19)

selected HSP  upon clicking "Get a Quote".



*See* https://www.homeadvisor.com/rated.InnovativeBuilding.67456049.html# (last visited

9/27/18) For other examples, see the Declaration of Stephanie E. Saunders In Support of PI/DJ

Motion at Exhibit D, Section III ((C.A. No. 1:18-cv-01802-WJM, Dkt. 35-4)

     360.    Although HomeAdvisor claims it provides Leads generated from the "Get a

Quote" button to Former HSPs, in reality HomeAdvisor intercepts these service requests in order

to insert itself between the HSP and homeowner to promote and direct website users to HSPs in

HomeAdvisor's network and create a false impression in the mind of the homeowner that the

Former HSP and HomeAdvisor are associated.  HomeAdvisor does this by sending emails to the

homeowner that submitted the service request that contain information about the Former HSPs'

competitors and encourage the homeowner to visit HomeAdvisor.com to find other service

providers.  In addition, in some cases, HomeAdvisor will replace the homeowner's phone number

with a HomeAdvisor phone number that allows HomeAdvisor to track the phone calls the Former

HSP is making to the homeowner.

     361.    The second version of the "Get a Quote" window utilized by HomeAdvisor

displays a false and misleading statement about the availability and services provided by the Former HSP in the area selected by the prospective customer. Prior to October 30, 2018, when a homeowner would provide their address, the "Get a Quote" window would present the literally false statement that the "[HSP] does not provide service to [zip code]", similar to what appeared on the McHenry Plaintiffs' OPP.



*See* https://www.homeadvisor.com/rated.BBCarpentry.65620492.html# (last visited 9/27/18). Furthering the deception, the "Get a Quote" window also stated: "See Pros who provide service to [zip code]" which was a hyperlink to a HomeAdvisor webpage containing a list of featured HSPs offering similar services in the selected service area. Through this version of the Get a Quote window, HomeAdvisor deliberately falsified information about Former HSPs in order to drive traffic to HomeAdvisor's website in an effort to redirect prospective customers to active, Lead-buying HA HSPs who competed with the Former HSP.

362.    On November 2, 2018, in opposition to the PI/DJ Motion, Mr. Sullivan submitted a Declaration wherein he stated that on or about October 30, 2018, HomeAdvisor changed the Get a Quote pathway to allow a homeowner to submit a service request to the Former HSP for those zip codes that were provided to HomeAdvisor by the Former HSP when it was a member of HomeAdvisor.  In addition, Mr. Sullivan stated that if the homeowner provided a zip code that

was outside of the zip codes provided by the Former HSP to HomeAdvisor, HomeAdvisor changed the language so the resulting message on the "Get a Quote" window stated the "[HSP] is not currently accepting service requests from HomeAdvisor in [zip code]." ███████████████

████████████████████████████████████████████████

█████████████████████████████████

363.    However, the new language utilized by HomeAdvisor continues to result in false and misleading statements about a Former HSP's availability, affiliation with HomeAdvisor, and service.  For example, while a member of HomeAdvisor, Scrub Club Cleaning Service, LLC serviced all of Traverse City, Michigan - which includes the zip codes 49684, 49685, 49696, and 49686 – and has continued to service all of these zip codes since it terminated its membership with HomeAdvisor.  However, when homeowners submit service requests for Scrub Club in zip codes 49696 and 49686, HomeAdvisor displays the false statement that: "Scrub Club Cleaning Service, LLC is  not currently accepting service requests from HomeAdvisor in [zip code]."  The false statement is still followed by a hyperlink directing the homeowner to HSPs in HomeAdvisor's network that service zip codes 49696 and 49686.



https://www.homeadvisor.com/rated.ScrubClubCleaning.68470102.html#quote=68470102 (last visited 1/3/19).

364.     Despite terminating her HomeAdvisor membership in August 2017, HomeAdvisor continued to use ***Plaintiff Ervine's*** OPP in violation of the Lanham Act until August 2018.  HomeAdvisor utilized Plaintiff Ervine's Online Profile Page and business name to confuse homeowners into thinking that Plaintiff Ervine's business, Glass Act Window Cleaning, was affiliated with HomeAdvisor and will receive the Lead request if the consumer selects the "Get a Quote" button on HomeAdvisor's website. Furthermore, the Online Profile Page contained a "Get a Quote" button at the top of the screen which invited prospective customers to submit a request for a quote.



*See* https://www.homeadvisor.com/rated.GlassActWindowCleaning.58137807.html (last visited 8/15/18).

365.     Although, the McHenry Plaintiffs cancelled their HomeAdvisor membership in July 2017, HomeAdvisor continued to use the McHenry Plaintiffs' OPP until approximately October 30, 2018 when it was removed in response to the PI/DJ Motion.



*See* https://www.homeadvisor.com/rated.BBCarpentry.65620492.html (last visited on 8/15/18).

366.    Similarly, HomeAdvisor HSP, Walter Garr Yarboro, beginning on July 24, 2018, contacted HomeAdvisor on numerous occasions requesting that HomeAdvisor terminate his membership only to have his requests ignored.  Despite Mr. Yarboro's repeated attempts to cancel his membership, HomeAdvisor continued to use Mr. Yarboro's OPP to create the false impression among prospective customers that Mr. Yarboro was affiliated with HomeAdvisor.  In fact, Mr. Yarboro was informed by loyal customers who had been trying to contact him, that their efforts to contact him were intercepted by HomeAdvisor.  HomeAdvisor's misappropriation of Mr. Yarboro's business name and likeness so negatively impacted his company's online presence and search engine optimization that he had customers come to his residence because their attempts to contact Mr. Yarboro through online searches were intercepted by HomeAdvisor – which then offered to connect his customers to other Home Service Professionals in its network. HomeAdvisor only removed Mr. Yarboro's OPP after HomeAdvisor sent Mr. Yarboro's account to a collection agency.

367.    For more than 7 months after cancelling her HomeAdvisor membership, HomeAdvisor continued to maintain Plaintiff Haukenes' Online Profile Page with a "Get a Quote"

button.



*See* https://www.homeadvisor.com/rated.BergenCertified.62508119.html (last visited 12/11/2017).

At the conclusion of those 7 months, instead of removing Plaintiff Haukenes' business name and information from its website, as discussed below, HomeAdvisor inserted a false and misleading alert in an effort to diver potential customers away from Plaintiff Haukenes.

368.    ***Online Profile Pages With a Misleading "Alert".***  In some situations, HomeAdvisor removes the "Get a Quote" button from the Former HSP's OPP and replaced it with an "alert" denoted by an exclamation point and bold red font and states: "Please Note: This business is not a screened and approved member of HA." This is an obviously misleading and deceptive statement intended to cast the Former  HSPs in a negative light so as to confuse and cause the prospective customer to alter course and  submit a service request to another active HomeAdvisor HSP. HomeAdvisor accomplishes this through the use of a service request solicitation that appears immediately below the "alert", offering customers the option to get quotes from "3 Prescreened" HSPs  (emphasis added).  These OPPs look similar to Plaintiff Haukenes' revised OPP:



*See* https://www.homeadvisor.com/sp/jasons-floor-covering (last visited 8/25/17).

369.    Upon submission of the service  request, HA generates a "Lead" that HA then charges to active HSPs, who are the Former HSPs'  competitors. Such misconduct denigrates the public's perception of the Former HSPs' businesses and misleads prospective customers.

370.    HomeAdvisor's active manipulation of Former HSP's OPPs is reflected in Plaintiff Haukenes' revised OPP.  In addition to revising Plaintiff Haukenes' OPP to contain the "alert," HomeAdvisor also included a phone number that was never associated with her business, business information under the headings "Quick Facts" and "Service Area" that was either inaccurate or incomplete and changed the URL to refer to a jasons-floor-covering.  HomeAdvisor continued to use Plaintiff Haukenes' OPP until approximately October 30, 2018, when HomeAdvisor removed it in response to the PI/DJ Motion.

371.    In response to the PI/DJ Motion, HomeAdvisor amended the "alert" language to state "Please Note: This business is not a current member of the HomeAdvisor network" but still maintains the prompt directing homeowners to submit a request to the Former HSP's direct competitors.   HomeAdvisor maintains these OPPs for Former HSPs for years after the HSPs membership with HomeAdvisor ends.  See https://www.homeadvisor.com/sp/advance (last visited January 2, 2019)(*See also* https://www.homeadvisor.com/sp/pestmasters, last review is dated 12-4-2013; https://www.homeadvisor.com/sp/finished-dimensions contains three reviews, last review dated 05-06-2002) (last visited January 2, 2019)

372.    ***Online Profile Pages Associated with the Company Names of Former HSPs.***  Prior to the changes HomeAdvisor implemented in response to the PI/DJ Motion, HomeAdvisor's final use of the OPP to divert customers away from Former HSPs involved deleting the content of the Former HSPs' Online Profile Page, but continuing to maintain a URL that includes Former HSPs' business names. These OPPs looked similar to that of Plaintiff Ervine's below:



*See* https://www.homeadvisor.com/rated.GlassActWindowCleaning.58137807.html (last visited 1/3/19).

373.    The overt act of altering the OPP of Former HSPs, but retaining the URL reflecting the name of the Former HSPs was done with the intent to capture prospective customers who are affirmatively searching for the Former HSPs and redirect them to HomeAdvisor's website. Once on the Former HSPs Online Profile Page, hosted on HomeAdvisor's site, prospective customers were informed that the "page [they] are looking for is no longer available", which gave the false impression that the Former HSPs were no longer in business. HomeAdvisor would then prompt prospective customers to "Follow the links below to be matched to top-rated pros for your projects." A submission would then be transformed by HA into a Lead sent and charged to the Former HSPs' competition.

374.    At no point does HomeAdvisor disclose to prospective or current HSPs the fact that the Online Listings it will interfere with HSPs' web presence, or that at the conclusion of the HSPs membership, HomeAdvisor will maintain the OPPs with false and misleading statements. While the homeowner attempting to contact a particular HSP is deceived, so too is the HSP. HomeAdvisor displays false and misleading statements about the selected HSP to divert the homeowner to HSPs that are in its network. Meanwhile the HSPs receiving and being charged for the Lead are under the impression that the homeowner specifically requested the quote from them. The lack of transparency and behind-the-scenes games diminishes any potential value derived from the service from the standpoint of the homeowners and the HSPs.

ii.   **HomeAdvisor Does Not Promptly Remove Former HSPs from the Exclusive Partner Network or Exact Match Listings**

375.   When an HSP pauses its Leads or terminate and/or do not renew its membership, HomeAdvisor does not remove the HSP's Exact Match listing or the listing on Exclusive Partner Network within a reasonable amount of time.  According to Former Employee A, Former HSPs' listings often remain active for 300-500 days post termination.  During such time, HomeAdvisor continues fielding proactive phone calls from homeowners seeking to contact the HSP on the listing.  Since that HSP is no longer active, HomeAdvisor distributes and charges other active HSPs for the redirected Exact Match Lead.

376.   However, prior to distributing the Lead, HomeAdvisor evaluates the HSP's status in the HomeAdvisor network. If the HSP has temporarily suspended the Lead services or has terminated their HomeAdvisor membership, HomeAdvisor will make false and misleading statements about the HSP's business, including lack of availability, the business is no longer in service, or that the HSP does not work in a specific geographic area.  HomeAdvisor will then distribute the Lead to other HSPs in its network, often at the premium Lead fee irrespective of the fact that the Lead no longer qualifies as an Exact Match.

377.   The  impact of these practices is highlighted by the following posts:

   a.   From   Consumer   Affairs   on   September   25,   2014, https://www.consumeraffairs.com/homeowners/homeadvisor.html?page=595 (last visited 1/3/19).

137



**Erik of Marietta , GA**
Sept. 25, 2014
Verified Reviewer ✔

★☆☆☆☆
*Satisfaction Rating*

We purchased 36 different leads from Home Advisor before we caught on to the scam they were pulling on the local contractors. We did land 3 of the jobs we called on from them which was a good thing. Back to the scam we receive many leads that we accept and pay $92.00 apiece for their "market match" leads and $112.00 for their "exact match" which you are forced to pay for no matter what. When you call for a refund on leads that don't EVER answer, they tell you that it's not their problem and no refund. Meanwhile the "exact match" leads are suppose to be exactly that but we have called many leads and have the so-called customer say they have too many people coming to look at it and hang up if they answer at all which is more often than not. Why would a REAL consumer fill out a specific questionnaire and then not answer the phone or emails or messages?

When we asked the Home Advisor "MANAGER" on duty what we are suppose to do he told us to pretty much harass the customer going to their private property and pushing them into talking to us. I am sure this is not what the consumer wants to hear how their personal information is being thrown out to a lot of different contractors. I did contact the news telling them about the experience and feel they should be investigated for fraud! Please leave feedback for us to read so we can figure out how to keep these people from scamming NEW contractors and SMALL businesses.

b.  From "Handyman Startup" on November 12, 2013, http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-to-know/ (last visited 1/3/19).

**kemccull256**   November 12, 2013

Its not necessarily what HomeAdvisors does, its what the lie to you that they don't do. They will lie to you about what exact match is and what they do to attract exact match leads. they will basically steal your market identity then feed it back to you at 150% of a market match lead. In other words, they will insert (somehow, I dont know how) their contact info in seemingly every place you have contact info for you company. So, anyone that looks you up gets their contact info. So rather than contact you directly, they contact HomeAdvisor. Then HA bills you 150% of the market match price for this. If you have paused your leads, you dont get the info.

Its not what they do, its what they lie to you to get your business. this is fraudulent. And needs to be reported. Oh, by the way, now they have a "listing" that clients can review and call you directly. For $30 per month flat. No choice. Ask them to produce what this is? they cant. Another rip off.

this needs to be report to you state Attorney General.

### iii.  **Website Hijacking**

378.   The Lanham Act Defendants also use various browser hijacking website domains. These website domains, such as Roofing.zone, use the company names of current and former HomeAdvisor HSPs to redirect legitimate internet traffic and searches away from the HSP's business to HomeAdvisor's impersonation websites.   This conduct confuses consumers and hijacks legitimate traffic and business opportunities away from the HSPs' businesses.

379.   For example, on November 2, 2016, Plaintiff Hass was reviewing his company's online presence by Googling "Alpine Roofing" and "Alpine Roofing Sidney", among other related search terms.   In the populated search results, below, Alpine Metal Roofing's website was sandwiched between the top ranking "Alpine Roofing Offers" Google ad by www.roofing.zone/Alpine and Alpine Metal Roofing's Online Profile Page on HomeAdvisor.com.



Source: Screenshot as of 12/30/16.

380.   Upon clicking on the top search result, Roofing.zone, users are asked to input details about the roofing project, and that upon submission of the form users will receive instant

and free quotes from 2-5 roofers.





381.    Upon completion of the form, Plaintiff Hass was contacted by other HomeAdvisor roofing HSPs who had received Plaintiff Hass' contact information in the form of a Lead from HomeAdvisor and for which each were charged approximately $70.  Immediately Plaintiff Hass contacted HomeAdvisor online customer support customer and sent follow up emails containing screenshots of the website hijacking, but HomeAdvisor failed to take any action absent promises to the contrary.

382.    In early December 2016 Plaintiff Hass canceled his HomeAdvisor membership and

requested that the deceptive Google ads be removed.  At that time, HomeAdvisor assured Plaintiff Hass that the issue would be reviewed.  Later that month, on December 30, 2016, Plaintiff Hass received an email from HomeAdvisor informing him that he would begin receiving Leads as of that day.  Before calling HomeAdvisor, Plaintiff Hass Googled his company and found that the same fraudulent Roofing.zone ad was still active.  Upon speaking to HomeAdvisor's customer service representative, Plaintiff Hass was told that his account had not been shut down entirely, but that it would be closed, and that HomeAdvisor would follow up with him about the website hijacking.

383.    Once again, HomeAdvisor took no steps to rectify Plaintiff Hass' complaints and was essentially silent until Plaintiff Hass sent an email on January 12, 2017 in which he threatened to take measures to expose HomeAdvisor's deceitful business practices.  In response, HomeAdvisor issued Plaintiff Hass a credit card refund in the amount of $881.27 on February 1, 2017, but provided no further explanation or clarification concerning the website hijacking.

384.    HomeAdvisor's misappropriation of HSPs' names and use of website hijacking to divert Leads away from HSPs was the subject of prior litigation in an action captioned *Rosati's Window Co., L.L.C. v. Remodelrepairreplace,com et. al.,* Case No. 2:15-cv-02711-JLG-TPK (U.S.D.C. S.D. Ohio) ("*Rosati Action*").  The *Rosati Action* alleged that HomeAdvisor and one of its lead generators, CrowdSteer, Inc., violated the Lanham Act and Ohio state law by misappropriating the name of Rosati's Window Co., L.L.C. ("Rosati") and using it on the websites RemodelRepairReplace.com and Rosati.windowcosts.com to divert internet users away from Rosati to sell to Rosati's competitors.  According to the *Rosati Action*, the website RemodelRepairReplace.com included ServiceMagic's Terms of Service.

385. ██████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

        iv.      **HSPs Nationwide are Victimized By The Lanham Act Defendants' Scheme**

386.    As is evidenced by the following statements from HSPs nationwide, HSPs are again victims of another scheme devised by the Lanham Act Defendants, built on the backs of HSPs by utilizing the company names and likenesses of both the current and former HSPs, to bestow significant financial benefits upon themselves to the detriment of HSPs.

      a.    A power-washing contractor in Maryland stated: "My biggest concern is that they [HomeAdvisor] have my business advertised with a 1800 number that goes to them and then they tell people that I am either not in service or do not work in that area. (I have even called that number and pretended to be a customer calling for Clean Power Wash and they told me that clean power wash wasn't available and didn't match the request for power washing) That is a gross misappropriation of my businesses reputation and strong profile on HomeAdvisor. They end up using my profile to sell leads for their company to other companies and I don't even get a shot at those calls. I have reported the issue several times and they initially told me I had to become a paid member instead of on a per lead basis (that is how I have been since day [sic]" Appendix I at Entry No. 590.

      b.    A driveway sealing and repair contractor in New Jersey reported the following: "I was off Homeadvisor's network for a few months and yet my page and information was still up. People were able to visit my contractors profile but there was a different number that was put in place. If a homeowner was trying to call my business, they would get in touch with homeadvisor instead which really confused a lot of my potential clients trying to get in touch with me." Appendix I at Entry No. 777.

      c.    A residential remodeling and repair contractor in Connecticut reported: "It's been two months since we cancelled our account and our company's information is still on the HomeAdvisor website. We can still log into the account (even though it says "past-due") And our HomeAdvisor profile comes up as a the top google hit when just searching our company name. Anyone looking for us on google would find HomeAdvisor first, which we

no longer wish to be affiliated with." Appendix I at Entry No. 227.

d.  An HSP posted an article on his website on March 15, 2017 in which he
    states: "They [HomeAdvisor] steal your business and sell it back to you.
    When you set up a profile with HomeAdvisor, it shows up on Google.
    Customers searching for your business find your HomeAdvisor profile and
    request an estimate through HomeAdvisor, who then charge you a high
    price for that lead. Even though the customer was searching for your
    business      in       the      first      place."      *See*
    http://paintingbusinesspro.com/homeadvisor-pro-reviews-complaints/ (last
    visited on 1/3/19).

e.  An HSP posted an un-dated article on his website in which he highlights
    HomeAdvisor's "very controversial" business and describes as a prominent
    issue with contractors that "contractor's [sic] and handymen have found out
    the hard way that HomeAdvisor actively builds links in their business's
    name pointing back to HomeAdvisor." Several HSPs commented on the
    article voicing similar concerns regarding HomeAdvisor "using our name
    to generate traffic to their website".

