# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION

---

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
CLASS COUNSEL PURSUANT TO FED. R. CIV. P. 23**

---

Plaintiffs submit this Motion for Class Certification and Appointment of Class Counsel

Pursuant to Fed. R. Civ. P. 23, accompanied by the attached Appendices and the DeSanto

Declaration with the Exhibits attached thereto cited as "Ex. _", and state as follows in support:

**I.      PRELIMINARY STATEMENT**

This case arises from the adoption and implementation of a sinister and deliberate business

model that has victimized hundreds of thousands of small businesses over a lengthy time period,

and continues to this day. HomeAdvisor ("HA") markets, advertises, offers for sale, and sells

various products to home service providers ("SP(s)"). Pertinent to this Motion are two products:

(1) the information HA purports to collect from "homeowners" (or, "customers") about their home

service requests ("SRs"), which HA then sends and charges to SPs as "Leads"; and, (2) an annual

membership for SPs to join HA's "network", which is the gateway for HA to automatically send

and charge SPs' "on-file" payment methods for the Leads ("Lead Fees").

HA armed its sales force with a uniform arsenal of communication vehicles[1] to sign up SPs

for HA's essential product: HA verified Leads. In reality, HA concealed from the SPs that HA did

---

[1] Ex. 1 is a presentation providing an illustrative example of HA's SP advertising and marketing.

not verify an overwhelming majority of its Leads before sending the Leads to SPs and lacked the systems to deliver SPs Leads that were verified as authentic, with accurate contact information, and from serious consumers who had the intent to have SPs contact them about projects. HA knew its systems were not verifying the Leads and were fundamentally defective, such knowledge being consistently evidenced by HA's closely monitored internal metrics as well as its own staff's inability ███████████████████████████████████ within minutes of the receipt of a SR. HA also knew, but concealed, that SP dissatisfaction was rampant as evidenced ██████████████████████████████ HA's top executives recognized that SP retention was a problem that could only be addressed by putting a halt to selling "garbage" to SPs, but the selling of "garbage" continued. Instead, executives at IAC (HA's principal owner) chortled that HA had a sizable sales force that had ████████████████████████ ████████████"[2] SPs were treated as cannon fodder to be cheated, sold unverified Leads, threatened or essentially ignored when SPs complained or sought refunds or credits, sent to collections, and replaced with other innocent victims from the ranks of small business America.[3]

Unsurprisingly, three years after this suit was initiated, the Federal Trade Commission ("FTC") of its own volition served a comprehensive Civil Investigative Demand ("CID") on HA and IAC, ██████████████████████.[4] In March 2022, after a nearly three-year investigation, the FTC brought an administrative complaint (Ex. 4) against HA charging it with committing unfair or deceptive practices in the sale of Leads to SPs. That HA's deceptive practices are continuing is reflected in the FTC's motion for summary decision

---

[2] Ex. 3 (Schiffman Deposition Ex. 1380) at IAC024497.
[3] Ex. 2 (Plaintiffs' compilation of SPs' reported experiences with HA and the Leads).
[4] The Third Amended Complaint (at Dkt. 449) is referred to herein as "TAC ¶ __".

(Ex. 5) filed in April 2022, seeking the issuance of a cease-and-desist order against HA.[5]

Considering Plaintiffs' liability and damages theories, and that Plaintiffs' proof is based on the extensive discovery of Defendants' conduct and HA's granular data containing details about every SR, Lead and SP through December 31, 2020 (the "2021 Data"),[6] it would be difficult to imagine a case that meets Rule 23 class certification requirements more clearly.

## II.   RELEVANT FACTUAL BACKGROUND

### A.   Defendants

The TAC details factual allegations and claims, with evidentiary foundation cited, against two Defendant groups: (1) the "HA Defendants", comprised of HomeAdvisor, Inc. ("HA"), Angi Homeservices Inc. ("ANGI"), IAC/InterActiveCorp ("IAC"), and Craftjack; and (2) "CDVM Defendants", comprised of C. David Venture Management, LLC, and VentureStreet, LLC.

IAC is a media and internet company that purports to offer a digital marketplace to connect SPs with consumers through certain of its brands, which include HA[7] and CraftJack.[8] In 2017, IAC combined HA with Angie's List, Inc. under IAC's new publicly traded holding company,

---

[5] The full set of exhibits to the FTC's statement of material facts ("SMF") (Ex. 6), which accompanies its motion for summary decision ("MSD"), are publicly available here: https://www.ftc.gov/system/files/ftc_gov/pdf/Complaint%20Counsel%27s%20Moton%20for%20Summary%20Decision.pdf

[6] The 2021 Data, analyzed by Plaintiffs' experts, contains granular information about each of the ██████████████████████████████████████████████ *See* DeSanto Decl. ¶119.  Because the fact discovery deadline was mid-2021, the 2021 Data produced ends at 12/31/20; the class period is not so confined. *See infra* § III.

[7] IAC acquired ServiceMagic in 2004 and rebranded it in 2012 as HA, which coincides with the start of the class period. TAC ¶1; *See also* Ex. 7 at ¶61 (Plaintiffs' Expert Report of Darlene Geller-Stoff) ("11.12.2021 DGS Report") (discussing IAC).

[8] In November 2012, IAC acquired CraftJack, a home services lead generation company that sold SRs to HA, pursuant to a revenue share arrangement between HA and CraftJack, garnering CraftJack ███████████████████ TAC ¶1, 26, 110-114, 410; Ex. 9 at Exhibit D, thereto, (Plaintiffs' Expert Report of Basil Imburgia) ("Imburgia 11.12.2021 Report").

ANGI. TAC n.1, ¶424-426. ANGI and HA remain predominantly owned (84.5% and 98.2% of the economic and voting interest, respectively, as of 12/31/2021) and controlled by IAC, *see* TAC ¶389-427. Key executives have worn multiple hats and served in various key roles in and among the HA Defendant entities. *See* Appendix H (Chart of executives and positions). The CDVM Defendants, which are home services lead generation companies, have been a source of HA's SRs since 2004, and, beginning in March-April 2016, entered into a revenue share arrangement with HA Defendants, garnering CDVM Defendants ███████████████████████[9]

**B.  The Members of the Classes—the Traditional SPs**

Defendants successfully employed multiple measures to defraud and mislead the US Traditional SPs[10] (or "Class SPs") into ultimately handing over during the telephonic enrollment process[11] a source of payment, to which membership and Lead Fees would be charged ("Payment Card"). Over approximately eight years, ██████ Traditional SPs were charged ███████████ in membership fees and ██████████████.[12] HA targeted small businesses, 1-2 "man shops" with the "owner work[ing] in the field"[13], often new to the home services business, with

---

[9] Ex. 9 at Exhibit C to Imburgia 11.12.2021 Report; TAC ¶1, 24-25, 115-121, 403.

[10] Excluded from the Classes are (i) the few businesses that had a different arrangement with HA (for example, some paid a flat rate per month for unlimited leads or paid substantially discounted lead prices). *See* Appendix A. Plaintiffs identified the "Non-Traditional SPs" and the "Traditional SPs" and US and non-US SPs from the 2021 Data. *Id.*

[11] Ex. 12, Dkt. 46, Sullivan 10/18/2018 Declaration, at ¶7: "SPs may connect with [HA] online, by email, or by telephone regarding becoming a member. However the contact is initiated, all SPs ultimately must follow common steps in order to enroll and be approved as members of [HA]…[o]nce the SP's owner, principal or authorized representative…indicates he or she would like to proceed with enrollment, [HA] requires the SP representative to complete a voice log …."

[12] Ex. 9 (Imburgia 11.12.2021 Report) at 33 ¶79 and the Ex. AI thereto (Data Appendix) at Table 2 (pg. 11) and Table 5 (pg. 14), in the Imburgia Report.

[13] Unless otherwise indicated, all internal citations, quotations, and alterations are omitted, and all emphasis and alterations are added.

██████████████████████████████████████████████████████[14]

### C. The Fraudulent and Deceptive Conduct and False and Misleading Statements

HA states that "providing quality leads to [these] SPs is at the heart of [HA's] business model".[15] HA markets the Leads as being from serious, legitimate, and real homeowners, who were serious about engaging with an SP to have work performed, and with whom HA would connect the SP. Plaintiffs' expert calls this HA's "Brand Promise".[16] *See* DeSanto Decl. ¶117.

