# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION

---

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO STRIKE THE PROFFERED TESTIMONY OF DEFENDANTS' EXPERTS: CARLOS HIDALGO, DR. ITAMAR SIMONSON, JESSIE STRICCHIOLA, AND LOUIS G. DUDNEY**

---

Plaintiffs hereby reply to HomeAdvisor, Inc. ("HA"), IAC/Interactivecorp ("IAC"), ANGI Homeservices, Inc. ("ANGI"), and CraftJack, Inc.'s Opposition [Dkt. 567] to Plaintiffs' Motion to Strike Defendants' Experts Carlos Hidalgo, Dr. Itamar Simonson, Jessie Stricchiola and Louis G. Dudney [Dkt. 549, "Plaintiffs' Motion" or "Pltfs.' Mot."][1], and C. David Venture Management, LLC and VentureStreet, LLC's Joinder thereto [Dkt. 565] (collectively, "Defendants' Opposition" or "Defs.' Opp."), and, further in support of their Motion, Plaintiffs state as follows:

## I. INTRODUCTION

Defendants' Opposition wholly ignores the actual challenges, and the legal authority on which those challenges are based, that were asserted in Plaintiffs' Motion and directed to each of Defendants' proffered experts and their specified opinions. Instead, Defendants principally resort to hyperbole and restating, and, at times, altering, their experts' proffered testimony and conclusory and unfounded opinions. Defendants sparingly cite to boilerplate black letter law about expert testimony, do not address Plaintiffs' authority, and fail to refute the particularized bases

[1] Capitalized terms herein have the same meaning as set forth in Plaintiffs' Motion. References to "Ex. __" are referencing the Exhibits submitted in support of Plaintiffs' Motion at Dkt. 549-1-24. References here to "Reply Ex. __" are to Exhibits filed herewith.

Plaintiffs identified which demonstrate that Defendants' experts' opinions and proffered testimony are inadmissible and do not constitute properly grounded "expert opinion" or rebuttal opinion, and, therefore, should be stricken.

## II. <u>ARGUMENT</u>

### A. <u>Plaintiffs Identified the Opinions and Proffered Testimony To be Stricken</u>

Defendants contend that Plaintiffs do not cite "any *opinions* that they seek to exclude" as a ground to deny Plaintiffs' Motion. Defs.' Opp. at page 4. This argument is facially absurd and indicative of the 40 pages of Defendants' Opposition that follow which are similarly devoid of substantive responses to the challenges raised in Plaintiffs' Motion. It is readily apparent that Plaintiffs' Motion identified the proffered opinions and testimony to be stricken, including by reference to page and even (when applicable) footnote number from the experts' Reports, and the bases for striking them. *See, e.g.*:

1. <u>Plaintiffs' Motion at pages 17-19</u>, identifying by page and footnote references Mr. Hidalgo's improper regurgitation of Defendants' defense and evidence, and interpretation and weighing of Plaintiffs' deposition testimony, in his 11.12.2021 Report (Ex. A [Dkt.549-1-3]) and 2.10.2022 Rebuttal Report (Ex. B [Dkt.549-4]).

2. <u>Plaintiffs' Motion at pages 19-20</u>, identifying by page and footnote references Dr. Simonson's improper regurgitation of Defendants' defense and evidence, and interpretation and weighing of Plaintiffs' deposition testimony, in his 2.10.2022 Rebuttal Report (Ex. D [Dkt.549-6]).

3. <u>Plaintiffs' Motion at page 20</u>, identifying by paragraph and page references Mr. Dudney's improper regurgitation of Defendants' defense and evidence, and interpretation and weighing of Plaintiffs' deposition testimony, in his 2.10.2022 Rebuttal Report (Ex. F [Dkt.549-8]).

4. Plaintiffs' Motion at pages 22 -23, identifying the unreliable and inadmissible opinion Mr. Hidalgo termed as **"Opinion 1",** and specifically quoting examples of the various iterations of "Opinion 1" contained in his 194 page report – *twelve quotes provided, to be specific* - concerning HA's purported lead verification processes, as well as the pages of the Hidalgo Reports on which such opinions appear.

5. Plaintiffs' Motion at 26-28, identifying Mr. Hidalgo's, Dr. Simonson's and Mr. Dudney's unreliable and inadmissible opinions about "Brand Promise", specifically quoting the opinions, and identifying the page and paragraph references (as applicable) where they appear in each of their respective Reports.

6. Plaintiffs' Motion at 29-30, identifying the Phillips Declaration and Mr. Hidalgo's unreliable and inadmissible "opinions" about HA's purported lead verification processes based on the Phillips Declaration by reference to the specific opinion and pages and footnote references in Mr. Hidalgo's Reports.

7. Plaintiffs' Motion at 32-33, identifying the unreliable and inadmissible opinions and attendant non-expert testimony by Mr. Dudney and Mr. Hidalgo with quotes, and specific paragraph or page references (as applicable) from their Reports, concerning and adopting Defendants' factually unsupported and misleading "Connection" argument.

8. Plaintiffs' Motion at pages 33-35, identifying the unreliable, wrong, and inadmissible opinion Mr. Hidalgo termed as **"Opinion 2",** which leads with specifically quoting the "Opinion 2", and identifying (quoting and by page reference) the seemingly attendant opinions from Mr. Hidalgo's Report, about the outreach and "nurturing" that Plaintiffs conducted after HA sent and charged the Plaintiffs for a Lead.

9. Plaintiffs' Motion at 35-37, identifying Ms. Stricchiola's unreliable and inadmissible rebuttal opinions concerning HA's Data and fraud detection, specifically quoting the opinions, and noting the page references where they appear in her Report.

10. Plaintiffs' Motion at 38-39, identifying the confusing, unhelpful, irrelevant and inadmissible opinions of Mr. Hidalgo and Mr. Dudney by specifically quoting the opinions and noting the page and paragraph references to the experts' Reports; these "expert opinions" purport to opine about what happened *after* HA sent and charged Plaintiffs for the Leads, including the Plaintiffs' and SPs' outreach and "nurturing", and whether Plaintiffs or SPs got any work from Leads.

11. Plaintiffs' Motion at 41-45, identifying specifically (with quote and page or paragraph references) at page 43 for Ms. Stricchiola and page 44 for Dr. Simonson, the proffered opinions and testimony that exceed the bounds of rebuttal.

Since the foregoing was evident to Defendants from Plaintiffs' Motion, possibly Defendants' assertion that Plaintiffs do not identify "any *opinions* that they seek to exclude" signals that they recognize and concede their experts are not offering "expert opinion." In any event, Plaintiffs identified the challenged proffered opinions and testimony, and, moreover, did so

with particularity. Defendants' response is wanting in substance and fails to refute that Plaintiffs are entitled to the relief sought.

### B. <u>Defendants Do Not Respond to Plaintiffs' Challenge that Defendants' Experts Are Improperly and Extensively Summarizing Defendants' View of the Evidence and Facts, as well as Witnesses' Testimony, and Improperly Opining on Plaintiffs' Testimony</u>

In Section IV. A of Plaintiffs' Motion (pages 15-20), Plaintiffs identify over 100 pages from Defendants' Experts' reports that are glaring illustrations of Defendants' improper attempts to use their experts as vehicles to summarize their evidence and their witnesses' testimony for the jury. Plaintiffs' challenge is supported by case law from District Courts within the Tenth and other Circuits, and Plaintiffs cited to the following ten cases in support of their Motion to strike all of the identified "testimony" or "expert opinion" on these grounds, *e.g.* Plaintiffs' Motion at 15-17:

- "Expert testimony may not be used to act as a 'mouthpiece for counsel.'" *Valdez v. Motyka*, 2019 U.S. Dist. LEXIS 165404, *17 (D. Colo. Sept. 26, 2019); *Ellis v. Hobbs Police Dep't*, 472 F. Supp. 3d 1087, 1096 (D. N.M. 2020)("[E]xperts should not serve as a mere mouthpiece for the expression of one party's version of events.").[2]

- "Experts cannot be proffered to summarize deposition testimony or regurgitate factual information." *Modica v. Maple Meadows Homeowners Ass'n,* 2014 U.S. Dist. LEXIS 45912, 2014 WL 1663150, at *1 (E.D. Pa. Apr. 2,2014); *In re C.R. Bard, Inc.*, 948

[2] Defs.' Opp. at 24 cites to *Ellis v. Hobbs Police Dep't*, 2020 WL 3618958, at *4 (D.N.M. July 2, 2020), a different decision from the same *Ellis* case, which Defendants cite to for a different proposition inapplicable to this point; the decision they cite, however, is supportive of other of Plaintiffs' challenges, including that when "the information or assumptions that [a party's] experts relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts," it would render an expert's testimony inadmissible. *Id. See,* Plaintiffs' Motion, Dkt. 549, at Section IV.B; and *infra* at Section II.B.

