IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 16-cv-01849-PAB-KLM
(Consolidated with Civil Action No. 18-cv-01802-PAB-KLM)

In re HOMEADVISOR, INC. LITIGATION
_____

**ORDER**
_____

This matter is before the Court on HomeAdvisor, Inc., IAC/InterActiveCorp, Angi

HomeServices, Inc., and CraftJack, Inc.'s Motion to Exclude Plaintiffs' Expert Opinions

[Docket No. 550]; Defendants C. David Venture Management, LLC, and VentureStreet,

LLC's Motion to Strike the Testimony of Basil Imburgia [Docket No. 547]; and Plaintiffs'

Motion to Strike the Proffered Testimony of Defendants' Experts: Carlos Hidalgo, Dr.

Itamar Simonson, Jessie Stricchiola, and Louis G. Dudney [Docket No. 549].  The Court

has jurisdiction pursuant to 28 U.S.C. § 1332(d)(2).

## I.    BACKGROUND

Plaintiffs Airquip, Inc., Kelly DaSilva, Nicole Gray, Charles Costello, Bruce

Filipiak, Josh Seldner, Anthony Baumann, Kourtney Ervine, Hans Hass, Iva Haukenes,

Brad and Linda McHenry, and Lisa LaPlaca (collectively the "plaintiffs") bring this class

action suit on behalf of themselves and a proposed class of similarly situated home

service professionals against defendants HomeAdvisor, Inc. ("HomeAdvisor"),

IAC/InterActiveCorp ("IAC"), ANGI Homeservices, Inc. ("ANGI"), CraftJack, Inc.

("CraftJack") (collectively the "HA defendants"), and C. David Venture Management, LLC ("CDVM") and Venture Street, LLC ("Venture Street") (collectively the "CDVM/VS defendants").  Docket No. 449 at 13.[1]

HomeAdvisor is an online marketplace that helps connect home service professionals with homeowners in need of home improvement services.  *Id*., ¶ 1. Plaintiffs are service professionals ("SPs") who paid for memberships with HomeAdvisor.  *Id*. at 20-26, ¶¶ 9-19.  HomeAdvisor collects information from homeowners in the form of a service request and sells that information to SPs as a "lead."  *Id*. at 13-14, 20-26, 33, ¶¶ 1, 9-19, 54.  In addition to membership fees, HomeAdvisor charges SPs per lead.  *Id*. at 33, ¶ 54.  According to plaintiffs, HomeAdvisor also contracts with over 100 lead generator companies, including defendants CDVM, Venture Street, and CraftJack, to obtain leads that HomeAdvisor sells to SPs.  *Id*. at 47, ¶ 86.

Plaintiffs allege that HomeAdvisor misrepresents the quality of the leads it sells to SPs.  *Id*. at 33-34, ¶¶ 55, 57.  Specifically, plaintiffs claim that HomeAdvisor advertises that its leads are from high quality, "project-ready" customers.  *Id*. at 33-35, ¶¶ 57-58. However, plaintiffs assert that the leads are of "no value" because the leads often contained "wrong or disconnected phone numbers" and "wrong contact information" or directed the SPs to "persons who never even heard of HomeAdvisor," "persons who are not homeowners," or homeowners who completed the projects "months or years prior to

_____

[1] On September 26, 2022, the Court granted CDVM and Venture Street's motion for summary judgment, dismissed the unjust enrichment claims against CDVM and Venture Street, and terminated these defendants from the case.  *See* Docket No. 603 at 27.

2

the Lead being sent." *Id*. at 38, ¶ 66.  Plaintiffs bring a class action on behalf of themselves and all other similarly situated SPs and seek to certify a nationwide class and nine state classes.  *Id*. at 171-73, ¶¶ 429-431; *see also* Docket No. 557.

Before the filing of plaintiffs' motion for class certification, *see* Docket No. 557, the HA defendants filed a motion to exclude the testimony of plaintiffs' affirmative experts Darlene Geller-Stoff, Basil Imburgia, and Richard Kahn.  Docket No. 550.  The CDVM/VS defendants filed a motion to strike the testimony of plaintiffs' affirmative expert Basil Imburgia.  Docket No. 547.[2]  Plaintiffs filed an omnibus opposition to defendants' motions.  Docket No. 566.  Defendants filed replies.  Docket Nos. 572, 574.

Additionally, plaintiffs filed a motion to exclude the testimony of the HA defendants' affirmative expert Carlos Hidalgo and the HA defendants' rebuttal experts Dr. Itamar Simonson, Jessie Stricchiola, and Louis Dudney.  Docket No. 549.  The HA defendants filed a response opposing plaintiffs' motion, Docket No. 567, joined by the CDVM/VS defendants, Docket No. 565, and plaintiffs filed a reply.  Docket No. 573.

## II.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[2] The CDVM/VS defendants also filed a document joining the arguments in the HA defendants' motion.  Docket No. 548.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590-91 (1993).  "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions."  *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted).

To determine whether an expert opinion is admissible, the Court must perform "a two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  First, the Court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Roe*, 42 F.4th at 1180 (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability.  *Id.* at 1180-81; Fed. R. Evid. 702(b)-(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592-93).  In assessing whether a methodology is reliable, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community."  *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert*, 508 U.S. at

593-94).  However, courts have "broad discretion to consider a variety of other factors." *Etherton v. Owners Ins. Co*., 829 F.3d 1209, 1217 (10th Cir. 2016).  Next, the court must assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)*; see also Roe*, 42 F.4th at 1181.  To demonstrate the reliability of an opinion that is based solely on an expert's experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes).  "Establishing reliability does not require showing that the expert's testimony is 'undisputably correct.'"  *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003) (discussing how the opinion is tested against the standard of reliability, not correctness).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  *Roe*, 42 F.4th at 1181.  "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Under Rule 702, a court must also ensure that the proffered testimony is relevant and will assist the trier of fact.  *See id.* at 156; *United States v. Rodriguez-Felix*, 450

F.3d 1117, 1122-23 (10th Cir. 2006).  "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted).  In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'"  *Id*. at 476-77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

Rule 26 of the Federal Rules of Civil Procedure permits the "admission of rebuttal expert testimony that is 'intended solely to contradict or rebut evidence on the same subject matter identified' by an initial expert witness."  *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv. II, LLC*, No. 14-cv-00134-PAB-KMT, 2016 WL 1597529, at *2 (D. Colo. Apr. 21, 2016) (quoting *TC Sys. Inc., v. Town of Colonie, NY*, 213 F. Supp. 2d 171, 179 (N.D.N.Y. 2002)).  By contrast, "an affirmative expert serves to establish a party's case-in-chief."  *Id*. at *3.  A rebuttal expert must submit a report that includes "a showing of facts supporting the opposite conclusion of those at which the opposing party's experts arrived in their response reports."  *Id*. (citation omitted).  "[R]ebuttal experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts."  *Id*. (citation omitted).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

III.    **ANALYSIS**

A.  **Darlene Geller-Stoff**

Darlene Geller-Stoff is plaintiffs' expert on HomeAdvisor's sale of leads to SPs. Docket No. 550-2 at 5, ¶ 11.  The HA defendants move to exclude Ms. Geller-Stoff's opinions on HomeAdvisor's "brand promise" and her reliance on the data compiled by PossibleNOW.  Docket No. 550 at 7-21, 30-33.

### 1.  *Brand Promise Opinions*

The HA defendants argue that the Court should exclude all of Ms. Geller-Stoff's opinions on HomeAdvisor's "brand promise," including her opinions that

> (1) HomeAdvisor maintained a "brand promise" during the putative class period that it consistently made to prospective service providers; (2) "HomeAdvisor's business model was vulnerable to the generation of service requests and the sale of leads that did not meet HomeAdvisor's Brand Promise;" (3) "HomeAdvisor's Brand Promise is the kind of information that prospective Service Professionals would rely on when deciding whether to buy a HomeAdvisor membership and leads;" (4) HomeAdvisor's business model was "exposed to the buying and generating of service requests" that did not meet the "Brand Promise;" and (5) "HomeAdvisor's business operations were insufficient to consistently and confidently ensure that leads sold to Service Professionals met the Brand Promise."

*Id*. at 8-9 (quoting Docket No. 550-2 at 7-8, 12-17, ¶¶ 23, 38-43).  The HA defendants challenge Ms. Geller-Stoff's qualifications to render opinions on a brand promise, the reliability of the opinions, and the helpfulness of the opinions to the jury.  *Id*. at 10.

### a.  Qualifications

Principally, the HA defendants argue that Ms. Geller-Stoff is not qualified to offer opinions on a brand promise because she has never herself developed a brand promise, never measured the effect of a brand promise on its intended audience, and never studied or written on the concept of a brand promise.  *Id*. at 10-11.  The HA

defendants assert that Ms. Geller-Stoff has no experience in the field of consumer behavior or purchasing decisions and she cites no professional literature discussing the concept of a brand promise in her reports.  *Id*. at 11-12.  Additionally, the HA defendants contend that Ms. Geller-Stoff offered only vague statements during her deposition regarding her experience with brand promises, "devoid of any explanation of how her experience supported her opinions."  *Id*. at 11.

Plaintiffs respond that Ms. Geller-Stoff is qualified to offer opinions on HomeAdvisor's brand promise because she has significant "experience in both lead generation and consumer engagement," Docket No. 566 at 22, including "sales, marketing, and customer service initiatives."  Docket No. 550-2 at 2, ¶ 2.  Ms. Geller-Stoff's report states

> I have over thirty years of understanding, developing, and executing on business and operational processes related to best practices for interactions between businesses and customers/consumers to ensure high quality and compliant communications and transactions that deliver on brand promise.  My engagements focus on the quality, consistency, and documentation of the operational processes, quality and compliance of the interactions and communications with customers and the measurability of customer expectation and brand promise.  I have provided services for businesses in many industries and a wide variety of products and services sold to businesses and consumers. Much of the work I have done has been in support of sales initiatives including lead generation and customer acquisition, customer care, consumer affairs, including complaint handling and product recalls, and help desk operations both internal and customer-facing.  I have assisted companies with their customer engagement and acquisition strategies including prospecting, lead generation, sales methodology models, scripting and training.

*Id*. at 4, ¶ 8.  Plaintiffs argue that Ms. Geller-Stoff is sufficiently qualified based on her "extensive industry experience in lead generation and consumer engagement" and that defendants' position would disqualify nearly all experts.  Docket No. 566 at 22-23.

The Court finds that Ms. Geller-Stoff is qualified to render opinions on HomeAdvisor's "brand promise" based on her experience.  Ms. Geller-Stoff has thirty years of experience in marketing and consumer engagement, including designing lead generation programs across a variety of industries.  Docket No. 550-2 at 2, 4-5, ¶¶ 2, 8-10.  Throughout this employment, she has gained experience with the "issues impacting lead generation, including fraudulent leads and the establishment of business processes . . . to ensure the consistent quality of leads."  *Id.* at 5, ¶ 9.  The Court finds that this experience qualifies Ms. Geller-Stoff to opine on HomeAdvisor's "brand promise," including the promises that HomeAdvisor made to SPs about leads, the type of information that consumers rely on, and whether HomeAdvisor's business model could fulfill its "brand promise."  As explained below, the way that plaintiffs use the term "brand promise," which is more of a label than a novel economic theory, does not entail specialized knowledge or experience that Ms. Geller-Stoff lacks.  Accordingly, the Court denies this portion of the HA defendants' motion.

### b.  Reliability

The HA defendants argue that Ms. Geller-Stoff's brand promise opinions are unreliable because she offers no support for: i) the concept or definition of a "brand promise;" ii) her opinion that the alleged brand promise was "consistently conveyed" to prospective SPs; iii) her opinion that HomeAdvisor's brand promise is the type of information that SPs would rely on; and iv) her opinions that HomeAdvisor's lead generation processes did not meet the brand promise.  Docket No. 550 at 15-22.