**Brad**
May 6, 2017

We have this same issue with home advisor. They are
still using our name to generate traffic to their website.
When we did use them, we constantly got charged for
exact match leads and the home owners would tell us
they got contacted by many contractors, way more than
3 per lead. I can assure you. As well as all the lies
customer service and ha sales reps tell you. Anything to
get you to pay more. My advice if you do use home
advisor is to use a pre paid credit card and only put
money on it when you want them to wipe it because they
will no matter what you were told when you signed up
with them

**Dan**
April 9, 2014

I'm the owner of an AC company in the Phoenix area, after realizing
home advisor uses your company name to attract business, I
dropped them, they are still using my company information without
my permission, and also have a CPM. (Google ad campaign ) using
my company information, basically I am competing with Home
Advisor for my own name, we are a $1mill company with 35% of our
customers coming directly from google, do the math on that! If you
are using home advisor, what ever you currently generate from
online or organic searches, home advisor gets that same dollar
amount using your name! Think about that! We track every lead! I

*See*   http://www.handymanstartup.com/home-advisor-pro-review-what-you-need-

to-know/ (last visited on 1/3/19).

387.    An HSP posted a review on sitejabber.com on July 14, 2017 titled "Illegal Activity"

in which he states: "I joined HomeAdvisor in an attempt to enhance my business. Within 5 days I

was sent 9 leads. Of the 9 only 2 were legit. 3 were suspect and 4 were discovered to be out right

fraudulent. When confronting HomeAdvisor they refused to credit the account. I disputed all

charges with the cc company and canceled the card to prevent further charges. Now they won't

remove my business from their search engines." *See* https://www.sitejabber.com/reviews/www.homeadvisor.com#68 (last visited on 1/3/19).

388. The Lanham Act Defendants' deceptive conduct in diverting business from HSPs through the unlawful use of (i) Online Profile Pages, (ii) the HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking, which conduct is wantonly executed with the objective to bestow significant financial benefits upon the Lanham Act Defendants, constitutes false association, false advertising, and unfair competition in violation of the Lanham Act, Section 1125(a)(1)(A) (Count XLIX), and Section 1125(a)(1)(B) (Count L); unfair competition in violation of the following state laws: Colorado Consumer Protection Act (Count LII); Colorado Unfair Competition law (Count LIII); Florida Deceptive and Unfair Trade Practices Act (Count LIV); Florida Unfair Competition law (Count LV); Idaho Consumer Protection Act (Count LVI); and New York Unfair Competition law (Count LVII).

## VII. IAC AND ANGI EXERT OPERATIONAL CONTROL OVER, AND PROFIT FROM, HOMEADVISOR

389. Barry Diller is IAC's founder and currently its Chairman and Senior Executive. Mr. Diller touts his "unique business model" for IAC which is to "[b]uy digital businesses, fold them into a conglomerate and then spin [them] out …." *See, The New York Times*, DealBook, "Barry Diller's Business Model Bears Fruit", 11/23/2015, http://www.nytimes.com/2015/11/24/business/dealbook/barry-dillers-business-model-bears-fruit.html?_r=0 (last visited 1/3/19). Mr. Diller runs IAC as a "sort of 'central flywheel' to create, buy and finance companies to later be spun out." Since the mid-2000s, IAC has been "a minifactory of spinoffs. 'I'm really an anti-conglomerateur,' Mr. Diller said." *Id.*

390.    IAC is like a business incubator.  It acquires, develops and spins off media and internet businesses including Expedia, TripAdvisor, HSN, LendingTree.com and the Match Group.  Irrespective of the competitive "home service-related lead generation" landscape, IAC was interested in acquiring HomeAdvisor "for a number of reasons including [HomeAdvisor's] market leading position and brand and [HomeAdvisor's] *business model*, which *complements the business models of [IAC's] other businesses*."  From the time IAC acquired Service Magic in 2004, through its rebranding of Service Magic as HomeAdvisor in 2012, until the Transaction (defined below, *see* ¶ 413), IAC was the parent company and majority shareholder of HomeAdvisor.  During that period, HomeAdvisor was referred to as an operating business, segment and wholly owned subsidiary of IAC in IAC's SEC filings and press releases, and in the statements by its officers.

### A.    IAC Led the Fraud to Achieve Record Growth for HomeAdvisor

391.    It was IAC's capital investment during the Class Period that enabled HomeAdvisor to develop and implement the fraudulent business model.  From 2013 to 2016, IAC made capital contributions to HomeAdvisor of nearly one-quarter billion dollars for marketing and to increase HomeAdvisor's salesforce, and IAC reported that, under its direction and control, HomeAdvisor had been transformed from an unprofitable business to one that IAC touted as its fastest-growing and most profitable segment.  (http://ir.iac.com/static-files/2d426593-84cd-44c6-acda-a1ab4f539e7c (last visited 1/4/19)).

392.    For example, in its Q2 2013 earnings call on July 31, 2013, IAC declared 2013 a transition year for HomeAdvisor, and highlighted IAC was "working on rolling out *some alternate business models to help make the business stickier with our service professionals*."

393.    With IAC at the helm, IAC reported in subsequent quarters that its actions had,

indeed, made things "stickier" -- for HSPs:

   a. During the April 30, 2014 Q1 2014 earnings call, IAC was able to report its "first quarter of double-digit revenue growth since the first quarter of 2012, and its first quarter of double-digit EBITDA growth since the third quarter of 2012. Additionally…active [HSPs] grew 15% year-over-year".[19]

   b. During the October 29, 2014, Q3 2014 earnings call, IAC, and its CFO Kip reported that HomeAdvisor's revenue increased 20% versus the prior year, and that *the number of paying HSPs was up nearly 30% year-on-year in the third quarter*.[20]

   c. During the February 4, 2015, Q4 2014 earnings call, IAC reported that HomeAdvisor was profitable, with almost $300 million in revenue, and with growth expected to continue in the 20%-30% range in 2015.[21]

   d. During the Q3 2015 earnings call on October 27, 2015, Kip highlighted and confirmed that HomeAdvisor's growth is tied to the HSPs: "so we just got [sic] crossed 100,000 service professionals last week, which is a huge milestone for us and we crossed it faster than we thought"; "the engagement and *spend from the average service professional is up significantly* year-over-year ……and *it is those guys [the HSPs] who are supplying the revenue* and fulfilling the customers and that the SP network is the biggest driver."[22]

394.   In IAC's Q3 2016 shareholder letter, dated November 2, 2016, Mr. Levin hyped HomeAdvisor's record quarter: "HomeAdvisor also had another record quarter with domestic revenue growing 39% and *a new record Adjusted EBITDA, up nearly 80% year over year*…[T]he [HSP] network was up nearly 50% year over year again…To put this growth in perspective, since we offered to acquire Angie's List in Q3 of last year, *we have added a net number of service professionals roughly equivalent to the size of Angie's [List's] entire network*."[23]

---

[19]   Source: http://seekingalpha.com/article/2177683-iac-interactive corp-management-discusses-q1-2014-results-earnings-calltranscript? part= single (last visited 1/3/19).
[20]   Source: http://seekingalpha.com/article/2611655-iac-interactivecorp-iaci-q3-2014-results-earnings-call-transcript?part=single (emphasis added) (last visited 1/3/19).
[21]   Source: https://seekingalpha.com/article/2884126-iac-interactivecorp-iaci-q4-2014-earnings-call-transcript?part=single (last visited 1/3/19).
[22]   Source: http://seekingalpha.com/article/3609106-iac-interactivecorp-iaci-ceo-joey-levin-q3-2015-results-earnings-call-transcript?part=single (emphasis added) (last visited 1/3/19).
[23]   Source: http://ir.iac.com/static-files/7a47b3c6-7879-4fa7-a58a-95d194148be2 (emphasis added) (last visited 1/4/19).

395.    HomeAdvisor's record growth continued through the fourth quarter of 2016.  In IAC's Q4 2016 Shareholder Letter, dated February 1, 2017, IAC's Joey Levin declared: "Once again, HomeAdvisor crushed it. Revenue was up 35% and Adjusted EBITDA more than doubled again from the prior year. For the full year 2016, we accelerated domestic revenue growth and more than doubled margins for the segment."[24]

396.    Consequently, HomeAdvisor's growth has been exponential year-to-year:

| HomeAdvisor Year Ended | Paying HSPs | Revenue | % Revenue Increase Over Prior Year |
|---|---|---|---|
| December 31, 2017 | 181,000 | $763,386,000 | 48% |
| December 31, 2016 | 143,000 | $498,890,000 | 38% |
| December 31, 2015 | 102,000 | $361,201,000 | 27% |
| December 31, 2014 | 85,000 | $283,541,000 | 18% |
| December 31, 2013 | 80,000 | $239,417,000 | (not reported) |

397.    Even after the announcement of the Transaction, IAC continued to push HomeAdvisor's growth.  In IAC's Q1 2017 shareholder letter, IAC stated:

> We are going to continue to press investment in HomeAdvisor notwithstanding the merger.  With 38% domestic revenue growth and domestic Adjusted EBITDA more than tripling in Q1, we want to invest into strength.  In Q2 we will increase our consumer marketing expenditures with a new creative campaign that launched a few weeks ago to strong early returns […].  We previously mentioned we might target $100 million of TV spend in 2017, up from our previous target of $85 million.  In this quarter, we will start down that path, increasing our TV marketing spend 75% year-over-year and expecting returns to hold.[25]

---

[24]    Source: http://ir.iac.com/static-files/db867c9d-3c27-4999-9f8b-403fb4cb796a (last visited 1/4/19).

[25]    Source:    http://ir.iac.com/static-files/4620bfd5-7630-4464-b008-d26ed78f3757    (last visited 1/16/18).

**B.      IAC Not Only Financed The Fraudulent Business Model of HomeAdvisor, IAC Actively Controlled And Influenced HomeAdvisor's Day-to-Day Business Operations.**

398.      IAC was not a hands-off parent company, rather it has operated HomeAdvisor as if it were a department within IAC.  In fact, IAC has publicly acknowledged that its executives are intimately involved in operating HomeAdvisor's business.  For example, in April 2016, IAC announced that its Executive Vice President and Chief Financial Officer, Jeffrey Kip, who had been in this position since March of 2012, would be succeeded by Glenn Schiffman as CFO, but would "remain with the Company and oversee the international expansion of the HomeAdvisor business." (*IAC Appoints Glenn H. Schiffman as Chief Financial Officer*, PR Newswire, 4/7/16). IAC's rationale for transitioning Mr. Kip's role was that Mr. Kip had been "a key contributor in HomeAdvisor's success." Mr. Kip's LinkedIn profile currently has him listed at the Chief Executive Officer of HomeAdvisor International.    https://www.linkedin.com/in/jeffkip/ (last visited 1/3/19).

399.      IAC's control and influence over HomeAdvisor's business strategies and operations are also supported by IAC's letters to its shareholders.  For example, for 2016, IAC established the following priorities for HomeAdvisor:

- "Grow brand awareness, primarily through marketing"
- "Add SPs [HSPs], primarily through our sales force"
- "Innovate the product, primarily through Instant Connect and Instant Booking, especially on mobile"
- "Expand internationally, where we've moved Jeff Kip to bring a renewed focus on the opportunity"

(*Id.* IAC Q1 2016 Shareholder Letter, 5/4/16).

400.      Similarly, for 2017 IAC established the following priorities for HomeAdvisor:

- Product Innovation through real-time data on HSP's location and availability
- Increase contact and follow up with homeowners and HSPs before and after a job
- Increase brand awareness through increased television and online spending
- Add larger HSPs with bigger budgets

148

- Expand internationally, through the acquisitions and organic growth

(IAC Q4 2017 Shareholder Letter, 2/1/17) (emphasis added).

401. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

402. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

403. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

404. ████████████████████████████████████████████



405. ███████████████████████████████████████████████

406. ███████████████████████████████████████████████



407.

408.

---

26    Felix was acquired by IAC in August 2012 (*See* https://www.businessinsider.com.au/felix-the-profitable-arm-of-yext-has-been-acquired-by-iac-for-30-million-2012-8 (last visited 1/4/19)) and has been listed as an IAC subsidiary in IAC's Form 10-K's for the periods ending December 31, 2012 through December 31, 2017.  (*See i.e.*, http://ir.iac.com/static-files/66a65771-ec1c-480d-8e89-64d2d312d44c (last visited 1/3/19).



409. ████████████████████████████████████████████████

410. ████████████████████████████████████████████████

411. ████████████████████████████████████████ For example, IAC changed Jeremy

Stewart's position from IAC's Vice President, Finance and Investor Relations, to Vice President, HomeAdvisor/Angie's List Integration, a position he held from July 2017 through March 2018.[27]

412. ███████████████████████████████████████████

## C.     IAC Capitalizes on Its Control of HomeAdvisor

413. On May 1, 2017, IAC announced that it had entered into a transaction with Angie's List whereby HomeAdvisor and Angie's List would become a wholly owned subsidiary of a new publicly traded company called ANGI Homeservices Inc. (the "Transaction"). Under the terms of the Transaction, IAC agreed to contribute HomeAdvisor to ANGI in exchange for shares of Class

---

[27] Notably, in March of 2018, Mr. Stewart's employer changed to ANGI and HomeAdvisor and he stepped into the title of EVP of Business Operations /GM of Angie's List. See https://www.linkedin.com/in/jeremy-stewart-2556b44/ (last visited 1/8/19).

B shares of common stock of ANGI.  Angie's List agreed to become a wholly owned subsidiary of ANGI in exchange for each Angie's List shareholders receiving the right to elect to receive one share of Class A common stock of ANGI or $8.50 per share in cash.  As a result of the Transaction, IAC would own between approximately 87 % and 90% of the new company's equity value and 98% of the total voting power. The Transaction closed on September 29, 2017.  The following diagram depicts the steps of the Transaction and the resulting structure of ANGI:



414.    The Transaction documents demonstrate that IAC exerted operational control over HomeAdvisor and its business.  Not only is HomeAdvisor not a party to any of the Transaction documents, but under the conduct of business section of the Agreement and Plan of Merger dated as of May 1, 2017 ("Merger Agreement"), IAC acknowledged that it directed HomeAdvisor's business operations.  Specifically, paragraph 5.1 (c) of the Merger Agreement states:

IAC covenants and agrees that **it shall conduct the HomeAdvisor Business** in the

ordinary course of business in all material respects, and shall use reasonable best efforts to preserve intact the HomeAdvisor Business's present lines of business, maintain its rights, franchises and permits and preserve relationships with employees, customers and suppliers. (emphasis added).

415.    In the Contribution Agreement by and between IAC and ANGI dated as of September 29, 2017 ("Contribution Agreement"), IAC acknowledged that it had full control of HomeAdvisor's business and asset.  Under Section 2.01 of the Contribution Agreement, IAC agreed to:

> implement a separation of the HomeAdvisor Business and the Remaining Business and to cause the HomeAdvisor Business to be transferred to NewCo and the Remaining Business to be held by IAC and its Subsidiaries

416.    In Section 2.03 of the Contribution Agreement, IAC agreed to:

> cause the HomeAdvisor Assets to be contributed, assigned, transferred, conveyed and delivered, directly or indirectly, to NewCo, and NewCo agrees to accept all of the HomeAdvisor Assets and all of the rights, title and interest in and to all of the HomeAdvisor Assets owned, directly or indirectly, by IAC

417.    The closing of the Transaction did not terminate IAC's involvement in HomeAdvisor's business.  In addition to owning 98% of ANGI's voting power and designating 80% of ANGI's board members, IAC and ANGI entered into a Services Agreement whereby IAC agreed to continue to perform certain services for ANGI.  While the specific services were not publicly disclosed, Section 3.01 of the Services Agreement acknowledges that, with respect to the specific services, IAC's involvement in the HomeAdvisor business will not change:

> the [IAC Service Providers] shall be required to perform the Services only in a manner, scope, nature and quality as provided by or within IAC that is similar in all material respects to the manner in which such Services were performed in the twelve (12) months immediately prior to the Effective Date

418.    In addition, HomeAdvisor employees are still directed, managed and/or employed by IAC. According to IAC's career website page (http://iac.com/careers/overview), individuals

interested in joining the "IAC team" have the option to explore the jobs available at IAC's 20 plus operating businesses. The jobs available through IAC's operating businesses also include IAC benefits, such as the "IAC Retirement Plan" and health benefits. IAC is responsible for the Form 5500 filings for both the retirement savings plan and the health and welfare benefit plan. HomeAdvisor does not make any such filings. *See* http://iac.com/careers/overview(last visited on 1/3/19).

419. Even after the close of the Transaction, IAC continues to treat HomeAdvisor executives and employees as IAC employees and incentivize them to operate HomeAdvisor and ANGI in a manner that would inure to IAC's benefit. In connection with the Transaction HomeAdvisor executives and employees received IAC denominated equity awards. These IAC denominated equity awards are options and performance-based restricted stock units that will vest as shares of IAC common stock and are directly tied to the value of IAC's stock price, which directly benefits form the ongoing fraudulent conduct alleged herein. Upon exercise of these IAC denominated equity awards, ANGI is required to issue additional shares to IAC as reimbursement. As of December 31, 2017, the equity awards amounted to 1.4 million IAC shares, a value of more than $207 million.

420. The rationale behind IAC's unrelenting pursuit of Angie's List is apparent -- it creates another immediate source of HSPs for HomeAdvisor to fill its pipeline to perpetuate the fraudulent and deceptive practices alleged herein. The combined HSP network will consist of "HomeAdvisor's network of more than 156,000 and Angie's List's network of more than 55,000, collectively up 24 percent year-over-year as of the first quarter of 2017."[28]

---

[28]    *See*  http://ir.iac.com/static-files/2dbc3a0d-a76e-41cf-95f9-1f98066ce29f  (last  visited 1/8/19).



421.    As a result of the Transaction, ANGI became the entity in charge of operating HomeAdvisor's Business. HomeAdvisor's CEO, Chris Terrill, became the then-CEO of both ANGI and HomeAdvisor, both of which are headquartered in the same building.  In fact, ANGI's website describes HomeAdvisor and Angie's List as two of ANGI's ten brands.

422.    In addition, through the Transaction, Glenn Schiffman, in addition to maintaining his role as IAC's CFO, became ANGI's CFO and Gregg Winiarski serves as ANGI's Interim Chief Legal Officer, as well as IAC's EVP and General Counsel.

423.    Furthermore, four key IAC executives comprise the 10-member Board of Directors of ANGI:  Joey Levin as Chairman of the Board, Glenn Schiffman (IAC's Chief Financial Officer), Mark Stein (IAC EVP and Chief Strategy Officer), and Gregg Winiarski (EVP, General Counsel and Secretary of IAC), all of whom were nominated to ANGI's Board of Directors because of the "unique knowledge and experience regarding ANGI and its businesses that he has gained through his     [roles]     with     IAC.     .     ."     *See* https://www.sec.gov/Archives/edgar/data/1705110/000104746918003353/a2235441zdef14a.htm (last visited 1/3/19).

424.    IAC has always steered HomeAdvisor's business and continues to do so well after

157

the close of the Transaction. Joey Levin's discussion of ANGI in the Q1 2018 Shareholder Letter to IAC shareholders is written in the voice of management actively operating ANGI and not in the voice of the CEO of ANGI's largest investor. For example, Mr. Levin acknowledges IAC's control over ANGI's business when he stated:

- a. *…our* big operational focus is still the integration of Angie's List, which we acquired late last year and combined with our HomeAdvisor;

- b. *We have* also taken significant costs out of the combined business;

- c. *We initially believed we* had the capacity to absorb most of the incremental customers coming in from Angie's List;

- d. …*our marketing spend* will be lower while we aggressively push on resolving our supply constraint; and

- e. *We have plans* to accelerate capacity expansion in the second half of the year.