HA has conveyed its Brand Promise to SPs since October 2012 (*see* Appendices B-D) through (a) HA's written/standardized advertising and marketing statements to SPs;[17] and (b) the sales scripts and materials HA used to train its sales representatives who handled the SP Enrollment calls,[18] all of which contain uniform, and identical or nearly-identical, language[19] to describe HA's Leads. *See* Ex. 7 (DGS 11.12.2021 Report) at ¶39-42. Likewise, when looking at HA's messaging across all of HA's advertising channels, the conclusion is the same: HA uniformly conveyed that SPs would receive verified Leads from HA.[20] Of note is that HA was specifically targeting

---

[14] Ex. 11 (2.10.2022 Imburgia Supplemental Data Appendix) Tables S7 and S8, pg. 9-10; Ex. 9 (11.12.2021 Imburgia Report) at ¶16.
[15] Ex. 7 (DGS 11.12.2021 Report) at ¶¶47-48 (citing ████████████████████████████████████████████████████████████████████████ "make clear that providing quality leads to SPs is at the heart of HomeAdvisor's business model.").
[16] Ex. 7 (DGS 11.12.2021 Report) at ¶39; Ex. 8 (DGS 2.10.2022 Report) at ¶¶3-8.
[17] *See* Appendix C (demonstrating the conveyance of a uniform description and message about its Leads in HA's written/standardized statements to SPs, e.g., emails, website, commercials).
[18] *See* Appendix D (demonstrating the conveyance of a uniform description and message by HA about its Leads in HA's sales scripts and training materials for calls with SPs); Ex. 7 (DGS 11.12.2021 Report) at ¶40-41 (HA's former VP of Sales and Training testified that: ████████████
████████████████████████████████████████████████████████████
[19] *See* Appendix B (demonstrating the uniformity of the language used in HA's advertising statements and training materials conveying the Brand Promise).
[20] *See* Appendix E (demonstrating the uniformity of HA's statements and message to class members within each advertising channel used by HA—i.e., through (1) written statements on its website, in marketing emails sent directly to class members, and other written advertising sources,

prospective SPs through an aggressive email campaign. By way of just one example, HA sent nearly ███████████ emails to prospective SPs conveying that HA had verified its Leads; of those emails, ████████████████████ emails stating that HA would "connect [SPs] with project-ready homeowners" or enable SPs to "reach project-ready homeowners",[21] and ██████████████████ emails to prospective SPs describing HA's Leads as "project-ready."[22] Furthermore, HA's false and misleading statements have existed since October 2012; thus, there is temporal uniformity. *See* Appendix F. Even HA's Vice President of Business-to-Business Marketing confirmed the longevity of HA's use of the false and misleading statements.[23]

HA's marketing and branding of the Leads, however, conflicts with, and conceals from SPs, the reality of HA's operations and Leads (*see* § II.D). Overwhelmingly, the Leads HA sold to SPs were not verified by HA. Before sending the Leads to the SPs and charging them Lead Fees, HA did not take the necessary steps to verify that (and, therefore, to know if ) the Leads were authentic, had accurate and complete contact information, and were from consumers serious about connecting with SPs about a project. Yet, notwithstanding, HA Defendants have been prominently and uniformly conveying the Brand Promise to SPs since October 2012 across HA's marketing and sales channels (including HA's website, FAQs, and marketing emails sent to SPs), and in

---

and (2) standardized scripts and training materials for sales calls with class members).

[21] *See* DeSanto Decl. ¶¶99-100 (compiling cites to each email template and showing the number of HA-reported transmissions of the same template, *e.g.* Ex. 54 (HA006746) at 6751 (showing ████████ of email stating "Ready to connect with project-ready homeowners?")).

[22] *See id.* (compiling cites to each email template and showing the number of HA-reported transmissions of the same template, *e.g.* Ex. 54 (HA006746) at 6756 ███████████████: "Get project-ready leads in real time")).

[23] Ms. Bergner ████████████
████████████████████████████████████████████████████████
████████████████████████████ From 2014." Ex. 21 (Bergner FTC Tr.) at 19:23-21:24.

internal sales training materials used by the HA sales team conducting the SP enrollment calls. The FTC reached the same conclusion: HA's false and misleading statements about the Leads were uniform, concealed the reality that HA had not verified the Leads, and misled SPs about the quality, characteristics and source of HA's Leads.[24]

### D.  The Reality of HA's Business and Leads

Albeit merits issues, the following serves to support that common issues exist and predominate, evoke class-wide evidence, and necessitate and permit class-wide determinations.

Of the ▮▮▮▮▮ Leads that were sent to the Traditional SPs, HA's 2021 Data shows that only approximately ▮▮▮▮▮ were generated by an HA customer service representative ("CSR Leads").[25] The remaining ▮▮▮▮▮ sent to SPs (the "Non-CSR Leads"),[26] were collected by HA through internet- or web-based traffic sources that include "paid marketing" sources known to be susceptible to fraud and manipulation for financial gain.[27]

HA knew what constituted a verified Lead, and expressly conveyed in writing that

---

[24] Ex. 5 (FTC MSD) at 12-25; Ex. 6 (FTC SMF) at Section III (referencing declarations given to the FTC by former HA sales representatives about their training and pitch to SPs (*see* Ex. 14)).

[25] HA ha▮▮▮▮▮
▮▮▮▮▮ Ex. 15 (Puccio Dep. Tr.) at 43:4-8; 76:10-12. CSR Leads were identified in the 2021 Data and excluded from Class damages. Ex. 9 (11.12.2021 Imburgia Report) at ¶68-69 and its Ex. AI (Data Appendix) at 14 (Table 5).

[26] Ex. 9 (11.12.2021 Imburgia Report) at ¶68-69; Ex. 7 (11.12.2021 DGS Report) at ¶¶58(3) ("That means there is not primarily a face-to-face or direct verbal interaction between the consumer and [HA] prior to a lead being sent to a [SP] for a majority of the [SPs'] leads to confirm intent and validate the quality and content of the lead.")

[27] Traffic is driven to web forms or "Get a Quote" forms on ▮▮▮▮▮ domains owned or operated by HA by HA's Search Engine Marketing (SEM) and Search Engine Optimization (SEO), and through referral partners (who place on their or their partners' websites links to HA's websites), or third party affiliate partners that gather and sell HA the SRs. Ex. 16 (Kahn 11.11.2021 Report) at pgs. 4-14. Ex. 7 (11.12.2021 DGS Report) at ¶57-59, 60-68.

information to those generating the CSR Leads.[28] HA knew that a verified Lead is not based on assumptions, but on knowing the Lead contains "a **valid first and last name**…the **correct phone number to reach the consumer**", who is "**ready to speak with [SPs], prior to submitting any [SR]**", to "ensure [SRs] are the product of a consumer's affirmative expression of interest." *Id.*

With respect to the Non-CSR Leads, HA claims that its processes "*ensure that its leads are verified before they reach service providers*."[29] That argument concedes HA's knowledge that its Leads should have been verified before reaching SPs, and that SPs were entitled to and expected verified Leads from HA. The reality, however, is that HA was not verifying the Non-CSR Leads before sending them to SPs. In response to Plaintiffs' ▮▮▮▮▮▮▮▮▮▮ requests seeking information about HA's lead verification processes,[30] HA identified: its use of "web forms"; contracts with referral partners and affiliates; process to match the SR to the SPs' service and location; a de-duplication process; a "filter process flow"; and its after-the-fact monitoring of metrics such as credit rate and win rate. Plaintiffs' and their experts' extensive review and analysis of each of HA's purported controls and processes demonstrates that HA's "processes" failed to

---

[28] HA CSRs "must obtain from the consumer prior to submitting the [SR]….a **valid first and last name**….the **correct phone number to reach the consumer**…[i]t is never acceptable to put in false/bogus information…[and] [e]very SR submitted should have details and comments…", and it was "zero tolerance" behavior to "submit[] a [SR] without the consumer's permission and agreement to phone calls." Ex. 8 (DGS 2.10.2022 Report) at ¶¶61-66.

[29] Ex. 18 at 72 (Excerpts from 9.12.2021 Report of Defendants' Expert Mr. Hidalgo), and same admission at 20 (HA "converts them into verified leads"), at 20 ("consumers who have verified their affirmative interest"), 24 ("ensures the consumer is in fact interested in the service identified).