F. Supp. 2d 589, 608 (S.D.W. Va. 2013) ("Expert testimony which merely regurgitates factual information that is better presented directly to the jury rather than through the testimony of an expert witness is properly excluded."); *Kia v. Imagine Scis. Int'l, Inc.*, 2010 U.S. Dist. LEXIS 90065, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010); *United States v. Cormier*, 468 F.3d 63, 73 (1st Cir. 2006).

- "Experts are not permitted to opine on the credibility or consistency of others' testimony, as it: usurps a critical function of the jury; is not helpful to the jury, which can make its own determination of credibility; is prejudicial; and, unduly influences the jury." *United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir. 2003)(Such testimony comes "dangerously close to usurping the jury's function" and "implicates Rule 403 as a 'needless presentation of cumulative evidence' and 'a waste of time.'"); *Olivet Baptist Church v. Church Mut. Ins. Co.*, 2016 U.S. Dist. LEXIS 25294, 2016 WL 772787, at *5 (N.D. Ill. Feb. 29, 2016).

- "Regurgitation of a party's evidence is not purported 'expert' opinion because it 'does not provide the jury any specialized knowledge to assist [with] commonsense determination[s]'". *O'Brien v. Costco Wholesale Corp.*, 2022 U.S. Dist. LEXIS 41906, *15-16 (D. Colo. March 9, 2022)

- "experts cannot be permitted to 'act[] outside of [the] limited role of providing the groundwork in the form of an opinion to enable the jury to make its own informed determinations.'" *United States v. Jacques Dessange, Inc.*, 2000 U.S. Dist. LEXIS 3597, at *4 (S.D.N.Y. March 21, 2000).

Defendants' response to the foregoing is to call Plaintiffs' challenge and the case law

"completely nonsensical". *See* Defs.' Opp. at 3. Defendants do not address or reference any of the cases cited by Plaintiffs. Defendants muster no attempt at a substantive response to this challenge, and there is none in the face of the case law and reality that Defendants and their experts have done that which is specifically prohibited for good reason, as the foregoing cases confirm. *See* Plaintiffs' Motion at pgs. 17-20.

The profound extent to which Mr. Hidalgo's 11.12.2021 Report exceeds the bounds of proper expert testimony causes Plaintiffs to think that it is possible that his Report [redacted]

Further, a possible motivation for Defendants' brazen and persistent attempt to improperly use their experts to be mouthpieces for fact witnesses is Defendants' desire to avoid seeking the appearances and cooperation of former executives [redacted].[4]

---

[3] [redacted]

[4] *See,* Reply Ex. W, hereto (Appendix H, to Pltfs' Motion for Class Certification Dkt. 557-9). Just as an example (*see id.*): Ryan Sullivan (HA and ANGI Chief Technology Officer) left in March 2020; Craig Smith HA and ANGI President and COO) left in January 2021; Brandon Ridenour (HA Chief Product Officer, ANGI Chief Executive Officer and Director) left in February 2021; Jamie Cohen (HA EVP Finance & Accounting, and ANGI CFO) left in March 2021; Allison Lowrie (HA and ANGI Chief Marketing Officer) left in April 2021 .

In any event, Defendants' Opposition seeks to distract from and avoid the actual challenges lodged. After calling the challenge and applicable precedent "completely nonsensical," Defendants then make a terse claim that their experts are just stating the "foundation" for their opinions, and then proceed to spill pages of ink just summarizing the challenged contents excerpted from their Experts' Reports (Defs.' Opp. at 5-11). That response, however, does not address Plaintiffs' challenge and the law cited. That same unpersuasive and rejected argument was available to all litigants and their experts in the above-discussed cases. It is also belied by the case law (*see* cases cited *supra* at 4-5, from Pltfs.' Motion[5]). It is also belied by the proffered testimony itself, as Plaintiffs identified how Defendants' experts' reports are replete with improper, extensive compilation and recitation of *Defendants' evidence* and assigning improper weight to the credibility of testimony, including that of the individual Plaintiffs.

Defendants, as confirmed by their Opposition, intend to improperly utilize Mr. Hidalgo, Dr. Simonson, and Mr. Dudney as mouthpieces to present Defendants' evidence, to give unmerited credibility to Defendants' witnesses, to improperly weigh credibility of and interpret Plaintiffs' testimony, and to offer non-expert opinions and testimony under the prejudicial guise of "expert" opinion. Defendants are prohibited from using their experts in these ways. Accordingly, Mr. Hidalgo, Dr. Simonson, and Mr. Dudney must be precluded from offering, and the Court is

---

[5] *See also*, *McBeth v. Physician Health Partners, Inc.*, 2019 U.S. Dist. LEXIS 126711, at *21-22 (D. Colo. July 30, 2019) ("Expert testimony may not be used as a guise for putting a party's interpretation of the facts before a jury. *See, e.g.*, *United States v. Rodriguez*, 125 F. Supp. 3d 1216, 1252 (D.N.M. 2015) ('When the expert opines on the basis of 'expertise' rooted in the facts of the case being tried, [the expert] is effectively arguing the case as a mouthpiece for counsel.'). Furthermore, '[e]xpert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not assist the trier of fact as required by Rule 702.' *United States v. Adams*, 271 F.3d 1236, 1245 (10th Cir. 2001) (internal quotation marks omitted)).")

respectfully requested to strike, the so-called "opinions" and testimony as identified in Plaintiffs' Motion at pages 17-20.

### C. <u>Defendants Improperly Attempt to Rewrite Their Experts' Unreliable and Erroneous Opinions In Response to Plaintiffs' Challenges</u>

Plaintiffs posited in Section IV. B of their Motion that Defendants' experts are not shielded by the general rule that assessments about credibility and the weight of the proffered expert evidence are left to the finder of fact, cross-examination, and the presentation of contrary evidence. *Cf.* Defs.' Opp. at 12. As Plaintiffs' Motion detailed, Defendants' experts have offered wholly unreliable opinions that are far removed from and untethered to the evidence in the Action. The case law is clear that the general rule (noted above) is inapplicable to opinions that are not the product of reliable principles and methods, and if the witness *fails to apply the principles and methods reliably to the facts of the case*. *See* Pltfs.' Motion at 21-22 (citing cases). Taking the same approach they did to Plaintiffs' other challenges, Defendants never reference or address the case law cited by Plaintiffs from the Tenth Circuit and District Courts within this Circuit.[6]

Further, as discussed below, in response to Plaintiffs' specific challenges to the inadmissibility of Defendants' experts' opinions due to their unreliability, the analytical gaps that

[6] Defendants do not address cases cited at Pltfs' Motion at 21-22: *Nash v. Wal-Mart Stores, Inc.*, 2017 U.S. Dist. LEXIS 215792, at *18 (D. Colo. Feb. 15, 2017); *Bell v. 3M Co.*, 2018 WL 4599689 (D. Colo. Sept. 25, 2018) (Jackson, J.); *Langille v. McLane FoodService, Inc.*, 2014 WL 2892657, *6 (D. Wyo. Apr. 18, 2014) (excluding testimony about a simulation prepared by an expert where the simulation contains obvious errors, making it difficult to justify its usefulness in assisting the jury); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)(striking an expert opinion is proper when "there is simply too great an analytical gap between the data and the opinion proffered." (*citation omitted)*; *Erickson v. City of Lakewood*, 2021 WL 4438035, *3 (D. Colo. Sept. 27, 2021) (Brimmer, J.)("[u]ltimately, the test requires that the expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'")

exist between the facts and the opinions proffered, unhelpfulness, lack of relevance, and likelihood to cause confusion (Pltfs.' Mot. at 22-36), Defendants' Opposition seeks to re-write their experts' opinions, in an attempt to distract from the utter lack of required foundation, reliability, and analytical tie between the facts and the opinions their experts offered.