### i.   <u>Concept of a Brand Promise</u>

The HA defendants argue that Ms. Geller-Stoff's opinion that HomeAdvisor maintained a brand promise is unreliable because she offers no support for the concept of a "brand promise." *Id*. at 15.  The HA defendants assert that Ms. Geller-Stoff's brand promise opinion has not been tested, has not been peer reviewed or published, has no controlling standards, and has no acceptance within the relevant scientific community. *Id*.  Furthermore, the HA defendants contend that the brand promise opinion has no support in the record because Ms. Geller-Stoff "simply assert[ed] that a 'brand promise' existed by offering [her] own interpretation of certain HomeAdvisor marketing and training documents."  *Id*.  Plaintiffs respond that the concept of a "brand promise" is a recognized term in the industry and that Ms. Geller-Stoff's opinion is reliable because she extensively reviewed HomeAdvisor's marketing, advertising, and sales materials to define HomeAdvisor's brand promise.  Docket No. 566 at 15.

The Court finds that Ms. Geller-Stoff's opinion that HomeAdvisor maintained a "brand promise" is sufficiently reliable under Rule 702.  Ms. Geller-Stoff testified that "a brand promise is a commitment by a company to provide a level of service or product or experience to their customers" and that the "development of a brand promise is very specific to each company."  Docket No. 550-9 at 17, 61:13-15, 22-25.  She discussed that "[b]rand promise is an accepted concept across every industry I've ever encountered," including "[h]otels, consumer products, packaged goods, [and] personal items."  *Id*. at 18, 63:4-6, 9-11.  Specifically, Ms. Geller-Stoff's report defines HomeAdvisor's "brand promise" as its promise to SPs that "HomeAdvisor would connect them with serious, legitimate, and real homeowners or consumers, who HomeAdvisor

determined were actively seeking to engage with a Service Professional about having work performed."  Docket No. 550-2 at 12, ¶ 39.  Ms. Geller-Stoff reviewed numerous materials to conclude that HomeAdvisor conveyed this brand promise during the class period, including HomeAdvisor's sales and advertising emails, online marketing materials, and training materials for its sales representatives, as well as HomeAdvisor's responses to interrogatories from the Federal Trade Commission ("FTC").  *Id*. at 12-17, 18-19, ¶¶ 39-42, 47.  Although Ms. Geller-Stoff did not subject her opinion to testing or peer review, *see generally id*., the HA defendants provide no argument that a company's specific "brand promise" is a concept that could be scientifically tested.  *See generally* Docket No. 550.  In essence, Ms. Geller-Stoff uses the term "brand promise" as a short-hand term to describe HomeAdvisor's alleged promises to SPs about its services.  If, instead of using the term "brand promise," she simply said "promises," it is hard to imagine how any of the HA defendants' challenges would have any basis.  The fact that Ms. Geller-Stoff uses "brand promise" instead of "promise" does not have the impact under Rule 702 that the HA defendants claim.  While some of the HA defendants' rebuttal experts vigorously contest whether the concept of a brand promise is sound, the test is reliability, not correctness.  *See Goebel*, 346 F.3d at 991.  Accordingly, the Court rejects the HA defendants' argument.

## ii.   Consistently Conveying the Brand Promise

The HA defendants argue that Ms. Geller-Stoff has no support for her opinion that HomeAdvisor's alleged brand promise was "consistently conveyed" to SPs throughout the class period.  *Id*. at 16.  The HA defendants contend that Ms. Geller-Stoff provides no evidence that a statistically significant portion of HomeAdvisor's marketing

or training materials contained the "brand promise" during the class period, she did not review all the materials, she did not know whether the training materials changed throughout the class period, and she did not interview any sales representatives.  *Id.* at 16-17.  Plaintiffs respond that Ms. Geller-Stoff's opinion is reliable because she reviewed many of HomeAdvisor's marketing materials, website pages, sales and advertising emails to prospective SPs, training materials for sales representatives, and filings with the Securities and Exchange Commission ("SEC") from 2012 through 2021. Docket No. 566 at 16-17.

The Court finds that Ms. Geller-Stoff's opinion that HomeAdvisor "consistently conveyed" the brand promise to SPs during the class period is sufficiently reliable under Rule 702.  *See* Docket No. 550-2 at 12, ¶ 40.  Ms. Geller-Stoff reviewed HomeAdvisor's marketing, training, and advertising materials from 2012 to 2021 and she identified the specific language in those materials that communicated the brand promise.  *See id.* at 12-16, ¶ 40 n.19-44.  Ms. Geller-Stoff also reviewed HomeAdvisor's FTC interrogatory responses where HomeAdvisor describes the "quality" of its leads.  *See id.* at 18-19, ¶¶ 47-48.[3]  Ms. Geller-Stoff was not required to review every HomeAdvisor document during the putative class period or to conduct a statistical analysis to show that her opinion is reliable.  *See Goebel*, 346 F.3d at 991.  The Court finds that Ms. Geller-Stoff's review of a sample of HomeAdvisor's materials from 2012 to 2021, as well as her

---

[3] In the interrogatory responses, HomeAdvisor states that "providing quality leads to SPs is at the heart of HomeAdvisor's business-model: The product that service professionals purchase from HomeAdvisor is quality lead information.  That information includes first name, last name, address, email, and lead details."  *Id.* at 18-19, ¶ 47. HomeAdvisor also describes an example of a "valid service request" as a "consumer who is ready to speak with contractors regarding an upcoming project."  *Id.* at 19, ¶ 48.

review of HomeAdvisor's FTC interrogatory responses, provides a sufficient basis for her opinion that HomeAdvisor consistently conveyed the claimed brand promise to SPs during the putative class period.

### iii.    SPs' Reliance on the Brand Promise

The HA defendants argue that Ms. Geller-Stoff has no support for her opinion that "HomeAdvisor's Brand Promise is the kind of information that prospective Service Professionals would rely on when deciding whether to buy a HomeAdvisor membership and leads." Docket No. 550 at 19 (quoting Docket No. 550-2 at 21-22, ¶ 57). The HA defendants contend that Ms. Geller-Stoff has no reliable methodology for this opinion because she admitted that she did not interview or survey any of the 835,000 putative class members to determine what information those people relied on when deciding whether to enroll in HomeAdvisor's program. *Id*.

The Court finds that Ms. Geller-Stoff has a reliable basis for this opinion. Contrary to the HA defendants' suggestion, Ms. Geller-Stoff is not opining that all 835,000 putative class members in fact relied on the alleged brand promise, but rather she states an opinion that the brand promise is "the kind of information" that prospective SPs "would rely on." *See* Docket No. 550-2 at 21, ¶ 57*.* Ms. Geller-Stoff explains that the basis for this opinion is her "experience in delivering marketing messages to consumers to encourage them to purchase goods or services." Docket No. 550-9 at 32, 120:23-121:12. The essence of marketing is making these estimations. Based on her thirty years of experience in the marketing field, Ms. Geller-Stoff explains that consumers rely on a wide variety of information when making purchasing decisions, including advertising from companies. *Id*. at 32-33, 121:20-122:7. The Court finds that

Ms. Geller-Stoff has adequately explained "how [her] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *See Medina-Copete*, 757 F.3d at 1104. Accordingly, this opinion is sufficiently reliable under Rule 702.

### iv.    Lead Generation Processes

The HA defendants assert that the following opinions of Ms. Geller-Stoff, regarding HomeAdvisor's lead generation processes, are unreliable:

- "HomeAdvisor's business model was vulnerable to the generation of service requests and the sale of leads that did not meet HomeAdvisor's Brand Promise."
- HomeAdvisor failed "to detect and prevent selling leads that did not meet HomeAdvisor's Brand Promise."
- "HomeAdvisor's business operations were insufficient to consistently and confidently ensure that leads sold to Service Professionals met the Brand Promise."

Docket No. 550 at 20-21 (quoting Docket No. 550-2 at 21, 26, ¶¶ 57, 68-69).  The HA defendants contend that these opinions are not reliable because Ms. Geller-Stoff cites no industry standards regarding how a company should meet a brand promise.  *Id*. at 21.  Furthermore, they argue that Ms. Geller-Stoff never quantified how many of the 83.9 million leads during the putative class period met or failed to meet the brand promise.  *Id*.  Plaintiffs respond that Ms. Geller-Stoff was not required to cite an industry standard because she compared HomeAdvisor's leads to HomeAdvisor's specific brand promise.  Docket No. 566 at 27.  Furthermore, plaintiffs contend that Ms. Geller-Stoff's opinions are reliable because she extensively reviewed HomeAdvisor's purported quality control processes and explained why HomeAdvisor's processes could not verify the authenticity of service requests collected through internet sources.  *Id*. at 28.

The Court finds that Ms. Geller-Stoff provided a reliable basis for her opinions on the validity of HomeAdvisor's lead generation processes and whether those processes could meet the brand promise.  Ms. Geller-Stoff extensively discusses HomeAdvisor's various processes to ensure the quality of its leads, including using contracts with third-party affiliates, tracking credit and win rates, and employing lead verification processes. Docket No. 550-2 at 27-54, ¶¶ 72-132.  Ms. Geller-Stoff explains that HomeAdvisor's processes – individually and in the aggregate – are insufficient to meet the brand promise, *see id.* at 27, ¶ 74, i.e., that HomeAdvisor would connect SPs with "serious, legitimate, and real homeowners or consumers, who HomeAdvisor determined were actively seeking to engage with a Service Professional about having work performed." *Id.* at 12, ¶ 39.  Based on her industry experience, Ms. Geller-Stoff explains that HomeAdvisor's various processes do not ensure that the leads have valid contact information or that the leads are from a consumer who owns the home, is ready to begin a project, and recently submitted the lead information.  *Id.* at 27, ¶ 75.  These opinions are sufficiently reliable under Rule 702.

The Court therefore denies this portion of the HA defendants' motion.

### c.  Relevance

The HA defendants argue that all of Ms. Geller-Stoff's brand promise opinions are irrelevant because expert testimony on this subject is not helpful to the jury.  Docket No. 550 at 24-25.  Defendants assert that expert testimony is not helpful to discern what information HomeAdvisor told the SPs or what information SPs relied on, particularly when the named plaintiffs can describe that information.  *Id.*  Plaintiffs respond that Ms.

Geller-Stoff's opinions are helpful because average jurors do not have experience with lead generation.  Docket No. 566 at 26.

The Court finds that Ms. Geller-Stoff's brand promise opinions are not "within the juror's common knowledge and experience," *see Garcia*, 635 F.3d at 476-77, because an average juror does not have experience in marketing, consumer engagement, lead generation, or processes to detect fraudulent leads and ensure that leads meet the company's promises.  Accordingly, the Court denies this portion of the HA defendants' motion.

### 2.  *Opinions on the PossibleNOW Analysis*

At the request of plaintiffs, PossibleNOW,[4] a global professional services firm specializing in consumer contact compliance consulting and auditing services, "evaluated the consumer contact information" for 83.9 million of HomeAdvisor's service requests sent to SPs.  Docket No. 550-3 at 2, 5; Docket No. 550-2 at 6-7, ¶ 15.  The HA defendants move to exclude Ms. Geller-Stoff's opinions based on PossibleNOW's analysis because Ms. Geller-Stoff is not qualified to testify about the analysis.  Docket No. 550 at 30-33.  In her report, Ms. Geller-Stoff discusses the results of PossibleNOW's analysis, including that "only 14.6 million [service requests] (17%) had identified association among the consumer contact information in the lead;" many leads were missing email addresses or contained suspicious domain names; and 11.8 million addresses were undeliverable by the U.S. Postal Service.  Docket No. 550-2 at 47-49, ¶ 121.  The HA defendants argue that Ms. Geller-Stoff is unqualified to offer opinions

---

[4] Ms. Geller-Stoff is the Vice President of Operations at CompliancePoint Litigation Support Services, a wholly-owned subsidiary of PossibleNOW.  Docket No. 550-2 at 2, ¶ 1.

that rely on PossibleNOW's analysis because she did not perform the analysis herself, did not oversee PossibleNOW's work, and did not instruct PossibleNOW about the proper methodology to employ.  Docket No. 550 at 31-32.  Plaintiffs respond that Ms. Geller-Stoff is not adopting any expert opinions of PossibleNOW, but she is stating facts obtained from PossibleNOW.  Docket No. 566 at 33.