*See* http://ir.iac.com/static-files/165fea50-d0d2-4715-906c-265f782f29c2 (last visited 1/3/19).

425. Mr. Levin's recognition that IAC continues to actively operate ANGI continued in the Q3 2018 Shareholder Letter to IAC shareholders, wherein he states:

- a. *our* latest rollup of figures has us 98% of the way to our original ambitious goal, set 18 months ago upon announcement of the deal, of $270 million of Adjusted EBITDA in our first full calendar year…;

- b. *we're* innovating across all products, and we're investing into strength.;

- c. Internal succession is what *we hope* and plan for with every business at IAC and, as Chris and I and the Board of Directors discussed regularly, there is no better successor for Chris than his partner, Brandon.; and

- d. *we* just acquired a much smaller but very ambitious new company called Handy.

158

*See* http://ir.iac.com/static-files/6986ad64-301f-40a7-9471-b6f907c3445e (last visited 1/8/19)

426.    Further, as evidenced by ANGI's and HomeAdvisor's website, ANGI and HomeAdvisor operate as a unitary entity.  For example, HomeAdvisor's website lists its executive team as Brandon Ridenour, CEO of ANGI; Craig Smith, President and COO of ANGI; Jamie Cohen, Executive Vice President of Finance of Accounting; Allison Lowrie, Chief Marketing Officer, and Ryan Sullivan, CTO.  https://www.abouthomeadvisor.com/who-we-are/executive-team/ (last visited 1/8/19).  Notably, these individuals' biographies list their roles with ANGI, not HomeAdvisor,          on          the          HomeAdvisor          website.          *See        also* https://www.angihomeservices.com/leadership/ (last visited 1/8/19).

427.    Therefore, because of IAC's and ANGI's direct control over HomeAdvisor and its business, supports claims for violations of RICO (Count I), aiding and abetting fraud/fraudulent concealment (Counts III, VIII, XIII, XVIII, XXIII, XXVIII, XXXII, XXXVII, XLII), unjust enrichment and restitution (Counts IV, X, XV, XX, XXV, XXX, XXXIV, XXXIX, XLIV, and XLVIII) and violations of California and Florida state law (Counts V and XVI).

## CLASS ACTION ALLEGATIONS

428.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Consolidated Amended Complaint.

429.    Plaintiffs bring this action, both individually and as a class action, on behalf of themselves and all similarly situated individuals, pursuant to Federal Rule of Civil Procedure 23.

## I.    Class Action Allegations for The Deceptive Business Practices Claims

430.    For Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(C), (Count I), Fraud/Fraudulent Concealment (Count II), Aiding and Abetting Fraud/Fraudulent Concealment (Count III),  and Unjust Enrichment (Count IV), Plaintiffs

seek to certify the following national class (the "Nationwide Class"):

**Nationwide Class**

All persons and entities who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

431.     For Plaintiffs' state common law fraud, aiding and abetting fraud, breach of implied contract, unjust enrichment and statutory claims under California law ("California Class"), Colorado law ("Colorado Class"), Florida law ("Florida Class"), Idaho law ("Idaho Class"), Illinois law ("Illinois Class"), Indiana Law ("Indiana Class"), New Jersey law ("New Jersey Class"), New York law ("New York Class") and Ohio law ("Ohio Class"), (collectively the "State Classes"), plaintiffs seek to certify the following State Classes:

**California Class (represented by Plaintiffs Josh Seldner and Lisa LaPlaca)**
All persons and entities who reside in California who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

**Colorado Class (represented by Plaintiffs Brad and Linda McHenry)**
All persons and entities who reside in Colorado who, since July 19, 2013, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

**Florida Class (represented by Plaintiffs DaSilva and Ervine)**
All persons and entities who reside in Florida who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

**Idaho Class (represented by Plaintiff Haukenes)**

All persons and entities who reside in Idaho who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Illinois Class (represented by Plaintiff Filipiak)

All persons and entities who reside in Illinois who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Indiana Class (represented by Plaintiff Gray)

All persons and entities who reside in Indiana who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### New Jersey Class (represented by Plaintiff Costello)

All persons and entities who reside in New Jersey who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### New York Class (represented by Plaintiff Airquip)

All persons and entities who reside in New York who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

### Ohio Class (represented by Plaintiff Baumann)

All persons and entities who reside in Ohio who, since October 1, 2012, paid for a HomeAdvisor home service professional membership (including for HomeAdvisor's Pro Connect[TM], Total Connect[TM], and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs), and/or paid for homeowner contact and service requests ("Leads") and/or mHelpDesk.

432.     Plaintiffs may seek to certify additional classes and/or subclasses and reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

433.     Excluded from the Nationwide and State Classes are: Defendants, any entity in which any Defendant has a controlling interest, and each Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

434.     Defendants' practices and omissions were applied uniformly to all members of the Nationwide and State Classes, so that the questions of law and fact are common to all members of the Classes.

435.     All members of the Nationwide and State Classes were and are similarly affected by the wrongful and deceptive practices of Defendants, and the relief sought herein is for the benefit of Plaintiffs and members of the Nationwide and State Classes.

436.     All members of the Nationwide and State Classes similarly relied on HomeAdvisor's deceptive representations and practices and such reliance resulted in harm to each Nationwide and State Class Member.

437.     Based on HomeAdvisor's, IAC's and ANGI's public statements, it is apparent that the Nationwide and State Classes consist of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

438.     Questions of law and fact common to the Plaintiffs and Nationwide and State Classes exist that predominate over the questions affecting only individual members of the

Nationwide and State Classes.  The common legal and factual questions include, *inter alia*:

(a)　　Whether HomeAdvisor and ANGI employed a deceptive course of conduct of charging members of the Classes for Leads that were not qualified business opportunities and were not generated by any means to assure that they were from targeted, serious, or project-ready homeowners.

(b)　　Whether HomeAdvisor and ANGI concealed and misrepresented to HSPs material information about the nature, quality and source of the Leads.

(c)　　Whether HomeAdvisor and ANGI generated or obtained bogus Leads from third parties that were virtually unvetted, rendering them unsusceptible to assessing their quality or suitability to be sold as Leads to HSPs.

(d)　　Whether HomeAdvisor, ANGI and IAC used systemically flawed and deficient processes to generate Leads that were not of the nature and quality of the Leads advertised to HSPs.

(e)　　Whether HomeAdvisor and ANGI sold bogus Leads to HSPs.

(f)　　Whether HomeAdvisor and ANGI charged the HSPs for Leads that were not qualified business opportunities.

(g)　　Whether HomeAdvisor and ANGI charged Plaintiffs and the members of the Classes for Leads that were sent to more than four HSPs.

(h)　　Whether HomeAdvisor and ANGI charged HSPs for mHelpDesk without knowledge or consent of the HSPs.

(i)　　Whether HomeAdvisor and ANGI systemically disregarded the parameters and limits placed by HSPs on the type and number of Leads to be charged to HSPs.

(j)　　Whether HomeAdvisor and ANGI employed tactics preventing HSPs from cancelling their membership and receipt of Leads, and from disputing or receiving meaningful credit or refunds for bogus Leads.

(k)　　Whether IAC aided and abetted HomeAdvisor's and ANGI's fraudulent and deceptive conduct.

(l)　　Whether HomeAdvisor's and ANGI's use of collection agencies to pursue and collect fabricated debt from defrauded HSPs supports a RICO violation.

(m)　　Whether the Lanham Act Defendants' use of former HSPs names, trademarks, service marks or likenesses to generate Leads supports a RICO violation.

(n)　　Whether IAC's and ANGI's control over and active direction of HomeAdvisor's actions supports a RICO violation.

(o)     Whether CDVM's, VentureStreet's and CraftJack's participation in the actions of the RICO Enterprise support a RICO violation.

(p)     Whether HomeAdvisor's, ANGI's and IAC's conduct violates consumer protection statutes and other laws as asserted herein;

(q)     The amount of revenues and profits Defendants received and/or the amount of monies imposed on or lost by the members of the Nationwide and State Classes as a result of Defendants' conduct.

(r)     Whether the members of the Nationwide and State Classes are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(s)     Whether the members of the Nationwide and State Classes are entitled to payment of damages plus interest thereon.

439.    The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Nationwide and State Classes, as the claims arise out of the same wrongful and unlawful course of conduct by Defendants, including HomeAdvisor's deceitful business practices with respect to the HomeAdvisor Leads and its membership services. Plaintiffs and the other members of the Nationwide and State Classes have sustained economic injuries arising from Defendants' conduct, and the relief sought is common to each member of the Class.

440.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Nationwide and State Classes, and do not have interests antagonistic to the interests of any other member of the Nationwide and State Classes.

441.    Plaintiffs have retained counsel competent and experienced in the prosecution of class actions, in particular consumer protection class actions.

442.    Certification of the Nationwide and State Classes is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the Nationwide and State Classes predominate over questions of law or fact affecting only individual

members of the Nationwide and State Classes.  This predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

443.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Plaintiffs and the members of the Nationwide and State Classes have all suffered and will continue to suffer harm and damages as a result of Defendants unlawful and wrongful conduct.  Absent a class action, most members of the Nationwide and State Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the damages of each member of the Nationwide and State Classes, it is highly likely that Plaintiffs or any other member of the Nationwide and State Classes would be able to protect their own interest and afford to seek legal redress for Defendants' misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery.  Therefore, absent a class action, members of the Nationwide and State Classes will continue to incur damages and Defendants' misconduct will continue without remedy.

444.    Certification also is appropriate because Defendants acted, or refused to act, on grounds generally applicable to the Plaintiffs and the Nationwide and State Classes, thereby making appropriate the relief sought on behalf of the Nationwide and State Classes as a whole. Further, given the large number of HSPs subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.  Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of

adjudication.

## II.     Class Action Allegations for The Misappropriation Claims

445.     For the Misappropriation Plaintiffs' claims under the Lanham Act Section 43(a),

15 U.S.C. § 1125(a)(1)(A), (Count XLIX), Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(B),

(Count L), and Declaratory Judgment (Count LI) the Misappropriation Plaintiffs seek to certify

the following national class (the "Lanham Act Class"):

### Lanham Act Class

All persons and entities who since July 13, 2015, did not have an active home service professional membership (including for HomeAdvisor's Pro Connect™, Total Connect™, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or any HomeAdvisor affiliate website.

446.     The Misappropriation Plaintiffs also seek to certify classes for their state

common law unfair competition and statutory claims under Colorado law ("Colorado

Misappropriation Class"), Florida law ("Florida Misappropriation Class"), Idaho law ("Idaho

Misappropriation Class"), and New York law ("New York Misappropriation Class") (collectively

the "State Misappropriation Classes"):

### Colorado Misappropriation Class (represented by the McHenry Plaintiffs)
All persons and entities during the Class Period who reside in Colorado, since July 13, 2015, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect™, Total Connect™, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness, or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

### Florida Misappropriation Class (represented by Plaintiff Ervine)
All persons and entities during the Class Period who reside in Florida, since July 13, 2014, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect™, Total Connect™, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

<u>**Idaho Misappropriation Class (represented by Plaintiff Haukenes)**</u>
All persons and entities during the Class Period who reside in Idaho, since July 13, 2016, and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect™, Total Connect™, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

<u>**New York Misappropriation Class (represented by Plaintiff Hass)**</u>
All persons and entities during the Class Period who reside in New York, since July 13, 2015,   and did not have an active home service professional membership (including for HomeAdvisor's Pro Connect™, Total Connect™, and/or for the predecessor or subsequent HomeAdvisor home service professional membership programs) and whose names, likeness or trademark appeared on HomeAdvisor's website or in relation with any HomeAdvisor affiliate website.

447.    The Misappropriation Plaintiffs may seek to certify additional classes and/or subclasses and reserve the right to modify or amend the definition of the proposed Lanham Act and State Misappropriation Classes before the Court determines whether certification is appropriate.

448.    Excluded from the Lanham Act and State Misappropriation Classes are: the Lanham Act Defendants, any entity in which any Lanham Act Defendant has a controlling interest, and each Lanham Act Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns; governmental entities; and, any judge or magistrate presiding over this action, as well as their immediate family members.

449.    The Lanham Act Defendants' practices were applied uniformly to all members of the Lanham Act and State Misappropriation Classes, so that the questions of law and fact are common to all members of the Lanham Act and State Misappropriation Classes.

450.    All members of the Lanham Act and State Misappropriation Classes were and are similarly affected by the wrongful and unfair practices of the Lanham Act Defendants, resulting

in harm to of the Members of the Lanham Act and State Misappropriation Classes, and the relief sought herein is for the benefit of the Misappropriation Plaintiffs and members of the Lanham Act and State Misappropriation Classes.

451.    Based on HomeAdvisor's, IAC's and ANGI's public statements, it is apparent that the Lanham Act and State Misappropriation Classes consists of many thousands of members, the identities and contact information of whom is readily ascertainable from HomeAdvisor's records, therefore rendering joinder impractical and impossible.

452.    Questions of law and fact common to the Misappropriation Plaintiffs and Lanham Act and State Misappropriation Classes exist that predominate over the questions affecting only individual members of the Lanham Act and State Misappropriation Classes.  The common legal and factual questions include, *inter alia*:

(a)    Whether the Lanham Act Defendants' online advertisements and maintenance of terminated HSPs' profiles on HomeAdvisor websites are part of a pattern and practice to divert or hijack business away from Plaintiffs and the Lanham Act and State Misappropriation Classes Members in violation of Section 43(a) of the Lanham Act.

(b)    Whether the Lanham Act Defendants' offers to connect homeowners to HSPs who are no longer affiliated with HomeAdvisor violates 15 U.S.C. § 1125(a)(1)(A) of the Lanham Act.

(c)    Whether the Lanham Act Defendants' false representations that Plaintiffs and the Lanham Act and State Misappropriation Classes Members were unable to accept new business opportunities violated 15 U.S.C. § 1125(a)(1)(B) of the Lanham Act.

(d)    Whether the conduct alleged herein constitutes unfair competition.

(e)    Whether the Lanham Act Defendants' conduct violates consumer protection statutes, and other laws as asserted herein.

(f)    The amount of revenues and profits the Lanham Act Defendants received and/or the amount of monies imposed on or lost by the members of the Lanham Act and State Misappropriation Classes as a result of the Lanham Act Defendants' conduct.

(g)     Whether the members of the Lanham Act and State Misappropriation Classes are threatened with irreparable harm and/or are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief.

(h)     Whether the members of the Lanham Act and State Misappropriation Classes are entitled to payment of damages plus interest thereon.

453.    The claims asserted by the Misappropriation Plaintiffs in this action are typical of the claims of the members of the Lanham Act and State Misappropriation Classes, as the claims arise out of the same wrongful and unlawful course of conduct by the Lanham Act Defendants, including the Lanham Act Defendants' deceptive conduct in misappropriating the names, trademarks or likenesses to divert business from the members of the Lanham Act and State Misappropriation Classes to HomeAdvisor. The Misappropriation Plaintiffs and the other members of the Lanham Act and State Misappropriation Classes have sustained economic injuries arising from the Lanham Act Defendants' conduct, and the relief sought is common to each member of the Lanham Act and State Misappropriation Classes.  In addition, HomeAdvisor continues to harm the Misappropriation Plaintiffs and the other members of the Lanham Act and State Misappropriation Classes by continuing to use their business names and information with false or misleading statements or in an effort to create a false association with HomeAdvisor and failing to provide any assurances that it will not resume its conduct of misappropriating the names, trademarks or likenesses of, and making false statements about, the Misappropriation Plaintiffs.

454.    The Misappropriation Plaintiffs will fairly and adequately represent and protect the interests of the members of the Lanham Act and State Misappropriation Classes, and do not have interests antagonistic to the interests of any other member of the Lanham Act and State Misappropriation Classes.

455.    The Misappropriation Plaintiffs have retained counsel competent and experienced

in the prosecution of class actions, in particular consumer protection class actions.

456.    Certification of the Lanham Act and State Misappropriation Classes is appropriate under Federal Rule of Civil Procedure 23 because questions of law or fact common to the respective members of the Lanham Act and State Misappropriation Classes predominate over questions of law or fact affecting only individual members of the Lanham Act and State Misappropriation Classes.  This predominance makes class litigation under Fed. R. Civ. P. 23 superior to any other method available for a fair and efficient decree of the claims.

457.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Misappropriation Plaintiffs and the members of the Lanham Act and State Misappropriation Classes have all suffered and will continue to suffer harm and damages as a result of the Lanham Act Defendants unlawful and wrongful conduct.  Absent a class action, most members of the Lanham Act and State Misappropriation Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.  Because of the relatively small size of the damages of each member of the Lanham Act and State Misappropriation Classes, it is highly likely that the Misappropriation Plaintiffs or any other member of the Lanham Act and State Misappropriation Classes would be able to protect their own interest and afford to seek legal redress for the Lanham Act Defendants' misconduct, because the cost of litigation through individual lawsuits might exceed expected recovery. Therefore, absent a class action, members of the Lanham Act and State Misappropriation Classes will continue to incur damages and the Lanham Act Defendants' misconduct will continue without remedy.

458.    Certification also is appropriate because the Lanham Act Defendants acted, or refused to act, on grounds generally applicable to the Plaintiffs and the Lanham Act and State

Misappropriation Classes, thereby making appropriate the relief sought on behalf of the Lanham Act and State Misappropriation Classes as a whole. Further, given the large number of HSPs subscribed to HomeAdvisor, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications. Treatment of common questions of law and fact in this action is a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

<u>**CAUSES OF ACTION**</u>

I.    **The Deceptive Business Practices Claims**

<u>**Nationwide**</u>

**COUNT I**
**Violations Of Racketeer Influenced And Corrupt Organizations Act,**
**18 U.S.C. § 1962(C)**
<u>**(Against All Defendants On Behalf of the Nationwide Class)**</u>

459.    Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

460.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and as set forth in ¶¶ 53-387 *supra*.

461.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and as set forth in ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426 *supra*.

462.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and as set forth in ¶¶ 6, 23, 53-387, and 411-426 *supra*.

463.    CDVM and VentureStreet are named as Defendants in this Count by virtue of their conduct summarized as follows and as set forth in ¶¶ 24, 25, 86, 88, and 159 *supra*.

464.    CraftJack is named as a Defendant in this Count by virtue of its conduct

summarized as follows and as set forth in ¶¶ 26, 86, 88, 109-114, 115-121, 159, and 410 *supra*.

### A.    RICO Enterprise.

465.    From at least October 1, 2012, to the present, the affiliation between and among IAC, ANGI, HomeAdvisor, CDVM, VentureStreet and CraftJack constituted an enterprise. The RICO enterprise, which engaged in, and whose activities affected interstate and foreign commerce, was comprised of an association-in-fact of entities and individuals that included the RICO Defendants.

466.    The association-in-fact enterprise also included the businesses and persons who sold leads to HomeAdvisor, including CDVM, VentureStreet, CraftJack, One Planet, Triares, Modernize, Meredith, Reed Badra and John Does, which are in the business of generating consumer contact information for a variety of industries and selling or re-selling leads to HomeAdvisor, and which had knowledge that HomeAdvisor was selling bogus Leads.

467.    The association-in-fact enterprise also includes the businesses and persons utilized by HomeAdvisor to collect monies from HSPs for the bogus Leads, including CMI, GGR, Phoenix Financial Services, LLC, MBW, and John Does.

468.    The association-in-fact enterprise also includes the businesses and persons, that utilize the HSPs' business names and identities to divert business away from the Lanham Act Class Members.

469.    The RICO Defendants, aided and abetted by the RICO Non-Parties, conducted and participated, directly or indirectly in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the RICO, 18 U.S.C. § 1962 (c).