[30] HA was asked to "[d]escribe all efforts that [it] undertake[s] to determine the accuracy, completeness, and authenticity of the Leads [it] provide[s] to service providers, including determining: that the contact information is valid…and accurate… that the consumer is ready to begin a project ….that the consumer has consented to a service provider contacting them;…" *See* Ex. 19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

ensure that HA was verifying the Non-CSR Leads before they were sold to SPs and HA's processes

do not verify that the Non-CSR Leads are (i) <u>authentic</u> (from a real person);[31] (ii) <u>accurate</u> (accurate

and complete contact information);[32] (iii) <u>intent-driven</u> (intended for SPs to receive the contact

information and call); and (iv) <u>serious</u> (serious about speaking with SPs about a project).[33] Those

verifications are fundamental, yet straightforward.

HA's surveys of SPs evidence and confirm the widespread deception by HA about its

Leads and that Defendants knew they were deceiving the SPs, as SPs conveyed that they were

wrongly being sent and charged for, *inter alia,* (a) Leads with incorrect information, including

incorrect consumer contact information, (b) Leads from consumers that were not serious or project

ready, and (c) Leads that were unreachable. *See* Ex. 7 (11.12.2021 DGS Report) at ¶100; ¶¶132-

133; Ex. 13 (Denver BBB complaints produced to FTC); Ex. 2 (SPs reported experiences).

---

[31] Ex. 7 (DGS 11.12.2021 Report) at Section II, and ¶29-30, 35 ("Lead fraud exists when a lead provider misrepresents how they collect a lead…misrepresent[s] the lead authenticity, site origin, lead age, offer presentation, collected data, and more…") (https://activeprospect.com/what-is-lead-fraud/ (last visited 4.14.2022)); Ex. 16 (Kahn 11.11.2021 Report) at pgs. 4-6; 11-14.

[32] For ▮▮▮▮ the SRs from which it created Leads, HA's filter process never performed, contemporaneously or before the Lead was sent to the SPs, testing to determine if there was an association among the name, address, and one phone number appearing in the Lead. *See* Ex. 9 (11.12.2021 Imburgia Report) at ¶61, and Ex. AI thereto at 37 (Table 26). Plaintiffs tested the SRs in the 2021 Data and found that only 16% had an identified association. *See* Ex. 7 (11.12.2021 DGS Report) at ¶121.b.i. and Exhibit 2 thereto at § VI.B.1. Plaintiffs' testing identified ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ from which Leads were created, that had one or more indications **not** consistent with the Brand Promise, such as invalid emails, lack of homeownership, undeliverable street addresses, or minimal association among the Lead's contact information. *Id.*

[33] Ex. 7 (11.12.2021 DGS Report) at ¶73 and ¶¶69-173; Ex. 8 (2.10.2022 DGS Report) at ¶¶ 9-86 detailing why HA's processes do not verify Leads; Ex. 16 (11.11.2021 Kahn Report) at 4-14 (identifying that HA failed to employ available and necessary lead fraud detection tools, and was susceptible to generating and selling fraudulent Leads); Ex. 17 (2.10.2022 Kahn Report) at 4-7. Also, despite awareness as early as 2012, there is no indication that HA's automated filtering process applied any fraud detection tools to proactively identify and prevent fraudulent submissions. Ex. 7 (11.12.2021 DGS Report) at ¶29, 63-64, 66-68, 121.f., 123-125; Ex. 16 (11.11.2021 Kahn Report) at. 4-6, 11-14. Ex. 17 (2.10.2022 Kahn Rebuttal Report) at pgs. 3-6.

Further, HA's top management tracked "connection rates"[34] by SPs who attempted to call Leads using HA's call tracking system, and identified that HA's web-based lead sources, including its own SEO and SEM sourced leads, were only resulting in a "connection" *(see* f. 34) for the SPs ███████ the time in 2017.[35] Also, HA's call tracking system failed to work at various times, further hindering the SPs' ability to connect, if a connection was even possible, and mis-recording the SPs' efforts to try to connect.[36] HA's "Lead Assist" program, where HA personnel were calling Leads within 15 minutes after HA had sent the Lead to SPs, revealed to HA that its personnel were not able to speak with ███████ and often when a connection was made the SR was confirmed to be invalid (e.g., bogus contact information or a consumer who was not serious).[37]

Furthering the deception and harm, HA "discouraged" its sales teams from discussing HA's credit policies during sales calls (as it was not the way "to pitch the product"), imposed time consuming processes on an SP requesting a credit, utilized a credit investigation process that limited the credits granted, and, even if a credit was approved, HA only issued "store credit" (not a cash refund) with a six months expiration date.[38] HA deliberately deterred SPs' credit requests.

---

[34] "Connection," as that term is used by Defendants, is misleading. A "connection" was a call with a recorded duration in HA's call tracking system of ███████ HA internally, and Plaintiffs' experts, identified that as too short of a duration to be a meaningful contact. Ex. 9 (11.12.2021 Imburgia Report) at ¶52; Ex.7 (11.12.2021 DGS Report) at ¶112(d).

[35] Ex.7 (11/12/21 DGS Report) at ¶94, 112(d), (e), 113; Ex. 9 (11/12/21 Imburgia Report) at ¶52.

[36] Ex. 81 HA0170636 (3/10/2016 email reflecting that SPs did not want call tracking because ███████ Ex. 82 HA0170511 (3/16/2016 email stating ███████ Ex. 83, HA0097830, referencing a fix to call tracking).

[37] Ex. 9 (11.12.2021 Imburgia Report) at ¶¶53-57. HA's presentations document its knowledge that its Leads were unverified, stating that the primary lead type sold to SPs failed to connect SPs to the ███████. Ex. 7 (11.12.2021 DGS Report) at ¶112(e).

[38] Ex. 84 (Craig Smith Dep. Tr.) at 143, 144, 211, 213-214; Ex. 5 (FTC MSD) at ¶ 50 (compiling SP complaints); Ex. 9 (11.12.2021 Imburgia Report) at ¶15 (citing HA's 9.6.2019 Response to

SPs' frustration with the Leads and that HA continued to charge SPs for Leads despite SPs' requests to terminate[39] is evidenced (and, thus, was known to Defendants) by the number of SPs who removed HA's access to their Payment Card[40] to which HA was charging Lead Fees.[41] Tellingly, approximately ███████████ Traditional SPs attempted to restrict HA's access to their Payment Cards, with ████████████████████████████████ ████████████████████████ than a year after joining. *See* Appendix I. HA tracked weekly SP status and was well-aware of the significant SP attrition and stop payment attempts.[42]

HA also experienced significant SP attrition, averaging an ██████████████████. Ex. 9 (11.12.2021 Imburgia Report) at ¶60.  HA's top management was aware of HA's atrocious (and concealed) SP attrition problems,[43] noting that one cause and fix would be to "cut out all the garbage" Leads and ██████████████████████████

---

FTC Rog 3, "[HA], in its sole discretion, may elect to offer lead credits to SPs…and such credits must be used within six months of the credit issuance."; Ex. 7 (11.12.2021 DGS Report) at ¶¶100(a), 113(b)-(d); Ex. 6 (FTC SMF) at ¶46.

[39] Ex. 2, SPs' reported experiences, *e.g.* at #12, 22, 73, 90, 134, 211, 214, 252, 294.

[40] For instance, Plaintiff Costello disputed HA charges with his credit card company after being charged $70.23 - $87.71 per Lead for Leads from "Mickey Mouse" at "123 Magical wat [sic]" (Ex. 90), "Bob Cheesesteak" at the address "This dick08232" (Ex. 91), "Deez Nuts" (Ex. 92), and "Desz Nuts" (Ex. 93). *See also,* SPs' reported experiences, Ex. 2 at *e.g.* #s 64, 94, 116, 132, 164, 169, 184, 232, 299, 326, 349, 435, 436, 449, 561.

[41] ████████████████████████████████████████████████████████████████ ██████████ Ex. 86 (HA0198100, 3.2014 HA Revenue & Collections) at 1.