For these reasons, the testimony and opinions of Defendants' Experts identified in Pltfs' Motion at 22-36 (*see supra* Section II.A) must be stricken and precluded.

#### ***1. Mr. Hidalgo's Opinion on HA's Lead Verification Processes is Inadmissible and Cannot be Salvaged via Rebuttal Witnesses***

As detailed in Plaintiffs' Motion at 22-26, Mr. Hidalgo lacked the necessary factual foundation for his "Opinion 1" and, therefore, his "Opinion 1" must be stricken. In response (Defs' Opp. at 12-14), Defendants claim that Plaintiffs mischaracterize his deposition testimony and that Plaintiffs' challenge can be addressed on "cross-examination". Defendants are wrong.

Plaintiffs' Motion did not characterize Mr. Hidalgo's testimony. Plaintiffs' Motion cited to Mr. Hidalgo's testimony and then juxtaposed that against his "Opinion 1", in which he opines, unequivocally, that HA's "lead generation, verification, and quality control processes" are "all designed to ***<u>ensure</u>* *that [SPs]* *<u>receive</u>* *leads from consumers who have affirmatively expressed interest"***, ensure the lead ***"is <u>in fact interested</u>*** in the service identified", ensure that "***the [SRs] it obtains <u>are legitimate</u> before transmitting them*** to [SPs]", ***and so on***. *See* Pltfs' Mot. at 22-23.

On the one hand, Mr. Hidalgo unequivocally opines in his Reports that HA's processes ensured verified Leads were sent to SPs, and then, on the other, Mr. Hidalgo's testimony is clear that HA's processes did not "validate who filled out the web form", "validate whether the person filling out the form intended to have their contact information shared with up to four service professionals", "validate whether the person who submitted the information in the service request

intended to have their contact information shared with up to four service professionals", verify the accuracy of the home service project type and geographic location of the project listed in the SR, and so forth. *See* Pltfs.' Mot. at 24-26. Likewise relevant is that Mr. Hidalgo also was unable to either agree or disagree with statements that directly address the very function of HA's purported verification processes about which he was opining, including when he was asked to agree that "HomeAdvisor did not know before it sent a lead to service professionals if there was a real person who filled out the service request" (Ex. C [Dkt. 549-5] Tr. 255:5-16); and "HomeAdvisor did not know before it sent a lead ·to a service professional if the person who filled out the form was using their own contact information or another person's contact information?" (*id.* at 255:21-256:14).

Furthermore, Defendants' argument (Opp. at 12-14, and n. 2) that "Whether Mr. Hidalgo identified some *other technical process* to confirm consumer 'seriousness' or 'who filled out the web form' is thus immaterial …'" is misleading and a red herring. This is not a matter of Mr. Hidalgo having not identified at his deposition "any *other* technical process" employed by HA to "confirm consumer seriousness" or "who filled out the webform". Mr. Hidalgo's "Opinion 1" identified HA's processes, opined that they "ensure" verified Leads, but then repeatedly identified through his testimony that the processes used by HA did not accomplished such verification.

Accordingly, Mr. Hidalgo's testimony demonstrates that he does not have the requisite factual foundation to render his Opinion 1, and an analytical gap (really gulph) exists between his written "Opinion 1" and what was revealed during his unfiltered deposition testimony about the actual ability of HA's processes to verify the Leads as he posits in "Opinion 1". Defendants' Opposition does not refute Plaintiffs' demonstration that Mr. Hidalgo's Opinion 1 is speculation

and is not grounded in the evidence adduced in the case about HA's lead verification processes.[7]

Facing Plaintiffs' well-founded challenges to the unreliability and lack of foundation of Mr. Hidalgo's "Opinion 1", Defendants' Opposition unsuccessfully attempts to re-write history. Specifically, Defendants try to salvage the fraught opinions from Mr. Hidalgo by claiming that Mr. Hidalgo is "not a lead fraud expert" and "the parties had separate experts in that field (Stricchiola and Kahn)." Defs.' Opp. at n. 2 (pg. 14). That response is problematic for Defendants because: *First,* it evidences Defendants' realization that Mr. Hidalgo's "Opinion 1" as proffered lacks the necessary expertise and factual foundation. *Second,* Defendants cannot use that transparent sleight of hand to fill gaps that should have been addressed by their affirmative experts with rebuttal experts.[8] *Third*, Mr. Hidalgo's Opinion 1 about HA's lead verification processes was

[7] Indeed, all of the evidence establishes empirically that HA's processes utterly failed to verify the Leads as legitimate before they were sent to SPs. As further detailed in Plaintiffs Motion at pgs. 8-10, the evidence establishes that Defendants knew and concealed from SPs that the nature and function of HA's controls and processes were not, did not, and could not verify the SRs for authenticity, accuracy, seriousness, and intent before HA sent and charged the SP for the Lead, including through HA's internal effort, its "Lead Assist" program, [redacted]. L [Dkt. 549-14] 11.12.2021 Imburgia Report ¶¶53-57.

[8] Defendants were required to put forth any expert opinions supporting their affirmative defenses in their opening expert reports. *See Brandt v. Honnecke*, 2018 U.S. Dist. LEXIS 167849, *7-9 (D. Colo. Sept. 28, 2018). "A rebuttal expert operates to "'explain, repel, counteract or disprove evidence of the adverse party.'" *Pertile v. Gm*, 2017 U.S. Dist. LEXIS 230512, *16 (D. Colo. May 8, 2017) *citing Carroll v. Allstate Fire & Cas. Ins. Co.*, No. 12-cv-00007-WJM-KLM, 2013 WL 3810864, at *5 (D. Colo. Jul. 22, 2013) (citing *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 749, 759 (8th Cir. 2006)). A rebuttal report is not intended to cure oversights in a party's case-in-chief and rebuttal experts cannot put forth their own theories. *Pertile*, 2017 U.S. Dist. LEXIS 230512 at*16; *Spring Creek*, 2016 U.S. Dist. LEXIS 53488 at *9. Moreover, "[i]f the purpose of expert testimony is to 'contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.'" *Spring Creek Exploration & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, 2016 U.S. Dist. LEXIS 53488, *9 (D. Colo. April 21, 2016)(citations and quotations omitted). The requirement that defendants put forth any affirmative defenses in an opening expert report is grounded in the fact that Federal Rule 26 "permits affirmative expert disclosures and rebuttal expert disclosures; it does not permit parties

unequivocal. The existence of lead fraud detection tools (such as those identified by Plaintiffs' expert Mr. Kahn that were available, but not used by HA) which are among the numerous ways that HA could have – but did not – verify that the Leads were not generated through "bots", is irrelevant to Mr. Hidalgo's opinion that HA's processes verified Leads. *Fourth,* Ms. Stricchiola did not provide any expert testimony that HA had processes that verified the Leads in any way before sending them to SPs. *See also,* Pltfs' Motion at 36-37; 43-44; and *infra* at Section II.C.6.

What Defendants attempt to do through their Opposition brief is not permitted; it is a flagrant attempt to backdoor new and revised opinions by their affirmative expert Mr. Hidalgo[9] and their rebuttal expert Ms. Stricchiola. This is improper and must be rejected.