Under Fed. R. Evid. 703, an expert may base an opinion on facts that are not admissible if "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703; *see also Black v. M & W Gear Co.*, 269 F.3d 1220, 1228 (10th Cir. 2001).  "While [i]t is true that experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field[,] . . . the expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert."  *ClearOne, Inc. v. PathPartner Tech., Inc.*, 2022 WL 1063733, at *19 (D. Utah Apr. 8, 2022) (internal quotations and citations omitted). Here, Ms. Geller-Stoff relies on PossibleNOW's data analysis of the service requests, as well as her own analysis of HomeAdvisor's quality-control processes, to form her opinion that "HomeAdvisor's business operations were insufficient to consistently and confidently ensure that leads sold to Service Professionals met the Brand Promise." *See* Docket No. 550-2 at 26-53, ¶¶ 69-126.  Ms. Geller-Stoff states in her report that she has considered information from a variety of sources, including PossibleNOW's analysis, "all of which are reasonably relied upon by experts in my field."  *Id*. at 6-7, ¶¶ 15, 21-22.  As a result, Rule 703 permits Ms. Geller-Stoff to rely on PossibleNOW's

data analysis to form her own opinions regarding the sufficiency of HomeAdvisor's operations.  The Court therefore denies this portion of the HA defendants' motion.[5]

**B.  <u>Basil Imburgia</u>**

Basil Imburgia is plaintiffs' damages expert.  *See* Docket No. 550-6 at 13, ¶ 21. The HA defendants move to exclude Mr. Imburgia's opinions on HomeAdvisor's brand promise, the economic damages in the case, and his reliance on the data compiled by PossibleNOW.  Docket No. 550 at 7-33.  The CDVM/VS defendants move to exclude Exhibit C of Mr. Imburgia's report.  Docket No. 547 at 7-15.

**1.  *Brand Promise Opinions***

The HA defendants argue that the Court should exclude all of Mr. Imburgia's opinions on HomeAdvisor's brand promise, including his opinions that

> (1) HomeAdvisor maintained a "Brand Promise" during the putative class period that it consistently made to prospective service providers; (2) HomeAdvisor's representations in its "Brand Promise" about "the nature and quality of the memberships and Leads are the kind of information that prospective SPs rely on when deciding whether to buy an HA membership and Leads"; (3) "Putative Class members similarly relied on [HomeAdvisor's] Brand Promise when deciding whether to buy [HomeAdvisor] memberships and Leads"; (4) HomeAdvisor's alleged "failure to meet SPs' expectations for the Brand Promise was pervasive"; (5) a "common method and common data can be used to show that [HomeAdvisor] charged nearly all putative Class members for Leads that did not fulfill [HomeAdvisor's] Brand Promise"; and (6) a "common method can be used with common data to quantify economic damages by putative Class member, and on a class-wide basis," based on the "Leads that did not fulfill [HomeAdvisor's] Brand Promise."

---

[5] However, if plaintiffs seek to introduce the PossibleNOW data at trial, plaintiffs must lay a proper foundation for the introduction of that evidence.  *See SolidFX, LLC v. Jeppesen Sanderson, Inc.*, No. 11-cv-01468-WJM-BNB, 2014 WL 1319361, at *4 (D. Colo. Apr. 2, 2014) (quoting Fed. R. Evid. 703, advisory committee notes) ("when an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted.").

Docket No. 550 at 9 (quoting Docket No. 550-6 at 14-16, ¶¶ 25-30).  The HA defendants challenge Mr. Imburgia's qualifications to render opinions on a brand promise, the reliability of the opinions, and the helpfulness of the opinions to the jury.  *Id.* at 10.

### a. Qualifications

Regarding the threshold inquiry of qualifications, the HA defendants argue that Mr. Imburgia is not qualified to render opinions on a brand promise because he is an accountant who has no experience with brand promises.  Docket No. 550 at 12-13.  The HA defendants also assert that Mr. Imburgia cannot adopt Ms. Geller-Stoff's brand promise opinions as his own opinions.  *Id.* at 27-28.  Plaintiffs respond that Mr. Imburgia is qualified to render these opinions because he has significant experience as a certified public accountant and certified fraud examiner and Mr. Imburgia has conducted "financial economic accounting-type analysis [spanning] most industries."  Docket No. 566 at 24.  Plaintiffs also argue that Mr. Imburgia is permitted to rely on Ms. Geller-Stoff's findings in rendering his own opinions.  *Id.* at 28-29.

The Court finds that Mr. Imburgia is not qualified to testify to Opinions 1, 2, 3, and 4.  Mr. Imburgia is a certified public accountant and certified fraud examiner with expertise "providing financial, accounting, and economic analysis" in litigation.  Docket No. 550-6 at 4, ¶ 1.  Mr. Imburgia testified at his deposition that he had never seen the terminology of "brand promise" before this case.  Docket No. 550-10 at 11, 35:23-36:12.  Plaintiffs have failed to show that Mr. Imburgia is qualified based on his knowledge, skill, experience, training, or education to offer opinions regarding consumer decision-making principles, HomeAdvisor's brand promise to SPs, whether putative class members relied on the brand promise, or whether HomeAdvisor's failure to meet SP's

expectations was pervasive.  *See* Fed. R. Evid. 702.  In his report, Mr. Imburgia states that Opinion 1-4 are his opinions.  *See* Docket No. 550-6 at 14-15, ¶¶ 25-27.  However, in his deposition, Mr. Imburgia backtracks and implies that he relied on Ms. Geller-Stoff's opinions for the brand promise and agrees with her opinions.  *See* Docket No. 550-10 at 61, 234:7-18 (stating that Ms. Geller-Stoff is "defining the brand promise, and I'm relying on her report"); *id.* at 13, 43:23-44:25 (stating that it is not his opinion that HomeAdvisor's representations are the "kind of information that prospective SPs rely on," but rather "I am relying on [an] industry expert [Ms. Geller-Stoff] for that statement. But from the standpoint of the information that I reviewed, I would agree with that statement").  Mr. Imburgia may rely on Ms. Geller-Stoff's opinions regarding HomeAdvisor's brand promise and lead generation processes to inform his damages opinions if it is common for damages experts to rely on that type of opinion.  *See* Fed. R Evid. 703.  However, Mr. Imburgia may not testify that he "agrees" with Ms. Geller-Stoff's conclusions because plaintiffs have failed to show that Mr. Imburgia is qualified to state such opinions.

The Court does find that Mr. Imburgia is qualified to testify to Opinions 5 and 6, regarding whether common methods can be used to determine damages and whether HomeAdvisor charged class members for leads that did not meet the brand promise, based on his education and training as a certified public accountant, as well as his experience providing economic analysis in litigation.  *See* Docket No. 550-6 at 4, ¶ 1.

Accordingly, the Court grants in part and denies in part this portion of the HA defendants' motion.  Mr. Imburgia is qualified to testify to Opinions 5 and 6.  The Court will exclude Mr. Imburgia from testifying to Opinions 1-4 as being his own opinions.[6]

### 2. *Damages Opinions*

The HA defendants move to exclude Mr. Imburgia's damages opinions because his methodology is unreliable.  Docket No. 550 at 22-24, 29-30.  Mr. Imburgia offers an opinion that the eleven putative class representatives incurred $68,932.97 in economic damages from October 1, 2012 through December 31, 2020 (the "analysis period").  Docket No. 550-6 at 35, ¶ 78.  Mr. Imburgia also offers an opinion that the 835,151 putative class members in the proposed nationwide class incurred $4.13 billion in economic damages from October 1, 2012 through December 31, 2020.  *Id.*, ¶ 79.  Mr. Imburgia concludes that there were approximately 115.8 million leads sent to putative class members that did not meet HomeAdvisor's brand promise and these were the leads generated through online submissions, rather than verbal communication between the customer and a HomeAdvisor representative.  *Id.* at 32-33, ¶¶ 68-69.  Mr. Imburgia calculates the economic damages over the analysis period by 1) adding up the "total lead fees" charged for leads to putative class members that did not fulfill HomeAdvisor's brand promise; 2) adding up the "total net membership fees" for SPs who were putative class members; and 3) subtracting the "total amount of any cash refunds" received by putative class members.  *Id.* at 33-34, ¶ 72.

---

[6] The Court therefore does not reach the HA defendants' additional arguments regarding the unreliability or helpfulness of Mr. Imburgia's Opinions 1-4.  *See generally* Docket No. 550 at 14-21, 24-27.

First, the HA defendants argue that Mr. Imburgia's damages methodology is unreliable because it is "founded solely" on the unreliable brand promise theory. Docket No. 550 at 22. The HA defendants assert that because Mr. Imburgia and Ms. Geller-Stoff are not qualified to opine on the "brand promise" theory, Mr. Imburgia's damages methodology inherently lacks a reliable foundation. *Id*. at 23. The HA defendants also argue that Mr. Imburgia has "no basis in objective fact for the unsupported claim that any lead submitted online did not meet [the] 'brand promise.'" *Id*. at 22. The Court rejects these arguments. The Court found that Ms. Geller-Stoff was qualified to opine on HomeAdvisor's brand promise, and therefore Mr. Imburgia may rely on her opinions in forming his damages calculations. The Court finds that Mr. Imburgia has a factual basis for his assumption that leads generated through online submissions did not meet the brand promise. *See* Docket No. 550-6 at 32, ¶ 68. Mr. Imburgia cites Ms. Geller-Stoff's opinions that HomeAdvisor's quality-control processes could not ensure that these leads met the brand promise because the processes failed to verify whether online service requests were submitted by real people, whether the requests contained accurate contact information, or whether the submitter was a homeowner. *Id*. at 27-28, ¶ 58. The Court therefore denies this portion of the HA defendants' motion.

Second, the HA defendants argue that Mr. Imburgia's damages methodology is unreliable because he ignores the benefits that SPs received from HomeAdvisor. Docket No. 550 at 29. The HA defendants contend that Mr. Imburgia's calculation includes damages for leads that SPs "converted into jobs." *Id*. For example, the named plaintiffs testified that they received many leads that were "good leads" and that led to paid work. Docket No. 574 at 12-13 (citing Docket No. 574-1 at 3, 250:20-251:13;

Docket No. 574-3 at 3, 293:6-13).  The HA defendants also argue that Mr. Imburgia's calculation includes damages for leads where HomeAdvisor granted a "credit"[7] to the SPs.  Docket No. 550 at 29.  The HA defendants assert that Mr. Imburgia did not employ the same level of intellectual rigor that characterizes the practice of an expert in the field of accounting because he "blindly followed Plaintiffs' counsel's mandate to report the highest-possible damages figure."  *Id*. at 29-30 (citing Docket No. 550-6 at 34, ¶ 74 ("I understand from [plaintiffs' law firm] that no offsets for Leads for which putative Class members may have received a benefit (e.g., made a connection with consumers, had a meaningful opportunity to sell their services to consumers, or win jobs from consumers) should be included in the economic damages calculation.")).

Plaintiffs respond that Mr. Imburgia's damages methodology is reliable and that the HA defendants' arguments regarding any offsets to the calculation go to weight, not admissibility.  Docket No. 566 at 29-31.  Plaintiffs also argue that Mr. Imburgia adequately explained why the calculation includes leads where HomeAdvisor granted a credit to the SPs: "the reason I didn't deduct noncash credits are because they're noncash, because they expire and because there's an 80 percent turnover for the SPs and that's the reason why I didn't deduct them . . . If [the credit] is just applied against a new lead that doesn't comply with the Brand Promise, then it wouldn't have value."  *Id*. at 30 (quoting Docket No. 550-10 at 46, 174:16-25).  Plaintiffs argue that Mr. Imburgia's calculation is properly focused on the defendants' conduct at the time a lead is sent to the SP.  *Id*.