470.    The members of the RICO enterprise all had a common purpose: to generate revenue through HomeAdvisor by signing up HSPs, and generating sham Leads and collecting money from HSPs for sham Leads. The foregoing misconduct, as alleged *supra,* was done at HomeAdvisor's direction and with the RICO enterprise's full knowledge.

471.    Moreover, the RICO enterprise was also forged by the relationships among those associated with it.  As described *supra,* HomeAdvisor contracted with various third-parties that gathered and sold HomeAdvisor the sham Leads and the Lanham Act Defendants utilized the names and likeness of the Lanham Act Class Members to create Leads for HomeAdvisor. HomeAdvisor purchased or otherwise used fraudulent means to acquire, and then sold to unsuspecting HSPs bogus Leads that were not of the quality and nature represented to the HSPs, and then used other third parties to improperly pursue the defrauded HSPs to collect fabricated "debt" from them.

472.    This RICO enterprise has remained in existence for several years, enabling its members to pursue the enterprise's purpose. The RICO Defendants and RICO Non-Parties conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that began in at least 2012 and continues through the present and has consisted of hundreds of thousands (or millions) of acts of wire fraud under 18 U.S.C. § 1343.

**B.    Wire Fraud.**

473.    As alleged in ¶¶53-387, HomeAdvisor engaged in a scheme or artifice to defraud HSPs by charging them for a sham product, including bogus Leads.

474.    Wire services, including internet, telephone and email were used in furtherance of the scheme.  The use of the wire services to further the scheme was known by the RICO Defendants and it was reasonably foreseeable that wire services would be used for the purpose of signing up

HSPs, collecting their payment information, charging them for the Leads, directing internet traffic to HomeAdvisor, acquiring and selling Leads to HomeAdvisor, and pursing HSPs with debt collectors

475.    Defendants have repeatedly violated the federal wire fraud statutes, which have all occurred during the Class Period, including:

(a)    Contacting HSPs about the HomeAdvisor products by telephone, email and text messages;

(b)    Maintaining a website, Homeadvisor.com, that informed HSPs about the membership programs and the Leads;

(c)    Collecting payment information from HSPs over the phone and by email for Membership Program and Lead fees;

(d)    Generating bogus Leads through websites and telephone;

(e)    Sending the bogus Leads to the HSPs by email and text message;

(f)    Charging HSPs' credit cards, and deducting automatically from HSPs' bank accounts, fees and costs for bogus Leads, mHelpDesk, membership programs and debt collection;

(g)    Providing over the phone and email, false information about the Leads to the HSPs;

(h)    Use of websites and emails of third parties to generate Leads that would be used in furtherance of the scheme;

(i)    Use of websites to misappropriate HSPs names and likenesses to generate Leads for HomeAdvisor;

(j)    Use of emails, phone and website to prevent HSPs from cancelling their membership and Leads and from disputing the propriety of a Lead in order to secure a refund; and,

(k)    Communications with third-parties, including the members of the enterprise, with

174

respect to buying and bidding on the Leads through the internet and email.

476.   As part of and in furtherance of the scheme to defraud, HomeAdvisor, and the John Does would receive documents and information by telephone and/or email from the HSPs with respect to the membership programs, mHelpDesk and the Leads.

477.   As part of and in furtherance of the scheme to defraud, HomeAdvisor, ANGI and John Does would intentionally misstate by telephone and/or email the nature and quality of the products for which the HSPs were charged.

C.   **Pattern of Racketeering**

478.   The thousands of violations constitute a pattern of racketeering. They are related in that they share the same purpose of defrauding HSPs and involve the same participants, victims, and methods of commission. And, because the RICO Defendants' large-scale criminal activities occurred over a period of several years and are continuing unabated, they amount to or pose a threat of continued criminal activity.

479.   Each of the RICO Defendants associated with the RICO enterprise knew of the existence of the enterprise and its related activities. IAC and ANGI, through their designated officers and employees, devised the scheme and coordinated with HomeAdvisor to carry it out. The RICO Defendants' and RICO Non-Parties employees oversaw, directed, and managed various aspects of the scheme, including commanding that sales persons employ the unscrupulous methods alleged herein to retain and secure payment information from HSPs, to misstate, omit material information about the Leads when communicating with HSPs, and to generate bogus Leads to sell to the HSPs, and pursuing HSPs with debt collection actions.

480.   The RICO Defendants and their employees conducted and participated in the affairs of the RICO enterprise through a pattern of racketeering activity. IAC, ANGI and HomeAdvisor

and their employees participated in the enterprise's decision-making or were plainly integral to carrying out the scheme to defraud.

481.    As part of their participation, the RICO Defendants knowingly and intentionally transmitted or caused to be sent, emailed, or transmitted fraudulent solicitations and information in interstate or foreign commerce. The fraudulent information constituted numerous and repeated violations of the federal wire fraud statutes in violation of 18 U.S.C. §§ 1341, 1343, as well as a pattern of racketeering activity in violation of 18 U.S.C. §§ 1961 (1), 1962 (c).

482.    The RICO Defendants knew, or at a minimum were reckless in not knowing, that the information was misleading, deceptive, and/or false when transmitted.

483.    The RICO Defendants' conduct and pattern of racketeering activity foreseeably and proximately caused damages to Plaintiffs and to members of the Nationwide Class.  Those damages include: wrongful payment for the Leads, the membership programs and mHelpDesk, wrongful collection proceedings and harm to credit, and wrongful misappropriation of HSP business names and identities.

### COUNT II
### Fraud/Fraudulent Concealment
### (On Behalf of the Nationwide Class)

484.    Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

485.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

486.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

487.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts

concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee. HomeAdvisor concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

488.    HomeAdvisor and ANGI knew that Plaintiffs and Nationwide Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Nationwide Class to act, *i.e.* to pay for a membership programs to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

489.    The representations about the Leads and the omissions about the Leads were material to Plaintiffs, such that, had Plaintiffs known that the representations were false and HomeAdvisor had omitted material information, Plaintiffs would not have purchased a membership programs and provided HomeAdvisor and ANGI with the means to charge their credit

card and/or debit their bank accounts. But Plaintiffs and the Nationwide Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor.

490. Plaintiffs and the members of the Nationwide Class had no way of knowing that HomeAdvisor's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiffs and the members of the Nationwide Class did not, and could not, unravel HomeAdvisor's deception on their own.

491. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiffs and the members of the Nationwide Class would rely upon the false representations.

492. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiffs and members of the Nationwide Class that, despite its affirmative representations about the services, including the Leads, it would charge Plaintiffs and the members of the Nationwide Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiffs and the members of the Nationwide Class would act.

493. As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiffs and the members of the Nationwide Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

494. HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Nationwide Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## Aiding and Abetting Fraud/Fraudulent Concealment
## (On Behalf of the Nationwide Class)

495.     Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

496.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280 and 389-426.

497.     HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiffs and the Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

498.     As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, IAC knew (or should have known) that the Leads were not of the nature and quality that HomeAdvisor and ANGI advertised. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of membership programs and Leads.

499.     IAC knew that Plaintiffs and Nationwide Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Nationwide Class to act, *i.e.* to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which

HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

500.     IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI,



utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor,

501.

502.     Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiffs and the Nationwide Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

503.     IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Nationwide Class' rights and well-being

to enrich IAC.

**COUNT IV**
**Unjust Enrichment/Restitution**
**(Against All Defendants On Behalf Of The Nationwide Class)**

504.    Plaintiffs repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

505.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

506.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280 and 289-426.

507.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387 and 411-426.

508.    CDVM and VentureStreet are named as Defendants in this Count by virtue of their conduct summarized as follows and as set forth in ¶¶ 24, 25, 86, 88, 115-121 and 159 *supra*. As to CDVM and VentureStreet, Count IV is asserted against them solely by Plaintiffs Airquip, Inc., Charles Costello, Bruce Filipiak, Kourtney Ervine, Hans Hass, and Lisa LaPlaca, with respect to leads that are the subject of CDVM's and VentureStreet's revenue share agreement with the other Defendants for which CDVM and/or VentureStreet retained a benefit, as alleged herein.

509.    CraftJack is named as a Defendant in this Count by virtue of its conduct summarized as follows and as set forth in ¶¶ 26, 86, 88, 109-114, 115-121, 159 and 410 *supra*.  As to CraftJack, Count IV is asserted against them solely by Plaintiffs Airquip, Inc., Anthony Bauman, Charles Costello, Nicole Gray, Hans Hass, Lisa LaPlaca and Brad and Linda McHenry, with respect to leads that are the subject of CraftJack's revenue share agreement with HomeAdvisor for

181

which CraftJack retained a benefit, as alleged herein.

510. As the intended and expected result of their conscious wrongdoing, and with the assistance of the RICO Non-Parties, the Unjust Enrichment Defendants have profited and benefited from Plaintiffs and the Nationwide Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

511. The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiffs and the Nationwide Class were not receiving services or Leads of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

512. The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs and the Nationwide Class, at the expense of these parties.

513. Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiffs and members of the Nationwide Class, as alleged herein.

514. Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon them by Plaintiffs and the members of the Nationwide Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiffs and members of the Nationwide Class, as ordered by the Court.

**California**

## COUNT V
### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*
### (On Behalf Plaintiffs Seldner and LaPlaca and the California Class)

515.    Plaintiffs Seldner and LaPlaca repeat and reallege the allegations above as if fully set forth herein.

516.    Plaintiffs Seldner and LaPlaca bring this claim on behalf of themselves and the California Class.

517.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

518.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

519.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

520.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

521.    HomeAdvisor's, ANGI's and IAC's conduct, as described herein, was and is in violation of the UCL.  HomeAdvisor, ANGI and IAC have engaged in "unfair" business practices ways and/or acts by, among other things, falsely representing the quality and nature of the Leads; failing to disclose the cost of mHelpDesk; and misrepresenting the availability of refunds and/or credits.

522.    HomeAdvisor, ANGI and IAC have engaged in unfair competition and unfair, unlawful or fraudulent business practices by their conduct, statements, and omissions described above.  In addition, HomeAdvisor, ANGI and IAC have engaged in unfair competition by

engaging in fraud and deceit.

523.     The acts engaged in by HomeAdvisor, ANGI and IAC are fraudulent and show a pattern of untruthful statements, false representations, concealment, intent to mislead, and a conspiracy to defraud that were all part of a scheme to mislead.

524.     These acts and practices have deceived Plaintiffs Seldner and LaPlaca and are likely to deceive the public.  HomeAdvisor's, ANGI's and IAC's violations of the UCL caused injuries to Plaintiffs Seldner and LaPlaca and members of the California Class.

525.     The injuries suffered by Plaintiffs Seldner and LaPlaca and members of the California Class are greatly outweighed by any potential countervailing benefit to consumers or to competition.  Nor are the injuries that Plaintiffs Seldner and LaPlaca and the California Class members should have or could have reasonably avoided.

526.     HomeAdvisor's, ANGI's and IAC's representations and acts as set out above induced Plaintiffs Seldner and LaPlaca and other similarly situated members of the California Class to pay the amounts charged by HomeAdvisor, ANGI and IAC allowing them to collect sums never agreed to by customers. Plaintiffs Seldner and LaPlaca reserve the right to identify additional violations by HomeAdvisor, ANGI and IAC as may be established through discovery.

527.     As a direct and legal result of its unlawful, unfair, and fraudulent conduct described above, Defendants have been unjustly enriched.  Specifically, HomeAdvisor, ANGI and IAC have been unjustly enriched by the receipt of large sums of ill-gotten gains from the deceptive and excess monthly charges they have levied on customers.

528.     Pursuant to California Business and Professions Code section 17203, Plaintiffs Seldner and LaPlaca seek an order of this court:

(a)     Compelling HomeAdvisor, ANGI and IAC to make restitution to Plaintiff Seldner

and LaPlaca and the California Class for all funds unlawfully, unfairly, or fraudulently obtained by HomeAdvisor, ANGI and IAC as a result of its violations of California Business and Professions Code section 17200 *et seq.*;

(b)     Declaring that HomeAdvisor, ANGI and IAC have violated the provisions of California Business & Professions Code section 17200, and California Business and Professions Code section 17500, and any other statutory violations; and

(c)     Enjoining and restraining HomeAdvisor, ANGI and IAC from charging and collecting additional unauthorized monthly charges from customers.

529.     In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs Seldner and LaPlaca seek to recover attorney fees under (i) section 1021.5 of the Code of Civil Procedure and/or (ii) the "common fund" doctrine available to a prevailing plaintiff who wins restitutionary relief for the general public.

### COUNT VI
### False and Misleading Advertising,
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### (On Behalf Plaintiffs Seldner and LaPlaca and the California Class)

530.     Plaintiffs Seldner and LaPlaca repeat and reallege the allegations above as if fully set forth herein.

531.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

532.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

533.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

534.     Plaintiffs Seldner and LaPlaca brings this claim on behalf of themselves and the California Class for violations of the California Business & Professions Code § 17500, which states, in relevant part:

> It is unlawful for any . . . corporation . . . with intent directly or indirectly to or to perform services to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or . . . any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, . . . or . . . not to sell that personal property or those services. . . as so advertised.

Cal. Bus. & Prof. Code § 17500.

535.     HomeAdvisor, ANGI and IAC caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to HomeAdvisor, ANGI and IAC, to be untrue and misleading Plaintiffs Seldner and LaPlaca and the other members of the California Class.

536.     HomeAdvisor, ANGI and IAC have violated § 17500 because their misrepresentations and omissions regarding the nature and quality of the membership programs, including the nature and quality of the Leads, the inclusion of mHelpDesk in the membership programs and the prices charged for mHelpDesk, and their policies and practices relating to Lead generation and dissemination to HSPs detailed in this Complaint were material and likely to deceive a reasonable consumer.

537.     Plaintiffs Seldner and and LaPlaca the other members of the California Class have

suffered an injury in fact, including the loss of money or property, as a result of HomeAdvisor's ANGI's and IAC's unfair, unlawful, and/or deceptive practices. In choosing to buy a membership program or Leads from HomeAdvisor, ANGI and IAC, Plaintiffs Seldner and LaPlaca and the other members of the California Class relied on the misrepresentations and/or omissions of HomeAdvisor, ANGI and IAC with respect to the price they would pay, the nature and quality of the Leads sold by HomeAdvisor and ANGI, and HomeAdvisor's and ANGI's adherence to the parameters and limits the HSPs established for their membership program. Had Plaintiffs Seldner and LaPlaca and the other members of the California Class known the true facts, they would not have agreed to buy a membership program or Leads from HomeAdvisor, ANGI and IAC, remained HomeAdvisor customers, and/or paid as much for a membership program or Leads. Accordingly, Plaintiffs Seldner and LaPlaca and the other members of the California Class overpaid and did not receive the benefit of their bargain.

538.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of HomeAdvisor's, ANGI's and IAC's business. HomeAdvisor's and ANGI's wrongful conduct is part of a pattern or generalized course of conduct that was perpetuated and repeated, both in the State of California and nationwide.

539.     Plaintiffs Seldner and LaPlaca, on behalf of themselves and the California Class, seek restitution, and injunctive relief under §§ 17500, *et seq*.

### COUNT VII
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)

540.     Plaintiffs Seldner and LaPlaca repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

541.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 53-339.

542.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

543.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the membership programs– including that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature and quality that was advertised and that Leads and mHelpDesk were part of the membership programs for additional fees. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of Membership Programs and Leads.

544.    HomeAdvisor and ANGI knew that Plaintiffs Seldner and LaPlaca and California Class Members relied upon such material representations about the membership programs, and HomeAdvisor and ANGI omitted material information and/or made such material representations about the benefits of the membership programs to induce Plaintiffs Seldner and LaPlaca and members of the California Class to act.  Moreover, to pay for the membership program, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.  Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material

to the HSPs.

545. The representations about the membership programs and the omissions about the Leads were material to Plaintiffs Seldner and LaPlaca, such that, had Plaintiffs Seldner and LaPlaca known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiffs Seldner and LaPlaca would not have purchased a membership program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts. But Plaintiffs Seldner and LaPlaca and the California Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor.

546. Plaintiffs Seldner and LaPlaca and the members of the California Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiffs Seldner and LaPlaca and the members of the California Class did not, and could not, unravel HomeAdvisor's deception on their own.

547. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiffs Seldner and LaPlaca and the members of the California Class would rely upon the false representations.

548. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiffs Seldner and LaPlaca and members of the California Class that, despite its affirmative representations about the services, including the membership programs and Leads, it would charge Plaintiffs Seldner and LaPlaca and the members of the California Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiffs Seldner and LaPlaca and the members of the California Class would act.

549.     As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiffs Seldner and LaPlaca and the members of the California Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

550.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs Seldner's  and LaPlaca's and the California Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT VIII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)

551.     Plaintiffs Seldner and LaPlaca repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

552.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280 and 389-426.

553.     HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiffs Seldner and LaPlaca and the California Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

554.     As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the membership programs including that the Leads were not from serious, project-ready homeowners and were sent to more

than four HSPs. Specifically, IAC knew (or should have known) that the membership programs were not of the nature and quality that HomeAdvisor and ANGI advertised and that Leads and mHelpDesk were part of the membership programs for additional fees. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of Membership Programs and Leads.

555. IAC knew that Plaintiffs Seldner and LaPlaca and California Class Members relied upon such material representations about the membership programs, and that HomeAdvisor and ANGI omitted material information and/or made such material representations about the benefits of the membership programs to induce Plaintiffs Seldner and LaPlaca and members of the California Class to act. Moreover, to pay for the membership programs, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

556. IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

557.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and omissions to sell the membership programs and Leads, to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

558.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiffs Seldner and LaPlaca and the California Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the membership programs, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

559.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs Seldner's and LaPlaca's and the California Class' rights and well-being to enrich IAC.

**COUNT IX**
**Breach Of Implied Contract**
**(On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)**

560.    Plaintiffs Seldner and LaPlaca repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

561.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

562.    Plaintiffs Seldner and LaPlaca and the members of the California Class paid money to HomeAdvisor in exchange for membership programs, including Leads and mHelpDesk.

563.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to provide Plaintiffs Seldner and LaPlaca and HSPs marketing tools and, if

192

desired, Leads that were from targeted, serious, qualified and/or project-ready homeowners.

564.    Plaintiffs Seldner and LaPlaca and the members of the California Class paid an annual fee to join a HomeAdvisor membership program and were charged hundreds and thousands of dollars for Leads.

565.    The sale of HomeAdvisor's Lead services were misrepresented to Plaintiffs Seldner and LaPlaca and the members of the California Class.  Furthermore, HomeAdvisor's Leads and Lead generation process systemically flawed, and are not comprised of targeted, serious, qualified and project-ready homeowners.

566.    The Leads were not of the nature and quality of the Leads that were represented and required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the HSPs that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged HSPs for Leads that have been sent to more than four HSPs and for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

567.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiffs Seldner and LaPlaca and members of the California Class.

568.    As a result, Plaintiffs Seldner and LaPlaca and members of the California Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

### COUNT X
### Unjust Enrichment/Restitution
### (On Behalf of Plaintiffs Seldner and LaPlaca and the California Class)

569.     Plaintiffs Seldner and LaPlaca repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

570.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

571.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

572.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

573.     As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiffs Seldner's and LaPlaca's and the California Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

574.     The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiffs Seldner and LaPlaca and the California Class were not receiving services of the quality, nature, fitness, or value that had been represented by the Unjust Enrichment Defendants, and that a reasonable consumer would expect.

575.     The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs Seldner and LaPlaca and the California Class, at the expense of these parties.

576.     Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants

to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiffs Seldner and LaPlaca and members of the California Class, as alleged herein.

577.   Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon them by Plaintiffs Seldner and LaPlaca and the members of the California Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiffs Seldner and LaPlaca and members of the California Class, as ordered by the Court.