[42] Ex. 87, HA0696433, Network Status Balance Sheet worksheet, with weekly statistics from November 20, 2016 to May 31, 2020, identifying that over that 3.5 year period, ████████ ████████████████████████████████████████████████████████████

[43] Over the span of 13 months, HA started with an SP network ███████████ and saw more than ███████████ *See* Ex. 2, at 3 (the Attrition Summary). HA experienced (but concealed) the equivalent of nearly an entire turnover ████████ of its SP network. HA's sales force was not soliciting new SPs to grow the network, but rather to replace the SPs heading for the exits ████████████████ (*Id*. at "% of Total Network").

████████████████████████████████ Ex. 7 (11.12.2021 DGS Report) at ¶¶102-105.

HA pursued collection efforts against SPs, internally and through third party collection agencies.[44] SPs whose accounts are sent to collections or have bad debt recorded by HA remain liable for payment of any outstanding amounts, including collection fees and finance charges.[45]

Further, even when SPs sever ties with HA, HA continues to harm the SPs by retaining their names and likenesses through the SPs' online profile pages ("OPPs"), which improves HA's website's SEO results, thereby redirecting web traffic to HA's website through the OPPs where HA falsely represents that the SP is not in business or accepting new business, to cause the consumer to submit an SR that will generate Lead Fees for HA. TAC ¶¶347-377. The open-ended and limitless grant of key business identity rights, that HA purports it acquired from the SPs via its "T&Cs", gives rise to the Class SPs' misappropriation claims and injunctive relief sought. *Id.*[46]

In sum, HA's deliberate fraud and deception concealed and omitted two key facts: first, HA's Non-CSR Leads were not verified by HA before they were sold to SPs; and, second, HA is seeking to use its "T&Cs" to the SPs' detriment.  As the FTC MSD (Ex. 5 at 36-37) concluded:

> Such serious, deliberate, and repeated deceptive acts and practices [by HA] represent flagrant violations of Section 5 of the FTC Act. **This case turns on Respondent's deception, nothing more and nothing less.** A strong cease and desist order with appropriate fencing-in relief is both legally appropriate and

---

[44] Ex. 2, SPs' reported experiences, *e.g.* at #56, 64, 67, 81, 90, 91, 96, 100, 108, 134, 142, 181, 211, 226, 251, 297, 305, 377, 416, 424; 499; *see* Ex. 5 (FTC MSD) at ¶51 (compiling SP complaints); Ex. 85 (Excerpt from HA0246555, 2016 Sales Billing Cycle worksheet).

[45] Ex. 85 (Excerpt from HA0246555, 2016 Sales Billing Cycle worksheet) at Rows 114-115.

[46] Ex. 88 (Ridenour Dep Ex. 1134) (pertinent language highlighted of T&Cs granting HA "a perpetual, irremovable, non-exclusive, royalty-free, transferable, assignable, sub-licensable, worldwide license to use…your Content.."); Ex. 89 (Plaintiffs' RFA No. 12), notwithstanding the Court's 9/17/2019 Order on HA's Motion to Compel Arbitration finding that HA failed to present evidence to demonstrate the existence of an enforceable agreement (Dkt. 276 at 6-12), HA Defendants refused to admit that the HA T&Cs do not constitute an enforceable contract or agreement between SPs and HA.

necessary to end Respondent's systematic lawbreaking.

## III.   CLASS DEFINITIONS, CLAIMS AND REPRESENTATIVES

As defined in Appendix A, Plaintiffs seek certification of two categories of proposed classes comprised of Traditional SPs from October 1, 2012 through present (the "Class Period"): (1) the Deceptive Practices Classes; and (2) the Misappropriation Classes.

The "Deceptive Practices Classes" consist of (1) a nationwide class, and (2) nine state classes—i.e., one for each of the following nine states: California, Colorado, Florida, Idaho, Illinois, Indiana, New Jersey, New York, and Ohio, and seek certification of these "Deceptive Practices Claims":

- On behalf of the nationwide Deceptive Practices Class, claims for (1) fraud/fraudulent concealment, (2) aiding and abetting fraud/fraudulent concealment,[47] and (3) unjust enrichment/restitution. *See id.*

- On behalf of the nine state Deceptive Practices Classes, Plaintiffs allege those same claims[48] plus claims for (1) breach of implied contract and (2) violations of various consumer protection statutes for eight[49] of the nine states. *See id.*

The "Misappropriation Classes" consist of (1) a nationwide class, and (2) three state classes—i.e., one for each of the following three states: Colorado, Florida, and Idaho, and seek certification of these "Misappropriation Claims" for injunctive relief only:

- On behalf of the nationwide Misappropriation Class, Plaintiffs allege claims for (1) violations of the Lanham Act sections 43(a) and 1125(a)(1)(B) and (2) a claim for declaratory judgment. *See id.*

- On behalf of the three state Misappropriation Classes, Plaintiffs allege claims for (1) violations of all three states' consumer protection statutes and (2) unfair

---

[47] Plaintiffs' nationwide aiding and abetting fraud/fraudulent concealment claim is limited to SPs residing, or maintaining their principal place of business, in 38 states and territories that recognize this cause of action. *See* Appendix A (identifying states that do not recognize the claim).

[48] Except Plaintiffs do not allege an aiding and abetting claim on behalf of the Ohio or Colorado individual-state classes. *See* Appendix A.

[49] Plaintiffs do not allege a statutory claim for the Indiana individual-state class.

competition for only the Colorado and Florida individual-state classes. *See id*.

Plaintiffs Airquip, Inc., DaSilva, Gray, Costello, Filipiak, Baumann, Ervine, Hass, Haukenes, the McHenrys, and LaPlaca seek to be named Class Representatives of their respective classes, as identified in Appendix A. *For the Deceptive Practices Classes*, each Class Representative, like the members of the Classes: is a Traditional SP, was charged for non-CSR Leads,[50] and was defrauded by HA's failure to have processes and controls to verify Leads prior to sending the Leads to the SPs. Further, each Class Representative testified that he/she was exposed to the false and misleading statements when deciding to join HA, such as, the Leads were "qualified" and "project-ready" and was misled about the Leads being verified by HA.[51]

*For the Misappropriation Classes*, the Class Representatives suffered and are at future risk of suffering misappropriation of their names and likenesses at the hands of HA, as HA (a) maintains their OPPs to generate web traffic and Leads through HA's website, despite those Plaintiffs terminating their HA membership (TAC ¶364-374), and (b) claims it has a license to utilize in perpetuity the SPs' business names and likenesses. *See* n.46.

## IV.    ARGUMENT

### A.    Plaintiffs Satisfy Each Requirement of Rule 23(a)

Plaintiffs readily satisfy each of Rule 23(a)'s four threshold requirements to certify the Classes: numerosity, commonality, typicality, and adequacy. *CGC Holding Co., Ltd. Liab. Co. v.*

---

[50] *See* Ex. 10 (Imburgia Table 7) (listing Lead Fees Charged to each Plaintiff for non-CSR leads).
[51] *See* Appendix G (Plaintiff's deposition testimony showing that they were uniformly misled by HA that Leads were qualified and project-ready). *See also* Ex. 94 at 45-49 (Plaintiffs' Fourth Amended Objections and Responses ("O & R") to Interrog. No. 15 listing the false and misleading statements); Ex. 95 at 52-61 (Plaintiffs' Fifth Amended O & R to Interrog. No. 29 listing the false and misleading statements, including but not limited to that Leads were "qualified, project-ready, serious homeowners actively seeking the [Plaintiff's] services").

*Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). Further, "[a]n identifiable class exists if its members can be ascertained by reference to objective criteria." *Rhodes v. Olson Assocs., P.C.*, 83 F. Supp. 3d 1096, 1111-12 (D. Colo. 2015).

### 1. *Numerosity and Ascertainability are Established*

Plaintiffs already used "objective criteria" in the form of the 2021 Data to (a) identify the specific Traditional SPs who are members of the Deceptive Practices and Misappropriation Classes[52], and (b) demonstrate that the Classes are sufficiently numerous that joinder of all members is impracticable, warranting Rule 23 certification.[53] *See Wendell H. Stone Co. v. Five Star Advert., LLC*, 2021 U.S. Dist. LEXIS 50721, at *10 (D. Colo. Mar. 17, 2021) (Brimmer, J.)(a class of 40 class members was "sufficient to satisfy the numerosity requirement.") Specifically, Plaintiffs identified ███████ Traditional US SPs, who are the members of the nationwide Classes, and ████████████ of the state Classes.[54] Ascertainability and numerosity are satisfied.