### *2. Defendants' Experts' Inadmissible Opinions About "Brand Promise" Must be Stricken*

Defendants' responses to Plaintiffs' challenges about Defendants' experts' opinions and statements about "Brand Promise" are limited and unpersuasive. *See* Defs.' Opp. at 15-19. It bears noting as an initial point that it is not a surprising or remarkable proposition that HA would be professing to sell to SPs Leads that HA claims to have verified as having accurate contact information and from project-ready, serious homeowners who are seeking to engage with SPs

---

to further rebut rebuttal expert disclosures." *Carballido v. Target Corp.*, 2021 U.S. Dist. LEXIS 70087, *3 (D. Colo. April 12, 2021), *citing Rothenberg v. Standard Ins. Co.*, No. 11-cv-01906-WYD-KMT, 2012 U.S. Dist. LEXIS 80925, 2012 WL 2126846, at *2 (D. Colo. June 12, 2012) (citing Fed. R. Civ. P. 26(a)(2)(A)).

[9] Plaintiffs' Counsel asked Mr. Hidalgo if he had any changes or amendments to make to his 11.12.2021 Report, including after he gave the testimony identified in Plaintiffs' Motion at 24-26, to which he responded that he had no changes, and as to his Rebuttal Report, he stated "but I would think absolutely not. I stand by the rebuttal report". Ex. C [Dkt. 549-5], Tr. at 245:22-246:4; and 263:15-20. Mr. Hidalgo standing by his opinions does not demonstrate that he is qualified to render "Opinion 1", or that his opinion is grounded in and analytically tied to facts (which Plaintiffs demonstrated it is not). Also, Defendants cannot change his opinions now via their arguments.

about a project. This is what Ms. Geller-Stoff calls HA's Brand Promise. It is equally unremarkable that HA's sales and advertising, with an expected aim to be effective, are, of course, predicated on identifying and providing what the target audience (*i.e.* the prospective SPs) wants to purchase. Again, unremarkable is that the quality and characteristics of that product are what is communicated to prospective SPs through product advertising, marketing, sales and branding, and that the company then needs to deliver on that "brand promise" made about the product. Notwithstanding Defendants' self-serving desire to use their experts to create baseless controversy, the concept of Brand Promise is neither extraordinary nor a novel concept.

Defendants claim that Plaintiffs mischaracterize the statement in Mr. Hidalgo's rebuttal report about Brand Promise. Defs' Opp. at 15. According to Defendants' argument, Mr. Hidalgo's *rebuttal* opinion is apparently now (no doubt, in light of his testimony) limited to the use of the term and concept of "Brand Promise" in "the context of [HA's] lead generation efforts". *Id.* Defendants' effort to unhinge Mr. Hidalgo's prior use of Brand Promise from this case is patently incredible. But even if that argument is taken at face value, and/or even assuming *arguendo* that "***it's not a thing***" in "lead generation" (*see* Defs.' Opp. at 16), Mr. Hidalgo's opinion is still not rebutting Ms. Geller-Stoff's use of the term and concept of Brand Promise. Ms. Geller-Stoff utilizes the term and concept "Brand Promise" to describe the marketing and sales message HA conveyed to the SPs (*i.e.* the customer). Ms. Geller-Stoff's identification of HA's "Brand Promise" appropriately identifies how HA identified its product being sold to SPs and what SPs expected they were buying from HA. As Plaintiffs noted in their Motion, how Ms. Geller-Stoff uses the term is no different than how Mr. Hidalgo has utilized the term, *see* Pltfs.' Mot. at 27-29, and Mr. Hidalgo, Dr. Simonson and Mr. Dudney cannot be permitted to testify to the contrary.

Further, Mr. Hidalgo's testimony calls into serious question his credibility, as Plaintiffs' Motion pointed out. His testimony about "Brand Promise" was not limited to his having used it in the context of generating leads, as Defendants' claim. Rather, he testified that he "can't recall a usage of 'brand promise' **in my consulting practice**" (*i.e.* his "consulting of customer experience"); and, when asked if he used the term **in the consumer context** he testified, "I don't talk about a brand promise. **So that would *also* be zero.**" Pltfs.' Mot. at 28, *citing* Ex. C, Hidalgo Tr. at 39:11-22. Yet, his unequivocal "**zero**" testimony was then proven wrong by the evidence, including his own CV (Pltfs.' Mot. at 27-29). Defendants' Opposition does not respond to or address that testimony. Plaintiffs have identified a plainly dutiful act by Mr. Hidalgo to toe the "company line" irrespective of his own experience that warrants the striking of his testimony.

As to Dr. Simonson, Defendants' response is to seemingly mock Plaintiffs' "so-called 'sources'", pointing out that one of the sources shown to Dr. Simonson from "MBA Skool" is spelled "Skool" and highlighting Dr. Simonson's testimony that "on the Internet you can find lots of things that have no credibility of validity whatsoever". *See* Defs.' Opp. at 17. The problem for Defendants and Dr. Simonson is that he proffered what he steadfastly posits (Ex. E, Simonson Tr., at 29:11-16, 49:20-21) as an unequivocal opinion about "Brand Promise" (*see*, Pltfs.' Mot. at 27). Dr. Simonson's and Defendants' desire to doggedly toe the company line aside, that opinion has been irrefutably proven to be wrong in its unequivocalness (at a minimum). Therefore, it must be stricken to avoid the inevitable confusion and false impression it aims to impart on the jury. *See* Plfs' Mot at 26-29.[10] Finally, as Defendants concede, Mr. Dudney relies on Dr. Simonson for his

[10]*See also Journal of Brand Strategy*, Vol. 8, No. 3, 1-17, Autumn/Fall 2019, Lerman (Professor of Marketing and Executive Director of the Center for Positive Marketing at Fordham University's Gabelli School of Business), and Morais (Adjunct Professor in the Marketing

opinions regarding Brand Promise. Accordingly, for the foregoing reasons and those set forth in Plaintiffs' Motion, Messrs. Hidalgo's and Dudney's and Dr. Simonson's[11] opinions about "Brand Promise" (*see* Pltfs.' Mot at 26-27) must be stricken and precluded.

***3. Mr. Hidalgo's Testimony Relying on and Citing to the Phillips Declaration Must Be Stricken***

As Plaintiffs' Motion (at pages 29-32) identified, a basis for Mr. Hidalgo's Opinion 1 was his citation to Defendants' use of online web forms to collect the SRs that were then sold as Leads to the SPs. *Id.*, citing to Ex. A [Dkt. 549-1], Hidalgo 11.12.2021 Report at 27-36, 39-41, 43, and footnotes 72-74, 76-80, 82, 84-90, 111, 133. For those web forms, Mr. Hidalgo relies on the 672-page declaration prepared by Mr. Phillips, dated 11.12.2021, containing 686 paragraphs related to 48 web domains (Exhibit A2 and A3 [Dkt. 549-2 & 3]). Defendants' Opposition mischaracterizes what the Phillips Declaration does and contains. Logically, if all the Phillips Declaration does is identify "web domain[s]" that were already disclosed "long before fact discovery closed" and

---

Division at Columbia Business School), https://www0.gsb.columbia.edu/mygsb/faculty/research/pubfiles/26288/Morais%20and%20Lerman%20JBS%20.pdf (last visited 5.24.2022), noting "The central components of a creative brief include the brand promise that is to be made to consumers and the primary reason that consumers should believe that promise, which will motivate them to buy a brand over its competitors"; Per Columbia Business School, "[k]ey elements to build a strong brand include….Communicating a clear brand promise and delivering it. https://www8.gsb.columbia.edu/globalbrands/students/classes (last visited 5.24.2022); *Brand Relevance: Making Competitors Irrelevant*, 2001, First Edition, https://www.drnishikantjha.com/papersCollection/David_A._Aaker_Brand_Relevance__Making_Competiton%20%20Irrelevant.pdf (last visited 5.24.2022), at pg. 303, "The most basic need is to simply deliver on the brand promise…", Per David A. Aaker's biography (https://haas.berkeley.edu/faculty/david-a-aaker/ (last visited 5.24.2022)), Professor Aaker is the E.T. Grether Professor Emeritus of Marketing and Public Policy at the University of California, BerkeleyHaas School of Business, hailed as the "father of modern branding".