---

[7] Ms. Geller-Stoff and Mr. Imburgia state that HomeAdvisor's "credits" were not cash refunds, but rather were credits towards another lead.  Docket No. 550-2 at 42, ¶ 113; Docket No. 550-6 at 9, ¶ 15.

The Court finds that Mr. Imburgia has provided a reliable foundation for his decision that the economic damages should include leads where HomeAdvisor granted a credit to the SPs.  Mr. Imburgia explains that non-cash credits have no value for several reasons, including that 1) the credits expire; 2) there is an 80 percent turnover for SPs; and 3) the credits are applied against a new lead that also does not comply with the brand promise.  Docket No. 550-10 at 46, 174:16-25.  The Court finds that Mr. Imburgia's decision not to deduct credits from his damages calculation is sufficiently grounded in facts to satisfy Rule 702.

However, the Court finds that Mr. Imburgia has not provided a reliable foundation for his decision that the economic damages should include leads which generated paid jobs for SPs.  A court may exclude an expert's opinion due to lack of foundation if the opinion is based solely on the self-serving statement of an interested party. *Champagne Metals v. Ken–Mac Metals, Inc*., 458 F.3d 1073, 1080 n.4 (10th Cir. 2006); *Mooring Capital Fund, LLC v. Knight*, 388 F. App'x 814, 821 (10th Cir. 2010); *Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60*, No. 09-cv-00858-WJM-MEH, 2011 WL 1755208, at *3 (D. Colo. May 5, 2011); *August v. Urquhart*, No. 21-cv-01338-CMA-MEH, 2022 WL 16745769, at *3 (D. Colo. Sept. 20, 2022).  Mr. Imburgia's report provides no foundation for his decision to include leads which generated paid work for SPs other than the directive from plaintiffs' counsel.  *See* Docket No. 550-6 at 34, ¶ 74 ("I understand from [plaintiffs' counsel] that no offsets for Leads for which putative Class members may have received a benefit (e.g., . . . had a meaningful opportunity to . . . win jobs from

consumers) should be included in the economic damages calculation.").[8]  Accordingly, there is no reliable foundation for this portion of Mr. Imburgia's damages calculation.

The Court therefore grants in part and denies in part this portion of defendants' motion.  In his damages calculation, Mr. Imburgia is not permitted to include the cost of leads that generated paid work for SPs.  However, Mr. Imburgia may include the cost of leads where HomeAdvisor granted a credit to SPs.  Mr. Imburgia shall file a supplemental report updating his damages calculations in accordance with this order within 60 days of the entry of the order.

### 3.  Opinions on the PossibleNOW Analysis

The HA defendants move to exclude Mr. Imburgia's opinions based on PossibleNOW's analysis because Mr. Imburgia is not qualified to testify about the analysis.  Docket No. 550 at 30-33.  In his report, Mr. Imburgia states, "[i]n summary, the PossibleNOW [consumer contact information ("CCI")] investigations identified only 13.1 million [service requests] (less than 16% of the 83.9 million total [service requests] investigated) to have a Full CCI Match with no additional detracting indicators."  Docket No. 550-6 at 29, ¶ 61.  Mr. Imburgia states that "PossibleNOW identified other trends that. . . are material red flags indicating a systemic persistent flow of [service requests] to HomeAdvisor that did not meet the Brand Promise and the steady flow of Leads to SPs that did not meet the Brand Promise."  *Id*. at 30, ¶ 62.  The HA defendants argue that Mr. Imburgia is unqualified to offer opinions on PossibleNOW's analysis because he did not do the analysis and had no role in PossibleNOW's work.  Docket No. 550 at

---

[8] Mr. Dudney, defendants' rebuttal expert, estimates that, by including leads that were converted into jobs for SPs, Mr. Imburgia's decision inflates the damages by approximately $148.8 million.  Docket No. 549-8 at 18, ¶ 27.

31.  Plaintiffs respond that Mr. Imburgia is not adopting any opinions of PossibleNOW, but he is stating facts obtained from PossibleNOW.  Docket No. 566 at 33.

As previously discussed with respect to Ms. Geller-Stoff, Rule 703 permits Mr. Imburgia to rely on PossibleNOW's data to form his own opinions regarding plaintiffs' damages.  *See* Fed. R. Evid. 703.  However, if plaintiffs seek to introduce the PossibleNOW data at trial, plaintiffs must lay a proper foundation for the introduction of that evidence.[9]  As a result, the Court denies the portion of the HA defendants' motion seeking to exclude Mr. Imburgia's opinions that rely on the PossibleNOW data.

### 4.  Exhibit C

The CDVM/VS defendants move to exclude Exhibit C of Mr. Imburgia's report as unreliable, irrelevant, and unhelpful.  Docket No. 547 at 7-15.  On September 26, 2022, the Court granted the CDVM/VS defendants' motion for summary judgment, dismissed plaintiffs' sole claims against CDVM/VS for unjust enrichment, and terminated the CDVM/VS defendants from this case.  *See* Docket No. 603 at 27.  The HA defendants did not join the CDVM/VS defendants' arguments to exclude Exhibit C of Mr. Imburgia's report.  *See generally* Docket Nos. 550, 574.  Accordingly, the Court denies the CDVM/VS defendants' motion as moot.

### C. <u>Richard Kahn</u>

Richard Kahn is plaintiffs' expert on lead fraud detection.  Docket No. 550-7 at 2. The HA defendants move to exclude several of Mr. Kahn's opinions as unreliable,

---

[9] "[W]hen an expert reasonably relies on inadmissible information to form an opinion or inference, the underlying information is not admissible simply because the opinion or inference is admitted."  *SolidFX, LLC*, 2014 WL 1319361, at *4 (quoting Fed. R. Evid. 703, advisory committee notes).

including his opinions that HomeAdvisor was susceptible to lead fraud, HomeAdvisor did not use proper tools and processes to deter lead fraud, and that affiliate traffic is one of the most common means of lead fraud.  Docket No. 550 at 33, 39.  The HA defendants also argue that Mr. Kahn is unqualified to offer an opinion on the costs that SPs incur from fraudulent leads.  *Id*. at 40.

### 1.   Opinions on HomeAdvisor's Susceptibility to Lead Fraud and the Proper Tools and Processes to Deter Lead Fraud

Mr. Kahn offers the opinion that "HomeAdvisor was susceptible to generating and selling fraudulent leads to SPs."  Docket No. 550-7 at 5.  He also offers the opinion that "HomeAdvisor was generating leads through web traffic but selling the leads to the SPs without ensuring the proper processes and tools were in place to determine or validate for HomeAdvisor's lead sources."  *Id*.

The HA defendants argue that these opinions are unreliable because Mr. Kahn "never tested HomeAdvisor's systems or the vast amount of lead data that it produced in discovery," did not understand or evaluate HomeAdvisor's sophisticated lead-filtering system, and did not test any of the fraud detection tools that he claims HomeAdvisor should have used.  Docket No. 550 at 33-35.  As a result, they argue that Mr. Kahn's opinions are all *ipse dixit*.  *Id*. at 33.  Furthermore, the HA defendants assert that Mr. Kahn's opinions are unreliable because no industry standards support his opinions.  *Id*. at 37.

Plaintiffs respond that Mr. Kahn's opinions are reliable because the opinions are based on his extensive experience in the lead fraud industry, as well as his review of HomeAdvisor's interrogatory responses describing its systems and documents evincing HomeAdvisor's knowledge that it was selling fraudulent leads.  Docket No. 566 at 36-

38.  Plaintiffs further argue that Mr. Kahn was not required to test HomeAdvisor's

system for fraud susceptibility when HomeAdvisor refused to produce the necessary

data to conduct the scan.  *Id*. at 35-36.  Additionally, plaintiffs assert that Mr. Kahn has

observed the effectiveness of other fraud detection tools personally, through feedback

from clients, and through a year-long study where he tested several of the tools.  *Id*. at

39.  Finally, plaintiffs claim that Mr. Kahn's opinions are informed by industry standards

set by the Media Rating Counsel ("MRC") and the Trustworthy Accountability Group

("TAG").  *Id*. at 39-40.

The Court finds that Mr. Kahn's opinion that HomeAdvisor was susceptible to

receiving and selling fraudulent leads is sufficiently reliable under Rule 702.  Mr. Kahn

explains in his report that HomeAdvisor was susceptible to lead fraud because it

obtained most leads from web-traffic, which can contain a large amount of fraud since

web-traffic does not require human interaction or verification.  Docket No. 550-7 at 8-10.

Mr. Kahn states that HomeAdvisor was buying leads from web-based affiliates, and his

own research has found that 40 to 50 percent of leads from affiliates are fraudulent.  *Id*.

at 8-9; Docket No. 550-23 at 35, 41-42, 76, 85, 132:4-9, 157:7-22, 294:2-5, 333:2-16.

Mr. Kahn also determines that HomeAdvisor was susceptible to lead fraud because

Chris David, the owner of CDVM/VS, testified that HomeAdvisor did not require

CDVM/VS to use fraud detection tools on leads it sent to HomeAdvisor, such as

matching IP addresses to zip codes or verifying that phone numbers, emails, and

addresses were connected to a name.  Docket No. 550-7 at 14.  The Court finds that

Mr. Kahn was not required to measure the levels of fraud on HomeAdvisor's system,

*see* Docket No. 550 at 33, to offer the opinion that HomeAdvisor was "susceptible" to

fraud.  Mr. Kahn has adequately explained how his experience leads to the conclusion that HomeAdvisor was susceptible to fraud, why his experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  *See Medina-Copete*, 757 F.3d at 1104.

Furthermore, the Court finds that Mr. Kahn's opinion that HomeAdvisor did not use proper tools and processes to deter lead fraud is also sufficiently reliable under Rule 702.  Mr. Kahn reviewed HomeAdvisor's FTC interrogatory responses discussing the various controls it uses to determine the authenticity and accuracy of leads.  Docket No. 550-7 at 14-15.  Mr. Kahn determines that HomeAdvisor's automated filtration system is not a sufficient lead fraud detection filter because it does not validate who submitted the lead.  *Id*. at 14.  Mr. Kahn explains that HomeAdvisor sometimes uses a third-party data validation tool, Neustar/TARGUS, to verify if a name from a lead matches the person's address and phone number.  *Id*.  However, Mr. Kahn explains that this process is insufficient to validate who submitted the lead because fraudsters often use real contact information from white page directories to bypass TARGUS.  *Id*. at 7, 14; *see also* Docket No. 550-23 at 36, 136:14-24.  In the FTC interrogatory responses, HomeAdvisor describes that it uses "significant oversight and quality controls" when it accepts service requests from affiliates.  Docket No. 566-11 at 35.  However, Mr. Kahn explains that these processes are not sufficient to detect lead fraud because HomeAdvisor does not require the affiliates to use any fraud detection tools before submitting the leads to HomeAdvisor.  Docket No. 550-7 at 14.  Mr. Kahn explains that numerous lead fraud detection solutions, certified by MRC or TAG, have been available on the market since 2012, but HomeAdvisor did not utilize these tools to his knowledge.

*Id*. at 11, 13.  The Court finds that Mr. Kahn's analysis of HomeAdvisor's interrogatory responses, combined with his knowledge of lead fraud detection tools, provides a reliable basis for this opinion.  As plaintiffs note, Mr. Kahn was not able to directly test HomeAdvisor's system for fraud because HomeAdvisor did not collect and store the necessary data to conduct a fraud scan, including the IP address and user agent for each lead.  Docket No. 566 at 35-36; *see also* Docket No. 550-23 at 43, 162:14-163:23.

Accordingly, the Court denies this portion of the HA defendants' motion.