### Colorado

## COUNT XI
### Violations of Colorado Consumer Protection Act ("CCPA"),
### Colo. Rev. Stat. § 6-1-101, *et seq.*
### (On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)

578.   Plaintiffs Brad and Linda McHenry repeat and reallege the allegations above as if fully set forth herein.

579.   HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

580.   ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

581.   Plaintiffs Brad and Linda McHenry bring this claim on behalf of themselves and the Colorado Class.

582.   Plaintiffs Brad and Linda McHenry are informed and believe, and thereon allege, that HomeAdvisor and ANGI engaged in extensive marketing, advertising and selling, including, but not limited to, electronic media, television, internet and direct marketing through their agents, to promote and sell its membership programs and ProLeads.

583.     HomeAdvisor and ANGI characterized the Leads as:  from targeted, serious, qualified and project ready homeowners; qualified new business opportunities (Pro Leads) to keep your pipeline full; from 'ready-to-buy' customers; targeted prospects and highly targeted prospects; from project ready homeowners; from homeowners actively seeking the services; from qualified homeowners; from serious homeowners; and being sent only to up to four HSPs. *See supra* ¶¶ 57-61.  But, the Leads are not as HomeAdvisor and ANGI  represented or of the quality and nature of what Plaintiffs Brad and Linda McHenry and the Colorado Class paid for because HomeAdvisor and ANGI maintain and employ systemically flawed and deficient processes to generate Leads, and send and charge HSPs for Leads that were not of such nature and quality.

584.     In addition, HomeAdvisor and ANGI concealed and omitted material information about: (a) the nature of the membership programs; (b) the Leads, including the true source and nature of the Leads, in that, *inter alia*, the Leads were generated through methods that could not and did not provide the Leads as advertised; and, (c) that substantial monthly fees would be charged to the HSPs for mHelpDesk.

585.     HomeAdvisor and ANGI also systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.

586.     HomeAdvisor and ANGI employed tactics that prevented or discouraged HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

587.     HomeAdvisor and ANGI had knowledge that the Leads and their practices and services were contrary to what the HSPs had paid over $763 million for in 2017 alone.

588.     HomeAdvisor's and ANGI's failure to disclose and instead to conceal the foregoing facts was intended to and induced the McHenry Plaintiffs and the members of the Colorado Class

to pay millions of dollars for membership programs, including Leads and mHelpDesk.

589.    This cause of action is brought on behalf of Plaintiffs Brad and Linda McHenry and all similarly situated members of the Colorado Class, pursuant to COLO. REV. STAT. § 6-1-105(e), (g), (i), (l), (n) and (u), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

*        *        *

(e) Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith;

*        *        *

(g)  Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another;

*        *        *

(i) Advertises goods, services, or property with intent not to sell them as advertised;

*        *        *

(l)  Makes false or misleading statements of fact concerning the price of goods, services, or property or the reasons for, existence of, or amounts of price reductions;

*        *        *

(n)  Employs "bait and switch" advertising, which is advertising accompanied by an effort to sell goods, services, or property other than those advertised or on terms other than those advertised and which is also accompanied by one or more of the following practices:

*        *        *

(III)  Requiring tie-in sales or other undisclosed conditions to be met prior to selling the advertised goods, property, or services;

*        *        *

(u)  Fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

590.    In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

591.    HomeAdvisor's and ANGI's deceptive practices occurred in the course of

HomeAdvisor's business, vocation or occupation.

592. HomeAdvisor's and ANGI's misconduct significantly impacts the public as actual or potential consumers of the HomeAdvisor's and ANGI's services described herein. The deceptive marketing, advertising and selling through electronic media, television, internet and direct marketing were directed to the market generally resulting in deception of actual and prospective purchasers.

593. The wrongdoing alleged herein has a significant public impact. Among other things: as of December 31, 2017, HomeAdvisor's network of HSPs consisted of approximately 181,000 paying Service Professionals in the United States, who provided services ranging from home repairs to larger home remodeling projects to thousands of homeowners nationwide; HomeAdvisor and ANGI are sophisticated and have superior bargaining power over the HSPs, as well as the homeowners, who are affected by the deceptive and false practices challenged herein; and, the wrongdoing has impacted HSPs, causing them substantial monetary damages, and has the significant potential to do so in the future.

594. HomeAdvisor's and ANGI's deceptive practices caused damage to Plaintiffs Brad and Linda and all Colorado Class Members. Because of HomeAdvisor's and ANGI's unfair, deceptive and fraudulent business practices, Plaintiffs Brad and Linda McHenry and the Colorado Class Members suffered and continue to suffer injuries by way of monetary loss.

595. In all respects, the foregoing constitutes deceptive trade practices by HomeAdvisor and ANGI. HomeAdvisor and ANGI committed deceptive acts and practices, and omitted material information, which have a capacity, tendency, and/or likelihood to deceive or confuse reasonable HSPs in that such consumers had a good faith basis for believing that (a) the Leads were generated, marketed, distributed and charged to the HSPs in a reliable and honest manner; (b) they would not

be charged for mHelpDesk; and (c) they would be able to control the Leads, as well as suspend or cancel receipt of and being charged for the Leads.  Instead, the McHenry Plaintiffs and the members of the Colorado Class were and were likely to be deceived by HomeAdvisor, as set forth herein.

596.    Plaintiffs Brad and Linda McHenry therefore seeks an order of this Court:

a.      Enjoining HomeAdvisor and ANGI from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to their marketing, distribution, taking of monies for, and the management of Leads, Membership Programs, mHelpDesk, Lead management, requests for refunds, and requests for suspension or cancellation of involvement in a Membership Program, Leads and mHelpDesk, in such manner as set forth in detail above;

b.      Requiring HomeAdvisor and ANGI to cease business practices that generate and charge for unqualified Leads;

c.       Enjoining HomeAdvisor and ANGI from representing that the Leads are qualified and of similar nature and quality, when they are not;

d.      Requiring HomeAdvisor and ANGI to cease charging for mHelpDesk without written, clear confirmation of a HSP's knowledge of the service and attendant charges, and his/her/its acceptance of such service and charges; and

e.      Enjoining HomeAdvisor and ANGI from initiating and proceeding with any collection action against Plaintiffs and the members of the Class.

597.    Plaintiffs Brad and Linda McHenry and the members of the Colorado Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and/or deceptive acts and practices of HomeAdvisor and ANGI, as described above, present a serious threat to the McHenry Plaintiffs and the members of the Colorado Class.

## COUNT XII
## Fraud/Fraudulent Concealment
### (On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)

598.    Plaintiffs Brad and Linda McHenry repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

599.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

600.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

601.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including that nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

602.    HomeAdvisor and ANGI knew that the McHenry Plaintiffs and Colorado Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce the McHenry Plaintiffs and members of the Colorado Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit all

Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

603.    The representations about the Leads and the omissions about the Leads were material to the McHenry Plaintiffs, such that, had the McHenry Plaintiffs known that the representations were false and HomeAdvisor had omitted material information, the McHenry Plaintiffs would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.  But the McHenry Plaintiffs and the Colorado Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

604.    Plaintiffs Brad and Linda McHenry and the members of the Colorado Class had no way of knowing that HomeAdvisor's and AGNI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiffs Brad and Linda McHenry and the members of the Colorado Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

605.    HomeAdvisor and ANGI knew its statements were false, and intended that the McHenry Plaintiffs and the members of the Colorado Class would rely upon the false representations.

606.    HomeAdvisor and ANGI concealed and failed to disclose to the McHenry Plaintiffs and members of the Colorado Class that, despite its affirmative representations about the membership programs, including the Leads, it would charge the McHenry Plaintiffs and the

members of the Colorado Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that the McHenry Plaintiffs and the members of the Colorado Class would act.

607.     As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, the McHenry Plaintiffs and the members of the Colorado Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

608.     HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the McHenry Plaintiffs' and the Colorado Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XIII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Brad and Linda McHenry and the Colorado Class)

609.     Plaintiffs Brad and Linda McHenry repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

610.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

611.     HomeAdvisor and ANGI committed fraud resulting in injury to the McHenry Plaintiffs and the Colorado Class, as alleged herein. IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

612.     As a result of its control over and direction of HomeAdvisor's day-to-day business

operations, IAC knew or was aware that HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and the inclusion of and cost associated with mHelpDesk. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of Membership Programs and Leads.

613.    IAC knew that the McHenry Plaintiffs and Colorado Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce the McHenry Plaintiffs and members of the Colorado Class to act, *i.e.* to pay for a membership program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

614.    IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead

generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

615.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless chose to maintain policies that enabled and assisted the fraud.

616.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on the McHenry Plaintiffs and the Colorado Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

617.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the McHenry Plaintiffs' and the Colorado Class' rights and well-being to enrich IAC.

**COUNT XIV**
**Breach Of Implied Contract**
**(On Behalf of Plaintiffs Brad and Linda McHenry and the Colorado Class)**

618.    Plaintiffs Brad and Linda McHenry repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

619.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

620.    Plaintiffs Brad and Linda McHenry and the members of the Colorado Class paid

money to HomeAdvisor in exchange for Leads.

621.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge the McHenry Plaintiffs and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

622.    The McHenry Plaintiffs and the members of the Colorado Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

623.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

624.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads. HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged the McHenry Plaintiffs and the members of the Colorado Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs. Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs. Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

625.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and the McHenry Plaintiffs and members of the Colorado Class.

626.    As a result, the McHenry Plaintiffs and members of the Colorado Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the

breach by HomeAdvisor.

## COUNT XV
### Unjust Enrichment/Restitution
### (On Behalf Of Plaintiffs Brad and Linda McHenry and the Colorado Class)

627.    Plaintiffs Brad and Linda McHenry repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

628.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

629.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

630.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

631.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from the McHenry Plaintiffs' and the Colorado Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

632.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiffs Brad and Linda McHenry and the Colorado Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

633.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to the McHenry Plaintiffs and the Colorado

Class, at the expense of these parties.

634. Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against the McHenry Plaintiffs and members of the Colorado Class, as alleged herein.

635. Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon them by the McHenry Plaintiffs and the members of the Colorado Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to the McHenry Plaintiffs and members of the Colorado Class, as ordered by the Court.

**Florida**

**COUNT XVI**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §501.201, *et seq.* ("DUTPA")**
**(On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class)**

636. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

637. Plaintiffs DaSilva and Ervine bring this Count individually and on behalf of the Florida Class.

638. HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

639. ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

640. IAC is named as a Defendants in this Count by virtue of its conduct as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

641.     The Florida Deceptive and Unfair Trade Practices Act ("DUTPA"), Fla. Stat. § 501.201, *et seq.*, makes unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

642.     As amended by the Florida Legislature in 2001, a "person" who has suffered a loss as a result of a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") has standing to sue under that statute. *See* Fla. Stat. § 501.211(2). This 2001 amendment replaced the word "consumer" with "person." Plaintiffs DaSilva and Ervine and the Florida Class members are "persons" within the meaning of the FDUTPA.

643.     As set forth herein, HomeAdvisor, ANGI and IAC engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the FDUPTA by willfully failing to disclose and actively concealing material facts regarding the true nature of the membership programs, including the quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk. Accordingly, HomeAdvisor, ANGI and IAC engaged in deceptive trade practices, including knowingly making false and misleading statements and/or omitting material information of the true nature membership programs, including the quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised. HomeAdvisor, ANGI and IAC intentionally concealed the foregoing from Plaintiffs DaSilva and Ervine and the Florida Class; and/or HomeAdvisor, ANGI and IAC made incomplete representations about the Leads while purposefully withholding and omitting material facts from Plaintiffs DaSilva and Ervine and the Class that contradicted these representations.

644.     Under the FDUTPA, § 501.211(2) and § 501.2105, Plaintiffs DaSilva and Ervine and the Florida Class are entitled to actual damages, injunctive relief and attorney's fees and costs.

## COUNT XVII
### Fraud/Fraudulent Concealment
### On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class)

645.    Plaintiffs DaSilva and Ervine repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

646.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

647.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

648.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

649.    HomeAdvisor and ANGI knew that Plaintiffs DaSilva and Ervine and Florida Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs DaSilva and Ervine and members of the Florida Class to act, *i.e.* to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit

all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

650. The representations about the Leads and the omissions about the Leads were material to Plaintiffs DaSilva and Ervine, such that, had Plaintiffs DaSilva and Ervine known that the representations were false and HomeAdvisor and ANGI have omitted material information, Plaintiffs DaSilva and Ervine would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts. But Plaintiffs DaSilva and Ervine and the Florida Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

651. Plaintiffs DaSilva and Ervine and the members of the Florida Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiffs DaSilva and Ervine and the members of the Florida Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

652. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiffs DaSilva and Ervine and the members of the Florida Classes would rely upon the false representations.

653. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiffs DaSilva and Ervine and members of the Florida Class that, despite its affirmative representations about the services, including the Leads, it would charge Plaintiffs DaSilva and Ervine and the members of

the Florida Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiffs DaSilva and Ervine and the members of the Florida Class would act.

654.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiffs DaSilva and Ervine and the members of the Florida Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

655.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs DaSilva's and Ervine's and the Florida Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XVIII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff DaSilva and Ervine and the Florida Class)

656.    Plaintiffs DaSilva and Ervine repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

657.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

658.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff DaSilva and Ervine and the Florida Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

659.    As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made

misrepresentations of material facts concerning the nature of the membership programs – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of membership programs and Leads.

660. IAC knew that Plaintiffs DaSilva and Ervine and the Florida Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Florida Class to act, i.e. to pay for a membership program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

661. IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead

generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

662.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

663.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff DaSilva and Ervine and the Florida Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

664.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff DaSilva's and Ervine's and the Florida Class' rights and well-being to enrich IAC.

**COUNT XIX**
**Breach Of Implied Contract**
**(On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class)**

665.    Plaintiffs DaSilva and Ervine repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

666.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

667.    Plaintiffs DaSilva and Ervine and the members of the Florida Class paid money to

HomeAdvisor in exchange for Leads.

668.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiffs DaSilva and Ervine and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

669.    Plaintiffs DaSilva and Ervine and the members of the Florida Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

670.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

671.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiffs DaSilva and Ervine and the members of the Florida Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

672.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiffs DaSilva and Ervine and members of the Florida Class.

673.    As a result, Plaintiffs DaSilva and Ervine and members of the Florida Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of

the breach by HomeAdvisor.

## COUNT XX
### Unjust Enrichment/Restitution
### (On Behalf of Plaintiffs DaSilva and Ervine and the Florida Class)

674.    Plaintiffs DaSilva and Ervine repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

675.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

676.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

677.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

678.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiffs DaSilva and Ervine and the Florida Class' purchase of the Membership Programs and payment for the Leads and mHelpDesk.

679.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiffs DaSilva and Ervine and the Florida Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

680.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiffs DaSilva and Ervine and the Florida Class, at the expense of these parties.

681.     Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiffs DaSilva and Ervine and members of the Florida Class, as alleged herein.

682.     Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon them by Plaintiffs DaSilva and Ervine and the members of the Florida Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiffs DaSilva and Ervine and members of the Florida Class, as ordered by the Court.

**Idaho**

## COUNT XXI
### Violations of the Idaho Consumer Protection Act,
### Idaho Civ. Code, § 480, *et seq.*
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

683.     Plaintiff Haukenes realleges and incorporates by reference all paragraphs as though fully set forth herein.

684.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

685.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

686.     HomeAdvisor and ANGI and Plaintiff Haukenes are "persons" under Idaho Civil Code § 48-602(1).

687.     HomeAdvisor and ANGI engaged in unfair methods and practices in the conduct of trade or commerce in violation of the Idaho Consumer Protection Act ("ICPA"), Idaho Civ.

Code § 48-603, including:

      a.     Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

      b.     Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

      c.     Advertising goods or services with intent not to sell them as advertised;

      d.     Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer; or

      e.     Engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

688.     As set forth herein, HomeAdvisor and ANGI engaged in unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the ICPA. HomeAdvisor and ANGI willfully failed to disclose and actively concealed material facts regarding the true nature of the membership programs, including the nature and quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk. Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices, including knowingly making false and misleading statements and/or omitting material information of the true nature of the membership programs, including the nature and quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised. HomeAdvisor and ANGI intentionally concealed the foregoing from Plaintiff Haukenes and the Idaho Class; and/or HomeAdvisor and ANGI made incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class

that contradicted these representations.

689.     HomeAdvisor's and ANGI's misleading, false, or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Haukenes.

690.     As a result of its violations of the ICPA detailed above, HomeAdvisor and ANGI caused actual damage and ascertainable loss to Plaintiff Haukenes.

691.     HomeAdvisor's and ANGI' deliberate, widespread and systematic business practices are so egregious and carried out with such willful and conscious disregard of the rights of its customers that its sales conduct would outrage or offend the public conscience, and is therefore an unconscionable method, act or practice under the ICPA as provided in Idaho Civil Code § 48-603C.

692.     Plaintiff Haukenes seeks punitive damages against HomeAdvisor and ANGI because their violations were repeated and flagrant, conducted over the course of many years, with knowledge of the illegality of the conduct, and therefore warrants the imposition of punitive damages under Idaho Civil Code § 48-608(1).

693.     Plaintiff Haukenes further seeks an order enjoining HomeAdvisor's and ANGI's unfair or deceptive acts or practices, punitive damages, costs of Court, attorney's fees under Idaho Civil Code § 48-608, and any other just and proper relief available under the ICPA.

## COUNT XXII
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

694.     Plaintiff Haukenes repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

695.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

696.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

697.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

698.    HomeAdvisor and ANGI knew that Plaintiff Haukenes and Idaho Class Members relied upon such material representations about the Leads, and HomeAdvisor omitted material information and/or made such material representations to induce Plaintiff Haukenes and members of the Idaho Class to act, *i.e.* to pay for a membership program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit all membership fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

699.    The representations about the Leads and the omissions about the Leads were

material to Plaintiff Haukenes, such that, had Plaintiff Haukenes known that the representations were false and HomeAdvisor had omitted material information, Plaintiff Haukenes would not have purchased a Membership Program and provided HomeAdvisor with the means to charge their credit card and/or debit their bank accounts. But Plaintiff Haukenes and the Idaho Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

700.    Plaintiff Haukenes and the members of the Idaho Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Haukenes and the members of the Idaho Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

701.    HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Haukenes and the members of the Idaho Class would rely upon the false representations.

702.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Haukenes and members of the Idaho Class that, despite its affirmative representations about the membership programs, including the Leads, it would charge Plaintiff Haukenes and the members of the Idaho Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Haukenes and the members of the Idaho Class would act.

703.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Haukenes and the members of the Idaho Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

704.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively,

220

deliberately, with intent to defraud, and in reckless disregard of Plaintiff Haukenes' and the Idaho Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT XXIII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Haukenes and the Idaho Class)

705.    Plaintiffs Haukenes repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

706.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

707.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Haukenes and the Idaho Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

708.    As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee.   IAC aided and abetted

HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of Membership Programs and Leads.

709.    IAC knew that Plaintiff Haukenes and Idaho Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Idaho Class to act, i.e. to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.    Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.    Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

710.    IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

711.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

712.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Haukenes and the Idaho Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

713.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Haukenes' and the Idaho Class' rights and well-being to enrich IAC.

**COUNT XXIV**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Haukenes and the Idaho Class)**

714.    Plaintiff Haukenes repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

715.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

716.    Plaintiff Haukenes and the members of the Idaho Class paid money to HomeAdvisor in exchange for Leads.

717.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Haukenes and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

718.    The Plaintiff Haukenes and the members of the Idaho Class paid an annual fee to join a HomeAdvisor membership program and paid hundreds and thousands of dollars for Leads.

719.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious,

qualified and project-ready homeowners.

720.     The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Haukenes and the members of the Idaho Class for Leads that have been sent to more than four HSPs.  HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

721.     Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Haukenes and members of the Idaho Class.