### 2. *Typicality is Established*

"Typicality is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at *18. "The interests and claims of the lead

---

[52] This Court explained that under circumstances present here "where the class members are identifiable using defendants' records … the class is … ascertainable." *Wornicki v. Brokerpriceopinion*, Civil Action No. 13-cv-03258-PAB-KMT, 2016 U.S. Dist. LEXIS 202271, at *25 (D. Colo. Sep. 20, 2016)(Brimmer, J.).

[53] *Id.* at 3-6 (¶¶C(1)-(3) explains Plaintiffs' methodology for utilizing HA's 2021 Data to identify Traditional SPs); *Id.* at 6 (Table 1 lists the number of members within each of Plaintiffs' ten proposed Deceptive Practices Classes, the number of members that suffered economic damages from those Deceptive Practices); *see also* Appendix A (listing each of the Deceptive Practices Classes and the number of class members for each).

[54] *See* Appendix A; Ex. 9 (11.12.2021 Imburgia Report) at Ex. A.I Data Appendix thereto at 3-6 ¶¶C(1)-(3) (describing methodology for utilizing 2021 Data to identify Traditional SPs).

plaintiff and the class members **need not be identical** to satisfy typicality and, provided the claims of the lead plaintiff and class members are based on the same legal or remedial theory, **differing fact situations of the class members do not defeat typicality**." *Id.*

The Class Representatives' claims arise from the same conduct and course of events as the members of the putative class. *See supra* § III. The Deceptive Practices Claims are based on HA's failure to verify its Leads, HA's false and misleading statements about its Non-CSR Leads, and HA's deception and concealment from SPs about the nature and quality of its Non-CSR Leads. *Id.* Likewise, the Misappropriation Claims are based on HA's use of SPs' names and likenesses on their OPPs after the SPs have terminated their HA memberships, HA misrepresenting on the OPPs that the SPs are not in business or not available to take on work; and, HA's claim that it has a perpetual worldwide license, a limitless grant of key business identity rights, purportedly acquired from the SPs via its "T&Cs". *Id.;* TAC ¶¶347-377; *see supra* n. 46. The foregoing course of conduct applies equally to each Class Representative and each member of the Classes. Thus, the Deceptive Practices and Misappropriation Claims "can be traced to the same overall fraud" and therefore satisfy typicality.[55]

### 3. *Adequacy is Established*

"The Tenth Circuit has identified two questions relevant to the adequacy of representation inquiry: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

---

[55] *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457, 511 (D. Utah 2017) ("where, as here, a party seeks to recover for fraud, the proposed class representative's claims are generally held to be typical of the class members' claims if the allegations can be traced to the same overall fraud, even if class members' specific claims are factually distinct") (quoting William B. Rubenstein, Newberg on Class Actions § 3:36 (5th ed. 2012)).

behalf of the class?" *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at *21. "As the Supreme Court has noted, the 'adequacy-of-representation requirement tends to merge with the … typicality criteria of Rule 23(a).'" *Id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)). The Class Representatives and their counsel do not have any conflicts of interest, do not have any interests antagonistic to the classes, and assert claims that are typical of the members of the Classes. *See supra* § IV.A.2. Plaintiffs are also able and willing to vigorously prosecute this action, as demonstrated by the immense time and effort they have already devoted to this case over the course of several years, including searching for and producing tens-of-thousands of documents in response to Defendants' 51 document requests covering a ten year period; responding to 63 detailed interrogatories; and providing over 8 hours of deposition testimony, with some Plaintiffs being deposed on two separate occasions. *See* DeSanto Decl. at ¶113. Further, Plaintiffs have retained counsel with significant experience in litigating complex litigation. *See* DeSanto Decl. at ¶123. Accordingly, the adequacy requirement is satisfied. *See Beltran*, 2018 U.S. Dist. LEXIS 23940, at *23 ("If the plaintiffs make a *prima facie* case of adequate representation, the burden shifts to the defendant. Absent evidence to the contrary, a presumption of adequacy applies.").

### 4. *Commonality is Established*

#### a. <u>Common Questions of Law and Fact Exist</u>

This Court has consistently explained that "[e]ven a single common question will satisfy commonality." *Wendell H. Stone*, 2021 U.S. Dist. LEXIS 50721, at *10; *see also Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at *12 (citing Rule 23(a)(2)). The Deceptive Practices Claims are straightforward, and the resolution of these common questions apply to each member of the Deceptive Practices Classes: Whether HA verified its Non-CSR Leads before sending them to SPs, rendering HA's conduct deceptive and its statements false and misleading

about the nature and quality of its Non-CSR Leads. *See supra* § III.

Also, the Fraud-Based Claims (consisting of the fraud/fraudulent concealment claims and the claims asserted under the nine consumer protection statutes) turn on the following common questions: (1) did HA omit material information about the nature and quality of its Leads and memberships; (2) did HA convey false and misleading information about the nature and quality of its Leads and memberships; (3) whether HA's internal processes were sufficient to ensure the Leads were authentic, accurate, and from serious consumers who had the intent to have SPs contact them about projects; and (4) whether HA charged class members for Leads that had never been verified or vetted by HA. *See also* TAC ¶438. The aiding and abetting fraud claims turn on whether and to what extent IAC was aware of the foregoing questions and facts, the determination of which is common to all members of the Classes. *See supra* §§ II.A.

Similarly, the unjust enrichment claims turn on a central question common to all class members: whether Defendants received and retained money from the Traditional SPs for unverified Leads.[56] Further, the implied contract claims turn on common questions and proof as to whether HA verified the Non-CSR Leads, and whether an implied contract was entered into between the SPs (all of whom provided HA with a Payment Card) and HA (who sent SPs the unverified Non-CSR Leads and charged the SPs Payment Card membership and Lead Fees). Finally, as to the Misappropriation Claims, which seek injunctive relief, the common question is

---

[56] For CDVM Defendants and CraftJack, the 2021 Data identifies every Non-CSR Lead generated by CDVM Defendants and CraftJack, that was charged to one or more Traditional SP, pursuant to those Defendants' revenue share arrangements with HA, and the Lead Fees charged on an individual Lead and SP basis, and in the aggregate. *See* Ex. 9 (11.12.2021 Imburgia Report) at ¶71, and at Ex. A.I Data Appendix pgs. 16-17 (Table 8, Lead Fees charged for CDVM-generated leads); *id*. at 18-19 (Table 9, Lead Fees charged for CraftJack generated leads).

whether HA secured a perpetual license to the Traditional SPs' names and likeness.

Because "Rule 23(a)(2) requires only a single question of law or fact common to the entire class," the multitude of common questions above for each claim readily satisfy commonality. *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at *12.[57]

### b. No Choice-of-Law Analysis is Required at this Stage

This Court[58] and many others[59] have previously certified common law claims on behalf of nationwide and/or multi-state subclasses without conducting a choice-of-law analysis. Moreover, courts nationwide have uniformly held that variations in state common law do not defeat commonality and/or class certification, including claims for fraud and unjust enrichment.[60]

For instance, in *It's Just Lunch*, the court found that variations in state law did not defeat commonality and certified a nationwide common law fraud claim because "all states require proof of misrepresentation, materiality of misrepresentation and reliance" such that "[l]itigation of the fraud claims on a classwide basis will therefore generate common answers apt to drive the

---

[57] Even if factual differences among the individual class members and Class Representatives exist (as Defendants will inevitably argue exist), commonality is nonetheless satisfied. As this Court previously explained, "[f]actual differences in the claims of the individual class members should not result in the denial of class certification where common questions of law exist." *Wendell*, 2021 U.S. Dist. LEXIS 50721, at *10.

[58] *See generally, e.g.*, *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271 (certifying fraudulent inducement and unjust enrichment claims on behalf of a nationwide (or at least geographically undefined) class even though the named plaintiffs resided in only Florida and Washington (*see id.* Dkt. 98 at ¶¶3-4), applying Colorado common law without conducting choice of law analysis).

[59] *See, e.g.*, *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 240 (C.D. Cal. 2003) (nationwide unjust enrichment class certified without choice-of-law analysis conducted).