[11] These problems of credibility and reliability with respect to Dr. Simonson are exemplified by a recent judicial decision where plaintiffs' motion to strike Dr. Simonson's rebuttal marketing expert report was granted "in substantial part." *See, infra*, at 29-30.

"almost ***four years*** before the close of fact discovery", which is what Defendants argue (Opp.at 20), then there would be no need for the 672-page Phillips Declaration and for Mr. Hidalgo to rely on it. Defendants' citations to their identification of web domains (which, of course, are not *the web forms that are now being identified and relied on*), which consumes their opposition on this point, are thus irrelevant and refute nothing.[12]

Of course, the Phillips Declaration is something very different. As Plaintiffs' Motion detailed, it compiles purported screen shots of Mr. Phillips navigating and completing interactive web forms that appear on domains as of a point in time between August 22, 2021 and October 20, 2021. The native web forms from these domains, from which HA SRs were generated since at least the filing of the Action in 2016, were not preserved by HA and not produced – a fact stated by Plaintiffs (Mot. at 30) that Defendants do not dispute. This is Defendants' improper, belated attempt to now introduce that which they failed to preserve, by having Mr. Phillips "walk through" web forms online, compile and produce screenshots of his interactions with those web forms, and provide *his* testimony about those web forms, all after the fact discovery deadline had passed.

Finally, Defendants do not respond to the fact (Pltfs.' Mot. at 30-31) that for over half of the *web forms* screenshotted in the Phillips Decl., the web forms were rebranded, inactive and the web form pathways, content and user interface changed since Mr. Phillips submitted his 11.12.2021 Declaration. Further, Defendants' passing reference to Rule 703 as permitting experts

[12] In a case cited by Plaintiffs (Opp. at 30) and never addressed in Defendants' Opposition, *Vitamins Online, Inc. v. Heartwise, Inc.*, No. 2:13-cv-00982-DAK, 2020 U.S. Dist. LEXIS 111709, at *9 (D. Utah June 24, 2020), the court notes, apropos here to Defendants' reference to the existence of the identified public web domains, that "The fact that the documents are public is of no consequence. The public domain is replete with scores of documents, but that does not mean that [a party] should be on perennial notice that any such documents may be used against it…" (internal citation omitted).

to base opinions on inadmissible evidence if facts and data are "of a type reasonably relied on by experts in the particular field" (Defs' Opp. at 22) is inapposite as the Phillips Declaration is not such data or study.

Accordingly, Plaintiffs' Motion seeking to strike both the Phillips Declaration (which Defendants determined to belatedly try to interject into this Action through their expert during expert discovery) and Mr. Hidalgo's opinions relying on it, is thus properly before this Court, and for the reasons stated, should be granted in full.

***4. Defendants' Experts' Erroneous "60 Seconds Connection" Assumption***

Other than somewhat of a passing nod in one footnote (n. 7) to Plaintiffs' actual argument, as discussed below, Defendants' Opposition at pgs. 22-24 does not address, and thus does not refute, the specific argument made in Plaintiffs' Motion (at 32-33) that the opinions that Plaintiffs identified from Mr. Dudney and Mr. Hidalgo (*id.*), must be stricken because they rely on a factually unsupported, erroneous, and unreliable assumption that [redacted] 60 seconds or more is a "successful contact with the consumer" and "resulted in a connection with the consumer". *First*, Defendants do not repudiate, because they cannot, that their experts utilize such assumption, and their experts expressly state that have used it. *Second*, Defendants do not refute Plaintiffs' assertion that the assumption is an unjustified, unrealistic assumption (really just speculation). *Third*, Defendants do not cite to anything, no facts, evidence, or study, about the assumption to try to demonstrate its reliability. *Fourth*, unable to refute that the assumption is pure speculation on the part of HA and now Defendants' experts, Defendants' Opposition simply re-states the challenged opinions offered by Mr. Dudney and Mr. Hidalgo (on which the assumptions are based). *See* Defs.' Opp. at 22-24. That circular "opposition" does not refute

Plaintiffs' challenge to Mr. Hidalgo's and Mr. Dudney's *reliance for those opinions on an assumption* that is purely rank speculation, not grounded in either of their experiences or a shred of evidence. Their opinions identified at Pltfs. Mot. at 22-23 must be stricken.

Footnote 7 of Defendants' Opposition states that their experts considered the evidence that Plaintiffs cited about the lack of reality and unreliability of the 60 seconds assumption (*see* Pltfs.' Mot. at 33), and, did not alter their opinions. Such an unremarkable and unpersuasive retort to a claim that experts, having relied on this assumption, do not now change their opinions, does not resolve whether the assumption was unrealistic and unjustified.

Finally, and likewise not addressing the challenge Plaintiffs made, Defendants claim that "these *opinions* are grounded in Mr. Hidalgo's experience". Defs.' Opp. at 24. They are not. The opinions are grounded in an erroneous and unsupported assumption. Mr. Hidalgo stated: "X axis represents the percentage of those calls **that resulted in successful contact with the consumer, defined as a call of 60 seconds or longer**" (Pltfs' Mot at 32, quoting from Ex. A1, Dkt. 549-1, Hidalgo's 11.12.2021 Report, bottom of page 150). Mr. Hidalgo does not cite any basis for how or why *a call of 60 seconds or longer is a "successful contact with the consumer"*. Mr. Dudney states that [redacted] and cites to Mr. Hidalgo's Report at p. 85 and n. 294. (Pltfs' Mot. at 32). That footnote reference in Mr. Hidalgo's Report states, in relevant part: [redacted] Ex. A1, Dkt. 549-1, Hidalgo 11.12.2021 Report, at n. 294.

Thus, there is no evidence in the record demonstrating the reliability of Mr. Hidalgo's and

Mr. Dudney's assumptions. Based on the above and Plaintiffs' Motion, and the cases cited by Defendants' Opp at 24, Defendants' experts' opinions based on the 60-second call duration assumption are inadmissible; they are speculative, unsupported by evidence or fact, "unjustified", and "so unrealistic and contradictory" warranting the striking of the opinions on which they are based. *See*, *Ellis*, 2020 WL 3618958, at *4 (D.N.M. July 2, 2020), and *Aluminum Phosphide*, 893 F. Supp. at 1507 (rejecting opinions "based on *unjustified* assumptions" (emphasis added)), *see* Defs.' Opp. at 24.

***5. Mr. Hidalgo's Named Plaintiffs' "Contact" Analysis***

Mr. Hidalgo's "<u>Opinion 2</u>" states, in pertinent part, "A lead-by-lead analysis of all leads received by Plaintiffs during their HomeAdvisor memberships establishes that their lead outreach and nurturing efforts fell below what a reasonably prudent service provider must do to maximize value from their leads." Ex. A, Hidalgo 11.12.2021 Report at 3. Further, specifically, at pages 156-175 (*id.*) Mr. Hidalgo opines that Plaintiffs are (A) "dissimilar to the average service provider during the class period," and were (B) "comparatively dilatory in placing an initial call following receipt of a lead" (*Id.* at 156). Mr. Hidalgo purports to base those opinions on statistical analyses performed by him or at his direction of (i) the number of leads each Plaintiff attempted to contact, and (ii) how long Plaintiffs waited—after receipt of the lead—to make those outreach efforts. *Id.*

In response to Plaintiffs' Motion (at 33-35) demonstrating why Mr. Hidalgo's various assertions about Plaintiffs' contacts and outreach to Leads were unreliable and misleading, Defendants respond only by quoting to Mr. Hidalgo's opinions. What Defendants' response and Mr. Hidalgo's opinions ignore, strategically, is that Mr. Hidalgo cannot offer his definitive opinion about whether an SP made a call to, or had a connection with "X" out of "Y" Leads sent to that

SP, if Mr. Hidalgo does not have all records and then cherry picks from the records in evidence.