### 2.  *Opinions on Affiliate Traffic*

Mr. Kahn opines that "[i]t is a well-known industry fact that affiliate traffic is one of the highest channels for fraud."  Docket No. 550-7 at 9.  During his deposition, Mr. Kahn stated that his own research has found that 40 to 50 percent of leads from affiliates are fraudulent.  Docket No. 550-23 at 35, 41, 54, 85, 132:4-9, 158:16-22, 206:7-12, 333:11-16.  The HA defendants argue that Mr. Kahn's opinions on affiliate traffic should be excluded as unreliable and irrelevant because none of this data was produced in this case and Mr. Kahn did not analyze HomeAdvisor's affiliate traffic.  Docket No. 550 at 39.  Plaintiffs respond that Mr. Kahn "possesses sufficient experience and empirical evidence to opine on the amount of fraudulent traffic that traditionally flows from affiliates and reliably applied this experience to the facts."  Docket No. 566 at 42.

The Court finds that Mr. Kahn's opinion that "affiliate traffic is one of the highest channels for fraud" is reliable and relevant to this case.  *See* Docket No. 550-7 at 9.  Mr. Kahn bases this opinion on his own experience evaluating the level of fraudulent leads from affiliates, *see* Docket No. 550-23 at 35, 42, 54, 85, 132:4-9, 158:16-22, 206:7-12, 333:11-16, which provides a reliable basis for his opinion.  Mr. Kahn's opinion is also

relevant to the case because HomeAdvisor collects leads from affiliates.  *See* Docket

No. 550-7 at 8.  This opinion therefore has a tendency to make the fact that

HomeAdvisor was susceptible to lead fraud more probable.  *See* Fed. R. Evid. 401.

Accordingly, Mr. Kahn is permitted to testify regarding this opinion.[10]

### 3.  *Opinions on the Costs that Service Professionals Incur from Fraudulent Leads*

Mr. Kahn's report discusses several costs that SPs incur from lead fraud:

Lead Fraud is costly to the SPs.  There is the out of pocket costs paid for a fraudulent lead.  There are other costs.  Contacting leads is costly and time-consuming, when reaching out and making multiple attempts to a fraudulent lead, it takes more time to reach someone that isn't expecting your call.  Also[,] costly and time-consuming is the time an SP spends explaining to the person on the other end of the phone why the SP has called them.  The time spent reaching out to fake leads is time spent being unproductive.  Also, if you're busy pursuing fake leads who never convert, you (and your sales team if you are lucky enough to have one) could miss vital opportunities to reach out to real customers before your competitors do.  Also, because many tactics employ the dissemination of false information including using real customers' information, an unwanted and unsolicited call can cause a diminished view of the company or brand.  Finally, calling someone that didn't give you express permission to call them is a [Telephone Consumer Protection Act] violation.

Docket No. 550-7 at 13.  The HA defendants argue that these opinions exceed Mr.

Kahn's purported expertise in fraud detection and that he bases these statements on

anecdotal evidence and common knowledge.  Docket No. 550 at 40.  Plaintiffs respond

that Mr. Kahn is qualified to offer opinions on the costs that lead fraud inflicts on SPs

based on his expertise in the lead fraud industry over the last 30 years.  Docket No. 566

at 37 n.40 (citing Docket No. 550-23 at 243-252).

---

[10] To the extent Mr. Kahn offers an opinion that "40 to 50 percent" of leads from affiliates are fraudulent, this opinion was not disclosed in his expert report.  *See generally* Docket No. 550-7.  Accordingly, Mr. Kahn cannot testify to this opinion since there is no indication that plaintiffs supplemented his report to add it.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i).

The Court finds that Mr. Kahn is qualified based on his experience in the lead fraud detection industry to offer opinions that lead fraud inflicts several types of costs on SPs. Mr. Kahn has 28 years of experience in the digital marketing and lead fraud detection industries. Docket No. 550-7 at 17. Mr. Kahn is the co-founder of Anura, an ad fraud detection tool designed to expose bots, malware, and fraud. *Id.* Mr. Kahn's report describes how Anura has saved "companies millions of dollars in lost cost, revenue, resources[,] and reduced [Telephone Consumer Protection Act] violations." *Id.* at 3. At his deposition, Mr. Kahn adequately explained how his experience in the fraud detection industry led to his conclusion that SPs incur various costs from lead fraud. Mr. Kahn testified that he learned about these costs from speaking with numerous SPs over the course of his career. Docket No. 550-23 at 63-64, 244:7-245:1, 245:15-22, 246:9-247:12, 248:11-25. Mr. Kahn has learned about the various costs that lead fraud inflicts on clients through his experience selling Anura. As a result, Mr. Kahn is permitted to testify to his opinions regarding the costs that SPs incur. The Court denies this portion of the HA defendants' motion.

**D. <u>Carlos Hidalgo</u>**

Carlos Hidalgo is the HA defendants' expert on lead generation, verification, and sale processes utilized within the lead generation industry. Docket No. 549-1 at 3. The HA defendants also offer Mr. Hidalgo as a rebuttal expert to Ms. Geller-Stoff's and Mr. Imburgia's opinions. Docket No. 549-4 at 3.

Plaintiffs move to exclude numerous opinions of Mr. Hidalgo on the grounds that: 1) he improperly summarizes evidence; 2) his Opinion 1 is unreliable; 3) his Opinion 2 is unreliable and inflammatory; 4) his brand promise rebuttal opinions are unreliable and

prejudicial; 5) the declaration of attorney Neil Phillips, as well as the Hidalgo opinions that rely on Phillips' declaration, violate Fed. R. Civ. P. 37(c)(1) and the Best Evidence Rule; and 6) his opinions on SPs' conduct after receiving the leads are irrelevant and not the subject of expert testimony.  Docket No. 549 at 17, 22-23, 26-30, 32-35, 38.

### 1.  Summarizing Evidence

Plaintiffs argue that Mr. Hidalgo's report is "devoid of proffered expert opinion" and that he improperly summarizes and regurgitates the HA defendants' evidence. Docket No. 549 at 17.  Accordingly, plaintiffs move to exclude pages 25-72, 77, 82-85, 86-87, 96-98, and 101-138 of Mr. Hidalgo's report and pages 3-30 of Mr. Hidalgo's rebuttal report.  *Id*. at 17-19.  The HA defendants respond that Mr. Hidalgo properly reviewed the record and uses facts from the case to support his expert opinions. Docket No. 567 at 5-8.

The Court finds that Mr. Hidalgo's reports are not devoid of expert opinion, nor do they improperly summarize or regurgitate evidence in the case.  Mr. Hidalgo cites facts and evidence from the case to support his expert opinions regarding HomeAdvisor's lead generation, verification, and quality control processes.  *See generally* Docket No. 549-1 at 24-195.  Mr. Hidalgo also uses facts from discovery to support his rebuttal opinions.[11]  *See generally* Docket No. 549-4 at 3-36.  Accordingly, the Court denies this portion of plaintiffs' motion.

---

[11] It is true that a party may not use an expert witness as a more polished and professional witness to introduce facts that the witness only learned about in connection with the litigation.  *See iFreedom Direct Corp. v. First Tenn. Bank Nat'l Ass'n*, 2012 WL 3067597, at *3 (D. Utah July 27, 2012) ("While [the expert] may rely on deposition testimony to reach his own opinions, he may not simply summarize such deposition testimony."); *Kia v. Imaging Scis. Int'l, Inc.*, 2010 WL 3431745, at *5 (E.D. Pa. Aug. 30, 2010) ("a party may not filter fact evidence and testimony through his expert merely to

### 2. Opinion 1 - HomeAdvisor's Lead Verification Processes

Plaintiffs move to exclude Opinion 1 in Mr. Hidalgo's report, regarding

HomeAdvisor's lead verification processes, as well as all iterations of Opinion 1

throughout his report and rebuttal report:

- Opinion 1: HomeAdvisor's "lead generation, verification, and quality control processes. . . . are all designed to ensure that HomeAdvisor service providers receive leads from consumer who have affirmatively expressed interest."
- "[T]hese processes serve to verify the resulting lead by requiring the submission of certain core information that ensures the consumer is in fact interested in the service identified."
- "HomeAdvisor employs several technical and manual checks to ensure that the service requests it obtains are legitimate before transmitting them to service providers."
- "[T]he methods used by HomeAdvisor to generate and verify its leads are designed to ensure that HomeAdvisor service providers receive quality leads in their area from consumers who have affirmatively expressed an interest with respect to the offered service."
- "Each of HomeAdvisor's lead generation methods, processes and controls discussed above collectively work to ensure that the leads HomeAdvisor ultimately provides to its service providers are verified, i.e., are from consumers who have affirmatively indicated an interest in a particular product or service and have shown an initial intent to purchase."
- "HomeAdvisor's filtering and de-duplication processes further establish that HomeAdvisor is making substantial efforts to ensure that its leads are verified before they reach service providers."
- "[U]tilizing various methods to ensure that its leads are verified and maintain consistent levels of quality before they reach service providers."
- "HomeAdvisor's lead generation, verification, and quality control processes did work to ensure that its leads were from consumers 'actively seeking to engage with' a service provider regarding a particular project or service."
- "[I]t is my opinion that HomeAdvisor's service request generation and filtering processes establish that HomeAdvisor is making substantial efforts to ensure that its leads are verified before they reach service providers, regardless of source."
- "[N]otwithstanding the numerous safeguards HomeAdvisor had in place to ensure the quality of its service request traffic, including its own robust filtering system. . ."

---

lend credence to the same[,] nor may expert testimony be used merely to repeat or summarize what the jury independently has the ability to understand.") (internal quotations, alterations, and citation omitted).  If the HA defendants attempt to use Mr. Hidalgo for this purpose at trial, plaintiffs have the ability to object.

- "At a high level, these processes [the online "questionnaires" and telephone submissions] serve to verify the resulting lead by requiring the submission of certain core information that ensures the consumer is in fact interested in the service identified."
- "[T]he function of HomeAdvisor's service request submission forms, which are intended to, as I stated, verify the resulting lead by requiring the submission of certain core information that ensures the consumer is in fact interested in the service identified."

Docket No. 549 at 22-23 (quoting Docket No. 549-1 at 2, 24, 26, 29, 48, 72, 82; Docket No. 549-4 at 2, 11, 25, 26, 30).  Plaintiffs argue that Mr. Hidalgo's opinions are unreliable because his deposition testimony demonstrates a lack of evidentiary support for the opinions.  *Id*. at 24.  Specifically, plaintiffs argue that Mr. Hidalgo agreed at his deposition that HomeAdvisor's processes "do[] not validate who filled out the web form," and do not, to his knowledge, "validate whether the person filling out the form intended to have their contact information shared with up to four service professionals."  *Id*. (quoting Docket No. 549-5 at 48, 51, 184:6-23, 195:20-196:5).  Furthermore, they assert that Mr. Hidalgo did not identify a HomeAdvisor process that verifies the accuracy of the project type or the geographic location of the project.  *Id*. at 25.

The HA defendants respond that Mr. Hidalgo's opinions on HomeAdvisor's lead verification processes are reliable and that nothing in Mr. Hidalgo's deposition contradicts the foundation of his opinions.  Docket No. 567 at 12-13.  The HA defendants assert that Mr. Hidalgo extensively analyzed HomeAdvisor's processes, including how it generates leads, collects information from consumers, matches leads to SPs, utilizes technical and manual checks to ensure the legitimacy of leads, and uses quality metrics and credit policies.  *Id*.  They also argue that Mr. Hidalgo explained how HomeAdvisor's methods meet industry best practices.  *Id*. at 13.