722.     As a result, Plaintiff Haukenes and members of the Idaho Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT XXV**
**Unjust Enrichment/Restitution**
**(On Behalf of Plaintiff Haukenes and the Idaho Class)**

723.     Plaintiff Haukenes repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

724.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-387.

725.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-

426.

726.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-387, and 411-426.

727.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff Haukenes and the Idaho Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

728.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff Haukenes and the Idaho Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

729.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Haukenes and the Idaho Class, at the expense of these parties.

730.    Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiff Haukenes and members of the Idaho Class, as alleged herein.

731.    Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff Haukenes and the members of the Idaho Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiff Haukenes and members of the Idaho Class, as ordered by the Court.

**Illinois**

## COUNT XXVI
### Violations Of The Illinois Uniform Deceptive
### Trade Practices Act ("Illinois DTPA")
### 815 Ill. Comp. Stat. §§ 510/1, *et seq*.
### (On Behalf of Plaintiff Filipiak and the Illinois Class)

732. Plaintiff Filipiak repeats and realleges the allegations above as if fully set forth herein.

733. HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

734. ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

735. This claim is brought on behalf of Plaintiff Filipiak and the Illinois Class.

736. The Illinois DTPA prohibits deceptive trade practices, including among others,

(a) Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(b) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(c) Representing that goods or services are of a particular standard, quality, or grade if they are of another;

(d) Advertising goods or services with intent not to sell them as advertised; and

(e) Engaging in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

737. HomeAdvisor and ANGI are a "person" as defined in 815 Ill. Comp. Stat. § 510/1(5).

738.     In the course of HomeAdvisor's business, HomeAdvisor and ANGI knowingly or willfully concealed, suppressed or failed to disclose material facts from Plaintiff Filipiak and the members of the Illinois Class and by making affirmative misrepresentations in order to induce Plaintiff Filipiak and members of the Illinois Class to pay for a Membership Program to get access to the Leads.  Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices as defined in 815 Ill. Comp. Stat. § 510/2, including representing that the Leads have characteristics, uses, benefits, and qualities which they do not have; representing that the Leads are of a particular standard and quality when they are not; advertising the Leads with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

739.     HomeAdvisor and ANGI intended for Plaintiff Filipiak and the other Illinois Class members to rely on its aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

740.     HomeAdvisor's and ANGI actions as set forth above occurred in the conduct of trade or commerce.

741.     HomeAdvisor and ANGI knew or should have known that its conduct violated the Illinois DTPA.

742.     HomeAdvisor and ANGI owed Plaintiff a duty to disclose the true nature of the membership programs, including the nature and quality of the Leads and that the HSPs would be signed up and charged for mHelpDesk because HomeAdvisor and ANGI possessed exclusive knowledge of the true nature of the membership programs, including the quality of the quality of the Leads and the charges associated with mHelpDesk and that they did not contain the qualities or characteristics, or perform, as advertised; HomeAdvisor and ANGI intentionally concealed the foregoing from Plaintiff Filipiak and the Illinois Class; and/or HomeAdvisor and ANGI made

227

incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class that contradicted these representations.

743.    HomeAdvisor's and ANGI's conduct and false representations/omissions were material to Plaintiff Filipiak and the Illinois Class.

744.    Plaintiff and the Illinois Class suffered ascertainable loss caused by HomeAdvisor's and ANGI's concealment of and failure to disclose material information. Class members who purchased a Membership Program or Leads either would have paid less for the Membership Program or Leads or would not have purchased a Membership Program or Leads at all but for HomeAdvisor's and ANGI's violations of the Illinois DTPA.

745.    HomeAdvisor and ANGI had an ongoing duty to consumers to refrain from unfair and deceptive acts and practices under the Illinois DTPA. All HSPs who signed up for a Membership Program or purchased Leads suffered ascertainable loss as a result of HomeAdvisor's and ANGI's deceptive and unfair acts and practices made in the course of HomeAdvisor's business.

746.    HomeAdvisor's and ANGI's conduct alleged herein proximately caused injuries to Plaintiff Filipiak and the other Class members.

747.    Plaintiff Filipiak and the other Illinois Class members were injured as a result of HomeAdvisor's and ANGI's conduct in that Plaintiff and the other Class members overpaid for a Membership Program or Leads and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of HomeAdvisor's and ANGI's omissions in violation of the Illinois DTPA.

748.    Pursuant to 815 Ill. Comp. Stat. § 510/3, Plaintiff and the Class are entitled to an award of injunctive relief to prevent HomeAdvisor's and ANGI's deceptive trade practices and,

because HomeAdvisor's and ANGI's conduct was willful, an award of reasonable attorneys' fees.

## COUNT XXVII
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Filipiak and the Illinois Class)

749. Plaintiff Filipiak repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

750. HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

751. ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

752. HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs, were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of Membership Programs and Leads.

753. HomeAdvisor and ANGI knew that Plaintiff Filipiak and Illinois Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Filipiak and members of the Illinois Class to act, *i.e.* to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking /

savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

754.    The representations about the Leads and the omissions about the Leads were material to Plaintiff Filipiak, such that, had Plaintiff Filipiak known that the representations were false and HomeAdvisor had omitted material information, Plaintiff Filipiak would not have purchased a Membership Program and provided HomeAdvisor with the means to charge their credit card and/or debit their bank accounts.   But Plaintiff Filipiak and the Illinois Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor.

755.    Plaintiff Filipiak and the members of the Illinois Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Filipiak and the members of the Illinois Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

756.    HomeAdvisor and ANGI knew its statements were false, and intended that Plaintiff Filipiak and the members of the Illinois Class would rely upon the false representations.

757.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Filipiak and members of the Illinois Class that, despite its affirmative representations about the membership programs, including the Leads, it would charge Plaintiff Filipiak and the members of the Illinois Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material

facts with the intention that Plaintiff Filipiak and the members of the Illinois Class would act.

758.   As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Filipiak and the members of the Illinois Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

759.   HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Filipiak' and the Illinois Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XXVIII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Filipiak and the Illinois Class)

760.   Plaintiffs Filipiak  repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

761.   IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

762.   HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Filipiak and the Illinois Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

763.   As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the membership

231

programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee.  IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of membership programs and Leads.

764.    IAC knew that Plaintiff Filipiak and the Illinois Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Illinois Class to act, i.e. to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.   Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

765.    IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to

HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

766.   IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

767.   Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Filipiak and the Illinois Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

768.   IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Filipiak's and the Illinois Class' rights and well-being to enrich IAC.

## COUNT XXIX
### Breach Of Implied Contract
### (On Behalf of Plaintiff Filipiak and the Illinois Class)

769.   Plaintiff Filipiak repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

770.   HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

771.   Plaintiff Filipiak and the members of the Illinois Class paid money to HomeAdvisor in exchange for Leads.

772.   An implied contract was created between HomeAdvisor and the HSPs whereby

HomeAdvisor was to send and charge Plaintiff Filipiak and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

773.    The Plaintiff Filipiak and the members of the Illinois Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

774.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

775.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Filipiak and the members of the Illinois Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.  Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

776.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Filipiak and members of the Illinois Class.

777.    As a result, Plaintiff Filipiak and members of the Illinois Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**<u>COUNT XXX</u>**
**Unjust Enrichment/Restitution**
**<u>(On Behalf of Plaintiff Filipiak and the Illinois Class)</u>**

778.    Plaintiff Filipiak repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

779.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

780.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

781.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

782.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff Filipiak and the Illinois Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

783.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff Filipiak and the Illinois Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

784.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Filipiak and the Illinois Class, at the expense of these parties.

785.    Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants'

misrepresentations and misconduct against Plaintiff Filipiak and members of the Illinois Class, as alleged herein.

786.    Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff Filipiak and the members of the Illinois Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiff Filipiak and members of the Illinois Class, as ordered by the Court.

**Indiana**

**COUNT XXXI**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Gray and the Indiana Class)**

787.    Plaintiff Gray repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

788.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

789.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

790.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the membership programs, namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs and the inclusion of the mHelpDesk in the Membership Programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads

and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

791.    HomeAdvisor and ANGI knew that Plaintiff Gray and Indiana Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Gray and members of the Indiana Class to act, *i.e.* to pay for a membership program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.  Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

792.    The representations about the Leads and the omissions about the Leads were material to Plaintiff Gray, such that, had Plaintiff Gray known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Gray would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.  But Plaintiff Gray and the Indiana Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

793.    Plaintiff Gray and the members of the Indiana Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that

HomeAdvisor and ANGI had omitted imperative details. Plaintiff Gray and the members of the Indiana Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

794.    HomeAdvisor and ANGI knew its statements were false, and intended that Plaintiff Gray and the members of the Indiana Classes would rely upon the false representations.

795.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Gray and members of the Indiana Class that, despite its affirmative representations about the services, including the Leads, it would charge Plaintiff Gray and the members of the Indiana Class for unqualified Leads and mHelpDesk.  HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Gray and the members of the Indiana Class would act.

796.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Gray and the members of the Indiana Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

797.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Gray's and the Indiana Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT XXXII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Gray and the Indiana Class)

798.    Plaintiffs Gray repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

799.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as

follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

800.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Gray and the Indiana Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

801.    As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee.  IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of Membership Programs and Leads.

802.    IAC knew that Plaintiff Gray and the Indiana Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the Indiana Class to act, i.e. to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.  Then, on a weekly basis,

HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

803. IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

804. IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

805. Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Gray and the Indiana Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

806. IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Gray's and the Indiana Class' rights and well-being to enrich IAC.

### COUNT XXXIII
### Breach Of Implied Contract

**(On Behalf of Plaintiff Gray and the Indiana Class)**

807.     Plaintiff Gray repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

808.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

809.     Plaintiff Gray and the members of the Indiana Class paid money to HomeAdvisor in exchange for Leads.

810.     An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Gray and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

811.     The Plaintiff Gray and the members of the Indiana Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

812.     The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

813.     The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Gray and the members of the Indiana Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.   Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their

membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

814.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Gray and members of the Indiana Class.

815.    As a result, Plaintiff Gray and members of the Indiana Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

## COUNT XXXIV
## Unjust Enrichment/Restitution
## (On Behalf Of Plaintiff Gray and the Indiana Class)

816.    Plaintiff Gray repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

817.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

818.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

819.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

820.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff Gray and the Indiana Class' purchase of the Membership Programs and payment for the Leads and mHelpDesk.

821.    The Unjust Enrichment Defendants have voluntarily accepted and retained these

profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff Gray and the Indiana Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

822.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Gray and the Indiana Class, at the expense of these parties.

823.    Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiff Gray and members of the Indiana Class, as alleged herein.

824.    Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff Gray and the members of the Indiana Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiff Gray and members of the Indiana Class, as ordered by the Court.

**New Jersey**

## COUNT XXXV
### Violations Of The New Jersey Consumer Fraud Act
### N.J.S.A. §§ 56:8-1, *et seq.* ("NJCFA")
### (On Behalf of Plaintiff Costello and the New Jersey Class)

825.    Plaintiff Costello incorporates by reference all preceding allegations as though fully set forth herein.

826.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 53-339.

827. ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

828. Plaintiff Costello bring this Count on behalf of New Jersey Class members.

829. The NJCFA prohibits the use or employment of any deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression or omission in connection with the sale or advertisement of any good or services. .

830. HomeAdvisor and ANGI violated the NJCFA by, at minimum employing deception, deceptive acts or practices, fraud, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of the Membership Programs and Leads.

831. In advertising and selling the Membership Programs containing the bogus Leads, falsely representing the quality and nature of the Leads; failing to disclose the cost of MHelp Desk; and misrepresenting the availability of refunds and/or credits HomeAdvisor and ANGI violated and continues to violate the N.J.S.A. by engaged in unconscionable, false, misleading or deceptive act(s) or practice(s), which were false or had the capacity to deceive.

832. HomeAdvisor's and ANGI's actions as set forth above occurred in the conduct of trade or commerce.

833. HomeAdvisor's and ANGI's unfair or deceptive acts or practices were likely to and did in fact deceive Plaintiff Costello and the New Jersey Class.

834. HomeAdvisor and ANGI intentionally and knowingly omitted material facts regarding the Membership Programs and Leads with an intent to mislead Plaintiff Costello and the

New Jersey Class.

835.     HomeAdvisor and ANGI knew or should have known that its conduct violated the NJCFA.

836.     HomeAdvisor and ANGI owed Plaintiff Costello and the New Jersey Class a duty to disclose the truth about the Membership Programs and quality of the Leads because HomeAdvisor:

a.      Possessed exclusive knowledge of the bogus nature of the Leads;

b.      Intentionally concealed the foregoing from Plaintiff Costello and the New Jersey Class; and/or

c.      Made incomplete representations regarding the Membership Programs and Leads, while purposefully withholding material facts from Plaintiff Costello and the New Jersey Class including with respect to the nature and quality of the Leads.

837.     HomeAdvisor's and ANGI's conduct proximately caused injuries to Plaintiff Costello and the other Class members. Plaintiff and the other New Jersey Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of HomeAdvisor's and ANGI's conduct in that Plaintiff Costello and the other New Jersey Class members overpaid for their Membership Programs and Leads and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of HomeAdvisor's and ANGI's concealment and omissions.

838.     HomeAdvisor's and ANGI's violations present a continuing risk to Plaintiff Costello as well as to the general public. HomeAdvisor's and ANGI's unlawful acts and practices complained of herein affect the public interest.

839.     Pursuant to N.J.S.A. § 56:8-20, Plaintiffs will serve the New Jersey Attorney

General with a copy of this Complaint within 10 days of filing.

**COUNT XXXVI**
**Fraud/Fraudulent Concealment**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

840.    Plaintiff Costello repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

841.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

842.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

843.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised, including the nature and quality of the Leads and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of membership programs and Leads.

844.    HomeAdvisor and ANGI knew that Plaintiff Costello and New Jersey Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Costello and members of the New Jersey Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a

246

checking / savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees. Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

845. The representations about the Leads and the omissions about the Leads were material to Plaintiff Costello, such that, had Plaintiff Costello known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Costello would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts. But Plaintiff Costello and the New Jersey Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

846. Plaintiff Costello and the members of the New Jersey Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Costello and the members of the New Jersey Class did not, and could not, unravel HomeAdvisor's deception on their own.

847. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Costello and the members of the Classes would rely upon the false representations.

848. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Costello and members of the New Jersey Class that, despite their affirmative representations about the membership programs, including the Leads, they would charge Plaintiff Costello and the members of the New Jersey Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI

247

concealed these material facts with the intention that Plaintiff Costello and the members of the New Jersey Class would act.

849.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Costello and the members of the New Jersey Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

850.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Costello's and the New Jersey Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT XXXVII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Costello and the New Jersey Class)

851.    Plaintiffs Costello repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

852.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

853.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff Costello and the New Jersey Class, as alleged herein.  IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

854.    As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made

misrepresentations of material facts concerning the nature of the membership programs, including the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the Membership Programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the membership programs were not of the nature that HomeAdvisor and ANGI advertised, including the nature and quality of the Leads and that mHelpDesk was included in the Membership Programs for an additional monthly fee. IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of Membership Programs and Leads.

855.   IAC knew that Plaintiff Costello and the New Jersey Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiffs and members of the New Jersey Class to act, i.e. to pay for a Membership Program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

856.   IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead

generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

857.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

858.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff Costello and the New Jersey Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

859.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Costello's and the New Jersey Class' rights and well-being to enrich IAC.

### COUNT XXXVIII
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

860.    Plaintiff Costello repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

861.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

862.    Plaintiff Costello and the members of the New Jersey Class paid money to HomeAdvisor in exchange for Leads.

863.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Costello and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

864.    The Plaintiff Costello and the members of the New Jersey Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

865.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

866.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Costello and the members of the New Jersey Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.   Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

867.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Costello and members of the New Jersey Class.

868.    As a result, Plaintiff Costello and members of the New Jersey Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

**COUNT XXXIX**
**Unjust Enrichment/Restitution**
**(On Behalf of Plaintiff Costello and the New Jersey Class)**

869.    Plaintiff Costello repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

870.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

871.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

872.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

873.    As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff Costello and the New Jersey Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

874.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff Costello and the New Jersey Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

875.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Costello and the New Jersey Class, at the expense of these parties.

876.    Equity and good conscience militate against permitting the Unjust Enrichment

Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiff Costello and members of the New Jersey Class, as alleged herein.

877.    Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff Costello and the members of the New Jersey Class is unjust and inequitable, the  Unjust Enrichment Defendants must pay restitution to Plaintiff Costello and members of the New Jersey Class, as ordered by the Court.

### New York

### COUNT XL
**Violations of the New York General Business Law,**
**N.Y. GEN. BUS. LAW § 349**
**(On Behalf of Plaintiff AirQuip and the New York Class)**

878.    Plaintiff AirQuip repeats and realleges the allegations above as if fully set forth herein.

879.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

880.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

881.    Plaintiff AirQuip brings this claim individually and on behalf of the New York Class.

882.    Plaintiff AirQuip and the members of the New York Class who purchased a Membership Program and/or Leads are protected under GBL 349.

883.    HomeAdvisor's and ANGI's practices, acts, policies and course of conduct

violated GBL 349 in that:

a.      HomeAdvisor and ANGI engaged in deceptive acts and practices in or affecting commerce, through its advertisements and representations of the Membership Programs and Leads, by representing to Plaintiff AirQuip and members of the New York Class, among other things, that the Leads were from verified, serious, project-ready homeowners; that they would only be charged for Leads within their geographical area and for services that they provided; that the Leads would be sold to only four HSPs; and that Plaintiff AirQuip and the New York Class could obtain refunds and/or credits for the Leads that did not meet these representations. Such pattern of conduct was uniform in nature with respect to the marketing and sale of the product.

b.      HomeAdvisor and ANGI also knowingly concealed, suppressed and consciously omitted material facts from Plaintiff and other members of the members of the New York Class – such as the hidden fee for mHelpDesk and the bogus nature of the Leads – knowing that HSPs would rely on the advertisements and HomeAdvisor's and ANGI's uniform representations concerning the quality and nature of the Leads and the Membership Programs.

884.    HomeAdvisor's and ANGI's acts and omissions possessed the tendency or capacity to mislead or create the likelihood of deception.

885.    Until the present, HomeAdvisor and ANGI knowingly accepted the benefits of their deception and improper conduct in the form of profits from the sale of the Membership Programs and Leads.

886.    As a proximate result of the above-described the violations of GBL 349, Plaintiff AirQuip and members of the New York Class: (a) purchased and the Membership Programs and Leads when they would not otherwise have done so; (b) suffered economic losses consisting of the cost to purchase the Membership Program and the Lead fees; (c) suffered and/or will suffer

additional economic losses in pursuing the fraudulent Leads; and (d) suffered and will suffer additional economic losses incidental to the HomeAdvisor's and ANGI's fraudulent business practices.

887. As a direct and proximate result of these deceptive commercial practices, Plaintiff AirQuip and the members of the New York Class have been damaged  and are entitled to recover actual damages to the extent permitted by law, including class action rules, measured as the greater of (a) actual damages in an amount to be proven at trial and (b) statutory damages.

888. Plaintiff AirQuip and New York Class Members also seek appropriate equitable relief, including an order requiring HomeAdvisor and ANGI to adequately disclose and remediate the defective Lead generation and verification process, and an order enjoining HomeAdvisor and ANGI from advertising or representing that the Leads are targeted, verified Leads from project-ready homeowners in the future.  Plaintiff AirQuip and the Class also seek attorneys' fees and any other just and proper relief available under GBL 349.

## COUNT XLI
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff AirQuip and the New York Class)

889. Plaintiff AirQuip repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

890. HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

891. ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

892. HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature of the membership programs, namely that the Leads were not from serious,

project-ready homeowners and were sent to more than four HSPs and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, HomeAdvisor and ANGI knew (or should have known) that the membership programs were not of the nature that was advertised and that mHelpDesk was included in the membership programs for an additional monthly fee. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of Membership Programs and Leads.