[60] *See, e.g.*, *It's Just Lunch*, 300 F.R.D. at 136; *Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 77-78 (E.D.N.Y. 2004) ("A claim or defense can implicate common issues and be litigated collectively, despite the existence of state law variations."); *see generally Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("Variations in state law do not necessarily preclude a 23(b)(3) action"); *see also infra* nn.62 & 63 (collecting cases).

resolution of this [claim]." 300 F.R.D. at 136.[61] Similarly, with respect to the nationwide unjust enrichment claim, the *It's Just Lunch* court explained:

> As for the unjust enrichment claims of the proposed national class, **several courts have recognized that a universal thread throughout all common law causes of action for unjust enrichment** is a focus on the gains of the defendants. **Accordingly, there is a question common to all class members and provable on a class-wide basis** as to whether defendants unjustly profited by making [allegedly misleading] representations ….

*Id.*[62] Therefore, variations in state common law for fraud and unjust enrichment claims do not defeat commonality or certification of Plaintiffs' nationwide Deceptive Practices Claims.

Should the Court determine to deviate from its prior precedent and conduct a choice of law analysis for Plaintiffs' nationwide Deceptive Practices Claims, the "most significant relationship" test governing that inquiry dictates that Colorado law applies nationwide. Indeed, HA has argued that Colorado law applies and that its intent for Colorado law to apply to the SPs' common law claims (pointing to its T&C's choice of law provision), is, per HA, "an eminently reasonable selection, since [HA] is headquartered in [] CO, employs sales and customer service

---

[61] *Id.* ("With regard to … fraud claims, although states vary on whether they require proof of intent as an element in a fraud action[,] all states require proof of misrepresentation, materiality of misrepresentation and reliance …And as the U.S. Supreme Court recently noted, materiality is judged according to an objective standard. Litigation of the fraud claims on a classwide basis will therefore generate common answers apt to drive the resolution [], particularly [as] to whether [defendant] made misrepresentations, and whether those misrepresentations were material.").

[62] *See also, e.g., Keilholtz*, 268 F.R.D. at 341 ("the variations among some states' unjust enrichment laws are not material because they do not significantly alter the central issue or the manner of proof in this case"); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 240 (C.D. Cal. 2003) (certifying nationwide class of unjust enrichment claimants); *Schumacher v. Tyson Fresh Meats, Inc.*, 221 F.R.D. 605, 612 (D.S.D. 2004) (certifying nationwide unjust enrichment claims and noting that the universal thread in all common law causes of action for unjust enrichment "the gains of the defendants, not the losses of the plaintiffs"); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (same); *Singer v. AT&T Corp.* 185 F.R.D. 681, 692 (S.D. Fla. 1998) (same).

representatives in Colorado who are responsible for interacting with SPs, and operates many of its web-based and other service from platforms located there." *See,* Dkt. 51 at 11, n.2, Dkt. 276 at 5 (Court Order applying CO law). HA Defendants are estopped from making a contrary argument.

Furthermore, even if the Court were to disagree with either of the above positions, Plaintiffs can nonetheless demonstrate "either": (1) "the similarity of applicable state laws"; or (2) "the susceptibility of the class to division into manageable subclasses," such that certification is nonetheless proper. *Simon v. Metro. Prop. & Cas. Ins. Co.*, No. CIV-08-1008-W, 2012 U.S. Dist. LEXIS 205994, at *12-13 (W.D. Okla. Jan. 12, 2012).

### B.  Plaintiffs Satisfy Rule 23(b)(3)'s Predominance Requirement

"Parallel with Rule 23(a)(2)'s commonality element, Rule 23(b)(3)'s predominance requirement imposes an obligation upon district courts to ensure that issues common to the class predominate over those affecting only individual class members." *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at *27. The Tenth Circuit explained that to satisfy predominance, "[i]t is not necessary that **all of the elements of the claim entail questions of fact and law that are common** to the class, **nor that the answers to those common questions be dispositive**." *CGC*, 773 F.3d at 1087. Instead, "the predominance prong asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id*. Further, "[i]f the same evidence will suffice for each member to make a prima facie showing, or if the issue is susceptible to generalized, class-wide proof, then it is a common issue." *Beltran*, 2018 U.S. Dist. LEXIS 23940, at *25 n.5.

#### 1.  *Common Questions of Law and Fact Concerning Liability Predominate*

##### a.  Fraud-Based Claims Satisfy Predominance

Each Fraud-Based Claim is predicated upon HA's conduct, specifically, HA's failure to

verify the Non-CSR Leads and HA conveying uniform statements throughout the Class Period (i) on HA's website, (ii) in HA marketing emails sent directly to prospective SPs, (iii) in other written advertising materials, and, (iv) through HA training and marketing materials used to train sales representatives, that were false and misleading and concealed from SPs the nature, quality, and source of HA's Non-CSR Leads. *See supra* § II.C, D and III.

Thus, common evidence of HA's purported processes and controls for verifying Leads, as well as HA's Brand Promise statements, will be used to prove the central elements for all of Plaintiffs' Fraud-Based claims (i.e., that HA deceived, and made false and misleading statements to, the Class SPs). Courts routinely certify fraud claims where, like here, they will be proven with common evidence of the defendant's conduct and uniform false and misleading statements.[63]

Common evidence exists and is grounded in Defendants' conduct (*see supra* § II.D) demonstrating (1) Defendants' knowledge of the Brand Promise statements' falsity and/or likelihood to mislead, (2) Defendants' intent to mislead, and (3) the materiality of those false and misleading statements, which further satisfies Rule 23(b)(3). *See, e.g.*, *It's Just Lunch*, 300 F.R.D. at 136 ("the U.S. Supreme Court recently noted, materiality 'is judged according to an objective

---

[63] *See, e.g.*, *Brokerpriceopinion*, 2016 U.S. Dist. LEXIS 202271, at \*33 (finding defendant's statements "were substantially uniform for all time periods relevant to th[e] case," and finding that fraudulent inducement claim satisfied predominance); *Beltran*, 2018 U.S. Dist. LEXIS 23940, at \*40 (finding predominance satisfied where "Plaintiffs' common law misrepresentation and fraud claims all arise from the same alleged misrepresentations Defendants communicated to [class members]" and the "state consumer protection claims arise from the uniform misrepresentations Defendants allegedly made"); *It's Just Lunch*, 300 F.R.D. at 136 (certifying nationwide common law fraud claim and holding, "plaintiffs' fraud … claims will rise or fall in significant part based on whether [defendants]' materially uniform representations to the class were materially misleading and whether [defendants] unjustly profited as a result"); *see also* Rule 23 Adv. Comm. Notes ("a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class").

standard.'") (quotation omitted). As such, "[l]itigation of the fraud claims on a classwide basis will therefore generate common answers apt to drive the resolution of this litigation, particularly with regard to whether [HA] made misrepresentations, and whether those misrepresentations were material." *Id.*[64] Further, because Plaintiffs' aiding and abetting fraud/fraudulent concealment claims[65] are based on their common law and statutory fraud claims, the foregoing common issues and evidence also predominate as to those claims, meriting their certification under Rule 23(b)(3).

### b. <u>Unjust Enrichment & Breach of Implied Contract</u>

The same facts underlying Plaintiffs' Fraud-Based Claims also form the basis of the Plaintiffs' and Class SPs' claims that Defendants were unjustly enriched by receiving Plaintiffs' payments for HA memberships and Non-CSR Lead Fees. The "unjust" element of the claim will be established using the common evidence of HA's false and misleading Brand Promise statements and HA's lack of internal processes to verify all Leads and ensure that its Non-CSR Leads were of the nature and quality described in the Brand Promise statements, such that predominance is satisfied. Furthermore, the 2021 Data is the common evidence that identifies: each Class SP who was charged a Lead Fee, the specific CSR and Non-CSR Leads that were sent and charged to each SP, and the amount each SP was charged for each Non-CSR Lead, which is common evidence establishing that each SP conferred a benefit upon Defendants and the amount of that benefit.

Likewise, the same common issues and evidence of HA's conduct – its failure to validate

---

[64] Also, as explained in *supra* § IV.A.4.b., state to state variances in common law fraud elements do not defeat predominance because, *inter alia*, "although states vary on whether they require proof of intent as an element in a fraud action[,] all states require proof of misrepresentation, materiality of misrepresentation and reliance." *It's Just Lunch*, 300 F.R.D. at 136.

[65] These claims turn upon whether and to what extent IAC was aware of HA's fraudulent conduct which, of course, will be proven on behalf of every single class member using common evidence of IAC's involvement in and control of HA's business. *See supra* §II.A.