Also, tellingly, through their Opposition at pg. 29, Defendants seemingly try to walk back Mr. Hidalgo's Opinion 2 to downplay the import of the errors identified by Plaintiffs. In this regard, Defendants state that "Opinion 2" is making a different "fundamental point" than apparently the one conveyed among the approximately 85-single spaced pages that Opinion 2 consumes in the Hidalgo Report. *See* Ex. A1, Dkt.549-1, at 89-183. *First*, that argument highlights how improper, unclear, and confusing to a jury it would be if Defendants were permitted to have their "expert" convey what comprises ultimately over a hundred pages of non-expert commentary and testimony. *Second*, as to the revised "fundamental point" – which Defendants state is whether "Plaintiffs maintained a documented and disciplined approach to quickly contacting and nurturing their leads" - the errors Plaintiffs identify render it lacking in sufficient factual foundation. Therefore, Mr. Hidalgo's Opinion 2 should be stricken.

### 6. *Defendants Fail to Demonstrate the Admissibility of Stricchiola's Opinions Concerning HA's Data and Fraud Detection*

In their Opposition at 29-31, Defendants do not attempt to refute the fact that Ms. Stricchiola did not review and was not aware of any facts in this case to support her "opinions" that Mr. Kahn was "required" to (A) evaluate the efficacy of commercially available tools in identifying fraudulent HA Leads, and (B) perform "an independent, direct analysis of the available raw data associated with the [redacted] to service providers since October 2012 to determine the actual extent of fraudulent leads in [HA's] data set, and failed to examine various relevant and essential data points to identify and understand [HA's] lead validity."[13] *See* Pltfs.'

[13] Defendants also cannot avoid the fact that Ms. Stricchiola claims, improperly, to have relied on Mr. Hidalgo's "[r]eport and his descriptions of [HomeAdvisor's systems]" to gain an

Motion at 35-37. As Plaintiffs' Motion detailed, among other reasons, Ms. Stricchiola *did not* request or review any of the produced 2021 Data to know if it contained the information necessary to analyze invalid lead traffic or bots (and did not know if it could be done with the produced 2021 Data), or know what the data third party fraud detection companies identified by Mr. Kahn would need to analyze the Lead data. *See* Pltfs.' Motion at 36-37.[14] Defendants offer no response to Plaintiffs' assertions. Defendants do not, therefore, have not refuted that that, on this basis alone, Ms. Stricchiola's opinions are inadmissible pursuant to Rule 703. Experts must base their opinions "on facts or data in the case that the expert *has been made aware of* or personally observed." *See Vox Mktg. Grp., LLC v. Prodigy Promos L.C.*, 521 F. Supp. 3d 1135, 1144 (D. Utah Feb. 22, 2021); *Talley v. City & County of Denver*, 2020 U.S. Dist. LEXIS 169698, *8-9 (D. Colo. July 13, 2020).

Instead, Defendants' lone argument is that Ms. Stricchiola is entitled to critique Mr. Kahn's opinions without providing an alternative approach. Defs.' Opp. at pg. 31. That is inapposite to

---

"understanding" of the "in-house and other tools" HomeAdvisor used to "assist in fraud detection". Pltfs' Motion at 36-37. The Stipulation and Order Regarding Expert Disclosure Protocol (Dkt. 395) ("Stipulation") filed in this Action required Ms. Stricchiola to identify in her rebuttal report all facts and data "relied upon" in forming her opinion and if those materials were produced in this Action, identify them by Bates number, deponent name or exhibit number. *See* Stipulation at ¶¶6, 9. Notably, the only fact or data cited by Ms. Stricchiola to support her understanding of HomeAdvisor's Systems is Mr. Hidalgo's Report. Ex. H [Dkt. 549-10], Stricchiola Report at ¶37n.41; Ex. I [Dkt. 549-10], Stricchiola Tr. at 187:11-188:18. Notably, the first time that Ms. Stricchiola mentions the [redacted] (Defs.' Opp. at 31 n. 10) was during her deposition, after she read the transcript of Mr. Kahn's deposition in which he discussed the relevant documents. Ex. I [Dkt. 549-10], Stricchiola Tr. at 23:22-24:4; 182:10-15.

[14] In contrast to Defendants' experts, using the HA-produced 2021 Data Plaintiffs tested whether there was an association among the name, address, and one phone number appearing in the Lead (*i.e.* that the name, address and phone number were associated with each other); Plaintiffs [redacted] indications **not** consistent with having been verified, such as invalid emails, lack of homeownership, undeliverable street addresses, or minimal association among the Lead's contact information. *See* Ex. J (11.12.2021 DGS Report, Dkt.549-12) at ¶121.b.i.

Plaintiffs' point. While courts have held that rebuttal reports that primarily critique the methodologies and opinions in opening expert reports are admissible, such critiques *must be based on the facts that are in the case*. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig*., 2021 U.S. Dist. LEXIS 116919, *42 (D. Kan. June 23, 2021) (noting the plaintiffs claimed defendants' rebuttal expert did "nothing more than regurgitate information found in documents"); *North Palm Motors, LLC v. GM LLC, 2020* U.S. Dist. LEXIS 202305, *9, (S.D. Fla. Oct. 30, 2020)(rebuttal expert opined how certain facts impacted opening experts' damages calculations); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 2011 U.S. Dist. LEXIS 62969, *18 (S.D. Fla. June 7, 2011)(rebuttal opinions were sufficiently grounded on expertise and "analysis of the facts"); *Mahaska Bottling Co. v. Pepsico, Inc.*, 441 F. Supp. 3d 745, 759 (S.D. Iowa 2019)(rebuttal expert's report critiqued the opening expert for ignoring or properly failing to consider facts in the case). As Plaintiffs identified *supra* and in their Motion at 35-37, having failed to review, let alone consider, the facts in this case to reach her opinions, Ms. Stricchiola's opinions are unreliable and untethered to the facts and must be stricken.

### D. <u>Defendants and Their Experts Seek to Proffer Irrelevant, Unhelpful, and Prejudicial Testimony, Improperly Couched as Expert Opinions</u>

Plaintiffs demonstrated (Mot. at 37-41) that Mr. Hidalgo's "Opinion 1" and "Opinion 2", and Mr. Dudney's rebuttal assertion that there are financial adjustments that he claims Plaintiffs' damages expert should have made, but did not, are: unconnected to the pertinent inquiry (both Plaintiffs' proof of liability and Defendants' defense thereof) of whether HA verified the Leads prior to sending and charging the Leads to SPs, which connection is a precondition to admissibility; Defendants' attempts to present their defenses and argument, not expert opinion, through the guise of an expert; and, nothing more than information (if it were admissible) an "untrained layman"

would be qualified to consider and determine "without enlightenment from those having a specialized understanding". (Pltfs.' Mot. at 37-39)

In response, Defendants make circular, conclusory claims and just quote from their experts' challenged opinions, none of which demonstrates the relevancy of the proffered expert testimony. Defs' Opp. at 32-38. For example, Defendants argue that "Mr. Hidalgo's opinions about the importance of service providers' efforts to contact and convert their leads into paying work ***have obvious relevance to the issues at the heart of this case***." Defs. Opp. at 33 (emphasis added).

However, nothing argued by Defendants, or what Defendants proffer through Mr. Hidalgo's Reports, demonstrate or make a link of their "obvious relevance" "to the issues at the heart of this case". That is because it does not exist. After HA sent the SP the Lead, whether and how the SPs contacted the Lead, nurtured the Lead, got "a job", "maximiz[ed] lead contact" or if an SP was "more successful" (*id.*), has no relevance to the claims or Defendants' defenses thereto. What is at the heart of this case is: what HA did prior to sending and charging SPs for the Lead, including whether HA possessed and used adequate processes to verify and establish the legitimacy of the Leads, the accuracy of the consumer contact information, and the consumer's seriousness and intent to be contacted by the SP.