The Court finds that Mr. Hidalgo has provided a sufficient foundation for Opinion 1 and his related opinions.  Mr. Hidalgo explains that, based on his twenty-five years of professional experience in the lead generation industry,

> while there are no documented industry-standard technical processes that lead generators must undertake before providing leads to end consumers, the best practice is for a lead generator to apply its own technical processes and/or utilize third-party lead verification services to attempt to weed out any obviously illegitimate requests that may have been inadvertently obtained.  Moreover, lead generators typically monitor lead traffic across their various sources to track any measurable drops in lead quality, using relevant quality metrics for that particular industry or company.  Finally, it is accepted in the industry that, even with best efforts, some leads containing inaccurate information will inevitably leak through, given that no technical or human verification process is foolproof.  Thus, as a backstop, many lead generators offer their users a credit or refund process to account for inaccurate leads that make it through the initial verification process and subsequent technical and quality control checks.

Docket No. 549-1 at 27.  Mr. Hidalgo demonstrates an extensive understanding of HomeAdvisor's lead generation and verification systems.  *See* Docket No. 549-1 at 26-28, 30-34 (discussing the information collected in HomeAdvisor's online questionnaires); *id*. at 28, 44-50 (discussing HomeAdvisor's affiliate contract terms that disincentivize affiliates from generating service requests through improper means); *id*. at 28, 54-68 (discussing HomeAdvisor's technical and manual checks to identify service requests that require further validation, including requests from previously flagged consumer accounts, requests for particular tasks, requests that contain nonsense names or inappropriate language, and requests from consumers who submitted multiple requests within a 24-hour time period); *id*. at 28, 60-62, 69-72 (discussing HomeAdvisor's use of Neustar's third-party verification services to validate contact information in the service requests); *id*. at 28, 54 (discussing HomeAdvisor's process to match leads with SPs based on project type and geography); *id*. at 29, 74-87

(discussing HomeAdvisor's monitoring of credit rates, win rates, and consumer contact rates to refine its lead sources); *id*. at 29, 88-100 (discussing HomeAdvisor's credit policy for inaccurate leads sold to SPs).  Mr. Hidalgo then opines that HomeAdvisor's processes, which utilize "numerous filters, manual intervention, third-party data validation services, as well as deduplication across service requests and service providers, far surpass those of most lead generation companies . . . [and] are among the most robust that I have encountered in my career." *Id*. at 74.  Mr. Hidalgo opines that "HomeAdvisor's lead generation, verification, and quality control processes follow industry best practices . . . and are all designed to ensure that HomeAdvisor service providers receive leads from consumers who have affirmatively expressed interest in a particular task or service." *Id*. at 4.  Mr. Hidalgo explains that, based on his professional experience, when a consumer has acted to submit personal contact information and detailed task information through an online submission form, "those actions are indicative of an intent and interest to learn more about a given project." *Id*. at 51.[12]  As a result, the Court finds that Mr. Hidalgo has provided a sufficiently reliable foundation for Opinion 1 and his related opinions under Rule 702.

Plaintiffs criticize the foundation of Mr. Hidalgo's opinions because Mr. Hidalgo agreed at his deposition that HomeAdvisor's processes do not validate who filled out the web form or whether the person intended to have his or her contact information shared with up to four SPs.  Docket No. 549 at 24.  However, the Court finds that Mr. Hidalgo's failure to identify a technical process that HomeAdvisor uses to validate the identity of

---

[12] To support his conclusion that the submission of an online form is indicative of consumer interest, Mr. Hidalgo also cites numerous studies explaining that consumers are reluctant to share personal information via the internet. *Id*. at 26-27 n.65.

the person submitting the web form does not form the linchpin of the admissibility of Opinion 1.  Rather, Mr. Hidalgo has taken HomeAdvisor's lack of this type of verification into account in reaching Opinion 1, which does not render Opinion 1 unreliable. Furthermore, plaintiffs provide no explanation as to why Mr. Hidalgo's opinion is unreliable based on his testimony that HomeAdvisor's processes do not validate whether the customer intended to have his or her contact information shared with up to four SPs.  *See generally* Docket No. 549.  That testimony has no bearing on Mr. Hidalgo's opinion that HomeAdvisor's lead generation and verification processes follow best practices.

The Court also rejects plaintiffs' argument that Mr. Hidalgo did not identify a HomeAdvisor process that verifies the accuracy of the project type or the geographic location of the project.  *See id*. at 25.  Mr. Hidalgo states that HomeAdvisor matches its leads with SPs based on "project type and geographic location" and that SPs "control this match criteria, by setting the particular zip codes and tasks" the SPs want to perform.  Docket No. 549-1 at 54.  Mr. Hidalgo also discusses that HomeAdvisor provides credits for scenarios where a "lead is submitted with the wrong zip code" or "the wrong job type" that does not match the SP's profile.  *Id.* at 88.  Whether HomeAdvisor should have verified the project type or geographic location for every service request is a disputed issue among the experts that the jury will eventually resolve.

Accordingly, the Court denies this portion of plaintiffs' motion.

### 3. Opinion 2 – Named Plaintiffs' Contact Analysis

Plaintiffs move to exclude Mr. Hidalgo's Opinion 2 and Mr. Hidalgo's related

opinions as unreliable and inflammatory:

- Opinion 2: "A lead-by-lead analysis of all leads received by Plaintiffs during their HomeAdvisor memberships establishes that their lead outreach and nurturing efforts fell below what a reasonably prudent service provider must do to maximize value from their leads."
- Plaintiffs are "[d]issimilar to the average service provider during the class period" and were "comparatively dilatory in placing an initial call following receipt of a lead."

Docket No. 549 at 32-35 (quoting Docket No. 549-1 at 5, 158).  First, plaintiffs argue

that Opinion 2 is unreliable because it is based on an unfounded assumption that SPs'

calls lasting 60 seconds or longer resulted in a successful contact with a consumer.  *Id.*

at 32.  Second, plaintiffs argue that Mr. Hidalgo's analysis of plaintiffs' outreach efforts is

unreliable because evidence shows that plaintiffs called leads that Mr. Hidalgo claims

they did not call, Mr. Hidalgo did not consider the lack of phone records in forming his

opinions, and evidence shows that plaintiffs often placed calls quicker than other SPs.

*Id.* at 34-35.  Finally, plaintiffs argue that Mr. Hidalgo's statement that plaintiffs were

"comparatively dilatory" is improperly inflammatory.  *Id.* at 34.

The HA defendants respond that Mr. Hidalgo's analysis of the plaintiffs' outreach

efforts is reliable because he considered extensive data, including plaintiffs' call tracking

data; separate phone, email, and text message records; and plaintiffs' notes about

customer contact in their HomeAdvisor portals.  Docket No. 567 at 25.  Mr. Hidalgo

"assume[d] the truth and accuracy" of the portal notes, even if plaintiffs failed to provide

corroborative evidence to support their outreach efforts.  *Id.*  The HA defendants argue

that plaintiffs' failure to produce complete phone records does not undermine the

reliability of Mr. Hidalgo's analysis of the available evidence.  *Id*. at 26-27.  Furthermore, the HA defendants contend that plaintiffs have no support for the assertion that plaintiffs called leads that Mr. Hidalgo claims they did not call.  *Id*. at 26.  Finally, the HA defendants respond that any inaccuracies in Mr. Hidalgo's underlying assumptions for Opinion 2 go to weight, not admissibility.  *Id*. at 24.

The Court finds that Opinion 2 is sufficiently reliable under Rule 702.  Mr. Hidalgo considered the phone, email, text message, and portal records for each named plaintiff, analyzed the time to first outreach for each lead, and compared the plaintiffs' call tracking data to other SPs' call tracking data.  *See* Docket No. 549-1 at 156-75.[13]  The lack of complete phone records for all named plaintiffs does not undermine the reliability of Mr. Hidalgo's analysis, particularly since Mr. Hidalgo assumed the truth of the notes in plaintiffs' portals.  Furthermore, the Court also finds that Mr. Hidalgo has a sufficient factual basis for his assumption that calls lasting longer than 60 seconds resulted in a successful contact with the consumer.  Mr. Hidalgo explained that HomeAdvisor historically calculated contact rates based on "the call lasting 60 seconds or 90 seconds."  Docket No. 549-1 at 87 n.294; *see also Goebel*, 346 F.3d at 991 (discussing how the test under Rule 702 is reliability, not correctness).  Finally, Mr. Hidalgo's statement that the plaintiffs were "comparatively dilatory in placing an initial call following receipt of a lead" is not inflammatory.  *See* Docket No. 549-1 at 158. Accordingly, the Court denies this portion of plaintiffs' motion.

---

[13] Ms. Geller-Stoff's and Mr. Hidalgo's disagreements about the call tracking data are, ultimately, factual and credibility disputes appropriately resolved by the jury. *Compare* Docket No. 549-13 at 29-45, ¶¶ 93-118 *with* Docket No. 549-1 at 156-177.

#### 4.  Brand Promise Rebuttal Opinions

In his rebuttal report, Mr. Hidalgo states "in my professional experience the concept of a 'Brand Promise' is not one that is utilized in the lead generation context (even though marketing consultants and brands will use 'brand promise' in other marketing disciplines) and, in my opinion, does not bear on whether a company is following best practices in its lead generation and verification processes."  Docket No. 549-4 at 4.  Plaintiffs move to exclude this opinion as unreliable and prejudicial because Mr. Hidalgo's resume lists the term "brand promise" twice, Mr. Hidalgo discusses brand promises during a podcast, and has written an article about brand promises.  Docket No. 549 at 26-28.  Defendants respond that the documents and testimony do not contradict Mr. Hidalgo's opinion that "brand promise" is not a term utilized in the lead generation context.  Docket No. 567 at 15.

The Court denies this portion of plaintiffs' motion.  The documents and deposition testimony do not call into question the reliability of Mr. Hidalgo's opinion that the term brand promise is not utilized in the lead generation field.

#### 5.  Opinions Relying on the Phillips Declaration

Plaintiffs move to exclude the 672-page declaration of attorney Neil Phillips, as well as Mr. Hidalgo's opinions concerning HomeAdvisor's web forms, that rely on the Phillips declaration.  Docket No. 549 at 29-30.  Specifically, plaintiffs seek to exclude pages 27-36, 39-41, and 43, and footnotes 72-74, 76-80, 82, 84-90, 111, and 133 of Mr. Hidalgo's report.  *Id*. at 30.  According to the declaration, between August 22, 2021 and October 20, 2021, Mr. Phillips visited the web domains used to generate service requests for HomeAdvisor, "navigated through the various service request pathways on

each site, taking screenshots of each individual page," and "separately saved a contemporaneous full-page PDF copy of each individual page."  Docket No. 549-2 at 6, ¶ 20.  Plaintiffs argue that the Phillips declaration and Mr. Hidalgo's opinions must be stricken under Fed. R. Civ. P. 37(c)(1) because the discovery deadline had passed by the time Mr. Phillips compiled the screenshots and the HA defendants failed to preserve the "native web forms."  Docket No. 549 at 30.  Furthermore, plaintiffs argue that the screenshots do not comply with the Best Evidence Rule because Mr. Phillips did not collect the native files of the web forms.  *Id*. at 31-32.

The HA defendants respond that plaintiffs' motion should be denied because plaintiffs advance a procedurally inappropriate discovery motion under Fed. R. Civ. P. 37(c)(1).  Docket No. 567 at 19.  The HA defendants argue that they produced the identity of all the web domains in the Phillips declaration before fact discovery closed and many domains remain publicly available.  *Id*. at 20.  Additionally, the HA defendants argue that the Best Evidence Rule does not preclude Mr. Hidalgo from considering the declaration and screenshots when a reasonable expert would rely on these facts.  *Id*. at 21-22.

The Court denies this portion of plaintiffs' motion.  Rule 703 of the Federal Rules of Evidence provides that

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703; *see also* Fed. Prac. & Proc. Evid. § 6273 (2d ed.) (April 2023) ("courts have held that Rule 703 permits experts to base opinion testimony on evidence that is inadmissible under the hearsay, authentication and best evidence rules.").  Mr.