893.    HomeAdvisor and ANGI knew that Plaintiff AirQuip and New York Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff AirQuip and members of the New York Class to act, *i.e.* to pay for a Membership Program to get access to the Leads.  Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor and ANGI can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

894.    The representations about the Leads and the omissions about the Leads were material to Plaintiff AirQuip, such that, had Plaintiff AirQuip known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff AirQuip would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts.  But Plaintiff AirQuip and the New York

Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

895. Plaintiff AirQuip and the members of the New York Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff AirQuip and the members of the New York Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

896. HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff AirQuip and the members of the New York Class would rely upon the false representations.

897. HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff AirQuip and members of the New York Class that, despite its affirmative representations about the services, including the Leads, it would charge Plaintiff AirQuip and the members of the New York Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff AirQuip and the members of the New York Class would act.

898. As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff AirQuip and the members of the New York Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

899. HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the New York Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct

in the future, which amount is to be determined according to proof.

## COUNT XLII
### Aiding and Abetting Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff AirQuip and the New York Class)

900.    Plaintiffs AirQuip repeats, realleges, and incorporates by reference each of the foregoing allegations as though fully set forth herein.

901.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

902.    HomeAdvisor and ANGI committed fraud resulting in injury to Plaintiff AirQuip and the New York Class, as alleged herein. IAC's conduct alleged herein enabled, substantially assisted, encouraged, and was a substantial factor in the commission of such fraud.

903.    As a result of its control over and direction of HomeAdvisor's day-to-day business operations, IAC knew or was aware that the HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs – and the inclusion of the mHelpDesk in the membership programs and the monthly fees charged for mHelpDesk. Specifically, IAC knew (or should have known) that the Leads were not of the nature and quality that HomeAdvisor and ANGI advertised and that mHelpDesk was included in the membership programs for an additional monthly fee.  IAC aided and abetted HomeAdvisor's and ANGI's concealment of material facts and/or material misrepresentations in order the boost the sales of membership programs and Leads.

904.    IAC knew that Plaintiff AirQuip and New York Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material

information and/or made such material representations to induce Plaintiff AirQuip and members of the New York Class to act, i.e. to pay for a Membership Program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking/savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees. Then, on a weekly basis, HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts. Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

905.    IAC substantially assisted HomeAdvisor and ANGI in the fraudulent conduct by playing an integral role in the operation and success of HomeAdvisor and ANGI, reviewing and approving the retention of third party Lead Generators and purchasing of Leads from lead generators that IAC knew produced poor quality Leads, utilizing its subsidiaries to sell Leads to HomeAdvisor and staff HomeAdvisor, and establishing compensation and incentive plans that encouraged fraudulent sales representations.

906.    IAC had actual knowledge of measures it could have taken to improve the quality of the Leads, to prevent HomeAdvisor and ANGI from utilizing fraudulent misrepresentations and commissions to sell Memberships and Leads, to provide HSPs with accurate information but nevertheless, and instead chose to maintain policies that enabled and assisted the fraud.

907.    Before and during the commission of the fraud, IAC intended to aid and abet, and did substantially assist, HomeAdvisor and ANGI in the fraud perpetrated on Plaintiff AirQuip and the New York Class by making statements about the quality of the Leads in regulatory filings, by concealing material information about the quality and nature of the Leads, and by allowing

HomeAdvisor and ANGI to continue to purchase and generate bogus Leads to sell to HSPs.

908.    IAC's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff AirQuip's and the New York Class' rights and well-being to enrich IAC.

**COUNT XLIII**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff AirQuip and the New York Class)**

909.    Plaintiff AirQuip repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

910.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

911.    Plaintiff AirQuip and the members of the New York Class paid money to HomeAdvisor in exchange for Leads.

912.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff AirQuip and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

913.    The Plaintiff AirQuip and the members of the New York Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

914.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

915.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads.  HomeAdvisor did not generate Leads

for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff AirQuip and the members of the New York Class for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs.  Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs.   Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

916.    Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff AirQuip and members of the New York Class.

917.    As a result, Plaintiff AirQuip and members of the New York Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

### COUNT XLIV
### Unjust Enrichment/Restitution
### (On Behalf Of Plaintiff AirQuip and Hass and the New York Class)

918.    Plaintiff AirQuip repeats, realleges and incorporates by reference each of the foregoing allegations as though fully set forth herein.

919.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

920.    IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

921.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

922.     As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff AirQuip and the New York Class' purchase of the membership programs and payment for the Leads and mHelpDesk.

923.     The Unjust Enrichment defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff AirQuip and the New York Class were not receiving services of the quality, nature, fitness, or value that had been represented by HomeAdvisor, and that a reasonable consumer would expect.

924.     The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff AirQuip and the New York Class, at the expense of these parties.

925.     Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiff AirQuip and members of the New York Class, as alleged herein.

926.     Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff AirQuip and the members of the New York Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiff AirQuip and members of the New York Class, as ordered by the Court.

**Ohio**

**COUNT XLV**
**Violations Of The Ohio Deceptive**
**Trade Practices Act ("Ohio DTPA")**
**O.R.C. 4165.01, *et seq*.**

**(On Behalf of Plaintiff Baumann and the Ohio Class)**

927.     Plaintiff Baumann repeats and realleges the allegations above as if fully set forth herein.

928.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

929.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

930.     This claim is brought on behalf of Plaintiff Baumann and the Ohio Class.

931.     The Ohio DTPA prohibits deceptive trade practices, including among others,

(a)      Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

(b)      Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; and

(c)      Representing that goods or services are of a particular standard, quality, or grade if they are of another;

(d)      Advertising goods or services with intent not to sell them as advertised.

932.     HomeAdvisor and ANGI are a "person" as defined in O.R.C. § 4165.01(D).

933.     In the course of HomeAdvisor's and ANGI's business, they knowingly or willfully concealed, suppressed or failed to disclose material facts from Plaintiff Baumann and the members of the Ohio Class and by making affirmative misrepresentations in order to induce Plaintiff Baumann and members of the Ohio Class to pay for a membership program to get access to the Leads.  Accordingly, HomeAdvisor and ANGI engaged in deceptive trade practices as defined in O.R.C. § 4165.02, including representing that the Leads have characteristics, uses,

benefits, and qualities which they do not have; representing that the Leads are of a particular standard and quality when they are not; advertising the Leads with the intent not to sell them as advertised; failing to disclose the inclusion of or costs associated with mHelpDesk and otherwise engaging in conduct likely to deceive.

934.    HomeAdvisor and ANGI intended for Plaintiff Baumann and the other Ohio Class members to rely on its aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

935.    HomeAdvisor's and ANGI's actions as set forth above occurred in the conduct of trade or commerce.

936.    HomeAdvisor and ANGI knew or should have known that its conduct violated the Ohio DTPA.

937.    HomeAdvisor and ANGI owed Plaintiff Baumann a duty to disclose the true nature of the membership programs, including the nature and quality of the Leads because HomeAdvisor and ANGI possessed exclusive knowledge of the true nature and quality of the membership programs and Leads, and that they did not contain the qualities or characteristics, or perform, as advertised; HomeAdvisor and ANGI intentionally concealed the foregoing from Plaintiff Baumann and the Ohio Class; and/or HomeAdvisor and ANGI made incomplete representations about the Leads while purposefully withholding and omitting material facts from and the Class that contradicted these representations.

938.    HomeAdvisor's and ANGI's conduct and false representations/omissions were material to Plaintiff Baumann and the Ohio Class.

939.    Plaintiff and the Ohio Class suffered ascertainable loss caused by HomeAdvisor's and ANGI's concealment of and failure to disclose material information. Class members who

purchased a membership program, including Leads and/or mHelpDesk, either would have paid less for the membership program or Leads or would not have purchased a membership program, Leads or mHelpDesk at all but for HomeAdvisor's and ANGI's violations of the Ohio DTPA.

940.      HomeAdvisor and ANGI had an ongoing duty to refrain from unfair and deceptive acts and practices under the Ohio DTPA. All HSPs who signed up for a membership program and paid for Leads and/or mHelpDesk suffered ascertainable loss as a result of HomeAdvisor's and ANGI's deceptive and unfair acts and practices made in the course of HomeAdvisor's business.

941.      HomeAdvisor's and ANGI's conduct alleged herein proximately caused injuries to Plaintiff Baumann and the other Class members.

942.      Plaintiff Baumann and the other Ohio Class members were injured as a result of HomeAdvisor's and ANGI's conduct in that Plaintiff and the other Class members overpaid for a membership program, and paid for Leads and/or mHelpDesk and did not receive the benefit of their bargain.  These injuries are the direct and natural consequence of HomeAdvisor's and ANGI's omissions in violation of the Ohio DTPA.

943.      Pursuant to O.R.C. § 4165.03, Plaintiff Baumann and the Ohio Class are entitled to an award of injunctive relief to prevent HomeAdvisor's and ANGI's deceptive trade practices, an award of damages and, because HomeAdvisor's and ANGI's conduct was willful, an award of reasonable attorneys' fees.

## COUNT XLVI
### Fraud/Fraudulent Concealment
### (On Behalf of Plaintiff Baumann and the Ohio Class)

944.      Plaintiff Baumann repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

945.      HomeAdvisor is named as a Defendant in this Count by virtue of its conduct

summarized as follows and set forth in greater detail at ¶¶ 53-339.

946.    ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

947.    HomeAdvisor and ANGI concealed and made misrepresentations of material facts concerning the nature and quality of the Leads – namely that the Leads were not from serious, project-ready homeowners and were sent to more than four HSPs. Specifically, HomeAdvisor and ANGI knew (or should have known) that the Leads were not of the nature and quality that was advertised. HomeAdvisor and ANGI concealed material facts and/or made the material misrepresentations in order the boost the sales of Membership Programs and Leads.

948.    HomeAdvisor and ANGI knew that Plaintiff Ohio and Ohio Class Members relied upon such material representations about the Leads, and HomeAdvisor and ANGI omitted material information and/or made such material representations to induce Plaintiff Baumann and members of the Ohio Class to act, *i.e.* to pay for a Membership Program to get access to the Leads. Moreover, to pay for the Leads, the HSPs were required to provide either a checking / savings account from which HomeAdvisor and ANGI can automatically debit all Membership Fees and Lead fees, or a credit card on which HomeAdvisor can automatically charge such fees.   Then, *on a weekly basis,* HomeAdvisor and ANGI automatically charged the HSPs for each Lead sent. The fee for each Lead is automatically charged to the HSPs' credit cards and/or debited from his/her/its debit accounts.  Consequently, the viability, accuracy, seriousness, qualified nature and limited distribution of each Lead are material to the HSPs.

949.    The representations about the Leads and the omissions about the Leads were material to Plaintiff Baumann, such that, had Plaintiff Baumann known that the representations were false and HomeAdvisor and ANGI had omitted material information, Plaintiff Baumann

would not have purchased a Membership Program and provided HomeAdvisor and ANGI with the means to charge their credit card and/or debit their bank accounts. But Plaintiff Baumann and the Ohio Class did not know the true facts, and relied upon the material representations and omissions made by HomeAdvisor and ANGI.

950.    Plaintiff Baumann and the members of the Ohio Class had no way of knowing that HomeAdvisor's and ANGI's representations were false and gravely misleading, or that HomeAdvisor and ANGI had omitted imperative details. Plaintiff Baumann and the members of the Ohio Class did not, and could not, unravel HomeAdvisor's and ANGI's deception on their own.

951.    HomeAdvisor and ANGI knew their statements were false, and intended that Plaintiff Baumann and the members of the Ohio Class would rely upon the false representations.

952.    HomeAdvisor and ANGI concealed and failed to disclose to Plaintiff Baumann and members of the Ohio Class that, despite its affirmative representations about the membership programs, including the nature and quality of the Leads, it would charge Plaintiff Baumann and the members of the Ohio Class for unqualified Leads and mHelpDesk. HomeAdvisor and ANGI concealed these material facts with the intention that Plaintiff Baumann and the members of the Ohio Class would act.

953.    As a result of HomeAdvisor's and ANGI's fraudulent representations and omissions, Plaintiff Baumann and the members of the Ohio Class were induced into the purchase of goods and/or services that they otherwise would not have purchased, or would have paid less, and have suffered injury, harm and damages as described herein.

954.    HomeAdvisor's and ANGI's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Baumann' and the Ohio

Class' rights and well-being to enrich HomeAdvisor and ANGI. HomeAdvisor's and ANGI's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT XLVII**
**Breach Of Implied Contract**
**(On Behalf of Plaintiff Baumann and the Ohio Class)**

955.    Plaintiff Baumann repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

956.    HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

957.    Plaintiff Baumann and the members of the Ohio Class paid money to HomeAdvisor in exchange for Leads.

958.    An implied contract was created between HomeAdvisor and the HSPs whereby HomeAdvisor was to send and charge Plaintiff Baumann and HSPs for Leads that were from targeted, serious, qualified and/or project-ready homeowners.

959.    The Plaintiff Baumann and the members of the Ohio Class paid an annual fee to join a HomeAdvisor Membership Program and paid hundreds and thousands of dollars for Leads.

960.    The Leads, as well as HomeAdvisor's Lead generation process, however, are systemically flawed and HomeAdvisor does not and cannot generate Leads of targeted, serious, qualified and project-ready homeowners.

961.    The Leads were not of the nature and quality of the Leads that were required, yet HomeAdvisor sent to and charged the HSPs for such Leads. HomeAdvisor did not generate Leads for the Home Services Professionals that were targeted and from serious, qualified or project-ready homeowners. Also, HomeAdvisor charged Plaintiff Baumann and the members of the Ohio Class

for Leads that have been sent to more than four HSPs. HomeAdvisor also charged HSPs for mHelpDesk without knowledge or consent of the HSPs. Furthermore, HomeAdvisor systemically disregarded the parameters and limits placed on the type and number of Leads to be charged to HSPs. Finally, HomeAdvisor employed tactics that prevent HSPs from cancelling their membership and Leads, and from disputing the propriety of a Lead in order to secure a refund.

962.     Accordingly, HomeAdvisor has breached the implied contract that was formed between it and Plaintiff Baumann and members of the Ohio Class.

963.     As a result, Plaintiff Baumann and members of the Ohio Class have been harmed and/or injured have incurred economic damages as a proximate and direct result of the breach by HomeAdvisor.

### COUNT XLVIII
### Unjust Enrichment/Restitution
### (On Behalf Of Plaintiff Baumann and the Ohio Class)

964.     Plaintiff Baumann repeat, reallege and incorporate by reference each of the foregoing allegations as though fully set forth herein.

965.     HomeAdvisor is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 53-339.

966.     IAC is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 22, 59, 87, 110, 164, 165, 199, 247, 248, 280, and 389-426.

967.     ANGI is named as a Defendant in this Count by virtue of its conduct summarized as follows and set forth in greater detail at ¶¶ 6, 23, 53-339, and 411-426.

968.     As the intended and expected result of their conscious wrongdoing the Unjust Enrichment Defendants have profited and benefited from Plaintiff Baumann and the Ohio Class'

purchase of the membership programs and payment for the Leads and mHelpDesk.

969.    The Unjust Enrichment Defendants have voluntarily accepted and retained these profits and benefits, with full knowledge and awareness that, as a result of the Unjust Enrichment Defendants' misconduct alleged herein, Plaintiff Baumann and the Ohio Class were not receiving services of the quality, nature, fitness, or value that had been represented by the Unjust Enrichment Defendants, and that a reasonable consumer would expect.

970.    The Unjust Enrichment Defendants have been unjustly enriched by their fraudulent and deceptive conduct and withholding of benefits to Plaintiff Baumann and the Ohio Class, at the expense of these parties.

971.    Equity and good conscience militate against permitting the Unjust Enrichment Defendants to retain these profits and benefits, and permitting the Unjust Enrichment Defendants to do so would be unjust and inequitable because of the Unjust Enrichment Defendants' misrepresentations and misconduct against Plaintiff Baumann and members of the Ohio Class, as alleged herein.

972.    Because the Unjust Enrichment Defendants' retention of the non-gratuitous benefit conferred upon it by Plaintiff Baumann and the members of the Ohio Class is unjust and inequitable, the Unjust Enrichment Defendants must pay restitution to Plaintiff Baumann and members of the Ohio Class, as ordered by the Court.

## II.    **The Misappropriation Claims**

### **Lanham Act**

### **COUNT XLIX**
### **Violation Of The Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A)**
### **(False Association and Trademark Infringement)**
### **(On Behalf of the Lanham Act Class)**

973.    The Misappropriation Plaintiffs re-allege and incorporate by reference all

allegations set forth in the preceding paragraphs.

974.    The Lanham Act Defendants are named as Defendants in this Count by acting as alleged above in ¶¶ 340-387 and by diverting business from HSPs through the unlawful use of (i) Online Profile Pages, (ii) the HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

975.    The Lanham Act Defendants violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) by using in commerce words, terms, names, or symbols, or a combination thereof, which were likely to cause confusion, mistake or deception as to the affiliation, connection, or association of the Lanham Act Defendants with the Misappropriation Plaintiffs and members of the Lanham Act Class, or as to the origin, sponsorship, or approval of their services or commercial activities.

976.    In acting as alleged above, the Lanham Act Defendants also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)) by using in commerce false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, which were likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of the Lanham Act Defendants with the Misappropriation Plaintiffs and members of the Class, or as to the origin, sponsorship, or approval of their services or commercial activities.

977.    The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(A) proximately caused an injury to a commercial interest in sales or business reputation of the Lanham Act Plaintiff and members of the Lanham Act Class.

978.    The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(A) have also deprived and will continue to deprive the Misappropriation Plaintiffs and members of the Lanham Act Class of the ability to control the consumer perception

of its products and services offered under their names and marks, placing the valuable reputation and goodwill of the Misappropriation Plaintiffs and members of the Lanham Act Class in the hands of the Lanham Act Defendants.

979.    The Lanham Act Defendants had direct and full knowledge of the Misappropriation Plaintiffs' and the Lanham Act Class Members' prior use of and rights in their names and marks before the acts complained of herein. The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

980.    Accordingly, pursuant to 15 U.S.C. § 1117, the Misappropriation Plaintiffs and members of the Lanham Act Class are entitled to recover: (1) the Lanham Act Defendants' profits, or an amount that is adequate, which the Court finds to be just according to the circumstances of the case, as compensation; (2) the damages sustained by the Misappropriation Plaintiffs and the Lanham Act Class Members, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees.

981.    As a result of the Lanham Act Defendants' aforesaid conduct and in addition to other damages, the Misappropriation Plaintiffs and the Lanham Act Class Members have suffered the continuing loss of the goodwill and reputation established by their names and marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the Misappropriation Plaintiffs and the Lanham Act Class Members have no adequate remedy at law. The Misappropriation Plaintiffs and the Lanham Act Class Members will continue to suffer irreparable harm unless this Court enjoins the Lanham Act Defendants' conduct pursuant to 15 U.S.C. §1125 (c)(1).

### COUNT L
### Violation Of The Lanham Act, 15 U.S.C. § 1125(a)(1)(B)
### (False Advertising and Trademark Infringement)
### (On Behalf of the Lanham Act Class)

982.    The Misappropriation Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

983.    The Lanham Act Defendants are named as Defendants in this Count by acting as alleged above in ¶¶ 340-387 and by diverting business from HSPs through the unlawful use of (i) Online Profile Pages, (ii) the HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

984.    The Lanham Act Defendants violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) by using in commerce words, terms, names, or symbols, or a combination thereof, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of the Misappropriation Plaintiffs' and the Lanham Act Class Members' services or commercial activities.