Non-CSR Leads - establish the central element of the Class breach of implied contract claims—
i.e., the breach. Further, to establish the existence of an implied contract under the laws of the nine
states under which Plaintiffs seek certification, the Court must look to the conduct of the parties.[66]
The HA 2021 Data is the common evidence that identifies: each Class SP who provided a Payment
Card, if HA charged that SP for membership and Lead Fees, the amounts charged to each SP for
each Lead, and the identification of each Non-CSR Lead sent by HA to each SP, all of which
establish the existence of an implied contract between each Class SP and HA, and SPs' damages.

### c. Defendants Cannot Defeat Predominance By Pointing to Particular Class Members Or Inventing Damages-Related Issues

Plaintiffs' claims and the determinations of liability and damages in this case are grounded
in Defendants' conduct <u>prior to</u> the Non-CSR Leads being sent to the SP, and evidence and proof
as to whether Defendants' processes and policies ensured the Non-CSR Leads were verified as
authentic, accurate, serious, and with intent—i.e., consistent with the message HA conveyed in its
false and misleading Brand Promise statements. Also, Plaintiffs already identified the members of

---

[66] *Farnworth v. Femling*, 125 Idaho 283, 287, 869 P.2d 1378, 1382 (Idaho 1994) ("An implied in
fact contract is … manifested by the conduct of the parties"); *Brown-Wright v. E. St. Louis Sch.
Dist. 189*, 2019 IL App (5th) 180311-U, ¶ 25 (Ill. App. 2019) ("the existence of … a contract
implied in fact [is inferred] from the parties' conduct or actions"); *Maxi-Med Supply v. Net*, 2021
Cal. Super. LEXIS 72120, *2-3 (Cal. Super. Ct. 2021) (an implied contract "is implied from the
promisor's conduct."); *Fennimore v. Partylite Gifts, Inc.*, 2021 U.S. Dist. LEXIS 154137, at *21-
22 (D.N.J. Aug. 17, 2021) ("an implied contract … is demonstrated by the conduct of the parties");
*In re Brinker Data Incident Litig.*, 2020 U.S. Dist. LEXIS 247918, at *16-17 (M.D. Fla. Jan. 27,
2020) (same); *Trs. of Ind. Univ. v. Spiegel*, 2022 Ind. App. LEXIS 95, at *10 (Ind. Ct. App. Mar.
31, 2022) (same); *Russo v. Banc of Am. Sec., LLC*, 2007 U.S. Dist. LEXIS 47903, at *12 (S.D.N.Y.
June 28, 2007) (same); *Winkler v. Bowlmor AMF*, 207 F. Supp. 3d 1185, 1190 (D. Colo. 2016)
(implied contract where "the [defendant] manifested his willingness to enter into a bargain"); *MPW
Indus. Servs. v. Pollution Control Sys.*, 2006 U.S. Dist. LEXIS 9360, at *14 (S.D. Ohio Mar. 9,
2006) ("an implied contract may be proved by showing that the circumstances surrounding the
parties' transactions make it reasonably certain that an agreement was intended.").

the Classes and their damages using HA's 2021 Data. Therefore, attempts by Defendants to sidestep the foregoing reality by manufacturing "individualized issues" among Class members (for example, about reliance or the SPs' conduct after receiving the Lead) would be unavailing. *See, e.g., Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014) ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.")

*First*, it is well settled that "the Tenth Circuit permits causation to be established through an inference of reliance where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct." *Beltran*, 2018 U.S. Dist. LEXIS 23940, at *32 (quoting *CGC*, 773 F.3d at 1089-90).[67] Here, every single putative Traditional SP Class member took the same affirmative act—i.e., each Traditional SP joined HA, handed over their form of payment, and was charged a membership fee and then Lead Fees.[68]

---

[67] It is well settled that "merits-based defenses" cannot be used to rebut the inference of reliance. *In re EpiPen*, 2020 U.S. Dist. LEXIS 40789, at *153-54; *see also, e.g., Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 259 (S.D. Ill. 2015) ("contrary to Defendants' assertion, the fact that individualized proof from each class member may be required on the issues of proximate causation and reliance does not make the class format unmanageable or support the denial of class…").

[68] *Beltran*, 2018 U.S. Dist. LEXIS 23940, at *33 ("[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations") (quoting *CGC*, 773 F.3d at 1090); *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004) (same); *CGC*, 773 F.3d at 1091-92 ("the fact that a class member paid the nonrefundable up-front fee … constitutes circumstantial proof of reliance on the misrepresentations and omissions"); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, No. MDL No: 2785, 2020 U.S. Dist. LEXIS 40789, at *153 (D. Kan. Feb. 27, 2020) (holding "the court can infer that the putative plaintiffs relied on defendants' misrepresentations or omissions about the [subject product] … when purchasing [that product]"); *Roberts v. C.R. England, Inc.*, 318 F.R.D. at 514 ("an inference of reliance and causation is warranted …. Individuals relied on promises of economic opportunity when they enrolled in and paid [for defendant's services] …. common sense dictates that each class member's reason for … joining the [defendant's services program] was the belief that Defendants[' alleged misrepresentations were true]"); *It's Just Lunch*, 300 F.R.D. at 139 (defendant's "representation to its prospective customers about multiple matches

*Second,* neither the SPs' conduct *after receiving* the Lead or the outcome of the Lead are of consequence to if, whether, and/or how Defendants verified the Non-CSR Leads before delivery to any SP. Defendants' processes (or lack thereof) are not changed, altered, or impacted by anything occurring <u>after</u> the sale of the Non-CSR Leads, including whether and how fast the SP called the Lead, whether the SP won a job, or if the SP had a return on his/her investment.[69]

Courts consistently hold that those types of individualized inquiry arguments, including specifically about class members that were supposedly uninjured or benefitted in some way from the defendant's alleged misconduct, do not defeat predominance.[70] As this Court has previously

---

was so fundamental that it is reasonable to infer not only that defendants intended for their representations to induce plaintiffs' reliance, but that plaintiffs in fact relied on those representations in becoming … customers"); *Dandong v. Pinnacle Performance Ltd.*, 2013 U.S. Dist. LEXIS 150259, 2013 WL 5658790, at *9 (S.D.N.Y. Oct. 17, 2013) (same); *Seekamp v. It's Huge, Inc.*, 2012 U.S. Dist. LEXIS 33295, 2012 WL 860364, at *10 (N.D.N.Y. Mar. 13, 2012) (same); *In re US FoodServ. Pricing Litig.*, 729 F.3d 108, 120 (2d Cir. 2013) (same).

[69] *See also, e.g., Harnish v. Widener Univ. Sch. of Law*, 833 F.3d 298, 307 (3d Cir. 2016) (reasoning that "[a]ctual value in a fraud case is generally determined as of the time of the transaction," such that plaintiffs' subsequent conduct and earnings are irrelevant); *id.* at 307 n.3 ("As a loose analogy, a lottery ticket's actual value at sale does not retroactively … skyrocket the moment a purchaser wins. If the odds were honestly [represented at the time of sale], all purchasers received exactly what they paid for, and neither a loser nor a winner could claim any damages. *And if the odds were misrepresented, both players would have the same damages arising from the fraud — namely, they were overcharged for placing their bets*."); *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 479 (C.D. Cal. 2012)(explaining the Ninth Circuit "roundly rejected the relevance" of information about plaintiff's conduct after receiving the allegedly defective product).

[70] *See infra* n.72; *see also, e.g., In re Ariz. Theranos*, No. 2:16-cv-2138-HRH, 2020 U.S. Dist. LEXIS 168254, at *24-27 (D. Ariz. Mar. 5, 2020) (rejecting the defendant's argument that predominance was lacking because "some of the plaintiffs and putative class members [received what they bargained for]"); *B.P. v. Balwani*, Nos. 20-15974, 20-15976, 2021 U.S. App. LEXIS 26998, at *4-5 (9th Cir. Sep. 8, 2021) ("[defendant]'s defense does not address this central issue of liability because whether individual tests were in fact accurate is not relevant to representations that were made …. Because more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance"); *Sturm Foods*, 311 F.R.D. at 259 (same); *Makaeff v. Trump Univ., Ltd. Liab. Co.*, 309 F.R.D. 631, 640 (S.D. Cal. 2015) (same).

explained: "[i]f one or more of the central issues in the action are common to the class and can be said to predominate, the class may be certified under Rule 23(b)(3) **even though other important matters will have to be tried separately**, such as damages or some **affirmative defenses peculiar to some individual class members**." *Beltran*, 2018 U.S. Dist. LEXIS 23940, at *25.[71]

### d.  Misappropriation Claims

The Misappropriation Claims, seeking injunctive relief, are established using common evidence related to HA's policy to maintain SPs' OPPs (with their names and likenesses), after those SPs cancelled their HA memberships, whether the uniform statements that HA placed on the OPPs were false and misleading, and whether HA is enjoined from claiming it secured any worldwide license to the SPs' names and likenesses. Those are common, aggregation-enabling, issues that predominate and warrant certification of the Misappropriation Claims.