Defendants' Opposition is replete with conclusory arguments in response, such as: Plaintiffs are unilaterally deeming "their own efforts (or not) to develop and nurture their leads 'of no consequence'", when, according to Defendants, "determining why a particular lead did or did not result in consumer contact…necessarily involves an assessment 'of what occurred *after*...'" Defs.' Opp. at 35. Each of Defendants' arguments are premised on what they would like Plaintiffs' claims to be, in order to get them to their desired result. That is not how it works. Defendants do

not dictate the claims they want to litigate. "Why a particular lead did or did not result in consumer contact" finds no place in this Action, and does not logically advance a material aspect of the case nor is it relevant or of consequence to Plaintiffs' claim and Defendants' defense concerning whether HA's processes verified the Leads before they were sent to SPs. The claim and defense depend on HA's conduct, and that conduct occurs prior to any Lead being sent by HA and being received by any SP on which the SP could then take any action.

For the reasons set forth in Plaintiffs' Motion and herein, and based on the cases cited therein, as well pursuant to *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011), cited by Defendants' Opp. at 38, the identified opinions of Mr. Hidalgo and Mr. Dudney must be excluded because they are not "Relevant expert testimony" as they do not "logically advance[ ] a material aspect of the case, and [are not] sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute."

### E. <u>Defendants' Opposition Fails To Rebut The Fact That Ms. Stricchiola and Dr. Simonson Did Not Offer Proper Rebuttal Opinions</u>

Defendants chose to designate one affirmative expert on November 11, 2021, the deadline for the identification of affirmative experts. Having deployed that strategy, thereby limiting the scope and subject matters of their affirmative experts, Defendants are not permitted to use their rebuttal experts to introduce opinions that are not otherwise directly contradicting or rebutting Plaintiffs' affirmative experts. Yet, as also discussed *supra*, that is what Defendants have sought to do through the reports and opinions proffered by Ms. Stricchiola and Dr. Simonson.

*First,* Defendants do not dispute that the applicable law is that "[e]xpert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal." *Dale*

*v. Country Preferred Ins. Co*., 2021 U.S. Dist. LEXIS 114829, *3-4 (D. Colo. June 21, 2021)[15]; *see also* Pltfs' Motion at 42-43 (collecting cases and citing to *Dale*).[16]

*Second,* Defendants' Opposition consists of a panoply of selectively spliced quotes from their experts' reports, which are misleading and do not demonstrate that Ms. Stricchiola or Mr. Simonson put forth proper *rebuttal* opinions. Specifically, Defendants do not point to a single opinion by Ms. Stricchiola that directly contradicts or rebuts Mr. Kahn's affirmative opinions:

(1) Because HA generated leads through web traffic and sold those leads to SPs, it needed to utilize appropriate and effective fraud detection tools and systems. (Ex. M, Dkt.549-17], 11.11.2021 Kahn Report) at 4, 9).

(2) Without those tools HA was not identifying fraudulent lead traffic before accepting it and selling it to SPs. (*Id.* at 4).

(3) Without those tools, HA was not preventing, at the point of the creation of the lead—and any and all points thereafter—the sale of fraudulent leads to SPs. (*Id.*).

(4) Lead fraud detection tools and processes available beginning in at least 2012 were not utilized by HA in order to prevent, as well as identify and cull, fraudulent leads from being distributed and charged to the SPs. (*Id.* at 4, 13).

(5) HA was generating leads through web traffic but selling the leads to the SPs without

---

[15] Defendants rely on *Dale*, but their assertion that it supports their position is wrong. Defs.' Opp. at 44. In *Dale*, the court found that a rebuttal expert's recitation of the history of the motor vehicle accident underling the litigation (*i.e.* the facts in the case) was proper as part of the expert's rebuttal "as it simply summarize[d] [the rebuttal expert's] understanding of the claim history that formed the basis of his rebuttal opinions." *Id*. at * 6. In contrast, here, Plaintiffs are challenging not Dr. Simonson's or Ms. Stricchiola's recitations of the facts in the case (to the extent they even cite to any), but challenge thier actual "rebuttal opinions" as failing to respond to the opinions of Plaintiffs' affirmative experts, and thus are improper rebuttal consistent with *Dale*.

[16] *See also Giertz v. State Farm Mut. Auto. Ins. Co*., 2021 U.S. Dist. LEXIS 72726, *5-6 (D. Colo. April 15, 2021) ("rebuttal evidence must also be directed to the same subject matter covered by the affirmative expert…expert reports that simply address the same general subject matter as a previously-submitted report, but do not directly contradict or rebut the actual contents of that prior report, do not qualify as proper rebuttal or reply reports."); *Mason v. Am. Family Mut. Ins. Co*., 2020 U.S. Dist. LEXIS 186689, *6 (D. Colo. Oct. 8, 2020)(same).

> ensuring the proper processes and tools were in place to determine or validate for HA's lead sources (organic, SEM, SEO, affiliates, referrals) if there was a real person behind the keyboard submitting the lead and if the lead was from a serious homeowner who had come to HA seeking to be contacted by the SPs for a current project. (*Id.* at 4, 12, 13).

Nor can they, because Ms. Stricchiola expressly stated that (A) she agreed that HA was susceptible to generating fraudulent traffic and (B) she was not opining that HA had sufficient process and tools in place to prevent, identify and cull fraudulent traffic. Pltfs' Motion at 43-44. Indeed, all that Ms. Stricchiola does is observe that: (1) Mr. Kahn does not identify systemic fraud within HA's Lead sources; and (2) Mr. Kahn does not evaluate the efficacy of commercially available tools in identifying fraudulent HA Leads. Ex. H [Dkt. 549-10], Stricchiola 2.10.2022 Report at 13-19. Those do not directly contradict or rebut Mr. Kahn's opinions.

Similarly, Defendants' lone citation to Mr. Kahn's report to support Ms. Stricchiola's two observations (noted above) is to Mr. Kahn's opinion that "HomeAdvisor was generating leads through web traffic but selling the leads to the [service providers] without having the necessary technology in place to determine if" those leads were fraudulent. Defs.' Opp. at 40. However, Ms. Stricchiola's observations are non-sequiturs. That "Kahn does not identify systemic fraud within HA's Lead sources" (Ms. Stricchiola's observation) does not rebut Mr. Kahn's statement that HA failed to have the technology to detect, prevent and cull fraudulent lead submissions. She does not state (because she cannot) that HA actually did possess and use technology to detect, prevent and cull fraudulent lead submissions before selling leads to the SPs. Likewise, that "Kahn does not evaluate the efficacy of commercially available tools in identifying fraudulent HA Leads" (Ms. Stricchiola's observation) does not contradict or rebut the actual opinions of Mr. Kahn's 11.11.2021 Report, identified *supra*.

Further, to try to avoid these facts demonstrating that Ms. Stricchiola's Report is improper

rebuttal, Defendants re-write Mr. Kahn's Reports and his opinions, in a futile attempt to transform Ms. Stricchiola's opinions from improper and untimely affirmative expert opinion into safe "rebuttal" opinion. In this regard, Defendants' Opposition argues the following (Opp. at 39-40):

> Ms. Stricchiola accordingly opines that "Mr. Kahn's opinion that HomeAdvisor was required to use the various 'lead fraud detection tools and processes' he identifies to 'prevent, as well as identify and cull out, fraudulent leads that were generated through web traffic' thus rests on a false premise," *i.e.*, that there is some "uniform or standard industry practice with respect to the identification and prevention of fraudulent traffic among companies engaged in online or other digital marketing, such as HomeAdvisor." *Id.* ¶ 28 (quoting Kahn Rpt. 13).