Hidalgo provides his opinions on HomeAdvisor's lead generation methods and cites facts about HomeAdvisor's online service request questionnaires to support those opinions. *See* Docket No. 549-1 at 29-39. Mr. Hidalgo was made aware of the facts through Mr. Phillips' declaration containing screenshots of the service request pathways on each site. *See id*. While Mr. Hidalgo's report does not directly state that experts in his field would rely on screenshots of a company's website to form opinions of a company's lead generation methods, plaintiffs do not argue that it would be unreasonable for an expert in the lead generation industry to rely on this type of information. As a result, the Court concludes that screenshots of a company's website, depicting the service request questionnaires, are a type of information reasonably relied upon by experts in the particular field of lead generation. *See Black*, 269 F.3d at 1229 (assuming that a study was reasonably relied upon by experts in the engineering field because the defendants did not argue otherwise); *see also Burgard v. Morales*, No. 17-cv-02537-MSK-SKC, 2020 WL 2214394, at *4 (D. Colo. May 7, 2020) (holding that, although expert's report did not directly state that it is "common practice" for a rehabilitation consultant to rely on data and opinions from medical providers, the court could reasonably infer that it is a common practice because defendant did not argue otherwise).

Accordingly, Mr. Hidalgo is permitted to testify to his opinions found at pages 27-36, 39-41, and 43, and footnotes 72-74, 76-80, 82, 84-90, 111, and 133.[14]

---

[14] To the extent plaintiffs seek to strike the Phillips declaration, plaintiffs must file a separate motion under Fed. R. Civ. P. 37(c)(1).

### 6. Opinions on Service Professionals' Conduct After Receiving the Leads

Plaintiffs move to exclude the following opinions on SPs' conduct after receiving the leads as both irrelevant and not the subject of expert testimony:

- "[M]ultiple factors determine [an SP's] success in converting leads into jobs, including the [SP's] own efforts and conduct in outreach to, nurturing of, and follow-up with the leads. This necessarily requires an assessment of the specific efforts and conduct of the particular [SP]."
- "[O]verall return on investment ['ROI'] is a standard method of valuing an investment in a lead generation service."
- Plaintiffs' experts "appear to presume that a service provider's own behavior has no bearing on the inquiry of why a particular lead did or did not result in contact with a consumer or, ultimately, a job."
- "[W]hether a particular [SP] followed certain behaviors is critical to maximizing lead contact and conversion, like proper outreach and nurturing. . ."

Docket No. 549 at 38 (quoting Docket No. 549-1 at 100, 185; Docket No. 549-4 at 36-37). Plaintiffs argue that these opinions are irrelevant because the SPs' conduct after receiving the lead is "of no consequence to whether and how Defendants verified the Leads." *Id*. at 40. Plaintiffs further contend that these opinions will not provide the jury any specialized knowledge. *Id*. at 41.

The HA defendants respond that these opinions are relevant because plaintiffs allege that HomeAdvisor sold "worthless" leads over a ten-year period. Docket No. 567 at 34. Defendants argue that the plaintiffs' efforts in contacting the leads is relevant to determining whether each lead was in fact "worthless" and whether the injury plaintiffs claim is attributable to HomeAdvisor's actions or plaintiffs' failure to timely develop their leads. *Id*. at 36. HomeAdvisor sold leads to multiple SPs at the same time and, therefore, the HA defendants assert that an SP could lose the job to other SPs due to his or her failure to conduct quick outreach to the customer. *See id*. at 34. Furthermore, the HA defendants argue that the leads were not "uniformly valueless"

because the named plaintiffs secured many paying jobs.  *Id*. at 34-35.  The HA defendants assert that Mr. Hidalgo's opinion on "return on investment" is relevant because it provides information on industry norms and refutes plaintiffs' claims that the leads had no value.  *Id*. at 37-38.  Finally, the HA defendants argue that plaintiffs provide "zero explanation" for their claim that Mr. Hidalgo's opinions are not based on specialized knowledge.  *Id*. at 38 n.13.

The Court finds that these opinions are relevant under Fed. R. Evid. 401 because the SP's conduct after receiving the leads is relevant to determining why many leads were arguably deficient and whether those deficiencies were caused exclusively by HomeAdvisor's actions or the SP's actions.  Mr. Hidalgo's opinions are also relevant to plaintiffs' damages theory because Mr. Hidalgo's opinions indicate that an SP's actions after receiving a lead can affect whether a lead turns into a business opportunity. Plaintiffs' damages theory is not restricted to leads with incorrect contact information, but rather encompasses all leads submitted online.  *See generally* Docket No. 550-6 at 32-33, ¶¶ 67-69.  Furthermore, the Court finds that this testimony – regarding converting leads into jobs – is not within the juror's common knowledge and experience.  *See Garcia*, 635 F.3d at 476-77.  Accordingly, the Court denies this portion of plaintiffs' motion.

### E.  Dr. Itamar Simonson

The HA defendants offer Dr. Itamar Simonson as a rebuttal expert to Ms. Geller-Stoff's and Mr. Imburgia's brand promise opinions.  Docket No. 549-6 at 7, ¶¶ 12-13. Plaintiffs move to exclude numerous Simonson opinions on the grounds that 1) Dr. Simonson improperly summarizes evidence; 2) his brand promise opinions are

unreliable and prejudicial; and 3) several opinions are outside the scope of proper rebuttal testimony.  Docket No. 549 at 17, 19, 27, 44-45.

### 1.  Summarizing Evidence

Plaintiffs argue that Dr. Simonson's report is "devoid of proffered expert opinion" and that he improperly summarizes and weighs the plaintiffs' deposition testimony. Docket No. 549 at 17, 19.  As a result, plaintiffs move to exclude pages 25-26 and 29-87 of Dr. Simonson's report.  *Id*. at 19.  The HA defendants argue that Dr. Simonson properly "uses the record to illustrate and explain why Plaintiffs' experts' 'brand promise' theory and opinions are unreliable, unfounded, and lack any scientific basis."  Docket No. 567 at 8.

The Court finds that Dr. Simonson's rebuttal report does not improperly weigh the plaintiffs' deposition testimony.  Dr. Simonson cites the plaintiffs' deposition testimony, in addition to other materials and scientific literature, to support his opinion that Ms. Geller-Stoff and Mr. Imburgia erroneously assume that all of HomeAdvisor's messaging communicated the same "brand promise" and that SPs uniformly relied on the brand promise.  *See* Docket No. 549-6 at 21-91.  His citations are not improper.  Accordingly, the Court denies this portion of plaintiffs' motion.

### 2.  Brand Promise Opinions

Plaintiffs move to exclude the following brand promise opinions as unreliable and prejudicial:

- "Although the phrase 'brand promise' is occasionally used by certain sales or marketing consultants, in my professional experience, it has no generally accepted, recognized meaning, definition, or measures within the field of consumer marketing and branding or the field of consumer decision-making."

- "[T]he Geller-Stoff and Imburgia Reports erroneously rely on the notion of 'Brand Promise' and related concepts that have no basis in recognized marketing principles and lack any scientific evidence."

Docket No. 549 at 27 (quoting Docket No. 549-6 at 7-8, ¶¶ 13-14).  Plaintiffs argue that "Dr. Simonson was presented at his deposition with sources that identify and discuss the term and use of 'Brand Promise,' as well as to an HA internal document utilizing the term 'Brand Promise' to describe HA's leads."  *Id*. at 28.  The HA defendants respond that these documents do not undermine the reliability of Dr. Simonson's opinions because Dr. Simonson testified unequivocally that the internet sources and internal document did not change his conclusions that the term brand promise has no generally accepted meaning or basis in scientific evidence.  Docket No. 567 at 16-17.

The Court denies this portion of plaintiffs' motion.  The documents shown to Dr. Simonson do not call into question the reliability of Dr. Simonson's opinions that the term "brand promise" has no generally accepted meaning or basis in recognized marketing principles.  The disagreement between each side's experts regarding whether "brand promise" is a viable marketing concept is a dispute that the jury will ultimately resolve.

### 3.  Exceeding the Scope of Proper Rebuttal Testimony

Plaintiffs argue that Dr. Simonson impermissibly "launch[es] into extensive affirmative testimony about consumers and consumer behavior" in his rebuttal report, Docket No. 549 at 44, and request that the Court exclude his opinions in paragraphs 23-27 and 29.  *Id*. at 44-45.  The HA defendants argue that Dr. Simonson's opinions are proper rebuttal testimony to Ms. Geller-Stoff and Mr. Imburgia's brand promise opinions.  Docket No. 567 at 41-45.

The Court finds that Dr. Simonson's opinions in paragraphs 23-27 and 29 are proper rebuttal testimony. Dr. Simonson explains that "the notion of a universal 'brand promise' and its purported power over consumers is undermined by established research on how consumers research and make their purchasing decisions, especially high-involvement decisions such as a decision to join the HomeAdvisor service provider network." Docket No. 549-6 at 11, ¶ 23. Dr. Simonson then discusses why Ms. Geller-Stoff's opinions that SPs would rely on the brand promise is "inconsistent with current knowledge about the manner in which consumers and businesses make decisions." *Id.* at 11-16, ¶¶ 23-30. Dr. Simonson's opinions properly rebut Ms. Geller-Stoff's brand promise opinions. Accordingly, the Court denies this portion of plaintiffs' motion.

### F. **Jessie Stricchiola**

The HA defendants offer Jessie Stricchiola as a rebuttal expert to Mr. Kahn's opinions. Docket No. 549-10 at 1, ¶ 1. Ms. Stricchiola offers the following rebuttal opinions in her report:

- Opinion 1: "There is no industry standard for fraud analytics."
- Opinion 2: "Mr. Kahn does not identify systemic fraud within HomeAdvisor's lead sources. . . . For example, Mr. Kahn has not performed an independent, direct analysis of the available raw data associated with the millions of HomeAdvisor leads sold to service providers during the Relevant Time Period to determine the actual extent of fraudulent leads in HomeAdvisor's data set, and failed to examine various relevant and essential data points to identify and understand HomeAdvisor's lead validity."
- Opinion 3: "Mr. Kahn does not evaluate the efficacy of commercially available tools in identifying fraudulent HomeAdvisor leads."

Docket No. 549-10 at 6, 13-14, 16. Plaintiffs move to exclude Ms. Stricchiola's second and third opinions as unreliable. Docket No. 549 at 35. Plaintiffs also argue that all three opinions exceed the scope of proper rebuttal testimony. *Id.* at 44.

### 1. Unreliable Opinions

Plaintiffs argue that the second and third opinions are unreliable because Ms. Stricchiola did not review HomeAdvisor's produced data to determine if the data contains the necessary information to analyze traffic fraud. *Id*. at 36. Furthermore, plaintiffs assert that Ms. Stricchiola did not conduct her own analysis to determine the level of fraud within HomeAdvisor's system. *Id*. They also argue that Ms. Stricchiola did not independently analyze how HomeAdvisor's systems operated, but rather relied on Mr. Hidalgo's descriptions of the systems, which is unreliable because Mr. Hidalgo admitted that he is not a lead fraud expert. *Id*. at 36-37. The HA defendants respond that Ms. Stricchiola was not required to review any of the produced data or conduct her own analysis of the data to offer her opinion that Mr. Kahn failed to conduct necessary analysis to support his opinions. Docket No. 567 at 30-31. The HA defendants contend that Ms. Stricchiola's rebuttal opinions properly attack Mr. Kahn's lack of foundation and untested methodology. *Id*. at 31.

The Court finds that Opinion 3 is sufficiently reliable under Rule 702. Mr. Kahn offers an opinion that "lead fraud detection tools and processes available beginning in at least 2012 were not utilized by HomeAdvisor in order to prevent, as well as identify and cull, fraudulent leads from being distributed and charged to" the SPs. Docket No. 550-7 at 5. Ms. Stricchiola criticizes Mr. Kahn's opinion because he did not test whether any of the commercially available tools would have identified fraud in HomeAdvisor's leads. Docket No. 549-10 at 16-17, ¶ 35. Ms. Stricchiola supports her opinion by referencing industry articles discussing how fraud detection services "are not one-size-fits-all" and

that different tools may show inconsistent levels of fraud.  *Id*. at 17, ¶ 36.  Accordingly, Ms. Stricchiola has provided a reliable basis for Opinion 3.