985.    In acting as alleged above, the Lanham Act Defendants also violated section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(B)) by using in commerce false designations of origin, false or misleading descriptions of fact, or false or misleading representations of fact, which in commercial advertising or promotion, misrepresented the nature, characteristics, or qualities of the Misappropriation Plaintiffs' and the Lanham Acts Class Members' services or commercial activities.

986.    The Lanham Acts Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(B) proximately caused an injury to a commercial interest in sales or business reputation of the Misappropriation Plaintiffs and the Lanham Act Class Members.

987.    The Lanham Act Defendants' misrepresentations and actions in violation of 15 U.S.C. § 1125(a)(1)(B) have also deprived and will continue to deprive the Misappropriation Plaintiffs and the Lanham Act Class Members of the ability to control the consumer perception of

their products and services offered under their names and marks, placing the valuable reputation and goodwill of Misappropriation Plaintiffs and the Lanham Act Class Members in the hands of Lanham Act Defendants.

988.    The Lanham Act Defendants had direct and full knowledge of the Misappropriation Plaintiffs' and the Lanham Act Class Members' prior use of and rights in their names and marks before the acts complained of herein. The knowing, intentional and willful nature of the acts set forth herein renders this an exceptional case under 15 U.S.C. § 1117(a).

989.    Accordingly, pursuant to 15 U.S.C. § 1117, the Misappropriation Plaintiffs and the Lanham Act Class Members are entitled to recover: (1) the Lanham Act Defendants' profits, or an amount that is just and adequate compensation according to the circumstances of the case; (2) the damages sustained by the Misappropriation Plaintiffs and the Lanham Act Class Members, in a sum above the amount found as actual damages, not exceeding three times such amount; (3) the costs of the action; and (4) reasonable attorney fees should the Court find this to be an exceptional action.

990.    As a result of the Lanham Act Defendants' aforesaid conduct and in addition to other damages, the Misappropriation Plaintiffs and the Lanham Act Class Members have suffered the continuing loss of the goodwill and reputation established by their names and marks. This continuing loss of goodwill cannot be properly calculated and thus constitutes irreparable harm and an injury for which the Misappropriation Plaintiffs and the Lanham Act Class Members have no adequate remedy at law. The Misappropriation Plaintiffs and the Lanham Act Class Members will continue to suffer irreparable harm unless this Court enjoins the Lanham Act Defendants' conduct pursuant to 15 U.S.C. § 1125(c)(1).

## COUNT LI
### Declaratory Judgment

**(On Behalf of the Lanham Act and State Misappropriation Classes)**

991.    The Misappropriation Plaintiffs re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

992.    The Lanham Act Defendants are named as Defendants in this Count by acting as alleged above in ¶¶ 340-387 and by diverting business from HSPs through the unlawful use of (i) Online Profile Pages, (ii) the HomeAdvisor Premier Online Directory, (iii) the Exclusive Partner Network, (iv) Exact Match Listings, and (v) Website Hijacking.

993.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief.  Furthermore the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

994.    An actual controversy has arisen as a result of the Lanham Act Defendants' use of Former HSPs' business names, information and marks in commerce which are likely to cause confusion, mistake, or deception as to the association of the Misappropriation Plaintiffs and members of the Lanham Act and State Misappropriation Classes with the Lanham Act Defendants. In addition, the Lanham Act Defendants continue to make false representations which misrepresent the nature, characteristics and quality of the Misappropriation Plaintiffs' and members of the Lanham Act and State Misappropriation Classes' businesses.

995.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment on declaring, among other things, the following:

        a.   On behalf of the Lanham Act Act, the Lanham Act Defendants have violated and continue to violate section 43(a) of the Lanham Act (15 U.S.C. § 1125);

        b.   On behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class,

HomeAdvisor has violated and continues to violate Colo. Rev. Stat. § 6-1-101, *et seq.*,

c. On behalf of Plaintiff Ervine and the Florida Misappropriation Class, HomeAdvisor has violated and continues to violate Fla. Stat. §501.201, *et seq.*, and

d. On behalf of Plaintiff Haukenes and the Idaho Misappropriation Class, HomeAdvisor has violated and continues to violate Idaho Civ. Code, § 480, *et seq.*

996. The Court should also issue corresponding prospective injunctive relief requiring that upon a request to terminate or the expiration of a one-year membership, absent express assent by the HSP at the time of termination, the Lanham Act Defendants will promptly remove the Misappropriation Plaintiffs' and members of the Lanham Act and State Misappropriation Classes' business names and information from their websites or websites affiliated with the Lanham Act Defendants.

**Colorado**

**COUNT LII**
**Violations of Colorado Consumer Protection Act ("CCPA"),**
**Colo. Rev. Stat. § 6-1-101, *et seq.***
**(On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class)**

997. Plaintiffs Brad and Linda McHenry repeat and reallege the allegations above as if fully set forth herein.

998. The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

999. Plaintiffs Brad and Linda McHenry bring this claim on behalf of themselves and the Colorado Misappropriation Class.

1000. This cause of action is brought on behalf of Plaintiffs Brad and Linda Mc Henry and all similarly situated members of the Colorado Misappropriation Class, pursuant to COLO. REV. STAT. § 6-1-105(a), (b), (c), and (h), which provide, in pertinent part, that "a person engages in a deceptive trade practice when, in the course of such person's business, vocation, or occupation, such person —

\*       \*       \*

(a) Knowingly passes off goods, services, or property as those of another;

\*       \*       \*

(b) Knowingly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property;

\*       \*       \*

(c) Knowingly makes a false representation as to affiliation, connection, or association with or certification by another;

\*       \*       \*

(h) Disparages the goods, services, property, or business of another by false or misleading representation of fact;

1001. As set forth herein, The Lanham Act Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the CCPA by:

a.       advertising, promoting or offering services under the McHenry Plaintiff's and the Colorado Misappropriation Class Member's names with full knowledge of the McHenry Plaintiffs and the Colorado Misappropriation Class Member's prior use and rights in their name;

b.       unfairly competing with the McHenry Plaintiffs and the Colorado Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with the McHenry Plaintiffs and the Colorado

Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, when The Lanham Act Defendants have no connection with or authorization from the McHenry Plaintiffs and the Colorado Misappropriation Class Members;

c.      misappropriating the McHenry Plaintiff's and the Colorado Misappropriation Class Member's goodwill and public recognition;

d.      making false and misleading statements about the McHenry Plaintiff's and the Colorado Misappropriation Class Member's business; and

e.      unlawfully benefiting from such activities.

1002.   In addition, C.R.S. § 6-1-105(3) provides: "The deceptive trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

1003.   HomeAdvisor's and John Doe's deceptive practices occurred in the course of HomeAdvisor's business, vocation or occupation.

1004.   HomeAdvisor's and John Doe's misconduct significantly impacts the public as actual or potential consumers of the HomeAdvisor's services described herein. The misappropriation and false representations through electronic media, internet and direct marketing were directed to the market generally resulting in deception of actual and prospective purchasers.

1005.   HomeAdvisor's and John Doe's deceptive practices caused damage to Plaintiffs Brad and Linda McHenry and all Colorado Misappropriation Class Members. Because of HomeAdvisor's unfair, deceptive and fraudulent business practices, Plaintiffs Brad and Linda McHenry and the Misappropriation Class Members suffered and continue to suffer injuries by way of monetary loss.

1006.   Plaintiffs Brad and Linda McHenry therefore seeks an order of this Court:

a.   Enjoining the Lanham Act Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to HomeAdvisor's and John Doe's misappropriation of the McHenry Plaintiffs; and the Colorado Misappropriation Class' names and likenesses to generate Leads for HomeAdvisor, in such manner as set forth in detail above;

b.   Enjoining the Lanham Act Defendants from making false and misleading statements about the McHenry Plaintiffs' and the Colorado Misappropriation Class Member's business; and

c.   Requiring HomeAdvisor to remove the McHenry Plaintiffs' and the Colorado Misappropriation Class Members from the HomeAdvisor website and any of HomeAdvisor's affiliate websites.

1007.   Plaintiffs Brad and Linda McHenry and the members of the Colorado Misappropriation Class may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted. The unfair and/or deceptive acts and practices of HomeAdvisor, as described above, present a serious threat to the McHenry Plaintiffs and the members of the Colorado Misappropriation Class.

### COUNT LIII
### Common Law Unfair Competition
### (On Behalf of the McHenry Plaintiffs and the Colorado Misappropriation Class)

1008.   Plaintiffs Brad and Linda McHenry re-allege and incorporate by reference all allegations set forth in the preceding paragraphs.

1009.   The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

1010.   The Lanham Act Defendants have advertised, promoted or offered services under the McHenry Plaintiff's and the Colorado Misappropriation Class Member's names with full knowledge of the McHenry Plaintiff's and the Colorado Misappropriation Class Member's prior use and rights in their name.

1011.   The Lanham Act Defendants have unfairly competed with the McHenry Plaintiffs and the Colorado Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, or that the source of the services offered by the Lanham Act Defendants are affiliated with or associated with the McHenry Plaintiffs and the Colorado Misappropriation Class Members, when the Lanham Act Defendants have no connection with or authorization from the McHenry's Plaintiffs or the Colorado Misappropriation Class Members.

1012.   The Lanham Act Defendants have misappropriated the McHenry Plaintiff's and the Colorado Misappropriation Class Member's goodwill and public recognition, and the Lanham Act Defendants have unlawfully benefited from such activities.

1013.   Continued use by the Lanham Act Defendants of the business names of the McHenry Plaintiffs and the Colorado Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of Colorado.

1014.   HomeAdvisor's and John Doe's actions have injured the business reputation of the McHenry Plaintiffs and the Colorado Misappropriation Class Members and will cause irreparable harm, damage and injury to the McHenry Plaintiffs and the Colorado Misappropriation Class Members unless restrained and enjoined by the Court.

**Florida**

## COUNT LIV
### Violation of the Florida Deceptive and Unfair Trade Practices Act,
### Fla. Stat. §501.201, *et seq.* ("FDUTPA")
### (On Behalf of Plaintiffs Ervine and the Florida Misappropriation Class)

1015.   Plaintiff Ervine repeats and realleges the allegations above as if fully set forth herein.

1016.   Plaintiff Ervine brings this Count individually and on behalf of the Florida Class.

1017.   The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

1018.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*, makes unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

1019.   As amended by the Florida Legislature in 2001, a "person" who has suffered a loss as a result of a violation of FDUTPA has standing to sue under that statute.  *See* Fla. Stat. § 501.211(2).  This 2001 amendment replaced the word "consumer" with "person."  Plaintiffs and Class members are "persons" within the meaning of the FDUTPA.

a.   As set forth herein, the Lanham Act Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the FDUPTA by: advertising, promoting or offering services under Plaintiff Ervine's and the Florida Misappropriation Class Member's names with full knowledge of Plaintiff Ervine's and the Florida Misappropriation Class  Member's prior use and rights in their name; unfairly competing with Plaintiff Ervine and the Florida Misappropriation

281

Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Ervine and the Florida Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Ervine and the Florida Misappropriation Class Members, when the Lanham Act Defendants have no connection with or authorization from Plaintiffs or the Florida Misappropriation Class Members;

b.   misappropriating Plaintiff Ervine's and the Florida Misappropriation Class Member's goodwill and public recognition;

c.   making false and misleading statements about Plaintiff Ervine's and the Florida Misappropriation Class Member's business; and

d.   unlawfully benefiting from such activities.

1020.   Under the FDUTPA, § 501.211(2) and § 501.2105, Plaintiff DaSilva and the Florida Misappropriation Class are entitled to actual damages, injunctive relief and attorney's fees and costs.

**COUNT LV**
**Common Law Unfair Competition**
**(On Behalf of Plaintiff Ervine and the Florida Misappropriation Class)**

1021.   Plaintiff Ervine realleges and incorporates by reference all allegations set forth in the preceding paragraphs.

1022.   The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

1023.   The Lanham Act Defendants have advertised, promoted or offered services under

Plaintiff Ervine's and the Florida Misappropriation Class Member's names with full knowledge of Plaintiff Ervine's and the Florida Misappropriation Class Member's prior use and rights in their name.

1024. HomeAdvisor has unfairly competed with Plaintiff Ervine and the Florida Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Ervine and the Florida Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Ervine and the Florida Misappropriation Class Members, when the Lanham Act Defendants have no connection with or authorization from Plaintiffs or the Florida Misappropriation Class Members.

1025. The Lanham Act Defendants have misappropriated Plaintiff Ervine's and the Florida Misappropriation Class Member's goodwill and public recognition, and the Lanham Act Defendants have unlawfully benefited from such activities.

1026. Continued use by the Lanham Act Defendants of the business names of Plaintiff Ervine and the Florida Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of Florida.

1027. HomeAdvisor's and John Doe's actions have injured the business reputation of Plaintiff Ervine and the Florida Misappropriation Class Members and will cause irreparable harm, damage and injury to Plaintiff Ervine and Florida Misappropriation Class Members unless restrained and enjoined by the Court.

**Idaho**

## COUNT LVI
### Violations of the Idaho Consumer Protection Act,
### Idaho Civ. Code, § 480, *et seq*.

**(On Behalf of Plaintiff Haukenes and the Idaho Misappropriation Class)**

1028.    Plaintiff Haukenes realleges and incorporates by reference all paragraphs as though fully set forth herein.

1029.   The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

1030.    HomeAdvisor, John Doe and Plaintiff Haukenes are "persons" under Idaho Civil Code § 48-602(1).

1031.    HomeAdvisor engaged in unfair methods and practices in the conduct of its trade or commerce in violation of the Idaho Consumer Protection Act ("ICPA"), Idaho Civ. Code § 48-603, including:

a.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have;

b.    Passing off goods or services as those of another;

c.    Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

d.    Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another;

e.    Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have; and

f.    Disparaging the goods, services, or business of another by false or misleading representation of fact.

1032.   As set forth herein, the Lanham Act Defendants engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of the ICPA by:

a.   advertising, promoting or offering services under Plaintiff Haukenes' and the Idaho Misappropriation Class Member's names with full knowledge of Plaintiff Haukenes' and the Idaho Misappropriation Class Member's prior use and rights in their name;

b.   unfairly competing with Plaintiff Haukenes' and the Idaho Misappropriation Class Members by creating the impression among and confusing relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by, sponsored by, originated with, and/or otherwise affiliated with Plaintiff Haukenes' and the Idaho Misappropriation Class Members, or that the source of the services offered by HomeAdvisor or John Doe are affiliated with or associated with Plaintiff Haukenes' and the Idaho Misappropriation Class Members, when the Lanham Act Defendants have no connection with or authorization from Plaintiff Haukenes' and the Idaho Misappropriation Class Members;

c.   misappropriating Plaintiff Haukenes' and the Idaho Misappropriation Class Member's goodwill and public recognition;

d.   making false and misleading statements about Plaintiff Haukenes' and the Idaho Misappropriation Class Members' business; and

e.   unlawfully benefiting from such activities.

1033.   As a result of its violations of the ICPA detailed above, HomeAdvisor caused actual damage and ascertainable loss to Plaintiff Haukenes and the Idaho Misappropriation Class.

1034.   HomeAdvisor's and John Doe's deliberate, widespread and systematic misappropriation, disparaging and fraudulent statements and unfair competition was so egregious

and carried out with such willful and conscious disregard of the rights of its customers that its sales conduct would outrage or offend the public conscience, and is therefore an unconscionable method, act or practice under the ICPA as provided in Idaho Civil Code § 48-603C.

1035.    Plaintiff Haukenes seeks punitive damages against the Lanham Act Defendants because their violations were repeated and flagrant, conducted with knowledge of the illegality of the conduct, and therefore warrants the imposition of punitive damages under Idaho Civil Code § 48-608(1).

1036.    Plaintiff Haukenes further seeks an order enjoining HomeAdvisor's and John Doe's unfair or deceptive acts or practices, punitive damages, costs of Court, attorney's fees under Idaho Civil Code § 48-608, and any other just and proper relief available under the ICPA.

**New York**

## COUNT LVII
### Common Law Unfair Competition
### (On Behalf of Plaintiff Hass and the New York Misappropriation Class)

1037.    Plaintiff Hass re-alleges and incorporates by reference all allegations set forth in the preceding paragraphs.

1038.    The Lanham Act Defendants are named as Defendants in this Count by virtue of their conduct summarized as follows and set forth in greater detail at ¶¶ 340-387.

1039.    The Lanham Act Defendants #1 have advertised, promoted or offered services under Plaintiff Hass's and the New York Misappropriation Class Member's names with full knowledge of Plaintiff Hass's and the New York Sub- Class Member's prior use and rights in their name.

1040.    The Lanham Act Defendants have unfairly competed with Plaintiff Hass and the New York Misappropriation Class Members by creating the impression among relevant consumers that the goods or services offered by the Lanham Act Defendants are endorsed by, licensed by,

sponsored by, originated with, and/or otherwise affiliated with Plaintiff Hass and the New York Misappropriation Class Members, or that the source of the services offered by the Lanham Act Defendants are affiliated with or associated with Plaintiff Hass and the New York Misappropriation Class Members, when the Lanham Act Defendants has no connection with or authorization from Plaintiff Hass or the New York Misappropriation Class Members.

1041. HomeAdvisor has misappropriated Plaintiff Hass and the New York Misappropriation Class Member's goodwill and public recognition, and the Lanham Act Defendants has unlawfully benefited from such activities.

1042. Continued use by the Lanham Act Defendants of the business names of Plaintiff Hass and the New York Misappropriation Class Members with any goods or services constitutes unfair competition under the common law of New York.

1043. The Lanham Act Defendants' actions have injured the business reputation of Plaintiff Hass and the New York Misappropriation Class Members and will cause irreparable harm, damage and injury to Plaintiff Hass and New York Misappropriation Class Members unless restrained and enjoined by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually on behalf of themselves and on behalf of members of the Classes, respectfully request that this Court:

A. Determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Classes;

B. Appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C. Award all actual, general, special, incidental, statutory, treble, punitive, and

consequential damages to which Plaintiffs and Members of the Classes are entitled;

    D.    Award all declaratory relief that Plaintiffs and Members of the Classes are entitled;

    E.    Award pre-judgment and post-judgment interest on such monetary relief;

    F.    Award Defendants' profits, or an amount that is adequate, pursuant to 15 U.S.C. § 1117;

    G.    Award reasonable attorneys' fees and costs;

    H.    Award injunctive relief is appropriate and necessary to remedy Defendants' wrongful conduct and to prevent the wrongful conduct from continuing; and

    I.    Award all other relief deemed appropriate by the Court.

## **JURY DEMAND**

Plaintiffs demand a trial by jury for all claims asserted in this Complaint so triable.

Dated: June 4, 2021

          **CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

          */s/ Nicholas E. Chimicles*
          Nicholas E. Chimicles
          Kimberly M. Donaldson Smith
          Stephanie E. Saunders
          361 West Lancaster Avenue
          One Haverford Centre
          Haverford, PA 19041
          Phone: 610-642-8500
          Fax: 610-649-3633
          nec@chimicles.com
          kds@chimicles.com
          ses@chimicles.com

            and

          Scott M. Tucker
          2711 Centerville Rd.
          Suite 201
          P.O. Box 1035
          Wilmington, DE 19808

Phone: 302-656-2500
Fax: 302-656-9053
Scotttucker@chimicles.com

Gordon W. Netzorg
Mark W. Williams
Carla R. Martin
**SHERMAN & HOWARD, L.L.C.**
633 17th Street, Suite 3000
Denver, CO 80202
Phone: 303-299-8381
Fax: 303-298-0940
gnetzorg@shermanhoward.com
mwilliams@shermanhoward.com
cmartin@shermanhoward.com

*Attorneys for Plaintiffs*