### e.  Plaintiffs Have *Already Calculated* Classwide Damages

With respect to damages, this Court previously explained that:

> Although a fair reading of *Comcast* may suggest that damages must be measurable on a classwide basis to satisfy Rule 23(b)(3), **courts have not**

---

[71] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 442, (2016) (same); *Anderson Living Tr. v. WPX Energy Prod., LLC*, 306 F.R.D. 312, 389 (D.N.M. 2015) ("A defendant's desire to assert individual affirmative defenses also often does not defeat predominance"); *Bustillos v. Bd. of Cty. Comm'rs*, 310 F.R.D. 631, 658-59 (D.N.M. 2015) ("the Court notes several recurring individual issues that often exist in the class action context, but which rarely defeat a predominance finding, such as … a defendant's desire to assert individual affirmative defenses"); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) (same); *Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 810 (1985) (same); *Allapattah Servs, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003) (same); *Whitton v. Deffenbaugh Disposal, Inc.*, No. 12-2247-CM, 2014 U.S. Dist. LEXIS 153405, at *21-22 (D. Kan. Oct. 28, 2014) ("courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses. After all, Rule 23(b)(3) requires … not that all issues be common to the class. If, moreover, evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms … [of placing certain members] in a separate subclass, or exclude[ing] them from the class altogether.").

> **interpreted the holding so broadly** …. the Tenth Circuit stated, '***Comcast* did
> not rest on the ability to measure damages on a class-wide basis** ….
> Therefore, that Plaintiffs' damages cannot be calculated on a classwide basis
> with uniform evidence **does not preclude certification** under Rule 23(b)(3).

*Douglas Cty. Fed'n v. Douglas Cty. Sch. Dist. Re-1*, 325 F.R.D. 355, 371 (D. Colo. 2018).

Notwithstanding, Plaintiffs have not only put forth a methodology for calculating classwide

damages utilizing HA's 2021 Data, they have *already performed* the calculations and stated the

exact amounts of damages[72], which irrefutably satisfies predominance with respect to proving

damages.[73]

### 2.  A Class Action is Manageable and the Superior Form of Adjudication

"The second requirement for certification under Rule 23(b)(3) is that 'a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy.'"

*Beltran*, 2018 U.S. Dist. LEXIS 23940, at *41-42 (quoting Fed. R. Civ. P. 23(b)(3)). Given the

large number of class members ███████ the relatively small dollar value of their individual

claims[74], and the common issues present that apply class-wide requiring class wide adjudication,

thereby promoting consistency and efficiency of adjudication and conserving judicial resources,

Rule 23 certification is the superior and most efficient and fair means of adjudicating the Claims.

Furthermore, although not a standalone requirement for certification, in analyzing

---

[72] *See* Ex. 9 (Imburgia 11.12.2021 Report) at 30-33, ¶¶67-77 (explaining methodology for
calculating damages); *id*. at 33-34, ¶¶78-80 (stating the amounts of total damages); *id*. at 15 the
Ex. A.I Data Appendix to 11.12.2021 Imburgia Report (Table 6 - damages for each of Plaintiffs'
proposed classes); Ex. 10 (Imburgia Table 7) (damages incurred by Class Representatives).

[73] Furthermore, it is axiomatic within the Tenth Circuit that "[t]he fact that damages may have to
be ascertained on an individual basis is not, standing alone, sufficient to defeat class certification."
*Harrel's LLC v. Chaparral Energy, LLC (Naylor Farms, Inc.)*, 923 F.3d 779, 798 (10th Cir. 2019);
*Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 922 (10th Cir. 2018) (same).

[74] Dividing the aggregate damages ███████ with Economic Damages
by ███████ the average damage is ███ per SP. Ex. 9, at A.I Data Appendix, Table 6.

superiority, Rule 23 instructs courts to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Litigating this case as a class action poses no particular manageability concerns; liability and damages turn on HA's conduct, and Plaintiffs have already received and analyzed the pertinent, detailed information about each SP and Lead contained in the 2021 Data.

### C.     Plaintiffs Satisfy 23(b)(2)

Rule 23(b)(2) certification is appropriate here as "an injunction or declaratory relief can be fashioned that enjoins defendants from continuing the main practices challenged in the complaint" *Lozoya v. AllPhase Landscape Constr., Inc.*, No. 12-CV-1048-JLK, 2015 WL 1524639, at *2 (D. Colo. Mar. 31, 2015). Plaintiffs' requested injunctive relief will: prohibit Defendants from employing any unfair and/or deceptive business acts or practices related to the marketing and selling of Leads, and SPs' requests for refunds and to suspend or cancel their Leads or membership; require Defendants to implement adequate procedures, technologies, and operational processes to validate the Leads; and enjoin Defendants from using SPs' names and likenesses in any capacity beyond that to which the SP gives written consent, and require that absent SP's express written assent when terminating, HA will promptly take down the SP's OPP. As none of the foregoing relief requires differentiating among the Class members, Rule 23(b)(2) certification is proper.

### V.     APPOINTMENT OF CLASS COUNSEL

The Court should appoint Chimicles Schwartz Kriner and Donaldson-Smith ("CSKD") as Class Counsel, and Sherman & Howard ("S&H") as local class counsel, pursuant to Rules 23(g) and 23(c)(1)(B). CSKD has represented plaintiffs in complex class action litigation for over 30 years, including at trial, and specific to this Action, for over six years, conducted extensive work to investigate the potential claims asserted in the TAC, prosecuted and defended the rights of the Plaintiffs and SPs in this Action through extensive motion practice and fact and expert discovery

(thereby demonstrating their "knowledge of the applicable law"), and has expended considerable resources, both time and expenses, to vigorously, fairly and adequately represent the Plaintiffs and the interests of the Classes, and will continue to do so. DeSanto Decl. ¶¶101-23.

## VI.   CONCLUSION

For the foregoing reasons, the Court should grant the relief sought herein, certifying the Classes and Class Representatives as set forth in Appendix A and appointing CSKD as class counsel and S&H as local class counsel, as set forth in the Proposed Order provided herewith.

DATED: May 5, 2022

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

_Nicholas E. Chimicles_
Nicholas E. Chimicles
Kimberly M. Donaldson-Smith
Mark B. DeSanto
Stephanie E. Saunders
361 West Lancaster Avenue
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
nec@chimicles.com
kds@chimicles.com
mbd@chimicles.com
ses@chimicles.com

***Attorneys for Plaintiffs***

Scott M. Tucker
2711 Centerville Rd.
Suite 201
Wilmington, DE 19808
Phone: 302-656-2500
Fax: 302-656-9053
Scotttucker@chimicles.com

Gordon W. Netzorg
Mark W. Williams
**SHERMAN & HOWARD, L.L.C.**
633 17th Street, Suite 3000
Denver, CO 80202
Phone: 303-299-8381
Fax: 303-298-0940
gnetzorg@shermanhoward.com
mwilliams@shermanhoward.com

## CERTIFICATE OF CONFERRAL PURSUANT TO D.C. COLO.LCivR. 7.1(A)

I, Nicholas E. Chimicles, hereby certify that pursuant to D.C. Colo.LCivR. 7.1(a), Plaintiffs conferred about this Motion with counsel for all Defendants via email and Defendants oppose this Motion.

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

_/s/ Nicholas E. Chimicles_

## CERTIFICATE OF SERVICE

I, Nicholas E. Chimicles, hereby certify that on this 5th day of May 2022, a true and correct copy of **PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL PURSUANT TO FED. R. CIV. P. 23** was filed electronically with the Clerk of Court using the CM/ECF system. As such, this motion was served on all counsel who are deemed to have consented to electronic service.

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

*/s/ Nicholas E. Chimicles*