Neither Defendants nor Ms. Stricchiola are quoting the Kahn Report accurately. Defendants manufacture that there is a "fundamental premise" or "core assumption" behind Mr. Kahn's opinions. Specifically, they are contending that he is applying "industry standards" to identify what HA was "required to use." Defs' Opp. at 39. But, Mr. Kahn does not opine that industry standards "require" HA to identify and prevent fraudulent traffic. Mr. Kahn's opinion is that there are technologies and tools used to detect and prevent lead fraud, and that he was unable to identify that HA possessed, implemented or used those tools or required its third-party affiliate sources to use them (Kahn Report, Ex. M, at pg. 13). Defendants do not provide a single citation to Mr. Kahn's Report where he states his opinions are based on industry standards or practices, or equally important, how industry standards or practices (if even such exist) are pertinent when the central issue in this case is whether HA was equipped to deliver verified Leads to SPs.

Defendants' Opposition fails in its attempts to demonstrate that Dr. Simonson's "rebuttal report" rebuts, as it must, the same subject matter in Plaintiffs' experts' affirmative expert reports. First, in the Opposition, Defendants continue the tactic of converting Ms. Geller-Stoff's opinion into a "notion of a universal 'brand promise'" in order to claim Dr. Simonson's Rebuttal opinions

appropriately proffer opinions on his views of consumers and consumer behavior. Ignoring the fact that Ms. Geller-Stoff's report did not use the phrase "uniformly communicated" a single time to suit their intended argument, Defendants use the phrase "uniform" or "uniformly" 16 separate times in their Opposition, so as to, unavailingly, try to connect the non-existent dots between Dr. Simonson's rebuttal to Ms. Geller-Stoff's opinions. *Compare* Defs' Opp. at 41-44 to Ex. E, [Dkt. 549-7] Simonson Tr. at 234:8-22.

Moreover, Defendants claim that Dr. Simonson was rebutting Ms. Geller-Stoff's and Mr. Imburgia's opinions about HomeAdvisor's "Brand Promise." However, that characterization does not comport with the substance of his mostly conclusory and factually ungrounded Rebuttal Report. *See,* Ex. D, Dkt. 549-6. *First*, as discussed *supra*, Dr. Simonson's rebuttal commentary about Brand Promise are untethered to Ms. Geller-Stoff's Brand Promise. *Second*, as Dr. Simonson testified, he did not consider evidence about the quality and nature of the HA Leads such as HA's email templates to SPs conveying the nature and quality of the Leads as consistently described by Ms. Geller-Stoff as HA's "Brand Promise" (Ex. E, Dkt. 549-7, Simonson Tr. at 187, 195, 219), or Plaintiffs' interrogatory responses evidencing their exposure to HomeAdvisor's "Brand Promise" about the nature and quality of its Leads (*id.* at 117-118, 129), and therefore is not offering any factually grounded rebuttal. *Third*, Dr. Simonson claims that Ms. Geller-Stoff fails to conduct a survey of the SPs (*e.g.* Ex. D, Dkt. 549-6 at ¶40), and does not conduct his own, but Ms. Geller-Stoff properly reviewed and relied on *HA's* surveys of the SPs. The reliability of such non-litigation surveys is established by practical business considerations, unlike litigation surveys (which Dr. Simonson claims Ms. Geller-Stoff should have done) that can be misused for advocacy purposes. *See McNeil-PPC, Inc. v. Merisant Co.*, No. CIV. 04-1090 (JAG), 2004 WL 3316380, at

*13 (D.P.R. July 29, 2004); *Binney & Smith v. Rose Art Indus.*, No. CIV. A. 00-2939, 2001 WL 910943, at *3 n.2 (E.D. Pa. Aug. 9, 2001) (same); *Quaker Oats Co. v. Mel Appel Enterprises, Inc.*, 703 F. Supp. 1054, 1058, 1061 (S.D.N.Y. 1989) (same); *Chase Fed. Sav. & Loan Ass'n v. Chase Manhattan Fin. Servs., Inc.*, 681 F. Supp. 771, 780 (S.D. Fla. 1987). Dr. Simonson's "rebuttal" offers up straw men and vague assertions. He fails to tie his "rebuttal opinion" to both Plaintiffs' affirmative experts' opinions and the facts of this case. Dr. Simonson's opinions exceed the scope of proper rebuttal opinion. *See, Pandora Jewelers*, 2011 U.S. Dist. LEXIS 62969, *18 (rebuttal opinions were sufficiently grounded on expertise and "analysis of the facts").

Defendants' Opposition further demonstrates the merit of, and does not refute the grounds asserted in, Plaintiffs Motion as to why Defendants' experts' opinions should be stricken, including due to (among other things) their use of hyperbole, setting up "straw men", proffering vague, improper rebuttals, and cherry-picking. These are, indeed, some of the very bases on which Dr. Simonson's rebuttal marketing report was recently stricken "in substantial part" in another case:

> Professor Simonson devotes several pages in his report to criticizing *any* postmortem or post-hoc case study created in the context of litigation. (*See* Simonson Rpt. at ¶¶ 16-26). He claims never before to have encountered one — a conclusion that renders the rest of his testimony highly suspect, since I have read a number of them, and I suspect most other federal judges have as well….
>
> And as for allegations of "cherry picking," rather than pointing out instances in which Erdem relied on improper information, or pointing to specific pieces of evidence that she eliminated from her analysis because it ran counter to the conclusions her client hired her to reach, Simonson's report is replete with vague generalities and statements, such as "without going over other facts that were widely known and that were highlighted in the Erdem Report . . ." (*Id.* at ¶ 32) … A rebuttal expert actually needs to be quite precise about the aspects of an expert's report with which he takes issue... In my view, what Simonson identifies as "cherry picking" is anything but….
>
> My principal problem with Simonson's report is that it is replete with assertions of fact that are unsupported by a citation to a single piece of record evidence, any contemporaneous document, or any authoritative text in the field of marketing...

> Professor Simonson's report also suffers from the practice of setting up "straw men" of Erdem's supposed opinions that are nowhere to be found in her report. Erdem did not opine that there was a generally accepted standard or test in the marketing field for when managers should "give up" on a new project; …This case is not about whether BlackBerry should not have launched the BB 10 devices, although you would never know that from reading Professor Simonson's report. …. Based on the report he has submitted, his testimony should be brief indeed.

*Pearlstein v. Blackberry Ltd.*, 2021 U.S. Dist. LEXIS 172218, at *26-27, 29, 32-35 (S.D.N.Y. Sep. 10, 2021)(granting "in substantial part" plaintiffs' motion to strike Dr. Simonson's rebuttal marketing expert report).

## III. CONCLUSION

For the reasons set forth above and in Plaintiffs' Motion, Plaintiffs respectfully request that the Court strike and preclude Defendants' experts' improper opinions and testimony identified.

DATED: May 25, 2022

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

*Kimberly M. Donaldson-Smith*
Nicholas E. Chimicles
Kimberly M. Donaldson-Smith
Stephanie E. Saunders
Mark B. DeSanto
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
Phone: 610-642-8500
Fax: 610-649-3633
nec@chimicles.com
kds@chimicles.com
ses@chimicles.com
mbd@chimicles.com

and

Scott M. Tucker
2711 Centerville Rd.
Suite 201
Wilmington, DE 19808
Phone: 302-656-2500
Fax: 302-656-9053
Scotttucker@chimicles.com

Gordon W. Netzorg
Mark W. Williams
**SHERMAN & HOWARD, L.L.C.**
633 17th Street, Suite 3000
Denver, CO 80202
Phone: 303-299-8381
Fax: 303-298-0940
gnetzorg@shermanhoward.com
mwilliams@shermanhoward.com

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I, Kimberly M. Donaldson-Smith, hereby certify that on this 25th day of May 2022, a true and correct copy of **PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO STRIKE THE PROFFERED TESTIMONY OF DEFENDANTS' EXPERTS: CARLOS HIDALGO, DR. ITAMAR SIMONSON, JESSIE STRICCHIOLA, AND LOUIS G. DUDNEY** was filed electronically with the Clerk of Court using the CM/ECF system. As such, this motion was served on all counsel who are deemed to have consented to electronic service.

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**

*/s/ Kimberly M. Donaldson-Smith*