The Court also finds that Opinion 2 is sufficiently reliable under Rule 702. Defendants are correct that Ms. Stricchiola is not required to independently analyze the level of fraud within HomeAdvisor's system to offer her opinion that Mr. Kahn's conclusions are flawed due to his failure to test HomeAdvisor's system for fraud.  *See Spring Creek Exploration*, 2016 WL 1597529, at *3 (noting that a rebuttal expert "must restrict their testimony to attacking the theories offered by the adversary's experts"). Ms. Stricchiola has shown a proper foundation for this opinion because she explains that, "even though it is accepted that web traffic is susceptible to fraud, such [a fraud] analysis would be necessary to determine whether, to what extent, and what types of fraud may or may not be present within a given company's web traffic."  Docket No. 549-10 at 14.  Accordingly, Ms. Stricchiola has provided a reliable basis for Opinion 2. The Court denies this portion of plaintiffs' motion.

### 2.  *Exceeding the Scope of Proper Rebuttal Testimony*

Plaintiffs argue that Ms. Stricchiola impermissibly exceeds the scope of proper rebuttal testimony because all three opinions do not contradict or rebut the actual contents of Mr. Kahn's report.  Docket No. 549 at 44.  The HA defendants respond that Ms. Stricchiola's three opinions "directly rebut" Mr. Kahn's opinions that (1) "HomeAdvisor generated leads 'without ensuring the proper processes and tools were in place to determine or validate for HomeAdvisor's lead sources;'" (2) "'the technologies and measures that were known and available since at least 2012 to prevent' and identify fraudulent leads 'were necessary at HomeAdvisor in order to

reliably identify and prevent the sale of fraudulent leads'. . ., but 'were not utilized by HomeAdvisor;'" and (3) "'HomeAdvisor was generating leads through web traffic but selling the leads to the [SPs] without having the necessary technology in place to determine if' those leads were fraudulent."  Docket No. 567 at 38-39 (internal citations omitted).

The Court finds that Opinion 1 is proper rebuttal testimony.  Ms. Stricchiola's opinion that there is "no industry standard for fraud analytics," *see* Docket No. 549-10 at 6, does not contradict any of Mr. Kahn's disclosed opinions in his report.  *See generally* Docket No. 550-7.  However, Mr. Kahn extensively opined in his deposition that there are "industry standards" for ad fraud detection, set by the Internet Advertising Bureau, MRC, and TAG.  *See* Docket No. 550-23 at 7-8, 19:23-25:10.  Defendants have not moved to exclude Mr. Kahn's undisclosed opinion under Fed. R. Civ. P. 26.  Accordingly, the Court finds that Ms. Stricchiola's Opinion 1 is within the scope of proper rebuttal testimony.

The Court finds that Opinion 2 is proper rebuttal testimony.  Mr. Kahn offers opinions that HomeAdvisor was "susceptible to generating and selling fraudulent leads" and that "HomeAdvisor's business processes were not designed and were not sufficient to detect and eliminate fraudulent leads."  Docket No. 550-7 at 5, 13.  Ms. Stricchiola's opinion that Mr. Kahn "does not identify systemic fraud within HomeAdvisor's lead sources" criticizes Mr. Kahn's foundation and methodology for these opinions.  *See* Docket No. 549-10 at 13.

The Court also finds that Opinion 3 is proper rebuttal testimony.  Mr. Kahn offers an opinion that "lead fraud detection tools and processes available beginning in at least

2012 were not utilized by HomeAdvisor in order to prevent . . . fraudulent leads."

Docket No. 550-7 at 5.  Ms. Stricchiola's opinion that Mr. Kahn failed to evaluate the

efficacy of those commercially available tools directly criticizes Mr. Kahn's methodology

for his opinion.  Accordingly, the Court denies this portion of plaintiffs' motion.

### G. **Louis Dudney**

The HA defendants offer Louis Dudney as an expert to rebut Mr. Imburgia's

opinions and damages calculations.  Docket No. 549-8 at 6, ¶ 1.  Plaintiffs move to

exclude 1) several opinions on the grounds that Mr. Dudney improperly summarizes

evidence; 2) his brand promise opinions as unreliable; and 3) his opinions on the

adjustments that Mr. Imburgia should have made to the damages calculations.  Docket

No. 549 at 20, 27, 39.

### 1. *Summarizing Evidence*

Plaintiffs argue that Mr. Dudney improperly summarizes and weighs the plaintiffs'

deposition testimony.  Docket No. 549 at 20.  Specifically, plaintiffs seek to exclude

paragraph 37 of Mr. Dudney's rebuttal report where he states, "Named Plaintiff Gray

appears to agree as she stated that 'Any [L]ead that I made contact with and was

looking for my services was a good [L]ead.'" *Id*.  Plaintiffs also seek to exclude

paragraph 55 of Mr. Dudney's rebuttal report which includes quotes from the plaintiffs'

deposition testimony and states that multiple named plaintiffs acknowledged they

received valuable HomeAdvisor Leads.  *Id*.; Docket No. 549-8 at 37-39, ¶ 55.

The HA defendants respond that Mr. Dudney properly cited plaintiff Gray's

testimony in support of his opinion that Mr. Imburgia's damages methodology does not

account for leads where the SPs successfully contacted a lead.  Docket No. 567 at 10.

Similarly, the HA defendants argue that Mr. Dudney properly cited deposition testimony in support of his opinion that Mr. Imburgia's damages calculation unreasonably includes leads that the named plaintiffs did not identify as deficient. *Id*. at 11.

The Court agrees with the HA defendants. Mr. Dudney did not improperly summarize the deposition testimony, but rather relied on the testimony to form his opinions. Accordingly, the Court denies this portion of plaintiffs' motion.

### 2. *Brand Promise Opinion*

Plaintiffs move to exclude Mr. Dudney's opinion that "there cannot be any damages using Mr. Imburgia's methodology" because the brand promise theory is "fundamentally unreliable and unsupported." Docket No. 549 at 27 (quoting Docket No. 549-8 at 14-16, ¶¶ 20-22). Plaintiffs argue that Mr. Dudney's brand promise opinion is unreliable. *Id*. Defendants respond that Mr. Dudney properly relies on Dr. Simonson's expert analysis of the unsupported brand promise to offer his opinion that Mr. Imburgia's damages methodology is unreliable. Docket No. 567 at 18.

Mr. Dudney's report states

> It is my understanding that Mr. Imburgia's "common method and common data" damages analysis is predicated on HomeAdvisor's assumed failure to meet a "Brand Promise." It is my further understanding that HomeAdvisor and its expert Dr. Simonson assert that Plaintiffs' "Brand Promise" theory is fundamentally unreliable and unsupported. Assuming that HomeAdvisor's and Dr. Simonson's assertions regarding the lack of a Brand Promise are found to be true, then Mr. Imburgia's methodology, which is predicated on the Brand Promise, fails to provide any reasonable estimation of damages.

Docket No. 549-8 at 14. Mr. Dudney is not offering his own opinion that the brand promise opinion is unreliable. Instead, he opines that, assuming Dr. Simonson's opinions are correct, Mr. Imburgia's methodology fails to properly estimate damages. As a result, the Court denies this portion of plaintiffs' motion.

### 3. Opinions on Adjustments to Mr. Imburgia's Calculations

Plaintiffs move to exclude Mr. Dudney's rebuttal opinions on the series of adjustments that Mr. Imburgia should have made to the damages calculations. Docket No. 549 at 39. First, plaintiffs move to exclude Mr. Dudney's opinion that Mr. Imburgia should have adjusted for leads "where contact was made between [an] SP and a HomeAdvisor consumer." *Id.* at 32 (quoting Docket No. 549-8 at 25). Plaintiffs argue that this opinion is unreliable because it is based on an unfounded assumption that SPs' calls lasting 60 seconds or longer resulted in a successful contact with a consumer. *Id.* The HA defendants respond that Mr. Dudney's opinion relies on Mr. Hidalgo's report for the 60 second assumption and argue that any inaccuracies in Mr. Hidalgo's underlying assumptions go to weight, not admissibility. Docket No. 567 at 24.

Citing Mr. Hidalgo's report, Mr. Dudney states

It is my understanding that HomeAdvisor has generally considered calls 60 seconds or longer, as measured through its call tracking service, to have resulted in a connection with the consumer. It further is my understanding that analyses in Mr. Hidalgo's reports indicate that the relationship between call connection rates and service provider success when certain critical service provider behaviors are followed—such as speed to call and number of contacts—supports HomeAdvisor's usage of a 60-second connection benchmark, and the plausible conclusion that service providers did, in fact, have a "meaningful opportunity" to engage with consumers during such calls. Named Plaintiff Gray appears to agree as she stated that "Any [L]ead that I made contact with and was looking for my services was a good [L]ead." Mr. Imburgia did not account for Leads that resulted in a connection with the consumer, as measured by the call tracking service, in his damages calculation.

Docket No. 549-8 at 26, ¶ 37. The Court finds that Mr. Dudney's reliance on Mr. Hidalgo's report concerning the 60 second assumption was proper. As a result, the Court denies this portion of plaintiffs' motion.

Next, plaintiffs move to exclude Mr. Dudney's opinions that Mr. Imburgia's calculation fails to adjust for: 1) leads that were converted to wins by SPs, 2) leads that were won by different SPs, and 3) leads from consumers who had at least one lead successfully converted to a win.  Docket No. 549 at 39 (citing Docket No. 549-8 at 17-24, ¶¶ 25-35).  Plaintiffs argue that these opinions are irrelevant because the SPs' conduct after receiving the lead is "of no consequence to whether and how Defendants verified the Leads."  *Id*. at 40.  Plaintiffs further contend that these opinions will not provide the jury any specialized knowledge.  *Id*. at 41.  The HA defendants respond that these opinions are relevant because Mr. Imburgia incorrectly assumes that every lead sold during the putative class period was worthless.  Docket No. 567 at 36.  The HA defendants argue that plaintiffs provide "zero explanation" for their claim that Mr. Dudney's opinions are not based on specialized knowledge.  *Id*. at 38 n.13.

The Court finds that these opinions are relevant under Fed. R. Evid. 401 to critiquing Mr. Imburgia's methodology and aiding the jury in any damages calculations. Furthermore, Mr. Dudney's opinions and calculations are not within the juror's common knowledge and experience.  *See Garcia*, 635 F.3d at 476-77.  However, given that the Court has barred Mr. Imburgia from including in his damages calculation any leads that were converted into jobs, Mr. Dudney is not permitted to testify that Mr. Imburgia's calculation fails to adjust for leads that were converted to wins by SPs.  However, Mr. Dudney is permitted to testify to his other critiques of Mr. Imburgia's methodology.  As a result, the Court grants in part and denies in part this portion of plaintiffs' motion.

## IV.    CONCLUSION

It is therefore

ORDERED that HomeAdvisor, Inc., IAC/InterActiveCorp, Angi HomeServices, Inc., and CraftJack, Inc.'s Motion to Exclude Plaintiffs' Expert Opinions [Docket No. 550] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

 ORDERED that Defendants C. David Venture Management, LLC, and VentureStreet, LLC's Motion to Strike the Testimony of Basil Imburgia [Docket No. 547] is **DENIED AS MOOT**.  It is further

ORDERED that Plaintiffs' Motion to Strike the Proffered Testimony of Defendants' Experts: Carlos Hidalgo, Dr. Itamar Simonson, Jessie Stricchiola, and Louis G. Dudney [Docket No. 549] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

ORDERED that plaintiffs shall file Mr. Imburgia's supplemental report updating his damages calculations within **60 days** of the entry of this order.

DATED July 25, 2023.


BY THE COURT:


PHILIP A. BRIMMER
Chief United States District Judge